## CIVIL COVER SHEET

JS-44
(Rev. 2/01 DC)

**I (a) PLAINTIFFS**

United States of America

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Donald J. Williamson, U.S. Department of Justice
Commercial Lit. Branch/Fraud Unit – PHB
601 D Street, NW, Wash., DC  20530  202 514-7900

**DEFENDANTS**

Science Applications
International Corporation

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: In land condemnation cases, use the location of the tract of land involved.

ATTORNEYS (IF KNOWN)

Alan Baron, Esq.,
Holland & Knight
2099 Pennsylvania Avenue, NW
Washington, DC  20006

**II BASIS OF JURISDICTION**
(SELECT ONE BOX ONLY)

◉ 1  U.S. Government
   Plaintiff

○ 2  U.S. Government
   Defendant

○ 3  Federal Question
   (U.S. Government Not a Party)

○ 4  Diversity
   (Indicate Citizenship of
   Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (SELECT ONE FOR PLAINTIFF AND ONE FOR DEFENDANT)
( FOR DIVERSITY CASES ONLY!)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Select one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410  Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310  Airplane
☐ 315  Airplane Product Liability
☐ 320  Assault, Libel & Slander
☐ 330  Federal Employers Liability
☐ 340  Marine
☐ 345  Marine Product Liability
☐ 350  Motor Vehicle
☐ 355  Motor Vehicle Product Liability
☐ 360  Other Personal Injury
☐ 362  Medical Malpractice
☐ 365  Product Liability
☐ 368  Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151  Medicare Act

**Social Security:**
☐ 861  HIA ((1395ff)
☐ 862  Black Lung (923)
☐ 863  DIWC/DIWW (405(g)
☐ 864  SSID Title XVI
☐ 865  RSI (405(g)

**Other Statutes**
☐ 891  Agricultural Acts
☐ 892  Economic Stabilization Act
☐ 893  Environmental Matters
☐ 894  Energy Allocation Act
☐ 890  Other Statutory Actions (If
   Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)   OR   ○ F. Pro Se General Civil**

**Real Property**
☐ 210  Land Condemnation
☐ 220  Foreclosure
☐ 230  Rent, Lease & Ejectment
☐ 240  Torts to Land
☐ 245  Tort Product Liability
☐ 290  All Other Real Property

**Personal Property**
☐ 370  Other Fraud
☐ 371  Truth in Lending
☐ 380  Other Personal Property Damage
☐ 385  Property Damage Product Liability

**Bankruptcy**
☐ 422  Appeal 28 USC 158
☐ 423  Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535  Death Penalty
☐ 540  Mandamus & Other
☐ 550  Civil Rights
☐ 555  Prison Condition

**Property Rights**
☐ 820  Copyrights
☐ 830  Patent
☐ 840  Trademark

**Forfeiture/Penalty**
☐ 610  Agriculture
☐ 620  Other Food &Drug
☐ 625  Drug Related Seizure of Property 21 USC 881
☐ 630  Liquor Laws
☐ 640  RR & Truck
☐ 650  Airline Regs
☐ 660  Occupational Safety/Health
☐ 690  Other

**Federal Tax Suits**
☐ 870  Taxes (US plaintiff or defendant)
☐ 871  IRS-Third Party 26 USC 7609

**Other Statutes**
☐ 400  State Reapportionment
☐ 430  Banks & Banking
☐ 450  Commerce/ICC Rates/etc.
☐ 460  Deportation
☐ 470  Racketeer Influenced & Corrupt Organizations
☐ 810  Selective Service
☐ 850  Securities/Commodities/Exchange
☐ 875  Customer Challenge 12 USC 3410
☐ 900  Appeal of fee determination under equal access to Justice
☐ 950  Constitutionality of State Statutes
☒ 890  Other Statutory Actions (if not administrative agency review or Privacy Act)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.                                    Civil No.

SCIENCE APPLICATIONS,
INTERNATIONAL CORPORATION,

                    Defendant.

## COMPLAINT AND JURY TRIAL DEMAND OF THE UNITED STATES

The United States of America, on behalf of its agency, the

Nuclear Regulatory Commission (NRC), states as follows:

### Introduction

1.   The United States alleges that Science Applications

International Corporation (SAIC), falsely claimed and received

more than $2 million dollars from the United States.  This money

was paid to SAIC to provide impartial and unbiased advice to the

NRC in connection with an effort by the NRC to develop

regulations for the standards to be applied to the release of

radioactive metals into commerce. SAIC failed in its obligation

to provide such advice and assistance, and instead mismanaged and

abused the funds and effort entrusted to it by the United States.

2.   As a result of SAIC's misconduct, SAIC's efforts were

fatally tainted by conflict of interest, NRC's regulatory efforts

were materially damaged, and the NRC suspended and ultimately

terminated its relationship with SAIC.

3.   The United States alleges that SAIC's actions undercut the fundamental purpose of the NRC's relationship with SAIC -- to receive SAIC's best, disinterested efforts and advice, untainted in both facts and appearance, on a controversial regulatory effort.

4.   During the course of the NRC rulemaking effort, SAIC submitted and/or caused to be submitted to the United States false and/or fraudulent bills and other statements.  These bills and statements falsely and/or fraudulently implied and expressly represented that SAIC was providing impartial, unbiased advice pursuant to policies and regulations which prohibited entering into conflicting relationships in accordance with the terms and conditions of its agreements with the United States.

5.   The United States paid more than $2 million to SAIC because of its false and/or fraudulent representations to the effect that it was providing services to the NRC which were free from bias and in accordance with the agreements between the parties.

### Jurisdiction and Venue

6.   This Court has jurisdiction under 28 U.S.C. § 1345 and 31 U.S.C. § 3732.

7.   Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), as the place where one or

more of Defendants reside and where a substantial part of the
events or omissions giving rise to the claim occurred;
specifically, SAIC has offices in this District and caused false
claims and false statements to be submitted to the NRC in the
District of Columbia.

### The Parties

8.   The plaintiff is the United States of America, acting
on behalf of the NRC.  The NRC is an independent federal agency
established by the Energy Reorganization Act in 1974 to regulate
civilian use of nuclear materials.

9.   Defendant SAIC is the largest employee-owned research
and engineering company in the United States.   SAIC has offices
located in Washington, DC and corporate headquarters located in
San Diego, California.

### Factual Allegations

### A.   Regulatory Background

10. Beginning in the 1940's and continuing to the present,
radioactively contaminated material has been generated and
accumulated at government and commercial nuclear facilities
throughout the United States.  Some of this material is only
slightly contaminated and is thought to have commercial value
upon recycle, especially decommissioned metal parts made of
nickel, steel, aluminum, etc.  Since the enactment of the Atomic
Energy Act in 1954 (AEA), the NRC has banned the release of such

-3-

radioactive byproduct material into interstate commerce without a license from the NRC. The NRC's regulations governing these licenses for release are detailed and extremely restrictive.

11.   In the period 1985-1992, the NRC attempted to set standards of contamination that would be below "regulatory concern" and, therefore, allow the unrestricted release of the contaminated material. This NRC effort was met with strong opposition from the public and Congress, and Congress ordered the effort halted in the Energy Policy Act of 1992 due to inadequate technical support (42 U.S.C.A. §2023).

12.   In 1992, NRC set about to gather the technical support and began a rulemaking progress referred to as NUREG 1640, "Radiological Assessments for Clearance of Equipment and Materials from Radioactive Facilities." (The Clearance Rulemaking). The purpose of the effort was to develop scientifically based standards for the free release of radioactive materials. It was understood from the beginning that this would be a controversial effort. In order for the effort to be successful, the process had to be free from bias.

**B.   Background:  SAIC's Work for NRC**

13.   As it set out on its rulemaking effort, NRC hired SAIC as its prime contractor. SAIC was hired because of its strong reputation for sound scientific analysis. NRC and SAIC executed contracts in 1992 and 1999 which provided that SAIC would deliver

technical assistance to NRC staff to support the NRC clearance rulemaking.  Contract NRC-04-92-037, was executed on August 18, 1992 and expired December 31, 1998.   Follow-on Contract NRC-04-99-046 was executed on August 4, 1999 and was designed to provide contractor technical assistance to NRC staff  for the remaining technical information on collective dose and some related costs as required by the Commission for their consideration of regulatory alternatives in the matter of clearance.

### C.   **The 1992 Contract**

14.   The 1992 Contract, NRC-04-92-037, "Guidance and Models for Reuse/Recycle Material," was awarded in the initial amount of $ 1,234,542.00 (the 1992 Contract).  This cost reimbursement contract spanned a period of six years and four months, with a final total contract value of $2,630,000.00.  The objective of this contract was for SAIC to provide NRC with technical assistance in the development of an information base and technical assistance in preparation of regulatory products including assistance in preparing a Generic Environmental Impact Statement (GEIS) related to recycle and reuse of material and equipment from nuclear facilities.  Deliverables were to include an options paper outlining the possible approaches for rulemaking, and many reports, including, e.g., a draft report on the results of the risk assessment scenarios for the recycle of iron and steel.

15.  Tasks under this contract included: a thorough review of the literature including review of previous pathway analyses performed, computer codes available for pathway analysis, and current recycle and reuse practices in other countries (Task 1); development of, or identification of adequate existing, pathway models and technical bases upon which to support NRC regulations in this area (Task 2); preparation of an options paper outlining the regulatory approach for recycle and reuse of materials and equipment with very low levels of radioactivity (Task 3); assistance in preparation of a rulemaking package, including a GEIS [Generic Environmental Impact Statement], a Regulatory Analysis, and amended rules (Task 4); and assistance in preparation of implementing regulatory guidance (Task 5).

16.  The work performed under Tasks 1 and 2 resulted in draft NUREG 1640, entitled "Radiological Assessments for Clearance of Equipment and Materials from Nuclear Facilities," delivered as a report by SAIC to NRC on September 23, 1997 (ultimately published by NRC in March 1999 as a draft report for comment, containing among other things, results of dose calculations.) (NUREG 1640).

17.  On or about October 31, 1996, NRC issued Modification 14 to the 1992 Contract.  The Modification amended Task 3 to require SAIC to, in a neutral manner,  (1) prepare a regulatory issues paper presenting the issues and concerns, pros and cons,

of stakeholders regarding recycle or reuse; (2) provide technical support to evaluate issues and alternatives raised by EPA for reuse and recycle, evaluate the reuse/recycle cost/benefit analysis to be published by the EPA in December 1996, and participate in meetings with NRC, EPA and EPA contractors; (3) prepare both a draft and final issues paper and a draft and final regulatory options paper, based upon the information gathered from various sources including planning and public meetings. The issues and regulatory options paper was delivered to NRC prior to expiration of the 1992 Contract.  However, the regulatory package and GEIS was never produced because of redirection by the Commission.

18.  SAIC's independence, neutrality, and freedom from conflicts (financial, contractual, organizational, or otherwise) on reuse and recycle issues were critical to the value of its performance under the 1992 Contract.

### D.   The 1999 Contract

19.  Although the 1992 Contract had expired, the Commission's work in the area of clearance rulemaking was not complete.  As a result of a competitive acquisition, NRC awarded the 1999 Contract to SAIC, effective August 4, 1999, in the initial amount of $ 1,811.812.00 with a period of performance through August 5, 2001.

20.   The 1999 Contract provided that the objective of the

-7-

work was to provide technical assistance for both individual and collective dose estimates and specific cost impacts of potential regulatory alternatives for the clearance of materials and equipment with sufficient quality, defensibility, and quantity to support NRC clearance rulemaking.

21.    The focus of the 1999 Contract was to take information (scenarios and dose factors) from draft NUREG 1640 and use it as a basis to calculate and report estimates of collective doses associated with the clearance of ferrous metals, copper, aluminum, concrete and equipment for reuse.   The ultimate goal was to obtain collective dose estimates from the total inventory (both of the kinds and amounts of scrap and equipment that can be potentially cleared) and ascertain the kinds and amounts of radioactivity associated with the potentially cleared materials.

22.    The scope of work under the 1999 Contract was categorized into three interrelated concepts: (1) Inventory; (2) Dose assessment; and (3) Costs.   The technical analyses provided by SAIC was to include descriptions and rationales to support a clearance rulemaking, consisting of scenarios, models, intermediate results, dose factors from exposure pathways, and associated uncertainties.

23.    For Part 1, "Inventory," SAIC was required to submit numerous reports to NRC staff, e.g., a report based upon the review of written sources concerning the amount and kinds of

radionuclides associated with potentially cleared materials and equipment. The report was to, among other things, consider the quality and quantity of the type of scrap and the kinds and amounts of radioactivity associated with each category. The collection of data was to give priority to sources of information on materials/equipment with potential for clearance by NRC and Agreement State licensees.

24.   A detailed report for publication as a Draft NUREG/CR (Contractor Report) for public review and comment was ultimately contemplated in Task 6 of the Contract. Also for Part 1, "Inventory," SAIC was required to review and summarize in a report, literature on actual practices directly applicable to the release of Naturally Occurring Radioactive Material (NORM) and Naturally Occurring  and Accelerator Produced Radioactive Material (NARM) into commerce, addressing individual and collective dose distributions and associated uncertainties.

25.   In addition, another required report was to provide the approach and results of a feasibility study on measurements of ferrous metals, aluminum, copper, and concrete to establish levels for radioactivity in commerce, resulting ultimately in a NUREG/CR (Contractor Report).

26.   For the Dose Assessment portion of the statement of work (Part 2), SAIC was required to perform data collection and calculations resulting in draft NUREG/CRs for public review and

comment.   Finally, for the Costs segment of the work statement
(Part 3), SAIC was required to provide a cost-benefit analysis
(required element of both an EIS and regulatory analyses) for the
clearance rulemaking focusing on public health (accident and
routine), occupational health (accident and routine), general
public and changes in costs of consumer products, and industrial
operations not licensed by NRC (e.g., scrap dealers, metal
refiners, truck/rail transporters, and landfill operators). The
costs estimated for regulatory alternatives were to be associated
with materials and equipment potentially cleared by NRC and
Agreement State licensees.

    27.   SAIC's independence, neutrality, and freedom from
conflicts (financial, contractual, organizational, or otherwise)
on reuse and recycle issues were critical to the value of its
performance under the 1999 Contract.

### E.   NRC Conflict Of Interest Requirements

    28.   Prescribed by statute, the Commission requires any
person proposing to enter into a contract for technical and
management support services, to provide the Commission with all
relevant information bearing on potential OCOIs with respect to
"being able to render impartial, technically sound, or objective
assistance or advice in light of other activities or
relationships with other persons . . . ."   42 U.S.C. § 2210a
(a)(1) (1999).

- 10 -

29.  NRC's  implementing regulations, the Nuclear Regulatory Commission Acquisition Regulation (NRCAR), provide that it is NRC's policy to avoid OCOIs and require contractors to submit information describing relationships "with organizations or persons (including those regulated by the NRC) which may give rise to actual or potential conflicts of interest  .   .   .  ." 48 C.F.R. § 2009.570-1 (a) (1999).

30.   Prior to contract award, offerors are required to provide organizational conflicts of interest representations to the agency wherein the contractor (offeror) represents to the best of its knowledge that the award to it of an NRC contract does not involve situations or relationships that would create a conflict of interest.   48 C.F.R. § 2052.209-72 (1999).

31.  Concerning contracts already awarded, the NRC's implementing regulations further provide that the contractor agrees that, if after award, it discovers OCOIs with respect to an NRC contract, it shall make an immediate and full disclosure in writing to the contracting officer.  This statement must include a description of the action which the contractor has taken or proposes to take to avoid or mitigate such conflicts. The NRC may, however, terminate the contract if termination is in the best interests of the Government.

32.  Both the 1992 and the 1999 Contract between NRC and SAIC provided that SAIC agreed to forego entering into consulting

or other contractual arrangements with any firm or organization that may give rise to an OCOI with regard to the work being performed under the contract.

33.  Specifically, the 1992 Contract provided in Section H.5(a) that the "primary purpose of this clause is to aid in ensuring that the Contractor: (1) is not placed in a conflicting role because of current or planned interests (financial, contractual, organizational, or otherwise) which relate to the work under this Contract... .

34.  Section H.5(c) "Work For Others" provides:

> Notwithstanding any other provision of this contract, during the term of this contract, the Contractor agrees to forego entering into consulting or other contractual arrangements with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under this contract.  The Contractor shall ensure that all employees under this contract abide by the provision of this clause.  If the Contractor has reason to believe with respect to itself or any employee that any proposed consultant or other contractual arrangement with any firm or organization may involve a potential conflict of interest, the Contractor shall obtain the written approval of the Contracting Officer prior to execution of such contractual arrangement.

35.  Sections H.5(d)(1) and (2) of the 1992 Contract provide:

> (1) The Contractor warrants to the best of its knowledge and belief, and except as otherwise set forth in this contract, it does not have any organizational conflicts of interest as defined in 41 CFR 20-1.5402(a).

> (2) The Contractor agrees that, if after award, it discovers organizational conflicts of interest with respect to this contract, it shall make immediate and full disclosure in writing to the Contracting Officer.  This statement must include a description of the action which the Contrtactor has taken or proposes to take to avoid or mitigate such conflicts.  The NRC

may, however, terminate the contract if termination is in the best interest of the Government.

36. Similarly, the 1999 Contract provides the same language with respect to "Work For Others" (Section H(C)(1)), absence of present conflicts (Section H(D)(1)), and "Disclosure After Award" (Section H(D)(2); and adds further language with respect to support of NRC Licensees in Section H(C)(2):

> The contractor may not represent, assist, or otherwise support an NRC licensee or applicant undergoing an NRC audit, inspection, or review where the activities that are the subject of the audit, inspection or review are the same as or substantially similar to the services within the scope of this contract (or task order as appropriate), except where the NRC licensee or applicant requires the contractor's support to explain or defend the contractor's prior work for the utility or other entity which NRC questions.

37. Additionally, NRC Regulations (48 C.F.R. § 2009.570-3(b)(i)(ii)(iv)(1999))provide that among other situations, there may be an OCOI:

(i)  Where the offeror or contractor provides advice and recommendations to the NRC in the same technical area where it is also providing consulting assistance to any organization regulated by NRC.

(ii) Where the offeror or contractor provides advice to the NRC on the same or similar matter on which it is also providing assistance to any organization regulated by NRC.

(iii)  Where the award of a contract would result in

- 13 -

placing the offeror or contractor in a conflicting role

in which its judgment may be biased in relation to its work for the

**F.   SAIC Statements and Certifications Regarding OCOI**

38.   In or about September 1992, as a material condition of
entering into the 1992 Contract with NRC,  SAIC certified that:
1) it did not have any OCOI; 2) it would forego entering into any
relationships that would create an OCOI during the term of the
1992 Contract; 3) it would ensure during the term of the 1992
Contract that its employees would avoid any OCOI; and 4) it would
notify the Contracting Officer at NRC in writing with an
immediate and full disclosure if any OCOI were discovered.

39.   The NRC relied upon the truth of these certifications
and statements.

40.   Given the critical importance to the NRC of SAIC's
impartiality and freedom from bias, SAIC was informed that NRC
may terminate the 1992 Contract if an OCOI was discovered.

41.   On at least December 14, 1994, April 2, 1996, April 5,
1996, July 30, 1996, October 31, 1996, April 7, 1998, May 15,
1998 and November 13, 1998, SAIC certified and/or stated that the
conditions with respect to its lack of an OCOI remained
unchanged.

42.   On at least those dates, SAIC again certified and/or
stated that it would immediately notify NRC of any changes which

may result in an OCOI.

43.  The NRC relied upon the truth of these certifications and statements.

44.  Between August 1992 and January 1999, SAIC submitted 81 invoices for payment under the 1992 Contract.

45.  The NRC relied upon the accuracy of SAIC's OCOI certifications in determining to pay those invoices.

46.  On or about May 27, 1999, SAIC submitted its proposal for the 1999 Contract to NRC.

47.  In its proposal, SAIC again certified that it did not have an OCOI with respect to the proposed effort for NRC.  This certification was a prerequisite to SAIC's qualifications for the contract.

48.  In August 1999, SAIC executed the 1999 Contract and again certified that it did not have an OCOI.

G.   **SAIC's Conflicting Commercial Relationships**.

49.  Contrary to the above-referenced OCOI obligations, and contrary to the numerous above-referenced certifications and statements that it did not have an OCOI, during the time it was performing the work for the NRC under the 1992 Contract and the 1999 Contract, SAIC was performing concurrent (thereby conflicting) commercial work in the areas of dose estimate and recycling of metals.

50.  Despite making numerous certifications and statements

to the contrary, from at least 1994 through March 2000, SAIC knew it had consulting and other contractual arrangements with other firms and organizations that created an OCOI with respect to the 1992 Contract and the 1999 Contract.

51.   Nevertheless, SAIC knowingly made false certifications and statements to the NRC to the effect that it did not have any consulting and other contractual arrangements that constituted an OCOI.

### 1.   <u>Association of Radioactive Metals Recyclers</u>

52.   Beginning in or about 1994, upon information and belief, SAIC became a sponsor of the Association of Radioactive Metal Recyclers (ARMR).  ARMR was a trade association that was formed by industry in order to facilitate and advocate the reuse of radioactive and contaminated metals.

53.   An SAIC Vice President was a member of the Board of Directors at ARMR and prepared "White Papers" that were presented to government officials and private executives urging support of radioactive metal recycling.

54.   SAIC's sponsorship and participation in the direct activities of an industry organization aimed at supporting the commercial recycling of radioactive metals recycling is in direct conflict with SAIC's OCOI obligations of neutrality and lack of bias under its contract with NRC.

55.   Despite these facts, SAIC has failed to this day to

disclose its participation in the ARMR to NRC as required by the 1992 Contract and the 1999 Contract.

### 2.   BNFL Relationship

56.  Beginning no later than July 1996, SAIC entered into discussions with British Nuclear Fuels, Ltd (BNFL) relating to a contractual effort to dismantle, decommission, decontaminate and recycle the radioactive metals located at several buildings with the Department of Energy's (DOE) complex in Oak Ridge, Tennessee.

57.  On September 25, 1996, SAIC entered into a Teaming Agreement with BNFL toward this end.

58.  The BNFL/SAIC Teaming Agreement in fact led to an agreement with DOE.  Specifically, on August 25, 1997, DOE entered into a contract in excess of $200 million dollars for building decontamination, decommissioning and recycle project at the former K-25 site in Oak Ridge, Tennessee (BNFL Contract). The team members for this contract were BNFL, Manufacturing Sciences Corporation (MSC), **SAIC** and American Technologies, Inc.

59.  MSC is a wholly owned subsidiary of BNFL.

60.  The Statement of Work under the BNFL Agreement provides basically that the BNFL team shall determine the most economical means of dispositioning the process equipment and materials removed from the buildings and is encouraged to promote waste minimization through recycling consistent with NRC regulations.

-17-

61. The recycling and release of contaminated metals was essential to the profitability of the BNFL Team's contract. Moreover, the BNFL Team's ability to successfully and profitably recycle metals was entirely dependent upon the very regulations for which NRC was seeking SAIC's unbiased and neutral advice.

62. Furthermore, the success of the BNFL Team's future recycling efforts at other DOE and DOD complex facilities was also dependent on the NRC regulations.

63. The objective of SAIC's efforts for the NRC was to collect information and provide the NRC with analysis that was free from potential bias. This objective was defeated by the fact that SAIC simultaneously was a member of a team of contractors whose future profits depended upon those same standards and how much radioactive material they could recycle.

64. Numerous employees of SAIC were aware of SAIC's efforts on behalf of the NRC and BNFL and at least one SAIC employee worked on both contracts.

65. As noted above, BNFL, MSC and SAIC were team partners under this contract. The Statement of Work encourages BNFL to promote waste minimization through recycling of equipment and materials and requires BNFL to comply with relevant provisions of the AEA as amended, and that radiological material transfers meet the AEA criteria, including transfers between DOE sites, contractors or NRC/Agreement States licensees.

66. MSC's principal business is the receipt, processing, survey and disposition of radioactive scrap metal from nuclear power plants, the Department of Energy and the Department of Defense.

67. MSC's facilities are covered by two Radioactive Materials Licenses issued by the State of Tennessee.

68. Section 274 of the AEA provides a special Federal-State regulatory framework under which NRC may enter into an agreement with a state for the discontinuance of NRC's regulatory authority over certain AEA material and the assumption of that authority by the state. Before the NRC may enter into such an agreement, it must find that the state's program is "adequate to protect public health and safety and compatible with the Commission's program." See, Statement of Principles and Policy for the Agreement State Program; Policy Statement on Adequacy and Compatibility of Agreement State Programs, 62 Fed. Reg. 46,517, 46,523 (1997). Section 274(j) of the Act requires the Commission to periodically review existing State programs to ensure continued adequacy and compatibility, and suspend or terminate its agreement with a State in order to protect public health and safety or, if the State is not in compliance with AEA Section 274 .

69. Accordingly, during the BNFL contract, the NRC continued to have the statutory responsibility to review the activities of Agreement States, such as the State of Tennessee,

in order to ensure that the state's regulatory actions provide for adequate protection of the public and are otherwise compatible with the Commission's program for the regulation of Atomic Energy Act materials.

70. In exercising this responsibility, the Commission from time to time may require states to adopt NRC standards in their regulatory programs.

71. Because MSC's recycling facilities were licensed by the state of Tennessee, SAIC's technical work for NRC on dose estimates and pertinent regulatory standards would have affected the standards that Tennessee would use when regulating the release of materials form MSC's recycling facility under the BNFL Contract.

72. In connection with its work on the BNFL team, SAIC created a document entitled "General Description of SAIC Support to BNFL," which notes that SAIC provides technical and regulatory support functions to a team of companies led by BNFL for the D&D and Metal Recycle Project under the DOE contract. SAIC notes:

> . . . SAIC has been involved as a primary partner with this $ 238M project since its inception and has been intimately involved in developing the fixed-price cost estimate, preparing and presenting technical evaluations, and developing innovative contractual and financial schemes to enable DOE to award the contract to BNFL on a sole-source basis. SAIC assisted in the preparation of BNFL's technical proposal, the cost estimate, and the technical basis for the cost estimate.

73. Further, this document, created by SAIC, states:

Recycle options include cleanup and survey of
equipment for reuse to perform its design function
or disassembly/decontamination of the equipment
metals for sale as free-release metal scrap
(nickel, steel, copper, and aluminum).
Mechanical, wet chemistry, and electrolysis
decontamination processes will be used to achieve
maximum economic recycle of available materials
with minimum secondary waste generation. . . .
SAIC used our process knowledge to completely plan
the D&D activities and to provide the integrated
cost estimate for the removal, decontamination,
and metal recycle actions . . . SAIC will
continue providing technical support throughout
the project in areas of QA, criticality analysis,
regulatory compliance, permitting, waste
management, radiation safety, industrial health
and safety, risk assessment, security, and
information management.

74. Prior to DOE's award of its prime contract to BNFL,
SAIC performed work for BNFL that played a significant role
assisting BNFL in negotiating the DOE contract.

75. Specifically, SAIC supported BNFL in negotiating the
DOE contract with two SAIC subcontract deliverables. SAIC, under
the team arrangement with BNFL, was promoting the maximum
economic use of equipment and materials recycling while at the
same time, the NRC was paying SAIC to provide unbiased technical
assistance to NRC to support NRC's clearance rulemaking.

76. SAIC was performing concurrently, work for both BNFL
and NRC in the same technical area of recycling of equipment and
materials.

77. SAIC had placed itself in a conflicting role in which
its technical judgment may be biased in relation to its work for

NRC based upon the type of services SAIC proposed to BNFL for the DOE contract.

78.   The success of the BNFL recycling contract depended on the standards adopted by NRC in its clearance rule.

79.   Given this substantial financial impact upon BNFL, the NRC was not in a position to be assured of receiving objective, impartial technical support and advice from SAIC for NRC's work under the 1992 Contract and the 1999 Contract.

80.   SAIC knew it was required by the terms of its contracts with the NRC to disclose its relationship with BNFL to the NRC.

81.   Despite these facts, SAIC did not disclose its relationship and activities with BNFL to the NRC as required by the terms of the 1992 Contract and the 1999 Contract.

**BJC Contract**

82.   During the first half of 1999, SAIC began negotiating yet another contract in the radioactive metal recycling area.   On or about June 7, 1999, SAIC entered into a commercial contract in the metal recycling/reuse area, a $719,448.00 effort with Bechtel Jacobs Company in support of DOE with a period of performance of June 7, 1999 through November 15, 1999.

83.   A document entitled  "Environmental Management and Enrichment Facilities Program Management and Planning Support," which included a Statement of Work and a page entitled "Technical Direction Authorization Form Attachment, KDS38V Subtask 130, GDP

Metals ALARA, described work to be performed for Bechtel Jacobs

in support of DOE as follows:

> SAIC will provide radiological dose assessment modeling
> in developing criteria to derive authorized or
> supplemental limits for the restricted or unrestricted
> release, per DOE guidelines, of radiologically
> contaminated metals from the three uranium enrichment
> gaseous diffusion plants.  Various technical expertise
> in support of this task may be required in fields such
> as . . . commercial recycling . . . .  Work will
> include: Completion of ALARA analysis . . . addressing
> various metal types with surface or volumetric
> radiological contamination associated with the gaseous
> diffusion plants at ETTP, Portsmouth and Paducah, and
> the impact on the public, industry, and environment if
> metals from the plants are released for unrestricted or
> restricted use . . . Technical interface with
> regulatory agencies as required, development and review
> of technical supporting documents, research and review
> of various metal recycling processes and industrial use
> of metals, literature searches of technical documents
> and standards to provide support for the analysis.

84.  SAIC commenced this commercial Bechtel Jacobs metals

recycling work eleven days after SAIC submitted its technical and

cost proposals to NRC for the same type of work required by

Solicitation RES-99-046, which resulted in the 1999 Contract.

85.  SAIC's work for Bechtel Jacobs violated the

organizational OCOI provisions of SAIC's contract with NRC.

86.  SAIC's relationship with Bechtel Jacobs involved

a subcontract effort under which SAIC was to provide dose

assessment modeling and development of criteria to derive limits

for the restricted or unrestricted release of radiologically

contaminated metals.  Considering that SAIC's expertise in

commercial recycling was required under Bechtel Jacob's (June

1999) technical direction authorization to SAIC (the technical
direction authorization for the Bechtel Jacobs work stated that
work would include research and review of various metal recycling
processes and industrial use of metals), SAIC was required to
disclose its financial tie and subcontract with Bechtel Jacobs to
NRC's Contracting Officer during SAIC's negotiation of Contract
NRC-04-99-046 with NRC.

87.   The commercial work SAIC performed for Bechtel Jacobs
is the same type of work SAIC was performing for NRC under the
1999 Contract.

88.   Despite these facts, SAIC did not disclose the BJC
contract to NRC as required under the terms of the 1999 Contract
with NRC.

89.   Upon information and belief, during the 1992 and 1999
Contracts with NRC, SAIC entered into other relationships that
created OCOI violations under the terms of the 1992 Contract and
the 1999 Contract and failed to disclose them to the NRC.

### H.   Termination Of 1999 Contract Due to OCOI

90.   In October 1999, some of SAIC's potential conflicts
were raised by a third party at a public NRC meeting.

91.   On November 10, 1999, as a result of the complaint,
NRC issued a request to SAIC for information on its activities in
the area of metals recycling.

92.   SAIC provided the NRC with some information. For the

first time SAIC disclosed the BJC Contract and the BNFL Contract to the NRC.   SAIC still did not disclose the ARMR relationship.

93.   On December 10, 1999, NRC issued a cure notice to SAIC under the 1999 Contract, which stated that NRC had reviewed the materials provided by SAIC and was of the view that SAIC had conflicting roles given its contracts with BNFL and with Bechtel Jacobs Company.

94.   NRC noted that these contracts had not been disclosed, were in the area of dose assessment and metals recycling and may bias SAIC's judgement in relation to its work for the NRC.

95.   SAIC was given an opportunity to present any exculpatory facts to the NRC by January 10, 2000.

96.   SAIC submitted a letter on January 10, 2000.

97.   On  March 17, 2000, the 1999 Contract was terminated because SAIC had failed to disclose its conflicting relationships as required by the contracts, this failure constituted significant breaches of the contracts, and the conflicts destroyed the integrity of the very regulatory activities that SAIC was paid by NRC to support.

98.   After SAIC's termination, and because of SAIC's conflicted relationships, NRC's efforts with respect to NUREG 1640 have suffered a series of delays.

99.   NRC is continuing with its effort to issue NUREG 1640. It has been forced to hire several additional contractors to

review the work done by SAIC.  It is still impossible to gauge the impact that the lingering questions of SAIC's bias will have on the Commission's credibility and efforts to issue NUREG 1640.

100. From at least 1994 through October 1999, SAIC submitted vouchers for payment under the 1992 Contract and then the 1999 Contract.  The United States has been harmed because during that period, including during the procurement process on the 1999 Contract, SAIC failed to notify the NRC of its concurrent commercial work for, among others, ARMR, BNFL and BJC.

101. NRC paid for SAIC's best, disinterested efforts and advice, untainted in both fact and appearance.  SAIC personnel were well aware that the entire issue of the release of contaminated metals was very controversial.  In order for the NRC to be effective in its Rulemaking function, its efforts had to be completely beyond second guessing and suggestions of bias.  In failing to disclose fully its substantial and ongoing industry and contractual efforts, SAIC has damaged NRC's credibility in the area.

102. Because of the failure of SAIC to disclose its substantial OCOI relationships to the NRC and the resulting damage to the NUREG 16640 effort, NRC received nothing of value under its 1992 Contract and the 1999 Contract with SAIC.

Count I: False or Fraudulent Claims

- 26 -

<u>31 U.S.C. § 3729(a)(1)</u>

103. Paragraphs 1 through 79 are realleged as though fully set forth herein.

104. SAIC knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1), specifically, the invoices submitted by SAIC to NRC for payment under the 1992 Contract and the 1999 Contract after the conflicting relationships arose.

105. Because of SAIC's acts, the Government sustained damages in an amount to be determined at trial.

<u>Count II:  False Statements</u>

<u>31 U.S.C. § 3729(a)(2)</u>

106. Paragraphs 1 through 79 are realleged as though fully set forth herein.

107. The defendant knowingly made, used or caused to be made or used false records and statements to get false or fraudulent claims paid or approved by the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2), specifically, certifications and statements made by SAIC to the NRC that it did not have an OCOI relationship and that it would immediately inform the NRC pursuant to the terms of the 1992 Contract and the 1999 Contract if an OCOI relationship developed.

108. Because of the defendant's acts, the Government sustained damages in an amount to be determined at trial.

### Count III: Unjust Enrichment

109. The United States realleges and incorporates by reference paragraphs 1 through 79 of this Complaint, as though fully set forth herein.

110. By reason of the foregoing conduct, defendant was unjustly enriched at the expense of the United States in an amount to be proven at trial, and in equity and good conscience, the money should be returned to the United States.

### Count IV: Payment by Mistake

111. The United States realleges and incorporates by reference paragraphs 1 through 79 of this Complaint, as though fully set forth herein.

112. By reason of the foregoing conduct of defendant, the United States made payments under mistake of fact.

113. As a result of these payments by mistake, the United States has sustained substantial damages, in an amount to be proven at trial.

### Count V: Breach of Contract

114. The United States realleges and incorporates by reference paragraphs 1 through 69 of this Complaint, as though fully set forth herein.

115. By reason of the actions described above, SAIC breached

its 1992 Contract with the United States by engaging in conflicting activities and failing to follow the terms and conditions of the contracts pertaining to OCOI.

116. By reason of the breach of contract described herein, the United States has been damaged.

## PRAYER FOR RELIEF

117. WHEREFORE, Plaintiff, the United States, demands judgment against Defendant as follows:

A.   Under Counts I and II (False Claims Act), a sum equal to three times the amount of damages the United States has sustained, including investigative costs, plus such civil penalties as are allowable by law; or

B.   Under Count III (Unjust Enrichment), a sum equal to the amount by which Defendant was unjustly enriched, plus interest and costs; or

C.   Under Count IV (Payment by Mistake), a sum equal to the amount which the United States paid by mistake, plus interest and costs;

D.   Under Count V (Breach of Contract), a sum equal to the amount which the United States paid under the 1992 Contract with SAIC during the period SAIC was in an OCOI relationship, plus interest and costs; and

E.   Such other relief as this Court may deem just and

proper, together with interests and costs of this action.

**THE UNITED STATES DEMANDS A JURY TRIAL AS TO ALL ISSUES SO TRIABLE**

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
D.C. BAR # 451058
United States Attorney

R. CRAIG LAWRENCE
D.C. BAR # 171538
Assistant United States Attorney

KEITH V. MORGAN
D.C. Bar #422665
Assistant U. S. Attorney

MICHAEL F. HERTZ
(D.C. Bar No. 965780)
DODGE WELLS
(D.C. Bar No. 425194)
DONALD J. WILLIAMSON

U.S. Department of Justice

Attorneys for Plaintiff
United States of America

September 3, 2004