**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
───────────────────────────
                              )
UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )
                              )
          v.                  )      Civil Action No. 04-1543 (RWR)
                              )
SCIENCE APPLICATIONS          )
INTERNATIONAL CORPORATION,    )
                              )
          Defendant.          )
───────────────────────────  )
```

## MEMORANDUM OPINION AND ORDER

The United States brought this action against Science
Applications International Corporation ("SAIC") under the False
Claims Act ("FCA"), 31 U.S.C. § 3729, and District of Columbia
common law, alleging SAIC's failure to disclose organizational
conflicts of interest ("OCIs") as was required under two
contracts that SAIC entered into with the Nuclear Regulatory
Commission ("NRC").  SAIC has moved under Federal Rules of Civil
Procedure 9(b) and 12(b)(6) to dismiss the government's FCA
claims in Counts I and II of the amended complaint to the extent
those counts are based on allegations contained in paragraph 89
of the amended complaint.  In addition, SAIC has moved for
summary judgment on the government's FCA claims and request for
damages, as well as the government's breach of contract and
quasi-contractual claims.  SAIC has also moved to strike the
government's Responsive Statement of Genuine Issues and Material
Facts.

-2-

Because paragraph 89 of the amended complaint meets the heightened pleading requirement of Rule 9(b) when supplemented by the government's answers to interrogatories and its opposition to SAIC's motion to dismiss and motion for summary judgment, SAIC's motion to dismiss the government's FCA claims as they relate to paragraph 89 will be granted only to the extent that paragraph 89 does not specifically identify the potential OCIs at issue. Because the government has presented genuine issues of material fact as to the existence of OCIs and whether SAIC knowingly submitted false claims, SAIC's motion for summary judgment on the FCA and breach of contract claims will be denied.  As the government has also presented genuine issues of material fact with regard to its claim for actual damages and statutory civil penalties under the FCA, SAIC's motion for summary judgment as to those damages will be denied.  However, because the government has failed to substantiate its claims for the costs of hiring third parties to peer review and complete SAIC's work and to examine NRC rulemaking options, SAIC will be granted summary judgment as to the government's claim for damages flowing from those costs.  Because quasi-contractual claims are precluded here since express contracts existed between the parties, SAIC's motion for summary judgment on the government's quasi-contractual

claims will be granted.[1]  Finally, because SAIC failed to comply
with Local Civil Rule 7(m) before filing its motion to strike and
the motion is unpersuasive, the motion will be denied.

<u>BACKGROUND</u>

The NRC is an independent federal agency established to
regulate the civil use of nuclear materials.  The NRC creates
scientific standards for allowing radioactive materials with low
levels of contamination to be released to the private sector for
recycling and reuse.  In 1992 and 1999, the NRC contracted with
SAIC to provide technical assistance related to this effort.
Under the 1992 contract, SAIC was to provide the NRC with
technical assistance related to the recycling and reuse of
radioactive material and was to present an options paper
outlining the possible approaches to rulemaking for the release
of these materials.[2]  The goal of the 1999 contract was to assess
regulatory alternatives regarding the release of reusable
materials.  SAIC's neutrality was critical under both contracts.
The contracts explained that SAIC's independence and neutrality

---

[1] Although SAIC's argument about the quasi-contractual
claims is contained in its memorandum supporting its summary
judgment motion, SAIC makes several loose references to seeking
dismissal of the claims.  As there is no dispute about the
existence of express contracts and judgment as a matter of law is
warranted, the wayward references to dismissal will be
disregarded.

[2] SAIC ultimately presented such a paper, referred to as
"draft NUREG-1640."

-4-

would be compromised by any OCI that raised an appearance of bias
in its rulemaking recommendations.

SAIC promised in both contracts to forego entering into any
consulting or other contractual arrangements with any
organization that could create a conflict of interest.  The
purpose of this clause was to avoid OCIs that were, among others,
financial, organizational, or contractual.  SAIC warranted upon
entering both contracts that it had no OCIs as that term is
defined in 41 C.F.R. § 20-1.5402(a).  The regulation defined an
OCI as "a relationship . . . whereby a contractor or prospective
contractor has present or planned interests related to the work
to be performed under an NRC contract which: (1) May diminish its
capacity to give impartial, technically sound, objective
assistance and advice or may otherwise result in a biased work
product, or (2) may result in its being given an unfair
competitive advantage."  41 C.F.R. § 20-1.5402(a) (1979).[3]   SAIC

---

[3]  Furthermore, the NRC regulations incorporated into the
1992 Contract required SAIC to disclose information concerning
situations or relationships that may give rise to OCIs under the
following circumstances:
(i)   Where the offeror or contractor provides advice and
      recommendations to the NRC in a technical area in which it
      is also providing consulting assistance in the same area to
      any organization regulated by the NRC.
(ii)  Where the offeror or contractor provides advice to the NRC
      on the same or similar matter in which it is also providing
      assistance to any organization regulated by the NRC.
(iii) Where the offeror or contractor evaluates its own
      products or services, or the products or services of another
      entity where the offeror or contractor has been
      substantially involved in their development or marketing.

-5-

further promised in both contracts to disclose any OCIs it
discovered after entering the contract.  (See Am. Compl. ¶¶ 35,
36.)  It repeatedly certified throughout the terms of the
contracts that it had no OCIs and would notify the NRC of any
changes resulting in an OCI.  (See id. ¶¶ 41, 42.)

The government alleges that SAIC breached its OCI
obligations under the contracts by engaging in relationships with
organizations that created an appearance of bias in the technical
assistance and support it provided the NRC.  (See id. ¶¶ 49-51.)
In its amended complaint, the government alleges that SAIC's no-

---

(iv) Where the award of a contract would result in placing the
     offeror or contractor in a conflicting role in which its
     judgment may be biased in relation to its work for the NRC,
     or would result in an unfair competitive advantage for the
     offeror or contractor.
Pl.'s Stmt. of Facts ¶ 71 (citing 41 C.F.R. 20-1.54 at p. 3).
     The NRC regulations incorporated into the 1999 Contract
required SAIC to disclose situations or relationships that may
give rise to organizational conflicts of interest under the
following circumstances:
(i)  Where the offeror or contractor provides advice and
     recommendations to the NRC in the same technical area where
     it is also providing consulting assistance to any
     organization regulated by the NRC.
(ii) Where the offeror or contractor provides advice to the NRC
     on the same or similar matter on which it is also providing
     assistance to any organization regulated by the NRC.
(iii)Where the offeror or contractor evaluates its own
     products or services, or has been substantially
     involved in the development or marketing of the
     products or services of another entity.
(iv) Where the award of a contract would result in placing the
     offeror or contractor in a conflicting role in which its
     judgment may be biased in relation to its work for the NRC,
     or would result in an unfair competitive advantage for the
     offeror or contractor.
Pl.'s Stmt. of Facts ¶ 72 (citing 48 C.F.R. 2009.570-3(b)(1)).

-6-

OCI certifications and subsequent requests for payment on the 1992 and 1999 contracts violated the FCA, and brings additional claims under quasi-contract and breach of contract theories.

SAIC has moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the government's FCA claims to the extent they rely upon paragraph 89 of the amended complaint,[4] arguing

---

[4]   Paragraph 89 states:
Upon information and belief, during the 1992 and 1999 Contracts with NRC, SAIC entered into other relationships that created [OCI] violations under the terms of the 1992 Contract and the 1999 Conract and failed to disclose them to the NRC.  Specifically, without limitation to other [OCI] relationships the details of which the United States is still not aware and upon which it seeks discovery, SAIC entered into the following other relationships involving the recycling or reuse of radioactive material or metal:
A)   Between 1993 and the present, SAIC entered into multiple contracts and an extended relationship with BNFL and Retech, Inc. to develop, test, market and ultimately patent a Radioactive Scrap Metal processing technology known as the Plasma Hearth Process (PHP). This PHP effort was conducted primarily at SAIC's offices in Idaho -- the same location as its efforts for the NRC under the 1992 Contract and the 1999 Contract;
B)   SAIC entered into other contracts and relationships with MSC and GTS Duratek involving Radioactive Scrap Metal processing including the National Convention Pilot Project at the Rocky Flats Environmental Technology Site in Colorado and the Small Scale Metal Recycle Project in Oak Ridge, Tennessee;
C)   SAIC entered into other relationships with BNFL, SEG, Inc., and GTS Duratek involving the recycling of Radioactive Scrap Metal, including the Advanced Mixed Waste Treatment Project in Idaho;
D)   Beginning in 1996, SAIC developed a nationwide "Business Initiative," which sought to expand into the "growing RSM/metal recycle market" by targeting and establishing relationships with all of the major radioactive scrap metal companies like MSC, SEG, Inc.,

-7-

that the allegations in that paragraph fail to meet the standard for pleading fraud with particularity as is required in Federal Rule of Civil Procedure 9(b).  SAIC has also moved for summary judgment, arguing that the government cannot show that SAIC knowingly submitted false claims for payment to the government as required for liability to attach under the FCA, that there was no breach of contract because no undisclosed OCIs existed, that the quasi-contract claims cannot be sustained because express contracts existed between the parties, and that the government cannot prove FCA damages.  In addition, SAIC has moved for an order striking the government's Responsive Statement of Genuine Issues and Material Facts, insisting that the government's statement violates Local Civil Rule 7(h) because it is not concise and contains improper argument and immaterial facts.

## DISCUSSION

A party may move under Federal Rule of Civil Procedure 12(b)(6) to dismiss a complaint for failure to state a claim upon which relief can be granted, but such a motion "must be made before pleading."  Fed. R. Civ. P. 12(b).  Although SAIC moved to to dismiss after it filed its amended answer, thereby violating

---

NMI/CMI, Alaron, Inc., M4, BNFL, Babcock & Wilcox, and Parsons Corporation; and
E)      From 1994 through 1996, SAIC developed a business plan and provided ongoing assistance in Oak Ridge to Lockheed Martin Energy Systems (LMES) in connection with the Large Scale Metal Recycling Program.
Am. Compl. ¶ 89.

-8-

the restriction in Rule 12(b), SAIC's motion will be treated initially as a motion for judgment on the pleadings under Rule 12(c).  See Summers v. Howard Univ., 127 F. Supp. 2d 27, 29 (D.D.C. 2000).  "If, on a motion under Rule . . . 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."  Fed. R. Civ. P. 12(d). Matters beyond the pleadings have been presented and considered here.  This motion, then, will be treated in turn as one for summary judgment.  See Mulhall v. Dist. of Columbia, 747 F. Supp. 15, 19 (D.D.C. 1990).

Summary judgment may be granted only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002).  The relevant inquiry "is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one that is capable of affecting the outcome of the litigation.  Id. at 248.  A genuine issue is one

-9-

where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," id., as opposed to evidence that "is so one-sided that one party must prevail as a matter of law." Id. at 251-52.  The burden falls on the moving party to provide a sufficient factual record that demonstrates the absence of a genuine issue of material fact.  See Beard v. Banks, 126 S. Ct. 2572, 2578 (2006).  "Once the moving party has carried its burden . . . [t]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." Taylor v. Blakey, 490 F.3d 965, 972 (D.C. Cir. 2007) (internal quotations and citation omitted) (emphasis in original).  In considering a motion for summary judgment, all "justifiable inferences" from the evidence are to be drawn in favor of the nonmovant.  Anderson, 477 U.S. at 255.

"The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion."  Nwachukwu v. Rooney, 362 F. Supp. 2d 183, 189 (D.D.C. 2005) (citation omitted).  "[T]he moving party bears a heavy burden as courts generally disfavor motions to strike."  Canady v. Erbe Elektromedizin GmbH, 384 F. Supp. 2d 176, 180 (D.D.C. 2005) (citing Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd., 647 F.2d 200, 201 (D.C. Cir. 1981)).

-10-

I.   MOTION TO STRIKE

SAIC argues that the government's Responsive Statement of Genuine Issues and Material Facts must be stricken because "rather than submitting a 'concise statement of genuine issues' as [Local Civil Rule] 7(h) requires, the government ignored the rules and filed an 85-page statement of 'facts,' including 190 numbered paragraphs that are erroneously presented as 'Additional Material Facts Not In Dispute.'" (Def.'s Mot. to Strike Pl.'s Responsive Stmt. of Genuine Issues and Material Facts ("Def.'s Mot. to Strike") at 1.) SAIC insists that the government's statement contains improper argument, immaterial facts, and is "an attempt to circumvent the page limitation on its brief in opposition." (<u>Id.</u>)

"In resolving motions to strike, . . . the court [should] use[] a scalpel, not a butcher knife." <u>Canady</u>, 384 F. Supp. 2d at 180 (internal quotations and citation omitted). To use such an exacting method would be difficult here, particularly in light of the fact that SAIC urges "[t]he Court [to] disregard the Government's Statement in its entirety[.]" (Def.'s Mot. to Strike at 6.) In support of its motion, SAIC expresses concern that "the Government's Statement . . . stands as an impediment to the efficient and just resolution of this case." (Def.'s Reply in Support of Mot. to Strike at 9.) However, by not consulting with the government prior to filing its motion to strike (<u>see</u>

-11-

Pl.'s Opp'n to Def.'s Mot. to Strike at 1-2), SAIC failed to comply with Local Civil Rule 7(m), the very purpose of which is "to promote the resolution of as many litigation disputes as possible without court intervention, or at least to force the parties to *narrow the issues that must be brought to the court*." Ellipso, Inc. v. Mann, 460 F. Supp. 2d 99, 102 (D.D.C. 2006) (emphasis added).  The fact that SAIC believed "that the government would not be willing to resolve the problems . . . short of this Court's intervention" (Def.'s Reply in Support of Mot. to Strike at 9) does not change the fact that it was under an obligation to make a "good faith effort . . . to narrow the areas of disagreement."  LCvR 7(m); accord Alexander v. FBI, 186 F.R.D. 185, 186-87 (D.D.C. 1999) (noting that although circumstances suggested "that the motion would be opposed, the greater problem involves whether there was a 'good faith effort . . . to narrow the areas of disagreement'").  Furthermore, despite SAIC's insistence to the contrary, it "has not demonstrated that it was prejudiced [by the government's statement] . . . as reflected by its reply submitted in support of its motion for summary judgment . . . prior to filing its motion to strike."  Smith Prop. Holdings v. United States, 311 F. Supp. 2d 69, 78 (D.D.C. 2004).  (See, e.g., Def.'s Reply in Support of Mot. to Strike at 5, n.4 ("[A]s SAIC points out *in its Reply Brief*, the government has blatantly mischaracterized the

-12-

. . . evidence[.]") (emphasis added).)  Accordingly, because SAIC

failed to comply with Rule 7(m) and meet its heavy burden in

filing its motion to strike, the motion will be denied.

II.  RULE 9(b) CHALLENGE TO PARAGRAPH 89

SAIC insists that paragraph 89 of the amended complaint

fails to comport with Federal Rule of Civil Procedure 9(b) and

should be dismissed.  "Th[e] [D.C.] Circuit has held that

complaints brought under the False Claims Act are subject to the

heightened pleading requirements of Fed. R. Civ. P. 9(b)."  Allen

v. Beta Constr., 309 F. Supp. 2d 42, 45 (D.D.C. 2004) (citing

United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542,

551-52 (D.C. Cir. 2002)).  Rule 9(b) requires that "[i]n alleging

fraud . . ., a party must state with particularity the

circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b).

"Conclusory allegations that a defendant's actions were

fraudulent or deceptive do not satisfy Rule 9(b)."  Elemary v.

Holzmann, 533 F. Supp. 2d 116, 137 (D.D.C. 2008) (citation

omitted).  "A plaintiff must specifically allege the time, place,

and contents of any affirmative misrepresentation."  Id. (citing

Totten, 286 F.3d at 552).  "By extension, a plaintiff claiming

fraud through 'suppression of facts' must identify the facts

concealed and/or acts of concealment with particularity."

Elemary, 533 F. Supp. 2d at 137.  "In other words, Rule 9(b)

requires that the pleader provide the 'who, what, when, where,

-13-

and how' with respect to the circumstances of the fraud." <u>Id.</u>
(citation omitted).

"Rule 9(b) is not . . . to be read in isolation from other
procedural canons. . . .  [T]he requirement of particularity does
not abrogate Rule 8 and it should be harmonized with the general
directive . . . of Rule 8 that the pleadings should contain a
short and plain statement of the claim or defense and that each
averment should be simple, concise and direct." <u>United States ex
rel. Joseph v. Cannon</u>, 642 F.2d 1373, 1385-86 (D.C. Cir. 1981)
(internal quotations and citation omitted).  "Thus, while the
'time, place, and contents of the false representations' must be
pleaded with specificity in an FCA cause of action, <u>Totten</u>, 286
F.3d at 552, 'the simplicity and flexibility contemplated by the
rules must be taken into account when reviewing a complaint for
9(b) particularity." <u>Allen</u>, 309 F. Supp. 2d at 46.

While FCA cases in this circuit reveal that "specificity
regarding the identities of individual actors is required[,]" <u>see
United States ex rel. El-Amin v. George Washington Univ.</u>, Civil
Action No. 95-2000 (JGP), 2005 WL 485971, at *6 (D.D.C. Feb. 25,
2005) (discussing cases), "where a complaint covers a multi-year
period, Rule 9(b) may not require a detailed allegation of all
facts supporting each and every instance of submission of a false
claim." <u>United States ex rel. Pogue v. Diabetes Treatment Ctrs.
of Am., Inc.</u>, 238 F. Supp. 2d 258, 268 (D.D.C. 2002) (citations

-14-

omitted); see also El-Amin, 2005 WL 485971, at *5 ("[T]he
complexity and duration of the alleged fraud might relieve some
of the burden required by Rule 9(b).").

Here, although the government does not provide "a detailed
allegation of all facts" involved in its paragraph 89
allegations, it does provide "specificity regarding the
identities" of SAIC's potential OCI relationships[5] and has set
forth a sufficiently "detailed description of the specific
falsehoods that are the basis for [its] suit." Totten, 286 F.3d
at 552.  Even if, however, paragraph 89 were not sufficiently
specific on its face, it has been adequately supplemented by the
government's interrogatory responses and the government's
opposition to SAIC's motion for summary judgment.  "While it is
generally understood that the complaint may not be amended by
legal memoranda that are submitted as oppositions to motions for
dismissal or summary judgment, . . . courts have allowed, for
Rule 9(b) purposes, a party to supplement its complaint through
such legal memoranda . . . for the sake of judicial economy."
Shekoyan v. Sibley Int'l Corp., 217 F. Supp. 2d 59, 73 (D.D.C.

_____

[5]  To the extent that the government does not specifically
name the potential OCIs at issue, see Am. Compl. ¶ 89 (alleging
that there are "other [OCI] relationships the details of which
the United States is still not aware"), those allegations must be
dismissed.  See El-Amin, 2005 WL 485971, at *7 ("Only claims
based on the conduct of the fifteen [actors] named in paragraph
34 survive; any claims based on the conduct of unnamed [actors]
are dismissed.").

-15-

2002) (citation omitted), aff'd, 409 F.3d 414 (D.C. Cir. 2005);
see also El-Amin, 2005 WL 485971, at *12 ("[A] complaint alleging
fraud that fails to meet the particularity requirement of Rule
9(b) can be cured, and adverse judgment avoided, if the
opposition to the motion to dismiss supplies the facts necessary
to meet 9(b)'s requirements.").

Although SAIC contends that allowing the government to
supplement its amended complaint in the manner described in
Shekoyan is improper, it does not argue that the government's
interrogatory answers and subsequent opposition briefs would
inadequately supplement paragraph 89. Here, it is clear that
allowing the government to supplement its allegations in
paragraph 89 furthers judicial economy. As is discussed below,
there are numerous genuine issues of material fact such that
SAIC's motion for summary judgment must be denied and this case
set for trial. It makes little sense to order the government to
file a second amended complaint at this stage, particularly when
SAIC "cannot credibly argue that [it is] not now on notice of the
charges against [it]." Allen, 309 F. Supp. 2d at 47.
Accordingly, SAIC's motion to dismiss Counts I and II to the
extent they are based on the allegations in paragraph 89 will be
denied in part.[6]

---

[6] The motion will be granted in part as is discussed in
note 5 supra.

-16-

III. COUNTS I AND II: FALSE CLAIMS ACT

SAIC also moves for summary judgment on the government's
False Claims Act counts.  The False Claims Act creates liability
for one who:

> (1) knowingly presents, or causes to be presented, to
> an officer or employee of the United States Government
> . . . a false or fraudulent claim for payment or
> approval; [or]
> (2) knowingly makes, uses, or causes to be made or
> used, a false record or statement to get a false or
> fraudulent claim paid or approved by the Government[.]

31 U.S.C. § 3729(a).  "The three elements of FCA liability are
that (1) defendant submitted a claim to the government; (2) which
was false; and (3) which the defendant knew was false."  United
States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F.
Supp. 2d 25, 57 (D.D.C. 2007) (internal quotations and citation
omitted).  SAIC urges that summary judgment in its favor is
warranted because the government cannot show that there is a
genuine issue of material fact as to any of these three elements
or as to damages.

A.   Whether submissions were "claims"

The FCA "proscribes only false *claims*, that is, actual
demands for money or property. . . .  [L]iability [attaches] to
the claim for payment not to the underlying activity."  United
States v. Intrados/Int'l Mgmt. Group, 265 F. Supp. 2d 1, 6
(D.D.C. 2002) (emphasis added) (citing Totten, 286 F.3d at 551).
In other words, "[t]he FCA is not a catchall anti-fraud

-17-

provision; it only goes after claims that are false, not claims that are submitted while fraud is afoot." Hockett, 498 F. Supp. 2d at 71 (citation omitted).  Where a plaintiff "fails to point to a single, specific false claim or sufficiently detailed description of one, he fail[s] to create a triable issue of fact." Hockett, 498 F. Supp. 2d at 71 (internal quotations and citation omitted).

There are three types of false claims under the FCA.  First, a claim may be "factually false if it invoices for services that were not rendered." Id. at 64.  Second, it may be legally false because it contains an express false certification -- that is, "a claim that falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite for payment." Id. (internal quotations and citation omitted).  Third, it may be legally false under an "implied certification theory." Id.  "The theory of implied certification . . . is that where the government pays funds to a party, and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent." United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 28, 33 (D.D.C. 2003).

-18-

Neither party contends that invoices submitted for payment
by SAIC were either factually false or that they contained
express false certifications; the issue is whether the government
can show that SAIC made *implied* false certifications in
submitting its invoices to the NRC.  SAIC urges that under
Hockett, in order for the implied certification theory to apply,
the government must show "that compliance with the NRC
regulations or the contract OCI clauses was an explicit condition
precedent to payment under the Contracts."  (Def.'s Reply to
Opp'n to Mot. for Summ. J. ("Def.'s Summ. J. Reply") at 12
(citing Hockett, 498 F. Supp. 2d at 68).)

SAIC's assertion is problematic for several reasons.  First,
Hockett states that "[t]he theory of implied false certification
. . . *typically* applies where . . . [a condition] is an explicit
condition precedent to payment[.]"  498 F. Supp. 2d at 68
(emphasis added).  Yet the case Hockett cites for the proposition
that "the regulation at issue must expressly condition payment on
compliance" -- Pogue -- seems to rely upon a Second Circuit
decision for the requirement of an express condition.  See Pogue,
238 F. Supp. 2d at 264 (citing United States ex rel. Mikes v.
Straus, 274 F.3d 687, 700 (2d Cir. 2001)).  The D.C. Circuit,
though, has never announced such a requirement.  To the contrary,
the two primary D.C. Circuit cases addressing the issue suggest
that for an implied certification theory to succeed, there must

-19-

simply be a "withholding of . . . information -- information
critical to the [government's] decision to pay[.]" <u>United States
v. TDC Mgmt. Corp.</u>, 288 F.3d 421, 426-27 (2002) (emphasizing that
"[the defendant] presented no evidence to dispute [a government]
[a]dministrator's . . . declaration that he would have
immediately terminated the contract had he been aware of
[defendant's] unreported activities") (internal quotations and
citation omitted); <u>see also</u> <u>United States ex rel. Siewick v.
Jamieson Sci. & Eng'g, Inc.</u>, 214 F.3d 1372, 1376 (2000) ("Courts
have been ready to infer certification from silence, but only
where certification was a prerequisite to the government action
sought."). This rule has been followed in other cases in this
district, without mention of an "express condition precedent"
requirement. <u>See, e.g.,</u> <u>United States ex rel. Bettis v.
Odebrecht Contractors of Cal., Inc.</u>, 297 F. Supp. 2d 272, 282
(discussing <u>Siewick</u> and suggesting that a false certification
claim would be appropriate only where "the demands for payment
furthered the original deceit by helping the wrongdoer obtain
money from the government to which he would not otherwise be
entitled"); <u>United States ex rel. Ortega v. Columbia Heathcare,
Inc.</u>, 240 F. Supp. 2d 8, 19 (D.D.C. 2003) ("[R]ecovery may be had
under the FCA for an implied certification where if the
government had known of the violation when presented with the
claim for payment, it would not have paid the claim." ); <u>Barrett,</u>

251 F. Supp. 2d at 33 ("The implied certification theory essentially requires a materiality analysis.  Certification of compliance with the statute or regulation alleged to be violated must be so important to the contract that the government would not have honored the claim presented to it if it were aware of the violation.").

Here, the government has presented evidence -- which SAIC fails to rebut -- that SAIC's no-OCI certifications constituted "information critical to the [government's] decision to pay[.]" <u>TDC</u>, 288 F.3d at 426.  (<u>See, e.g.</u>, Pl.'s Stmt. of Genuine Issues ("Pl.'s Stmt.") Ex. 43, ¶ 10 (Aff. of Stephen M. Pool) ("As Contracting Officer, I would not have requested payments on an invoice had I known that contrary to any one of SAIC's certifications, that SAIC did indeed, have any relationships of the type set forth in the pertinent NRC [OCI] regulation.").)  Moreover, as the government highlights, even <u>Hockett</u> itself acknowledges that an implied certification theory can be asserted when the defendant makes a false claim to obtain eligibility for a federal contract and then submits claims impliedly certifying that continued eligibility.  498 F. Supp. 2d at 69-70 & n.33 ("The question is one of eligibility in the first instance; had the government known about the fraud . . ., it never would have entered the contract, and no payments would have been made.").  In fact, one of the cases the <u>Hockett</u> court cites, <u>Harrison v.</u>

Case 1:04-cv-01543-RWR   Document 81   Filed 05/15/08   Page 21 of 45

-21-

Westinghouse Savannah River Co., 352 F.3d 908 (4th Cir. 2003), found that a defendant's false OCI certifications did render its claims for payment false.  Id. at 913.  In so doing, the Harrison court explicitly rejected a defendant's claim that "the falsity of the no-OCI certification was not material to the government's decision to fund [the defendant]."  Id. at 913-14.  Thus, there can be little doubt that "[a] government contractor's failure to disclose an organizational conflict of interest constitutes a false claim under the False Claims Act."  United States ex rel. Ervin & Assocs. v. Hamilton Secs. Group, 370 F. Supp. 2d 18, 51-52 (D.D.C. 2005) (citing Harrison, 352 F.3d at 916-17).

    B.   Whether submissions were "false"

    SAIC argues that it would be improper to find that it submitted false claims because, at base, the government cannot prove that SAIC's no-OCI certifications were actually false.  The government bears the burden of establishing falsity.  Hockett, 498 F. Supp. 2d at 57.

    There are two principal ways an OCI could have existed in this case such that SAIC's no-OCI certifications would be false.  First, a potential conflict may have existed if SAIC conducted concurrent work in the same "technical area" or "on the same or similar matter" for both the NRC and an "organization regulated by the NRC."  See 48 C.F.R. § 2009.570-3(b)(1)(i) and (b)(1)(ii); see also note 3 supra.  Second, a potential conflict could have

-22-

existed if SAIC was placed "in a conflicting role in which its judgment may have been biased in relation to its work for the SAIC[.]"  48 C.F.R. § 2009.570-3(b)(1)(iv); <u>see also</u> note 3 <u>supra</u>.  SAIC insists that neither of these two OCI scenarios could be found to apply to its relationships with several entities about which the government complains.

      1.   British Nuclear Fuels, Ltd.

SAIC insists that the government cannot meet its burden of proving that SAIC's relationship with British Nuclear Fuels, Ltd. ("BNFL") created an OCI.  SAIC's main two arguments are that the government has not provided evidence showing that BNFL was "an organization regulated by the NRC" (Def.'s Summ. J. Reply at 18-20), and that the government cannot prove bias.  (Def.'s Mem. P & A. in Supp. of Mot. for Summ. J. ("Def.'s Summ. J. Mem.") at 23.)

With regard to whether BNFL was "an organization regulated by the NRC," the government highlights that in a 1999 letter to the NRC, SAIC itself stated that it was "provid[ing] statements of work and other documents that describe the work SAIC has performed and is presently performing for the [NRC] licensees or applicants (including . . . BNFL) which comes within the scope of the . . . contracts[.]"  (<u>See</u> Pl.'s Stmt. Ex. 46 at 1.)  SAIC retorts that it is "disingenuous" for the government to cite to the letter because SAIC was simply repeating back the language the NRC used to request the information at issue (<u>see</u> Pl.'s Stmt.

Ex. 45 (NRC's request)) "much in the same way that parties to litigation repeat the language of an interrogatory in their response." SAIC's point seems misplaced, however. Responding to an interrogatory by simply repeating a question in the form of an answer where that creates an inaccurate response is hardly standard litigation practice. Indeed, here, SAIC stated outright that it was providing information regarding BNFL, an NRC "licensee[] or applicant," which came within the scope of SAICs contracts with the NRC. As the government persuasively argues, this evidence raises a genuine issue of material fact as to whether SAIC's relationship with BNFL created an OCI.

Regarding the issue of bias, SAIC underscores the fact that "had Draft NUREG-1640 been used as the technical basis for a new NRC clearance rule, the new rule would have <u>decreased</u> the amount of contaminated materials that could be released to the public." (Def.'s Summ. J. Reply at 21 (emphasis in original).) SAIC cites to several depositions in which NRC officials state that the actual work provided by SAIC was not biased, and indeed constituted the "opposite of a conflict." (<u>See id.</u> (citing Def.'s Ex. 4 (Dep. of Robert Meck) at 144-45, 155-58; Def.'s Ex. 6 (Dep. of Carl Paperiello) at 71-71 & Ex. 5 n.1).) As the government correctly notes, however, "a showing that the conflicting work exhibit *actual* technical bias is not at all required [when] the evidence supports the allegation that SAIC's

-24-

judgment *may* have been biased." (Pl.'s Opp'n to Mot. Summ. J.
("Pl.'s Summ. J. Opp'n") at 32 (emphasis added).) Indeed, the
exact wording of the OCI regulation required SAIC to certify that
it did not have a "conflicting role in which its judgment *may* be
biased." 48 C.F.R. 2009.570-3(iv). A lack of actual bias
apparent from the ultimate work produced is not determinative.
What matters is evidence beforehand that SAIC may have been
biased. Here, the government has presented evidence that SAIC's
relationship with BNFL prior to entering the 1999 Contract had
the potential to create bias (see, e.g., Pl.'s Stmt. Ex. 29 (Dep.
of Stephen Turner) at 181-187 (acknowledging that it is "common
sense" that it would have been a bad business idea for SAIC to
"criticiz[e] a business area" such as SAIC's work for and desired
future projects with BNFL)), further making summary judgment
unwarranted as to claims related to the BNFL relationship.

　　　2.　Bechtel Jacobs Company

　　　SAIC insists that the government cannot prove that a
conflict existed involving Bechtel Jacobs Company ("BJC") because
(1) SAIC's work for BJC was not similar to the work it performed
for the NRC; (2) even if the work were similar, BJC was not an
NRC licensee; and (3) SAIC was not placed in a position where its
judgment may have been biased. (See Def.'s Summ. J. Mem. at 23-
25.) Both parties have presented adequate evidence so as to
render the similarity of the work a genuine issue. (Compare

-25-

Def.'s Summ. J. Mem. Ex. 31 (1/25/06 Expert Report of J. Frazier)
at 5-6 ("The work performed by SAIC for NRC . . . was totally
different and distinct from the . . . evaluation performed by
SAIC . . . through . . . BJC."), with Pl.'s Stmt. ¶ 181 (showing
how SAIC copied entire sections of its work for the NRC to
present to BJC (citations omitted)).  While SAIC urges that any
such similarity is immaterial because BJC was not a NRC licensee,
the government explains that "whether [BJC] was licensed by the
NRC is not at all dispositive of whether SAIC's certifications
were false . . . [because] two of the four categories [of the OCI
regulations] consider advice and assistance provided to
'organization[s] regulated by the NRC,' a classification broader
than mere licensure[,]" and that BJC had several plants "that
were directly under NRC regulation[.]"  (Pl.'s Summ. J. Opp'n at
34 & n.4.)  The government's point is persuasive, and SAIC fails
to respond to it.  (See Def.'s Summ. J. Reply at 22-23.)  Summary
judgment that SAIC's relationship with BJC created no conflict is
unwarranted.[7]

_____

    [7]  Similarly, the government has presented facts creating a
genuine issue as to whether SAIC's work for BJC placed SAIC in a
position where its judgment may have been biased in relation to
its work for the NRC.  (See, e.g., Pl.'s Stmt. ¶ 186 (explaining
that SAIC's assessment that BJC's release of radioactive material
from its plants would result in a "trivial" dose to the public
"was precisely one of the issues sought to be determined by the
NRC in the 1992 Contract and the 1999 Contract.").)

-26-

3.   Association of Radioactive Metal Recyclers

SAIC contends that the government cannot prove that the relationship with the Association of Radioactive Metal Recyclers ("ARMR") created a conflict, insisting that although Gerald Motl, an SAIC employee, served in a "personal capacity" on ARMR's board of directors, "SAIC was never a member, sponsor, or participant in that short-lived association, and in fact declined every invitation to join."  (Def.'s Summ. J. Mem. at 25.)  SAIC also urges that the "government was on notice that Mr. Motl was a participant in ARMR and yet it was unconcerned about the possibility of conflict[,]" thereby negating SAIC's FCA liability.  (Id.)

The government admits that "[i]n its proposal for the 1999 Contract, SAIC explained that . . . Motl[] 'served a complete term as director' of ARMR[,]" but it argues that "SAIC did not disclose this as an OCI relationship . . . [and] it is not enough to simply bury it in the text of a Technical Proposal."  (Pl.'s Stmt. ¶ 22 (internal quotations omitted).)  The government adds that SAIC's statement regarding Motl's membership "was in the past tense, when, in fact, Mr. Motl was still serving as an ARMR director at the time of the proposal."  (Id.)  Viewing the facts in a light most favorable to the government, it is far from clear that the government knew, or even should have known, that Motl's participation with ARMR could raise conflict concerns.  More

-27-

importantly, however, the existence of government knowledge "is
relevant to determining whether [a] defendant lacked the
requisite *scienter*[,]" <u>United States ex rel. Bettis v. Odebrecht
Contrs. Of Cal., Inc.</u>, 297 F. Supp. 2d 272, 286 n.22 (D.D.C.
2004) (emphasis in original), <u>aff'd</u>, 393 F.3d 1321 (D.C. Cir.
2005), not to whether the claim at issue was objectively false.
<u>See also</u>, <u>United States ex rel. Becker v. Westinghouse Savannah
River Co.</u>, 305 F.3d 284, 289 (4th Cir. 2002) ("[T]he government's
knowledge of the facts underlying an allegedly false record or
statement can negate the scienter required for an FCA
violation."); <u>United States ex rel. Kreindler & Kreindler v.
United Techs. Corp.</u>, 985 F.2d 1148, 1156 (2d Cir. 1993) ("[T]he
statutory basis for an FCA claim is the defendant's knowledge of
the falsity of its claim . . . which is not automatically
exonerated by any overlapping knowledge by government
officials."). Here, both parties have marshaled facts that
support their arguments regarding whether SAIC's connection to
ARMR was violative of the OCI regulations. "Without making
credibility determinations, a task for the factfinder at trial
and not for summary judgment, the Court cannot rule[,]" <u>Chaple v.
Johnson</u>, 453 F. Supp. 2d 63, 71 (D.D.C. 2006), and SAIC's request
for summary judgment as to this claim will be rejected.

-28-

d.   Alaron Corporation

The government contends that "SAIC provided consulting assistance to the Alaron Corporation, a company both licensed and regulated by the NRC, in technical areas that were very similar if not identical to the advice that SAIC gave to the NRC[.]" (Pl.'s Summ. J. Opp'n at 26.)   SAIC argues that the government cannot prove that the Alaron Corporation relationship created a conflict, noting that "[t]he government's only evidence of SAIC's 'extensive' work for Alaron consists of a single-page 'letter of commitment' responding to an Alaron inquiry."   (Def.'s Summ. J. Reply at 23-24.)

In the letter at issue, SAIC states to Alaron that "SAIC's broad range of . . . experience with hazardous, radioactive, and mixed waste . . . management, treatment and disposal, [and] regulatory compliance . . . is an excellent compliment to Alaron's hands-on processing know-how."   (See Pl.'s Stmt. Ex. 128 at Ex. 3.)   SAIC insists that the letter should not be taken out of context -- namely, Alaron was to use SAIC's expertise "for purposes of Alaron's submission of a proposal to work as a subcontractor on . . . a facility owned and operated by the Department of Energy."   (Def.'s Summ. J. Reply at 24.)   This point is unavailing, however, because the government also presents evidence showing that SAIC knew that Alaron was regulated by the NRC.   (See, e.g., Pl.'s Stmt. Ex. 128 at Ex. 1

-29-

(Alaron Proposal to Westinghouse Savannah River Co.), p. 7, sec.
A.2 ("ALARON Corporation will be responsible for compliance with
all applicable . . . Federal . . . Regulations, and codes, etc.
ALARON will utilize the services of SAIC to ensure compliance
with these standards . . . .   [T]he industry standards followed
by ALARON include[]: [NRC regulations.]").)   Moreover, even if
the government's evidence did not show that SAIC knew that Alaron
was regulated by the NRC, the government has also presented facts
showing that "SAIC was in a conflicting role because it was
advising both the agency contemplating a rule and the commercial
entity that stood to profit from the rule."   (Pl.'s Summ. J.
Opp'n at 27.)   Accordingly, SAIC's argument that summary judgment
is warranted on the basis that the government cannot show that
the Alaron relationship created a conflict is unconvincing.[8]

     C.   SAIC's knowledge

     SAIC insists that even if the government could show that
SAIC presented false claims, SAIC did not do so "knowingly" as
required under the FCA.   Pursuant to the FCA, the government must
prove that SAIC "*knowingly* presented a false or fraudulent claim
to the Government."   United States ex rel. Fago v. M & T Mortg.

-------------------------

     [8]   SAIC does not present evidence to show an absence of a
genuine issue of material fact with regard to the OCI allegations
in paragraph 89 of the amended complaint.   Thus, to the extent
those allegations survive SAIC's motion to dismiss paragraph 89
as is discussed above, they also survive SAIC's motion for
summary judgment.

-30-

Corp., 518 F. Supp. 2d 108, 123 (D.D.C. 2007) (internal
quotations and citation omitted) (emphasis added).  A person acts
"knowingly" under the FCA if he:

  (1)  has actual knowledge of the information;

  (2)  acts in deliberate ignorance of the truth or
       falsity of the information; or

  (3)  acts in reckless disregard of the truth or falsity
       of the information.

31 U.S.C. § 3729(b).

     "The first element of 'knowingly' goes after subjective
knowledge, while the second seeks out the kind of willful
blindness from which subjective intent can be inferred.  As for
reckless disregard, it is an extension of gross negligence, or
gross-negligence-plus, and is not merely a proxy for subjective
intent."  Hockett, 498 F. Supp. 2d at 57 (internal quotations and
citation omitted).  "Mere negligence cannot support liability
under the FCA."  Id.  "Though scienter is often a fact-bound
inquiry, summary judgment is appropriate where plaintiff produces
no evidence sufficient to support a finding of the requisite
scienter."  Id. at 57-58 (internal quotations and citations
omitted).

     SAIC argues that "[t]he government cannot point to a single
document that shows, or to a person who claims, that SAIC was
aware of an OCI related to the NRC Contracts that it failed to
disclose."  (Def.'s Summ. J. Mem. at 29.)  The government

-31-

contends, however, that "[t]he evidence shows that SAIC had
'actual knowledge' that its various certifications were false
. . . [and] that SAIC acted in 'reckless disregard' of the truth
or falsity" of its no-OCI certifications.[9]  (See Pl.'s Summ. J.
Opp'n at 37.)

        In support of its "actual knowledge" claim, the government,
primarily relying on the First Circuit case of United States v.
Bank of New England, 821 F.2d 844 (1987), urges that SAIC should
be held liable for the "collective knowledge" of its employees.
(See id. at 37-40.)  Under the "collective knowledge" doctrine,
"[c]orporations are liable for the collective knowledge of all
employees and agents within (and acting on behalf of) the
corporation."  United States v. Philip Morris USA, Inc., 449 F.
Supp. 2d 1, 893-94 (D.D.C. 2006).  SAIC insists that application
of the collective knowledge doctrine to this case would be
inappropriate, highlighting that "in Bank of New England, . . .
as the D.C. Circuit has observed, 'corporate knowledge of certain
facts was accumulated from the knowledge of various employees,
but the proscribed intent (willfulness) depended on the wrongful
intent of specific employees.'  Saba v. Compagnie Nationale Air
France, 78 F.3d 664, 670 n.6 (D.C. Cir. 1996) (emphasis added)."
(Def.'s Summ. J. Reply at 4.)  Yet, SAIC "[tries] to read into

_____

        [9]  The government does not allege that SAIC acted with
"deliberate ignorance."

-32-

this brief footnote [in <u>Saba</u>] more than is warranted." <u>Phillip</u>
<u>Morris</u>, 449 F. Supp. 2d at 896 n.34 (citing <u>Saba</u>, 78 F.3d at 670
n.6). Indeed, "[i]n light of the complexity and confusion in the
law on [the collective knowledge doctrine], it is hard to believe
that this somewhat Delphic footnote will bear the weight which
Defendant[] place[s] on it." <u>Id.</u>  Thus, although SAIC urges
otherwise, "it is both appropriate and equitable to conclude that
a company's fraudulent intent may be inferred from all of the
circumstantial evidence including the company's collective
knowledge." <u>Id.</u> (citing <u>Saba</u>, 78 F.3d at 668).

Here, the government has provided sufficient evidence to
suggest more than "individual acts of negligence on the part of
employees." <u>Saba</u>, 78 F.3d at 670 n.6. (<u>See generally</u> Pl.'s
Summ. J. Opp'n at 38-39.) Yet even if the application of the
collective knowledge doctrine were inappropriate here, the
government has still provided sufficient evidence to survive
summary judgment as to the FCA scienter requirement. As was
explained by the <u>Harrison</u> court in response to a corporate
defendant's insistence that the district court could not "piece
together knowledge of more than one of its employees to find that
the corporation knowingly . . . submit[ted] the false no-OCI
certification[,]"

> [w]e need not adopt the 'collective knowledge' doctrine
> as . . . the government espouse[s] it . . . because we
> are not cobbling together pieces of 'innocent'
> knowledge to find the requisite scienter. . . . [T]he

-33-

> issue of material importance . . . [is] whether there
> was at least one . . . employee who knew or should have
> known that [the defendant] was submitting a bid seeking
> government funds and that this bid was tainted by an
> OCI.

Harrison, 352 F.3d 908, 918-19 & n.9; accord Fago, 518 F. Supp. 2d at 123-124 (D.D.C. 2007) (relying upon Harrison's "at least one" rule to find that plaintiff raised a genuine dispute of fact regarding whether a corporation's certifications were knowingly false).  See also Grand Union Co. v. United States, 696 F.2d 888 (11th Cir. 1983) (holding that a corporation could be held liable under the FCA even if the certifying employee was unaware of the wrongful conduct of other employees).

In this case, the government has certainly presented evidence suggesting that there was at least one SAIC employee who knew that SAIC was bidding for the NRC Contracts despite having OCIs.  (See, e.g., Pl.'s Stmt. Ex. 31 (Dep. of Gerald Motl) at 20-24 (discussing his involvement with ARMR during the preparation and submission of SAIC's proposal for the 1999 Contract); see also, Pl.'s Stmt. Ex. 28 (Aff. of Alex Murray) at ¶ 18 (stating that he urged management to address OCI concerns "earlier in the bidding process")).  Furthermore, the government has also provided evidence, although wholly unnecessary to the scienter determination, from which a jury could infer that SAIC acted recklessly when it made its multiple no-OCI certifications.

(See, e.g., Pl.'s Stmt. Ex. 28 (Aff. of Alex Murray) at ¶ 18.)[10] Thus, the government's evidence is sufficient to raise a genuine dispute of fact regarding whether SAIC's no-OCI certifications were knowingly false.

     D.   Damages

     SAIC also argues that it is entitled to summary judgment because even if the government can prove that SAIC knowingly submitted false claims, the government cannot prove that it suffered damages.  (See Def.'s Summ. J. Mem. at 35-43.)  "As an initial matter, it is important to note that the FCA provides for two types of liability."  Fago, 518 F. Supp. 2d at 120 (citing United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 199 (D.C. Cir. 1995)).  "First, the submitter of a false claim or statement is liable for a civil penalty, regardless of whether the submission of the claim actually causes the

---

     [10]  "In my years of employment with SAIC, I observed that SAIC's corporate philosophy was to pursue new contract opportunities aggressively, and to consider organizational conflict of interest ('[OCI]') issues later.  This policy was easily observable through conversations and meetings with management in SAIC's various field offices.  I communicated to SAIC management . . . that they must deal with [OCI] concerns earlier in the bidding process, and in a more defined and consistent way.  I was present at staff and section meetings where other SAIC personnel communicated the same [OCI] concerns. I observed that in a number of instances, my name was placed on SAIC proposal documents when I had no idea that proposals were being made or even considered.  In other instances, I was expected to report for work on SAIC projects when I . . . had [not] participated in a conflict of interest checking process."  Id.

-35-

government any damages."  Id. (internal quotations omitted)."
Thus, as the government correctly notes, it "need not prove that
the alleged false statements caused the Government any actual
damages in order to recover statutory civil penalties under the
FCA."  (Pl.'s Summ. J. Opp'n at 41 (quoting United States ex rel.
Fago, 518 F. Supp. 2d at 120).)

        "The second form of liability is for damages actually caused
[to] the Government because of the submission of the false claim.
To recover for these damages, Plaintiff must prove causation --
specifically, that the Defendant caused the Government to pay
claims because of the alleged false statements."  Fago, 518 F.
Supp. 2d at 120 (internal quotations and citations omitted).
Under the D.C. Circuit's proximate cause standard, "a submitter
of a false claim should be liable only for those damages that
arise because of the falsity of the claim, i.e., only for those
damages that would not have come about if the defendant's
misrepresentations had been true."  Schwedt, 59 F.3d at 200; see
also United States ex rel. Purcell v. MWI Corp., 520 F. Supp. 2d
158, 178 (D.D.C. 2007) ("Ultimately, damages are measured based
on 'what the government would have paid out had it known of the
information that [the defendant] omitted.'") (quoting TDC, 288
F.3d at 428).

        Here, the government claims that the evidence establishes
that SAIC's no-OCI certifications were the proximate cause of the

-36-

NRC's decision to pay SAIC's invoices, specifically highlighting
that the "NRC Contract Specialist who formally requested payment
of SAIC's vouchers relied entirely upon SAIC's certifications,
and would not have requested payment had he known that . . . SAIC
did indeed have undisclosed OCI Relationships." (Pl.'s Summ. J.
Opp'n at 42 (citing Pl.'s Stmt. ¶ 89 (citing Ex. 43, ¶ 10 (Aff.
of Stephen M. Pool) ("As Contracting Officer, I would not have
requested payments on an invoice had I known that contrary to any
one of SAIC's certifications, that SAIC did indeed, have any
relationships of the type set forth in the pertinent NRC OCOI
regulation."))) (emphasis in original).)[11]  Although SAIC
generally asserts that the government cannot prove that SAIC's
work had no value (see Def.'s Summ. J. Mem. at 36-39), this point
is immaterial because it does not negate the government's
proximate cause argument.[12]  Thus, the government has raised a

---

[11]  Notably, Pool's statement nearly mirrors the statements
underscored by the D.C. Circuit in TDC: "[Defendant] fails to
rebut the declarations of [agency] officials that [the agency]
relied on [defendant's] . . . reports and would not have
continued to make payments but for the omissions."  288 F.3d at
428.

[12]  In SAIC's reply brief, it urges that the government's
claim for damages must fail because the government advances "a
'but for' standard that is inapplicable as a matter of law to the
facts of this case."  (Def.'s Summ. J. Reply at 2 n.2.)  SAIC's
insistence is unfounded for two reasons.  First, the standard
SAIC insists the government must meet was established in the
Fourth Circuit, see Harrison, 352 F.3d at 923 (suggesting that a
proper measure of damages is the difference between what was paid
and what would have been paid absent a conflict), and there is no
indication that the D.C. Circuit has adopted this alternative

-37-

triable issue as to its claim for actual damages for the payments
it made to SAIC, as well as for statutory civil penalties.

SAIC additionally argues that the government cannot recover
$92,705.24 that the NRC paid to a third party to conduct a peer
review of SAIC's draft product from the 1992 contract, NUREG-
1640.  In support of its argument, SAIC urges that "[t]hese
alleged damages have been satisfied according to the NRC's own
rationale for entering into a "No Cost Settlement Termination" of
the 1999 Contract."  Specifically, SAIC highlights that NRC's
Contracting Officer for the 1999 Contract stated, "[t]he no-cost
settlement included non-payment of SAIC Invoice Number 5 in the
amount of $120,672.57 . . . .  This offsets the approximate
$100,000 required for future peer review of NUREG 1640."  (Def.'s
Summ. J. Mem. at 39-40 (quoting "No-Cost Settlement Termination,"
Def.'s Ex. 15 at 9, 10).)  The government fails to account for
the money it retained from SAIC for the purpose of a peer review,
and does not present any evidence showing why it is entitled to
more damages for such a purpose.  Accordingly, SAIC is entitled
to partial summary judgment as to the government's claims for
actual damages flowing from the costs of peer reviewing the
NUREG-1640 draft.

---

standard.  Second, the government does not even rely entirely on
a "but for" theory.  It presents both "but for" and proximate
cause theories.  (See Pl.'s Summ. J. Opp'n at 42-43.)

-38-

Next, SAIC argues that the government cannot show that SAIC
is liable for the amounts paid to a third-party company, Sanford
Cohen & Associates ("SC&A"), to complete NUREG-1640 after SAIC's
1999 Contract was terminated.  (See Def.'s Summ. J. Mem. at 40.)
As SAIC notes, "when a job is incomplete, the government must
expend funds to get the work done, and is entitled to claim
damages only in the amount of the excess which it pays for the
job over what it would have paid had the contractor not
defaulted."  (Id. (quoting Lamb Eng'g & Constr. v. United States,
58 Fed. Cl. at 113 (quoting United States v. Munsey Trust Co.,
332 U.S. 234, 243 (1947)).  SAIC insists "that there is no
evidence that the NRC's costs to complete NUREG-1640 were any
higher because of SAIC's alleged OCI" (Def.'s Summ. J. Mem. at
41), and cites to statements of various individuals to support
its contention, including that of NRC representative Cheryl
Trottier, who explained that "[t]he original bid that [SC&A]
submitted to finalize 1640 was much less than we would have paid
SAIC."  (Def.'s Summ. J. Mem. Ex. 17 (Int. of Cheryl Trottier) at
46523.)  Notably, though, that same individual also stated that
"it's likely that the ultimate cost could have been higher than
had we . . . had SAIC.  I don't know."  (Id.; see also Def.'s
Summ. J. Mem. Ex. 37 (Trottier Dep.) at 38 ("[SC&A] exceeded
their projection [of costs to complete the 1999 Contract] by a
lot.").)  While Trottier's latter statements could be viewed as

creating a genuine issue of fact as to whether using SC&A was ultimately more expensive for NRC than had SAIC's contract not been terminated, "the government does not even attempt to defend . . . [this] categor[y] of damages" (Def.'s Summ. J. Reply at 2 n.2), and "[a] Party that fails to refute an opposing party's argument on Summary Judgment may be found to have conceded the point." Hodes v. United States HUD, 532 F. Supp. 2d 108, 117 (D.D.C. 2008) (citing Speaks v. Dist. of Columbia, Civil Action No. 03-1965 (JDB), 2006 WL 5259200, at *4 n.1 (D.D.C. Apr. 6, 2006) ("Defendants' summary judgment motion seized upon these deficiencies in the record, yet plaintiff's opposition papers are silent on the issue, which arguably provides an independent basis for treating defendants' arguments as conceded[.]")).  Thus, SAIC will also be granted partial summary judgment as to the government's claim for damages flowing from the costs of replacing SAIC with SC&A.

Finally, SAIC argues that the government cannot show that SAIC is liable for treble the amount that NRC paid to the National Academy of Sciences ("NAS") for its examination of the NRC rulemaking options.  (Def.'s Summ. J. Mem. at 42-43.)  SAIC points out the NRC "could not even definitively claim that SAIC's alleged OCIs were the cause of the NAS study."  (Id. at 42 (citing Ex. 37 (Trottier Dep.) at 38 ("It's hard to tell whether or not the NAS study would have occurred in the absence of the

-40-

issues surrounding the technical basis or not.").)  Again, the
government fails to present any evidence to refute SAIC's
contention, and partial summary judgment will be granted to SAIC
as to the government's claim for treble damages for the NAS
study.

IV.  COUNTS III AND IV: QUASI-CONTRACT CLAIMS

SAIC also seeks summary judgment on the government's quasi-
contract claims -- Counts III (unjust enrichment) and IV (payment
by mistake) -- because "an express contract exists between the
parties."  (Def.'s Summ. J. Mem. at 44.)  The government argues,
however, "[c]ourts have regularly approved the United States'
pursuit of common law claim[s] for unjust enrichment and payment
by mistake in actions brought under the False Claims Act, even
when an express contract existed between the parties."  (Pl.'s
Summ. J. Opp'n at 44 (collecting cases[13]).)

---

[13]  See, e.g., United States v. Applied Pharmacy Consultants,
Inc., 182 F.3d 603, 608 (8th Cir. 1999) (affirming the district
court's award of damages under the government's unjust enrichment
claim where the government abandoned its action for breach of the
express contract at trial); United States v. United Techs. Corp.,
No. C-3-99-093, 2000 WL 988238, at *4 (S.D. Ohio Mar. 20, 2000)
("Even though an express contract exists between the parties, the
United States may plead, in the alternative, unjust enrichment,
payment by mistake, and breach of contract, along with its claims
under the False Claims Act[.]"); United States ex rel. Costa v.
Baker & Taylor, Inc., No C-95-1825-VRW, 1998 WL 230979, at *13
(N.D. Cal. Mar. 20, 1998) ("Defendants cannot seriously argue
that should the court disregard the contracts, plaintiffs could
not state a claim under common law."); United States ex rel.
O'Keefe v. McDonnell Douglas Corp., 918 F. Supp. 1338, 1344 (E.D.
Mo. 1996) ("[T]he existence of an express contract does not
necessarily preclude recovery of theories of unjust enrichment

-41-

The government is correct, but its point is unavailing.  As
was noted in United States ex rel. Purcell v. MWI Corp., 254 F.
Supp. 2d 69 (D.D.C. 2003), "at the motion-to-dismiss stage,
courts in this district . . . have permitted the government to
proceed with claims alleging FCA violations as well as claims for
unjust enrichment or payment by mistake."  Id. at 79 (citing
United States v. Bouchey, 860 F. Supp. 890, 892-94 (D.D.C.
1994)).  Purcell goes on to emphasize, however, that "courts
. . . have granted motions to dismiss an unjust-enrichment claim
in light of the existence of an express contract[,]"[14] and that
"allegations of an express contract may warrant dismissal of an
unjust enrichment claim[.]"  Id.

This case is clearly well beyond the "motion-to-dismiss
stage" -- discovery has closed and a summary judgment motion is

_____

and restitution, or payment under mistake of fact.").

    [14]  See, e.g., United States v. United Techs. Corp., 51 F.
Supp. 2d 167, 200 (D. Conn. 1999) ("The . . . amended complaint
state[s] common law, quasi-contractual claims of unjust
enrichment and payment by mistake[.]  Because these two common
law claims are quasi-contractual, they are inappropriate claims
where, as here, there is an express contract.");  United States
v. ERR Sys. Corp., 950 F. Supp. 130, 133 (D. Md. 1996) ("Because
the above common law counts are quasi-contractual[,] . . . they
are inappropriate claims when there is an express contract.");
United States ex rel. Mayman v. Martin Marietta Corp., 894 F.
Supp. 218, 225 (D. Md. 1995);  United States v. Hydroaire, Inc.,
No. 94 C 4414, 1995 WL 86733, at *6 (N.D. Ill. Feb. 27, 1995)
("While it is true that a plaintiff can plead in the alternative,
as the Government suggests, the doctrine of unjust enrichment has
no application where, as in this case, a specific contract
governs the relationship of the parties.").

-42-

pending -- and both parties acknowledge the existence of an
express contract.  While the government cites several FCA cases
in other circuits in which it was deemed appropriate to consider
quasi-contractual claims despite an express contract after the
motion-to-dismiss stage,[15] it does not appear that the D.C.
Circuit has waivered from the rule that "there can be no claim
for unjust enrichment when an express contract exists between the
parties."  Albrecht v. Comm. on Employee Benefits of the Fed.
Reserve Employee Benefits Sys., 357 F.3d 62, 69 (D.C. Cir. 2004)
(quoting Schiff v. AARP, 697 A.2d 1193, 1194 (D.C. 1997)).
Accordingly, SAIC is entitled to judgment as a matter of law on
the quasi-contractual theories of recovery, and SAIC's motion as
to Counts III and IV will be granted.[16]

CONCLUSION AND ORDER

Because paragraph 89 of the amended complaint meets the
heightened pleading requirement of Rule 9(b) when supplemented by

---

[15]  See Applied Pharmacy Consultants, Inc., 182 F.3d at 608;
United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970).

[16]  SAIC also urges that it is entitled to summary judgment
on Count V of the amended complaint, in which the government
alleges that SAIC breached the 1992 Contract "by engaging in
conflicting activities and failing to follow the terms and
conditions of the [contracts pertaining] to [OCI]."  (Am. Compl.
¶ 115.)  SAIC argues that "[w]ith no OCI, there could have been
no breach of the 1992 Contract [and the] breach of contract claim
accordingly must be dismissed."  (Def.'s Summ. J. Mem. at 44.)
As is discussed above, however, there are genuine issues of
material fact as to the existence of OCIs and whether SAIC is
liable to the government.  Thus, Count V will survive summary
judgment.

-43-

the government's answers to interrogatories and its opposition to
SAIC's motion to dismiss and motion for summary judgment, SAIC's
motion to dismiss the government's FCA claims as they relate to
paragraph 89 will be granted only to the extent that paragraph 89
does not specifically identify the potential OCIs at issue.
Because the government has presented genuine issues of material
fact as to the existence of OCIs and whether SAIC knowingly
submitted false claims, SAIC's motion for summary judgment on the
FCA and breach of contract claims will be denied.  SAIC's motion
for summary judgment as to damages, however, will be granted in
part and denied in part, as the government has presented genuine
issues of material fact with regard to its claim for actual
damages and statutory civil penalties under the FCA, but has
failed to substantiate its other claims for damages.
Furthermore, because the express contracts existing between the
parties here preclude quasi-contractual claims, SAIC's motion for
summary judgment on the government's quasi-contractual claims
will be granted.  Finally, because SAIC failed to comply with
Local Civil Rule 7(m) before filing its motion to strike and the
motion is unpersuasive, the motion will be denied.  Accordingly,
it is hereby

    ORDERED that defendant's motion [65] to dismiss be, and
hereby is, GRANTED IN PART AND DENIED IN PART.  Defendant's
motion is GRANTED only to the extent that paragraph 89 of the

-44-

amended complaint does not specifically identify the potential
OCIs at issue; the motion is DENIED in all other respects.  It is
further

ORDERED that defendant's motion [67] for summary judgment
be, and hereby is, GRANTED IN PART AND DENIED IN PART.  Defendant
is DENIED summary judgment as to Counts I and II of the amended
complaint.  Defendant is GRANTED summary judgment as to the
plaintiff's claim for actual damages flowing from the costs of
peer reviewing the NUREG-1640 draft, for damages flowing from the
costs of replacing SAIC with SC&A, and for treble damages for the
NAS study.  Defendant is DENIED summary judgment as to all other
claims by the government for damages under Counts I and II.
Defendant is GRANTED summary judgment as to the Counts III and IV
of the amended complaint.  Defendant is DENIED summary judgment
as to Count V of the amended complaint.  It is further

ORDERED that defendant's motion [75] to strike plaintiff's
responsive statement of genuine issues and material facts be, and
hereby is, DENIED.  It is further

ORDERED that defendant's motion [79] for a status conference
be, and hereby is, GRANTED IN PART AND DENIED IN PART.
Defendant's request for a status conference to resolve its motion
for summary judgment and motion to dismiss is DENIED AS MOOT.
Defendant's request for a pre-trial conference is GRANTED.  The
pre-trial conference is SCHEDULED for June 18, 2008 at 9:45 a.m.

-45-

and the trial is SCHEDULED to begin on July 1, 2008 at 9:15 a.m.

A special jury panel is being summoned.  If summoned prospective

jurors submit requests in advance to be excused, counsel will be

notified periodically to come to court to review these requests.

Trial will be in recess on Fridays.  The parties will be given up

until July 31, 2008 to complete their presentations and arguments

to the jury.

SIGNED this 15th day of May, 2008.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge