UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
UNITED STATES OF AMERICA,       )
                               )
          Plaintiff,            )
                               )
     v.                         )       Civil Action No. 04-1543 (RWR)
                               )
SCIENCE APPLICATIONS            )
INTERNATIONAL CORPORATION,       )
                               )
          Defendant.            )
_____)
```

<u>MEMORANDUM OPINION AND ORDER</u>

The United States brought this action against Science Applications International Corporation ("SAIC") under the False Claims Act ("FCA"), 31 U.S.C. § 3729, and the law of the District of Columbia, alleging that SAIC failed to make required disclosures of organizational conflicts of interest ("OCIs") as was required under two contracts that SAIC entered into with the Nuclear Regulatory Commission ("NRC") in 1992 and 1999. After a jury found SAIC liable on FCA and breach of contract claims, SAIC moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial under Rule 59. Because the evidence presented at trial was sufficient for a reasonable jury to find SAIC liable, and because SAIC has not established an error was committed at trial such that justice requires a new trial, SAIC's motion for judgment as a matter of law or for a new trial will be denied.

-2-

BACKGROUND

The NRC is an independent federal agency established to regulate the civil use of nuclear materials.  The NRC creates scientific standards for allowing radioactive materials with low levels of contamination to be released to the private sector for recycling and reuse.  In 1992 and 1999, the NRC contracted with SAIC to provide technical assistance related to this effort. Under the 1992 contract, SAIC was to provide the NRC with technical assistance related to the recycling and reuse of radioactive material and was to present an options paper outlining the possible approaches to rulemaking for the release of these materials.  The goal of the 1999 contract was to assess regulatory alternatives regarding the release of reusable materials.  SAIC's neutrality was critical under both contracts.

SAIC promised in both contracts to forego entering into any consulting or other contractual arrangements with any organization that could create a conflict of interest.  The purpose of this clause was to avoid OCIs that were, among others, financial, organizational, or contractual.  SAIC warranted upon entering both contracts that it had no OCIs as that term is defined in 41 C.F.R. § 20-1.5402(a).  The regulation defined an OCI as "a relationship . . . whereby a contractor or prospective contractor has present or planned interests related to the work to be performed under an NRC contract which: (1) may diminish its

-3-

capacity to give impartial, technically sound, objective

assistance and advice or may otherwise result in a biased work

product, or (2) may result in its being given an unfair

competitive advantage." 41 C.F.R. § 20-1.5402(a) (1979).[1]  SAIC

---

[1]  Furthermore, the NRC regulations incorporated into the
1992 Contract required SAIC to disclose information concerning
situations or relationships that may give rise to OCIs under the
following circumstances:
(I)   Where the offeror or contractor provides advice and
      recommendations to the NRC in a technical area in which it
      is also providing consulting assistance in the same area to
      any organization regulated by the NRC.
(ii)  Where the offeror or contractor provides advice to the NRC
      on the same or similar matter in which it is also providing
      assistance to any organization regulated by the NRC.
(iii) Where the offeror or contractor evaluates its own
      products or services, or the products or services of another
      entity where the offeror or contractor has been
      substantially involved in their development or marketing.
(iv)  Where the award of a contract would result in placing the
      offeror or contractor in a conflicting role in which its
      judgment may be biased in relation to its work for the NRC,
      or would result in an unfair competitive advantage for the
      offeror or contractor.
See 41 C.F.R. 20-1.54 at p. 3.
    The NRC regulations incorporated into the 1999 Contract
required SAIC to disclose situations or relationships that may
give rise to organizational conflicts of interest under the
following circumstances:
(I)   Where the offeror or contractor provides advice and
      recommendations to the NRC in the same technical area where
      it is also providing consulting assistance to any
      organization regulated by the NRC.
(ii)  Where the offeror or contractor provides advice to the NRC
      on the same or similar matter on which it is also providing
      assistance to any organization regulated by the NRC.
(iii) Where the offeror or contractor evaluates its own
      products or services, or has been substantially
      involved in the development or marketing of the
      products or services of another entity.
(iv)  Where the award of a contract would result in placing the
      offeror or contractor in a conflicting role in which its
      judgment may be biased in relation to its work for the NRC,

-4-

further promised in both contracts to disclose any OCIs it discovered after entering the contract.  SAIC repeatedly certified throughout the periods its contracts were in force that it had no OCIs and would notify the NRC of any changes resulting in an OCI.

The government filed a five-count amended complaint against SAIC contending that SAIC breached its OCI obligations under the 1992 and 1999 contracts by engaging in relationships with organizations that created an appearance of bias in the technical assistance and support it provided the NRC.  (Am. Compl. ¶¶ 49-51.)  In its amended complaint, the government alleged that SAIC's no-OCI certifications and subsequent requests for payment on the 1992 and 1999 contracts violated the FCA, and brought additional claims under quasi-contract and breach of contract theories.

A jury trial was held on Counts I, II and V of the United States' amended complaint.[2]  Count I alleged that SAIC violated the FCA under 31 U.S.C. § 3729(a)(1) by presenting payment vouchers to the NRC while knowingly withholding from the NRC

_____

or would result in an unfair competitive advantage for the
offeror or contractor.
See 48 C.F.R. 2009.570-3(b)(1).

[2]On May 15, 2008, the defendant's motion for summary
judgment was granted in part and judgment was entered in favor of
SAIC on Counts III and IV of the amended complaint.  United
States v. Science Applications Int'l Corp., 555 F. Supp. 2d 40,
60 (D.D.C. 2008).

-5-

information about SAIC's OCIs.  Count II alleged that SAIC
violated the FCA under 31 U.S.C. 3729(a)(2)[3] by knowingly making
false statements, including false certifications that SAIC had no
OCIs, for the purpose of getting the NRC to pay SAIC's false and
fraudulent vouchers.  Count V alleged that SAIC breached its 1992
contract by failing to disclose OCIs that SAIC was required to
disclose under the terms of the contract.

The jury found SAIC liable under § 3729(a)(1) and (a)(2) and
liable for breach of its 1992 contract with the NRC.
Specifically, the jury found that SAIC knowingly presented or
caused to be presented sixty false or fraudulent claims for
payment or approval by the government, causing the government to
pay to SAIC $1,973,839.61 over and above what the government
would have paid had SAIC presented truthful claims.  The jury
also found that SAIC knowingly made, used, or caused to be made
or used seventeen false records or statements to get a false or
fraudulent claim paid or approved by the United States
government, causing the government to pay to SAIC $1,973,839.61
on the false or fraudulent claims over and above what the
government would have paid had SAIC made truthful statements.  In
addition, the jury found that there was a contract between the

---

[3]Under the Fraud Enforcement and Recovery Act of 2009, Pub.
L. No. 111-21, this subsection was recodified as 18 U.S.C.
§ 3729(a)(1)(B).  As is discussed in Part IV(B) below, the
amended version does not apply in this action, and this
memorandum opinion will continue to refer to § 3729(a)(2).

United States and SAIC and that SAIC breached the contract by
failing to fully perform a duty under the contract without legal
excuse and awarded the United States monetary damages of $78 for
the breach.  Judgment was entered in favor of the United States
against SAIC in the amount of $5,921,518.83 in damages for the
FCA claims, $577,500 in civil penalties for the FCA claims, and
$78 in damages for the contract claim, for a total of
$6,499,096.83.[4]

SAIC has moved for judgment as a matter of law under Federal
Rule of Civil Procedure 50(b),[5] and, in the alternative, has
moved for a new trial under Rule 59(a), asserting that the United

_____

[4]Judgment also was entered in favor of the United States
against the defendant for plaintiff's costs incurred in this
action.  The United States submitted a bill of costs totaling
$84,080.07.  SAIC objects to the United States recovering costs
for witness Dan Guttman's return flight to China on August 23,
2008.  SAIC points out that Guttman is a permanent resident of
the District of Columbia and did not fly from D.C. to China until
six weeks after his testimony and three weeks after trial in this
case concluded.  The United States' reply to SAIC's objections
does not address Guttman's residency status or explain the
circumstances surrounding the delay between Guttman's testimony
and his departure to China.  Accordingly, because the United
States has not adequately rebutted the inference that the flight
was optional and not necessary, or otherwise established that
Guttman's August 23, 2008 flight was a cost related to this
litigation, the defendant's objection to the United States'
request for the costs of Guttman's return flight to China will be
sustained.

[5]SAIC moved for judgment as a matter of law under Rule 50(a)
at the close of the United States' case in chief, and renewed its
motion at the close of all evidence.

-7-

States failed to carry its burden of proof in several respects
and that numerous legal errors were committed.[6]

## DISCUSSION

"'Under Rule 50, a court should render judgment as a matter
of law when a party has been fully heard on an issue and there is
no legally sufficient evidentiary basis for a reasonable jury to
find for that party on that issue.'" Alkire v. Marriott Int'l,
Inc., Civil Action No. 03-1087 (CKK), 2007 WL 1041660, at *1
(D.D.C. Apr. 5, 2007) (quoting Reeves v. Sanderson Plumbing
Prods., Inc., 530 U.S. 133, 149 (2000)).  The court assesses not
"the weight of the evidence [but] only its sufficiency.  The
jury's verdict will stand unless 'the evidence and all reasonable
inferences that can be drawn therefrom are so one-sided that
reasonable men and women could not disagree on the verdict.'"
Smith v. Washington Sheraton Corp., 135 F.3d 779, 782 (D.C. Cir.
1998) (quoting Scott v. District of Columbia, 101 F.3d 748, 753
(D.C. Cir. 1996)).  "Evidence supporting the verdict, however,
must be 'more than merely colorable; it must be significantly
probative.'" Duncan v. Wash. Metro. Area Transit Auth., 240 F.3d
1110, 1114 (D.C. Cir. 2001) (quoting Smith, 135 F.3d at 782).
"In ruling on [a] renewed motion, the court may: (1) allow

---

[6]Upon SAIC's consent motion to stay execution of judgment
under Rule 62(b), execution of judgment in this action was stayed
pending resolution of SAIC's motion for judgment as a matter of
law, or for a new trial.

judgment on the verdict, if the jury returned a verdict; (2)
order a new trial; or (3) direct the entry of judgment as a
matter of law."  Fed. R. Civ. P. 50(b).

Under Rule 59(a), a court has discretion to grant a new
trial "after a jury trial, for any reason for which a new trial
has . . . been granted in an action at law in federal court[.]"
Fed. R. Civ. P. 59(a).  Reasons for granting a new trial include
errors in admitting or excluding evidence, or in giving or
refusing to give instructions.  Miller v. Holzmann, 563 F. Supp.
2d 54, 75 (D.D.C. 2008).  "The standard for a new trial is less
onerous than the one applicable to a Rule 50 motion[,] . . .
[b]ut just as with a motion for judgment as a matter of law, the
[c]ourt should not disturb a jury verdict unless the evidence and
all reasonable inferences that can be drawn therefrom are so one-
sided that reasonable men and women could not disagree on the
verdict."  Id. (internal quotation marks and citation omitted).
"A new trial 'should be granted only where the court is convinced
the jury verdict was a seriously erroneous result' and where
denial of the motion will result in a clear miscarriage of
justice."  Nyman v. FDIC, 967 F. Supp. 1562, 1569 (D.D.C. 1997)
(quoting Sedgwick v. Giant Food, Inc., 110 F.R.D. 175, 176
(D.D.C. 1986)).

-9-

I.   "KNOWLEDGE" UNDER THE FCA

SAIC alleges that it is entitled to judgment as a matter of law because (1) its reasonable interpretation of its OCI obligations precludes a jury finding that it knowingly submitted false claims; (2) the government improperly relied on a collective knowledge theory to prove SAIC's scienter; and (3) the government failed to prove that SAIC acted recklessly or with deliberate ignorance.   In the alternative, SAIC contends that it is entitled to a new trial because the jury was not instructed that a defendant does not act knowingly if its actions were the result of "mere 'differences in interpretation' of a contract or regulation" and was improperly instructed on a collective knowledge theory.

A.   <u>SAIC's interpretation of its OCI disclosure obligations</u>

SAIC argues that it is entitled to judgment as a matter of law because its "reasonable, good faith understanding of the NRC's OCI regulations preclude[s] any finding of 'knowledge'" under the FCA.   (Def.'s Mem. in Support of Its Mot. for Judgment as a Matter of Law or for a New Trial ("Def.'s Mem") at 6.) Relying on the court of appeals' decision in <u>United States ex rel. K&R Limited Partnership v. Massachusetts Housing Finance Agency</u>, 530 F.3d 980 (D.C. Cir. 2008), SAIC contends that "as a matter of law, a contractor's plausible interpretation of its contractual or regulatory obligations does not evidence the kind

-10-

of 'reckless disregard' necessary to prove a violation of the [FCA]." (Id. at 2.)  In K&R, the relator brought a qui tam action against the Massachusetts Housing Finance Agency ("MHFA") alleging that the MHFA knowingly submitted false claims for payment to Department of Housing and Urban Development ("HUD"). 530 F.3d at 981.  For each alleged false claim, MHFA's representative had "'certifie[d] to the best of his knowledge and belief' that 'each interest reduction payment [submitted to HUD] . . . ha[d] been calculated in accordance with' the applicable agreement."  Id.  The court of appeals upheld the district court's granting summary judgment in favor of MHFA because K&R had failed to show that MHFA "at least recklessly disregarded the falsity of its claims."  Id. at 983.  The court found that K&R failed to carry its burden because the MHFA's interpretation of its calculation obligations was "plausible" and "K&R point[ed] to nothing else 'that might have warned [MHFA] away from the view it took[.]'"  Id. (quoting Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 70 (2007)).

Here, SAIC contends that it "reasonably understood that work it performed in support of the Department of Energy ("DOE") could not present a conflict with the work it was doing under its [c]ontracts with the NRC" because the DOE and its contractors are excluded from NRC regulation.  (Def.'s Mem. at 3-4.)  As is explained in Part II(A) below, although under 42 U.S.C.

-11-

§ 2140(a)(1) certain work performed for the DOE is not subject to NRC regulation, it does not follow that an entity which performs work outside the scope of the DOE exclusion can avoid NRC regulation for all purposes.  Unlike in K&R, the government presented evidence here that SAIC knew that it had relationships with entities that were in fact regulated by the NRC, even if those entities performed other work for the DOE that was excluded from NRC regulation.  That evidence could tend to discredit SAIC's argument that its alleged false statements were the result of its belief that the entities with which it had relationships were entities wholly excluded from NRC regulation because of those entities' work for the DOE.  Thomas Rodehau, a former SAIC employee involved with NRC and DOE contracts, testified that the term "regulated by the NRC" found in the NRC's OCI regulations meant "subject to the regulations of" or "subject to the regulatory authority of" the NRC.  (Rodehau Test., 7/3 p.m. Tr. 50:2-16.)  Several other SAIC employees testified that they were aware that SAIC's recycle project for British Nuclear Fuels, Ltd. ("BNFL") on which they were working contemplated the application of NRC's waste disposal regulations to BNFL's proposed activities.  (See Chris Caldwell Test., 7/9 p.m. Tr. 80:17-83:1; Jeff Slack Test., 7/9 a.m. Tr. 95:22-104:3; Jerry Truitt Test., 7/10 p.m. Tr. 7:25-9:23; 21:10-22:1.)  In addition, SAIC employee Richard Profant testified that Manufacturing Science Corporation

-12-

("MSC"), a wholly owned subsidy of BNFL and an entity for whom
SAIC provided services during the time period of the NRC
contracts at issue, had an NRC license.  (Profant Test., 7/22
p.m. Tr. 18:2-19:8 (admitting that he received an e-mail in 1999
indicating that MSC had an NRC license through the state of
Tennessee).)  This testimony permitted reasonable jury inferences
that SAIC knew that it had relationships with entities, including
BNFL and MSC, that were subject to the regulations of the NRC,
regardless of whether these entities were doing other work for
the DOE excluded from the NRC's regulatory authority, that should
have been disclosed under the NRC's OCI regulations.[7]  A
defendant's reasonable interpretation of an ambiguous regulation
may well be a successful defense to an alleged FCA violation in
appropriate cases.  In this case, though, the government
presented sufficient evidence at trial upon which the jury could
conclude that SAIC's representations to the NRC regarding its
OCIs were not the result of SAIC's adoption of a reasonable
interpretation of ambiguous regulations.

Moreover, SAIC has not shown error in the jury instructions
given regarding SAIC's knowledge.  A trial judge has "the

---

[7] In addition, as is discussed in Part II(B) below, the
government also presented sufficient evidence for the jury to
conclude that SAIC had relationships with entities that placed
SAIC in a conflicting role where its judgment may have been
biased, and the relationships should have been disclosed under 48
C.F.R. 2009.570-3(b)(1)(iv), regardless of whether the entities
were "regulated by the NRC."

inescapable duty . . . to instruct the jurors, fully and correctly, on the law applicable to the case."  9C C. Wright, A. Miller, E. Cooper & R. Freer, <u>Federal Practice and Procedure</u> § 2556 (3d ed. 2008).  "The district judge need not use any particular form of words or sequence of ideas so long as the charge as a whole conveys to the jury a clear and correct understanding of the applicable substantive law without confusing or misleading them."  <u>Id.</u>  In this case, the jury was instructed that "[f]or the United States to recover from SAIC for a violation of" either § 3729(a)(1) or § 3729(a)(2), the United States had to prove by a preponderance of the evidence, among other essential elements, "that SAIC acted knowingly."  (7/28 a.m. Tr. 14:7-13; 14:25-15:6.)  The jury was further instructed that

> the term "knowingly" means that a defendant, with respect to information, one, had actual knowledge of the true information, or, two, acted in deliberate ignorance of the truth or falsity of the information, or, three, acted in reckless disregard of the truth or falsity of the information.  It is not necessary for the United States to prove that SAIC acted with an intent to defraud the government.  Although the specific intent to defraud is not required, more than an honest mistake or mere negligence must be found.  "Actual knowledge" means that the defendant affirmatively knew the truth or falsity of the information in a claim or statement.  The United States can prove deliberate ignorance through proof that SAIC deliberately closed its eyes to what would otherwise have been obvious to it.  A finding that SAIC purposely avoided learning all the facts or suspected a fact but refused to confirm it also constitutes deliberate ignorance.  Stated another way, SAIC's knowledge of a fact may be inferred from willful blindness to the

-14-

existence of the fact.  It is entirely up to you as to
whether you find any deliberate closing of the eyes and
the inference to be drawn from any such evidence.  I
also instructed you that the term "knowingly" includes
acting in "reckless disregard" of an act's truth or
falsity.  For purposes of the False Claims Act,
reckless disregard can be equated with "an extreme
version of ordinary negligence" or "gross negligence
plus."

(7/28 a.m. Tr. 15:25-16:25.)  With these instructions, the jury

was informed of the law they were to apply with regard to

knowledge under the FCA and instructed that they had to find SAIC

acted based on more than "an honest mistake or mere negligence,"

but instead with actual knowledge, or at least reckless disregard

or deliberate ignorance of the truth or falsity of its claims.

See 31 U.S.C. § 3729(b) (FCA definition of "knowing" or

"knowingly").  SAIC was free to and did argue that its reasonable

efforts to fulfill its disclosure obligations, including its

interpretation of the relevant contractual provisions and NRC

regulations, negated the government's allegation that SAIC acted

with actual knowledge, reckless disregard, or deliberate

ignorance.  However, there was no error in instructing on the

government's required quantum of proof while declining to

instruct on SAIC's proposed argument about the proof, namely,

informing the jury that it "could consider whether SAIC's efforts

to detect and disclose OCIs reasonably demonstrated that it did

not act recklessly or with deliberate disregard."  (Def.'s Mem.

at 39 (citing SAIC's Proposed Jury Instruction No. D-20).)

-15-

Accordingly, SAIC has not shown it is entitled to judgment as a matter of law because of its purported interpretation of its OCI obligations, or shown that the jury instructions regarding knowledge under the FCA were erroneous, warranting a new trial.

B.   <u>SAIC's collective knowledge</u>

SAIC argues that it is entitled to judgment as a matter of law because the government improperly relied on a "collective knowledge" theory to establish SAIC's scienter.  In the alternative, SAIC seeks a new trial on the basis that the jury should not have been instructed on the government's collective knowledge theory.  SAIC contends that knowledge under the FCA "is not merely the knowledge of the facts, but the knowledge (or reckless disregard or deliberate ignorance) of an objective falsehood," and "[g]eneral, factual information that is known within a company does not establish that the company 'knew' of a falsehood" under the FCA.  (Def.'s Mot. at 6-7.)  In addition, SAIC challenges the jury instruction describing a corporation's liability for the collective knowledge of its employees.[8]

---

[8]The jury was instructed that
[a] corporation is liable for the collective knowledge of all employees and agents within the corporation so long as those individuals obtained their knowledge acting on behalf of the corporation.  Therefore, if a corporation has many employees or agents, you must consider the knowledge possessed by those employees and agents as if it was added together and combined into one collective pool of information.  If that collective pool of information here gives a reasonably complete picture of . . . false or fraudulent claims or false

-16-

SAIC's argument rests largely on a footnote in <u>Saba v.
Compagnie Nationale Air France</u>, 78 F.3d 664 (D.C. Cir. 1996), in
which the court observed that in <u>United States v. Bank of New
England</u>, 821 F.2d 844 (1st Cir. 1987), <u>cert. denied</u>, 484 U.S. 943
(1987), "corporate knowledge of certain facts was accumulated
from the knowledge of various individuals, but the <u>proscribed
intent</u> (willfulness) depended on the wrongful intent of specific
employees." <u>Saba</u>, 78 F.3d at 670 n.6 (citing <u>Bank of New
England</u>, 821 F.2d at 855-56)).  As was explained in the opinion
resolving SAIC's pre-trial dispositive motions, SAIC "'read[s]
into this brief footnote . . . more than is warranted.'" <u>United
States v. Science Applications Int'l Corp.</u>, 555 F. Supp. 2d 40,
55 (D.D.C. 2008) (quoting <u>United States v. Phillip Morris USA,
Inc.</u>, 449 F. Supp. 2d 1, 896 n.34 (D.D.C. 2006)).  "[I]t is both
appropriate and equitable to conclude that a company's fraudulent
intent may be inferred from all of the circumstantial evidence
including the company's collective knowledge." <u>Id.</u>  The
government's use of a collective knowledge theory to prove SAIC's
fraudulent intent was permissible, and its use does not entitle
SAIC to judgment as a matter of law.  In addition, because the
jury could have properly inferred SAIC's fraudulent intent from

---

statements, you may find that SAIC itself possessed a
reasonably complete picture of the false or fraudulent
claims or false statements and acted knowingly.
(7/28 a.m. Tr. 17:1-14.)

-17-

its collective knowledge, the jury was properly instructed that
it could infer from the "collective pool of information" known by
SAIC's employees and agents that "SAIC itself possessed a
reasonably complete picture of the false or fraudulent claims or
false statements and acted knowingly."  (Tr. 7/28, 17:1-14.)
Accordingly, SAIC has not established that the jury instruction
given regarding SAIC's collective knowledge was an error
requiring a new trial.

     C.  <u>Reckless disregard or deliberate ignorance</u>

     SAIC contends that "[t]he evidence at trial was legally
insufficient to support a jury finding of knowledge under [a]
reckless disregard or deliberate ignorance" theory because the
evidence shows that SAIC "made diligent inquiry to ensure
compliance with its OCI obligations."  (Def.'s Mem. at 9-10.)
SAIC points to trial testimony explaining that "for the purposes
of complying with its OCI obligations in all of its government
contracts, SAIC designed and implemented a comprehensive OCI
compliance system."  (<u>Id.</u> at 10.)  While SAIC maintains that its
OCI compliance system was both reasonable and effective, and that
it made a diligent inquiry to ensure compliance, there was also
testimony provided by at least two witnesses, Sandra Carder and
Betty Bidwell, who testified that SAIC's OCI compliance system
was inadequate in certain important respects, including by
failing to incorporate some of SAIC's business relationships, by

-18-

containing incomplete descriptions of SAIC's work, and by failing to associate relevant key words with certain descriptions. (Carder Test., 7/22 a.m. Tr. 66:18-69:11, 78:13-21; Bidwell Test., 7/16 a.m. Tr. 76:14-77:9.)  Similarly, witness John Pierce Martin testified that he made representations to the government about SAIC's OCIs without having seen documents the jury could have deemed relevant to their assessment of SAIC's OCIs.  (See Martin Test., 7/14 p.m. Tr. 18-40.)  Accordingly, there was sufficient evidence to support a jury's finding that SAIC acted with reckless disregard or deliberate ignorance.

II.  EVIDENCE OF CLAIMS CONTAINING AN OBJECTIVE FALSEHOOD

SAIC contends that the government's claims that SAIC failed to disclose OCIs and certified to the absence of OCIs, as defined by the NRC's regulations, fail as a matter of law because SAIC's alleged OCIs involving DOE-related work did not involve organizations regulated by the NRC and did not place SAIC in a conflicting role where its judgment may have been biased.

A.   Work for entities "regulated by the NRC"

SAIC alleges that as a matter of law, the government failed to prove that SAIC's alleged OCIs involved work for entities regulated by the NRC because the NRC does not regulate the DOE, DOE contractors, or DOE facilities.  (Def.'s Mem. at 13-14.) SAIC specifically cites 42 U.S.C. § 2140(a)(1), which excludes from NRC regulation,

-19-

> (1) the processing, fabricating, or refining of special
> nuclear material, or the separation of special nuclear
> material, or the separation of special nuclear material
> from other substances, under contract with and for the
> account of the [DOE]; or (2) the construction or
> operation of facilities under contract with and for the
> account of the [DOE.]

42 U.S.C. § 2140(a)(1).  Although the NRC is statutorily excluded

from regulating certain DOE activities and facilities, there was

sufficient evidence introduced at trial that entities with which

SAIC had a business relationship were in fact subject to the

regulations of the NRC for activities that fell outside the scope

of § 2140.  SAIC employees testified that BNFL, with whom SAIC

entered into an agreement regarding a recycle project for the

DOE, was subject to the NRC's regulations concerning disposal of

radioactive waste once the waste left DOE facilities and MSC, a

subsidiary of BNFL, was NRC-licensed.  (Caldwell Test., 7/9 p.m.

Tr. 80:17-83:1; Slack Test., 7/9 a.m. Tr. 95:22-104:3; Profant

Test., 7/22 p.m. Tr. 18:2-19:8.)  Similarly, government witness

Kevin Tempel testified that Alaron Corporation -- an entity with

which SAIC pursued potential radioactive metal recycling

opportunities -- had an NRC-regulated facility.  (See Tempel

Test., 7/10 a.m. Tr. 23:8-11; 26:4-27:21.)

> B.   Situations involving a conflicting role and possible
>      bias

SAIC contends that the government failed to prove that SAIC

had any situations or relationships where it was placed in a

"conflicting role in which its judgment may be biased in relation

-20-

to its work for the NRC," 48 C.F.R. § 2009.570-3(b)(1)(iv),
because "the NRC and DOE each have its own distinct area of
jurisdiction" and "[SAIC's] DOE-related work could not have
biased its judgment with respect to its [c]ontracts with the
NRC."  (Def.'s Mem. at 16.)

     At trial, the government presented testimony and exhibits
identifying several projects upon which the jury could have
concluded that SAIC was placed in a conflicting role in which its
judgment may have been biased.  The government's evidence showed
that under SAIC's contract with the NRC, SAIC was charged with
the responsibility to "assess[] the health and safety impacts of
the potential large scale reuse and recycle of contaminated
nuclear material."  (Frank Cardile Test., 7/2 a.m. Tr. 28:3-5.)
Meanwhile, the government's evidence showed, the "Work Smart
Standards" that SAIC created for the BNFL project assured BNFL
how the proposed project "would be safe for public health and
safety."  (Pl.'s Opp'n at 18 (citing Slack Test., 7/9 a.m. Tr.
93, 101-03).)  In addition, the government presented evidence
that SAIC sought to continue and expand its business relationship
with BNFL into the future.  (Turner Test., 7/8 a.m. Tr. 94:5-8.)
Given that SAIC assessed the safety of the BNFL recycle project
in light of existing NRC regulations and saw the BNFL recycle
project as a potential business opportunity going forward, it is
a reasonable conclusion that SAIC's judgment regarding whether

-21-

and how recycle projects with components similar to the BNFL
project could affect public health and safety may have been
biased by its BNFL work.  Moreover, the government introduced
evidence that in assessing the BNFL project, SAIC considered the
NRC's existing regulations governing waste disposal, including
Nuclear Regulatory Commission Guide 1.86.  (See Slack Test., 7/9
a.m. Tr. 103:10-19.)  SAIC scientist Michael McKenzie-Carter
testified that the advice SAIC provided to the NRC included
advice regarding new guidance that could replace the NRC's Guide
1.86.  (McKenzie-Carter Test., 7/17 p.m. Tr. 41:14-42:7.)
Because the SAIC's work for BNFL and for the NRC both involved
consideration of the NRC's regulatory guidance on waste disposal,
the jury could have reasonably concluded that SAIC had an
obligation to disclose its work with BNFL under 48 C.F.R.
§ 2009.570-3(b)(1)(iv).

Similarly, the government presented evidence that SAIC's
work for the Bechtel Jacobs Company ("BJC") also placed SAIC in a
conflicting role where its judgment may have been biased.  SAIC
radiochemist Thomas Rucker testified that for the BJC Dose
Assessment project, SAIC conducted an "As Low As Reasonably
Achievable" ("ALARA") assessment for the recycle of contaminated
scrap metal from three DOE facilities.  (Rucker Test., 7/10 a.m.
Tr. 88:17-90:6.)  He also said that SAIC analyzed the costs and
benefits of recycling such materials for BJC.  (Id.)  The

-22-

government introduced testimony and other evidence from several
witnesses suggesting that SAIC's work for the NRC included
similar dose assessment and cost/benefit analysis of proposed
recycle options.  (<u>See</u> Gerald Motl Test., 7/23 a.m. Tr. 23:5-22
(testifying that SAIC's proposed work for the NRC included a
cost/benefit analysis of recycling alternatives); Clyde Jupiter
Test., 7/22 p.m. Tr. 29:16-34:10 (explaining that he provided
cost/benefit analysis as a subcontractor for SAIC on its NRC
contract); Slack Test., 7/9 p.m. Tr. 5:2-9:21 (discussing the BJC
Dose Assessment project); McKenzie-Carter Test., 7/17 p.m. Tr.
38:10-20 (testifying that SAIC's work for the NRC included
figuring out the level of activity that could occur at certain
dose levels); Robert Meck Test., 7/3 a.m. Tr. 94:22-97:7
(discussing SAIC's regulatory options task for the NRC).)  On the
evidence presented at trial regarding the similarities between
the work performed for the NRC and for the BJC Dose Assessment
project, the jury could have reasonably concluded that the BJC
project may have created an actual or potential OCI.

Moreover, the government presented sufficient evidence upon
which the jury could have concluded that SAIC vice president
Motl's involvement with the Association of Radioactive Metal
Recyclers ("ARMR") placed SAIC in a conflicting role where it may
have been biased.  Motl and ARMR founder and former chairman
Valmore Loiselle testified that ARMR was created to promote the

-23-

recycle and reuse of radioactive scrap metal and to advocate for
a national standard governing the release and recycle of such
material.  (Loiselle Test., 7/10 a.m. Tr. 72:24-77:3; Motl.
Test., 7/23 a.m. Tr. 11:20-25.)  Motl testified that "ARMR was a
very small operation," and that it took steps to advocate for a
"standard to allow for the recycle or release of radioactive
materials."  (Motl Test., 7/23 a.m. Tr. 18:1.)  Motl also
testified that he was tasked on SAIC's 1999 NRC contract bid to
provide "key management and technical support to the cost/benefit
task" assessing recycle options.  (Motl Test., 7/23 a.m. Tr.
23:5-9.)  The government's evidence at trial showing that Motl
played an active part in ARMR's advocating for a standard
governing release or recycle of radioactive material was
sufficient for the jury to conclude that Motl's ARMR
participation may have placed him in a conflicting role that
could have biased his judgment with regard to his work under
SAIC's 1999 NRC contract.  In light of this collection of
evidence, SAIC has not established that the government failed to
prove an objective falsehood and that SAIC is entitled to
judgment as a matter of law.

III. IMPLIED FALSE CERTIFICATION

    The government relied on an implied certification theory to
establish that SAIC made false claims for payment.  "The theory
of implied certification . . . is that where the government pays

funds to a party, and would not have paid those funds had it
known of a violation of a law or regulation, the claim submitted
for those funds contained an implied certification of compliance
with the law or regulation and was fraudulent." United States ex
rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d
28, 33 (D.D.C. 2003) (citing Ab-Tech Construction, Inc. v. United
States, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994)). SAIC alleges that
it is entitled to judgment as a matter of law because the
government failed to prove that SAIC submitted any false claims
under an implied certification theory because the government did
not prove that payment was expressly conditioned on SAIC's OCI
representations. In the alternative, SAIC alleges that it is
entitled to a new trial because the jury instructions did not
inform the jury that "the theory of implied false certification
applies only when the underlying regulatory or contractual
violation is an explicit pre-condition to payment." (Def.'s Mem.
at 41.)

SAIC cites United States ex rel. Hockett v. District of
Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25 (D.D.C. 2007),
for the proposition that a defendant can be liable for impliedly
certifying compliance with a condition set forth in a "background
regulation, law, or other requirement" only if the regulation or
law at issue "expressly condition[s] payment on compliance." Id.
at 68 (citing United States ex rel. Pogue v. Diabetes Treatment

Centers of Am., Inc., 238 F. Supp. 2d 258, 263-66 (D.D.C. 2002)).
Hockett recognizes that implied false certification "typically
applies where: (1) the defendant submits a claim, thus impliedly
certifying compliance with a condition; (2) that condition, by
virtue of some background regulation, law, or other requirement
is an explicit condition precedent to payment; and (3) compliance
with that condition is essential to the government's decision to
pay." Id. SAIC alleges that "[t]he government 'has not
identified a regulation or law in this case that specifically
conditions payment on compliance with a law, regulation, or other
requirement' that SAIC allegedly violated.'" (Def.'s Mem. at 19-
20 (quoting Hockett, 498 F. Supp. 2d at 68 (emphasis added)).)

As was discussed in the opinion denying SAIC's motion for
summary judgment on this issue, although Hockett places a
significant emphasis on the requirement that a regulation
expressly condition payment on compliance, "[t]he D.C. Circuit
. . . has never announced such a requirement." SAIC, 550 F.
Supp. 2d at 50. Instead, the court of appeals has recognized
that "the essence of a false claim" is "[t]he withholding of
. . . information critical to the [government's] decision to
pay." United States v. TDC Mgmt. Corp., 288 F.3d 421, 426 (D.C.
Cir. 2002) (internal quotation marks omitted) (quoting Ab-Tech
Constr., 31 Fed. Cl. at 434); see also United States ex rel.
Siewick v. Jamieson Sci. & Eng'g, 214 F.3d 1372, 1376 (D.C. Cir.

2000) ("Courts have been ready to infer certification from
silence, but only where certification was a prerequisite to the
government action sought."). Thus, as <u>Barrett</u> explains, "[t]he
implied certification theory essentially requires a materiality
analysis. Certification of compliance with the statute or
regulation alleged to be violated must be so important to the
contract that the government would not have honored the claim
presented to it if it were aware of the violation." 251 F. Supp.
2d at 33 (citing <u>TDC</u>, 288 F.3d at 426 and <u>Harrison v.
Westinghouse Savannah River Co.</u>, 176 F.3d 776, 785 (4th Cir.
1999)); <u>see</u> <u>United States ex. rel. Ortega v. Columbia Healthcare,
Inc.</u>, 240 F. Supp. 2d 8, 19 (D.D.C. 2003) (finding that "recovery
may be had under the FCA for an implied certification where if
the government had known of the violation when presented with the
claim for payment, it would not have paid the claim").

At trial, the government presented sufficient evidence to
support the jury's finding that SAIC's OCI representations were
critical to the government's decision to pay. Numerous witness
from both the NRC and SAIC testified that the OCI obligations in
SAIC's contracts with the NRC were important to the overall
purpose of the contract. (<u>See, e.g.</u>, Rodehau Test., 7/3 p.m. Tr.
43:24-44:10; Mary Lynn Scott Test., 7/3 a.m. Tr. 32:2-8 (NRC
Director of the Division of Contracts); Mark Otis Test. 7/17 a.m.
Tr. 21:16-22:1, Ashok Tahdani, 7/21 a.m. Tr. 53:15-56:6, 64:19-

67:2; see also McKenzie-Carter Test., 7/17 p.m. Tr. 45:8-46:21

(explaining that SAIC avoids OCIs to ensure its work product is

trustworthy).)  In addition, NRC contracting officer Mary Mace

testified that had she known of SAIC's relationships with BNFL

and BJC, she would not have awarded either the 1992 or 1999

contract or would not have approved payments under the contracts.

(Mace Test., 7/15 p.m. Tr. 114:20-118:4.)  NRC contract

specialists Stephen Pool and Sharlene McCubbin also testified

that they considered OCI representations before approving payment

and that they would not have approved payment if SAIC had

apparent or actual OCIs.  (Pool Test., 7/15 a.m. Tr. 32:15-33:5;

McCubbin Test., 7/15 p.m. Tr. 67:5-68:11.)  Similarly, SAIC's

Rodehau, who had been responsible for some of SAIC's contracts

with the NRC and DOE between 1991 and 1996, also testified that

SAIC was required to certify that it had no apparent or actual

OCIs for proposed work under its NRC contracts and that such

certification was required for SAIC to get the contract and

receive payments under the contract.  (Rodehau Test., 7/3 p.m.

Tr. 62:7-22; see also 68:17-69:7 (testifying that if SAIC failed

to make its OCI certifications, it would not get paid under its

contracts with the NRC).)  Thus, the government carried its

burden to provide sufficient evidence showing that SAIC's

withholding of information that should have been disclosed under

-28-

its OCI disclosure obligations constituted the submission of false claims for payment to the NRC.

Moreover, the jury was properly informed on the law regarding the government's use of the implied false certification theory to establish that SAIC made false or fraudulent "claims" to the NRC.  With respect to what constitutes a false or fraudulent claim, the jury was instructed that

> [a] claim includes any request or demand for payment
> from government funds.  A claim may include a voucher,
> invoice, or any other demand for payment of government
> money.  A claim or statement is false if it is an
> assertion that is untrue when made or when used.  A
> claim is fraudulent if it is an assertion that is known
> to be untrue.  A claim for payment or a statement made
> in order to get payment is false if there is a
> withholding of information that is critical to the
> government's decision to pay.  In other words, a claim
> or statement is considered to be false or fraudulent
> where, if the government had known of the information
> when presented with a claim or payment, it would not
> have paid the claim.

(7/28 Tr. 15:13-24.)  In light of the holding in TDC, this correctly explained what constitutes a false or fraudulent claim under an implied false certification theory.  Thus, SAIC is not entitled to a new trial because the jury was properly instructed on this element of the government's case.

IV.  FALSE STATEMENTS TO GET FALSE CLAIMS PAID

    A.    Application of the Supreme Court's decision in Allison
          Engine

Regarding the government's § 3729(a)(2) claim, SAIC alleges that the government failed to prove that SAIC submitted false

-29-

statements to get its false claims paid.  In addition, SAIC
alleges that the jury instruction regarding the government's
burden of proof under § 3729(a)(2) erroneously eliminated the
requirement that the government prove "SAIC made false statements
with the <u>intent</u> and for the <u>purpose</u> of getting its false claims
paid."  (Def.'s Mem. at 42.)  It argues that under the Supreme
Court's decision in <u>Allison Engine Co., Inc. v. United States ex
rel. Sanders</u>, 128 S. Ct. 2123 (2008), "[i]t is not enough for the
[g]overnment to claim that a defendant's statements affected its
decision to pay."  (Def.'s Mem. at 22.)  Instead, SAIC contends,
the government was "'obligated to prove that the defendant made a
false record or statement <u>for the purpose of</u> getting a false or
fraudulent claim paid or approved by the Government[,]'" and in
this case, "[t]he evidence presented at trial was legally
insufficient to meet this burden [because] it showed that SAIC's
alleged 'false statements' were entirely separate from the issue
of payment on SAIC's vouchers."  (<u>Id.</u> at 21 (quoting <u>Allison
Engine</u>, 128 S. Ct. at 2130).)

     Under 31 U.S.C. § 3729(a)(2), a defendant who "knowingly
makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by
the Government" is civilly liable to the United States.  In
<u>Allison Engine</u>, the relator produced fraudulent invoices
submitted by subcontractors to a Navy contractor as evidence of

-30-

false statements to get false claims paid under § 3729(a)(2).

128 S. Ct. at 2127.   The Supreme Court held that the term in

§ 3729(a)(2) "'[t]o get' denotes purpose, and thus a person <u>must</u>

<u>have the purpose of</u> getting a false or fraudulent claim 'paid or

approved by the government' in order to be liable under [that

section]."   128 S. Ct. at 2128 (emphasis added).   Thus, <u>Allison</u>

<u>Engine</u> concluded that

>   a subcontractor violates § 3729(a)(2) if the
>   subcontractor submits a false statement to the prime
>   contractor intending for the statement to be used by
>   the prime contractor to get the Government to pay its
>   claim.   If, [on the other hand,] a subcontractor or
>   another defendant makes a false statement to a private
>   entity and does not intend the Government to rely on
>   that false statement as a condition of payment, the
>   statement is not made <u>with the purpose of</u> inducing
>   payment of a false claim "by the Government."   In such
>   a situation, the direct link between the false
>   statement and the Government's decision to pay or
>   approve a false claim is too attenuated to establish
>   liability.

<u>Id.</u> at 2130 (emphasis added).

Unlike the attenuated statements at issue in <u>Allison Engine</u>,

the statements at issue here were made directly to the NRC,

rather than to a private entity.   In addition, there was

significant evidence upon which the jury could conclude that

SAIC's statements about their OCIs were made <u>for the purpose of</u>

having their claims paid.   For example, SAIC's Rodehau testified

that SAIC had to agree to the provisions regarding OCIs in its

NRC contract to be eligible for an award of the contract and to

receive payment under the contract, and that a violation of the

OCI provisions could result in termination of the contract.  (<u>See</u>
Rodehau Test., 7/3 p.m. Tr. 43:24-47:7; 62:7-22, 67:19-69:7; <u>see</u>
<u>also</u> Thadani Test. 7/21 a.m. Tr. 53:15-20 (testifying that SAIC
was obligated to provide advice to the NRC that was free from
potential bias).)  SAIC's Martin also testified that in response
to the NRC's cure notice seeking additional information regarding
SAIC's OCIs, SAIC submitted a response to the NRC that SAIC
intended the NRC to rely on when deciding whether to terminate
its contract with SAIC.  (Martin Test., 7/14 p.m. Tr. 14:12;
22:16-23:3; 29:25-30:3.)  Moreover, several NRC employees
testified that SAIC's compliance with its OCI obligations was
important to the NRC's decision to pay SAIC under its NRC
contract and failure to comply with the OCI obligations would
result in nonpayment.  (Mace Test., 7/15 p.m. Tr. 114:20-118:4
(stating that she would not have awarded the 1992 or 1999
contracts or approved payment under them if she had known about
SAIC's relationships with BNFL or BJC); Scott Test., Tr. 7/3 a.m.
32:4-8 (stating that the NRC was very concerned that work done by
the agency or in support of its regulations "be free of any kind
of doubt or conflict, and that the public can trust in the work
that the agency does"); Pool Test., 7/15 a.m. Tr. 32:19-33:5
(testifying that whether SAIC complied with the OCI provisions in
its contract would affect whether he would approve payment and
that he would not have approved payment if SAIC had an actual or

-32-

potential OCI); McCubbin Test., 7/15 p.m. Tr. 67:5-68:11 (stating

that the NRC relied on certifications from contractors).)   With

this evidence, a reasonable jury could have concluded that SAIC's

representations regarding actual and potential OCIs were made for

the purpose of getting its claims paid.

In addition, the jury instructions on the required elements

of a § 3729(a)(2) claim were not erroneous.  The jury was

instructed that

> [f]or the United States to recover from SAIC for a
> violation of Section 3729(a)(2), it must prove each of
> the following essential elements by a preponderance of
> the evidence: First, that SAIC made or caused another
> to make a statement for the purpose of getting the
> United States government to pay a false or fraudulent
> claim; second, that the statement was false; and
> third, that SAIC acted knowingly.

(7/28 Tr. 14:25-15:6.)  Immediately after this instruction, the

jury also was told that

> [t]o find a violation of the False Claims Act, you must
> find that the false or fraudulent claim or false
> statement would have been material.  A claim or
> statement is material if it has a natural tendency to
> influence, is capable of influencing, or is essential,
> important, or pertinent to, the government's decision
> to pay.

(Id. at 15:7-12.)  SAIC contends that the reading of the

materiality instruction immediately after the elements of

§ 3729(a)(2) "effectively eliminated the Allison Engine

requirement that the [g]overnment show" that SAIC made a

statement for the purpose of getting the government to pay its

claim.  (Def.'s Mem. at 42.)  The instructions given to the jury

-33-

clearly distinguished between the essential elements specifically pertaining to a § 3729(a)(2) claim -- which were presented to the jury in a numbered list -- and the additional requirement for any FCA violation that a false claim or false statement be material. Separate from the enumerated list of essential elements of a § 3729(a)(2) violation, the materiality instruction that followed began with "[t]o find a violation of the False Claims Act," informing the jury that the instruction pertained to all alleged FCA violations. Contrary to SAIC's allegation, there was nothing in the materiality instruction suggesting that the materiality requirement replaced any of the essential elements under § 3729(a)(2). Thus, SAIC has not shown the jury instructions regarding the elements of § 3729(a)(2) and materiality to be erroneous.

     B.   <u>Fraud Enforcement and Recovery Act</u>

     Post-trial, on May 20, 2009, the Fraud Enforcement and Recovery Act ("FERA") of 2009, Pub. L. No. 111-21, 123 Stat. 1617, was enacted, which amends certain provisions of the FCA to reflect the original intent of the law. FERA "legislatively overrules" the holding of <u>Allison Engine</u> by amending the language of § 3729(a)(2), replacing the words "to get" with the word "material." <u>See</u> S. Rep. No. 111-10 (2009). Thus, under the new version, recodified as 31 U.S.C. § 3729(a)(1)(B), a person is liable under the FCA if he "knowingly makes, uses or causes to be

-34-

made or used, a false record or statement material to a false or

fraudulent claim." 123 Stat. at 1621.  Section 4(f) of FERA also

provides that

> [T]he amendments made by this section shall take effect
> on the date of enactment of this Act and shall apply to
> conduct on or after the date of enactment, except that
> --
> (1) subparagraph (B) of section 3729(a)(1) of title 31,
> United States Code, as added by subsection (a)(1),
> shall take effect as if enacted on June 7, 2008, and
> apply to all claims under the False Claims Act (31
> U.S.C. 3729 et seq.) that are pending on or after that
> date; and
> (2) section 3731(b) of title 31, as amended by
> subsection (b); section 3733, of title 31, as amended
> by subsection (c); and section 3732 of title 31, as
> amended by subsection (e); shall apply to cases pending
> on the date of enactment.

123 Stat. at 1625 (codified as a note following 31 U.S.C.

§ 3729).

The United States filed a notice of supplemental authority

contending that section 4(f)(1) retroactively applies the new

§ 3729(a)(1)(B) to all <u>cases</u> pending on or before June 7, 2008.

Thus, it contends, FERA eliminates the United States' burden of

proving that SAIC made false statements for the purpose of

getting claims paid and moots SAIC's argument that the government

failed to do so at trial.  In response, SAIC contends that

section 4(f)(1)'s retroactivity does not apply to the present

case because the provision's use of the phrase "<u>claims under the</u>

-35-

[FCA]" implicates the FCA's definition of "claim" in § 3729(c)[9]

and none of SAIC's claims at issue in this action were pending on

or after June 7, 2008.[10]   SAIC alleges in the alternative that to

the extent that FERA does apply § 3729(a)(1)(B) to this case,

"constitutional notions of fundamental fairness" require that

SAIC be "entitled to a new trial in which the evidence and

instructions would properly reflect the applicable law."  (Def.'s

Response to United States' Notice of Supp. Auth. at 8.)

     Under 31 U.S.C. § 3729, a "claim" is a "request or demand

. . . for money or property."  31 U.S.C. § 3729(c).  "Statutory

definitions control the meaning of statutory words . . . in the

usual case."  Lawson v. Suwannee Fruit & S.S. Co., 336 U.S. 198,

201 (1949).  Under § 3729's definition of "claim,"

§ 3729(a)(1)(B) does not apply in this case because none of

---

[9]Before FERA, under § 3729(c), a claim included:
any request or demand, whether under a contract or
otherwise, for money or property which is made to a
contractor, grantee, or other recipient if the United
States Government provides any portion of the money or
property which is requested or demanded, or if the
government will reimburse such contractor, grantee, or
other recipient for any portion of the money or
property which is requested or demanded.
31 U.S.C. § 3729(c) (emphasis added).  FERA amends the definition
of claim in ways not relevant to issues in this case and codifies
the new definition as 31 U.S.C. § 3729(b)(2).

[10]SAIC also argues that application of § 3729(a)(1)(B) to its
conduct would violate its rights under the Ex Post Facto Clause,
U.S. Const. art. I, § 10, and its Fifth Amendment due process
rights.

SAIC's claims at issue here were pending on or before June 7, 2008.

The government contends the legislative history of FERA compels the conclusion that Congress did not intend "claim" in FERA section 4(f)(1) to apply this statutory definition, citing Senate Report 111-10.  The Senate Report's explanation of FERA's amendments to the FCA similarly utilizes "claims" to refer to a defendant's request for payment and "cases" when discussing civil actions for FCA violations.  <u>See</u> S. Rep. No. 110-10 (2009) (discussing <u>Allison Engine</u>'s expansion of the scope and applicability of the FCA to certain false claims and defendants' use of <u>Allison Engine</u> as a defense in "FCA <u>cases</u>").  Thus, contrary to the government's contention, FERA's legislative history supports applying the statutory definition of "claim" when interpreting the reach of FERA section 4(f)(1).

Further, the full text of section 4(f) supports the conclusion that Congress did not intend "claims" in subsection 4(f)(1) to mean "cases."  Subsection 4(f)(2), immediately after the provision at issue reads "section 3731(b) of title 31, as amended . . . shall apply to <u>cases</u> pending on the date of enactment."  123 Stat. at 1625.  Surely, had Congress intended the retroactivity of subsection 4(f)(1) to be measured by "cases," it would have said so as it did in subsection 4(f)(2).  There is no reason to depart from the usual rule and section

-37-

4(f)(1) will be interpreted to apply to "claims" as defined in
§ 3729, that is, requests or demands for money or property.
Thus, FERA has no impact on the present action.

V.   DAMAGES

SAIC contends that the judgment should be amended because
the government failed to prove that it suffered any damages
actually or proximately caused by the alleged false claims
submitted to SAIC.  In the alternative, it seeks a new trial
because the damages instructions given to the jury were
erroneous.  SAIC contends that the government's theory for
assessing damages, as explained to the jury, "ignor[ed] the value
of the services and work product SAIC provided" to the NRC.
(Def.'s Mem. at 22.)  The jury was instructed that if it found
that SAIC violated the FCA, "[t]he damages that the United States
[was] entitled to recover under the [FCA were] the amount of
money that the government paid out by reason of the false claims
over and above what it would have paid out had SAIC not made the
false claims."  (7/28 Tr. 21:15-21.)  The jury was further
instructed that its

> calculations of damages should be limited to
> determining what the [NRC] paid to SAIC over and above
> what the NRC would have paid had it known of SAIC's
> organizational conflicts of interest [and its]
> calculation of damages should not attempt to account
> for the value of services, if any, that SAIC conferred
> upon the [NRC].

(7/28 Tr. 21:22-22:3.)

-38-

A defendant is liable under the FCA "for damages <u>actually</u> caused the Government because of the submission of [a] false claim." <u>United States ex rel. Fago v. M&T Mortgage Corp.</u>, 518 F. Supp. 2d 108, 120 (D.D.C. 2007).  To recover actual damages, a plaintiff "must prove causation -- specifically that the Defendant caused the Government to pay claims because of the alleged false statements." <u>Id.</u> (internal quotations and citations omitted).  Applying this proximate cause standard, a defendant is liable for "for those damages that arise because of the <u>falsity</u> of the claim, <u>i.e.</u>, . . . those damages that would not have come about if the defendant's misrepresentations had been true." <u>United States ex rel. Schwedt v. Planning Research Corp.</u>, 59 F.3d 196, 200 (D.C. Cir. 1995).

For example, in <u>TDC</u>, TDC entered into a contract with the Urban Mass Transit Authority of the Department of Transportation to assist with a program "designed to assist minority enterprises in securing bonding from sureties when bidding on large transportation construction projects." <u>TDC</u>, 288 F.3d at 422-23. TDC's role was to use its "best efforts" to locate investors willing to provide collateral and other assistance to minority enterprises and sureties to participate in the program, and to act as ombudsman between the parties, "with no financial interest in [p]rogram operations." <u>Id.</u> at 423.  After it was discovered that TDC had fraudulently failed to disclose in its monthly

-39-

progress reports that it had a financial stake in the program's operations, the government sought damages under the FCA using a "'but for' measure of damages, based on what the government would have paid out had it known of the information that TDC omitted from its monthly progress reports." Id. at 428. Relying on its previous position in Schwedt "that if the government can show it relied on representations in a contractor's progress reports in deciding to make payments, 'those payments may constitute damages,'" the court of appeals found no error in the district court's use of the "but for" theory. Id. (quoting Schwedt, 59 F.3d at 200).

Under the government's theory of proximate causation -- that "had SAIC made truthful statements regarding its [OCIs], the NRC would not have awarded either contract in the first instance [and] would not have paid SAIC" (Pl.'s Opp'n at 30) -- the value of work done by SAIC is irrelevant because absent SAIC's false claims, no money would have been paid to SAIC under its contracts. Under TDC, where, as here, the government alleges that it would not have accepted or paid for such advice from the defendant if it had known of the defendant's false or fraudulent claims, the government can properly contend and prove that its damages are all amounts paid because of the false claims that would not have been paid out if the defendant had not made the false claims. See 288 F.3d at 428; see also United States v.

Rogan, 517 F.3d 449, 453 (7th Cir. 2008) (finding that the government's FCA damages for Medicare reimbursement claims omitting material information that, if disclosed, would have resulted in nonpayment were the entire amount paid on the claims regardless of whether medical services were actually provided). Thus, the jury was properly instructed that its calculation should not attempt to account for the value of SAIC's work because, under the government's theory, but for SAIC's false or fraudulent claims, it would not have paid anything for SAIC's work.

In addition, there was significant testimony at trial by the NRC's contracting officers stating that the NRC would not have awarded the contracts at issue to SAIC or approved SAIC's claims for payment if they had known about SAIC's OCIs.  (Mace Test., 7/15 p.m. Tr. 114:20-118:4; Pool Test., 7/15 a.m. Tr. 32:15-33:5; McCubbin Test., 7/15 p.m. Tr. 67:5-68:11.)  Accordingly, the defendant's motion for judgment as a matter of law on the issue of damages or for a new trial on the basis that the jury instructions regarding damages were erroneous will be denied.

VI.  "APPEARANCE" OF AN OCI

SAIC contends that it is entitled to a new trial because the government was erroneously permitted to argue "that SAIC had an obligation to disclosure the 'appearance' of a conflict of interest to the NRC."  (Def.'s Mem. At 35.)  SAIC contends that

-41-

its disclosure obligation was "limited to avoiding 'actual' or 'potential' OCIs," as defined by the NRC's OCI regulations, and the government's references to "apparent" OCIs likely led the jury "to believe that the mere appearance of an OCI," without proof an actual or potential OCI could be a violation of the FCA. (Id. at 36.)

SAIC's argument rests on the unsupported premise that there is a difference between an "apparent" OCI and a "potential" OCI. However, in direct contrast to SAIC's argument, the D.C. Circuit has previously referred to "apparent" conflicts of interest interchangeably with "potential" or "possible" conflicts of interests when the relevant regulatory language referred to "potential" and "actual" conflicts of interest. See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Abraham, 347 F.3d 315, 322-24 (D.C. Cir. 2003) (analyzing whether the Department of Energy correctly analyzed a planned procurement under applicable federal regulations).

In any event, the jury was properly instructed on the law they were to apply with respect to SAIC's OCI disclosure obligations utilizing the language of its contracts with the NRC and the NRC's OCI regulations. (See 7/28 Tr. 19:1-19 (instructing the jury that "[w]hether SAIC's judgment may have been biased includes whether SAIC's relationships with third parties had the potential of causing SAIC to be biased or

-42-

impairing SAIC's objectivity in the work it was performing for

the NRC" (emphasis added)).)   The jury was also instructed that

if "any difference appear[ed] to [them] between the law as stated

by counsel and that stated by [the court] in [its] instructions,

[they were] to be governed by [the court's] instructions."   (7/28

Tr. 5:2-5.)   Thus, regardless of any references made by counsel

or witnesses to an "apparent" OCI, the jury was properly

instructed that SAIC was required to disclose relationships that

had the potential of causing SAIC to be biased or impairing its

objectivity.   Having shown neither that an apparent OCI differs

from a potential OCI or that the jury was improperly instructed

with respect to SAIC's OCI disclosure obligations, SAIC has not

demonstrated that it is entitled to a new trial on the grounds

that the government improperly argued that SAIC had to disclose

the appearance of an OCI.

VII. INSTRUCTIONS REGARDING SAIC'S OCI DISCLOSURE OBLIGATIONS

SAIC contends that it is entitled to a new trial because of

erroneous instructions provided to the jury regarding its OCI

disclosure obligations.   It alleges that the jury instructions

did not adequately define "ambiguous terminology" in the NRC's

OCI regulations and improperly "omitted any reference to the

applicable contract language that governed SAIC's post-award OCI

disclosure obligations."   (Def.'s Mem. at 38, 40.)

-43-

A district court has discretion to craft jury instructions and "jury instructions are not considered erroneous if, when viewed as a whole, 'they fairly present the applicable legal principles and standards[.]" <u>Joy v. Bell Helicopter Textron, Inc.</u>, 999 F.2d 549, 556 (D.C. Cir. 1993) (quoting <u>EEOC v. Atlantic Community Sch. Dist.</u>, 879 F.2d 434, 436 (8th Cir. 1989)). Thus, "[i]t is well established that challenges to jury instructions are subject to the harmless error rule. . . . Accordingly, reversal is appropriate only if 'the trial court's error could have affected the substantial rights of the parties.'" <u>Id.</u> at 559 (internal citations omitted) (quoting <u>Williams v. U.S. Elevator Corp.</u>, 920 F.2d 1019, 1023 (D.C. Cir. 1990)).

   A.   <u>Explanation of key terms in the NRC's OCI regulations</u>

SAIC alleges that the jury should have been instructed differently on the meaning of the terms "regulated by the NRC," "relationship," "bias," "may diminish capacity," "potential OCI," "present or planned interest," and "appearance," as they are used in or in relation to the NRC's OCI regulations. (<u>Id.</u>) For the reasons articulated at the July 25, 2008 jury charge conference and explained below, SAIC has not shown the jury instructions on the NRC's OCI regulations to be erroneous with respect to these terms.

-44-

To the extent SAIC contends the jury instructions lacked sufficient explanation of the term "regulated by the NRC" within the explanation of what constitutes an OCI under the NRC's regulations, SAIC has not shown the instructions on this issue to be erroneous.  SAIC argued at the jury charge conference and argues now that "regulated by the NRC" means "licensed by the NRC."  (7/24 Tr. 57:2-5.)  Contrary to SAIC's argument, neither the unobjected to evidence at trial nor the NRC's regulations support SAIC's limited definition of "regulated by."  Trial testimony applied a common sense, ordinary usage of "regulated by the NRC" -- that is, an organization is regulated by the NRC if it is subject to the regulations of the NRC.  (See, e.g., Rodehau Test., 7/3 p.m. Tr. 50:2-16.)  The term "regulated by the NRC" does not carry a specialized definition under the NRC regulations, and the jury was adequately informed of the ordinary definition of "regulated by the NRC" throughout trial.  Further definition in the jury instruction was unnecessary and omitting SAIC's proposed language was not grounds for a new trial.

The terms "relationship," "present or planned interest," and "bias" were defined for the jury utilizing the adequate language of the NRC regulations regarding OCIs.  The jury was instructed that

> [a]n organizational conflict of interest is a
> relationship whereby a contractor has present or
> planned interests related to the work to be performed
> under an NRC contract which may diminish its capacity

-45-

> to give impartial, technically sound, objective
> assistance and advice, or may otherwise result in a
> biased work product.  <u>Present or planned interest may</u>
> <u>not be contractual but instead may be financial,</u>
> <u>contractual, organizational, or other interests</u> which
> relate to a contractor's work for the NRC.

(7/28 Tr. 18:9-16 (emphasis added).)   The jury was further

instructed that

> [w]hether SAIC's judgment may have been biased includes
> whether SAIC's relationships with third parties had the
> potential of causing SAIC to be <u>biased or impairing</u>
> <u>SAIC's objectivity in the work it was performing for</u>
> <u>the NRC</u>.  It does not require a showing that SAIC was,
> in fact, biased or lacked objectivity or that any such
> bias or lack of objectivity actually had an affect on
> SAIC's work for the NRC.

(7/28 Tr. 19:13-19 (emphasis added).)   These instructions, which

closely mirror the language of the NRC's regulations, informed

the jury what constitutes an OCI, including what type of present

or planned interest with another entity creates an actual or

potential conflicting relationship, and what it means to have the

potential for bias.

Regarding the terms "potential" OCI and "may diminish

capacity," SAIC has not established that these words carry

anything other than their common sense meanings in ordinary

usages.  Failing to include additional definitions of these terms

posed no error.  Similarly, to the extent that SAIC contends the

jury instructions should have defined "appearance," the court's

instructions did not use the word "appearance."  SAIC has not

shown that "appearance," which is not used in the NRC's OCI

regulations, is a term on which it was necessary to instruct the jury regarding SAIC's OCI disclosure obligations.  Accordingly, SAIC has not shown that the jury instructions failed to define key terms in a way that could have substantially affected its rights, and has not shown it is entitled to a new trial on such a ground.

    B.   <u>Omission of contract language regarding post-award disclosure obligations</u>

SAIC alleges that the instructions given to the jury regarding its OCI obligations were erroneous because they omitted "any reference to the applicable contract language that governed SAIC's post-award OCI disclosure obligations." (Def.'s Mem. at 40.)  SAIC contends that the instructions should have used such language and informed the jury that post-award, SAIC was obligated to disclose only "actual conflicts when (and if) [it] discovers them during performance and to disclose proposed work for others that SAIC had reason to believe created a potential conflict of interest[.]" (<u>Id.</u> (internal quotation marks omitted).)

This contractual language was presented to the jury in the evidence admitted at trial, including the relevant contracts, and explained through witness testimony.  Both parties were free, and encouraged, to utilize the language from the contracts in their closing arguments.  It was unnecessary for the jury instructions to re-read all of the language from the contracts with which they

-47-

had already been presented.  As is discussed above, the jury was properly instructed regarding what constituted an actual or potential OCI.  The jury also was properly instructed as to the state of mind required for SAIC to be liable under the FCA -- i.e., that SAIC had to have acted "knowingly."  There was significant evidence supporting the jury's finding that SAIC either discovered actual conflicts during its performance or had reason to believe its work for others created a potential conflict, and by failing to disclose the actual or potential conflicts, SAIC knowingly submitted false claims with respect to its OCI obligations.  Accordingly, SAIC has not shown either that the jury instruction's omission of this contract language was in error, or that if the additional instruction should have been included, the omission was anything but harmless.

## CONCLUSION

Given all of the evidence presented at trial and the reasonable inferences that could be drawn from it, there was sufficient evidence upon which a reasonable jury could find for the United States on its FCA and breach of contract claims.  SAIC is not entitled to judgment as a matter of law on any count.  In addition, SAIC has not shown that the instructions given to the jury were erroneous or that any other error was committed at trial such that it would be a clear miscarriage of justice not to grant SAIC a new trial.  SAIC's motion for judgment as a matter

-48-

of law or, in the alternative, for a new trial, will be denied.

Thus, it is hereby

ORDERED that SAIC's motion [152] for judgment as a matter of

law or for a new trial be, and hereby is, DENIED.  It is further

ORDERED that SAIC's objection [156] to the United States'

bill of costs be, and hereby is, SUSTAINED.  Travel costs for

witness Dan Guttman's flight to China are EXCLUDED from the

United States' bill of costs.  It is further

ORDERED that the stay of execution of judgment issued on

November 7, 2008 be, and hereby is, LIFTED.

SIGNED this 14th day of September, 2009.


_____/s/_____

RICHARD W. ROBERTS
United States District Judge