UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.                                          Civil No.  04-CV-1543 (RWR)

SCIENCE APPLICATIONS
INTERNATIONAL CORPORATION,

Defendant.

**PLAINTIFF UNITED STATES OF AMERICA'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, the United States of America, by and through the undersigned counsel, in

accordance with Federal Rule of Civil Procedure 56 and with LCvR 7 and LCvR 56.1 of the rules

of this Court, respectfully moves for partial summary judgment in its favor regarding the element

of falsity.  Because  SAIC is legally estopped from re-litigating matters that have been fully litigated

and conclusively resolved in prior proceedings, and because  no genuine issue of material fact exists

concerning the falsity of claims submitted, and of statements made and used to get claims paid, by

SAIC, the United States' Motion for Partial Summary Judgment should be granted.  Granting the

United States' Motion for Partial Summary Judgment will appropriately narrow the issues for retrial

to those that are actually in dispute.

A Memorandum of Points and Authorities in Support, a Statement of Undisputed Material

Facts, and a proposed order are contemporaneously filed herewith.  The United States respectfully

requests that the Court entertain oral argument on this motion.

Respectfully submitted,

TONY WEST
ASSISTANT ATTORNEY GENERAL


*/s/ Daniel Hugo Fruchter*
JOYCE R. BRANDA
PATRICIA R. DAVIS
DONALD J. WILLIAMSON
DANIEL HUGO FRUCHTER
PATRICIA M. FITZGERALD
Attorneys
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 305-2035


DATED: June 23, 2011



### CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June, 2011, I caused a true copy of the foregoing **PLAINTIFF UNITED STATES OF AMERICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT** as well as a Memorandum of Points and Authorities, Statement of Undisputed Material Facts, and proposed order in support thereof to be served via the Court's electronic filing system to:

Andrew Santo Tullumelo
David Penn Burns

Counsel for SAIC


*/s/ Daniel Hugo Fruchter*
Daniel Hugo Fruchter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

            Plaintiff,

       v.                              Civil No.  04-CV-1543 (RWR)

SCIENCE APPLICATIONS
INTERNATIONAL CORPORATION,

           Defendant.

**UNITED STATES OF AMERICA'S MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF ITS
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Nuclear Regulatory Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    SAIC's contracts with the NRC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    SAIC's Organizational Conflicts of Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        The BNFL Oak Ridge Recycle Project. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        The Bechtel Jacobs Gaseous Diffusion Plant ("GDP") Dose Assessement. . . . . 11

        Association of Radioactive Metal Recyclers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        Plasma Hearth Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        Alaron Corporation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.    The Doctrines of Issue Preclusion and "Law of the Case" Foreclose SAIC From Attempting to Re-Litigate Determinations that SAIC Breached Its Conflict of Interest Obligations to Avoid and Disclose Conflicts of Interest and that SAIC Submitted False Claims and Statements to the NRC. . . . . . . . . . . . . . . . . . . . . . 16

        1.    Issue Preclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        2.    Law of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    II.    The Undisputed Evidence Demonstrates that SAIC Made and Used False Statements and Submitted False Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1.    Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.    By Failing to Disclose Its Relationships and Denying Their Existence In Certifications to the NRC, SAIC, As a Matter of Law, Made False Statements and Submitted False Claims To the NRC. . . . . . . . . . . . . . . . 26

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

In accordance with Federal Rule of Civil Procedure 56 and with LCvR 7 and LCvR 56.1 of the Rules of this Court, the United States respectfully submits this brief in support of its Motion for Partial Summary Judgment.  The United States respectfully submits that in light of both prior decisions of this Court and the Circuit Court, and of the undisputed evidence in this case, while triable issues of fact exist concerning knowledge and damages, no genuine issue of material fact exists concerning the falsity of the statements made and used, or of the claims submitted, by the Defendant Science Applications International Corporation ("SAIC") on its contracts with the United States Nuclear Regulatory Commission ("NRC").

SAIC should be estopped under both the issue preclusion and law-of-the-case doctrines from re-arguing matters that have been fully litigated and conclusively determined by a finder of fact when those findings are undisturbed on appeal.  Alternatively, the United States is entitled to partial summary judgment because the undisputed evidence at trial demonstrated that SAIC did not disclose to the NRC its business relationships, which it was required to disclose pursuant to its contracts with the NRC, and that SAIC falsely certified to the nonexistence of such relationships.  The undisputed evidence at trial, in light of the applicable legal standard established through prior decisions in this case, further demonstrates that the information that SAIC failed to disclose was material to the NRC's decision to award SAIC its contracts, to allow SAIC to continue performing under its contracts, and to pay SAIC's claims for work performed under its contracts, and that by failing to disclose information about its business relationships, SAIC therefore submitted false claims and statements to the NRC.  Accordingly, partial summary judgment on the question of falsity, a distinct element of a False Claims Act action, is appropriate.

## INTRODUCTION

After a four week trial in which forty witnesses testified and hundreds of exhibits were introduced, the jury unanimously found that SAIC knowingly made 17 false statements and knowingly submitted 60 false claims for payment, in violation of the False Claims Act, 31 U.S.C. § 3729 *et. seq.  U.S. v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1264 (D.C. Cir. 2010) (*citing  U.S. v. Sci. Appl. Int'l Corp.*, 653 F. Supp. 2d 87, 94 (D.D.C. 2009)).  The jury further found that, as a result of defendant's conduct, the United States sustained $1,973,839.61 in damages.  *Id.*  Additionally, the jury found that SAIC had breached its contract with the NRC, and awarded $78 in additional nominal damages on that count.  *Id.*  Accordingly, imposing mandatory False Claims Act treble damages and penalties, the Court entered judgment in the amount of $6,499,096.83.  *Id.*  The Court subsequently denied SAIC's motion for judgment as a matter of law or for a new trial.  *SAIC*, 626 F.3d at 1264-65; *SAIC*, 653 F. Supp. 2d at 94.

SAIC appealed from the Court's denial of its post-judgment motion.  On appeal, the Court of Appeals, District of Columbia Circuit affirmed in part and reversed in part the Court's decision and remanded the matter for a new trial.  First, the Circuit Court affirmed the judgment that SAIC had breached its contract with the NRC.  *SAIC*, 626 F.3d at 1273, 1280.  Second, the Circuit Court affirmed this Court's opinion denying SAIC's motion for judgment as a matter of law.  *Id.* at 1270-71, 1280.  In doing so, the Circuit Court found that sufficient evidence was presented at trial from which a jury could have reasonably concluded that SAIC violated the False Claims Act and that the United States sustained damages in the amount found by the jury.  *Id.* at 1270-80.  However, the Circuit Court held that two of the Court's instructions to the jury,

3

regarding SAIC's knowledge and the damages caused by SAIC under the False Claims Act, were

incorrect.  *Id.* at 1273-80.  The Circuit Court held that although sufficient evidence was presented

at trial from which a jury could have, applying the proper standard, found for the United States

on both issues, the jury could have relied on aspects of the instructions that the Circuit Court

believed were improper in finding for the United States on the issues of SAIC's knowledge and

the amount of damages.  *Id.*  Accordingly, the Circuit Court reversed this Court's judgment on

the False Claims Act counts and remanded the matter to this Court.

Following a status hearing on April 1, 2011, the Court entered a Scheduling Order

providing for the Parties to file briefs and/or motions by June 23, 2011.  (Doc. 194).  In

accordance with the Court's Order, the United States files its Motion for Partial Summary

Judgment and this Memorandum of Points and Authorities in support thereof.

## FACTUAL BACKGROUND

### The Nuclear Regulatory Commission

The United States Nuclear Regulatory Commission ("NRC") is an independent federal

agency responsible for regulating the civilian use of radioactive material in order to ensure the

protection of public health, safety, and the environment.  *See, e.g.*, *SAIC*, 653 F. Supp. 2d at 92.

Pursuant to its general authority, the NRC oversees the release and recycle into interstate

commerce of commercially valuable radioactively contaminated materials from nuclear facilities.

*See SAIC*, 626 F.3d at 1261; United States' Statement of Undisputed Material Facts In Support of

United States' Motion for Partial Summary Judgment ("SMF") at ¶¶ 1-3.  The NRC sets

scientific standards regarding the release of such material and any person who wishes to possess,

receive, release, or dispose of regulated radioactive material must possess an NRC license.  *Id.*

4

**SAIC's contracts with the NRC**

Beginning in the early 1990s, the NRC commenced studies aimed at developing scientific criteria designed to form the basis of an NRC regulation that would set uniform national standards on the recycle and release of radioactive materials. *SAIC*, 626 F.3d at 1261; SMF at ¶¶ 4-5. As part of its efforts, the NRC entered into two contracts with SAIC which required SAIC to provide advice, recommendations, and assistance in support of the NRC's potential rulemaking. *SAIC*, 626 at 1261-62; SMF at ¶¶ 4-14.

SAIC's contract required, among other things, that it: 1) perform an analysis of existing studies and other available information concerning radioactive waste release and recycle; 2) create and prepare a "dose assessment" analyzing the possible amount of radioactivity that a member of the public could be expected to sustain if radioactive materials of varying levels and types of radioactivity were released or recycled; 3) prepare regulatory options and issues papers identifying stakeholders in the NRC's rulemaking process and setting forth the pros and cons of various regulatory options that the NRC was considering, including "no release," "limited release," and "free release" alternatives; 4) analyze and characterize the inventory of radioactive materials found at commercial and government sites across the United States; and 5) assess the costs and benefits of the various options for a possible NRC rule in this area. SMF at ¶¶ 4-14. SAIC fully understood that the NRC's rulemaking was in a controversial area and required careful balancing of public health, safety, and the environment as well as the significant economic and other costs of radioactive waste disposal. SMF at ¶¶ 4-14. SAIC further understood that the advice and assistance that it was providing for the NRC therefore had to be free from actual or potential conflicts of interest, or even the appearance of such a conflict. SMF

at ¶¶ 6, 19, 27.

In fact, the NRC was required by statute to promulgate and enforce rules and regulations to ensure that anyone with whom it contracted first disclosed "all relevant information . . . bearing on whether that person has a possible conflict of interest.."  Section 170A of the Atomic Energy Act, 42 U.S.C. § 2210a; SMF at ¶ 16.  Further, the NRC was statutorily prohibited from entering into a contract with anyone unless it found, based on full disclosure of all relevant information, that no conflict of interest existed or that any conflict could be adequately avoided or mitigated.  *Id.*

Pursuant to the NRC's statutory obligations, SAIC's contracts with the NRC contained a number of provisions regarding the requirement for SAIC to avoid and disclose actual or potential organizational conflicts of interest ("OCIs").  *SAIC*, 626 F.3d at 1262-63; *see also* SMF at ¶¶ 15-17, 22, 26.  Specifically, SAIC was required to, and agreed to, forego entering into any arrangement "with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under [the] contract."  *Id.*  If SAIC had "reason to believe with respect to itself or any employee that any proposed consultant or other contractual arrangement with any firm or organization may involve a potential conflict of interest," the contract obliged SAIC to obtain the NRC's prior written approval.  *Id.*  The contract also included disclosure obligations that required SAIC to "warrant[] to the best of its knowledge and belief" that it had no "organizational conflicts of interest" and would make "an immediate and full disclosure in writing" if it discovered such conflicts after the contract award.  *Id.*  In the event SAIC disclosed a conflict, the NRC retained the unilateral right to terminate the contract if it believed that doing so was "in the best interest of the government."  *Id.*  The contract defined

organizational conflicts of interest by reference to NRC regulations, which in turn defined an

organizational conflict of interest as follows: "a relationship . . . whereby a contractor or

prospective contractor has present or planned interests related to the work to be performed under

an NRC contract which: (1) may diminish its capacity to give impartial, technically sound,

objective assistance and advice or may otherwise result in a biased work product, or (2) may

result in its being given an unfair advantage." *Id.* (*citing* 41 C.F.R § 20-1.5402(a) (1979)); 48

C.F.R. § 2009.570-3.

In addition, the contract required SAIC to make several representations and certifications

regarding organizational conflicts of interest ("OCI").  SMF at ¶¶ 15-29.  In order to obtain and

keep its contracts and modifications thereto, and to be paid under its contracts, SAIC repeatedly

certified that it did not have any "situations or relationships" set out in the NRC regulations

identifying potential conflicts of interest.  SMF at ¶¶ 15-29.  The NRC's  regulation, now

codified at 48 C.F.R. § 2009.570-3(b), lists the following situations or relationships that give rise

to conflicts:

> (i) Where the . . . contractor provides advice and
> recommendation to the NRC in a technical area in
> which it is also providing consulting assistance in the
> same area to any organization regulated by the NRC.
>
> (ii) Where the . . . contractor provides advice to the
> NRC on the same or similar matter on which it is
> also providing assistance to any organization
> regulated by the NRC.
> . . . .
> (iv) Where the award of a contract would otherwise
> result in placing the . . . contractor in a conflicting
> role in which its judgment may be biased in relation
> to its work for the NRC, or would result in an unfair
> competitive advantage . . .

SMF at ¶¶ 15-29; 41 C.F.R. 20-1.5402(a) (1979); *SAIC*, 626 F.3d at 1262.  Further, SAIC's

contract with the NRC provided that "[t]he nondisclosure or misrepresentation of any relevant

interest may . . . result in the disqualification of [SAIC] for award," and that if "nondisclosure or

misrepresentation is discovered after the award, the resulting contract may be terminated" by the

NRC.  *SAIC*, 626 F.3d at 1262; SMF at ¶ 22, 27.  SAIC's witnesses unanimously testified that

they fully understood the importance of these OCI requirements and OCI certifications - namely,

that SAIC's entitlement to receipt of payment from the NRC was contingent on its making these

certifications and on abiding by its legal and contractual obligations regarding OCIs. SMF at ¶¶

27-29.

In total, SAIC presented 87 invoices for payment to the NRC on its two NRC contracts.

SMF at ¶¶ 30.  While certifying to the absence of the four categories of OCI Relationships, and

submitting invoices for payment under its contracts, SAIC never disclosed its financial

relationships with BNFL, Inc. ("BNFL"), Bechtel Jacobs Company ("BJC"), the Association of

Radioactive Metal Recyclers ("ARMR"), or the Alaron Corporation, nor did it disclose its

financial interest in a radioactive waste treatment technology known as the Plasma Hearth

Process ("PHP").  SMF at ¶¶ 15-32.  A jury has already determined that SAIC breached its NRC

contract by failing to disclose its OCI relationships, and both this Court and the Circuit Court

have affirmed that determination.  *See SAIC*, 626 F.3d at 1273 (*affirming, in part, U.S. v. Science

Applications Int'l. Corp.* 653 F.Supp.2d 87, 111-12 (D.D.C. 2009)).

## SAIC's Organizational Conflicts of Interest

As the undisputed evidence at trial demonstrated, as a jury has already unanimously

determined, as this Court has already ruled, and as the D.C. Circuit has affirmed, SAIC failed to abide by its contractual requirements with the NRC to <u>avoid</u> conflicts of interest, to <u>disclose</u> them should they arise, and to <u>certify</u> to their absence.

<i>The BNFL Oak Ridge Recycle Project</i>

British Nuclear Fuels, Inc ("BNFL") was a full service nuclear waste management, decommissioning, engineering, and nuclear materials handling company.  BNFL performed these services for both government and commercial customers.  SMF at ¶ 44.  Additionally, during the relevant time period, BNFL partnered with and also later owned Manufacturing Sciences Corporation ("MSC").  MSC was a commercial radioactive metal recycling company that was licensed by the State of Tennessee, pursuant to NRC regulations and NRC regulatory authority, to possess and recycle radioactive material.   SMF at ¶ 5, 11, 44.

By March 1996, SAIC and BNFL had a business relationship under which SAIC was providing advice and assistance to BNFL on a large-scale project to release and recycle radioactive material from the Oak Ridge Diffusion Plant buildings in Oak Ridge, Tennessee. (the "BNFL Oak Ridge Recycle Project").  SMF at ¶¶ 44-77.  SAIC and BNFL entered into teaming agreements and, later, contracts, under which SAIC provided this advice and assistance.  SMF at ¶¶ 44-77.  The purpose of this project was to dismantle, remove, decontaminate, and economically maximize the recycle of radioactively contaminated equipment and material from the project.  SMF at ¶¶ 44-77.

The advice and assistance that SAIC provided to BNFL was in the precise technical area and concerned the precise subject matter as the work that it was performing for the NRC.  SMF at ¶¶ 4-14, 45.  SAIC's assistance to BNFL included "completely plann[ing]" the project and

9

advising BNFL about the various scientific and regulatory standards governing free release, including the very release standard that was the subject of SAIC's advice to the NRC.  SMF at ¶¶ 44-77.  SAIC's advice and assistance to BNFL also included preparing the Waste Management Plan for the project and other planning documents that would form the backbone for how the project was carried out, preparing the cost estimates for the recycle and release of radioactive material by MSC, and other matters.  *Id*.  Additionally, SAIC prepared the "Work Smart Standards" laying out the regulatory rules under which the project was carried out, standards which included NRC regulations and scientific standards for the release of radioactive material. SMF at ¶¶ 60-61, 70-72.  SAIC certified to BNFL that these "Work Smart Standards" it prepared were adequate to protect public health, safety, and the environment - the same subject upon which SAIC was providing advice and assistance to the NRC.  *Id.*; *SAIC*, 653 F. Supp. 2d at 100.

SAIC's witnesses unanimously testified that this project was carried out under the regulatory authority of the NRC because they involved the removal, release, and recycle of radioactive material into general commerce, an activity governed by the NRC and subject to NRC regulation.  SMF at ¶ 12, 60; *SAIC*, 626 F.3d 1271-72; *see also SAIC*, 653 F. Supp. 2d at 100-101 ("SAIC employees testified that BNFL, with whom SAIC entered into an agreement regarding a recycle project for the DOE, was subject to the NRC's regulations concerning disposal of radioactive waste once the waste left DOE facilities and MSC, a subsidiary of BNFL, was NRC-licensed.").   Because SAIC was providing advice and assistance to BNFL in the same technical area and on the same or similar subject matter on a project subject to the NRC's regulatory authority*,* and because SAIC's work for BNFL created the potential for bias with respect to its work for the NRC, SAIC was required to disclose the BNFL Oak Ridge Recycle

10

Project to the NRC.  SMF at ¶¶ 17, 45, 63-65, 68-84, 102, 113.  SAIC never disclosed the BNFL

Oak Ridge Recycle Project and, in fact, when the NRC learned about SAIC's role on the project

from other channels, SAIC submitted to the NRC additional false statements regarding its role on

the project in a futile attempt to keep its NRC contract.  SMF at ¶¶ 33-43, 45-77.

<u>*The Bechtel Jacobs Gaseous Diffusion Plant ("GDP") Dose Assessement*</u>

Beginning in 1998, SAIC provided advice and assistance to Bechtel Jacobs Corporation

("BJC") on a project involving analyzing radioactive material release and recycle from a number

of facilities.  *SAIC*, 653 F. Supp. 2d at 101; SMF at ¶¶ 86-97.  Under its contract with BJC, SAIC

was required to perform an analysis of the inventory of the facilities in question, which included

the Oak Ridge site as well as two additional facilities owned by the Department of Energy

("DOE") but operated by commercial entities pursuant to NRC licenses.  *Id.*  SAIC was also

required to analyze the costs and benefits of different options for dispositioning the material at

these facilities, including an analysis of release, recycle, and limited release alternatives, the same

task it was performing for the NRC.  *Id.; SAIC*, 653 F. Supp. 2d at 101; *see also* SMF at ¶¶ 13-

14, 106 (SAIC performing cost-benefit tasks related to recycle and free release on its NRC

contracts).  Finally, SAIC was required to perform an assessment of the expected dose resulting

from the release and recycle of radioactive material, the same task it was performing for the

NRC, and utilizing the very same scientific standards SAIC was analyzing for the NRC.  SMF at

¶¶ 86-97 (NRC Regulatory Guide 1.86 used in BJC Dose Assessment; BJC Dose Assessment

utilized and considered SAIC's work for the NRC).

In its report for BJC, SAIC concluded that release and recycle of all of the materials

would result in only a "trivial dose" and that the benefits of free release and recycle outweighed

the costs.  SMF at ¶¶ 94-97.  This created an obvious potential for bias with respect to SAIC's

work for the NRC, particularly in light of the fact that SAIC was already participating in the

release and recycle from one of the facilities it was studying for BJC on the BNFL Oak Ridge

Recycle Project, and that SAIC had plans to perform similar tasks on the other two facilities that

were the subject of the BJC Dose Assessment.  *Id.*; *see also* SMF at ¶¶ 46-54, 65-66.  SAIC's

work for BJC was in exactly the same technical area and concerned the exact same subject matter

as its work for the NRC.  *See, e.g.,* SMF at ¶¶ 86-97.  In fact, SAIC's work for BJC was so

similar to SAIC's work for the NRC that SAIC employees copied significant portions of an SAIC

report for the NRC into a report it delivered to BJC.  SMF at ¶ 91.  The copied portions included

scientific judgments and conclusions about what would, and would not, be considered by SAIC

in its analysis.  *Id.*

Despite the obvious possible conflict of interest and potential for bias inherent in SAIC's

dual roles for BJC and the NRC, SAIC never disclosed its work on the BJC project to the NRC

until after the NRC had learned of another OCI, the BNFL Oak Ridge Recycle Project, through

other channels.  SMF at ¶¶ 33-42, 113.  In fact, when the NRC questioned SAIC's work on the

BJC Dose Assessment project, SAIC made false statements to the NRC about its work on the

project in a futile attempt to keep its NRC contract.  SMF at ¶¶ 33-42.

### *Association of Radioactive Metal Recyclers*

Beginning in 1995, SAIC and its employees became involved in an organization known

as the Association of Radioactive Metal Recyclers ("ARMR").  SMF at ¶¶ 98-107.  ARMR was a

trade organization that lobbied the NRC to adopt a release rule that would allow for the free

release and recycle of radioactive material.  *Id.*   This was the <u>exact same rule</u> upon which the

12

SAIC was purportedly providing the NRC with unbiased advice and assistance.  *Id.*  ARMR's members included many NRC licenses and other entities with an interest in releasing and recycling radioactive material under the NRC's regulatory authority.  *Id.*

An SAIC Vice President, Gerald Motl, was one of the most important members of ARMR, and was an officer of ARMR who served as Director at the same time that SAIC was performing its work for the NRC.  SMF at ¶¶99-102, 104.  Mr. Motl traveled to numerous ARMR events at SAIC's expense.  SMF at ¶ 102.  Mr. Motl even participated in drafting a letter to the NRC chairperson to advocate for a release rule - again, the same rule upon which SAIC was providing advice and assistance to the NRC.  SMF at ¶ 106.  Even more problematically, Mr. Motl, an ARMR director who enthusiastically participated in ARMR's lobbying activities, was one of the key personnel that SAIC proposed to perform work on SAIC's NRC Contract.  SMF at ¶ 106.  The subject matter of the work that Mr. Motl was proposed to provide was assessing the costs and benefits of release and recycle of radioactive material.  *Id.*   Meanwhile, ARMR, with Mr. Motl's enthusiastic participation, had already taken the position in letters to the NRC that the benefits of release and recycle outweighed the costs.  SMF at ¶¶ 98-107.  Although SAIC's relationship with ARMR concerned the precise subject matter - an NRC release rule for release and recycle of radioactive material - and pertained to the same technical area as SAIC's work for the NRC, and although SAIC's relationship with ARMR created a clear potential for bias with respect to SAIC's work for the NRC by virtue of SAIC/Motl's dual loyalties to ARMR and to the NRC, SAIC never disclosed its relationship with ARMR to the NRC.  SMF at ¶ 107.

*Plasma Hearth Process*

SAIC's work in developing a radioactive waste treatment technology known as the Plasma Hearth Process ("PHP") began in 1990.  SMF at ¶¶ 78-85.  By 1994, SAIC was already experimenting with the technology, and soon after, SAIC employees were planning the commercialization of the technology.  *Id.*  SAIC planned for the PHP to be used to decontaminate radioactive waste, allowing the resulting metal to be free released and/or recycled into commerce.  *Id.*  SAIC knew that in order to utilize the PHP in this manner, it would be subject to NRC regulations governing the release and recycle of radioactive material, the exact same rules on which SAIC was advising the NRC.  SMF at ¶¶ 82-84.  Accordingly, SAIC committed to "follow" the NRC's rulemaking efforts as part of its work on the PHP.  *Id.*  In early 1996, SAIC filed a patent application for the PHP in order to protect its financial and proprietary interest in the treatment technology.  SMF at ¶¶79-80.  SAIC's commercialization plan for the PHP also included obtaining an NRC license for the technology, so that material treated by the PHP could be free released under NRC's regulations.  SMF at ¶ 83.  By early 1997, SAIC and BNFL had entered into a teaming agreement to further develop the PHP and to commercialize it for use in both government and commercial applications.  SAIC knew that use of the PHP in such applications would have to comply with NRC free release regulations.  SMF at ¶¶ 82-84.

One of the inventors of the PHP, Gary Leatherman, was also one of the individuals providing advice and assistance to the NRC under SAIC's NRC contracts.  SMF at ¶¶ 81.  His work for the NRC - namely, helping to identify the way in which different radioisotopes migrate to different states of matter and form different streams of waste, was also an important aspect of his work on the PHP.  *Id.*  At the same time, Mr. Leatherman was also engaging in efforts to

develop and market the PHP to prospective customers.  *Id.*

SAIC's direct ownership interest in and plans for the PHP created a clear conflict of interest and obvious potential for bias with respect to its work for the NRC.  SMF at ¶¶ 78-85. Despite this, and even though SAIC's work on the PHP predated even its very first NRC contract, SAIC never disclosed its interest in or work on the PHP, even as the it moved to patent, market, and commercialize the technology for use under the NRC's regulatory authority.   SMF at ¶ 85.

<u>Alaron Corporation</u>

Beginning in January 1996, SAIC provided advice and assistance to a company known as Alaron Corporation regarding a proposed project to release and recycle radioactive waste in Pennsylvania and South Carolina.  *SAIC*, 653 F. Supp. 2d at 100; SMF at ¶¶ 108-112.  Alaron was both a member of ARMR and an NRC licensee in the business of recycling and releasing radioactive metal.  *Id.*   SAIC and Alaron entered into a teaming agreement under which SAIC would provide advice and assistance to Alaron concerning Alaron's proposed release and recycle of radioactive material, including advice and assistance pertaining to Alaron's proposed release and recycle under NRC regulations.  *Id.*  In May 1996, the SAIC/Alaron team sought and obtained a blanket ordering agreement from the Westinghouse Savannah River Corporation to carry out such work.  SMF at ¶ 110.

At least one SAIC Vice President responsible for SAIC's work on the BNFL Oak Ridge Recycle Project was aware enough of SAIC's work for Alaron to include it in his plan to make Oak Ridge the "radioactive scrap metal recycling capital of the world."  SMF at ¶¶ 46-48. Although the SAIC/Alaron team was never selected to perform any of the release and recycle

work that it proposed, the existence of the relationship, which clearly fell under the NRC's

regulatory authority, was a "planned interest" exactly of the kind for which the NRC's

regulations and SAIC's NRC contract required disclosure.  SMF at ¶ 17.  SAIC nonetheless failed

to disclose to the NRC that it was advising one of its licensees on radioactive material release

and recycle, the exact subject matter and technical area on which it was advising the NRC.   SMF

at ¶ 112.

## ARGUMENT

I. **The Doctrines of Issue Preclusion and "Law of the Case" Foreclose SAIC From Attempting to Re-Litigate Determinations that SAIC Breached Its Conflict of Interest Obligations To Avoid and Disclose Organizational Conflicts of Interest and that SAIC Submitted False Claims and Statements to the NRC**

1. Issue Preclusion

The doctrine of issue preclusion, or collateral estoppel, bars a party from "successive

litigation of an issue of fact or law actually litigated and resolved in a valid court determination

essential to the prior judgment," even if the issue recurs in the context of a different claim.

*Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (*quoting New Hampshire v. Maine*, 532 U.S. 742,

748-49 (2001)); *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 295 (D.C. Cir. 1994) (*quoting*

*Nat'l Post Office Mail Handlers v. Am. Postal Workers*, 907 F.2d 190, 192 (D.C. Cir. 1990)); *see*

*also Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 334 (D.C. Cir. 2011).  By

"preclud[ing] parties from contesting matters that they have had a full and fair opportunity to

litigate," this doctrine protects against "the expense and vexation attending multiple lawsuits,

conserv[es] judicial resources, and foste[rs] reliance on judicial action by minimizing the

possibility of inconsistent decisions." *Taylor*, 552 U.S. at 892 (*quoting Montana v. United States*,

440 U.S. 147, 153-54 (1979)).

Issue preclusion is applicable in the context of one case having two separate claims with overlapping requirements.  In such a case, once a final determination has been made as to facts necessary to reach an answer in the first claim that determination is binding as to the second claim.  For example, in *Hailey v. City of Camden*, the court granted plaintiffs' partial motion for summary judgment based on collateral estoppel as to hostile work environment on federal claims because a previous jury had found in favor of the plaintiffs on their state law claims, and a finding of hostile work environment was necessary for the jury to reach that verdict.  650 F. Supp. 2d 349, 353-56 (D.N.J. 2009).  *See also Freeman v. Chicago Park District*, 189 F.3d 613, 618 (7th Cir. 1999) (jury verdict that plaintiff not harassed because of race on a Title VII count bars plaintiff's § 1981 claim because an essential element of a § 1981 claim is discriminatory motive).

In the District of Columbia Circuit, issue preclusion applies if three factors are met.  First, the issue sought to be precluded "must have been actually litigated, that is, contested by the parties and submitted for determination by the court."  *McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C. Cir. 1986).  Second, the issue must have actually and necessarily been decided by a court of competent jurisdiction.  *Id.* at 1201.  Third, the party that issue preclusion is invoked against must have had an incentive to fully litigate the issue in the first proceeding to avoid unfairness.  *Felter v. Salazar*, 679 F. Supp. 2d 1, 9 (D.D.C. 2010); *North v. Walsh*, 1998 WL 47669, at *1 (D.D.C. April 29, 1988).  Because all three factors are met here, SAIC should be precluded from arguing during retrial that it did not breach its duty to avoid and disclose organizational conflicts of interest.  Moreover, because, as discussed above, compliance with

17

SAIC's OCI obligations and the information withheld from the NRC was material, SAIC, as a matter of law, submitted false claims and made false statements and partial summary judgment is therefore appropriate on the element of falsity. *See, infra*, pp. 27-29.

First, the question of whether SAIC breached its duty to avoid and disclose OCI was actually litigated because it was decided by the jury and affirmed on appeal. The United States alleged that SAIC breached its contract with the NRC by failure to abide by the OCI obligations set forth in the contract. This question was presented to the jury, which unanimously found that SAIC breached its contract with the NRC by failing to avoid and disclose organizational conflicts of interest. This Court affirmed that verdict when it denied SAIC's Motion for Judgment as a Matter of Law, and the D.C. Circuit affirmed this Court's judgment in that regard. Therefore, it is clear that the question of whether SAIC had organizational conflicts of interest was actually litigated.

Second, the jury necessarily had to find that SAIC breached its obligation to avoid and disclose OCI in order to find, as it did, that SAIC breached its contract with the NRC. SAIC's failure to abide by its OCI obligations was the only basis for the Government's breach of contract claim. *See* SMF at ¶ 115 (7/28 a.m. Tr. 23:8-24:6 (jury instructed that "[t]he United States claims that SAIC breached this contract by failing to disclose circumstances that the government alleges constituted organizational conflicts of interest that SAIC was required to disclose to the NRC under the terms of the contract.")). Thus, in order for the jury to find, as it did, SAIC liable for breach of contract, the jury necessarily had to conclude both that SAIC's contract with the NRC required disclosure of SAIC's OCI relationships and that SAIC failed to disclose its OCI relationships. *Id.* The D.C. Circuit upheld the verdict against SAIC on breach of contract,

holding that "the record was sufficient to permit the jury to find that SAIC breached its obligations both to avoid potential conflicts and to disclose any that arose during the course of performance" and therefore that SAIC breached its NRC Contract.  *SAIC*, 626 F. 3d at 1273.

Third, SAIC had an obvious incentive to, and did, fully litigate the question of whether it breached its duty to avoid and disclose OCI.  In fact, throughout this litigation and throughout the jury trial, SAIC vigorously contested that it had breached its OCI obligations.  SAIC participated in a four-week-long jury trial, direct- or cross-examined forty witnesses, and moved hundreds of documents into evidence.  SAIC was a party to the litigation and fully litigated the question of whether it breached its duty to avoid and disclose OCI to the jury, to this Court in its post-judgment motion, and to the D.C. Circuit.  Therefore, no concerns of fairness to SAIC exist to caution against issue preclusion.

That SAIC breached its conflict of interest disclosure obligations by failing to disclose its OCI relationships to the NRC, and that the claims submitted and statements made by SAIC were therefore false, are settled issues because these questions was actually litigated, were necessary to the jury's findings that SAIC had breached its contract and submitted false claims and statements, findings that has been affirmed both by this Court and by the D.C. Circuit.[1] Additionally, SAIC had an incentive to, and indeed did, fully litigate these questions at trial. Based on issue preclusion, judgment as a matter of law is therefore appropriate.

---

[1]    For the reasons discussed below at pp. 28-31 and as found both by this Court and by the Circuit Court, because compliance with SAIC's OCI obligations and the information regarding SAIC's OCIs were material to the NRC's decision to pay SAIC's claims, SAIC's statements and claims were false as that term is defined by the False Claims Act in light of SAIC's failure to disclose its OCIs to the NRC.

2.      Law of the Case

Similar to the issue preclusion doctrine, the "law of the case" doctrine and the related "mandate rule" dictates that determinations of a district court that are not the subject of an appellate court's reversal or remand are adhered to on remand by the district court and should not be re-litigated.  *See New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004); *Tex. Oil & Gas Corp. v. Hodel*, 654 F. Supp. 319, 323 (D.D.C. 1987); *Teague v. Mayo*, 553 F.3d 1068, 1072-73 (7th Cir. 2009).  *See also Sherwin v. Welch*, 319 F.2d 729, 731 (D.C. Cir. 1963) (a "judgment of reversal and remand [does] not necessarily require a complete new trial."); 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 4418 (2d ed.) ("Affirmance on an appeal actually taken likewise concludes a common issue that otherwise would arise in continuing proceedings, whether the theory be issue preclusion or law of the case.").

As the cases make clear, on remand, the Court should confine the disputed issues to those that were the subject of the appellate court's decision to reverse.  The Court should not allow relitigation of issues that have been the subject of a jury verdict and whose disposition an appellate court has affirmed because such issues have become the settled "law of the case."  *See New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (legal and factual determinations that were not the subject of the appellate court's reversal were "law of the case" and could not be disturbed); *Tex. Oil & Gas Corp. v. Hodel*, 654 F. Supp. 319, 323 (D.D.C. 1987) (holding that if appellate court's ruling is confined to a particular issue or issues, only those issues that were the subject of the appellate court's ruling are appropriate issues for retrial); *see also Sallenger v. City of*

20

*Springfield,* 630 F.3d 499, 505 (7th Cir. 2010) ("[T]he jury verdicts are now the law of this case, and they conclusively establish that no excessive force occurred."); *Teague v. Mayo*, 553 F.3d 1068, 1072-73 (7th Cir. 2009) ("Intuitively, we know a verdict trumps factual disputes on an identical issue. . . . [T]he verdict stands. It has become the law of the case. As to issues of fact, given an unchanged record, law-of-the-case reluctance [to reconsider] approaches maximum force.").

While the Circuit Court reversed judgment against SAIC on the two False Claims Act counts based on jury instructions regarding knowledge and damages that it deemed improper, all other aspects of this Court's decision were affirmed or have not been appealed. *See SAIC*, 626 F.3d 1257. This includes this jury's verdict and the Court's determination that: (1) SAIC violated its OCI obligations to avoid and disclose organizational conflicts of interest; and (2) that SAIC made false and submitted false claims and statements by failing to disclose its situations and relationships and by falsely certifying to their absence. *SAIC*, 626 F.3d at 1266-73. These settled determinations are the "law of the case" and may not be properly contested in any further proceeding for reasons that have previously been articulated by this Court:

> Adherence to the law of the case doctrine preserves judicial economy. It promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues. The law of the case applies even to a non-final, non-appealable decision; it seeks to minimize expenditure of judicial resources and energy on matters already decided, and is triggered by a final decision on a particular issue. Perpetual litigation of any issue … delays, and therefore threatens to deny, justice. This Court is not in the business of denying justice.

*See United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 238 F. Supp. 2d 258, 262

(D.D.C. 2002) (internal citations and quotations omitted).  The scope of further proceedings in this matter should therefore be confined to the narrow scope of the Circuit Court's decision to reverse – namely, SAIC's knowledge under the False Claims Act, and the damages sustained by the United States as a result of SAIC's conduct.

Accordingly, there can be no question that the issue of SAIC's noncompliance with its OCI obligations and its submission of false claims and statements have been fully litigated and have been the subject of a jury determination that has been upheld on appeal.  The interest of judicial economy, the interest in preventing inconsistent rulings, and the doctrine of issue preclusion all foreclose SAIC from attempting to re-litigate these settled factual and legal issues. Judgment as a matter of law is therefore appropriate on the element of falsity with respect to the government's False Claims Act counts.

II.     **The Undisputed Evidence Demonstrates that SAIC Made and Used False Statements and Submitted False Claims**

As discussed above, under the issue preclusion and "law of the case" doctrines, the only proper considerations for retrial are SAIC's knowledge and damages sustained by the United States as a result of SAIC's conduct.  SAIC should be legally precluded from relitigating this Court's determinations that: (1) SAIC breached its conflict of interest obligations by failing to avoid and disclose organizational conflicts of interest; and (2) SAIC submitted false claims and false statements to the NRC by making affirmative statements that SAIC had no OCIs, and by submitting claims to the NRC without disclosing its OCIs.  However, even if SAIC were not legally precluded from making such an argument, no genuine dispute of material fact exists concerning these questions, and summary judgment is therefore appropriate.

22

1.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[2]  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Although summary judgment is not the occasion for the court to weigh credibility or evidence, summary judgment is appropriate if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Holcomb*, 433 F.3d at 895 (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.   A factual dispute, by itself, is not sufficient to defeat summary judgment.  Only genuine disputes of facts that are material justify denying a summary judgment motion.  *See, e.g., United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 (6th Cir. 1998).  The substantive law governs which facts are material. *Anderson*, 477 U.S. at 248.

---

[2]      Fed. R. Civ. P. 56 was revised in 2010 to improve the procedures for presenting and deciding summary judgment motions.  The standard for granting summary judgment remains unchanged.  *See* Advisory Committee Notes, 2010 Amendments.

Accordingly, in this case, it is the law of the False Claims Act, 31 U.S.C. § 3729 *et. seq*., that governs.  Enacted in 1863, the False Claims Act, 31 U.S.C. 3729, et seq. (2006), "has been used more than any other [statute] in defending the Federal treasury against unscrupulous contractors and grantees."  S. Rep. No. 345, 99th Cong., 2d Sess. 4 (1986).  The Act was originally enacted in response to contractor fraud perpetrated on the Union Army during the Civil War.  S. Rep. No. 99-345 at 4 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5269.  As the Supreme Court has explained, in enacting the False Claims Act, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"  *Cook County, Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) *(quoting United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

In this case, the United States has alleged causes of action under both 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(2) (now (a)(1)(B)[3]).  The elements of a cause of action under section 3729(a)(1) are: (1) the defendant submitted, or caused to be submitted, a claim to

---

[3]     The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (May 20, 2009), modified and renumbered the subsections of 31 U.S.C. § 3729(a), "to reflect the original intent of the law." *Id*. § 4, 123 Stat. 1621. Among other things, FERA modified former section 3729(a)(2) to impose civil liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* (recodifying section 3729(a)(2) as 3729(a)(1)(B)). As explained in FERA's legislative history, Congress made this change "to clarify and correct erroneous interpretations of the law" in decisions such as *Allison Engine Co. v. United States ex rel. Sanders*, 128 S.Ct. 2123 (2008), which held that the FCA requires proof that a defendant intended to get the government to pay a false claim, and thus effectively immunized fraud on contractors or other grantees disbursing federal funds. See S. Rep. No. 111-10, 111th Cong., 1st Sess., at 10 (2009).  This Court has previously held that the "pre-FERA" section 3729(a)(2) applies to all of the defendant's claims in this action.  *See* 653 F. Supp. 2d. at 106-107.   Because the United States contends that it is entitled to summary judgment under either standard, this brief sites to both section 3729(a)(1) and 3729(a)(2) as they existed before the FERA amendments.

the United States; (2) the claim was false or fraudulent; and (3) the defendant had knowledge, as defined by the False Claims Act, that the claim was false.  *See, e.g.*, *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d. 129, 135 (D.D.C. 2010).  The elements of a cause of action under section 3729(a)(2) are: (1) the defendant made or used a false record or statement; (2) to get a false or fraudulent claim paid by the United States; and (3) the defendant had knowledge, as defined by the FCA, that the record or statement was false.  *Id.* at 140.  Additionally, while not an element of a violation the False Claims Act, one who violates the False Claims Act is liable to the United States for statutory penalties for each false statement or claim, "plus three times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a).

In this case, all of the relevant facts recounted above and in the United States' Statement of Undisputed Material Facts are undisputed.  They have been testified to in a lengthy jury trial with full opportunity for cross-examination and impeachment.  The United States respectfully submits that although there exist triable issues of fact as to whether SAIC acted knowingly within the meaning of both sections 3729(a)(1) and (a)(2) of the False Claims Act, and the amount of damages sustained by the United States as a result of the SAIC's actions, there is no genuine dispute of material fact that SAIC submitted false claims and made false statements to the NRC.  The undisputed facts presented at trial, coupled with the D.C. Circuit's opinion affirming this Court's opinion regarding the law of implied certification, resolve this issue, as a matter of law, in favor of the United States.  Resolving the issue of falsity now will narrow the issues for trial and therefore is an appropriate subject of summary judgment.

> 2.     By Failing to Disclose Its Relationships and Denying Their Existence In
> Certifications to the NRC, SAIC, As a Matter of Law, Made False
> <u>Statements and Submitted False Claims To the NRC</u>

It is undisputed that SAIC did not disclose its relationships with BNFL, BJC, ARMR, or

Alaron, or its financial interest in the PHP, to the NRC contracting officer as it was required to

do under its contracts with the NRC.  Additionally, the undisputed facts demonstrate that these

relationships were of the type for which the contract required disclosure.  As discussed above,

each of these organizational conflicts of interest ("OCIs") involved situations in which SAIC

provided advice and assistance to organizations regarding the release and recycle of radioactive

material on matters and to entities subject to the NRC's regulatory authority, and thus, "regulated

by the NRC."  SMF at ¶ 17; *see, supra*, pp. 9-16.

For example, because the nature of the BNFL project involved removing radioactive

material from a DOE site and free releasing it into interstate commerce, it fell within the ambit of

the NRC's regulatory authority.  *See, e.g.*, SMF at ¶¶ 12, 45-77; *see also SAIC*, 653 F. Supp. 2d

at 99-100, *supra*, pp. 9-11.  Indeed, the inclusion of MSC, an entity licensed and operating under

NRC regulatory authority, in the project team as the entity that would actually be recycling and

releasing the material, makes this point very clear.  SMF at ¶¶ 44, 60.  ARMR included a number

of NRC licensees, and SAIC's Vice President's role in ARMR included providing advice and

assistance related to the very same rulemaking effort on which SAIC was assisting the NRC.

SMF at ¶¶ 98-107; *supra*, pp. 12-13.  SAIC's plans for the PHP included both following the

NRC's rulemaking efforts and obtaining an NRC license for the recycle and release of materials.

SMF at ¶ 83; *supra*, pp. 14-15.  Alaron was an NRC licensee, and SAIC's advice and assistance

26

concerned regulatory compliance regarding the free release of materials from Alaron's NRC-licensed and regulated facility. *SAIC*, 653 F. Supp. 2d at 100; SMF at ¶¶ 108-112; *supra*, 15-16.

Further, as discussed above, each of these OCIs placed SAIC in a situation in which its work for the NRC could potentially be biased. *See, e.g.*, *SAIC*, 653 F. Supp. 2d at 100-101; *supra*, pp. 9-16. Notably, SAIC's own training materials regarding organizational conflicts of interest noted that this potential for bias existed if SAIC was providing advice and assistance to the NRC, and, at the same time, was providing advice and assistance to any other organization in the same technical area or on the same or similar matter and that such a situation therefore required disclosure. SMF at ¶ 113. It is thoroughly undisputed that the BNFL, BJC, Alaron, PHP, and ARMR relationships each involved situations in which SAIC was providing advice and assistance to other entities in the same technical area, that is, release and recycle of radioactive material, in which it was providing advice and assistance to the NRC. *See, supra*, pp. 9-16. That alone created a potential for bias which required disclosure, as recognized by SAIC's own OCI training materials.

Furthermore, a number of these relationships involved SAIC being required to assess the public health and safety impacts of release and recycle of radioactively contaminated material, the same task that SAIC was performing for the NRC. *See, e.g.*, *SAIC*, 653 F. Supp. 2d at 100-101; SMF at ¶¶ 7, 10, 14, 45, 58, 60-61, 70-72, 96-97; *supra*, pp. 9-16. Because SAIC saw the BNFL Oak Ridge Recycle project and similar projects as current and planned future business opportunities, SAIC's judgment for the NRC regarding whether and to what extent release and recycle could impact public health and safety could have been biased. *See, e.g.*, *SAIC*, 653 F. Supp. 2d at 100 ("Given that SAIC assessed the safety of the BNFL recycle project in light of

27

existing NRC regulations and saw the BNFL recycle project as a potential business opportunity going forward, it is a reasonable conclusion that SAIC's judgment regarding whether and how recycle projects with components similar to the BNFL project could affect public health and safety may have been biased by its BNFL work."), at 101 (BJC and ARMR relationships also placed SAIC in a position in which its judgment for the NRC could have been biased); SMF at ¶¶ 52-54, 60-62, 66 (BNFL), at ¶¶ 93-97 (BJC), at ¶ 103, 105 (ARMR).

Additionally, SAIC's analysis of these projects in light of the NRC's current release standard, NRC Regulatory Guide 1.86, created a potential for bias in that SAIC understood that its work for the NRC could have replaced that standard with a new standard based on SAIC's work for the NRC, particularly given that SAIC understood that if its work demonstrated that Regulatory Guide 1.86 was not adequately protective of public health, the BNFL project and other projects would be in danger. SMF at ¶ 61; *SAIC*, 653 F. Supp. 2d at 100-101. Moreover, the fact that the success of each of these projects would be enhanced by an NRC clearance rule created an additional potential for bias that required disclosure. SMF at ¶¶ 10-12, 17, 60-62 (BNFL), at ¶¶ 65-66, 75-77 (BNFL), at ¶¶ 80-84 (PHP), at ¶¶ 93-97 (BJC), at ¶¶ 103-105 (ARMR), at ¶ 109 (Alaron).

A claim is false if it rests on a false representation of compliance with a federal statute, federal regulation, or contractual term. *SAIC*, 626 F.3d at 1266-69; *see also* S. Rep. No. 99–345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (the "most common form" of false claim is a "claim for goods or services not provided, or provided in violation of contract terms, specification, statute, or regulation."). Such a representation of compliance may be either express or implied. *Id.* A claim is false or fraudulent under the False Claims Act on the basis of

an implied certification if "the contractor withheld information about its noncompliance with material contractual requirements." *SAIC*, 626 F.3d at 1269; *SAIC*, 653 F. Supp. 2d at 101-104; see *also United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000).[4]

In the False Claims Act context, a statement, regulation, or contractual provision is material if it "has a natural tendency to influence agency action or is capable of influencing agency action." *See U.S. ex rel. Fago v. M & T Mort. Corp.*, 518 F. Supp. 2d 108, 118 (D.D.C. 2007) (*quoting U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Alabama*, 104 F.3d 1453, 1460 (4th Cir. 1997)); *U.S. ex rel. Ervin and Assoc., Inc. v. Hamilton Secs. Grp., Inc.*, 370 F. Supp. 2d 18, 45-46 (D.D.C. 2005); *see also Hays v. Hoffman*, 325 F.3d 982, 992 (8th Cir. 2003) ("false claims were material if they were capable of influencing the government's payment decision") (internal quotation marks omitted).  Here, the evidence is undisputed, and, indeed, SAIC and

---

[4]        As noted by the D.C. Circuit in *SAIC*, other circuits have also found FCA liability when a defendant submits claims while violating material contractual terms.  *See, e.g., United States ex rel. Hutcheson v. Blackstone*, – F.3d –, 2011 U.S. App. LEXIS 10972, *29-32 (1st Cir. 2011) (a claim is false if the defendant fails to comply with a material condition of payment); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010) ("[F]alse certification—regardless of whether it is implied or express—is actionable under the FCA only if it leads the government to make a payment which, absent the falsity, it may not have made."); *id*. at 1170 (concluding that the qui tam plaintiff successfully stated an FCA claim by alleging regulatory violations that "also constituted material breaches of ... contractual obligations"); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531–32 (10th Cir. 2000) (monthly invoices were false because the company implicitly certified that it met contractual obligations to recover and dispose of trace silver according to Environmental Protection Agency guidelines); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.2010) ("[i]mplied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim.").

NRC witnesses unanimously testified, that SAIC's OCI obligations were material to the NRC's decisions to award SAIC its contracts, to allow SAIC to keep its contracts, and to approve payment to SAIC on its contracts.  *See SAIC*, 626 F.3d at 1271. (OCI obligations material as "[n]umerous witness[es] from both the NRC and SAIC testified that the [organizational conflict of interest] obligations in SAIC's contracts with the NRC were important to the overall purpose of the contract.") (*quoting SAIC*, 653 F. Supp. 2d at 103 (D.D.C. 2009); SMF at ¶¶ 6, 27-29, 30-32.

As in *Ervin*, not only did SAIC's OCI obligations and certifications, and undisclosed relationships have the tendency to influence the NRC's decisions, but the evidence is undisputed that they <u>did</u> influence the NRC's decisions, a point made most starkly by the fact that when the NRC first learned of only some of the relevant facts surrounding SAIC's relationships with BNFL and BJC, it immediately terminated SAIC's contract.   SMF at ¶¶ 33-43; *Ervin*, 370 F. Supp. 2d at 46.   Mary Mace, the NRC's contracting officer, as well as other NRC officials, testified that the NRC made the decision to terminate SAIC's contract because of the new information regarding SAIC's organizational conflicts of interest, and that, had the NRC been aware of SAIC's relationships earlier, it would not have awarded the contracts, would have terminated SAIC's contracts, and would not have approved payment of claims submitted by SAIC.  SMF at ¶¶ 30-32; *see also SAIC*, 626 F.3d at 1271 ("NRC contracting officers and specialists also testified that had they been aware of SAIC's apparent or actual conflicts, such as its relationships with British Nuclear and Bechtel Jacobs, they would not have awarded the two contracts, nor would they have made payments under those contracts."); *SAIC*, 653 F. Supp. 2d at 102-104.  Indeed, this Court has already determined, as a matter of law, that the information that

SAIC withheld regarding its relationships as well as SAIC's affirmative false certifications regarding OCIs, did have a tendency to influence the NRC's payment decisions and were therefore material.  *See* SMF at ¶ 114 (7/24 a.m. Tr. 138:4-22).

For the same reasons, the undisputed facts demonstrate that SAIC made and used its false statements regarding its lack of OCIs to get its claims paid.  *SAIC*, 653 F. Supp. 2d at 104-106;. *see also Allison Engine v. U.S. ex rel. Sanders*, 553 U.S. 662, 668-69 (2008).  Indeed, SAIC's own contracts manager testified that SAIC made its representations to the NRC regarding OCIs in order to the contracts and to get payments under its contracts, that it understood that the OCIs provisions were essential to SAIC's eligibility to perform and be paid under the contract, and further testified that he understood that such certifications were required in order to get SAIC's claims paid.  SMF at ¶¶ 27-29.

Accordingly, because the undisputed evidence demonstrates that SAIC had an obligation to disclose its OCIs and SAIC failed to do so, and because the undisputed evidence demonstrates that the OCI obligations were material to the NRC's decisions to pay SAIC's claims, and that SAIC understood that its obligations were material, the United States is entitled to judgment as a matter of law that SAIC submitted false claims to the NRC and made and used false statements regarding the absence of OCIs in order to get its false claims paid.

## CONCLUSION

As stated above, the D.C. Circuit's opinion, the doctrines of issue preclusion and "law of the case," and the undisputed evidence establish that because compliance with SAIC's OCI obligations and the information that SAIC withheld were material to the NRC's decisions to award the contracts and to pay SAIC, the claims submitted by SAIC on its NRC contracts were,

31

as a matter of law, false claims.  Additionally, it is undisputed that SAIC's statements regarding

the lack of OCIs were false statements that were made and used to get SAIC's false claims paid.

Partial summary judgment on the element of falsity, a distinct element of a cause of action under

the False Claims Act, is therefore appropriate.  Whether SAIC acted with knowledge, as that

term is defined by the False Claims Act, is an appropriate subject of a retrial in light of the D.C.

Circuit's opinion, as is the amount of damages sustained by the United States as a result of

SAIC's conduct.


Respectfully submitted,

TONY WEST
ASSISTANT ATTORNEY GENERAL


*/s/ Daniel Hugo Fruchter*
JOYCE R. BRANDA
PATRICIA R. DAVIS
DONALD J. WILLIAMSON
DANIEL HUGO FRUCHTER
PATRICIA M. FITZGERALD
Attorneys
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 305-2035


DATED: June 23, 2011

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.                                          Civil No.  04-CV-1543 (RWR)

SCIENCE APPLICATIONS
INTERNATIONAL CORPORATION,

Defendant.

## PLAINTIFF UNITED STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules LCvR 7 and

LCvR 56.1, Plaintiff, the United States of America, hereby submits the following Statement of

Undisputed Material Facts ("SMF") in support of its accompanying Motion for Partial Summary

Judgment.

**The Nuclear Regulatory Commission**

1.       The NRC is an independent federal agency established by the Energy

Reorganization Act in 1974 to regulate the civilian use of nuclear materials and to protect public

health, public safety, and the environment from the harmful effects of radiation.  *See* 42 U.S.C. §

2201; *United States v. SAIC*, 626 F. 3d 1257, 1261 (D.C. Cir. 2010).

2.       Pursuant to the Atomic Energy Act of 1946, as amended in 1954 (AEA), the

Atomic Energy Commission and its successor, the NRC, are given the authority to regulate the

civilian possession, use, transportation and disposal of nuclear material in the United States.  *See*

42 U.S.C. § 2201.

3.      Pursuant to its statutory authority, the NRC oversees the release into interstate commerce of commercially valuable recycled radioactively contaminated materials from nuclear facilities.  The NRC carries out its responsibilities by establishing scientific standards for release and recycle, and by requiring entities to possess an NRC license in order to possess, utilize, dispose of, or transport radioactive material.  42 U.S.C. §§ 2201, 2111; 10 C.F.R. § 8.4.  *See also* *SAIC*, 626 F. 3d at 1261.

**SAIC's NRC Contracts**

4.      In 1992, the NRC contracted with SAIC to provide technical assistance in the areas of control, release, and recycle of radioactive solid material (the "1992 NRC Contract"). The 1992 NRC Contract called for technical assistance on the subject matter of the release and reuse/recycle of material and equipment from nuclear facilities.  *SAIC*, 626 F.3d at 1261-62; Cardile Testimony, attached hereto as Exhibit 1, 7/1 p.m. Tr. 78:23-79:10; 86:90:2-90:6[1].

5.      SAIC's advice and assistance to the NRC on the 1992 NRC Contract was intended to assist the NRC in developing a regulation regarding the release and recycle of radioactive scrap metal and other radioactive material  by NRC and Agreement State Licensees. (the "clearance rule").  Cardile Testimony, Exh. 1, 7/1 p.m. Tr. 82:10-85:13; Mauro Testimony, attached hereto as Exh. 2, 7/21 a.m. Tr. 117:19-119:19.

6.       SAIC understood that the subjects upon which SAIC was advising the NRC were and are, by their very nature, controversial.  It was therefore essential that SAIC's work for

---

[1]      References to testimony in this Statement of Undisputed Material Facts reference testimony during the jury trial in this matter that took place in July 2008.  References to exhibits reference exhibits that were admitted at trial.

the NRC be free from any actual or potential conflict of interest.  Rodehau Testimony, attached

hereto as Exhibit 3, 7/3 p.m. Tr. 59:1-59:23; Cardile Testimony, Exh. 1, 7/1 p.m. Tr. 71:15-72:4;

84:1-19.

7.      SAIC's work for the NRC on the 1992 Contract was in the following technical

areas: (1) clearance, recycle and release of nuclear material from nuclear facilities; (2)

measurement of radioactivity in solid materials at nuclear facilities; (3) regulations and standards

applicable to the release of slightly contaminated solid material from nuclear facilities; (4)

measuring inventories of solid material at nuclear facilities; and (5) assessment of health and

safety issues for nuclear workers, the public and the environment pertaining to the release of

nuclear material from nuclear facilities.  Cardile Testimony, Exh. 1, 7/1 p.m. Tr. 82:10-82:15,

85:3-85:13, 7/2 a.m. Tr. 6:3-17:2; McKenzie-Carter Testimony, attached hereto as Exhibit 4,

7/17 a.m. Tr. 96-102:16;  *SAIC*, 653 F. Supp. 87, 92-93 (D. D. C. 2009); *see also* Slack

Testimony, attached hereto as Exhibit 5, 7/9 p.m. Tr. 66:21-68:9; Rucker Testimony, Exh. 6,

attached hereto as Exhibit 6, 7/10 a.m. Tr. 109:3-110:15.

8.      The NRC sought assistance in these areas because it needed to develop a solid,

defensible and unbiased technical foundation and basis to engage in rulemaking on the issue of

the release of slightly contaminated solid material from nuclear facilities.  Cardile Testimony,

Exh. 1, 7/1 p.m. 85:3-85:13, 90:2-90:6.

9.      The 1992 NRC Contract set out formal tasks for SAIC to: 1) conduct a literature

search and analysis of the information available related to the potential reuse and recycle of

material from nuclear facilities; 2) assess the potential dose to various members of the public that

could be expected to occur from the recycle, reuse, and release of radioactive material from

nuclear facilities; 3) prepare a draft regulatory options paper for the NRC consideration setting forth various regulatory options for release and recycle, and the pros and cons of each option; 4) assist in the preparation of regulatory products as the NRC moved to rulemaking; and 5) assist in the preparation of regulatory guides.  Cardile Testimony, Exh. 1, 7/2 a.m. Tr. 6:19-17:2; Meck Testimony, attached hereto as Exhibit 7, 7/3 a.m. Tr. 89:4-89:15.   A subsequent modification to the 1992 NRC contract required SAIC to prepare a regulatory issues paper setting out the issues and concerns of various "stakeholders," including those who carried out recycle and release of radioactive scrap metal, as well as the costs and benefits of various regulatory options for recycle and release.  Jupiter Testimony, attached hereto as Exhibit 8, 7/22 p.m. Tr. 27-34.

10.     At the time of the 1992 NRC Contract, release of radioactively contaminated solid materials was governed by NRC Regulatory Guide 1.86.  SAIC understood that its work on the NRC contract included considerations of Regulatory Guide 1.86 and that  part of what it was advising the NRC on was whether Regulatory Guide 1.86 was adequately protective of public health, safety, and the environment.  Additionally, SAIC understood that the NRC regulation for which SAIC was providing broad technical advice and recommendations would have replaced NRC Regulatory Guide 1.86 and that SAIC's work would have been used in determining types and quantities of radioactive material that could be released.  McKenzie-Carter Testimony, Exh. 4, 7/17 p.m. Tr. 41:25-42:16.

11.     Any NRC rule governing the release and recycle of radioactive material into general commerce would have governed entities in so-called "agreement states" such as Tennessee, which are legally required to enact laws and policies consistent with NRC rules and regulations.  SAIC understood this.   Cardile Testimony, Exh. 1, 7/1 p.m. Tr. 82:16-83:22;

McKenzie-Carter Testimony, Exh. 4, 7/17 p.m. Tr. 40:20-41:13; Murray Testimony, attached

hereto as Exhibit 9, 7/2 p.m. Tr. 67:25-68:8; Rucker Testimony, Exh. 6, Exh. 6, 7/10 a.m. Tr.

78:6-78:9; Mauro Testimony, Exh. 2, 7/21 a.m. Tr. 117:19-119:19.

12.     Additionally, any NRC rule governing the release and recycle of radioactive

material into general commerce would have applied to release into general commerce from DOE

facilities.  This is because once material leaves a DOE site and enters general commerce, it

becomes subject to NRC regulatory authority and jurisdiction.  SAIC understood this.

*SAIC*, 626 F.3d at 1272; *SAIC*, 653 F. Supp. 2d. at 96-97, 100; Truitt Testimony, attached hereto

as Exhibit 10, 7/10 pm Tr. 21:7-22:1 ("any radiological material that went off-site would be

subject to NRC once it left the DOE fence"). Turner Testimony; attached hereto as Exhibit 11,

7/8 p.m.  Tr. 39-40, 7/8 a.m Tr. 66-67; Caldwell Testimony, attached hereto as Exhibit 12, 7/9

p.m. Tr. 80:11-83:6 (material from the BNFL project that left the DOE site would be subject to

compliance with NRC regulations and requirements).

13.     As of December 1998, SAIC's work on the 1992 NRC Contract was not

complete.  Therefore, the NRC awarded a follow-on contract to SAIC in 1999 (the "1999 NRC

Contract").  Meck Testimony, Exh. 7, 7/3 a.m. Tr. 96:13-97:2, 100:17-102:25.

14.     Under the 1999 NRC Contract, SAIC was to provide continued advice and

assistance on the NRC's effort to establish a rule providing for the release and recycle of

radioactively contaminated solid materials.  Specifically, SAIC's work in the 1999 Contract was

divided into three areas: (1) analysis and characterization of sources of radioactively

contaminated solid material that existed at commercial and Department of Energy nuclear sites;

(2) "dose assessment," that is, estimation of the potential public health, safety, and environmental

impacts of release and recycle of radioactively contaminated materials; and (3) cost-benefit analysis for the proposed rulemaking focusing on public health, occupational health, potential changes in costs of consumer products, and industrial operations not licensed by NRC.  The costs estimated for regulatory alternatives were to be associated with materials and equipment potentially cleared by NRC and Agreement State licensees.  Meck Testimony, Exh. 7, 7/3 a.m. 102:2-103:12; McKenzie-Carter Testimony, Exh. 4, 7/17 p.m. Tr. 16:25-17:8; Motl Testimony, attached hereto as Exhibit 13, 7/23 a.m. 21:20-23:5, 45:1-46:14.

### SAIC's Organizational Conflicts of Interest Obligations

15.     Both the 1992 and 1999 NRC Contracts (collectively, the "NRC Contracts") imposed obligations on SAIC regarding actual and potential organizational conflicts of interest ("OCIs").  Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 43:8-53:20.  Under both contracts, the ultimate determination as to whether a particular situation or relationship gave rise to an organizational conflict of interest rested with the NRC.  41 C.F.R. 20-1.54 at p. 3 ("The ultimate determination by NRC as to whether organizational conflicts of interest exist will be made in light of common sense."); 48 C.F.R. 2009.570-3 ("NRC's ultimate determination that organizational conflicts of interest exist will be made in light of common sense…"); Rodehau Testimony, Exh. 3, 7/3 pm Tr. 72:8-72:13.

16.     Under both contracts, SAIC was required to avoid certain types of situations and relationships, to certify to the absence of such situations and relationships, and to disclose such situations and relationships if and when they did arise.  *SAIC*, 626 F. 3d at 1262; 41 C.F.R. 20-1.54 (1979) ("It is the policy of the U.S. Nuclear Regulatory Commission (NRC) to avoid, eliminate or neutralize contractor organizational conflicts of interest.  The NRC achieves this

objective by requiring all prospective contractors to submit information describing relationships, if any, with organizations or persons (including those regulated by the NRC) which may give rise to actual or potential conflicts of interest in the event of contract award."); 48 C.F.R. § 2009.570-3; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 44:25-46:10 (SAIC was obligated to avoid relationships that could give rise to an OCI, to disclose any such relationships, and to certify to the absence of any such relationships); Martin Testimony, attached hereto as Exhibit 14, 7/14 a.m. Tr. 72:22-77:15; *see also* 42 U.S.C. § 2210a; Scott Testimony, attached hereto as Exhibit 15, 7/3 a.m. Tr. 32:2-32:18 (NRC's OCI requirements are required by and based on its statutory obligation to contract for conflict-free work).

17.     NRC regulations incorporated into SAIC's NRC Contracts described the relationships that SAIC was required to avoid and disclose, and to the absence of which SAIC was required to certify:

(i)     Where the offeror or contractor provides advice and recommendations to the NRC in a technical area in which it is also providing consulting assistance in the same area to any organization regulated by the NRC.

(ii)    Where the offeror or contractor provides advice to the NRC on the same or similar matter in which it is also providing assistance to any organization regulated by the NRC.

(iv)    Where the award of a contract would otherwise result in placing the offeror or contractor in a conflicting role in which its judgment may be biased in relation to its work for the NRC or may otherwise result in an unfair competitive advantage for the offeror or contractor.

41 C.F.R. 20-1.54 at p. 3; *SAIC*, 626 F. 3d at 1262-63; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 48:6-50:1; Scott Testimony, Exh. 15, 7/3 a.m. Tr. 42:16-44:2.  The 1999 NRC Contract contained a similar provision that did not differ in substance from that found in the 1992 Contract.  48 C.F.R. § 2009.570-3; *SAIC*, 626 F.3d at 1262; Scott Testimony, Exh. 15, 55:2-57:8.

7

The situations or relationships subject to the rule could be contractual or other than contractual, and could be present or planned.  Scott Testimony, Exh. 15, 7/3 a.m. Tr. 45:23-46:19, 67:6-73:21; Martin Testimony, Exh. 14, 7/14 a.m. Tr. 52:3-52:8; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 75:13-76:17.

18.     SAIC's Cost Proposal for the 1992 Contract, submitted on October 1, 1991, contained the following certification made by SAIC:

> I represent to the best of my knowledge and belief that [t]he award to Science Applications International Corp. of a contract or the modification of an existing contract . . . does not involve situations or relationships of the type set forth in 20-1.5403(b).

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 54:16-55:9.

19.     SAIC's Cost Proposal for the 1992 Contract also certifies that "there are no former or current contractual or organizational relationships of SAIC as a corporation or of individual SAIC personnel that might give rise to apparent or actual organizational conflicts of interest with respect to the work proposed.  SAIC will immediately notify NRC of any changes which may result in any organizational conflicts of interest."  Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 55:10-57:6.

20.     SAIC's Best and Final Offer of January 23, 1992, as well as its May 18, 1992 Revised Best and Final Offer, certify that SAIC and its individual personnel have no relationships that might give rise to organization conflicts of interest with respect to the work proposed.  SAIC stated that it would "immediately notify NRC of any changes which may result in organizational conflicts of interest."  Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 59:23-62:22.

21.     The text of the 1992 Contract, executed on August 18, 1992, incorporated and

contained the following certification:

> I represent to the best of my knowledge and belief that:
> The award to Science Applications International Corp. of a contract or the
> modification of an existing contract . . . does not involve situations or
> relationships of the type set forth in 20-1.5403(b).

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 64:20-65:8; *SAIC*, 626 F.3d at 1262-63.

22.     The 1992 Contract contained post-award OCI obligations in which SAIC agreed

to "forego entering into consulting or other contractual arrangements with any firm or

organization, the result of which may give rise to a conflict of interest with respect to the work

being performed under this contract."  Section H.5(d)(2) of the contract in particular stated:

> The contractor agrees that, if after award, it discovers organization
> conflicts of interest with respect to this contract, it shall make an
> immediate and full disclosure in writing to the Contracting Officer. . . .
> The NRC may . . . terminate the contract if termination is in the best
> interest of the Government.

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 41:16-50:1; *see also SAIC*, 626 F.3d 1261-62.

23.     SAIC submitted proposals for contract modification to the 1992 Contract on at

least the following occasions: December 14, 1994, April 2, 1996, and April 7, 1998.  Each of

SAIC's proposals for contract modification contained the following statement:

> To the best of my knowledge and belief, the award to SAIC of this modification to
> Contract No. NRC-04-92-037 does not involve situations or relationships of the
> type set forth in NRCAR 2009.570-3(b)(1).

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 65:9-70:10; Martin Testimony, Exh. 14, 7/14 a.m. Tr.

59:3-61:5; *SAIC* 626 F.3d at 1262-63.

24.     Additionally, the 1992 Contract was bilaterally modified on a number of

occasions. Each modification contained representations by SAIC that all terms of conditions of

9

the original contract, including SAIC's OCI obligations, "remain unchanged and in full force and

effect." Martin Testimony, Exh. 14, 7/14 a.m. Tr. 64:7-71:10.

25.    On May 27, 1999, SAIC's proposal for the 1999 NRC Contract contained the

following representation:

> I represent to the best of my knowledge and belief that:
> The award to Science Applications International Corporation of a contract or the
> modification of an existing contract . . . does not involve situations or
> relationships of the type set forth in 48 CFR 2009.570-3(b).

Martin Testimony, Exh. 14, 7/14 a.m. Tr. 72:8-77:15.

26.    Like the 1992 Contract, the 1999 Contract also contained post-award disclosure

obligations in which SAIC agreed to "forego entering into consulting or other contractual

arrangements with any firm or organization, the result of which may give rise to a conflict of

interest with respect to the work being performed under this contract."  Section H.1(d)(2) of the

contract in particular stated:

> The contractor agrees that, if after award, it discovers organization conflicts of
> interest with respect to this contract, it shall make an immediate and full
> disclosure in writing to the contracting officer. . . . The NRC may . . . terminate
> the contract if termination is in the best interest of the government.

Martin Testimony, Exh. 14, 7/14/a.m. Tr. 72:8-77:15.

27.    SAIC made these certifications in ¶¶ 17-26, *supra*, to get its NRC contracts, to

keep its NRC Contracts, and to get payments under its NRC Contracts.  SAIC understood that it

had to abide by its OCI obligations in order to get paid on its NRC Contracts.  Rodehau

Testimony, Exh. 3, 7/3 p.m. Tr. 43:24-44:3; 47:5-47:7; 62:19-62:22 (Q: "And again, it was a

requirement in order for SAIC to get the contract and to get payments under the contract that it

make such certifications, correct?  A: Yes.").  SAIC further understood that fulfilling its OCI

obligations was important to NRC's project.  McKenzie-Carter Testimony, Exh. 4, 7/17 p.m. Tr. 45:8–46:21; Thadani Testimony, attached hereto as Exhibit 16, 7/21 a.m. Tr. 53:15–56:6, 64:19–67:2; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 44:7-44:10 (SAIC's contracts manager stated that it was "absolutely" important that SAIC provided advice that was free from bias or potential bias).  SAIC understood that noncompliance with its OCI obligations was grounds for disqualification from award or termination of SAIC's NRC Contracts.  Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 46:18-47:4; Scott Testimony, Exh. 15, 7/3 a.m. Tr. 51:12-53:14.

28.     The NRC relied on the accuracy of SAIC's representations that SAIC had no relationships of the type listed in the NRC's OCI regulations in awarding SAIC its NRC Contracts, in allowing SAIC to keep its NRC Contracts, and in approving SAIC's claims for payment on its NRC Contracts.  *SAIC,* 626 F.3d at 1271; McCubbin Testimony, attached hereto as Exhibit 17, 7/15 p.m. Tr. 65:14-68:11, 69:9-70:19; Pool Testimony, attached hereto as Exhibit 18, 7/15 a.m. Tr. 30:4-34:18, 48:6-48:25; *see also* Scott Testimony, Exh. 15, Tr. 7/3 a.m. 32:4–32:8 (stating that the NRC was very concerned that work done by the agency or in support of its regulations "be free of any kind of doubt or conflict, and that the public can trust in the work that the agency does").

29.     SAIC understood that if it had a situation or relationship for which disclosure was required, it was irrelevant whether SAIC could "resist temptations" that could arise from OCIs in any given instance because it was the potential for bias that created an organizational conflict of interest and thus required disclosure.  48 C.F.R. § 2009.570-3(d); Scott Testimony, Exh. 15, 7/3 a.m. Tr. 40-41; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 51:7-51:22.  In other words, SAIC understood that it was irrelevant to the NRC whether SAIC or someone else could demonstrate

11

that SAIC did not allow an OCI to improperly influence its work.  SAIC understood that what

mattered to the NRC was the potential for bias.  *Id.*

### SAIC's Claims For Payment Under Its NRC Contracts

30.     SAIC submitted, and the NRC paid, 82 claims for payment under the 1992 NRC

Contract, for a total of $2,630,000.00, and 5 claims for payment under the 1999 NRC Contract,

for a total of $216,068.42.  In total, SAIC was paid $2,846,068.48 by the NRC on the two

contracts.  Plaintiff's Exhibit 955, stipulated exhibit regarding claims submitted to and paid by the

NRC, attached hereto as Exhibit 19; Martin Testimony, Exh. 14, 7/14 a.m. Tr. 71:17-72:7, 84:9-

84:20.

31.     SAIC did not disclose its financial interest in the Plasma Hearth Process

("PHP"), or its relationships with British Nuclear Fuels, Inc. ("BNFL"),  Bechtel-Jacobs

Corporation ("BJC"), the Association of Radioactive Metals Recyclers ("ARMR"), or Alaron

Corporation ("Alaron") to the NRC.  Mace Testimony, attached hereto as Exhibit 20, 7/15 p.m.

Tr. 114:7-114:10, 116:18-118:1, 7/16 a.m. Tr. 37:14-38:7; Pool Testimony, Exh. 18, 7/15 a.m.

Tr. 34:23-36:19; Meck Testimony, Exh. 7, 7/3 p.m. Tr. 35-36.

32.     If SAIC had disclosed its relationships with those entities, the NRC: (1) would not

have awarded SAIC its NRC Contracts; (2) would not have allowed SAIC to keep its NRC

Contracts; and (3) would not have approved payment to SAIC on its NRC Contracts.  Mace

Testimony, Exh. 20, 7/15 p.m. Tr. 114:11-115:19 (if the NRC had known about SAIC's

relationships, "[t]he contract would not have been awarded to SAIC" and if the NRC had found

out after the contract had been awarded, it would have been terminated); Pool Testimony, Exh.

18, 7/15 a.m. Tr. 34:23-38:21, 42:16-43:16; McCubbin Testimony, Exh. 17, 7/15 p.m. Tr. 73:5-

12

80:16; Plaintiff's Exhibit 981, No-Cost Settlement Termination, attached hereto as Exhibit 21.

The NRC would have immediately pursued the matter and terminated the contract as it did in

March 2000 after SAIC was forced to disclose its relationships with BNFL and BJC. Mace

Testimony, Exh. 20, 7/15 p.m. Tr. 107:16-108:9, 117:3-118:1; Plaintiff's Exhibit 981, No-Cost

Settlement Termination, Exh. 21, *see also, infra*, SMF at ¶¶ 33-42.

**The NRC Discovers SAIC's Organizational Conflicts of Interest**

33.     In November 1999, with the NRC still completely unaware of SAIC's OCIs, the

NRC held a public meeting to discuss its clearance rulemaking.  At the public meeting, an

individual complained that the NRC's rulemaking was tainted because of contractor conflict of

interest in that SAIC was involved as a partner to BNFL in a large radioactive metal recycling

project in Oak Ridge Tennessee.  Cardile Testimony, Exh. 1, 7/2 a.m. Tr. 43:16-46:21; Meck

Testimony, Exh. 7, 7/3 a.m. Tr. 108:11-108:22, 7/3 p.m. Tr. 4:21-5:17.  This was the first time

the NRC learned about SAIC's role in the BNFL Oak Ridge Recycle Project.  *Id.*

34.     Immediately, on November 10, 1999, NRC Contracting Officer, Mary Mace, sent

a letter to SAIC stating that the NRC was "very concerned" about this allegation of conflict of

interest and asked SAIC to provide an immediate and full disclosure by November 22, 1999 to

the NRC of documents that "describe the work that SAIC has performed and is presently

performing involving NRC licensees or applicants (including the Department of Energy and

BNFL) which comes within the scope of the referenced NRC/SAIC contracts (including but not

limited to individual and collective dose estimates, and recycle or release of nuclear wastes.)"

Martin Testimony, Exh. 14, 7/14 a.m. Tr. 84:21-87:18; Plaintiff's Exhibit 779, November 10,

1999 Letter from NRC to SAIC, attached hereto as Exhibit 22.

35.    On November 22, 1999, SAIC responded to the NRC request and set forth a total

of 10 previously undisclosed relationships.   Martin Testimony, Exh. 14, 7/14 a.m. Tr. 93:24-

106:7.  SAIC's November 22, 1999 submission did not contain any mention of SAIC's

relationships with Alaron, ARMR, or with respect to the PHP. Martin Testimony, Exh. 14, 7/14

a.m. Tr. 105:18-106:7, 110:16-110:19.

36.    In response to the NRC's November 10, 1999 letter requesting "statements of

work or other documents that describe the work that SAIC has performed and is presently

performing involving NRC licensees or applicants (including Department of Energy and BNFL)

which comes within the scope of the [1992 and 1999 Contracts] (including but not limited to

individual and collective dose estimates, and recycle or release of nuclear wastes), SAIC

disclosed certain work performed for BNFL and BJC that is at issue in this case.  Martin

Testimony, Exh. 14, 7/14 a.m. Tr. 93:24-106:7.  This was the first time that SAIC disclosed these

relationships to the NRC.  Martin Testimony, Exh. 14, 7/14 a.m. Tr. at 104:17-104:21.

37.    On November 24, 1999, SAIC sent the NRC an additional letter, stating:

"Although SAIC has been involved with reguatory compliance work since the
project onset, we have not supported work or regulatory compliance specifically
related to the unconditional release of materials."

Martin Testimony, Exh. 14, 7/14 a.m. Tr. at 111:19-112:21.

38.    On December 16, 1999, the NRC, having considered SAIC's November 22

disclosures, issued a Stop Work Order to SAIC.  Martin Testimony, Exh. 14, 7/14 a.m. Tr. 113:9-

114:14.

39.    On December 17, 1999, NRC notified SAIC that it considered SAIC's failure to

disclose its relationships with BNFL and BJC to be a breach of the OCI provisions in its contract

with the NRC.  NRC further notified SAIC that it was considering terminating the contract

because of these violations.  SAIC was given until January 10 to provide NRC with facts as to

why the contract should not be terminated.  Plaintiff's Exhibit 812, December 17, 1999 Cure

Letter from NRC to SAIC, attached hereto as Exhibit 23; Martin Testimony, Exh. 14, 7/14 p.m.

Tr. 5:15-7:22.

40.     On January 10, 2000, SAIC responded to NRC's Cure Notice of December 17

with a Letter to the NRC Contracting Officer.   SAIC set forth facts about its relationships with

BNFL and BJC and asserted that termination was unwarranted.  Id.  SAIC sent this letter

intending that the NRC rely on the representations contained therein, in order to convince the

NRC that it did not have any OCIs and that it should be permitted to keep its NRC Contract, and

thus, continue to get paid on its NRC contract.   Plaintiff's Exhibit 837, January 10, 2000 Letter

from SAIC to the NRC, attached hereto as Exhibit 24; Martin Testimony, Exh. 14, 7/14 p.m. Tr.

13:25-14:12, 22:16–23:3; 29:25–30:3; *see also SAIC*, 653 F. Supp. 2d. 87, 105 (D.D.C. 2009).

41.     SAIC's January 10, 2000 letter to the NRC made a number of assertions about

SAIC's relationship with BNFL and SAIC's role on the BNFL Oak Ridge Recycle Project.

SAIC's January 10, 2000 letter claimed, *inter alia*, that: (1) the BNFL contract did not "involve

commercial activities of any kind"; (2) "SAIC did not support activities where the State of

Tennessee was the regulatory authority"; (3) "SAIC did not support activites realted to the

unconditional release of materials"; (4) "SAIC did not provide support to BNFL or its

subcontractor, MSC, in making dose estimates for released materials"; (5) "SAIC did not provide

support to BNFL or its subcontractor, MSC, in assessing the final state of metals or materials

decontaminated by MSC, including residual quantities"; (6) "SAIC has not developed models or

15

prescribed methods and procedures for measuring unconditional releases of materials"; (7)

"Neither BNFL, nor its subcontractor, MSC, has requested that SAIC review or comment on the

dealings between the project, DOE, and the State of Tennessee relating to unconditional releases

of material"; and (8) "SAIC has not performed analyses of any sort under the BNFL contract

related to the unconditional release of materials, including monitoring requirements or ALARA

analyses.  Plaintiff's Exhibit 837, January 10, 2000 Letter from SAIC to the NRC, Exh. 24;

Martin Testimony, Exh. 14, 7/14 p.m. Tr. 14:20-40:10.

42.     SAIC's January 10, 2000 letter to the NRC also made a number of assertions

about SAIC's relationship with BJC and SAIC's role on the BJC Dose Assessment Project.  The

letter claimed, *inter alia*, that: (1) "SAIC's assessments [for BJC] address current DOE

requirements"; and (2) "[SAIC's assessments] are not based on or derived from SAIC's work

under the NRC contract."  Plaintiff's Exhibit 837,  January 10, 2000 Letter from SAIC to the

NRC, Exh. 24; Martin Testimony, Exh. 14, 7/14 p.m. Tr. 40:11-42:17.

43.     On March 17, 2000, because of SAIC's failure to avoid and disclose its

organizational conflicts of interest, NRC terminated the SAIC Contract with a no-cost settlement

of the 1999 NRC Contract.   Plaintiff's Exhibit 981, No-Cost Settlement Termination Memo,

Exh. 21; Mace Testimony, Exh. 20, 7/15 p.m. Tr. 107:16-111:1.

**British Nuclear Fuels, Inc.**

44.     During the course of SAIC's performance of its NRC Contracts, BNFL Inc., the

United States subsidiary of British Nuclear Fuels plc., was a nuclear waste management,

decommissioning, engineering, and nuclear materials handling company.  *See, e.g.,* Murray

Testimony, Exh. 9, 7/2 p.m. Tr. 65:10-20.  During the course of SAIC's performance of its NRC

Contracts, Manufacturing Sciences Corporation (MSC) was a radioactive materials recycling

company.   Murray Testimony, Exh. 9, 7/2 p.m. Tr. 65:10-68:8.  As of January 1996, MSC and

BNFL were business partners on MSC's radioactive metal recycling facility in Oak Ridge,

Tennessee.  Loiselle Testimony, attached hereto as Exhibit 25, 7/7 a.m. Tr. 91-93; Turner

Testimony, Exh. 11, 7/7 p.m. Tr. 94-95.  This facility was licensed by the State of Tennessee,

pursuant to NRC regulations, to possess, handle, decontaminate, and recycle radioactive

materials.  Murray Testimony, Exh. 9, 7/2 p.m. Tr. 65:10-68:8.  Subsequently, during the

relevant time period, BNFL purchased MSC.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 91-93;

*SAIC*, 653 F. Supp. 2d at 100 (MSC a BNFL subsidiary).

45.     As set forth in ¶¶ 48-77, by no later than March 1996, SAIC began developing a

relationship with BNFL pursuant to which SAIC provided BNFL with advice and assistance in

the technical area of clearance of materials for recycle and reuse.  *See, e.g.,* Turner Testimony,

Exh. 11,  7/7 p.m. Tr. 81:17-82:14, 120:18-121:15, 7/8 a.m. Tr. 7:5-7:10, 12:20-13:15, 19:23-

23:6.  Between March 1996 and March 2000, SAIC advised and assisted BNFL on a variety of

nuclear projects relating to clearance of materials for reuse/recycle.  SAIC provided advice and

assisted BNFL with technical issues and matters related to: (1) clearance, recycle and release of

nuclear material from nuclear facilities (2) measurement of radioactivity in solid materials at

nuclear facilities; (3) regulations and standards applicable to the release of slightly contaminated

solid material from nuclear facilities; (4) measuring inventories of solid material at nuclear

facilities; (5) dose assessments relating to nuclear materials; and (6) assessment of health and

safety issues for nuclear workers, the public and the environment pertaining to the release of

nuclear material from nuclear facilities.  SAIC's work with BNFL was in the same technical area,

and on the same and similar matters, as its work for the NRC under its NRC Contracts.  *Id*; *see also* Turner Testimony, Exh. 11, 7/7 p.m. Tr. 84:17-103:17, Murray Testimony, Exh. 9, 7/2 p.m. Tr. 71:15-72:9; Slack Testimony, Exh. 5, 7/9 p.m. Tr. 66:21-68:9; Caldwell Testimony, Exh. 12, 7/9 p.m. Tr. 77:9-80:10, 101:10-103:10; McBride Testimony, attached hereto as Exhibit 26, 7/10 p.m. Tr. 54:3-63:18; *see also, infra,* ¶¶ 4-14 (scope of SAIC's NRC Contracts), 46-77 (scope of SAIC's assistance to BNFL).

March 6, 1996 Proprietary Memorandum

46.     On March 6, 1996, SAIC's Turner prepared and distributed a Proprietary Memorandum to eight other executives at SAIC as part of SAIC's business planning in the area of metal recycling and recovery.  The Memorandum identified "major opportunities" for SAIC to pursue involving radioactive scrap recycling including with BNFL.  Plaintiff's Exhibit 94, March 6, 1996 Memo from Steve Turner, attached hereto as Exhibit 27; Turner Testimony, Exh. 11, 7/7 p.m. Tr. 84:17-103:17.

47.     SAIC knew that BNFL/MSC was focusing on becoming the world's center for radioactive scrap metal recycling in Oak Ridge, Tennessee. Turner Testimony, Exh. 11, 7/7 p.m. Tr. 99:4-103:17.

48.     BNFL/MSC was planning on recycling not only DOE radioactive materials but also radioactive metal from commercial nuclear power plants licensed by the NRC.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 99:4-103:17.   SAIC was looking at ways of taking advantage of these opportunities on its own behalf by teaming with BNFL and MSC.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 99:4-103:17; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 81:21-85:18.

March 25, 1996 Metal Recycling Update

49.     On March 25, 1996, SAIC's Turner updated his opportunities memorandum on metal recycling and circulated it to the same executives.  In this memorandum, SAIC again discussed "long-term opportunities" in the Metal Recycling and Recovery business.  SAIC noted that one of the "discriminators" that made SAIC stand out for commercial firms looking for opportunities was its "DOE/NRC knowledge."  Plaintiff's Exhibit 100, 3/25/1996 Memorandum from S. Turner, attached hereto as Exhibit 28; Turner Testimony, Exh. 11, 7/7 p.m. Tr. 104:2-108:1.

50.     At the same time, also in March 1996, another SAIC Vice President, Jeffrey Slack, had identified "DOE Metal Recycling" as the number one business development priority for his group.  At this time, Slack was particularly interested in opportunities teaming with BNFL/MSC at Oak Ridge and other GDPs.  Slack Testimony, Exh. 5, 7/9 a.m. Tr. 81:21-85:18.

June 1996 Business Initiative

51.     SAIC provided advice and assistance on decontamination methods for release and recycle, the price of radioactive scrap metal, the amounts and quality of radioactive scrap metal, the regulatory standards in existence for different types of contamination in radioactively contaminated scrap metal, recycling facilities available in Oak Ridge, and long term planning on how to make the radioactive scrap metal recycling part of a long-term business.  Murray Testimony, Exh. 9, 7/2 p.m. Tr. 70:12-75:8; Turner Testimony, Exh. 11, 7/7 p.m. Tr. 108:14-118:21.  At the same time SAIC was providing this advice and assistance, SAIC was performing similar work on the 1992 Contract.  Murray Testimony, Exh. 9, 7/2 p.m. Tr. 75:9-75:25, 47:9-51:1; *see also, supra*, ¶¶ 4-14.

19

52.     SAIC also prepared a Radioactive Scrap Metal Recycling Business Initiative in June 1996.  Turner Testimony, Exh. 11,  7/7 p.m. Tr. 108:9-118:21, 7/8 a.m. Tr. 78:15-84:24.  The Business Initiative is accompanied by a status report indicating that BNFL wanted SAIC on its team to support BNFL in the decontamination and decommissioning (D&D) of all three Gaseous Diffusion Plants (GDPs) located in the United States.  *Id.*

53.     SAIC understood that the market for radioactive scrap metal would grow as the D&D of commercial nuclear reactors licensed by the NRC commenced.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 108:9-118:21, 7/8 a.m. Tr. 78:15-84:24; Murray Testimony, Exh. 9, 7/2 p.m. Tr. 56:2-59:14.

54.     By this point in time, SAIC had a Business Plan in which it would play a support role for BNFL on the D&D of the GDPs, work that would cost billions of dollars to complete.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 108:9-113:24; *see also* Murray Testimony, Exh. 9, 7/2 p.m. Tr. 62:24-64:5.   SAIC estimated in 1996 that it might earn more than $300 million in revenues from teaming with BNFL on D&D and recycle projects for the three GDPs.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 108:9-113:24

BNFL Oak Ridge Recycle Project

55.     By July 19, 1996, SAIC had already assisted BNFL by preparing a plan and cost estimate for the D&D and recycle of Building K-33 in Oak Ridge.   The SAIC Plan called for "maximizing the unrestricted free release of materials contained within K-33 into forms which are suitable for onward processing (recycle or reuse)."  The plan contained a detailed estimate of the amounts of material available for recycle from Building K-33.  The Plan specifically notes that it is assumed the project will be performed under NRC and EPA regulations.  Turner

Testimony, Exh. 11, 7/8 a.m. Tr. 95:4-101:11.

56.     Over the next several years SAIC continued to provide assistance to BNFL with respect to the clearance of material for recycle and reuse on this BNFL Oak Ridge Recycle Project.  SAIC admitted in its own project description that it was involved with BNFL on the K-25 Site 3-Building D&D and Metal Recycle Project from "the onset of the project providing technology selection and design to establish the best technical means of applying the proven BNFL methods to the U.S. equipment within the regulatory constraints of the DOE and other regulators."  Plaintiff's Exhibit 521, BNFL Project Description, attached hereto as Exhibit 29; Turner Testimony, Exh. 11, 7/8 a.m. Tr. 41:11-44:9.

57.     SAIC has admitted that it used its process knowledge to "completely plan the D&D activities and to provide the integrated cost estimate for the removal, decontamination, and metal recycle actions."  SAIC acknowledged that it was responsible for all of the documentation associated with the regulatory actions to enable the project to begin.  Plaintiff's Exhibit 521, BNFL Project Description, Exh. 29; Turner Testimony, Exh. 11, 7/8 a.m. Tr. 41:11-44:9.

58.     On September 20, 1996, SAIC entered into a Teaming Agreement with BNFL for metals recycling at Oak Ridge, Tennessee.  SAIC committed to providing assistance to BNFL on this recycle project in the areas of regulatory support, health and safety, and radiation protection. Plaintiff's Exhibit 190 (BNFL-SAIC Teaming Agreement) and Plaintiff's Exhibit 204, Memo re: Possible SAIC Services for Teaming Agreement, attached hereto as Exhibit 30; Turner Testimony, Exh. 11, 7/8 a.m. Tr. 111:18-112:15.

59.     SAIC discussed a number of potential services it could provide pursuant to its Teaming Agreement with BNFL.  These services included "develop[ing] and issu[ing] to the

21

NRC all necessary licensing documents."  Plaintiff's Exhibit 190 (BNFL-SAIC Teaming

Agreement) and Plaintiff's Exhibit 204, Memo re: Possible SAIC Services for Teaming

Agreement, Exh. 30; Turner Testimony, Exh. 11, 7/8 a.m. Tr. 111:18-112:15.

60.     SAIC understood that the purpose of the BNFL Oak Ridge Recycle Project was,

in part, to remove radioactive material from a DOE facility and release and/or recycle that

material into general commerce, an activity regulated by the NRC.   *SAIC*, 626 F.3d at 1272

("several employees acknowledged at trial that British Nuclear and MSC intended to sell

materials recycled from DOE's Oak Ridge facility and that such contaminated materials would be

subject to NRC regulation once released into general commerce."); *SAIC*, 653 F. Supp. 2d at

100-101 ("SAIC employees testified that BNFL, with whom SAIC entered into an agreement

regarding a recycle project for the DOE, was subject to the NRC's regulations concerning

disposal of radioactive waste once the waste left DOE facilities and MSC, a subsidiary of BNFL,

was NRC-licensed."); Truitt Testimony, Exh. 10, 7/10 p.m. Tr. 21:7-22:1 ("any radiological

material that went off-site would be subject to NRC once it left the DOE fence"); Turner

Testimony, Exh. 11, 7/8 a.m. Tr. 112:16-115:4 ("[R]ecycling was a key portion [of the BNFL

Oak Ridge Recycling Project]"), 7/8 p.m. Tr. 39:21-40:8; 66:16-68:5; Caldwell Testimony, 7/9

p.m. Tr. 80:11-83:6 (material from the BNFL project that left the DOE site would be subject to

compliance with NRC regulations and requirements); Slack Testimony, Exh. 5, 7/9 a.m. Tr.

87:1-87:19:9 ("focus" of BNFL project was metals removal and recycle from Oak Ridge);

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 49:19-50:16 ("regulated by the NRC" means subject to

the regulations or regulatory authority of the NRC and was broader than just commercial utilities

licensed by the NRC); Palau Testimony, attached hereto as Exhibit 31, 7/15 a.m. 13-20 (SAIC's

work for the NRC actually used to release materials from the BNFL project). Additionally, SAIC understood that the standard under which this release and recycle would take place was the NRC's then-existing release standard, NRC Regulatory Guide 1.86. Turner Testimony, Exh. 11, 7/8 a.m. Tr. 29:12-30:18; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 95:3-99:21; Caldwell Testimony, Exh. 12, 7/9 p.m. Tr. 100:10-100:21; *see also,* infra, ¶ 63, 70-72. In fact, SAIC prepared the project documents that set out that release from the BNFL Oak Ridge Recycle Project would be conducted under NRC Regulatory Guide 1.86, including the Work Smart Standards. These Work Smart Standards set out the regulatory and scientific standards, including Regulatory Guide 1.86, that would govern release from the project, and certified that release and recycle under that standard would be adequately protective of public health, safety, and the environment. Turner Testimony, Exh. 11, 7/8 a.m. Tr. 29:12-30:18; Slack Testimony, Exh. 5, 7/ 9 a.m. Tr. 95:3-104:12. SAIC's work for the NRC involved considerations of the need for replacing Regulatory Guide 1.86.

61.     SAIC understood that if it was determined that release of material under NRC Regulatory Guide 1.86 was not protective of public health, that would be a big problem for the project. Turner Testimony, Exh. 11, 7/8 p.m. Tr. 17:14-21:9. Whether Regulatory Guide 1.86 was adequately protective of public health was precisely one of the issues being considered by SAIC as part of its work on the 1992 NRC Contract. Plaintiff's Exhibit 573, Draft Options Paper, attached hereto as Exhibit 32, at pp. 2, 12. Additionally, the rule SAIC was assisting the NRC to develop would have replaced Regulatory Guide 1.86. *See, supra,* ¶ 10.

62.     On the other hand, SAIC understood that the recycling potential of the BNFL project, and thus the viability of the project as a whole, would benefit from a "volumetric" free

23

release standard, precisely the same standard on which SAIC was advising and assisting the NRC.  Turner Testimony, Exh. 11, 7/8 a.m. Tr. 59:15-59:24, 7/8 p.m. Tr. 116:4-117:4; Murray Testimony, Exh. 9, 7/2 p.m. Tr. 56:2-59:19; Caldwell Testimony, Exh. 12, 7/9 p.m. Tr. 91:24-93:15 (SAIC understood that the recycling potential of the BNFL project would be enhanced by a volumetric standard such as that on which SAIC was assisting the NRC).

63.    Additionally, the BNFL Oak Ridge Recycle Project Contract, executed on August 25, 1997, expressly provided that "all contractor activities under this statement of work and/or within the scope of the removal action shall comply with federal and state regulations identified as Applicable or Relevant and Appropriate Requirements (ARAR) and applicable DOE Orders listed on Appendix I of this SOW and Clause H-5 of this contract entitled Laws Regulations and DOE Directives.  These applicable regulations and standards identified by the Contract included NRC Regulation 10 CFR 71 and NRC Regulatory Guide 1.86."  Turner Testimony, Exh. 11, 7/8 a.m. Tr. 25:25-31:17.

64.    Additionally, Section 2.9.2 of the BNFL Contract specifically stated that all Uranium Deposits "shall be transferred to an NRC Class-I nuclear materials licensee, or facilities operated under a UK Nuclear Installations Inspectorate Site License..." Turner Testimony, Exh. 11, 7/8 a.m. Tr. 32:5-34:10.

Cost Benefit Analyses

65.    SAIC offered assistance to BNFL in performing cost valuations for recycling materials on the BNFL Recycle Project and cost/benefit analyses for determining what materials should be recycled and reused.   Turner Testimony, Exh. 11, 7/8 a.m. Tr. 97:7-110:3, 10:13-12:19; Murray Testimony, Exh. 9, 7/2 p.m. Tr. 70:12-75:8.  For example, on September 5, 1996,

SAIC's Turner completed a cost evaluation for the BNFL Recycle Project.  Plaintiff's Exhibit 176, Cost Estimate, attached hereto as Exhibit 33; Turner Testimony, Exh. 11, 7/8 a.m. Tr. 104:7-110:3.

66.     In June 1997, BNFL sought advice from SAIC on the potential revenues that could be obtained from the D&D of all the Gaseous Diffusion Plants.  SAIC was hoping to partner with BNFL on this work as well. Turner Testimony, Exh. 11, 7/8 a.m. Tr. 91:8-94:17, Murray Testimony, Exh. 9, 7/2 p.m. Tr. 59:15-61:14; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 81:21-85:18.

Assistance on Strategies to Free Release Materials

67.     SAIC assisted BNFL in calculating the free release potential and strategies for releasing material from the BNFL Project.  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 21:19-29:3, 55:25-64:1.  In October 1997, SAIC assisted BNFL in assessing the "free release" potential and realistic revenue streams that could be expected from releasing certain nickel tubing from the project.  SAIC provided advice and recommendations to BNFL on the methods and means by which they might free release nickel from the BNFL recycle project in the fall of 1997 and the Spring of 1998.  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 55:25-64:1.

Regulatory Analyses and Advice On Release and Recycle

68.     SAIC assisted BNFL by providing advice about the various laws and regulations applicable to clearance of materials for recycle/reuse.  SAIC assisted BNFL in devising the regulatory strategy for the BNFL Recycle Project.  Caldwell Testimony, Exh. 12, 7/9 p.m. Tr. 101:10-110:7, 77:9-83:5 (SAIC's Caldwell was the regulatory compliance manager for the BNFL project and frequently provided advice and assistance to BNFL regarding regulatory compliance);

25

Turner Testimony, Exh. 11, 7/8 p.m. Tr. 8:1-8:25.

69.     SAIC assisted BNFL in preparing the January 1997 Technical Proposal submitted

on the BNFL Oak Ridge Recycle Project and, in fact, prepared most of BNFL's proposal for the

project.  Turner Testimony, Exh. 11, 7/8 a.m. Tr. 19:23-23:12.

70.     SAIC was the lead member of the BNFL Oak Ridge Recycling Project Team for

designing the Work Smart Standards (WSS) that governed the regulatory requirements for the

entire recycle project.  SAIC was the project leader for developing the WSS on the BNFL

Recycle Project.   The WSS process was used to define the applicable DOE Orders and other

nationally recognized codes, standards and regulations needed to ensure safety and

environmental protection for the project.   The WSS identified all of the regulations and

standards that applied to the Recycle Project, including NRC Regulatory Guide 1.86 and NRC

Regulation 10 CFR 71, an NRC regulation.  Plaintiff's Exhibit 266, Work Smart Standards for

the BNFL Oak Ridge Recycle Project, attached hereto as Exhibit 34; Caldwell Testimony, Exh.

12, 7/9 p.m. Tr. 82:4-83:1; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 94:23-104:12.

71.     The WSS Report noted that its purpose is to demonstrate that a confirmed set of

ES&H standards that fully meets DOE requirements has been developed and to provide the

results of the WSS process as performed on the D&D/Recycling Project.  The WSS Report was

signed and approved by various representatives of DOE, BNFL, and SAIC in January 1997.

SAIC identified itself as a "Stakeholder" in the BNFL Oak Ridge Recycle Project.  Slack

Testimony, Exh. 5, 7/9 a.m. Tr. 90:25-104:12; WSS, Exh. 34, at Appx. D and Section 5.3

72.     In signing the Work Smart Standards, SAIC understood that it was taking a

position that the standards that were being applied to the BNFL Recycle Project were sufficient

to protect the workers, the public and the environment with regard to all the work being performed, including the free release and recycling activities.  WSS, Exh. 34, at iii (the WSS "adequately ensure the health and safety of workers and the public and protection of the environment"); Slack Testimony, Exh. 5, 7/9 a.m. Tr. 94:23-104:12.

Dose Assessments

73.     SAIC assisted BNFL with dose assessments in connection with the BNFL Recycle Project.  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 47:1-49:4; McBride Testimony, Exh. 26, 7/10 p.m. Tr. 54:3-63:18, 7/14 p.m. Tr. 93:13-95:22.

Technical Requirements Advice and Assistance For Clearance Of Materials

74.     SAIC also provided BNFL with substantial assistance in determining the technical requirements for clearing materials for off-site shipments for recycle and reuse.  *See, e.g.,* Truitt Testimony, Exh. 10, 7/10 p.m. Tr. 6:7-8:17.  For example, SAIC provided advice and assistance regarding the development of management instructions and other project documents regarding the procedures and requirements related to free release and recycle of material from the BNFL Oak Ridge Recycle project.  *See*, *e.g.,* Truitt Testimony, Exh. 10, 7/10 p.m. Tr. 6:10-22:1.

75.     SAIC assisted BNFL in preparing the characterization requirements for any materials on the BNFL Oak Ridge Recycle Project that were to be sent off site for recycling and/or disposal, and for determining whether those materials could be free released or needed to be sent to MSC for further decontamination.  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 42:5-46:17.  SAIC's assistance to BNFL included assistance related to the applicability of NRC regulations to material being released from the BNFL Oak Ridge Recycle Project.  Truitt Testimony, Exh. 10, 7/10 p.m. Tr. 19:6-22:1.

27

76.     SAIC assisted BNFL in writing the Waste Management Plan (WMP) for the BNFL Oak Ridge Recycle Project.  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 116:4-117:4; Plaintiff's Exhibit 427, August 11, 1997 Waste Management Plan, attached hereto as Exhibit 35.  The WMP advised that wastes would be generated that were subject to several environmental statutes and implementing regulations.  These included materials subject to NRC and DOE Regulations.  WMP, Exh. 35, at 19.  The WMP was prepared by SAIC to advise and assist BNFL and the Recycle Team about the requirements necessary to ensure wastes from the project would be managed in a safe and compliant manner.  This included radioactively contaminated recyclable metal that would be shipped off site to MSC for further decontamination and material that was deemed to be non-radioactive and could be free released right from the facility.  WMP, Exh. 35, at 8-10.

77.     SAIC's WMP explicitly noted that, in addition to using NRC Regulatory Guide 1.86, the BNFL Oak Ridge Recycle project would make use of any volumetric standards that were "subsequently developed."  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 116:4-117:4; WMP, Exh. 35, at 10.  Such a volumetric standard for release is the very project on which SAIC was assisting the NRC.  *See*, *supra*, ¶¶ 4-14.

**Plasma Hearth Process**

78.     Beginning in 1990, SAIC was developing an experimental plasma treatment technology for high-temperature treatment of radioactive waste.  The goal for the technology was to treat radioactive waste in such a way that a large portion of it could be released or recycled into general commerce, greatly reducing disposal and storage costs.  Larsen Testimony, attached hereto as Exhibit 36, 7/10 a.m. Tr. 72:5-72:8, 65:10-65:14; Leatherman Testimony, attached

28

hereto as Exhibit 37, 7/16 a.m. Tr. 42:8-44:16.

79.     The purpose of the Plasma Hearth Process was to separate hard-to-treat mixed waste into a small and stable volume of glass/slag suitable for disposal while separating metal largely free from contamination for reuse/recycle.  Mixed waste contains both hazardous and radioactive materials.  Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 7:3-10:5, 16:14-19:14; Leatherman Testimony, Exh. 37, 7/16 a.m. Tr. 42:8-44:16.

80.      On June 7, 1996, a patent application was filed by inventors of a method for such a  high-temperature waste treatment.  SAIC was listed as Assignee.  SAIC referred to this technology as the Plasma Hearth Process.  Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 23:1-25:16.  The purpose of SAIC's development and patenting of the PHP was to develop a technology that would be profitable for SAIC.  Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 73:4-74:13.

81.     One of the inventors of the PHP, Gary Leatherman, was also one of the individuals providing advice and assistance to the NRC under SAIC's NRC contracts.  Leatherman Testimony, Exh. 37, 7/16 a.m. Tr. 47-51.  His work for the NRC - namely, helping to identify the way in which different radioisotopes migrate to different states of matter and form different streams of waste - was also an important aspect of his work on the PHP.  Leatherman Testimony, Exh. 37, 7/16 a.m. Tr. 47-51.  Mr. Leatherman also engaged in efforts to market the PHP technology to prospective government and commercial customers.  Leatherman Testimony, Exh. 37, 7/16 a.m. Tr. 44:24-45:16.

82.     In December 1996, SAIC and BNFL executed a Memorandum of Understanding (MOU) setting forth their plans for the worldwide development of the PHP.  The BNFL-SAIC PHP MOU set forth the SAIC and BNFL plan to cooperate to demonstrate and commercialize the

PHP.  It states that BNFL and SAIC hope to market and use the PHP technology for treatment of

Nuclear and Mixed Waste for the DOE and other nuclear and mixed waste projects worldwide,

including commercial projects.   Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 25:24-30:16.

83.     SAIC understood that in order to market the PHP to commercial users, as it

planned to do, the release and recycle of any material treated by the PHP would be subject to

NRC regulation.  Therefore, SAIC's commercialization and business plans for the PHP included

the need for an NRC license for the technology as well as the need to follow the NRC's ongoing

rulemaking efforts in the area of free release of radioactive material.  Larsen Testimony, Exh. 36,

7/10 a.m. Tr. 31:11-35:5 (NRC license needed for planned commercial use for the PHP), 39:9-

42:12 (SAIC needed to follow NRC rulemaking efforts regarding free release because NRC

regulations would apply for prospective release/recycle from planned commercial users of the

PHP).  This was the very rule on which SAIC was assisting the NRC.  *See, supra,* ¶¶ 4 to 14.

84.     SAIC understood that one of the major advantages for the development of the

PHP was its ability to separate the recyclable metal from the slag.  Larsen Testimony, Exh. 36,

7/10 a.m. Tr. 18:12-19:14.  Along these same lines, SAIC also understood that a key

characteristic of the PHP was its ability to generate two separate products, "allowing segregation

and possible reuse of the metal."  Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 51:5-51:21.

85.     In November 1999, even after the NRC learned about SAIC's role on the BNFL

Oak Ridge Recycle Project and requested information about SAIC's other relationships with

BNFL, SAIC did not disclose the PHP Project to the NRC.  Martin Testimony, Exh. 14, 7/14

a.m. Tr. 110:16-110:19.

**Bechtel Jacobs and the GDP Dose Assessment**

86.     Beginning in 1998 and continuing in 1999, SAIC also began work for the Bechtel

Jacobs Corporation ("BJC") on a dose assessment project involving recycle and release of

materials from the three Gaseous Diffusion plants (GDPs) in Oak Ridge, Tennessee, Paducah,

Kentucky and Portsmouth, Ohio. (GDP Dose Assessment). Slack Testimony, Exh. 5, 7/9 a.m. Tr.

112:14-117:16; Rucker Testimony, Exh. 6, 7/10 a.m. Tr. 88:11-94:2.

87.     SAIC's work on the GDP Dose Assessment was to provide technical support for

radiological dose and risk assessment modeling and assist in developing criteria for the

unrestricted and restricted release of radiologically contaminated materials.  Slack Testimony,

Exh. 5, 7/9 a.m. Tr. 112:14-117:16; Rucker Testimony, Exh. 6, 7/21 p.m. Tr. 46:16-48:17.

88.     The Technical effort by SAIC involved an analysis of the amount of material

meeting the "current DOE and NRC limits for release (see regulatory Guide 1.86)."   Slack

Testimony, Exh. 5, 7/9 p.m. Tr. 26:2-27:8.

89.     SAIC's work on the GDP Dose Assessment included tasks related to inventory

analysis and characterization, preparation of a dose-assessment, and cost-benefit analysis of

various recycle and release options.  Slack Testimony, Exh. 5, 7/9 a.m. Tr. 117:1-117:16; Rucker

Testimony, Exh. 6, 7/21 p.m. Tr. 43:6-43:9 (cost-benefit one of the tasks performed by SAIC on

the GDP Dose Assessment).  SAIC performed inventory, cost-benefit, and dose assessment tasks

related to release and recycle of radioactive material from nuclear facilities on its NRC Contracts

as well.  Meck Testimony, Exh. 7, 7/3 a.m. 102:2-103:12, *supra*, ¶¶ 4-14.

90.     In performing the GDP Dose Assessment, SAIC compared and utilized the results

of its work on the NRC 1992 Contract.  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 5:4-8:3; Rucker

Testimony, Exh. 6, 7/21 p.m. Tr. 54:12-55:14.

91.    In performing its GDP Dose Assessment, SAIC copied, without attribution, whole

sections of SAIC's work for the NRC on the 1992 Contract.  Slack Testimony, Exh. 5, 7/9 p.m.

Tr. 29:5-42:14; Rucker Testimony, Exh. 6, 7/21 p.m. Tr. 72:2-81:8  The copied sections included

both general background and also SAIC's judgments, conclusions, and recommendations

regarding what, and what not, to consider in SAIC's analysis.  Slack Testimony, Exh. 5, 7/9 p.m.

Tr. 35:21-36:9, 70:4-74:19; Rucker Testimony, Exh. 6, 7/21 p.m. Tr. 72:2-81:8.

92.    SAIC employees Jeffrey Slack and Thomas Rucker both worked on the BJC Dose

Assessment, SAIC's NRC Contracts, and the BNFL Oak Ridge Recycle Project.  Both agreed

that many similarities existed between the three projects.  Slack Testimony, Exh. 5, 7/9 p.m. Tr.

66:21-68:9; Rucker Testimony, Exh. 6, 7/8 Tr. 109:3-110:15.

93.    SAIC's GDP Dose Assessment considered the release and recycle of metals from

the three gaseous diffusion plants in the United States.  These included the Oak Ridge plant and

thus involved the same materials on which SAIC was advising BNFL on the BNFL Oak Ridge

Recycle Project.  Slack Testimony, Exh. 5, 7/9 a.m. Tr. 112:14-117:16.  SAIC's GDP Dose

Assessment also included considerations related to release of materials from the Paducah and

Portsmouth GDPs, the very same sites that SAIC was hoping to make money on if the BNFL

project was a success.  Turner Testimony, Exh. 11,  7/7 p.m. Tr. 108:9-118:21, 7/8 a.m. Tr.

78:15-84:24; Murray Testimony, Exh. 9, 7/2 p.m. Tr. 59:15-61:14; Slack Testimony, Exh. 5, 7/9

a.m. Tr. 81:21-85:18.

94.    One of the SAIC conclusions in the GDP ALARA Dose Assessment was that the

release and recycle of the of radioactive materials from the three GDP's would result in only a "trivial" dose of one millirem a year.  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 12:16-16:4. Assessing the expected dose to a member of the public resulting from the release and recycle of material from a nuclear facility was the same subject matter and technical area on which SAIC was providing advice to the NRC.  *Supra*, ¶¶ 4-14.

95.     SAIC's assessment of the costs and benefits of various recycle and release options concluded that the recycle and free release option was the best option.  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 11:20-12:15.  SAIC was assessing the same costs and benefits of these same release and recycle options in its work for the NRC.  *Supra*, ¶¶ 9, 13.

96.     In its work on the GDP Dose Assessment, SAIC calculated the dose that would be expected from release under the limits prescribed in NRC Regulatory Guide 1.86.  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 26:2-27:8.  This was the same release standard on which SAIC was providing the NRC with advice and assistance, including assistance as to whether NRC Regulatory Guide 1.86 was adequately protective of public health and whether it needed to be replaced.  McKenzie–Carter Testimony, Exh. 4, 7/17 p.m. Tr. 41:14–42:7.

97.     Additionally, in its GDP Dose Assessment report for BJC, SAIC reiterated the conclusion it had reached in the Work Smart Standards on the BNFL project that recycling and releasing radioactive metal at Oak Ridge was an activity that was safe for occupational, public, and environmental health.  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 12:16-16:4 (both the GDP Dose Assessment and the Work Smart Standards conclude that recycling and release from Oak Ridge is safe for the public, occupational health, and the environment).  This was one of the same subjects upon which SAIC was advising the NRC.  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 66:21-

33

68:9; *supra*, ¶¶ 4-14; Cardile Testimony, Exh. 1, 7/2 a.m. Tr. 27:19-28:5; *SAIC*, 653 F. Supp. 2d

at 100 ("The government's evidence showed that under SAIC's contract with the NRC, SAIC

was charged with the responsibility to 'assess the health and safety impacts of the potential large

scale reuse and recycle of contaminated nuclear material.'") (internal quotation omitted).

### SAIC and the Association of Radioactive Metals Recyclers ("ARMR")

98.     Between 1994 and 1999, ARMR was a trade organization related to the recycle of

radioactive materials.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 55:6-55:22.  ARMR's purpose

was to facilitate and advocate to various entities, including the NRC, for the recycle of

radioactively contaminated materials.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 56:3-56:24,

72:14-74:4; Motl Testimony, Exh. 13, 7/23 a.m. Tr. 11:18-11:25.

99.     Gerald Motl, an SAIC Vice President, served on the Board of Directors of

ARMR.  SAIC Amended Answer at ¶ 53, Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 58:2-58:4.

Motl served on the ARMR Board of Directors between January 1996 and some time in 1999.

Motl Testimony, Exh. 13, 7/23 a.m. Tr. 6:4-9:21.

100.    Mr. Motl participated substantially in ARMR while an SAIC employee.  Loiselle

Testimony, Exh. 25, 7/7 p.m. Tr. 3:20-9:17.

101.    A number of ARMR members, including the Alaron Corporation as well as

BNFL and MSC, are NRC licensees and entities regulated by the NRC.  Motl Testimony, Exh.

13, 7/23 a.m. Tr. 12:1-13:3; Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 56:12-56:24, 85:11-85:18.

102.    At the time he was serving on the ARMR Board of Directors, SAIC Vice

President Motl was a business developer for SAIC in the primary markets of Defense, Energy

and the Commercial Nuclear Industry.  Motl Testimony, Exh. 13, 7/23 a.m. Tr. 6:4-8:12.  Mr.

Motl attended ARMR events on behalf of SAIC and at SAIC's expense, which he charged to his

"business development" account at SAIC.  Motl Testimony, Exh. 13, 7/23 a.m. Tr. 52:11-55:16.

103.    ARMR was created to advocate for the recycle and reuse of radiologically

contaminated metals.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 56:3-56:24, 72:14-74:4.

ARMR's bylaws specifically state that ARMR's purpose is to "[p]romote the recycle of

[radioactive scrap metal] as an environmentally favorable and cost-effective alternative to

disposal."  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 81:17-20.  The member organizations of

ARMR hoped to profit financially from the expansion of the radioactive scrap metal industry,

and an NRC free release rule would make such expansion possible.  Loiselle Testimony, Exh. 25,

7/7 a.m. Tr. 79:16-80:15; Motl Testimony, Exh. 13, 7/23 a.m. Tr. 14:8-15:2.  The lack of a

clearance standard like the one being developed by the NRC was a barrier to the development of

the radioactive scrap industry for the ARMR members.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr.

74:20-77:3; Motl Testimony, Exh. 13, 7/23 a.m. Tr. 14:8-15:2.

104.    As a director, SAIC's Motl voted to authorize ARMR to conduct its business.

Loiselle Testimony, Exh. 25, 7/7 p.m. Tr. 11:15-11:21; Motl Testimony, Exh. 13, 7/23 a.m. Tr.

9:19-9:21.  The Directors of ARMR managed the business and affairs of ARMR.  *Id.*  Mr. Motl

contributed substantially to the matters of policy, technical direction and activity of ARMR on

behalf of its members.  Loiselle Testimony, Exh. 25, 7/7 p.m. Tr. 3:20-9:17.

105.    SAIC understood that BNFL/MSC, Alaron, and the other members of ARMR

would receive a clear benefit from the NRC rulemaking on release and recycle. Motl Testimony,

Exh. 13, 7/23 a.m. Tr. 42:12-44:20.  Additionally, the rule for which ARMR was formed to

advocate was precisely the same rule on which SAIC was providing advice and assistance to the NRC.  *See, supra*,  ¶¶ 4-14.

106.    SAIC's Motl was one of SAIC's key personnel proposed to perform a cost/benefit analysis for the clearance of radioactive materials on SAIC's contract with the NRC.  Motl Testimony, Exh. 13, 7/23 a.m. Tr. 20:22-24:19, 38:14-42:6.   In his role as an ARMR director, Mr. Motl also had a role promoting the benefit of just such a clearance rule and seeking the issuance of just such a rule by the NRC.   For example, ARMR drafted correspondence to the NRC, in which Mr. Motl participated in drafting and reviewing.  This correspondence took a clear position in favor of a rule that would allow free release and recycle.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 102:24-106:7, 106:14-109:8, 7/7 p.m. Tr. 8:12-9:17 (Motl "absolutely" reviewed ARMR advocacy letters to the NRC regarding a free release standard), 10:16-11:9 (Motl participation on an ARMR call regarding the ARMR letter to the NRC regarding rulemaking for recycle and reuse).

107.    SAIC did not disclose its relationship with ARMR to the NRC.  Mace Testimony, Exh. 20, 7/15 p.m. Tr. 114:7-114:10, 116:18-118:1; Pool Testimony, Exh. 18, 7/15 a.m. Tr. 34:23-36:19; Meck Testimony, Exh. 7, 7/3 p.m. Tr. 36:12-36:17.

**SAIC and Its Undisclosed Relationship with Alaron**

108.    During the relevant time period, SAIC also provided consulting assistance to Alaron Corporation, a Pennsylvania corporation licensed by the NRC to recycle and free release nuclear material.  Taylor Testimony, attached hereto as Exhibit 38, 7/9 a.m. Tr. 53:9-64:8; Tempel Testimony, attached hereto as Exhibit 39, 7/9 a.m. Tr. 18:3-33:9.  SAIC's advice to Alaron was in the technical area of the release of nuclear material from nuclear facilities.  Taylor

Testimony, Exh. 38, 7/9 a.m. Tr. 53:9-64:8; Tempel Testimony, Exh. 39, 7/9 a.m. Tr. 18:3-33:9.

SAIC's assistance was in the technical area of regulatory compliance and characterization of

nuclear materials being shipped off site and recycled. Taylor Testimony, Exh. 38, 7/9 a.m. Tr.

62:13-64:8; Tempel Testimony, Exh. 39, 22:6-33:9.

109.    Alaron was another member of ARMR and was seeking a national standard for

recycling and release in order to improve its business in the area. Taylor Testimony, Exh. 38, 7/9

a.m. Tr. 52:6-53:8.

110.    By May 1996, SAIC assisted Alaron in proposing for, and receiving, a blanket

ordering agreement from Westinghouse Savannah River Company to treat, release and dispose of

Large Equipment from the Savannah River Site.  SAIC's assistance and support were necessary

to the award of the contract to Alaron.  Ryan Testimony, attached hereto as Exhibit 40, 7/8 p.m.

Tr. 119:15-123:2, 7/9 a.m. Tr. 5:15-8:11; Tempel Testimony, Exh. 39, 7/9 a.m. Tr. 22:6-33:9;

Taylor Testimony, Exh. 38, 7/9 a.m. Tr. 53:9-64:8.

111.    As SAIC well understood, the proposed and planned Alaron project was regulated

by the NRC.  Alaron was to receive, possess, decontaminate, and, ultimately, release the material

pursuant to its NRC license and in compliance with NRC regulations regarding free release.

Tempel Testimony, Exh. 39, 7/9 a.m. Tr. 22:6-33:9, 47:12-49:6; Taylor Testimony, Exh. 38, 7/9

a.m. Tr. 53:9-64:8.  SAIC's relationship with Alaron called for SAIC to provide advice and

assistance to Alaron regarding this release and recycle of material, the same subject matter upon

which it was advising the NRC.  Tempel Testimony, Exh. 39, 7/9 a.m. Tr. 22:6-33:9, 47:12-49:6;

Taylor Testimony, Exh. 38, 7/9 a.m. Tr. 53:9-64:8;

112.    SAIC did not disclose its relationship with Alaron to the NRC, even though

Alaron was an NRC-licensed entity, even though SAIC's advice and assistance to Alaron was in the same technical area as its work for the NRC, and even though SAIC's OCI obligations specifically required disclosure of "planned interests" that could give rise to actual or potential OCIs.   Mace Testimony, Exh. 20, 7/15 p.m. Tr. 114:7-114:10, 116:18-118:1; Pool Testimony, Exh. 18, 7/15 a.m. Tr. 34:23-36:19; Martin Testimony, Exh. 14, 7/14 a.m. Tr. 105:18-106:7, 110:16-110:19.

### SAIC's OCI Training

113.   SAIC understood, and indeed trained its employees, that the potential for bias in SAIC's work existed whenever SAIC performed work for one organization and performed work in the same technical area for any other organization and that, therefore, such situations had to be disclosed.  Plaintiff's Exhibit 919, SAIC OCI Training, attached hereto as Exhibit 41; Bidwell Testimony, attached hereto as Exhibit 42, 7/16 a.m. Tr. 62:16-68:23 (emphasis supplied).

### Findings and Jury Instructions

114.   At the close of evidence, the Court concluded, that as a matter of law, SAIC's statements and omissions were material to the NRC's decision to pay SAIC.  7/24 a.m. Tr. 138, attached hereto as Exhibit 43.

115.   The Court instructed the jury that, in order to find SAIC liable to the United States for breach of contract, the jury had to find that SAIC failed to adhere to its contractual obligation to avoid and disclose organizational conflicts of interest.  7/28 a.m. Tr. 22-24, attached hereto as Exhibit 44.

Respectfully submitted,

TONY WEST
ASSISTANT ATTORNEY GENERAL


/s/ Daniel Hugo Fruchter
JOYCE R. BRANDA
PATRICIA R. DAVIS
DONALD J. WILLIAMSON
DANIEL HUGO FRUCHTER
PATRICIA M. FITZGERALD
Attorneys
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 305-2035


DATED: June 23, 2011