## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SCIENCE APPLICATIONS )<br>INTERNATIONAL CORPORATION, )<br>)<br>Defendant. )<br>) | Case No.: 04-cv-1543 (RWR) |

## DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON FALSE CLAIMS ACT LIABILITY

Defendant Science Applications International Corporation, by and through counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and LCvR 7(h) of the Rules of this Court, hereby moves for summary judgment in its favor on Counts I and II. A Statement of Undisputed Material Facts, a Memorandum of Points and Authorities, and a Proposed Order are filed contemporaneously herewith. Pursuant to LCvR 7(f), the undersigned counsel respectfully requests an oral hearing on the issues addressed in this Motion.

Dated: June 23, 2011

Respectfully submitted,

John P. Rowley, III
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 835-6151
E-mail: john.rowley@bakermckenzie.com

    /s/ Andrew S. Tulumello
Andrew S. Tulumello (D.C. Bar No. 468351)
Amir C. Tayrani (D.C. Bar No. 490994)
Ryan J. Watson (D.C. Bar No. 986906)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com

*Counsel for Defendant Science Applications International Corporation*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 04-cv-1543 (RWR) |
| | ) | |
| SCIENCE APPLICATIONS | ) | |
| INTERNATIONAL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON FALSE CLAIMS ACT LIABILITY

Pursuant to Federal Rule of Civil Procedure 56 and LCvR 7, Defendant Science

Applications International Corporation ("SAIC") submits the following Statement of

Undisputed Material Facts in Support of its Motion for Summary Judgment on False Claims Act

Liability.

**The Contracts Between The NRC And SAIC**

1.  The Nuclear Regulatory Commission ("NRC") is the federal agency that regulates civilian

    uses of nuclear power.  Am. Compl. ¶ 8.  The U.S. Department of Energy ("DOE"), in

    contrast, operates the Government's atomic research and weapons facilities.  DX 800, at

    39 (Exh. 1).

2.  Among its other responsibilities, the NRC regulates the disposition of radioactive materials

    from NRC-licensed facilities.  Since 1954, the NRC has prohibited the release of such

    materials into interstate commerce without an NRC license.  Am. Compl. ¶ 10.

3.   Beginning in the mid-1980s, the NRC sought to alter its case-by-case licensing approach by establishing standards of contamination that are below the level of "regulatory concern," which would have permitted certain slightly radioactive materials to be released from NRC facilities without a license.  Am. Compl. ¶ 11.  In 1992, however, Congress "ordered the effort halted . . . due to inadequate technical support."  *Id.*

4.   In response, the NRC set out "to gather the technical support . . . to develop scientifically based standards for the free release of radioactive materials."  Am. Compl. ¶ 12.  As part of this effort, the NRC contracted with SAIC in 1992 to obtain SAIC's assistance in creating a calculational model relating to the potential reuse of radioactive materials (hereinafter "1992 Contract").   Under the 1992 Contract, SAIC performed a variety of tasks, including preparing a draft report on "risk assessment scenarios," reviewing relevant literature, and developing and identifying adequate "technical bases upon which to support NRC regulations in this area."  *Id.* ¶¶ 14-17.

5.   The 1992 Contract included conflict-of-interest provisions to ensure that SAIC was "not placed in a conflicting role because of current or planned interests (financial, contractual, organizational, or otherwise) which relate to the work under th[e] contract[s]."  PX 8, at 138174 (Exh. 2).  These provisions required SAIC to "forego entering into consulting or other contractual arrangements with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under [the] contract" and mandated that if SAIC "has reason to believe with respect to itself or any employee that any proposed consultant or other contractual arrangement with any firm or organization may involve a potential conflict of interest, [SAIC] shall obtain the written approval of the Contracting Officer prior to execution of such contractual arrangement."

*Id.* at 138175.  SAIC also warranted that "it does not have any organizational conflicts of interest as defined in 41 CFR 20-1.5402(a)," and agreed that "if after award, [SAIC] discovers organizational conflicts of interest with respect to this contract, it shall make an immediate and full disclosure in writing to the Contracting Officer."  *Id.*  In addition, SAIC "represent[ed] to the best of [its] knowledge and belief" that the award of the contract did "not . . . involve situations or relationships of the type set forth in 20-1.5403(b)."  *Id.* at 138203.

6.   In 1997, SAIC delivered a technical report known as draft NUREG-1640 to the NRC.  Am. Compl. ¶ 16.

7.   SAIC submitted 46 claims for payment to the NRC prior to June 1996.  *See* PX 955 (Exh. 4).

8.   SAIC submitted 40 claims for payment to the NRC after June 1996.  *See* PX 955 (Exh. 4).

9.   Although SAIC had completed its work under the 1992 Contract, the NRC still required additional technical assistance for its contemplated rulemaking.  As a result, in August 1999, the NRC entered into a follow-on contract (hereinafter "1999 Contract") with SAIC under which SAIC was to provide additional "technical assistance . . . to support NRC clearance rulemaking."  Am. Compl. ¶ 20.

10.  In November 1999, a representative of the Paper, Allied-Industrial, Chemical and Energy Workers union ("PACE")—who later testified that he lacked knowledge of the details of SAIC's work—alleged at a public NRC meeting that SAIC had conflicts of interest with respect to its work for the NRC.  *See* Am. Compl. ¶ 90; Guttman Test., 7/14 a.m. Tr. 34 (Exh. 5).  PACE took the position that, because of the alleged conflicts, the NRC should

discard the work SAIC had performed under the 1992 Contract. Thadani Test., 7/21 a.m. Tr. 16 (Exh. 6).

11. After the NRC and SAIC exchanged additional information, the NRC informed SAIC on December 10, 1999, that it believed the company's work in support of DOE created a conflict of interest. Am. Compl. ¶¶ 91-93. As a result, the NRC ordered SAIC to stop work on the 1999 Contract, effective December 17, 1999. *See* Martin Test., 7/14 p.m. Tr. 4-5 (Exh. 7); PX 809 (Exh. 8).

12. In early 2000, the NRC and SAIC agreed to terminate the contract and entered into a no-cost settlement. Martin Test., 7/14 p.m. Tr. 86 (Exh. 7). In this settlement, the NRC required SAIC to forgo payment for an outstanding invoice of $120,672.57 and for additional costs incurred after November 26, 1999, in order to "offset[ ] the approximate $100,000 required for future peer review of NUREG 1640" arising from the alleged conflicts. PX 981, at 10 (Exh. 9).

13. When the NRC officially closed out the 1992 Contract, it observed that "[a]ll obligations have been met by the parties." *See* PX 889 (Exh. 3). SAIC was paid $2,630,000 for its work on the 1992 Contract. *Id.*

**The Alleged Conflicts Of Interest**

14. In 1997, BNFL, Inc. ("BNFL") entered into a contract with DOE to decommission and decontaminate certain buildings at DOE's facility in Oak Ridge, Tennessee. Am. Compl. ¶¶ 56, 58. This project—which is sometimes referred to as the "DOE Three-Building Project"—was subject to DOE oversight. SAIC was a subcontractor to BNFL on this contract. *See* Turner Test., 7/8 p.m. Tr. 90 (Exh. 10). SAIC never performed recycling on the BNFL project. Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 11).

15.  Manufacturing Sciences Corporation ("MSC"), a wholly-owned subsidiary of BNFL, was a subcontractor to BNFL on BNFL's prime contract with DOE for the Three-Building Project.  *See* Am. Compl. ¶¶ 58-59.  There is no evidence that SAIC and MSC had a contractual relationship in connection with this project.

16.  In mid-1999, SAIC performed work for Bechtel Jacobs Company ("BJC"), a contractor for DOE facilities in Oak Ridge.  Am. Compl. ¶ 82; PX 731, at 1-3 (Exh. 12).  SAIC conducted a radiological dose assessment and performed a cost-benefit analysis regarding the recycling of contaminated metal from DOE facilities.  *See* Am. Compl. ¶ 86; Rucker Test., 7/10 a.m. Tr. 88-90 (Exh. 13).  The task order stated that this work was performed "per DOE guidelines."  PX 731, at 2 (Exh. 12).

17.  Alaron Corporation bid on a DOE contract for work at a DOE weapons facility in Georgia.  *See* Tempel Test., 7/9 a.m. Tr. 18-20 (Exh. 14).  SAIC would have played a supporting role to Alaron on that contract, but Alaron did not win the contract.  *See id.* at 22; Taylor Test., 7/9 a.m. Tr. 64, 66 (Exh. 15).  Alaron had a site-specific NRC license for an unrelated facility in Pennsylvania.  *See* Taylor Test., 7/9 a.m. Tr. 65, 67 (Exh. 15).

18.  The Plasma Hearth Process was an experimental concept funded primarily by DOE that was envisioned as a means of melting drums of DOE-generated waste.  *See* Larsen Test., 7/10 a.m. Tr. 7-8, 57-58, 60-61 (Exh. 16).  Although SAIC postulated that the sludge resulting from the process might be susceptible to recycling, the technology "was never intended to be a recycling technology," never progressed beyond the conceptual stage, was never tested on radioactive waste, and was not commercially viable.  *Id.* at 58, 60, 62, 66.

19.  The Association of Radioactive Metal Recyclers ("ARMR") was a small, short-lived trade association that advocated a national standard governing the release and recycling of

radioactive metal.  *See* Loiselle Test., 7/7 p.m. Tr. 48 (Exh. 17); Motl Test., 7/23 a.m. 8:15,

17:23-18:1 (Exh. 18).  SAIC was never a member, never paid dues, and had little or no

communication with ARMR.  *See* Loiselle Test., 7/7 p.m. Tr. 31, 38, 48 (Exh. 17).  An

SAIC employee, Gerry Motl, began serving on ARMR's board during his prior

employment with an ARMR member.  After he arrived at SAIC, he did not immediately

resign as a board member.  Motl was tasked on SAIC's bid on the 1999 Contract (Motl

Test., 7/23 a.m. Tr. 23:5-9 (Exh. 18)), but ARMR was effectively "defunct" by the time

that contract was executed.  *See* Loiselle Test., 7/7 p.m. Tr. 48 (Exh. 17).

## John Pierce Martin

20.  Beginning in June 1996, SAIC employee John Pierce Martin served as the contract

representative on the 1992 Contract.  Martin Test., 7/14 a.m. Tr. 46:4-9, 47:25-48:7 (Exh.

19); *see also* 12/12/05 Martin Depo. Tr. 34:3-6 (Exh. 20).  In addition, Martin served as

SAIC's contract representative on the short-lived 1999 Contract.  Martin Test., 7/14 a.m.

Tr. 46:4-9 (Exh. 19).

21.  Martin did not know during the relevant time periods that SAIC was allegedly violating its

conflict-of-interest obligations.  *See* Martin Test., 7/14 p.m. Tr. 15:11-16:8, 46:8-18, 49:3-7,

50:4-6 (Exh. 7); 1/16/06 Martin Depo. Tr. 6:5-7:17, 48:5-20, 49:18-50:4, 115:16-20, 117:5-

8 (Exh. 21).

22.  Martin did not have knowledge of SAIC's relationships that the Government now

characterizes as conflicts of interest.  From the time he began working on the 1992

Contract until March 2000, Martin did not know about any relationships that SAIC may

have had with ARMR, Alaron, or MSC.  1/16/06 Martin Depo. Tr. 48:5-20 (Exh. 21).

Moreover, Martin did not know about any relationship that SAIC had with BNFL until

November 1999—the month in which he worked on SAIC's response to the NRC's request for information about possible conflicts of interest. *Id.* at 49:18-50:4; *see also id.* at 6:5-7:17. Martin did not know that SAIC was doing work for BJC "involving the release of radioactive scrap metals" until November 1999. *Id.* at 115:16-20. Nor did Martin know anything about SAIC's purported development of the Plasma Hearth Process. *Id.* at 117:5-8; *see also id.* at 48:5-20.

23. Martin believed that "[t]here were no conflicts because the majority of those contracts were being performed by the Department of Energy" and "[t]he NRC does not regulate the Department of Energy." Martin Test., 7/14 p.m. Tr. 50:4-6 (Exh. 7); *see also id.* at 15:11-16:8. Thus, Martin did not believe that any of the relationships disclosed in SAIC's November 22, 1999 response to the NRC constituted conflicts of interest. *Id.* at 49:3-7, 50:4-6; *see also id.* at 46:8-18.

24. Martin was not aware of certain documents at the time he made various conflict-of-interest representations to the NRC. Martin Test., 7/14 p.m. Tr. 43:22-44:2 (Exh. 7). Martin testified that, even after he was shown the documents at trial, they did not make him "question the truthfulness or accuracy of SAIC's response to the NRC's cure notice." *Id.* at 44:3-7; *see also id.* at 43-46.

25. Martin did not know during the relevant time periods that compliance with conflict-of-interest obligations was allegedly material to the Government's decisions to pay SAIC's vouchers. *See* Martin Test., 7/14 a.m. Tr. 54:19-24 (Exh. 19) (testifying, when asked whether he had "an understanding whether SAIC had to obey these conflict of interest requirements in order to be paid under the contract," that "[t]he payment is separate from complying with the organizational conflict of interest clause"); *id.* at 55:7-10 (testifying that

SAIC could "still bill the NRC and receive payment for its work" even if SAIC did "not obey these conflicts of interest provisions").

26. One possible remedy for noncompliance with the NRC's conflict-of-interest requirements was termination of the contract. Martin Test., 7/14 p.m. Tr. 58:5-8 (Exh. 7); *see also* 1/16/06 Martin Depo. Tr. 12:5-13 (Exh. 21).

27. SAIC's January 10, 2000 letter in response to the NRC's cure notice was intended to persuade the NRC to let SAIC keep the 1999 Contract. Martin Test., 7/14 p.m. Tr. 11:16-14:12 (Exh. 7); 1/16/06 Martin Depo. Tr. 11:22-12:4, 105:8-17 (Exh. 21).

28. Martin did not know whether SAIC would be paid on its outstanding invoices if the NRC elected to terminate the 1999 Contract. Martin Test., 7/14 p.m. Tr. 12:20-23 (Exh. 7).

29. Even when the NRC believed that SAIC had a conflict of interest, it nevertheless paid at least one of SAIC's invoices. Martin Test., 7/14 p.m. Tr. 88-91 (Exh. 7).

**Thomas Rodehau**

30. Thomas Rodehau helped prepare SAIC's bid for the 1992 Contract and then served as SAIC's contract administrator on the 1992 Contract until June 1996. Rodehau Test., 7/3 p.m. Tr. 42-43 (Exh. 22); Rodehau Test., 7/7 a.m. Tr. 41:8-10 (Exh. 23); Martin Test., 7/14 a.m. Tr. 47:25-48:7 (Exh. 19); *see also* Rodehau Test., 7/3 p.m. Tr. 69-70 (Exh. 22).

31. Rodehau did not know that SAIC was allegedly violating its conflict-of-interest obligations. At the time he made certifications under the 1992 Contract, he "[a]bsolutely" "believe[d] them to be true and accurate." Rodehau Test., 7/3 p.m. Tr. 77-78 (Exh. 22); *see also* Rodehau Depo. Tr. 188:3-6, 199:12-16 (Exh. 24) (similar). He "[n]ever" "learn[ed] of anything that made [him] question the truthfulness and accuracy" of SAIC's certifications. Rodehau Test., 7/3 p.m. Tr. 78 (Exh. 22); *see also* Rodehau Depo. Tr. 188:7-9 (Exh. 24).

32. Rodehau "wasn't aware of any relationship" between SAIC and BNFL during his time working on the 1992 Contract. Rodehau Depo. Tr. 121:11-14 (Exh. 24). During his work on the 1992 Contract, Rodehau "had no knowledge" of any SAIC relationship with ARMR and, in fact, had never heard of ARMR until he prepared for his deposition. *Id.* at 122:8-123:16. In addition, he had "never heard" of Alaron. *Id.* at 126:2-13.

33. Rodehau participated in a public rulemaking during which "the head of NRC's Office of Acquisition . . . made it clear . . . that DOE was not an entity subject to the NRC's regulatory authority." Rodehau Test., 7/7 a.m. Tr. 32:2-8 (Exh. 23).

34. Rodehau "would not view [the NRC] as having authority over the DOE and its contractors and the work being performed by those contractors for DOE." Rodehau Depo. Tr. 160:18-161:3 (Exh. 24); *see also id.* at 245:14-22, 251:17-253:5.

35. Rodehau did not know that SAIC's compliance with its conflict-of-interest obligations was allegedly material to the Government's decision to pay. Rodehau explained that, although the NRC required offerors responding to a proposal to make a representation regarding the existence of conflicts of interest, the NRC did *not* require such contractors to represent that they had no conflicts of interest. *See* Rodehau Test., 7/7 a.m. Tr. 20 (Exh. 23); *see also id.* at 18-19. Rodehau believed that "the NRC did not require SAIC to respond . . . that we have no" conflicts. *Id.* at 18.

36. Rodehau testified that, although certifications were required when proposing certain modifications to the 1992 Contract, SAIC was *not* required to certify that it had no conflicts. Rodehau Test., 7/7 a.m. Tr. 28:1-17, 30:16-24 (Exh. 23). SAIC was permitted to state that it had a conflict that it needed to discuss with the NRC. *Id.* at 28:1-17.

37.   Rodehau explained that, if a contractor disclosed a conflict or potential conflict, it was

      sometimes possible to "mitigate or avoid" the conflict, and the offeror could also propose

      to restructure the Statement of Work so that any potential conflict was eliminated from the

      scope of services.  Rodehau Test., 7/7 a.m. Tr. 19-20 (Exh. 23).  In addition, the NRC

      could, among other things, impose conditions to avoid a conflict or could determine that it

      was in the Government's best interests to seek an award of the contract notwithstanding

      the conflict.  *Id.* at 19.

38.   When Rodehau made no-conflict representations as part of proposing modifications to the

      work under the 1992 Contract, he did not make those representations in order to obtain

      payment on pending claims.  Rodehau Test., 7/7 a.m. Tr. 30:9-15 (Exh. 23).

39.   Rodehau "[n]ever" decided not to disclose a conflict to ensure that SAIC got its claims

      paid and "[n]ever" submitted any no-conflict representation to the NRC "just in order to

      get the company's claims paid."  Rodehau Test., 7/7 a.m. Tr. 30:25-31:6 (Exh. 23).

40.   "[N]one" of the conflict-of-interest representations that Rodehau made before the award

      of the 1992 Contract "were made in order to get any claims paid."  Rodehau Test., 7/7

      a.m. Tr. 22-23 (Exh. 23).

41.   Rodehau's certification in SAIC's best and final offer from January 1992 and his

      certification in SAIC's revised best and final offer were not made to obtain payment from

      the NRC.  Rodehau Test., 7/7 a.m. Tr. 21-22 (Exh. 23).

**Michael McKenzie-Carter**

42.   Michael McKenzie-Carter, an SAIC scientist, helped prepare SAIC's technical proposal for

      the 1992 Contract and worked on both the 1992 and 1999 Contracts.  McKenzie-Carter

Test., 7/17 a.m. Tr. 87:11-12, 91:21-23, 96:2-13 (Exh. 25); 2/6/06 McKenzie-Carter Depo. Tr. 8:15-17 (Exh. 26).

43. McKenzie-Carter did not have knowledge of any alleged conflicts of interest. *See* McKenzie-Carter Test., 7/17 p.m. Tr. 14-16, 24:3-9, 48:7-9, 60:20-23, 88:14-25 (Exh. 27); Meck Test., 7/3 a.m. Tr. 104-06 (Exh. 28); DX 396 (Exh. 29).

44. McKenzie-Carter "never worked at any projects with private companies involving [the] recycle" of radioactively contaminated materials. *See* McKenzie-Carter Test., 7/17 p.m. Tr. 48:7-9 (Exh. 27).

45. Prior to the conflict-of-interest allegations being raised in late 1999, McKenzie-Carter "didn't know . . . that [SAIC] had anything specific with BNFL" in Oak Ridge, Tennessee. McKenzie-Carter Test., 7/17 p.m. Tr. 24:3-9 (Exh. 27); *id.* at 60:20-23.

46. When McKenzie-Carter asked an NRC official to authorize the sharing of information that DOE had developed relating to the BJC-SAIC project, the NRC official raised no concerns about SAIC simultaneously working on the NRC project and the BJC project; instead, the NRC official authorized the DOE to allow the SAIC team working on the DOE project to share its work product with the SAIC team that was working on the NRC contract. *See* Meck Test., 7/3 a.m. Tr. 104-06 (Exh. 28); DX 396 (Exh. 29).

47. McKenzie-Carter visited what he thinks was an MSC facility in Oak Ridge (McKenzie-Carter Test., 7/17 p.m. Tr. 59:10-13 (Exh. 27)), and, at the request of the NRC's Dr. Meck, he worked with other SAIC employees to obtain certain data from MSC about contaminated drums. *Id.* at 76:24-77:3, 88:14-25.

48. McKenzie-Carter was aware that SAIC had disclosed a potential conflict of interest prior to the award of the 1999 Contract. McKenzie-Carter Test., 7/17 p.m. Tr. 14-16 (Exh. 27).

49. McKenzie-Carter did not know, prior to the time that the 1999 Contract was terminated, that SAIC employee Gerry Motl allegedly had been an officer or director of ARMR. 2/6/06 McKenzie-Carter Depo. Tr. 221:9-222:2, 222:12-14 (Exh. 26).

50. McKenzie-Carter "was not aware of any specifics" about the Plasma Hearth Process, and he did not know that the Plasma Hearth Process purportedly involved the potential recycling or reuse of metals that exited that plasma technology. 5/24/06 McKenzie-Carter Depo. Tr. 321:6-17, 322:4-13 (Exh. 39).

51. There is no evidence that McKenzie-Carter knew that compliance with conflict-of-interest requirements was material to the Government's decision to pay. *See* McKenzie Carter Test., 7/17 a.m. 87-116 (Exh. 25); McKenzie Carter Test., 7/17 p.m. 3-89 (Exh. 27).

**Sandra Carder**

52. Sandra Carder was SAIC's Vice President and Director of Contracts for Corporate Contracts (Carder Test., 7/22 a.m. Tr. 38:13-14 (Exh. 30)) and therefore "didn't have involvement at the line contract level" (*id.* at 78:23-79:1).

53. There is no evidence that Carder knew that SAIC was allegedly violating its conflict-of-interest obligations. *See* Carder Test., 7/22 a.m. Tr. 36-83 (Exh. 30).

54. There is no evidence that Carder knew that compliance with conflict-of-interest requirements was allegedly material to the Government's decision to pay. *See* Carder Test., 7/22 a.m. Tr. 36-83 (Exh. 30).

**Dr. Mark Otis**

55. Dr. Mark Otis was an SAIC employee who worked on both the 1992 and 1999 Contracts. Otis Test., 7/17 a.m. Tr. 14:2-3 (Exh. 31); Otis Test., 7/16 p.m. Tr. 8:12-17 (Exh. 32).

56.   There is no evidence that Dr. Otis knew that SAIC was allegedly violating its conflict-of-interest obligations.  *See* Otis Test., 7/17 a.m. Tr. 5-30 (Exh. 31); Otis Test., 7/16 p.m. Tr. 5-83 (Exh. 32).

57.   There is no evidence that Dr. Otis knew that compliance with conflict-of-interest requirements was allegedly material to the Government's decision to pay.  *See* Otis Test., 7/17 a.m. Tr. 5-30 (Exh. 31); Otis Test., 7/16 p.m. Tr. 5-83 (Exh. 32).

**Alex Murray**

58.   Alex Murray did a small amount of work for SAIC on the 1992 Contract and now works at the NRC.  *See* Murray Test., 7/2 p.m. Tr. 24:3-12, 47:9-11, 51:19-24 (Exh. 33); 9/22/06 Aff. of Alex Murray ¶¶ 1-2 (Exh. 38).

59.   Murray knew that SAIC's policy was to avoid conflicts; he knew that SAIC wanted any employee who believed there was a problem to report that concern to the company; and he knew that SAIC's "management would be quite concerned about the possibility of a conflict of interest if one truly existed."  Murray Test., 7/2 p.m. Tr. 94:16-20, 105:15-23 (Exh. 33).

60.   Murray did not believe that there was "anything wrong with SAIC doing work for the NRC and for the Department of Energy at the same time."  Murray Test., 7/2 p.m. Tr. 89:24-90:12 (Exh. 33).

61.   Murray testified that, when he purportedly raised a conflict-of-interest issue with SAIC managers, he was attempting to "encourage communications" between SAIC employees because he felt that "it is a generally good thing for different parts of a company to know what they're doing, synergism, cross-fertilization of ideas, et cetera."  Murray Test., 7/2 p.m. Tr. 76:18-77:6 (Exh. 33); *see also id.* at 89:24-90:12; *see also* Murray Test., 7/3 a.m. Tr.

11:18-19 (Exh. 37) ("I did not complain.  I just said we needed to make sure that things were adequately addressed.").  Murray stated that he was "expressing . . . a concern that we needed to dot the I's and cross the T's, metaphorically, that work SAIC was doing at Oak Ridge and work SAIC was doing in Germantown, Idaho on the NRC contract were . . . not a potential conflict of interest."  Murray Test., 7/2 p.m. Tr. 106:18-22 (Exh. 33); *see also id.* at 109-10.

62.   SAIC specifically addressed the issue that Murray raised and informed him of the company's conclusion that there was not a conflict-of-interest problem.  *See* Murray Test., 7/2 p.m. Tr. 109:7-110:17 (Ex. 33).

63.   When SAIC informed Murray on January 5, 1996, that he had the option of being laid off or becoming "a consulting employee," Murray drafted a document touting opportunities that he purported to have for additional work at SAIC.  Murray Test., 7/2 p.m. Tr. 80:21-83:11 (Exh. 33).  One such opportunity related to decontaminating and decommissioning "the very same gaseous diffusion plant" at which SAIC purportedly wanted to team with BNFL.  *Id.* at 83:9-84:12.  Murray stated that the "suggestion in that letter that [he] might be involved in that work was based on [his] understanding" that a conflict of interest "did not exist at that time . . . or . . . would be checked and/or resolved or mitigated."  *Id.* at 108:10-14; *see also id.* at 84.

64.   Murray testified that, because of SAIC's structure, "there was a much greater emphasis placed on communication, trying to find out what other parts of SAIC were doing."  Murray Test., 7/2 p.m. Tr. 32:1-9 (Exh. 33).

**SAIC's Conflict-Of-Interest Compliance System**

65.     SAIC had a formal policy that it would "not engage in contracts where there could be conflict" with SAIC's other work.  Carder Test., 7/22 a.m. Tr. 41:11-42:11 (Exh. 30); *see also* Rodehau Test., 7/3 p.m. Tr. 81:3-20 (Exh. 22).

66.     SAIC had a handbook for contracts representatives, which addressed conflict-of-interest issues and described the process to be utilized when SAIC was considering bidding on a contract.  Carder Test., 7/22 a.m. Tr. 47:4-51:2 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 72:18-73:12 (Exh. 22); *see also* Carder Test., 7/22 a.m. Tr. 49:5-7 (Exh. 30) (the handbook "spell[ed] out in a very detailed level exactly what everyone was supposed to do and how they were supposed to go about it").

67.     SAIC's business units and its Corporate Contracts Department performed conflict-of-interest training.  Carder Test., 7/22 a.m. Tr. 50:9-14, 52:21-55:5 (Exh. 30); *see also* Rodehau Test., 7/3 p.m. Tr. 40:19-23 (Exh. 22).  An SAIC contracts manager's responsibilities included attending and providing training regarding conflicts of interest.  *See* Bidwell Test., 7/16 a.m. Tr. 59:1-2, 60:2-5, 60:16-18 (Exh. 11).

68.     SAIC had a Business Ethics Handbook that addressed conflicts of interest; every employee was required to read this handbook and sign a certification annually.  Carder Test., 7/22 a.m. Tr. 51:8-18, 52:4-13 (Exh. 30); Bidwell Test., 7/16 a.m. Tr. 83:4-9 (Exh. 11).

69.     All SAIC employees had an obligation to report within the organization any concerns or information about potential or actual conflicts of interest.  Bidwell Test., 7/16 a.m. Tr. 64:6-20 (Exh. 11).

70.     SAIC encouraged employees to raise any concerns about conflicts of interest, and SAIC specifically addressed an issue allegedly raised by Murray by informing him of the

company's conclusion that there was not a conflict of interest. *See* Murray Test., 7/2 p.m. Tr. 105:15-23, 109:7-110:17 (Exh. 33).

71. Before it entered into its NRC contracts, SAIC had developed a program to identify and address potential conflicts of interest. When designing this system, SAIC took into account NRC and DOE regulations. *See* Carder Test., 7/22 a.m. Tr. 65:5-7 (Exh. 30).

72. SAIC was "conscientious and attempted to identify and report all conflicts of interest that arose under the[ir] agency work assignments." McWhirter Depo. Tr. 10:18-11:9, 54:7-19, 68:5-12, 76:2-6 (Exh. 40); *see also id.* at 129:8-22, 130:7-11 (concluding that SAIC's compliance system was above average).

73. SAIC's compliance system, "consisting of written policies, actual procedures, training materials, system tools, and supplemental databases[,] was effective in ensuring company-wide notice and access to relevant facts and circumstances to avoid and/or mitigate potential OCIs." 6/12/06 Expert Report of C. Wilkins at 4 (Exh. 41). SAIC's "practices are consistent with industry practice." 9/18/06 Supp. Expert Report of C. Wilkins at 4 (Exh. 42).

74. The work to be performed by a contractor is not defined in teaming agreements, and "customary practice" does not involve evaluating such opportunities for conflict-of-interest compliance. 9/18/06 Supp. Expert Report of C. Wilkins at 3 & n.3 (Exh. 42).

75. SAIC's system was responsible for managing the thousands of contracts that SAIC had at any given time. *See* Carder Test., 7/22 a.m. Tr. 64:1-8 (Exh. 30); Bidwell Test., 7/16 a.m. Tr. 80:7-10 (Exh. 11); Martin Test., 7/14 p.m. Tr. 50:11-12 (Exh. 7).

76. The first step in SAIC's compliance system was set in motion when an SAIC contract representative received a Request for Proposal ("RFP"). Upon receipt of an RFP, the

contract representative would read and analyze the RFP, focusing specifically on any

conflict-of-interest clauses or other clauses that might limit future contracts.  Carder Test.,

7/22 a.m. 45:6-12 (Exh. 30); Rodehau Test., 7/7 a.m. Tr. 5:14-20 (Exh. 23).

77.     For large procurements, SAIC had an acquisition council that would evaluate certain

opportunities early on—typically, before a proposal was submitted—to determine, among

other things, whether the proposed opportunity presented any conflicts of interest.

Rodehau Test., 7/3 p.m. Tr. 82:12-21 (Exh. 22).

78.     Under SAIC's compliance system, a notification would be electronically routed to other

groups within SAIC to inform them about the work on which SAIC was considering

bidding and to delineate the types of restrictions that the proposal might involve.  Carder

Test., 7/22 a.m. Tr. 45:13-16 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 79:8-20, 83:11-13

(Exh. 22); *see also* Martin Test., 7/14 a.m. Tr. 45:14-23 (Exh. 19).  Such notifications were

sent via an electronic routing form that identified the potential customer, described the

work on which SAIC was considering bidding, and detailed the relevant conflict-of-interest

provisions.  Carder Test., 7/22 a.m. Tr. 56:7-17, 57:15-19, 59:15-25 (Exh. 30); *see also*

Rodehau Test., 7/3 p.m. Tr. 83:11-22 (Exh. 22).  SAIC's contracts staff was "trained on

how to summarize the scope of work for purposes of using this system."  Carder Test.,

7/22 a.m. Tr. 57:11-13 (Exh. 30).

79.     Once a conflict-of-interest routing was circulated through SAIC's system, the routings

were received by SAIC's senior contracts staff, who were involved in contracts operations

at the business unit level.  Carder Test., 7/22 a.m. Tr. 58:1-8 (Exh. 30); *see also* Rodehau

Test., 7/3 p.m. Tr. 40:7-13 (Exh. 22); Martin Test., 7/14 p.m. Tr. 64:24-65:11 (Exh. 7).

Those individuals were responsible for comparing the routings against the contracts that

existed within their respective parts of the company, and for identifying, and alerting others to, any conflicts of interest.  Carder Test., 7/22 a.m. Tr. 45:17-22, 58:9-15 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 87:4-16 (Exh. 22); *see also* Rodehau Test., 7/7 a.m. Tr. 10:5-14 (Exh. 23); Martin Test., 7/14 p.m. Tr. 65:8-15 (Exh. 7).

80.   If the contracts staff person who received a routing needed additional information, she could forward the routing to other SAIC employees.  Carder Test., 7/22 a.m. 73:12-16 (Exh. 30); *see also* Rodehau Test., 7/3 p.m. 87:10-16 (Exh. 22).  In carrying out his responsibility to review the conflict-of-interest routings, Rodehau "would meet" with his program managers "at least on a weekly basis [to] review[ ] the routings."  Rodehau Test., 7/7 a.m. Tr. 10:5-22 (Exh. 23).

81.   If no possible conflict-of-interest issues were raised as a result of the routing process, SAIC would then submit its bid.  Carder Test., 7/22 a.m. Tr. 45:20-22 (Exh. 30).  If issues were raised, however, the contract representative who circulated the routing would investigate the issue further and would share the relevant information with SAIC's technical staff.  *See* Rodehau Test., 7/3 p.m. Tr. 91:5-22 (Exh. 22).  The contract representative who circulated the routing and the employees who responded with a possible conflict-of-interest issue would then confer and determine whether there was a way to mitigate the conflict so that SAIC could submit a bid.  Carder Test., 7/22 a.m. Tr. 45:23-46:3, 59:7-11 (Exh. 30); *see also* Rodehau Test., 7/7 a.m. 13:4-14:16 (Exh. 23).  If the two groups could not agree, SAIC's Corporate Contracts Department would assist and determine the best approach.  Carder Test., 7/22 a.m. Tr. 46:4-8 (Exh. 30).  If there was no consensus within SAIC as to how to proceed, SAIC would not submit the bid.  *Id.* at 46:9-13; *see also* Rodehau Test., 7/7 a.m. Tr. 16:25-17:15 (Exh. 23).

82. SAIC's conflict-of-interest routing system was used for bids, proposals, modifications to contracts, and "qualification packages that could result in a contract award." Rodehau Test., 7/7 a.m. Tr. 44:12-17 (Exh. 23); *see also* Carder Test., 7/22 a.m. Tr. 66:18-20 (Exh. 30).

83. "It would serve no purpose" to include teaming agreements within the compliance systems because such agreements "do not have an extensive detailed Statement of Work." Carder Test., 7/22 a.m. Tr. 66:21-25 (Exh. 30). Teaming agreements simply involve "companies getting together to think about a future project," and SAIC therefore receives no compensation under such agreements. Carder Test., 7/22 a.m. Tr. 68:15-18, 81:25-82:8 (Exh. 30); *see also* Rodehau Test., 7/7 a.m. Tr. 46:16-20 (Exh. 23); Bidwell Test., 7/16 a.m. Tr. 77:24 (Exh. 11).

84. SAIC had methods of communicating internally about teaming agreements. "[T]here was a separate process for teaming agreements" (Rodehau Test., 7/7 a.m. Tr. 44:19 (Exh. 23)), whereby one business unit teaming with a company could notify other business units about that arrangement. *See* Carder Test., 7/22 a.m. Tr. 81:13-18 (Exh. 30); Rodehau Test., 7/7 a.m. Tr. 44:19 (Exh. 23).

85. During the relevant time period, SAIC made a transition to a new computerized routing system. At the time it was being used by SAIC, the earlier system "was state-of-the-art." Carder Test., 7/22 a.m. Tr. 61:24-25 (Exh. 30); *see also* Rodehau Test., 7/7 a.m. Tr. 6:18-23 (Exh. 23).

86. On a regular basis, SAIC chose not to pursue work because the work would have presented conflict-of-interest concerns. Carder Test., 7/22 a.m. Tr. 40:3-8 (Exh. 30).

87. SAIC had a contract management database that contained information about the conflict-of-interest clauses contained in SAIC's contracts. Rodehau Test., 7/3 p.m. Tr. 88:23-89:2, 89:18-22 (Exh. 22). This contract management database could be searched using key words in an attempt to identify possible conflicts of interest. Bidwell Test., 7/16 a.m. Tr. 75:2-16 (Exh. 11). For example, Rodehau input information into this database upon notification of award of the 1992 Contract; Martin searched the database in connection with several modifications to that contract; and the database was searched when SAIC was preparing its November 22, 1999 response to the NRC's request for information. Rodehau Test., 7/3 p.m. Tr. 88 (Exh. 22); Martin Test., 7/14 a.m. Tr. 106:22-24 (Exh. 19); Martin Test., 7/14 p.m. Tr. 50:7-16, 51:1-4, 59:4-15, 60:14-23 (Exh. 7).

88. SAIC's conflict-of-interest policies and systems were implemented in connection with the 1992 and 1999 Contracts. SAIC used the conflict-of-interest routing procedure for the proposals that it prepared for both contracts. Rodehau Test., 7/3 p.m. Tr. 88:11-18 (Exh. 22); Martin Test., 7/14 p.m. Tr. 62:14-22 (Exh. 7). In addition, SAIC used the routing system in connection with proposals for substantive modifications. Rodehau Test., 7/7 a.m. Tr. 28:18-22 (Exh. 23); Rodehau Test., 7/3 p.m. Tr. 84:6-9 (Exh. 22); Martin Test., 7/14 p.m. Tr. 59:4-18, 60:14-23 (Exh. 7); *see also* Martin Test., 7/14 a.m. Tr. 86:16-25, 87:25-89:3 (Exh. 19).

89. Martin complied with SAIC's conflict-of-interest policies and procedures in administering the 1992 and 1999 Contracts. Martin Test., 7/23 a.m. Tr. 87:20-88:1, 90:20-91:4 (Exh. 34). SAIC performed a "due diligence check" before making any conflict-of-interest certifications in connection with those contracts. Rodehau Test., 7/3 p.m. Tr. 53:7-12 (Exh. 22); *see id.* at 77:24-79:25.

90.   During contract negotiations with the NRC in 1999, SAIC identified a potential future

conflict of interest based on "a future desire" for one of SAIC's business units possibly to

"go and market" to a particular NRC licensee; this created a potential problem because the

initial RFP called for the SAIC team working on the NRC project to visit certain NRC

licensee sites, and there was some potential that those sites would be the same ones where

the other SAIC business unit had a desire to perform marketing.  Martin Test., 7/14 p.m.

Tr. 66:2-67:4 (Exh. 7).  *See generally* McKenzie-Carter Test., 7/17 p.m. 14:24-16:15 (Exh.

27).  SAIC disclosed the potential conflict to the NRC and worked with the agency to

develop a mutually acceptable mitigation plan.  *See* Martin Test., 7/14 p.m. Tr. 69:1-17,

71:3-9 (Exh. 7); *see also id.* at 64-71; McKenzie-Carter Test., 7/17 p.m. 16:4-15 (Exh. 27).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SCIENCE APPLICATIONS<br>INTERNATIONAL CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: 04-cv-1543 (RWR)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON FALSE CLAIMS ACT LIABILITY

Andrew S. Tulumello (D.C. Bar No. 468351)
Amir C. Tayrani (D.C. Bar No. 490994)
Ryan J. Watson (D.C. Bar No. 986906)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com

John P. Rowley, III
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 835-6151
E-mail: john.rowley@bakermckenzie.com

*Counsel for Defendant Science*
*Applications International Corporation*

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 1

II.    BACKGROUND ...................................................................................................... 3

     A.    The Contracts Between SAIC And The NRC ............................................... 3

     B.    SAIC's Compliance System For Identifying Conflicts Of Interest ............. 5

     C.    Conflict-Of-Interest Allegations Are Raised .............................................. 7

     D.    History Of This Litigation ........................................................................... 7

III.    LEGAL STANDARD .......................................................................................... 11

IV.    ARGUMENT ........................................................................................................ 12

     A.    THE FALSE CLAIMS ACT ESTABLISHES AN EXACTING
           SCIENTER REQUIREMENT THAT IS PARTICULARLY
           IMPORTANT IN IMPLIED CERTIFICATION CASES .................................. 13

     B.    NO REASONABLE JURY COULD FIND THAT A SPECIFIC SAIC
           EMPLOYEE ACTED WITH SCIENTER ................................................... 16

           1.    John Pierce Martin Did Not Act With Scienter ............................ 17

           2.    Thomas Rodehau Did Not Act With Scienter .............................. 20

           3.    Alex Murray Did Not Act With Scienter ...................................... 23

           4.    Michael McKenzie-Carter Did Not Act With Scienter ............... 25

           5.    Sandra Carder Did Not Act With Scienter .................................... 28

           6.    Dr. Mark Otis Did Not Act With Scienter .................................... 29

     C.    NO REASONABLE JURY COULD FIND THAT SAIC'S
           STRUCTURE OR COMPLIANCE SYSTEM DEMONSTRATES
           THAT THE COMPANY ACTED WITH RECKLESS DISREGARD
           OR DELIBERATE IGNORANCE ............................................................. 30

           1.    SAIC Did Not Act In Reckless Disregard Of Its Conflict-Of-
                  Interest Obligations ...................................................................... 30

           2.    SAIC Did Not Act In Deliberate Ignorance Of The Truth Or
                  Falsity Of Its Claims And Statements ......................................... 40

     D.    NOTHING IN THE D.C. CIRCUIT'S OPINION OR THIS COURT'S
           PREVIOUS OPINIONS FORECLOSES SAIC'S REQUEST FOR
            SUMMARY JUDGMENT ...................................................................... 42

V.    CONCLUSION .................................................................................................... 44

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................................................. 11

*Ben-Kotel v. Howard Univ.,*
319 F.3d 532 (D.C. Cir. 2003) ............................................................................................... 11

*Calhoun v. Johnson,*
632 F.3d 1259 (D.C. Cir. 2011) ............................................................................................. 11

*Conrod v. Davis,*
120 F.3d 92 (8th Cir. 1997) .................................................................................................... 12

*Dillon v. Cobra Power Corp.,*
560 F.3d 591 (6th Cir. 2009) ........................................................................................... 12, 44

*Downes v. Beach,*
587 F.2d 469 (10th Cir. 1978) ............................................................................................... 12

*Global-Tech Appliances, Inc. v. SEB S.A.,*
563 U.S. ___, 131 S. Ct. 2060 (2011) ................................................................................... 31

*Jama v. Immigration & Customs Enforcement,*
543 U.S. 335 (2005) ................................................................................................................ 43

*Kelley v. Price-Macemon, Inc.,*
992 F.2d 1408 (5th Cir. 1993) ............................................................................................... 12

*Langston v. Johnson,*
478 F.2d 915 (D.C. Cir. 1973) ......................................................................................... 12, 44

*Reiss v. Luchetta,*
No. 94-1489, 1996 U.S. App. LEXIS 3351 (10th Cir. 1996) ............................................. 12

*Saba v. Compagnie Nationale Air France,*
78 F.3d 664 (D.C. Cir. 1996) ................................................................................................ 15

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,*
393 F.3d 1321 (D.C. Cir. 2005) ............................................................................................ 14

* *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Grp., Inc.,*
298 F. Supp. 2d 91 (D.D.C. 2004) ............................................................................ 30, 31, 39

*United States ex rel. Farmer v. City of Houston,*
523 F.3d 333 (5th Cir. 2008) ................................................................................................. 31

* *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.,*
495 F.3d 103 (3d Cir. 2007) ...................................................................................... 15, 31, 39

*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency,*
456 F. Supp. 2d 46 (D.D.C. 2006) ................................................................................... 11, 26

*United States ex rel. Norbeck v. Basin Elec. Power Coop.*,
 248 F.3d 781 (8th Cir. 2001) ............................................................ 31

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
 214 F.3d 1372 (D.C. Cir. 2000) ...................................................... 14

*United States ex rel. Totten v. Bombardier Corp.*,
 380 F.3d 488 (D.C. Cir. 2004) ........................................................ 26

* *United States v. Krizek*,
 111 F.3d 934 (D.C. Cir. 1997) ........................................... 15, 31, 41

*United States v. Philip Morris USA Inc.*,
 566 F.3d 1095 (D.C. Cir. 2009) ...................................................... 15

*United States v. Sci. Applications Int'l Corp.*,
 555 F. Supp. 2d 40 (D.D.C. 2008) .............................................41, 43

* *United States v. Sci. Applications Int'l Corp.*,
 626 F.3d 1257 (D.C. Cir. 2010) ...............................................*passim*

*United States v. Sci. Applications Int'l Corp.*,
 653 F. Supp. 2d 87 (D.D.C. 2009) ............................... 3, 8, 9, 13, 43

## Statutes

31 U.S.C. § 3729(a)(1) .......................................................... 7, 10, 13

31 U.S.C. § 3729(a)(2) .......................................................... 8, 10, 13

31 U.S.C. § 3729(b) (2008) ......................................................... 1, 13

42 U.S.C. § 2140(a) ......................................................................... 3

Fraud Enforcement and Recovery Act of 2009,
 Pub. L. No. 111-21, § 4(a)(2), 123 Stat. 1617 .............................. 13

Fraud Enforcement and Recovery Act of 2009,
 Pub. L. No. 111-21, § 4(f), 123 Stat. 1617 .................................... 13

## Other Authorities

10A Wright, Miller & Kane,
 *Federal Practice and Procedure* § 2722 (3d ed. 2010) ................. 12

5A Anthony J. Thompson et al.,
 *Environmental Law Practice Guide* § 40.03[3] (2009) ................... 3

Comm. of Sponsoring Orgs. of the Treadway Comm'n,
 *Internal Control—Integrated Framework* (1994) ........................ 40

Memorandum from Mark Filip, Deputy Att'y Gen., U.S. Dep't of Justice,
 *Principles of Federal Prosecution of Business Organizations*
 § 9-28.800(A) (Aug. 28, 2008) ...................................................... 40

S. Rep. 99-345, 1986 U.S.C.C.A.N. 5266 ......................................... 30

U.S. Sentencing Guidelines Manual § 8B2.1(b)(1) (2010) ............................................................39, 40

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................................................11

Fed. R. Civ. P 56(c)(1) ...................................................................................................................11, 44

**Regulations**

10 C.F.R. § 30.12 ...................................................................................................................................3

10 C.F.R. § 40.11 ...................................................................................................................................3

10 C.F.R. § 70.11 ...................................................................................................................................3

41 C.F.R. § 20-1.5403(b) (1979) ..........................................................................................................4

41 C.F.R. § 20-1.5403(b)(i) (1979) .......................................................................................................4

41 C.F.R. § 20-1.5403(b)(ii) (1979) ......................................................................................................4

41 C.F.R. § 20-1.5403(b)(iv) (1979) .....................................................................................................4

# I.  INTRODUCTION

In reviewing, and vacating, the judgment in this case, the D.C. Circuit emphasized that the "scienter requirement" of the False Claims Act ("FCA") must be "[s]trict[ly] enforce[d] . . . to ensure that ordinary breaches of contract are not converted into FCA liability."  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010) ("*SAIC IV*").  To meet its burden of proof on scienter, the Government must establish that Science Applications International Corporation ("SAIC") *knowingly* submitted false claims and *knowingly* made false statements to get false claims paid.  *See* 31 U.S.C. § 3729(b) (2008).  Confronted with its failure of proof on this issue at trial, the Government attempted an end-run around this element of FCA liability by proposing, and receiving, a "collective knowledge" jury instruction that permitted it "to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials."  *SAIC IV*, 626 F.3d at 1275 (internal quotation marks omitted). The D.C. Circuit held that this instruction was flawed and vacated the FCA judgment.  "[U]nder the FCA," the D.C. Circuit reasoned, "'collective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose."  *Id.* at 1274.

The D.C. Circuit explained that, on retrial, the Government must identify a specific SAIC employee who, at the time SAIC was submitting allegedly false claims, (1) knew, or was recklessly unaware, that SAIC was violating its conflict-of-interest obligations, and (2) knew, or was recklessly unaware, that compliance with those obligations was material to the Government's decision to pay SAIC's claims.  *See SAIC IV*, 626 F.3d at 1271.  In the alternative, the Government must prove that SAIC's conflict-of-interest compliance system was so utterly

defective that it reflected deliberate ignorance or reckless disregard by the SAIC employees who designed and implemented that system. *Id.* at 1275-76.

The Government cannot satisfy this rigorous scienter standard. Indeed, the Government cannot even point to sufficient evidence to create a triable question of fact on this issue. <u>There is simply no evidence that any SAIC employee simultaneously knew of SAIC's alleged conflict-of-interest violations and that those violations were supposedly material to the Government's payment decisions.</u> The relevant SAIC employees lacked knowledge of SAIC's allegedly conflicting relationships with other entities or lacked knowledge that such relationships could constitute a conflict of interest. In addition, the relevant employees uniformly did not know that compliance with conflict-of-interest obligations was purportedly material to the Government's decision to pay SAIC's claims.

Nor is there evidence that the employees responsible for SAIC's corporate structure or compliance systems acted with reckless disregard or deliberate ignorance of the company's conflict-of-interest obligations. On the contrary, the undisputed evidence establishes that SAIC designed and implemented a comprehensive and state-of-the-art compliance system to identify potential and actual conflicts of interest. And, there is certainly no evidence that SAIC deliberately compartmentalized its various departments in an effort to evade FCA liability.

For each of these reasons, there is no genuine dispute of material fact pertaining to scienter and the Court should enter summary judgment in favor of SAIC on the Government's FCA claims.

## II.  BACKGROUND

**A.    The Contracts Between SAIC And The NRC**

The Nuclear Regulatory Commission ("NRC") is the federal agency that regulates

civilian uses of nuclear power.  *United States v. Sci. Applications Int'l Corp.*, 653 F. Supp. 2d 87, 92

(D.D.C. 2009) ("*SAIC III*").  The U.S. Department of Energy ("DOE"), in contrast, "operat[es]

. . . the federal government's atomic research and weapons facilities."  5A Anthony J. Thompson

et al., *Environmental Law Practice Guide* § 40.03[3] (2009).  The NRC does not regulate DOE or

contractors working under DOE oversight.  *See* 42 U.S.C. § 2140(a); 10 C.F.R. §§ 30.12, 40.11,

70.11; *see also* Thompson et al., *supra*, § 40.03[3].

The NRC has long prohibited the unlicensed release of radioactive materials from NRC-

regulated facilities.  Am. Compl. ¶ 10.  Beginning in the mid-1980s, the NRC sought to alter its

case-by-case licensing approach by establishing standards of contamination that would permit

certain slightly radioactive materials to be released without a license.  *Id.* ¶ 11.  When Congress

"ordered the effort halted . . . due to inadequate technical support," the NRC set out "to

develop scientifically based standards for the free release of radioactive materials."  *Id.* ¶¶ 11-12.

In furtherance of that effort, the NRC contracted with SAIC in 1992 to obtain assistance

in developing a calculational model that the NRC could use in formulating possible standards

for the release of radioactive materials from NRC-licensed facilities.  Under this contract

(hereinafter "1992 Contract"), SAIC agreed to perform a variety of tasks, including preparing a

draft report on "risk assessment scenarios," reviewing relevant literature, and developing and

identifying adequate "technical bases upon which to support NRC regulations in this area."  Am.

Compl. ¶¶ 14-17.

The 1992 Contract also contained several conflict-of-interest provisions.  These provisions required SAIC to "forego entering into consulting or other contractual arrangements with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under [the] contract," and mandated that if SAIC "has reason to believe with respect to itself or any employee that any proposed consultant or other contractual arrangement with any firm or organization may involve a potential conflict of interest, [SAIC] shall obtain the written approval of the Contracting Officer prior to execution of such contractual arrangement."  PX 8, § H(c) at 138175 (Exh. 2).  SAIC also warranted that "it does not have any organizational conflicts of interest as defined in 41 CFR 20-1.5402(a)," and agreed that "if after award, [SAIC] discovers organizational conflicts of interest with respect to this contract, it shall make an immediate and full disclosure in writing to the Contracting Officer."  *Id.* § H.5(d) at 138175.  In addition, SAIC "represent[ed] to the best of [its] knowledge and belief" that the award of the contract did "not . . . involve situations or relationships of the type set forth in 20-1.5403(b)."  *Id.* § K.19 at 138203.  As relevant here, 41 C.F.R. § 20-1.5403(b) (1979) defined the following situations or relationships as conflicts of interest:

> (i)  Where the offeror or contractor provides advice and recommendations to the NRC in a technical area in which it is also providing consulting assistance in the same area to any organization regulated by the NRC.

> (ii)  Where the offeror or contractor provides advice to the NRC on the same or similar matter in which it is also providing assistance to any organization regulated by the NRC.

> . . .

> (iv)  Where the award of a contract would result in placing the offeror or contractor in a conflicting role in which its judgment may be biased in relation to its work for the NRC . . . .

41 C.F.R. § 20-1.5403(b) (i), (ii), (iv) (1979); *see also* PX 8 at 138225 (Exh. 2).

In 1999, the NRC entered into a follow-on contract (hereinafter "1999 Contract") with SAIC under which SAIC was to provide additional "technical assistance . . . to support NRC clearance rulemaking." Am. Compl. ¶ 20. The 1999 Contract had materially identical conflict-of-interest provisions to the 1992 Contract. *See SAIC IV*, 626 F.3d at 1264.

## B.      SAIC's Compliance System For Identifying Conflicts Of Interest

In bidding upon and performing its contracts with the NRC, SAIC utilized the comprehensive compliance system that it had designed to identify and address potential conflicts of interest. Under this system—which is analyzed in substantial detail in Section IV.C.1, *infra*—one of SAIC's contract representatives would review every request for proposal ("RFP") to which SAIC was considering submitting a response. Carder Test., 7/22 a.m. Tr. 45:6-12 (Exh. 30); Rodehau Test., 7/7 a.m. Tr. 5:14-20 (Exh. 23). In undertaking that review, the contract representative would specifically focus on any conflict-of-interest clauses or other clauses that might limit future contracts. Carder Test., 7/22 a.m. Tr. 45:6-12 (Exh. 30); Rodehau Test., 7/7 a.m. Tr. 5:14-20 (Exh. 23). An electronic routing would then be circulated to inform other SAIC employees about the potential bid and the conflict-of-interest provisions that would govern the new work. Carder Test., 7/22 a.m. Tr. 45:13-16, 57:15-19, 59:15-25 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 79:8-20, 83:11-22 (Exh. 22); *see also* Martin Test., 7/14 a.m. Tr. 45:14-23 (Exh. 19). Once a conflict-of-interest routing was circulated, SAIC's senior contracts staff—who were involved in contracts operations at the business unit level—compared the routings against the existing contracts within their respective parts of the company in order to identify any actual or potential conflicts of interest. Carder Test., 7/22 a.m. Tr. 45:17-22, 58:1-15 (Exh. 30); *see also* Rodehau Test., 7/3 p.m. Tr. 40:7-13, 87:4-16 (Exh. 22); Rodehau Test., 7/7 a.m. Tr. 10:5-14 (Exh. 23); Martin Test., 7/14 p.m. Tr. 64:24-65:11 (Exh. 7).

If no possible conflict-of-interest issues were identified through the routing process, SAIC would then submit its bid.  Carder Test., 7/22 a.m. Tr. 45:20-22 (Exh. 30).  If a conflict issue was raised, however, the contract representative who circulated the routing would investigate the issue further and the SAIC employees working on the potentially conflicting project and those working on the bid would confer and determine whether the possible conflict could be mitigated.  *See* Rodehau Test., 7/3 p.m. Tr. 91:5-22 (Exh. 22); Rodehau Test., 7/7 a.m. Tr. 13:4-14:16 (Exh. 23); Carder Test., 7/22 a.m. Tr. 45:23-46:8, 59:7-11 (Exh. 30).  If there was no consensus within SAIC as to how to proceed, SAIC would not submit the bid.  Carder Test., 7/22 a.m. Tr. 46:9-13 (Exh. 30); *see also* Rodehau Test., 7/7 a.m. Tr. 16:25-17:15 (Exh. 23).

In addition to the routing system described above, SAIC maintained a contract management database that contained information about the conflict-of-interest clauses in all of its contracts.  Rodehau Test., 7/3 p.m. Tr. 88:23-89:2, 89:18-22 (Exh. 22).  SAIC's conflict-of-interest compliance system was also supported by formal policies, training, and documentation on conflict-of-interest issues.  *See* Carder Test., 7/22 a.m. Tr. 41:11-42:11, 47:4-51:2, 49:5-7, 50:9-14, 51:8-18, 52:4-13, 52:21-55:5 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 40:19-23, 72:18-73:12, 81:3-20 (Exh. 22); Bidwell Test., 7/16 a.m. Tr. 59:1-2, 60:2-5, 60:16-18, 64:6-20, 83:4-9 (Exh. 11).

SAIC adhered to its conflict-of-interest policies and compliance system in connection with the 1992 and 1999 NRC contracts.  *See* Martin Test., 7/23 a.m. Tr. 87:20-88:1, 90:20-91:4 (Exh. 34) (testimony of SAIC's contract representative for the 1999 Contract and part of the 1992 Contract that he complied with SAIC's conflict-of-interest policies and procedures in administering both contracts); Rodehau Test., 7/3 p.m. Tr. 53:7-12 (Exh. 22) (testimony of SAIC's other contract representative for the 1992 Contract that SAIC performed a "due

diligence check" before making any conflict-of-interest certifications); *see also id.* at 77:24-79:25. For example, SAIC used the conflict-of-interest routing procedure in connection with its proposals for both contracts as well as proposals for substantive modifications to the contracts. Rodehau Test., 7/3 p.m. Tr. 84:6-9, 88:11-18 (Exh. 22); Rodehau Test., 7/7 a.m. Tr. 28:18-22 (Exh. 23); Martin Test., 7/14 a.m. Tr. 86:16-25, 87:25-89:3 (Exh. 19); Martin Test., 7/14 p.m. Tr. 59:4-18, 60:14-23, 62:14-22 (Exh. 7).  Through its compliance system, SAIC discovered a potential future conflict of interest during contract negotiations with the NRC in 1999; SAIC disclosed that potential conflict to the NRC and negotiated a mitigation plan with the agency. *See, e.g.*, Martin Test., 7/14 p.m. Tr. 64-71 (Exh. 7).

## C.     Conflict-Of-Interest Allegations Are Raised

In late 1999, a union representative—who later testified that he lacked knowledge of the details of SAIC's work—alleged at an NRC meeting that SAIC had undisclosed conflicts of interest with respect to its work for the NRC.  *See* Am. Compl. ¶ 90; Guttman Test., 7/14 a.m. Tr. 34 (Exh. 5).  Following this allegation, the NRC ordered SAIC to stop work under the 1999 Contract.  In early 2000, the NRC and SAIC agreed to terminate the 1999 Contract and entered into a no-cost settlement.  Martin Test., 7/14 p.m. Tr. 86 (Exh. 7).

## D.     History Of This Litigation

In 2004, the Government "brought suit against SAIC, raising two claims under the [FCA]" as well as a claim alleging that SAIC breached its 1992 Contract.  *SAIC IV*, 626 F.3d at 1263.  The Government alleged that SAIC knowingly submitted impliedly false claims in violation of 31 U.S.C. § 3729(a)(1) "by continuing to submit payment invoices after" alleged conflicts of interest arose.  *SAIC IV*, 626 F.3d at 1263.  The Government further alleged that

"SAIC knowingly made false statements to get false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(2)." *Id.*

All but one of the Government's conflict-of-interest allegations were premised on work that SAIC performed or sought to perform in support of DOE.  The Government's allegations focused on the following six relationships:

- **BNFL:**  In 1997, BNFL, Inc. entered into a contract with DOE to decommission and decontaminate certain buildings at DOE's facility in Oak Ridge, Tennessee.  Am. Compl. ¶¶ 56, 58.  This project—which is sometimes referred to as the "DOE Three-Building Project"—was subject to DOE oversight.  SAIC was a subcontractor to BNFL on this contract.  *See* Turner Test., 7/8 p.m. Tr. 90 (Exh. 10).

- **Manufacturing Sciences Corporation ("MSC"):**  Like SAIC, MSC—a wholly-owned subsidiary of BNFL—was a subcontractor to BNFL on BNFL's prime contract with DOE for the Three-Building Project.  Am. Compl. ¶¶ 58-59.  SAIC and MSC did not have a contractual relationship in connection with this project.

- **Bechtel Jacobs Company ("BJC"):**  In mid-1999, SAIC performed work for BJC, a contractor for DOE facilities in Oak Ridge.  Am. Compl. ¶ 82; PX 731, at 1-3 (Exh. 12).  SAIC conducted a radiological dose assessment and performed a cost-benefit analysis regarding the recycling of contaminated metal from DOE facilities.  *See* Am. Compl. ¶ 86; *see also SAIC III*, 653 F. Supp. 2d at 101.  The task order stated that this work was performed "per DOE guidelines."  PX 731, at 2 (Exh. 12).

- **Alaron:**  Alaron Corporation bid on a DOE contract for work at a DOE weapons facility in Georgia.  *See* Tempel Test., 7/9 a.m. Tr. 18-20 (Exh. 14).  SAIC would have played a supporting role to Alaron on that contract, but Alaron did not win the

contract. *See id.* at 22; Taylor Test., 7/9 a.m. Tr. 64, 66 (Exh. 15). Alaron had a site-specific NRC license for an unrelated facility in Pennsylvania. *See* Taylor Test., 7/9 a.m. Tr. 65, 67 (Exh. 15).

- **Plasma Hearth Process:** The Plasma Hearth Process was an experimental concept funded primarily by DOE that was envisioned as a means of melting drums of DOE-generated waste. *See* Larsen Test., 7/10 a.m. Tr. 7-8, 57-58, 60-61 (Exh. 16). Although SAIC postulated that the sludge resulting from the process might be susceptible to recycling, the technology "was never intended to be a recycling technology," never progressed beyond the conceptual stage, was never tested on radioactive waste, and was not commercially viable. *Id.* at 58, 60, 62, 66.

- **Association of Radioactive Metal Recyclers ("ARMR"):** ARMR was a small, short-lived trade association that advocated a national standard governing the release and recycling of radioactive metal. *See SAIC III*, 653 F. Supp. 2d at 101. SAIC was never a member, never paid dues, and had little or no communication with ARMR. *See* Loiselle Test., 7/7 p.m. Tr. 31, 38, 48 (Exh. 17). An SAIC employee, Gerry Motl, began serving on ARMR's board during his prior employment with an ARMR member. After he arrived at SAIC, he did not immediately resign as a board member. Motl was tasked on SAIC's bid on the 1999 Contract (*SAIC III*, 653 F. Supp. 2d at 101), but ARMR was effectively "defunct" by the time that contract was executed. *See* Loiselle Test., 7/7 p.m. Tr. 48 (Exh. 17).

SAIC disputed the Government's allegations at trial that these relationships constituted conflicts of interest and also argued that, even if the Government could prove that SAIC submitted false claims and made false statements under the FCA, the Government could not

9

prove that it did so "knowingly" and therefore could not prove scienter.  Over SAIC's objection, the Court instructed the jury that it could find scienter if the "collective pool of information" possessed by SAIC's employees created a "reasonably complete picture" of a false claim.  7/28 Tr. 17 (Exh. 35); SAIC's Objections to U.S.'s Proposed Jury Instructions (Dkt. #116) at 4; 7/24 Tr. 48-50 (Exh. 36).  Based on this instruction, the jury found that SAIC "knowingly present[ed] or cause[d] to be presented" sixty "false or fraudulent claim[s] for payment" under 31 U.S.C. § 3729(a)(1), and "knowingly ma[de], use[d], or cause[d] to be made or used" seventeen false records or statements to get a "false or fraudulent claim paid or approved" under 31 U.S.C. § 3729(a)(2).  *See* Verdict Form (Dkt. #127).  The general verdict form did not require the jury to specify which claims were false or to determine which alleged conflicts of interest rendered those claims false.  *See id.*  The jury awarded the Government $78 in breach-of-contract damages and $1,973,839.61 in FCA damages.  *Id.*  After trebling the FCA damages and awarding the Government civil penalties, the Court entered final judgment for the Government in the amount of $6,499,096.83.

On appeal, the D.C. Circuit affirmed the judgment on the breach-of-contract claim, but vacated the judgment on the FCA claims because "under the FCA, 'collective knowledge' provides an inappropriate basis for proof of scienter."  *SAIC IV*, 626 F.3d at 1274.  The collective knowledge instruction was erroneous, the Court explained, because it "allowed the jury to find that SAIC knowingly submitted false claims for payment even if the jury also concluded (1) that no individual at SAIC was simultaneously aware (or was recklessly unaware) of the company's NRC contract and its relationships with other companies involved in the recycling of radioactive materials, and (2) that SAIC, acting on the basis of the knowledge of its individual employees, took reasonable steps to identify potential conflicts."  *Id.* at 1275.  The

court emphasized that "[s]trict enforcement of the FCA's scienter requirement" is essential to prevent abuse of this punitive statute, and remanded the FCA claims to this Court for further proceedings. *Id.* at 1271.

## III.  LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011).  "A dispute about a material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Calhoun*, 632 F.3d at 1261 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).  "In making that determination, the court must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." *Id.* (internal quotation marks and alterations omitted).  To avoid summary judgment, however, a party cannot rely on "unsupported allegations or denials and must [support its case with] affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 54 (D.D.C. 2006), *aff'd*, 530 F.3d 980 (D.C. Cir. 2008) (internal quotation marks omitted). This showing cannot be made through proffers of vague or speculative testimony.  *See Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003).

In determining whether summary judgment is appropriate, a court looks to all "materials in the record," including trial testimony, exhibits from earlier proceedings in the same case, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P 56(c)(1);

*see also Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1409-10, 1413, 1415 & n.12 (5th Cir. 1993);

*Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978) (explaining that, when deciding a summary

judgment motion after a new trial has been granted, a court may look to a wide variety of record

materials, including depositions, admissions, affidavits, and transcripts of trial testimony).

Courts have recognized that "sworn testimony given in earlier court proceedings is the same as"

the materials specifically listed in Rule 56.  *Dillon v. Cobra Power Corp.*, 560 F.3d 591, 596 (6th Cir.

2009); *see also Langston v. Johnson*, 478 F.2d 915, 918 n.17 (D.C. Cir. 1973) ("It is well settled that a

certified transcript of judicial . . . proceedings may be considered on a motion for summary

judgment."); 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2722 (3d ed. 2010)

(same).[1]

## IV.  ARGUMENT

Without the benefit of the collective knowledge theory rejected by the D.C. Circuit, the

Government cannot plausibly meet its burden of proving that SAIC acted "knowingly" when it

failed to disclose alleged conflicts of interest to the NRC.  Because no reasonable jury could find

that a specific, identifiable SAIC employee acted with the scienter required by the FCA, SAIC is

entitled to summary judgment on the Government's FCA claims.

---

[1]  In *Kelley*, for example, the defendant moved for summary judgment after a verdict had been
rendered and a new trial had been ordered.  992 F.2d at 1409.  The Fifth Circuit affirmed the
grant of summary judgment in defendant's favor and found "no error" in the fact that "the
district court, in adjudicating [defendant's] motion for summary judgment, primarily relied upon
the testimony offered at the prior trial."  *Id.* at 1415 n.12.  Similarly, in *Conrod v. Davis*, 120 F.3d
92 (8th Cir. 1997), a jury verdict was reversed on appeal, the case was remanded, and the
defendant then moved for summary judgment "[b]ased on the testimony presented at the first
trial."  *Id.* at 93.  Relying on the trial testimony, the Eighth Circuit held that defendant was
entitled to summary judgment.  *See id.* at 93-96; *see also Reiss v. Luchetta*, No. 94-1489, 1996 U.S.
App. LEXIS 3351, at *7, *15 (10th Cir. Feb. 28, 1996) (unpublished).

A.     **THE FALSE CLAIMS ACT ESTABLISHES AN EXACTING SCIENTER REQUIREMENT THAT IS PARTICULARLY IMPORTANT IN IMPLIED CERTIFICATION CASES.**

To establish FCA liability under 31 U.S.C. § 3729(a)(1) or § 3729(a)(2), the Government must prove that the defendant acted with the requisite scienter—*i.e.*, that the defendant acted "knowingly." *See* 31 U.S.C. § 3729(b) (2008). Under the FCA, the term "knowingly" is "defined to include a defendant's 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard' of the truth or falsity of information in the defendant's claim for payment or statements made to get such claims paid." *SAIC IV*, 626 F.3d at 1266 (quoting 31 U.S.C. § 3729(b) (2008)).[2]

"Strict enforcement of the FCA's scienter requirement . . . help[s] to ensure that ordinary breaches of contract are not converted into FCA liability" and punished with onerous treble-damages awards and civil penalties. *SAIC IV*, 626 F.3d at 1271; *see also id.* at 1270. The requirement is particularly important in cases, like this one, that proceed under the implied certification theory, which permits the Government to establish FCA liability on the basis of a claim or statement that, although accurate on its face, was made against the backdrop of a contractual or regulatory violation that was material to the Government's decision to pay. *Id.* at 1264, 1266. "[W]ithout clear limits and careful application," the D.C. Circuit has cautioned, that

---

[2]  The Fraud Enforcement and Recovery Act of 2009 ("FERA") made nonsubstantive amendments to the definition of "knowingly" that are inapplicable to this pre-FERA case. *See* Pub. L. No. 111-21, § 4(a)(2), 123 Stat. 1617, 1622 (nonsubstantive amendments); *id.* § 4(f), 123 Stat. at 1625 (providing that "[t]he amendments made by this section shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment"— which was May 20, 2009—unless an exception applies). In addition, although § 3729(a)(2) was also amended by FERA, this Court has held that "the amended version [does] not apply in this action," which was filed before the amendments went into effect. *SAIC III*, 653 F. Supp. 2d at 94 n.3, 106-07.

theory "is prone to abuse by the government and *qui tam* relators." *Id.* at 1270-71; *see also United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1330 (D.C. Cir. 2005).

To demonstrate "actual knowledge" under the FCA, the Government must establish that the defendant knew that its claims or statements were false—not merely that it knew underlying facts on which the Government later relies to prove falsity. *See SAIC IV*, 626 F.3d at 1266 (the "actual knowledge" standard is satisfied when there is knowledge "of the truth or falsity of information in the defendant's claim for payment or statements made to get such claims paid"); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000). Otherwise, "any contracting party that misunderstands its legal entitlements and therefore fails to recover on an invoice in full would be liable under the False Claims Act." *Siewick*, 214 F.3d at 1378. In a case brought "on the basis of implied certification," "[e]stablishing knowledge . . . requires the plaintiff to prove that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." *SAIC IV*, 626 F.3d at 1271. As the D.C. Circuit made clear on appeal, the Government cannot make this showing by relying on the "collective knowledge" of SAIC's employees. "'[C]ollective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose." *Id.* at 1274.

Moreover, "[a]lthough Congress defined 'knowingly' to include some forms of constructive knowledge, its definition of that term imposes liability for mistakenly false claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence." *SAIC IV*, 626 F.3d at 1274-75. The deliberate ignorance standard serves "as a

substitute for *willful* misconduct" and "prevent[s] the defendant from deliberately blinding himself to the consequences of his tortious action." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (emphasis added; internal quotation marks and alteration omitted).

The Government therefore must identify a specific SAIC employee who, at the time SAIC was allegedly submitting false claims, (1) knew, or was recklessly unaware, that SAIC was violating its conflict-of-interest obligations *and* (2) knew, or was recklessly unaware, that compliance with those obligations was material to the Government's decision to pay SAIC's vouchers. *See SAIC IV*, 626 F.3d at 1271; *see also United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) (concluding that one employee's "after-the-fact interpretation of the situation does not establish that the individuals submitting the claims knew that they were submitting false claims").[3]  In the absence of such a showing, the Government must prove that SAIC's compliance system was so manifestly defective that it reflected deliberate ignorance or reckless disregard by the SAIC employees who designed and implemented the system. *SAIC IV*, 626 F.3d at 1275-76.

---

[3]  It cannot be disputed that the D.C. Circuit's decision requires the Government to prove that a particular SAIC employee possessed both components of scienter.  The Court of Appeals expressly declared that FCA plaintiffs must "prove[ ] both" components without relying on the collective knowledge theory, which is a theory that would improperly "allow[ ] a plaintiff to prove scienter by piecing together scraps of innocent knowledge held by various corporate officials." *SAIC IV*, 626 F.3d at 1271, 1275 (internal quotation marks omitted).  And that rule is unsurprising, as it comports with well-settled tort law and agency principles.  *See Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 670 n.6 (D.C. Cir. 1996) ("the acts of an agent . . . can be attributed to its principal[,] . . . [b]ut the agency relationship cannot transform" an innocent state of mind into a culpable state of mind by aggregating the mental state of multiple employees); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118, 1122 (D.C. Cir. 2009), *cert. denied sub nom. Lorillard Tobacco Co. v. United States*, 130 S. Ct. 3502 (2010) (explaining, in the fraud context, that "proscribed corporate intent depends on the wrongful intent of specific employees" and that the court is "dubious of the legal soundness of the 'collective intent' theory").

The Government cannot satisfy the elements of the FCA's scienter requirement in this case. In fact, the Government can point to no evidence of a specific, identifiable SAIC employee who knew both that SAIC had prohibited conflicts of interest and that those conflicts were material to the Government's decision to pay. Nor could a reasonable jury find that SAIC's state-of-the-art conflict-of-interest compliance system or corporate structure demonstrated reckless disregard or deliberate ignorance of SAIC's conflict-of-interest obligations. Summary judgment in favor of SAIC on the Government's FCA claims is therefore appropriate.

## B.  NO REASONABLE JURY COULD FIND THAT A SPECIFIC SAIC EMPLOYEE ACTED WITH SCIENTER.

No reasonable jury could find that there is a specific, identifiable SAIC employee who, at the time SAIC was submitting allegedly false claims, (1) knew that SAIC was violating its conflict-of-interest obligations *and* (2) knew that compliance with those obligations was material to the Government's decision to pay SAIC's claims. In prior briefing, the Government has pointed to two SAIC employees—John Pierce Martin and Thomas Rodehau—who purportedly knew that SAIC's compliance was material to the Government's decision to pay. *See* Mem. In Opp'n To Def.'s Mot. For Judgment As A Matter Of Law (Dkt. #155) at 24-27, 30 ("Post-Trial Opp'n"); Proposed Judgment (Dkt. #128) at 6; 7/28 Tr. 132 (Exh. 35). Additionally, the Government has alleged that three other SAIC employees—Michael McKenzie-Carter, Sandra Carder, and Dr. Mark Otis—understood in a general sense that compliance was important. *See* Post-Trial Opp'n at 24 & n.17, 26 n.19; Proposed Judgment at 6.

As discussed in detail below, the Government's evidence of scienter is insufficient as a matter of law to carry its burden of proof at trial. Not only did the employees identified by the Government lack knowledge that compliance with conflict-of-interest requirements was material

to payment, but they also lacked knowledge that SAIC was purportedly violating its conflict-of-interest obligations.  Thus, none of these SAIC employees possessed *either* component of scienter—let alone *both* components, as the Government must prove.

**1.      John Pierce Martin Did Not Act With Scienter.**

**a.      Martin Did Not Know That SAIC Was Allegedly Violating Its Conflict-Of-Interest Requirements.**

Beginning in June 1996, SAIC employee John Pierce Martin served as the contract representative on the 1992 Contract.  Martin Test., 7/14 a.m. Tr. 46:4-9, 47:25-48:7 (Exh. 19); *see also* 12/12/05 Martin Depo. Tr. 34:3-6 (Exh. 20).  In addition, Martin served as the contract representative on the short-lived 1999 Contract.  Martin Test., 7/14 a.m. Tr. 46:4-9 (Exh. 19). *Martin did not know that SAIC was allegedly violating its conflict-of-interest obligations under those contracts. As detailed below, Martin testified that he was not aware of any relationships that SAIC had with MSC, Alaron, or ARMR; he knew nothing about SAIC's purported development of the Plasma Hearth Process; he knew nothing about BNFL prior to November 1999; he did not know, prior to November 1999, of any SAIC work for BJC involving the release of radioactive scrap metals; and, even when he learned of more allegations at the time of trial, he still did not believe that SAIC had a conflict of interest.*

Martin believed at all times that SAIC was in compliance with its conflict-of-interest obligations under both the 1992 and 1999 Contracts.  Martin Test., 7/23 a.m. Tr. 91:5-7 (Exh. 34); *see also* Martin Test., 7/14 p.m. Tr. 56:18-57:2 (Exh. 7).  Martin testified that, while SAIC was performing the 1992 and 1999 Contracts, he did not become aware of any facts that would render SAIC's conflict-of-interest representations or certifications inaccurate.  Martin Test., 7/14 p.m. Tr. 56:18-57:2 (Exh. 7); 12/12/05 Martin Depo. Tr. 113:18-114:5, 143:19-145:13 (Exh. 20); *see also* Martin Test., 7/14 p.m. Tr. 46:8-18 (Exh. 7) (testifying that at the time he submitted the January 10, 2000 letter responding to the NRC about alleged conflicts of interest,

he did not believe that SAIC had any conflicts, and explaining that he never learned anything to make him question SAIC's compliance with its conflict-of-interest obligations).  Martin further stated that, by the time of trial, he still had not "learned any information, since [he] submitted [the January 10, 2000] letter to the NRC" regarding alleged conflicts "that cause[d] [him] to question the truthfulness or accuracy of the information that was submitted to the NRC."  *Id.* at 45:14-20.

In fact, Martin did not even have knowledge of SAIC's relationships that the Government now characterizes as conflicts of interest.  From the time he began working on the 1992 Contract until March 2000, Martin did not know about any relationships that SAIC had with ARMR, Alaron, or MSC.  1/16/06 Martin Depo. Tr. 48:5-20 (Exh. 21).  Moreover, Martin did not know about any relationship that SAIC had with BNFL until November 1999—the month in which he worked on SAIC's response to the NRC's request for information about possible conflicts of interest.  *Id.* at 49:18-50:4; *see also id.* at 6:5-7:17 (testifying that he did not know anything about BNFL other than what he learned when inquiring and gathering documents in response to the NRC's request).  Similarly, Martin did not know that SAIC was doing work for BJC "involving the release of radioactive scrap metals" until November 1999.  *Id.* at 115:16-20.  Nor did he know anything about SAIC's purported development of the Plasma Hearth Process.  *Id.* at 117:5-8; *see also id.* at 48:5-20.

Finally, even if Martin had known about the underlying facts on which the Government relies to allege conflicts of interest, Martin still would not have concluded that SAIC had a conflict.  Martin believed that "[t]here were no conflicts because the majority of those contracts were being performed by the Department of Energy" and "[t]he NRC does not regulate the Department of Energy."  Martin Test., 7/14 p.m. Tr. 50:4-6 (Exh. 7); *see also id.* at 15:11-16:8

(testifying that he believed the NRC "doesn't regulate the Department of Energy" and that this fact would affect whether SAIC had a conflict of interest because much of SAIC's work was as a subcontractor under a DOE program).

      **b.    Martin Did Not Know That Compliance Was Purportedly Material To The Government's Decision To Pay.**

*At no time did Martin know that compliance with conflict-of-interest requirements was supposedly material to the Government's decision to pay SAIC's claims.* In fact, Martin explicitly testified that he believed SAIC's compliance with its conflict-of-interest obligations was *not* material to the Government's decision to pay. When Martin was asked if he had "an understanding [as to] whether SAIC had to obey these conflicts of interest requirements in order to be paid under the contract," he responded that "[t]he payment is separate from complying with the organizational conflict of interest clause." Martin Test., 7/14 a.m. Tr. 54:19-24 (Exh. 19). It was Martin's understanding that SAIC could "still bill the NRC and receive payment for its work" even if SAIC did "not obey these conflicts of interest provisions." *Id.* at 55:7-10. And that understanding was confirmed by the Government's decision to pay at least one of SAIC's invoices even after the NRC discovered SAIC's alleged conflicts. Martin Test., 7/14 p.m. Tr. 88-91 (Exh. 7).

Martin also testified that one possible remedy for noncompliance with conflict-of-interest requirements was termination of the contract, Martin Test., 7/14 p.m. Tr. 58:5-8 (Exh. 7); *see also* 1/16/06 Martin Depo. Tr. 12:5-13 (Exh. 21), and that SAIC's January 10, 2000 letter in response to the NRC's cure notice was intended to persuade the NRC to let SAIC keep its contract. Martin Test., 7/14 p.m. Tr. 11:16-14:12 (Exh. 7); 1/16/06 Martin Depo. Tr. 11:22-12:4, 105:8-17 (Exh. 21). But even if Martin believed that compliance was material to the Government's decision about whether to *terminate the contract*, that does not establish his

knowledge that compliance was "material to the government's *decision to pay*" for work that SAIC

had already completed.  *SAIC IV*, 626 F.3d at 1271 (emphasis added).  Indeed, Martin indicated

that he did not know whether SAIC would be paid on its outstanding invoices in the event that

the NRC elected to terminate the contract based on the alleged conflict-of-interest violations.

Martin Test., 7/14 p.m. Tr. 12:20-23 (Exh. 7).[4]

## 2.    Thomas Rodehau Did Not Act With Scienter.

### a.    Rodehau Did Not Know That SAIC Was Allegedly Violating Its Conflict-Of-Interest Requirements.

Thomas Rodehau helped prepare SAIC's bid for the 1992 Contract and then served as

SAIC's contract administrator on the 1992 Contract until June 1996.  Rodehau Test., 7/3 p.m.

Tr. 42-43 (Exh. 22); Rodehau Test., 7/7 a.m. Tr. 41:8-10 (Exh. 23); Martin Test., 7/14 a.m. Tr.

47:25-48:7 (Exh. 19); *see also* Rodehau Test., 7/3 p.m. Tr. 69-70 (Exh. 22).  *Rodehau did not know*

*that SAIC was allegedly violating its conflict-of-interest obligations under that contract.  As detailed below,*

*Rodehau testified that he was not aware, during his time working on the 1992 Contract, of any relationships that*

*SAIC had with BNFL, Alaron, or ARMR; Rodehau did not testify that he was aware of any relationship*

*with BJC, any relationship with MSC, or SAIC's purported development of the Plasma Hearth Process; and,*

*even when he learned of more allegations at the time of trial, he still did not believe that SAIC had a conflict of*

*interest.*

---

4  Moreover, Martin did not serve as SAIC's contract representative on the 1992 Contract until
June 1996.  Martin Test., 7/14 a.m. Tr. 47:25-48:7 (Exh. 19); *see also* 12/12/05 Martin Depo. Tr.
34:3-6 (Exh. 20).  Accordingly, even if the Government could prove that Martin simultaneously
knew that SAIC was violating its conflict-of-interest obligations and that those obligations were
material to the Government's payment decisions, doing so would at most satisfy the scienter
requirement for the period after June 1996.  *See* PX 955 (Exh. 4).

Rodehau testified that, at the time he made conflict-of-interest certifications under the 1992 Contract, he "[a]bsolutely" "believe[d] them to be true and accurate." Rodehau Test., 7/3 p.m. Tr. 77-78 (Exh. 22); *see also* Rodehau Depo. Tr. 188:3-6, 199:12-16 (Exh. 24) (similar).  He further testified that he "[n]ever" "learn[ed] of anything that made [him] question the truthfulness and accuracy" of SAIC's certifications.  Rodehau Test., 7/3 p.m. Tr. 78 (Exh. 22); *see also* Rodehau Depo. Tr. 188:7-9 (Exh. 24) (testifying that he is not aware of conflicting situations that arose since his tenure at SAIC).

Although Rodehau stated that, in the abstract, a potential conflict of interest might "[p]ossibly" exist if SAIC represented a federal agency "on potential rulemaking, and at the same time represent[ed] in the same technical area companies that [m]ight be impacted by that regulation," that testimony does not establish that Rodehau knew that SAIC had conflicts of interest.  Rodehau Depo. Tr. 111:21-112:6 (Exh. 24); *see also id.* at 164:15-22.  Indeed, Rodehau did not have knowledge of numerous underlying facts pertaining to those alleged conflicts.  For example, Rodehau "wasn't aware of any relationship" with BNFL during his time working on the 1992 Contract.  *Id.* at 121:11-14.  Moreover, during his work on that contract, Rodehau "had no knowledge" of any SAIC relationship with ARMR and, in fact, had never heard of ARMR until he prepared for his deposition.  *Id.* at 122:8-123:16.  In addition, he had "never heard" of Alaron.  *Id.* at 126:2-13.

Rodehau also recounted his participation in a public rulemaking during which "the head of NRC's Office of Acquisition . . . made it clear . . . that DOE was not an entity *subject to the NRC's regulatory authority*."  Rodehau Test., 7/7 a.m. Tr. 32:2-8 (Exh. 23) (emphasis added).  Consistent with that agency guidance, Rodehau explained that he "would not view [the NRC] as having authority over the DOE and its contractors and the work being performed by those

contractors for DOE." Rodehau Depo. Tr. 160:18-161:3 (Exh. 24); *see also id.* at 245:14-22, 251:17-253:5.

### b. Rodehau Did Not Know That Compliance Was Purportedly Material To The Government's Decision To Pay.

*At no time did Rodehau know that compliance with conflict-of-interest requirements was supposedly material to the Government's decision to pay SAIC's claims.* Rodehau repeatedly testified that, although SAIC was required to make certifications regarding the existence of conflicts of interest, "the NRC did not require SAIC to respond . . . that we have no [conflicts]" in order for SAIC to receive payment. Rodehau Test., 7/7 a.m. Tr. 18:19-22 (Exh. 23); *see also id.* at 18-20. For example, Rodehau testified that, while certifications were required when proposing certain modifications to the 1992 Contract, SAIC was *not* required to certify that it had no conflicts. Rodehau Test., 7/7 a.m. Tr. 28:1-17, 30:16-24 (Exh. 23). On the contrary, SAIC was permitted to state that it had a conflict that it needed to discuss with the NRC. *Id.* at 28:1-17. Rodehau explained that, if a contractor disclosed a conflict or potential conflict, it was sometimes possible to "mitigate or avoid" the conflict, and the offeror could also propose to restructure the Statement of Work so that any potential conflict was eliminated from the scope of services. *Id.* at 19-20. In addition, the NRC could, among other things, impose conditions to avoid a conflict or could determine that it was in the Government's best interest to proceed with the contract notwithstanding the conflict. *Id.* at 19.

Moreover, Rodehau repeatedly testified that he never made a certification about the absence of a conflict of interest in order to obtain payment from the NRC—which he would have done had he believed that compliance with conflict-of-interest requirements was material to the Government's payment decision. Rodehau stated that he "[n]ever" decided not to disclose a conflict to ensure that SAIC got its claims paid and that he "[n]ever" submitted any

no-conflict representation to the NRC "just in order to get the company's claims paid."

Rodehau Test., 7/7 a.m. Tr. 30:25-31:6 (Exh. 23).  He also testified that "none" of the conflict-

of-interest representations he made before the award of the 1992 Contract "were made in order

to get any claims paid" and that SAIC did not make its conflict-of-interest representations in the

1992 Contract "in order to get any claims paid."  *Id.* at 22-23, 25.[5]

### 3.      Alex Murray Did Not Act With Scienter.

#### a.      Murray Did Not Know That SAIC Was Allegedly Violating Its Conflict-Of-Interest Requirements.

Former SAIC employee Alex Murray, who was working at the NRC at the time of trial,

performed a small amount of work on the 1992 Contract.  9/22/06 Aff. of Alex Murray ¶¶ 1-2

(Exh. 38); Murray Test., 7/2 p.m. Tr. 24:3-9 (Exh. 33).  *Murray did not know that SAIC was allegedly*

*violating its conflict-of-interest obligations under that contract.  As detailed below, no reasonable jury could*

*conclude that Murray's purported concerns regarding SAIC's alleged effort with BNFL and MSC establishes*

*scienter, and Murray did not testify that he was aware of any relationship with ARMR, BJC, or Alaron.*

To be sure, Murray testified that he informed managers at SAIC that he believed there

was some possibility for a conflict of interest arising from SAIC's work on the NRC project and

its work on the DOE Three-Building Project at the Oak Ridge facility.  Murray Test., 7/2 p.m.

Tr. 89:24-90:12, 93:21-94:4 (Exh. 33); Murray Test., 7/3 a.m. Tr. 11:20-12:4 (Exh. 37).  But

Murray acknowledged that, when he raised this issue, his message was little more than a vague

and equivocal attempt to "encourage communications" between SAIC employees because he

---

5  Finally, because Rodehau worked as contract administrator on the 1992 Contract only until June 1996 (Rodehau Test., 7/3 p.m. Tr. 42-43 (Exh. 22); Rodehau Test., 7/7 a.m. Tr. 41:8-10 (Exh. 23); Martin Test., 7/14 a.m. Tr. 47:25-48:7 (Exh. 19); *see also* Rodehau Test., 7/3 p.m. Tr. 69-70 (Exh. 22)), even if the Government could prove that he acted with scienter, his conduct would be limited to claims submitted prior to June 1996.  *See* PX 955 (Exh. 4).

felt that "it is a generally good thing for different parts of a company to know what they're doing, synergism, cross-fertilization of ideas, et cetera." Murray Test., 7/2 p.m. Tr. 76:18-77:6 (Exh. 33); *see also id.* at 89:24-90:12. In Murray's own words:  "I did not complain.  I just said we needed to make sure that things were adequately addressed." Murray Test., 7/3 a.m. Tr. 11:18-19 (Exh. 37). According to Murray, he was merely "expressing . . . a concern that we needed to dot the I's and cross the T's, metaphorically, that work SAIC was doing at Oak Ridge and work SAIC was doing in Germantown, Idaho on the NRC contract were . . . not a potential conflict of interest." Murray Test., 7/2 p.m. Tr. 106:18-22 (Exh. 33); *see also id.* at 109-10.

What is more, Murray testified that he did not believe that there was "anything wrong with SAIC doing work for the NRC and for the Department of Energy at the same time." Murray Test., 7/2 p.m. Tr. 89:24-90:12 (Exh. 33).  Indeed, when SAIC informed Murray on January 5, 1996, that he had the option of being laid off or becoming "a consulting employee," Murray drafted a letter touting numerous opportunities that he had for additional work at SAIC. *Id.* at 80:21-83:11.  One such opportunity related to decontaminating and decommissioning "the very same gaseous diffusion plant" at which SAIC purportedly wanted to team with BNFL.  *Id.* at 83:9-84:12.  In other words, Murray explicitly offered to perform the same work that the Government now alleges that Murray was concerned about.  When confronted about this fact at trial, Murray stated that the "suggestion in that letter that [he] might be involved in that work was based on [his] understanding" that a conflict of interest "did not exist at that time . . . or . . . would be checked and/or resolved or mitigated." *Id.* at 108:10-14; *see also id.* at 84.[6]  And, in

---

[6]  In any event, Murray's purported concern was limited to SAIC's alleged relationships with BNFL or MSC in connection with the DOE Three-Building Project (*see* Murray Test., 7/3 a.m. Tr. 11-12 (Exh. 37)), and there is nothing in Murray's testimony that addresses any purported

[Footnote continued on next page]

fact, SAIC took Murray's concerns seriously.  Murray himself testified that SAIC specifically addressed the issue that he raised and informed him of the company's conclusion that there was not a conflict-of-interest problem.  *See id.* at 109:7-110:17.

> ### b.     Murray Did Not Know That Compliance Was Purportedly Material To The Government's Decision To Pay.

*At no time did Murray know that compliance with conflict-of-interest requirements was supposedly material to the Government's decision to pay SAIC's claims.*  Murray's testimony simply does not demonstrate that he knew that compliance with conflict-of-interest requirements was material to the Government's payment decisions.  Because there is no evidence that Murray possessed this second component of scienter, the Government cannot rely on Murray's testimony to prove that SAIC acted with scienter.

> ### 4.     Michael McKenzie-Carter Did Not Act With Scienter.

> ### a.     McKenzie-Carter Did Not Know That SAIC Was Allegedly Violating Its Conflict-Of-Interest Requirements.

Michael McKenzie-Carter, an SAIC scientist, helped prepare SAIC's technical proposal for the 1992 Contract and worked on both the 1992 and 1999 Contracts.  McKenzie-Carter Test., 7/17 a.m. Tr. 87:11-12, 91:21-23, 96:2-13 (Exh. 25); 2/6/06 McKenzie-Carter Depo. Tr. 8:15-17 (Exh. 26).  *McKenzie-Carter did not know that SAIC was allegedly violating its conflict-of-interest obligations under those contracts.  As detailed below, McKenzie-Carter testified that he was not aware, prior to the conflict-of-interest allegations being raised in late 1999, that SAIC allegedly had any specific work with*

--------

[Footnote continued from previous page]

relationships with ARMR, BJC, or Alaron.  In addition, the only time frame to which Murray's testimony applies is between 1995 and August 1997.  *See* Murray Test., 7/2 p.m. Tr. 24:3-9, 89 (Exh. 33) (testifying that he worked on the 1992 Contract in 1995, was allegedly involved with meetings relating to the Three-Building Project in 1995 or 1996, and left SAIC in August 1997); 9/22/06 Aff. of Alex Murray ¶¶ 9-10 (Exh. 38).

*BNFL in Oak Ridge, Tennessee; the NRC's actions with respect to BJC and MSC are inconsistent with the allegations that McKenzie-Carter knew that such alleged relationships constituted conflicts; McKenzie-Carter did not testify that he was aware of any relationship with Alaron; and no reasonable jury could conclude that McKenzie-Carter knew that SAIC allegedly had a conflict of interest relating to ARMR or the Plasma Hearth Process.*

McKenzie-Carter "never worked at any projects with private companies involving [the] recycle" of radioactively contaminated materials. *See* McKenzie-Carter Test., 7/17 p.m. Tr. 48:7-9 (Exh. 27). For example, prior to the conflict-of-interest allegations being raised in late 1999, McKenzie-Carter "didn't know . . . that [SAIC] had anything specific with BNFL" in Oak Ridge, Tennessee. McKenzie-Carter Test., 7/17 p.m. Tr. 24:3-9 (Exh. 27); *id.* at 60:20-23. And, when McKenzie-Carter asked an NRC official to authorize the sharing of information that DOE had developed relating to the BJC-SAIC project, the NRC official raised no concerns about SAIC's simultaneous work on the NRC project and the BJC project. In fact, the NRC official authorized the DOE to allow the SAIC team working on the DOE project to share its work product with the SAIC team that was working on the NRC project. *See* Meck Test., 7/3 a.m. Tr. 104-06 (Exh. 28); DX 396 (Exh. 29). That NRC authorization is inconsistent with any suggestion that McKenzie-Carter knew the BJC project constituted a conflict of interest. *See, e.g.*, *United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 984 (D.C. Cir. 2008) (affirming summary judgment for an FCA defendant on scienter grounds, partly because the defendant brought the relevant fact to the Government's attention and there was "no evidence" that the Government "expressed any concerns"); *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 496 (D.C. Cir. 2004). Similarly, at the request of the NRC's Dr. Meck, McKenzie-Carter worked with other SAIC employees to obtain certain data from MSC

26

about contaminated drums.  McKenzie-Carter Test., 7/17 p.m. Tr. 76:24-77:3 (Exh. 27).  Again,

the NRC raised no concerns to McKenzie-Carter about SAIC's simultaneous work on the two

projects.

Nor could a reasonable jury conclude that McKenzie-Carter knew that SAIC allegedly

had a conflict of interest relating to ARMR or the Plasma Hearth Process.  McKenzie-Carter

explicitly stated that he did not know, prior to the time that the 1999 Contract was terminated,

that SAIC employee Gerry Motl purportedly had been an officer or director of ARMR.  2/6/06

McKenzie-Carter Depo. Tr. 221:9-222:2, 222:12-14 (Exh. 26).  Moreover, McKenzie-Carter

knew that the Plasma Hearth Process was being developed for *DOE*, "was not aware of any

specifics" about the process, and did not know that the Plasma Hearth Process purportedly

involved the potential recycling or reuse of metals that exited that plasma technology.  5/24/06

McKenzie-Carter Depo. Tr. 321:6-17, 322:4-13 (Exh. 39).

      **b.**    **McKenzie-Carter Did Not Know That Compliance Was Purportedly Material To The Government's Decision To Pay.**

*At no time did McKenzie-Carter know that compliance with conflict-of-interest requirements was*

*supposedly material to the Government's decision to pay SAIC's claims.*  The Government has asserted in

prior briefing that McKenzie-Carter agreed "that the [conflict-of-interest] obligations set forth in

the SAIC Contracts were critically important to the overall purpose of the contract."  Post-Trial

Opp'n at 24 & n.17; *see also id.* at 26 n.19.  But McKenzie-Carter did nothing more than

acknowledge that, under the terms of those contracts, SAIC was required to avoid and disclose

conflicts of interest and that such requirements were one way the NRC sought to ensure the

reliability of its contractors' work.  *See* McKenzie-Carter Test., 7/17 p.m. Tr. 45:8-14 (Exh. 27)

(agreeing that SAIC "need[ed] as an organization to avoid and disclose relationships that might

give rise to conflicts of interest or potential conflicts of interest"); *id.* at 46:3-8 ("Q:  And you

understood that . . . one of the ways that NRC seeks to make sure that its contractors' assistance

can be trusted is organizational conflict of interest avoidance; would you agree?  A:  Yes, I think

so.").  McKenzie-Carter never testified that he knew that the Government's decision whether to

pay a claim submitted by SAIC depended on SAIC's compliance with contractual conflict-of-

interest requirements.

     **5.**       **Sandra Carder Did Not Act With Scienter.**

*Sandra Carder did not know that SAIC was allegedly violating its conflict-of-interest obligations under*

*those contracts.  Indeed, the Government made no attempt to establish through Carder's testimony that she had*

*knowledge of alleged conflicts of interest relating to BNFL, MSC, BJC, Alaron, the Plasma Hearth Process, or*

*ARMR.*  And for good reason:  Carder was SAIC's Vice President and Director of Contracts for

Corporate Contracts.  Carder Test., 7/22 a.m. Tr. 38:13-14 (Exh. 30).  In that capacity, she

"didn't have involvement at a line contract level" and thus had no occasion to uncover

purported conflicts.  *Id.* at 78:23-79:1.

*Moreover, at no time did Carder know that compliance with conflict-of-interest requirements was*

*supposedly material to the Government's decision to pay SAIC's claims.*  Carder's testimony does not

indicate that she knew that compliance with conflict-of-interest requirements was material to the

Government's payment decisions.  Although the Government has suggested that Carder

testified that she "understood how important it was to avoid conflicts of interest and to disclose

them if they arose" (Proposed Judgment at 6), Carder's testimony did *not* address the materiality

of SAIC's conflict-of-interest obligations.  *See* Carder Test., 7/22 a.m. Tr. 36-83 (Exh. 30).

Instead, Carder simply acknowledged that SAIC's corporate policy treated organizational

conflicts of interest as "very important."  *Id.* at 41:11-42:3.  That unelaborated-upon statement

would not permit a reasonable jury to find that Carder knew that the Government's payment decisions depended on SAIC's compliance with conflicts requirements.

>        6.        **Dr. Mark Otis Did Not Act With Scienter.**

Dr. Mark Otis was an SAIC employee who worked on both the 1992 and 1999 Contracts.  Otis Test., 7/17 a.m. Tr. 14:2-3 (Exh. 31); Otis Test., 7/16 p.m. Tr. 8:12-17 (Exh. 32).  *Dr. Otis did not know that SAIC was allegedly violating its conflict-of-interest obligations under those contracts.  Indeed, the Government made no attempt to establish through Dr. Otis's testimony that he had knowledge of alleged conflicts of interest relating to BNFL, MSC, BJC, Alaron, the Plasma Hearth Process, or ARMR.*  Dr. Otis's testimony is therefore completely silent on that issue.

*Furthermore, at no time did Dr. Otis know that compliance with conflict-of-interest requirements was supposedly material to the Government's decision to pay SAIC's claims.*  While Dr. Otis testified that it was important for each of the individuals who contributed his or her judgment to SAIC's work product to be "free from any improper bias" (Otis Test., 7/17 a.m. Tr. 21:16-20 (Exh. 31)), he offered no testimony that he knew that compliance with conflict-of-interest requirements was purportedly material to the NRC's payment decisions.

>        *        *        *

The record provides no support for the Government's allegation that SAIC employees acted "knowingly" when they purportedly submitted false claims and statements to the Government.  Based on that record, no reasonable jury could find that there is a specific, identifiable SAIC employee who, at the time SAIC was allegedly submitting false claims, (1) knew that SAIC was violating its conflict-of-interest obligations *and* (2) knew that compliance with those obligations was material to the Government's decision to pay those claims.  *See SAIC IV*, 626 F.3d at 1271.

**C.  NO REASONABLE JURY COULD FIND THAT SAIC'S STRUCTURE OR COMPLIANCE SYSTEM DEMONSTRATES THAT THE COMPANY ACTED WITH RECKLESS DISREGARD OR DELIBERATE IGNORANCE.**

"Under the FCA, if a plaintiff can prove that a government contractor's structure prevented it from learning facts that made its claims for payment false, then the plaintiff may establish that the company acted in deliberate ignorance or reckless disregard of the truth of its claims." *SAIC IV*, 626 F.3d at 1275-76.  The complete absence of evidence of intentional compartmentalization to impede the discovery of conflicts—and the undisputed evidence of SAIC's comprehensive, state-of-the-art conflicts compliance system—would prevent a reasonable jury from making such a finding in this case.

**1.  SAIC Did Not Act In Reckless Disregard Of Its Conflict-Of-Interest Obligations.**

The Government cannot survive summary judgment by arguing that SAIC recklessly disregarded the NRC's conflict-of-interest requirements.  The undisputed evidence establishes that any imperfections in SAIC's compliance system fall well short of "aggravated gross negligence." *SAIC IV*, 626 F.3d at 1274-75.

**a.  The FCA's Reckless Disregard Standard Applies Only To Aggravated Gross Negligence.**

To establish that a defendant acted recklessly under the FCA, the Government must do more than prove mere negligence or point to simple imperfections in the defendant's compliance systems.  As Congress explained when it amended the FCA to encompass recklessness, while it "'intend[ed] that at least some inquiry be made, the inquiry need only be reasonable and prudent under the circumstances, which clearly recognizes a limited duty to inquire as opposed to a burdensome obligation.'" *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Grp., Inc.*, 298 F. Supp. 2d 91, 100 (D.D.C. 2004) (quoting S. Rep. 99-345, at 20,

1986 U.S.C.C.A.N. 5266, 5285) (some internal quotation marks omitted).  Accordingly, as the D.C. Circuit declared in this case, "Congress clearly had no intention to turn the FCA . . . into a vehicle for either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence' or imposing 'a burdensome obligation' on government contractors rather than a 'limited duty to inquire.'"  *SAIC IV*, 626 F.3d at 1274.

The Government must make an exacting showing to establish scienter under the FCA's "reckless disregard" standard, which is equivalent to "aggravated gross negligence."  *Krizek*, 111 F.3d at 941-42; *see also SAIC IV*, 626 F.3d at 1274-75.  In other words, conduct must be truly outrageous to constitute recklessness under the FCA.  *See Hamilton Secs. Grp.*, 298 F. Supp. 2d at 101 ("Proof of reckless disregard requires much more than errors, even egregious errors.").  To satisfy this standard, the Government must carry the "demanding" and "onerous" burden of proving that a defendant acted in such an "extremely . . . foolish manner" that it *exceeds* gross negligence.  *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338, 341, 343 (5th Cir. 2008); *United States ex rel. Norbeck v. Basin Elec. Power Coop.*, 248 F.3d 781, 792 (8th Cir. 2001) (internal quotation marks omitted); *Krizek*, 111 F.3d at 935-36, 941-42 (holding that Dr. Krizek and his wife acted recklessly where Mrs. Krizek made absolutely "no effort to establish how much time Dr. Krizek spent with any particular patient . . . and Dr. Krizek 'failed utterly' to review bills submitted on his behalf"); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. ___, 131 S. Ct. 2060, 2071 (2011) (observing in a different context that "a reckless defendant" must "know[ ] of a substantial and unjustified risk of . . . wrongdoing").  Importantly, an FCA decision from this District explicitly rejected the argument that the "fail[ure] to install a system by which concerns . . . were to be routed to the responsible personnel" establishes reckless disregard.  *Hamilton Secs. Grp.*, 298 F. Supp. 2d at 101; *see also Hefner*, 495 F.3d at 106-08, 110

(holding that although the defendant's billing system did not function as intended, the defendant did not act recklessly because "[t]he mere failure of a system to catch an error does not establish recklessness").

### b.   SAIC Developed And Implemented A Comprehensive Compliance System To Identify And Address Potential Conflicts Of Interest.

Against this backdrop, an examination of SAIC's conflict-of-interest compliance systems shows that SAIC's good-faith effort to comply with its obligations does not amount to reckless disregard.  The uncontradicted evidence makes clear that SAIC's conduct did not come remotely close to constituting recklessness.  On the contrary, a former EPA employee who led a 1996 audit of SAIC's conflict-of-interest compliance system stated that his team was "convinced that [SAIC was] conscientious and attempted to identify and report all conflicts of interest that arose under the[ir] agency work assignments."  McWhirter Depo. Tr. 10:18-11:9, 54:7-19, 68:5-12 (Exh. 40); *see also id.* at 129:8-22, 130:7-11 (concluding that SAIC's compliance system was above average).  Similarly, an expert opined that SAIC's compliance system, "consisting of written policies, actual procedures, training materials, system tools, and supplemental databases[,] was effective in ensuring company-wide notice and access to relevant facts and circumstances to avoid and/or mitigate potential OCIs."  6/12/06 Expert Report of C. Wilkins at 4 (Exh. 41).

Before it entered into its NRC contracts, SAIC had developed a comprehensive program to identify and address potential conflicts of interest.  *See, e.g.*, Carder Test., 7/22 a.m. Tr. 40:22-42:11, 51:8-52:13, 56:5-6 (Exh. 30);  Rodehau Test., 7/3 p.m. Tr. 88:11-18 (Exh. 22); Martin Test., 7/14 p.m. Tr. 62:14-22 (Exh. 7).  In developing that compliance system, SAIC expressly took into account NRC and DOE conflict-of-interest regulations.  Carder Test., 7/22 a.m. Tr. 65:5-7 (Exh. 30).  Then, when it bid upon and performed its contracts with the NRC, SAIC used that system to carefully review its existing work on other matters for potential conflicts of

interest.  Rodehau Test., 7/3 p.m. Tr. 84:6-9, 88:11-18 (Exh. 22); Martin Test., 7/14 p.m. Tr.

59:4-18, 60:14-23, 62:14-22 (Exh. 7); Rodehau Test., 7/7 a.m. Tr. 28:18-22 (Exh. 23); *see also*

Martin Test., 7/14 a.m. Tr. 86:16-25, 87:25-89:3 (Exh. 19).  And, when SAIC's compliance

system uncovered potential conflicts, SAIC disclosed those relationships to the NRC and

worked with the agency to mitigate the conflict.  *See* Martin Test., 7/14 p.m. Tr. 64-71 (Exh. 7).

SAIC's compliance process was triggered whenever an SAIC contract representative

received an RFP.  Upon receipt of an RFP, the contract representative read and analyzed the

RFP, focusing specifically on any conflict-of-interest clauses or other clauses that could limit

future contracts.  Carder Test., 7/22 a.m. 45:6-12 (Exh. 30); Rodehau Test., 7/7 a.m. Tr. 5:14-20

(Exh. 23).  For particularly large procurements, the RFP was submitted to an SAIC acquisition

council that would evaluate certain opportunities early on—typically, before a proposal was

submitted—to determine whether the proposed opportunity presented any conflicts of interest.

Rodehau Test., 7/3 p.m. Tr. 82:12-21 (Exh. 22).

After initial review by the contract representative, a notification was electronically routed

to other groups within SAIC to inform them about the potential work and to identify the types

of restrictions that the proposal might involve.  Carder Test., 7/22 a.m. Tr. 45:13-16 (Exh. 30);

Rodehau Test., 7/3 p.m. Tr. 79:8-20, 83:11-13 (Exh. 22); *see also* Martin Test., 7/14 a.m. Tr.

45:14-23 (Exh. 19).  Those notifications were sent via a routing form that identified the potential

customer, described the work on which SAIC was considering bidding, and detailed some of the

relevant provisions and limitations, including conflict-of-interest requirements.  Carder Test.,

7/22 a.m. Tr. 56:7-17 (Exh. 30).  SAIC's contracts staff was "trained on how to summarize the

scope of work for purposes of using this system."  *Id.* at 57:11-13.

Once conflict-of-interest routings were circulated through SAIC's system, the routings were reviewed by SAIC's senior contracts staff, who were involved in contracts operations at the business unit level.  Carder Test., 7/22 a.m. Tr. 58:1-8 (Exh. 30); *see also* Rodehau Test., 7/3 p.m. Tr. 40:7-13 (Exh. 22); Martin Test., 7/14 p.m. Tr. 64:24-65:11 (Exh. 7).  Those employees were responsible for comparing the routings against the existing contracts within their respective units of the company and for reporting any potential or actual conflicts of interest.  Carder Test., 7/22 a.m. Tr. 45:17-22, 58:9-15 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 87:4-16 (Exh. 22); *see also* Rodehau Test., 7/7 a.m. Tr. 10:5-14 (Exh. 23); Martin Test., 7/14 p.m. Tr. 65:8-15 (Exh. 7).  If the contracts staff person who received a routing needed additional information, she could forward the routing to other employees.  Carder Test., 7/22 a.m. 73:12-16 (Exh. 30); *see also* Rodehau Test., 7/3 p.m. 87:10-16 (Exh. 22).  For example, Rodehau testified that, in carrying out his responsibility to review the conflict-of-interest routings, he "would meet" with his program managers "at least on a weekly basis, reviewing the routings."  Rodehau Test., 7/7 a.m. Tr. 10:5-22 (Exh. 23).

If no possible conflict-of-interest issues were raised as a result of the routing process, SAIC would then submit its bid.  Carder Test., 7/22 a.m. Tr. 45:20-22 (Exh. 30).  If issues were raised, however, the contract representative who circulated the routing would investigate the issue further and would share the relevant information with SAIC's technical staff.  *See* Rodehau Test., 7/3 p.m. Tr. 91:5-22 (Exh. 22).  The two groups within SAIC—those who circulated the routing and those who responded with a possible conflict-of-interest issue—would then confer and determine whether there was a way to mitigate the issue so that SAIC could submit a bid.  Carder Test., 7/22 a.m. Tr. 45:23-46:3, 59:7-11 (Exh. 30); *see also* Rodehau Test., 7/7 a.m. 13:4-14:16 (Exh. 23).  If the two groups could not agree, SAIC's Corporate Contracts Department

would intervene to determine the appropriate resolution.  Carder Test., 7/22 a.m. Tr. 46:4-8

(Exh. 30).  If there was no consensus within SAIC as to how to proceed, SAIC would not

submit the bid.  *Id.* at 46:9-13; *see also* Rodehau Test., 7/7 a.m. Tr. 16:25-17:15 (Exh. 23).

Indeed, on a regular basis, SAIC chose not to pursue work because the work would present

conflict-of-interest concerns.  Carder Test., 7/22 a.m. Tr. 40:3-8 (Exh. 30).

In addition to its routing system, SAIC also had a contract management database that

contained information about the conflict-of-interest clauses contained in SAIC's contracts.

Rodehau Test., 7/3 p.m. Tr. 88:23-89:2, 89:18-22 (Exh. 22).  The database could be searched

using key words in an attempt to identify possible conflicts of interest.  Bidwell Test., 7/16 a.m.

Tr. 75:2-16 (Exh. 11).  For example, Rodehau input information into this database upon

notification of award of the 1992 Contract; Martin searched the database in connection with

several contract modifications; and the database was searched when SAIC was preparing its

November 22, 1999 response to the NRC's request for information.  Rodehau Test., 7/3 p.m.

Tr. 88 (Exh. 22); Martin Test., 7/14 a.m. Tr. 106:22-24 (Exh. 19); Martin Test., 7/14 p.m. Tr.

50:7-16, 51:1-4, 59:4-15, 60:14-23 (Exh. 7).

SAIC's conflict-of-interest compliance system was buttressed by formal policies, training,

and documentation on conflict-of-interest issues.  SAIC had a formal policy that it would "not

engage in contracts where there could be a conflict" with SAIC's other work.  Carder Test., 7/22

a.m. Tr. 41:11-42:11 (Exh. 30); *see also* Rodehau Test., 7/3 p.m. Tr. 81:3-20 (Exh. 22).  That

policy was reflected in SAIC's handbook for contracts representatives, which addressed conflict-

of-interest issues and described the process that should be utilized when SAIC was considering

bidding on a contract.  Carder Test., 7/22 a.m. Tr. 47:4-51:2 (Exh. 30); Rodehau Test., 7/3 p.m.

Tr. 72:18-73:12 (Exh. 22); *see also* Carder Test., 7/22 a.m. Tr. 49:5-7 (Exh. 30) (the handbook

"spell[ed] out in a very detailed level exactly what everyone was supposed to do and how they

were supposed to go about it").  To ensure that employees adhered to the conflict-of-interest

policy, SAIC's business units and its Corporate Contracts Department performed conflict-of-

interest training.  Carder Test., 7/22 a.m. Tr. 50:9-14, 52:21-55:5 (Exh. 30); *see also* Rodehau

Test., 7/3 p.m. Tr. 40:19-23 (Exh. 22).  SAIC also had a Business Ethics Handbook that

addressed conflicts of interest; every employee was required to read this handbook and sign a

certification annually.  Carder Test., 7/22 a.m. Tr. 51:8-18, 52:4-13 (Exh. 30); Bidwell Test., 7/16

a.m. Tr. 83:4-9 (Exh. 11).  And, all SAIC employees had an obligation to report within the

company any concerns or information about potential or actual conflicts of interest.  Bidwell

Test., 7/16 a.m. Tr. 64:6-20 (Exh. 11).

There is no dispute that SAIC's conflict-of-interest policies and systems were

implemented in connection with the 1992 and 1999 Contracts.  SAIC used the conflict-of-

interest routing procedure for proposals that it prepared for the 1992 and 1999 Contracts.

Rodehau Test., 7/3 p.m. Tr. 88:11-18 (Exh. 22); Martin Test., 7/14 p.m. Tr. 62:14-22 (Exh. 7).

It also used the routing system in connection with proposals for substantive modifications to

those contracts.  Rodehau Test., 7/7 a.m. Tr. 28:18-22 (Exh. 23); Rodehau Test., 7/3 p.m. Tr.

84:6-9 (Exh. 22); Martin Test., 7/14 p.m. Tr. 59:4-18, 60:14-23 (Exh. 7); *see also* Martin Test.,

7/14 a.m. Tr. 86:16-25, 87:25-89:3 (Exh. 19).  Moreover, Martin testified that he complied with

SAIC's conflict-of-interest policies and procedures in administering both contracts.  Martin

Test., 7/23 a.m. Tr. 87:20-88:1, 90:20-91:4 (Exh. 34).  And, Rodehau testified that SAIC

performed a "due diligence check" before making any conflict-of-interest certifications on those

contracts.  Rodehau Test., 7/3 p.m. Tr. 53:7-12 (Exh. 22); *see id.* at 77:24-79:25.  When these

procedures uncovered a possible future conflict of interest during negotiations relating to the

1999 Contract, SAIC disclosed the potential conflict to the NRC and worked with the agency to develop a mutually acceptable mitigation plan.  *See* Martin Test., 7/14 p.m. Tr. 66:2-67:4, 69:1-17, 71:3-9 (Exh. 7); *see also id.* at 64-71; McKenzie-Carter Test., 7/17 p.m. 14:24-16:15 (Exh. 27) (describing the mitigation plan).

**c.**  **The Government's Critiques Of SAIC's Compliance System Do Not Demonstrate Aggravated Gross Negligence.**

In prior briefing, the Government has attempted to identify alleged flaws in SAIC's conflict-of-interest compliance system.  None of these purported imperfections—which the Government has mentioned almost as an afterthought—is sufficient to create a material issue of fact regarding SAIC's scienter.  Indeed, the Amended Complaint contains no allegations regarding SAIC's compliance system; the jury instructions did not mention this issue; and the Government's summary judgment brief and closing argument critiqued SAIC's compliance system only in passing (*see* Mem. In Opp'n To Def.'s Mot. For Summ. Judgment (Dkt. #70) at 40-41; 7/28 Tr. 50:8-51:6 (Exh. 35)).

Rodehau testified that SAIC's conflict-of-interest routing system was used for bids, proposals, modifications to contracts, and "qualification packages that could result in a contract award."  Rodehau Test., 7/7 a.m. Tr. 44:12-17 (Exh. 23); *see also* Carder Test., 7/22 a.m. Tr. 66:18-20 (Exh. 30).  The Government has nevertheless nitpicked SAIC's system on the ground that "teaming agreements" were not entered into the system.  *See* Carder Test., 7/22 a.m. Tr. 66:21-25 (Exh. 30); Rodehau Test., 7/7 a.m. Tr. 44:18-19 (Exh. 23); *cf.* Bidwell Test., 7/16 a.m. Tr. 79:4-6 (Exh. 11).  But Sandra Carder's uncontradicted testimony is that "[i]t would serve *no purpose*" to include teaming agreements within the compliance system because such agreements "do not have an extensive detailed Statement of Work."  Carder Test., 7/22 a.m. Tr. 66:21-25 (Exh. 30) (emphasis added).  Teaming agreements simply involve "companies getting together to

37

think about a future project." *Id.* at 68:15-18, 81:25-82:8; *see also* Rodehau Test., 7/7 a.m. Tr.

46:16-20 (Exh. 23) (testifying that, as far as he knew, SAIC only provided assistance to other

organizations pursuant to contracts); Bidwell Test., 7/16 a.m. Tr. 77:24-78:4 (Exh. 11).  As one

expert has explained, the work to be performed by a contractor is not defined in teaming

agreements, and "customary practice" does *not* involve evaluating such opportunities for

conflict-of-interest compliance.  9/18/06 Supp. Expert Report of C. Wilkins at 3 & n.3 (Exh.

42).  In any event, SAIC had methods of communicating internally about teaming agreements:

Rodehau testified that "there was a separate process for teaming agreements," and Carder

explained that "[t]ypically, if one business unit is teaming with a company, they might notify

other business units."  Carder Test., 7/22 a.m. Tr. 81:13-18 (Exh. 30); Rodehau Test., 7/7 a.m.

Tr. 44:19 (Exh. 23).

　　　　Struggling to manufacture another purported deficiency in SAIC's compliance system,

the Government has also pointed to Betty Bidwell's testimony that, for a subcontract that BNFL

issued to SAIC in connection with the DOE Three-Building Project, the "key words" used for

searches in SAIC's contract database included the word "remediation" but not the word

"recycle."  Bidwell Test., 7/16 a.m. Tr. 76:1-23 (Exh. 11); *see also* Carder Test., 7/22 a.m. 76:18-

78:21 (Exh. 30).  SAIC never performed "recycling" on the BNFL project, however (Bidwell

Test., 7/16 a.m. Tr. 81:13-20 (Exh. 11)), and thus would have had no reason to include the key

word "recycle."

　　　　In addition, the Government has criticized SAIC's compliance system because Martin

had not seen certain documents at the time that he made conflict-of-interest representations to

the NRC.  But Martin testified that, even if he had been aware of those documents, he still

would have concluded that SAIC did not have conflicts of interest.  *See* Martin Test., 7/14 p.m.

Tr. 43:19-46:18 (Exh. 7).  In any event, such minor imperfections in a compliance system are demonstrably insufficient, as a matter of law, to establish recklessness.  *See Hefner*, 495 F.3d at 110; *see also Hamilton Secs. Grp., Inc.*, 298 F. Supp. 2d at 101 ("fail[ure] to install a system by which concerns . . . were to be routed to the responsible personnel" does not establish reckless disregard).

Alex Murray testified that, "in practice, SAIC, at least when I worked there and from what I could see of the company from the SAIC Germantown office, the main interest was in pursuing business opportunities, contracts and programs, and then they would look into any potential conflicts at a later time.  So it really was more like a secondary interest."  Murray Test., 7/3 a.m. Tr. 29:10-15 (Exh. 37); *see also* 9/22/06 Aff. of Alex Murray ¶ 18 (Exh. 38).  This extraordinarily narrow and vague statement—which is limited to one technical staff person's perspective during a particular, limited period of time—cannot create a triable issue of fact regarding the adequacy of SAIC's compliance system.  *See* Murray Test., 7/3 a.m. Tr. 29:10-15 (Exh. 37).  Indeed, it is wholly unclear that looking into potential conflicts "at a later time"—for example, at the time a final bid is submitted—would be improper.  In any event, Murray was a technical staffer who likely did not fully appreciate the comprehensive compliance system that SAIC was implementing in an effort to detect and address potential conflicts of interest.

The Government's critiques of SAIC's compliance system are further undermined in light of the fact that SAIC's compliance system fares well when compared with external benchmarks for compliance systems.  As an initial matter, an expert who studied SAIC's system concluded that SAIC's "practices are consistent with industry practice."  9/18/06 Supp. Expert Report of C. Wilkins at 4 (Exh. 42).  Moreover, SAIC "establish[ed] standards and procedures to prevent and detect" conflicts of interest (*cf.* U.S. Sentencing Guidelines Manual § 8B2.1(b)(1)

(2010) (establishing benchmark)); SAIC's Business Ethics Handbook and other policies—including the requirement that all employees read the handbook and sign a certification annually—satisfy the benchmark of having "codes of conduct and other policies regarding acceptable business practice [or] conflicts of interest" (*cf.* Comm. of Sponsoring Orgs. of the Treadway Comm'n, *Internal Control—Integrated Framework* 31 (1994) (Exh. 43) (discussing benchmark); *see also id.* at 77); SAIC's routing system "[p]rovid[ed] information to the right people in sufficient detail and on time to enable them to carry out their responsibilities efficiently and effectively" (*id.* at 67 (identifying this as a relevant factor)); SAIC took "reasonable steps to respond appropriately" when it detected a possible future conflict of interest relating to the 1999 Contract (*cf.* U.S. Sentencing Guidelines Manual § 8B2.1(b)(7) (creating benchmark); Memorandum from Mark Filip, Deputy Att'y Gen., U.S. Dep't of Justice, *Principles of Federal Prosecution of Business Organizations* § 9-28.800(A) (Aug. 28, 2008) (hereinafter "Filip Memo") (encouraging voluntary disclosure to the Government)); SAIC had a robust training program (*cf.* Filip Memo § 9-28.800(B) (describing benchmark)); and SAIC implemented its system in good faith (*see* McWhirter Depo. Tr. 76:2-6 (Exh. 40) (stating that he had no reason to question SAIC's good faith); *cf.* Filip Memo § 9-28.800(B) (using good faith as a benchmark)). Accordingly, if this Court were to hold that such a compliance system could give rise to liability based on a recklessness standard, it would work a revolution in compliance programs and fundamentally distort the best practices that the Department of Justice, the Treadway Commission, and other groups have encouraged companies to implement.

### 2.       SAIC Did Not Act In Deliberate Ignorance Of The Truth Or Falsity Of Its Claims And Statements.

The Government also argued that Murray's testimony demonstrated that "SAIC engage[d] in . . . 'compartmentalizing' behavior."  Post-Trial Opp'n at 11-12; *see also* Murray

Test., 7/2 p.m. Tr. 24:3-12, 47:9-11, 51:19-24 (Exh. 33).  But that testimony falls well short of providing a basis for a reasonable jury to find that SAIC acted in deliberate ignorance of alleged conflict-of-interest violations when submitting claims or making statements to the NRC.

The "deliberate ignorance" standard serves "as a substitute for *willful* misconduct—to prevent the defendant from deliberately blinding himself to the consequences of his tortious action."  *Krizek*, 111 F.3d at 942 (emphasis added; internal quotation marks and alteration omitted); *see also SAIC IV*, 626 F.3d at 1274-75.  The Government has not identified *any* evidence that SAIC deliberately structured itself in a way that was intended to "evad[e] liability by 'compartmentaliz[ing] knowledge, [and] subdividing the elements of specific duties and operations into smaller components.'"  *SAIC IV*, 626 F.3d at 1275; *see, e.g.*, Bidwell Test., 7/16 a.m. Tr. 86:17-24 (Exh. 11).  This is simply not a case in which a corporation has intentionally walled off its employees to prevent the sharing of information.[7]

Murray professed concern about SAIC's many "groups or divisions" and the purportedly inadequate communications among those groups.  Specifically, Murray stated that SAIC had "a number of company groups or divisions, . . . which operated largely autonomously from each other and from the corporate parent."  Murray Test., 7/2 p.m. Tr. 31:1-3 (Exh. 33).  Murray believed that this structure meant that SAIC "had to be careful about conflict[s] of interest," and that "communications between [SAIC's] semi-autonomous groups was very, very poor."  *Id.* at 32:1-21, 34:1-6.

---

[7]  The Government recognized as much in its pre-trial filings, leading this Court to conclude prior to trial that "[t]he government does not allege that SAIC acted with 'deliberate ignorance.'"  *United States v. Sci. Applications Int'l Corp.*, 555 F. Supp. 2d 40, 55 n.9 (D.D.C. 2008) ("*SAIC I*").

Murray's speculative and internally inconsistent assertions are insufficient to create a triable issue of fact about SAIC's purported deliberate ignorance. In fact, Murray completely undercut his own alleged concerns about SAIC's structure when he testified that, as a result of that structure, "there was a much greater emphasis placed on communication, trying to find out what other parts of SAIC were doing." Murray Test., 7/2 p.m. Tr. 32:1-9 (Exh. 33). Similarly, Murray testified that he knew that SAIC's policy was to avoid conflicts; he knew that SAIC wanted any employee who believed there was a conflicts issue to report that concern to the company; and he knew that SAIC's "management would be quite concerned about the possibility of a conflict of interest if one truly existed." *Id.* at 94:16-20, 105:15-23.

*     *     *

No reasonable jury could conclude that SAIC's structures or compliance system demonstrate that the company acted in reckless disregard or deliberate ignorance of its conflict-of-interest requirements. The undisputed evidence is that SAIC designed and implemented a robust conflict-of-interest compliance system, trained employees in its conflict-of-interest policies and procedures, and actively encouraged communications among employees about potential conflicts. For these reasons—and because the Government cannot establish that a particular individual at SAIC knowingly made false conflict-of-interest certifications that were material to the Government's payment decisions—SAIC is entitled to summary judgment.

**D.      NOTHING IN THE D.C. CIRCUIT'S OPINION OR THIS COURT'S PREVIOUS OPINIONS FORECLOSES SAIC'S REQUEST FOR SUMMARY JUDGMENT.**

In light of the undisputed record evidence that is reviewed exhaustively above, the Government will likely retreat to an argument that certain statements in the D.C. Circuit's opinion or in this Court's previous opinions foreclose SAIC's request for summary judgment. If

necessary, SAIC will explore these issues more thoroughly in its reply brief, but it nonetheless believes that it is helpful at this time to highlight several fatal flaws in such an argument.

While the D.C. Circuit's opinion suggests that "trial testimony could support a jury conclusion that SAIC employees knew that the company, in violation of NRC conflict of interest regulations to which it certified compliance, was 'providing consulting assistance' to organizations 'regulated by the NRC'" (*SAIC IV*, 626 F.3d at 1272), the D.C. Circuit's statements to this effect focused on the first component of the scienter requirement (knowledge of conflicts of interest), not the second component (knowledge that compliance with conflict-of-interest obligations was material) (*see id.*).  Accordingly, the latter element, which is now a required component of scienter, is not resolved by the D.C. Circuit's statements.  Moreover, neither the D.C. Circuit's opinion nor this Court's post-trial opinion states that the evidence could support a finding that the *same* SAIC employee knew (1) that SAIC had conflicts of interest that violated its contractual requirements *and* (2) that compliance with those requirements was material to the Government's decision to pay.  *See id.*; *see SAIC III*, 653 F. Supp. 2d at 95, 99.  Finally, any suggestion by the D.C. Circuit that the jury could conclude that SAIC had scienter even without relying on the collective knowledge doctrine was mere dicta— and it is well established that dicta "settles nothing" (*Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 351 n.12 (2005)).

Nor does this Court's reasoning in its 2008 summary judgment opinion foreclose SAIC's summary judgment motion.  *See generally SAIC I*, 555 F. Supp. 2d at 55.  The legal and factual landscapes have changed substantially since 2008.  Importantly, the D.C. Circuit subsequently underscored the importance of strictly applying the scienter requirement and emphasized that an SAIC employee could only have scienter if she knew that the company's compliance with its

conflict-of-interest obligations was material.  *See SAIC IV*, 626 F.3d at 1271, 1274-75.

Accordingly, assuming *arguendo* that a single SAIC employee knew the company had a conflict of interest, that knowledge would not satisfy the FCA's scienter requirement unless *the same employee* also knew that the conflict-of-interest requirements were material.  In any event, the summary judgment record now is not the same as it was in 2008, because the testimony from the first trial may be cited to support SAIC's anticipated summary judgment motion.  *See, e.g.*, *Langston*, 478 F.2d at 918 n.17; *Dillon*, 560 F.3d at 596; *see also* Fed. R. Civ. P. 56(c)(1)(A).  Consequently, the question whether the record could reasonably support a finding in favor of the Government on scienter remains open on remand.

## V.  CONCLUSION

For the foregoing reasons, SAIC is entitled to summary judgment on Counts I and II.

Dated:  June 23, 2011                    Respectfully submitted,

                                             /s/ Andrew S. Tulumello
John P. Rowley, III                      Andrew S. Tulumello (D.C. Bar No. 468351)
BAKER & McKENZIE LLP                     Amir C. Tayrani (D.C. Bar No. 490994)
815 Connecticut Avenue, N.W.             Ryan J. Watson (D.C. Bar No. 986906)
Washington, D.C.  20006                  GIBSON, DUNN & CRUTCHER LLP
Telephone: (202) 835-6151                1050 Connecticut Avenue, N.W.
E-mail: john.rowley@bakermckenzie.com    Washington, D.C.  20036
                                         Telephone: (202) 955-8657
                                         E-mail: atulumello@gibsondunn.com

*Counsel for Defendant Science Applications International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June 2011, I filed the foregoing with the Clerk of

Court via the CM/ECF system, which will send notification of such filing to the counsel of

record in this matter who are registered on the CM/ECF system.

In addition, a true and accurate copy of the foregoing was served via e-mail this 23rd day

of June 2011, upon the following:

Daniel Hugo Fruchter
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20004
E-mail: Daniel.Fruchter@usdoj.gov

    /s/ Andrew S. Tulumello
Andrew S. Tulumello (D.C. Bar No. 468351)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com