UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                         Civil No.  04-CV-1543 (RWR)

SCIENCE APPLICATIONS
INTERNATIONAL CORPORATION,

        Defendant.

**UNITED STATES OF AMERICA'S MEMORANDUM IN OPPOSITION TO
DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S
MOTION FOR SUMMARY JUDGMENT ON FALSE CLAIMS ACT LIABILITY**

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………2

FACTUAL BACKGROUND……………………………………………………………...4

    The Nuclear Regulatory Commission…………………………………………………4

    SAIC's Contracts With the NRC………………………………………………………4

    SAIC's Organizational Conflicts of Interest…………………………………………...8

        *The BNFL Oak Ridge Recycle Project*………………………………………….……9

        *The Bechtel Jacobs Gaseous Diffusion Plant Dose Assessement*………………..11

        *SAIC's Relationship With the Association of Radioactive Metal Recyclers*….…..13

        *SAIC's Development of the Plasma Hearth Process*……………………………14

        *SAIC's Undisclosed Relationship With the Alaron Corporation*….…………….16

    SAIC's Organizational Conflict of Interest Compliance System……….…………..17

LEGAL STANDARD…………………………………………………………………......19

ARGUMENT……………………………………………………………………………..20

    **I.**      **Knowledge Under the False Claims Act**………………………………………20

    **II.**     **Under the Knowledge Standard Articulated by the D.C. Circuit, SAIC's
            Motion for Summary Judgment Must Fail Because the Record Supports
            That SAIC Acted Knowingly Based On the Knowledge of SAIC's
            Individual Employees**.......................................................................................21

          1.  The D.C. Circuit Has Already Considered, and Rejected SAIC's
             Argument, and Has Explicitly Held that Record Evidence Supports a
             Finding that Individual SAIC Employees Acted With Knowledge……...21

          2.  SAIC's Argument Misinterprets the Standard Articulated By the
             D.C. Circuit and Posits an Improperly Narrow Knowledge Standard…...27

          3.  Even Under the Standard Articulated by SAIC, SAIC's Motion Fails
             Because Multiple Individual SAIC Employees Knew of Both SAIC's

Conflicting Work and the Materiality of SAIC's Organizational Conflict of Interest Requirements  …………………………………………..31

**III.    SAIC Acted With Reckless Disregard And/Or Deliberate Ignorance**………35

**CONCLUSION**…………………………………………………………………………....38

In accordance with Federal Rule of Civil Procedure 56 and with LCvR 7 of the Rules of this Court, the United States respectfully submits this brief in opposition to Defendant Science Applications International Corporation's Motion for Summary Judgment on False Claims Act Liability.  The United States respectfully submits that in light of both prior decisions of this Court and the Circuit Court, and of the well-established evidentiary record in this case, that a triable issue of fact exists concerning SAIC's knowledge under the False Claims Act.  The United States further submits that, as both the Circuit Court and this Court have already held, and as the evidence in this case plainly demonstrates, more than sufficient evidence exists to demonstrate that SAIC both had actual knowledge and/or that SAIC acted with deliberate ignorance or reckless disregard of the truth.  Therefore, Defendant's motion for summary judgment should be denied.

## **INTRODUCTION**

After a four week trial in which forty witnesses testified and hundreds of exhibits were introduced, the jury unanimously found that SAIC knowingly made 17 false statements and knowingly submitted 60 false claims for payment, in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.  *U.S. v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1264 (D.C. Cir. 2010) (*citing U.S. v. Sci. Appl. Int'l Corp.*, 653 F. Supp. 2d 87, 94 (D.D.C. 2009)).  The jury further found that, as a result of defendant's conduct, the United States sustained $1,973,839.61 in damages.  *Id.*  Additionally, the jury found that SAIC had breached its contract with the NRC, and awarded $78 in additional nominal damages on that count.  *Id.*  Accordingly, imposing mandatory False Claims Act treble damages and penalties, the Court entered judgment in the amount of $6,499,096.83.  *Id.*  The Court subsequently denied SAIC's motion for judgment as a matter of law or for a new trial.  *SAIC*, 626 F.3d at 1264-65; *SAIC*, 653 F. Supp. 2d at 94.

SAIC appealed from the Court's denial of its post-judgment motion.  On appeal, the Court of Appeals, District of Columbia Circuit affirmed in part and reversed in part the Court's decision and remanded the matter for a new trial.  First, the Circuit Court affirmed the judgment that SAIC had breached its contract with the NRC.  *SAIC*, 626 F.3d at 1273, 1280.  Second, the Circuit Court affirmed this Court's opinion denying SAIC's motion for judgment as a matter of law on the United States' False Claims Act counts.  *Id.* at 1270-71, 1280.  In doing so, the Circuit Court found that sufficient evidence was presented at trial from which a jury could have reasonably concluded that SAIC knowingly submitted false claims and knowingly made false statements and therefore violated the False Claims Act.  *Id.* at 1270-77.  The Circuit Court also found that sufficient evidence was presented at trial from which a jury reasonably could have concluded that SAIC's actions damaged the United States in the amount found by the jury.  *Id.* at 1277-80.  However, the Circuit Court held that two of the Court's instructions to the jury, regarding SAIC's knowledge and the damages caused by SAIC under the False Claims Act, were incorrect.  *Id.* at 1273-80.  The Circuit Court held that although sufficient evidence was presented at trial from which a jury could have, applying the proper standard, found for the United States on both issues, the jury could have relied on aspects of the instructions that the Circuit Court believed were improper in finding for the United States on the issues of SAIC's knowledge and the amount of damages.  *Id.*  Accordingly, the Circuit Court reversed this Court's judgment on the False Claims Act counts and remanded the matter to this Court.

Following a status hearing on April 1, 2011, the Court entered a Scheduling Order providing for the Parties to file briefs and/or motions by June 23, 2011.  (Doc. 194).  On June 23, 2011, SAIC filed its Motion for Summary Judgment on False Claims Act Liability (Doc. 196) ("SAIC's Liability Motion").  Pursuant to the Court's April 1, 2011 Scheduling Order, the

United States hereby respectfully files its Memorandum in Opposition to SAIC's Liability

Motion.  Pursuant to LCvR 7 of the Rules of this Court, the United States also files, concurrent

with this Memorandum, its Responsive Statement of Material Facts in Support of its

Memorandum in Opposition to SAIC's Motion on False Claims Act Liability ("RSMF").

## FACTUAL BACKGROUND

### The Nuclear Regulatory Commission

The United States Nuclear Regulatory Commission ("NRC") is an independent federal

agency responsible for regulating the civilian use of radioactive material in order to ensure the

protection of public health, safety, and the environment.  *See, e.g.*, *SAIC*, 653 F. Supp. 2d at 92.

Pursuant to its general authority, the NRC oversees the release and recycle into interstate

commerce of commercially valuable radioactively contaminated materials from nuclear facilities.

*See SAIC*, 626 F.3d at 1261; *see also* RSMF at ¶¶ 90-93.  The NRC sets scientific standards

regarding the release of such material and any person who wishes to possess, receive, release, or

dispose of regulated radioactive material must possess an NRC license.  *Id.*

### SAIC's contracts with the NRC

Beginning in the early 1990s, the NRC commenced studies aimed at developing scientific

criteria designed to form the basis of an NRC regulation that would set uniform national

standards on the recycle and release of radioactive materials.  *SAIC*, 626 F.3d at 1261;

RSMF at ¶¶ 94-95.  As part of its efforts, the NRC entered into two contracts with SAIC which

required SAIC to provide advice, recommendations, and assistance in support of the NRC's

rulemaking effort.  *SAIC*, 626 F.3d at 1261-62; RSMF at ¶¶ 94-104.

SAIC's contracts with the NRC required, among other things, that SAIC: 1) perform an

analysis of existing studies and other available information concerning radioactive waste release

and recycle; 2) create and prepare a "dose assessment" analyzing the possible amount of radioactivity that a member of the public could be expected to sustain if radioactive materials of varying levels and types of radioactivity were released or recycled; 3) prepare regulatory options and issues papers identifying stakeholders in the NRC's rulemaking process and setting forth the pros and cons of various regulatory options that the NRC was considering, including "no release," "limited release," and "free release" alternatives; 4) analyze and characterize the inventory of radioactive materials found at commercial and government sites across the United States; and 5) assess the costs and benefits of the various options for a possible NRC rule in this area. RSMF at ¶¶ 94-104; *SAIC*, 653 F. Supp. 2d at 92-93. SAIC fully understood that the NRC's rulemaking was in a controversial area and required careful balancing of public health, safety, and the environment as well as the significant economic and other costs of radioactive waste disposal. *See, e.g.,* RSMF at ¶ 96; *SAIC*, 653 F. Supp. 2d at 93 ("SAIC's neutrality was critical under both contracts."). SAIC further understood that the advice and assistance that it was providing for the NRC therefore had to be free from actual or potential conflicts of interest, or even the appearance of such a conflict. RSMF at ¶¶ 96, 106-108, 110 (SAIC understood the need to disclose apparent conflicts), 118-119.

In fact, the NRC was required by statute to promulgate and enforce rules and regulations to ensure that anyone with whom it contracted first disclosed "all relevant information . . . bearing on whether that person has a possible conflict of interest." Section 170A of the Atomic Energy Act, 42 U.S.C. § 2210a; RSMF at ¶ 106. Further, the NRC was statutorily prohibited from entering into a contract with anyone unless it first concluded, based on full disclosure of all relevant information by the contractor, that no conflict of interest existed or that any conflict could be adequately avoided or mitigated. *Id.*

Pursuant to the NRC's statutory obligations, SAIC's contracts with the NRC contained a number of provisions regarding the requirement for SAIC to avoid and disclose actual or potential organizational conflicts of interest ("OCIs").  *SAIC*, 626 F.3d at 1262-63; *SAIC* 653 F. Supp. 2d at 93; see *also* RSMF at ¶¶ 106-108, 113, 115, 117-118.  Specifically, SAIC was required, and agreed, to forego entering into any arrangement "with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under [the] contract." *Id.*  If SAIC had "reason to believe with respect to itself or any employee that any proposed consultant or other contractual arrangement with any firm or organization may involve a potential conflict of interest," the contract obliged SAIC to obtain the NRC's prior written approval. *Id.*  The contract also included disclosure obligations that required SAIC to "warrant[] to the best of its knowledge and belief" that it had no "organizational conflicts of interest" and that SAIC would make "an immediate and full disclosure in writing" if it discovered such conflicts after the contract award. *Id.*  In the event SAIC disclosed a conflict, the NRC retained the unilateral right to terminate the contract if it believed that doing so was "in the best interest of the government." *Id.*  The contract defined organizational conflicts of interest by reference to NRC regulations, which in turn defined an organizational conflict of interest as follows: "a relationship . . . whereby a contractor or prospective contractor has present or planned interests related to the work to be performed under an NRC contract which: (1) may diminish its capacity to give impartial, technically sound, objective assistance and advice or may otherwise result in a biased work product, or (2) may result in its being given an unfair advantage." *Id.* (*citing* 41 C.F.R § 20-1.5402(a) (1979)); *see also* 48 C.F.R. § 2009.570-3.

In addition, the contract required SAIC to make several representations and certifications regarding organizational conflicts of interest.  RSMF at ¶¶ 116-119.  In order to obtain and keep

its contracts and modifications thereto, and to be paid under its contracts, SAIC repeatedly

certified that it did not have any of the potential organizational conflict of interest "situations or

relationships" set out in the NRC regulations.  RSMF at ¶¶ 116-119; *SAIC*, 653 F. Supp. 2d at 93

("SAIC repeatedly certified throughout the periods its contracts were in force that it had no OCIs

and would notify the NRC of any changes resulting in an OCI.").  The NRC's  regulation, now

codified at 48 C.F.R. § 2009.570-3(b), lists the following situations or relationships that give rise

to actual or potential conflicts and that must therefore be disclosed:

> (i) Where the . . . contractor provides advice and
> recommendation to the NRC in a technical area in
> which it is also providing consulting assistance in the
> same area to any organization regulated by the NRC.
>
> (ii) Where the . . . contractor provides advice to the
> NRC on the same or similar matter on which it is
> also providing assistance to any organization
> regulated by the NRC.
> . . . .
> (iv) Where the award of a contract would otherwise
> result in placing the . . . contractor in a conflicting
> role in which its judgment may be biased in relation
> to its work for the NRC, or would result in an unfair
> competitive advantage . . .

RSMF at ¶¶ 116-119; 41 C.F.R. 20-1.5402(a) (1979); *SAIC*, 626 F.3d at 1262; *SAIC* 653 F.

Supp. 2d at 93 n. 1.  Further, SAIC's contract with the NRC provided that "[t]he nondisclosure

or misrepresentation of any relevant interest may . . . result in the disqualification of [SAIC] for

award," and that if "nondisclosure or misrepresentation is discovered after the award, the

resulting contract may be terminated" by the NRC.  *SAIC*, 626 F.3d at 1262; RSMF at ¶¶ 113,

117.  SAIC's witnesses testified that they fully understood the importance of these OCI

requirements and OCI certifications - namely, that SAIC's entitlement to receipt of payment

from the NRC was contingent on its making these certifications and on abiding by its legal and

contractual obligations regarding OCIs.  RSMF at ¶¶ 115, 118-119; *see also SAIC*, 653 F. Supp. 2d at 103 ("Numerous witness from both the NRC and SAIC testified that the OCI obligations in SAIC's contracts with the NRC were important to the overall purpose of the contract.").

In total, SAIC presented 87 invoices for payment to the NRC on its two NRC contracts. RSMF at ¶¶ 7-8.  While certifying to the absence of each of the categories of OCI Relationships, and submitting invoices for payment under its contracts, SAIC never disclosed its financial relationships with BNFL, Inc. ("BNFL"), Bechtel Jacobs Company ("BJC"), the Association of Radioactive Metal Recyclers ("ARMR"), or the Alaron Corporation, nor did it disclose its financial interest in a radioactive waste treatment technology known as the Plasma Hearth Process ("PHP").  RSMF at ¶¶ 122-123.  A jury has already determined that SAIC breached its NRC contract by failing to disclose its OCI relationships, and both this Court and the Circuit Court have affirmed that determination.  *See SAIC*, 626 F.3d at 1273 (*affirming, in part, SAIC*, 653 F. Supp. 2d 87).

### SAIC's Organizational Conflicts of Interest

As the evidence at trial demonstrated, as a jury has already unanimously determined, as this Court has already ruled, and as the D.C. Circuit has affirmed, SAIC failed to abide by its contractual requirements with the NRC to avoid and disclose potential organizational conflicts of interest.  *SAIC*, 653 F. Supp. 2d at 94, 111-12 (*affirmed in part*, by *SAIC*, 626 F.3d 1257.) Multiple individual SAIC employees had actual knowledge of SAIC's work for the NRC and also SAIC's business relationships in the area of radioactive material release and recycle.  *SAIC*, 626 F.3d at 1272, 1276 ("We agree that the jury, relying entirely on evidence of actual knowledge possessed by individual company employees, could have found that SAIC knowingly submitted false claims and made false statements.").

### *The BNFL Oak Ridge Recycle Project*

Beginning in early 1996 and continuing throughout the life of its NRC Contracts, SAIC provided advice and assistance to British Nuclear Fuels, Inc. ("BNFL") and its subsidiary, Manufacturing Sciences Corporation ("MSC") on a large project involving the release and recycle of radioactive material from a gaseous diffusion facility owned by the Department of Energy ("DOE") in Oak Ridge, Tennessee (the "BNFL Oak Ridge Recycle Project").  RSMF at ¶¶ 14-15, 131-162.  SAIC was not only a teaming partner with BNFL and MSC on the BNFL Oak Ridge Recycle Project, but admitted that SAIC employees "completely plan[ned]" the project, including its recycle and removal actions.  *Id.* at ¶¶ 14-15, 131-138.  Multiple SAIC employees, including, for example, Alex Murray, Steve Turner, and Jeff Slack, who also knew about SAIC's work for the NRC, understood that the BNFL Oak Ridge Recycle Project involved the release and recycle of radioactive material into general commerce, activities regulated by the NRC.  *Id.* at ¶¶ 2, 14-15, 134-136, 138-139, 143, 147, 161-162; *SAIC*, 653 F. Supp. 2d at 100 ("SAIC employees testified that BNFL, with whom SAIC entered into an agreement regarding a recycle project for the DOE, was subject to the NRC's regulations concerning disposal of radioactive waste once the waste left DOE facilities[.]").  Indeed, MSC, one of the teaming partners and the entity actually designated to perform the recycle and release of the material, was licensed and operated under NRC regulatory authority.  RSMF at ¶¶ 14-15, 139-141, 155; *SAIC*, 653 F. Supp. 2d at 100 ("SAIC employees testified that . . . MSC, a subsidiary of BNFL, was NRC-licensed.").

SAIC's plans for radioactive release and recycle projects did not end with Oak Ridge but extended to other nuclear facilities.  RSMF at ¶¶ 132, 135, 139, 142, 163-183, 201-214; *SAIC*, 653 F. Supp. 2d at 100 ("In addition, the government presented evidence that SAIC sought to

continue and expand its business relationship with BNFL into the future."). SAIC employees including Murray and Turner, who also knew about SAIC's work for the NRC, understood that an NRC regulation providing for release and recycle of radioactive material would benefit both the BNFL project and similar projects on which SAIC hoped to work. RSMF at ¶¶ 135, 139, 162; *SAIC*, 653 F. Supp. 2d at 100-101.

At least the following SAIC employees worked on and/or had actual knowledge of the BNFL project and also had actual knowledge of SAIC's work for the NRC: Stephen Turner, Jeffrey Slack, Alex Murray, Thomas Rucker, Reginald Gotchy, Rick Profant. RSMF at ¶¶ 131-155, 161-162. Additionally, Michael McKenzie-Carter had actual knowledge of SAIC's work for the NRC and may have had actual knowledge of SAIC's work on the BNFL Oak Ridge Recycle Project. RSMF at ¶¶ 156-160. Each of these individuals also knew that SAIC was obligated to avoid and disclose potential organizational conflicts of interest. RSMF at ¶¶ 131-162.

Alex Murray not only knew about SAIC's conflicting work but was concerned that SAIC's simultaneous work on the BNFL Oak Ridge Recycle Project and for the NRC could constitute a potential organizational conflict of interest. RSMF at ¶¶ 59-64, 139-141. Murray relayed these concerns to at least Stephen Turner, Rick Profant, and Reginald Gotchy. RSMF at ¶¶ 59-64, 139-141, 153-154. Turner told Murray that his concerns had been addressed; however, there is no evidence that anyone at SAIC appropriately addressed Murray's concerns or relayed them to the appropriate personnel. RSMF at ¶¶ 62, 140. Not only did SAIC and its employees conceal SAIC's role on the BNFL Oak Ridge Recycle Project from the NRC, but when the NRC learned about SAIC's role on the project at a public meeting regarding the NRC's ongoing rulemaking efforts, SAIC employees knowingly made numerous false statements to the NRC,

with the intent that the NRC rely on these statements, in an effort to convince the NRC that no

organizational conflict of interest existed.  RSMF at ¶¶ 24, 120-130.  The statements SAIC made

to the NRC were flatly contradicted by BNFL Oak Ridge Recycle Project documents authored

by Stephen Turner, who participated in drafting the letter to the NRC and therefore knew of its

falsity, and by admissions that Mr. Turner made at trial.  RSMF at ¶¶ 24, 120-138.

<u>*The Bechtel Jacobs Gaseous Diffusion Plant ("GDP") Dose Assessement*</u>

Beginning in 1998, SAIC provided advice and assistance to Bechtel Jacobs Corporation

("BJC") on a project involving analyzing radioactive material release and recycle from a number

of facilities.  *SAIC*, 653 F. Supp. 2d at 101; RSMF at ¶¶ 16, 163-183.  Under its contract with

BJC, SAIC was required to perform an analysis of the inventory of the facilities in question,

which included the Oak Ridge site that was the subject of the BNFL Oak Ridge Recycle Project

as well as two additional facilities owned by the Department of Energy ("DOE") but operated by

commercial entities pursuant to NRC licenses.  RSMF at ¶¶ 16, 163-166, 169.  SAIC was also

required to analyze the costs and benefits of different options for dispositioning the material at

these facilities, including an analysis of release, recycle, and limited release alternatives, the

same task it was performing for the NRC.  *Id.; SAIC*, 653 F. Supp. 2d at 101; *see also* RSMF at

¶¶ 16, 163-166.  Finally, SAIC was required to perform an assessment of the expected dose

resulting from the release and recycle of radioactive material, the same task it was performing for

the NRC, and utilizing the very same scientific release standards that SAIC was analyzing for the

NRC.  RSMF at ¶¶ 16, 163-169 (NRC Regulatory Guide 1.86 used in BJC Dose Assessment;

BJC Dose Assessment utilized and considered SAIC's work for the NRC).

In its report for BJC, SAIC concluded that release and recycle of all of the materials

would result in only a "trivial dose" and that the benefits of free release and recycle outweighed

11

the costs.  RSMF at ¶¶ 16, 165.  This created an obvious potential for bias with respect to SAIC's

work for the NRC, particularly in light of the fact that SAIC was already participating in the

release and recycle from one of the facilities it was studying for BJC on the BNFL Oak Ridge

Recycle Project, and that SAIC had plans to perform similar tasks on the other two facilities that

were the subject of the BJC Dose Assessment.  RSMF at ¶¶ 132, 139, 142.  SAIC's work for

BJC was in exactly the same technical area and concerned the same subject matter as its work for

the NRC.  *See, e.g.,* RSMF at ¶¶ 163-169.  In fact, SAIC's work for BJC was so similar to

SAIC's work for the NRC that SAIC employees copied significant portions of an SAIC report

for the NRC into a report it delivered to BJC.  RSMF at ¶¶ 168-169, 174-175.  The copied

portions included scientific judgments and conclusions about what would, and would not, be

considered by SAIC in its analysis.  *Id.*

At least the following SAIC employees had actual knowledge of both SAIC's work on

the BJC Dose Assessment Project and SAIC's work for the NRC: Jeffrey Slack, Thomas Rucker,

Michael McKenzie-Carter, and Betty Bidwell.  RSMF at ¶¶ 163-183.  However, despite the

obvious possible conflict of interest and potential for bias inherent in SAIC's dual roles for BJC

and the NRC, SAIC never disclosed its work on the BJC project to the NRC until after the NRC

had learned of the BNFL Oak Ridge Recycle Project.  RSMF at ¶¶ 16, 123.  In fact, when the

NRC questioned SAIC's work on the BJC Dose Assessment project, Mr. Slack participated in

drafting a letter to the NRC in which SAIC knowingly made false statements about its work on

the project in a futile attempt to keep its NRC contract.  RSMF at ¶¶ 120-130.  These statements

were flatly contradicted by Mr. Slack's testimony and by documents in which Mr. Slack

participated in drafting.  *See* RSMF at ¶¶ 128, 163-169.

*SAIC's Relationship With the Association of Radioactive Metal Recyclers*

Beginning in 1995, SAIC and its employees became involved in an organization known as the Association of Radioactive Metal Recyclers ("ARMR").  RSMF at ¶¶ 19, 184-195. ARMR was a trade organization that lobbied the NRC to adopt a release rule that would allow for the free release and recycle of radioactive material.  RSMF at ¶¶ 19, 184-195.  This was the exact same rule upon which the SAIC was purportedly providing the NRC with unbiased advice and assistance.  RSMF at ¶¶ 94-104.  ARMR's members included many NRC licenses and other entities with an interest in releasing and recycling radioactive material under the NRC's regulatory authority.  RSMF at ¶¶ 19, 188, 190, 192-93.

An SAIC Vice President, Gerald Motl, was one of the most important members of ARMR, and was an officer of ARMR who served as Director at the same time that SAIC was performing its work for the NRC.  RSMF at ¶¶ 19, 184-195.  Mr. Motl traveled to numerous ARMR events at SAIC's expense.  RSMF at ¶ 189.  Mr. Motl even participated in drafting a letter to the NRC chairperson to advocate for a release rule - again, the very same rule upon which SAIC was providing advice and assistance to the NRC.  RSMF at ¶ 193.  Even more troublingly, Mr. Motl, an ARMR director who enthusiastically participated in ARMR's lobbying activities, was one of the key personnel that SAIC proposed to perform work on SAIC's NRC Contract.  RSMF at ¶ 193.  The subject matter of the work that Mr. Motl was proposed to provide was assessing the costs and benefits of release and recycle of radioactive material. RSMF at ¶ 193.  Meanwhile, ARMR, with Mr. Motl's enthusiastic participation, had already taken the position in letters to the NRC that the benefits of release and recycle outweighed the costs.  RSMF at ¶ 193.

Gerald Motl had actual knowledge of both SAIC's relationship with ARMR and SAIC's work on the NRC Contracts. RSMF at ¶¶ 19, 184-195.  Michael McKeznie-Carter also had

actual knowledge of SAIC's work on the NRC Contracts and knew, or should have known, of

SAIC's and Motl's relationship with ARMR.  RSMF at ¶¶ 49, 196-200.  However, although

SAIC's relationship with ARMR concerned the precise subject matter - an NRC release rule for

release and recycle of radioactive material - and pertained to the same technical area as SAIC's

work for the NRC, and although SAIC's relationship with ARMR created a clear potential for

bias with respect to SAIC's work for the NRC by virtue of SAIC/Motl's dual loyalties to ARMR

and to the NRC, SAIC never disclosed its relationship with ARMR to the NRC.  RSMF at ¶ 122.

### *SAIC's Development of the Plasma Hearth Process*

SAIC's work in developing a radioactive waste treatment technology known as the

Plasma Hearth Process ("PHP") began in 1990.  RSMF at ¶ 206.  By 1994, SAIC was already

experimenting with the technology, and soon after, SAIC employees were planning the

commercialization of the technology.  RSMF at ¶¶ 201-210.  SAIC planned for the PHP to be

used to decontaminate radioactive waste, allowing the resulting metal to be free released and/or

recycled into commerce.  RSMF at ¶¶ 201-210.  SAIC knew that in order to utilize the PHP in

this manner, it would be subject to NRC regulations governing the release and recycle of

radioactive material, the exact same rules on which SAIC was advising the NRC.  RSMF at ¶

208.  Accordingly, SAIC committed to "follow" the NRC's rulemaking efforts as part of its work

on the PHP.  *Id.*  In 1996, SAIC prepared and filed a patent application for the PHP in order to

protect its financial and proprietary interest in the treatment technology.  RSMF at ¶¶ 203, 206.

SAIC's commercialization plan for the PHP also included obtaining an NRC license for the

technology, so that material treated by the PHP could be free released under NRC's regulations.

RSMF at ¶ 208.  By early 1997, SAIC and BNFL had entered into a teaming agreement to

further develop the PHP and to commercialize it for use in both government and commercial

14

applications.  RSMF at ¶ 207.  SAIC knew that use of the PHP in such applications would have to comply with NRC free release regulations.  RSMF at ¶ 208.

One of the inventors of the PHP, Gary Leatherman, was also one of the individuals providing advice and assistance to the NRC under SAIC's NRC contracts.  RSMF at ¶¶ 18, 201-205.  His work for the NRC - namely, helping to identify the way in which, when radioactive metal is heated, different radioisotopes migrate to different states of matter, was also an important aspect of his work on the PHP.  *Id*.  At the same time, Mr. Leatherman was also engaging in efforts to develop and market the PHP to prospective customers.  *Id.*

At least the following SAIC employees had actual knowledge of both SAIC's work on the PHP and SAIC's work on its NRC Contracts: Gary Leatherman, Michael McKenzie-Carter, Alex Murray, and Steve Turner.  RSMF at ¶¶ 18, 50, 201-205, 211-213.  Additionally, SAIC's Milo Larsen had actual knowledge of SAIC's work on the PHP and knew, or should have known, about SAIC's work on its NRC Contracts.  RSMF at ¶¶ 206-210.  SAIC's direct ownership interest in and plans for the PHP, including its planned relationship with BNFL to market and commercialize the PHP, created a clear conflict of interest and obvious potential for bias with respect to its work for the NRC.  RSMF at ¶¶ 201-213.  Despite this, and even though SAIC's work on the PHP predated even its very first NRC contract, SAIC never disclosed its interest in or work on the PHP, even as the it moved to patent, market, and commercialize the technology for use under the NRC's regulatory authority.   RSMF at ¶ 122.

*SAIC's Undisclosed Relationship With the Alaron Corporation*

Beginning in January 1996, SAIC provided advice and assistance to a company known as Alaron Corporation regarding a proposed project to release and recycle radioactive waste in Pennsylvania and South Carolina.  *SAIC*, 653 F. Supp. 2d at 100; RSMF at ¶¶ 17, 214.  Alaron

was both a member of ARMR seeking an NRC rule in the area of radioactive material release and recycle and an NRC licensee in the business of recycling and releasing radioactive metal. RSMF at ¶¶ 17, 188, 214.   SAIC and Alaron entered into a teaming agreement under which SAIC would provide advice and assistance to Alaron concerning Alaron's proposed release and recycle of radioactive material, including advice and assistance pertaining to Alaron's proposed release and recycle under NRC regulations, which was to take place at Alaron's NRC-licensed facility in Pennsylvania.  *Id.*  In May 1996, the SAIC/Alaron team sought and obtained a blanket ordering agreement from the Westinghouse Savannah River Corporation to carry out such work. *Id*.

Stephen Turner, the SAIC official most responsible for SAIC's work on the BNFL Oak Ridge Recycle Project, included the Alaron project in his plan to make Oak Ridge the world's "center for radioactive scrap metal recycling."  RSMF at ¶ 214. Although the SAIC/Alaron team was never selected to perform any of the release and recycle work that it proposed, the existence of the relationship, which clearly fell under the NRC's regulatory authority, was a "planned interest" exactly of the kind for which the NRC's regulations and SAIC's NRC contract required disclosure.  RSMF at ¶¶ 17, 53, 66, 71, 83-84, 108, 214, 218.  SAIC employee Stephen Turner had actual knowledge of both SAIC's work with Alaron and SAIC's work for the NRC.  RSMF at ¶ 214.  Nonetheless, SAIC failed to disclose to the NRC its relationship with Alaron, even after the NRC specifically demanded all SAIC work in the area of radioactive material release and recycle.  RSMF at ¶ 122.

### SAIC's Organizational Conflict of Interest Compliance System

Although SAIC had a compliance system related to organizational conflicts of interest, the evidence at trial revealed serious deficiencies in both the design of SAIC's system and the

ways in which it was implemented in connection with SAIC's work for the NRC.  *SAIC*, 653 F. Supp. 2d at 99; RSMF at ¶¶ 53, 59-64, 66-67, 69-74, 76, 78-90, 139-141.  First, SAIC's system concerned only contracts, contract proposals and modifications.  RSMF at ¶¶ 71, 76, 78, 82, 218. SAIC's system ignored relationships such as patent rights, memoranda of understanding, teaming agreements, planned interests, and associational affiliations, even though SAIC fully understood that such relationships and situations could constitute organizational conflicts of interests with respect to SAIC's work for the NRC.  *Id.*  Second, SAIC's system did not adequately account for the fact that its obligations to the NRC did not end after contract award but continued for the life of SAIC's NRC Contracts.  RSMF at ¶¶ 5, 66, 87-88, 113.  Third, SAIC's system depended largely on "key word" entries and on SAIC employees both adequately and accurately describing SAIC's work and selecting appropriate key words.  RSMF at ¶¶ 78, 83, 87, 217.  Of course, SAIC employees were incentivized to describe work generally and select few key words so that potential conflicts did not interfere with SAIC's pursuit of business opportunities.  Fourth, SAIC's system lacked positive controls to ensure that its employees even read SAIC's organizational conflict of interest routings, let alone that they appropriately analyzed them for potential conflicts.  RSMF at ¶¶ 78, 84-85, 216.

Each of these weaknesses is underscored further by the events of this case.  SAIC's relationships with Alaron, ARMR, and on the PHP never were routed or analyzed for potential organizational conflict at all. RSMF at ¶¶ 76, 78, 88.  SAIC's entry for the BNFL Oak Ridge Recycle Project is woefully vague and SAIC failed to select the key words "decontamination and decommissioning" and "recycle" in its system for the project, even though both of those terms appear in the <u>title</u> of the project.  RSMF at ¶¶ 78, 83, 87, 217.  SAIC's entry on the BNFL Oak Ridge Recycle Project fails to even select the term "radiation."  RSMF at ¶¶ 78, 83, 87, 217.  Nor

were <u>any</u> of these projects even made known to Pierce Martin or Thomas Rodehau, the two

individuals responsible for making SAIC's organizational conflict of interest certifications to the

NRC, even though each of the five relationships were in the same technical area as SAIC's work

for the NRC, even though each of them presented the potential for bias with respect to SAIC's

NRC work, and even though SAIC's internal organizational conflict of interest training stressed

the importance of escalating and disclosing <u>any</u> situation in which SAIC assisted a government

agency in a technical area and, at the same time, assisted <u>any other organization</u> in the same

technical area.  RSMF at ¶¶ 22, 31-32, 220.

Some of SAIC's employees stated that in not escalating SAIC's relationships, they relied

on their belief that these relationships did not need to be considered for potential conflict because

SAIC's conflicting projects were being performed by DOE contractors, and DOE is not regulated

by the NRC.  RSMF at ¶¶ 23, 34, 169, 175, 180.  This position is explicitly contradicted by the

NRC regulations, by testimony of SAIC witnesses, and by SAIC's own training materials used to

train employees regarding organizational conflicts of interest.  *Id.*; *see also* RSMF at ¶ 219; 48

C.F.R. 2009.570-3 (only two of the three relevant potential conflict situations in the NRC

regulations require that work be performed for an entity "regulated by the NRC.").  SAIC

therefore did not follow even its own inadequate OCI compliance system with respect to its work

for the NRC.

## **LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). In

deciding whether there is a genuine issue of material fact, the court is to view the record in the

light most favorable to the party opposing the motion, giving the non-movant the benefit of all

favorable inferences that can reasonably be drawn from the record and the benefit of any doubt

as to the existence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S.

144, 157-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  To determine which facts are "material," a

court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A material fact is one "that

might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106

S.Ct. 2505.   A "genuine issue" is one whose resolution could establish an element of a claim or

defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322, 106 S.Ct.

2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.  When evaluating a summary judgment

motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S.

at 255, 106 S.Ct. 2505; *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct.

2097, 147 L.Ed.2d 105 (2000).

**ARGUMENT**

SAIC argues that no genuine issue of material fact exists with respect to its knowledge of its false claims and statements.  See Memorandum of Points and Authorities in Support of Defendant Science Applications International Corporation's Motion for Summary Judgment on False Claims Act Liability ("Def. Mem.") at 1-2.  Although SAIC cites to the D.C. Circuit's opinion in support of its motion, SAIC ignores that the D.C. Circuit has already considered, and explicitly rejected, SAIC's argument that it is entitled, on the basis of the trial record, to judgment as a matter of law on the issue of scienter.  *See SAIC*, 626 F. 3d at 1272-1273 ("we conclude that record evidence is sufficient to have allowed the jury to reasonably believe that SAIC knowingly submitted false claims for payment and made false statements of compliance with the organizational conflict of interest requirements set forth in its NRC contracts.").  Applying the standard articulated by the D.C. Circuit, it is evident that the record supports a finding that SAIC acted knowingly.  SAIC, however, mischaracterizes the legal standard articulated by the D.C. Circuit and seeks to impose a standard that would allow corporate defendants to escape liability for conduct that Congress intended to cover in its definition of knowledge under the False Claims Act ("FCA").  SAIC ignores not only the D.C. Circuit's opinion and case law, but a record replete with instances of SAIC's actual knowledge, deliberate ignorance, and reckless disregard.  *See*, *supra*, pp. 9-17; RSMF at ¶¶ 131-221.

I.      **Knowledge Under the False Claims Act**

The False Claims Act ("FCA") defines the term "knowingly" to mean that an entity like SAIC, with respect to information: "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).   "[N]o proof of specific intent to

<u>defraud is required</u>."  *Id.* (emphasis added).  Therefore, the False Claims Act's knowledge standard is triggered based on a defendant's knowledge of the falsity of the underlying information.  *Id.*

Congress established the FCA's scienter requirement when it amended the FCA  in 1986 to clarify that even absent evidence of specific intent to defraud, a defendant is liable under the FCA when it has actual knowledge of the falsity of their claims or when it acts with deliberate ignorance or reckless disregard of the truth or falsity of their claims or statements.  *See SAIC*, 626 F. 3d at 1274.  Congress adopted this definition of "knowingly" to capture the "'ostrich-like' conduct which can occur in large corporations" whereby a defendant fails to take reasonable steps to ensure that statements and claims submitted to the United States are truthful.  *Id.* (*citing* S.Rep. No. 99–345, at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272, 5285). Accordingly, the False Claims Act's legislative history makes it clear that, even in the absence of actual knowledge, a defendant who presents claims or makes representations without making inquiries that are "reasonable and prudent under the circumstances" has acted with knowledge and is therefore liable.  *See, e.g., U.S. v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008); S. Rep. No. 99-345, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5285.

II.     **Under the Knowledge Standard Articulated by the D.C. Circuit,
        SAIC's Motion for Summary Judgment Must Fail Because the
        Record Supports that SAIC Acted Knowingly Based On the Knowledge
        <u>of SAIC's Individual Employees</u>**

1.  The D.C. Circuit Has Already Considered, and Rejected SAIC's Argument,
    and Has Explicitly Held that Record Evidence Supports a Finding that
    Individual SAIC Employees Acted With Knowledge

Although the D.C. Circuit vacated judgment against SAIC on the two False Claims Act counts based on what it believed was an incorrect instruction regarding collective knowledge that allowed the jury "to prove scienter by piecing together scraps of 'innocent' knowledge held by

various corporate officials," *see SAIC*, 626 F.3d at 1275, the D.C. Circuit also explicitly held,

even applying the proper standard, that the "record evidence is sufficient to have allowed the jury

to reasonably believe that SAIC knowingly submitted false claims for payment and made false

statements of compliance with the organizational conflict of interest requirements set forth in its

NRC contracts." *Id*. at 1273.  The D.C. Circuit further explained that:

> We agree that the jury, <u>relying entirely on evidence of actual knowledge
> possessed by individual company employees, could have found that SAIC
> knowingly submitted false claims and made false statements</u>. Alternatively,
> relying on evidence regarding the actions of employees or SAIC's systems and
> structure, <u>the jury could also have concluded that the company acted recklessly or
> with deliberate ignorance</u> of the truth.

*Id.* at 1276 (emphasis supplied).  Based on this holding, the D.C. Circuit upheld the denial of

SAIC's motion for judgment as a matter of law on the issue of knowledge.  *Id.* at 1280.  For that

reason alone, SAIC's motion for summary judgment based on the same argument must be denied

here.  *See, e.g., Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504, 512 (D.C. Cir. 2005)

(summary judgment standard mirrors standard for judgment as a matter of law); *see also U.S. ex

rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 56 (D.D.C. 2007) ("The

summary judgment standard is very close to the reasonable jury directed verdict standard, and

despite their different procedural postures, the inquiry under each is the same: whether the

evidence presents a sufficient disagreement to require submission to a jury or . . . is [instead] so

one-sided that one party must prevail as a matter of law.") (internal citations and quotations

omitted).

Even if the Circuit Court had not already explicitly considered and rejected SAIC's

argument, it would fail.  Applying the standard articulated by the D.C. Circuit and other courts

that have considered this question, there is more than sufficient evidence to demonstrate that

numerous SAIC employees knew about both SAIC's work for the NRC and SAIC's business

relationships in the area of radioactive material release and recycle.  *See*, *supra*, pp. 9-17, 23-26;

*see also* RSMF at ¶¶ 131-214.  Although the standard articulated by the D.C. Circuit does not

explicitly so require, these same employees also understood that SAIC was obligated to avoid

and disclose organizational conflicts of interest.  *See*, e.g., RSMF at ¶¶ 25-26 (Martin), 35

(Rodehau), 51, 157 (McKenzie-Carter), 58-64, 141 (Murray), 145, 147 (Slack), 149 (Rucker),

153 (Gotchy), 154 (Profant), 177 (Bidwell), 195 (Motl).  Therefore, while the D.C. Circuit

believed that the "collective knowledge" instruction given to the jury was impermissibly broad,

the D.C. Circuit also acknowledged that SAIC's liability in this case in no way depends on

"piecing together scraps of 'innocent' knowledge" held by different SAIC officials.  *See U.S. ex*

*rel. Harrison v. Westinghouse Savannah River Corp.*, 352 F.3d 908, 918-19 (4th Cir. 2003) (if an

employee of the defendant knew of both the conflicting relationship and the work for the

government, defendant acted knowingly within the meaning of the act, and no concern is raised

regarding "piecing together scraps of 'innocent' knowledge.").

Specifically, as the Circuit Court noted, "[t]he jury also could have concluded that SAIC

employees knew that either the company or its employees had other relationships that placed

SAIC in a conflicting role that might have biased its judgment."  *SAIC*, 626 F.3d at 1272

(emphasis supplied, internal citation omitted), *see also id.* at 1276 ("We agree that the jury,

relying entirely on evidence of actual knowledge possessed by individual company employees,

could have found that SAIC knowingly submitted false claims and made false statements.")

(emphasis supplied).

In fact, the record is replete with evidence that SAIC individuals personally and actually

knew of each and every one of SAIC's impermissible organizational conflict of interest

relationships and simultaneously knew of SAIC's work for the NRC.  For example, SAIC

employees Jeffrey Slack and Thomas Rucker worked on and knew about both SAIC's work for the NRC, and SAIC's efforts on both the BNFL Oak Ridge Recycle Project and the BJC Dose Assessment Project. *See, supra,* pp. 9-13; RSMF at ¶¶ 142-152, 163-175. Slack further understood that BNFL Oak Ridge Recycle Project activities were taking place pursuant to NRC regulations and NRC standards for release of radioactive material. RSMF at ¶ 143. Rucker and Slack also admitted that they knew that all three projects involved the same technical areas and many of the same considerations. RSMF at ¶¶ 169 (Slack), 175 (Rucker). SAIC's Bidwell also had actual knowledge about SAIC's work for the NRC and SAIC's relationships with BNFL and BJC. RSMF at ¶¶ 176-180. At a minimum, SAIC's Slack, Rucker, Turner, Murray, Gotchy, Profant, and Bidwell simultaneously knew about SAIC's work for the NRC and SAIC's efforts on the BNFL Oak Ridge Recycle Project. RSMF at ¶¶ 58-64, 138-141, 153-154. Both Turner and Murray further understood that SAIC was pursuing additional business opportunities in the area of radioactive material release and recycle, that the BNFL Oak Ridge Recycle Project and future projects they wished to pursue would benefit from an NRC rule permitting release and recycle of radioactive material, and that SAIC was assisting the NRC in coming up with just such a rule. *Id.*, *see also* ¶ 135. Murray even discussed his concerns with Turner, Profant, and Gotchy, that SAIC working simultaneously for BNFL and the NRC in the area of radioactive material release and recycle constituted a potential organizational conflict of interest. RSMF at ¶¶ 58-64, 138-141. Turner was also simultaneously aware of SAIC's relationship with Alaron and on the PHP, and was aware that SAIC's relationship with Alaron was in the area of radioactive material release and recycle, at the same time that he was aware of SAIC's work for the NRC. RSMF at ¶¶ 213-214.

SAIC's Motl was aware of SAIC's work for the NRC in developing a rule that would permit the release and recycle of radioactive material and, at the same time, substantially participated in ARMR, a trade organization that was created for the purpose of advocating for just such a rule because it would financially benefit its members.  RSMF at ¶¶ 184-195.  SAIC's Leatherman both assisted the NRC in developing a release/recycle rule and, at the same time, developed and attempted to commercialize the PHP, a technology that could benefit from the NRC rule, as demonstrated by SAIC's business plans to "follow" the NRC's rulemaking and SAIC's belief that use of the PHP technology would require SAIC to obtain an NRC license.  RSMF at ¶¶ 201-210.  SAIC's McKenzie-Carter had actual knowledge of the PHP and the BJC Dose Assessment Project, while at the same time working extensively for the NRC.  RSMF at ¶¶ 50, 211 (PHP), 181-183 (BJC).  He may have also been actually aware of ARMR and of the BNFL Oak Ridge Recycle Project.  RSMF at ¶¶ 156-160 (BNFL), 196-200 (ARMR).

Not only did these individuals, and others, have actual knowledge about both SAIC's work for the NRC and SAIC's organizational conflict of interest relationships, but, as stated above, each of these individuals understood that SAIC was required to avoid and disclose organizational conflicts of interest.  *See, e.g.,* RSMF at ¶¶ 51, 157 (McKenzie-Carter), 138 (Turner), 58-64, 141 (Murray), 145, 147 (Slack), 149 (Rucker), 153 (Gotchy), 154 (Profant), 177 (Bidwell), 195 (Motl).  In fact, each and every SAIC employee was responsible for and trained on organizational conflict of interest compliance.  RSMF at ¶ 105.

In addition to actual knowledge, as more fully discussed below, the record contains a great deal of evidence from which a jury could find that SAIC employees acted with reckless disregard when they failed to share information they possessed that would have alerted SAIC to potential organizational conflict of interest concerns.  For example, Alex Murray testified that he

informed at least three SAIC managers, including the SAIC individuals most knowledgeable regarding both the BNFL Oak Ridge Recycle Project and the NRC Contract, of his concerns that SAIC's simultaneous work on these two projects could constitute an organizational conflict of interest.  RSMF at ¶¶ 58-64, 138-141, 153-54.  These concerns were apparently never escalated to the SAIC contract managers responsible for SAIC's NRC Contract, as they should have been even according to SAIC's own OCI policy.  RSMF at ¶¶ 58-64, 138-141, 153-54, 219.  In addition to the individual actual knowledge on the part of Murray and the three supervisors to whom he raised these concerns, a jury could conclude by failing to appropriately escalate and resolve these concerns as SAIC's own OCI policy required, each of these individuals acted with deliberate ignorance or reckless indifference.  Additionally, SAIC's Slack and Rucker testified that they understood the many similarities between the BNFL Oak Ridge Recycle project, the BJC Dose Assessment Project, and SAIC's work for the NRC.  RSMF at ¶¶ 163, 169, 170, 175.  Both of these individuals understood their obligation to report potential organizational conflicts of interest, and Rucker further understood that a potential organizational conflict of interest existed whenever SAIC assisted a government agency in a given technical area, while, at the same time, SAIC assisted any other entity in the same technical area.  RSMF at ¶¶ 145, 148, 169-170, 175.  However, neither Slack nor Rucker ever relayed any concerns to McKenzie-Carter, with whom they were in contact on the NRC Contract.[1]  In addition, McKenzie-Carter claims not to have been aware of ARMR or Motl's role in that organization.  However, as the project manager on the 1999 NRC contract for which Motl was proposed, McKenzie-Carter only had to

---

[1]       Both Slack and Rucker now claim that they failed to escalate or disclose SAIC's organizational conflict of interest because they believed that SAIC's conflicting work was performed for contractors of the Department of Energy, an entity not regulated by the NRC, and therefore they did not believe such would could pose a conflict with respect to SAIC's work for the NRC.  *See* RSMF at ¶¶ 169, 175.  This view, however, is flatly contradicted both by the organizational conflict of interest regulations themselves and by SAIC's own training materials.  SAIC has failed to produce a shred of documentary evidence in support of this supposed "DOE exception" to its organizational conflict of interest obligations, and a jury could well conclude that any such belief on the part of SAIC employees was unreasonable and therefore reckless, giving rise to False Claims Act liability.

glance at Motl's resume or have a brief conversation with Motl, his key person on one of the three tasks on the NRC Contract, to learn what ARMR was and of Motl's ongoing role in that organization.  RSMF at ¶¶ 196-200.  Unfortunately, as both Murray and Motl testified, it was common for SAIC personnel to be proposed on contracts without even their knowledge, just as it was common for SAIC personnel to have their resume altered and submitted on a proposal without their knowledge or communication with the employee in question.  RSMF at ¶ 199.  Out of many resumes for Motl that SAIC produced during this litigation, only the resume supplied to the NRC as part of SAIC's proposal on the 1999 NRC Contract omits Motl's then-ongoing participation in ARMR.  RSMF at ¶ 198.  These facts could easily support a jury finding of deliberate indifference or reckless disregard with respect to ARMR.

> 2.   SAIC's Argument Misinterprets the Standard Articulated By the
>       D.C. Circuit and Posits an Improperly Narrow Knowledge Standard

SAIC posits that, in order to prevail, the United States "must identify a specific SAIC employee who, at the time SAIC was submitting allegedly false claims, (1) knew, or was recklessly unaware, that SAIC was violating its conflict-of-interest obligations, and (2) knew, or was recklessly unaware, that compliance with those obligations was material to the Government's decision to pay SAIC's claims."  Def. Mem. at 15.  SAIC's articulated standard finds no support either in the D.C. Circuit's opinion or the case law, is contrary to the plain language and legislative history of the False Claims Act, and would encourage and reward corporations for engaging in exactly the type of activity that the False Claims Act was designed to prevent.[2]

Contrary to SAIC's argument, at no point does the D.C. Circuit's opinion articulate the

---

[2]      As discussed below, SAIC is incorrect regarding both the applicable standard and the relevant facts.  In fact, multiple individual SAIC employees did know about SAIC's work for the NRC, and SAIC's improper business relationships, and that SAIC's organizational conflict of interest obligations were material to the NRC, as found by both this Court and the D.C. Circuit.

standard posited by SAIC.  Nothing in the Circuit Court's opinion suggests, in order for SAIC to be liable under the False Claims Act, that an individual SAIC employee must have had knowledge both that SAIC was in violation of SAIC's organizational conflict of interest requirements and that the same employee must simultaneously have knowledge that SAIC's organizational conflict of interest requirements were material to the NRC's payment decision. Regarding materiality, the Circuit Court held that, in order to be held liable under an implied certification theory, <u>SAIC</u> must have known that its organizational conflict of interest requirements were material, which, unquestionably, it did.  *SAIC*, 626 F. 3d at 1271; *SAIC*, 653 F. Supp. 2d at 103.   Rather, the Circuit Court's objection to this Court's collective knowledge instruction was that it "allowed the jury to find that SAIC knowingly submitted false claims for payment even if the jury also concluded "that no individual at SAIC was simultaneously aware (or was recklessly unaware) of the company's NRC contract and its relationships with other companies involved in the recycling of radioactive materials[.]"  *SAIC*, 626 F. 3d at 1275.  This is precisely the standard that the United States addresses above, in demonstrating that numerous individual SAIC employees had actual knowledge of, and/or recklessly disregarded, both SAIC's NRC contracts and SAIC's relationships with private companies involved in release and recycle of radioactive materials.

Indeed, the Circuit Court cited approvingly to *U.S. ex rel. Harrison v. Westinghouse Savannah River Company*, a case in which the Fourth Circuit explicitly refused to adopt a standard less onerous than the one sought by SAIC here on the basis that adopting a "single actor" theory of knowledge in FCA cases would allow corporations to "immuniz[e] themselves against FCA liability."  352 F.3d 908, 919 (4th Cir. 2003).  In *Harrison*, the defendant argued that in order to impose FCA liability, an individual employee of the defendant would have to

both know of the organizational conflict of interest and also know that the defendant "was required to and did submit the false no-OCI certification to the DOE." *Id.* at 918.  The Fourth Circuit rejected this argument, holding that the appropriate standard for knowledge was whether an individual employee of the defendant knew of both the proposal for the government contract and also the facts underlying the organizational conflict of interest.  *Id.* at 918-919 (affirming instruction that in order to impose liability, the jury had to find "that at least one individual employee of [the defendant] knew" of proposed work for the government and also "knew of facts which would have required disclosure of an organizational conflict of interest[.]").  This is precisely the same standard articulated by the D.C. Circuit and fully addressed above.  As the D.C. Circuit has already found, and as discussed above, the evidence easily satisfies this standard.

In fact, the standard SAIC seeks goes far beyond the standard flatly rejected as overly narrow in *Harrison*.  SAIC seeks to impose a requirement that, in order to demonstrate knowledge, not only must one particular SAIC employee know of SAIC's work for the NRC, and that SAIC had an impermissible conflict of interest, but SAIC seeks to impose even an additional requirement – that the same SAIC employee must have explicitly acknowledged that those obligations were "material" to the government's payment decision.[3]  As the Fourth Circuit held in *Harrison*, a "single actor" rule would enable corporations to segregate roles in order to immunize themselves from FCA liability.  *Harrison*, 352 F.3d at 919; *see also United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987), cert. denied, 484 U.S. 943 (1987).  As the Fourth Circuit explained in *Harrison*, if one individual knew of both the government contract

---

[3]      Although the standard articulated by SAIC suggests that reckless disregard or deliberate ignorance with respect to the materiality of SAIC's OCI obligations might be sufficient for liability, nowhere does SAIC address these states of mind with respect to individual employees, much less demonstrate their absence.  Indeed, SAIC's argument appears to assume that if SAIC employees did not explicitly use the word "material" in their testimony, this insulates them from liability.  *See, e.g.,* RSMF at ¶ 35.

and the conflicting relationship, that was sufficient for liability and no concerns about "piecing together 'innocent' scraps of knowledge" were present notwithstanding that the individual in question might not also know additional details about the agency's organizational conflict of interest requirements. *Harrison*, 352 F.3d at 918-19.

SAIC's concerns here are similarly misplaced. The evidence demonstrates that multiple individual SAIC employees: (1) knew about SAIC's work for the NRC; (2) knew about SAIC's situations and relationships; and (3) understood that they had an obligation to avoid and disclose potential organizational conflicts of interest to their customers. Surely no more is required to demonstrate SAIC's knowledge under the False Claims Act, and the D.C. Circuit required no more. In contrast, SAIC's posited standard would allow corporations to escape liability by compartmentalizing information and establishing segregated organizations that do not share relevant information, or by not training its employees of the importance of recognizing and escalating conflicts. The evidence in this case is that SAIC did compartmentalize and fail to communicate, and SAIC should not be able to benefit from it, particularly when each and every SAIC employee understood his or her obligation to ensure freedom from potential organizational conflicts of interest. RSMF at ¶ 58-64, 105, 139-141.

Indeed, SAIC has not pointed to a single case in support of its assertion that, in order to demonstrate a corporation's knowledge under the FCA, the United States must demonstrate that one "single actor" knew all facts underlying the defendant's liability under the FCA. In fact, this "single actor" theory has uniformly been rejected, and it was not adopted by the D.C. Circuit's opinion in this case. *See, e.g., Harrison*, 352 F. 3d at 919; see *also Miller v. Holzmann*, 563 F. Supp. 2d 54, 100-101 (*rev'd* on other grounds, 608 F. 3d 871).[4] To demonstrate the requisite

---

[4]     At the very least, a factfinder should be permitted to determine that SAIC knowingly submitted false claims based on the cumulative knowledge of SAIC employees who, working together, carried out the fraud. *See, e.g.,*

scienter based on knowledge of individual SAIC employees under the standard articulated by the

D.C. Circuit, it is sufficient for the United States to demonstrate that individual employees knew,

or were recklessly unaware, of the basic facts giving rise to FCA liability.

> 3. Even Under the Standard Articulated by SAIC, SAIC's Motion Fails Because Multiple Individual SAIC Employees Knew of Both SAIC's Conflicting Work and the Materiality of SAIC's Organizational Conflict of Interest Requirements

SAIC posits that in order for SAIC to be liable under the False Claims Act, the United

States must identify a "specific SAIC employee who, at the time SAIC was allegedly submitting

false claims, (1) knew, or was recklessly unaware, that SAIC was violating its conflict-of-interest

obligations and (2) knew, or was recklessly unaware, that compliance with those obligations was

material to the Government's decision to pay SAIC's vouchers." Def. Mem. at 15. As stated

above, SAIC's argument misstates the standard articulated by the Circuit Court, which did not

contain a "single actor" requirement and, in fact, cited approvingly to cases that rejected such a

requirement. However, even under the standard SAIC articulates, its argument must fail. The

evidence is clear that, for each of SAIC's improper and undisclosed relationships, multiple SAIC

employees knew of both SAIC's concurrent work for the NRC and for private companies

seeking to profit from the release and recycle of radioactive material, and also knew that

compliance with SAIC's organizational conflict of interest obligations was material to the NRC.

*See, supra,* pp. 7-17, 23-26; *see* RSMF at ¶¶ 131-214.

As demonstrated above, individual SAIC employees knew of both SAIC's efforts for the

NRC and SAIC's work for private companies in the area of radioactive material release and

---

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F. 3d 200, 208 (5th Cir. 2009) (in securities fraud case, looking to state of mind of corporate officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion or the like)"); *see also Staub v. Proctor Hosp.*, No. 09-400, slip op. 6-8 (S. Ct. Mar. 1, 2011) (recognizing, in context of employment discrimination action, that the employer's "authority to reward, punish, or dismiss is often allocated among ultimate agents," and rejecting the argument that the employer is not liable unless the final decisionmaker is motivated by discriminatory animus).

recycle for each and every one of SAIC's organizational conflict of interest relationships.  These same employees also had actual knowledge, and certainly knowledge within the definition of the False Claims Act, that SAIC's obligation to avoid and disclose potential organizational conflicts of interest was of great importance.  RSMF at ¶¶ 25-26, 35, 51, 58-64, 141, 145, 147, 149, 153-154, 157, 177, 195.  For example, Steve Turner testified that he and other SAIC took organizational conflict of interest compliance very seriously and that he fully understood that compliance with SAIC's organizational conflicts of interest obligations was very important.  RSMF at ¶ 138.  Turner simultaneously knew of SAIC's work for the NRC and of SAIC's efforts on the BNFL Oak Ridge Recycle Project, SAIC's efforts on the Plasma Hearth Process, and SAIC's planned work on the Alaron Recycle Project.  RSMF at ¶¶ 131-138, 213-214.  Alex Murray also testified that he fully understood the importance of compliance with SAIC's organizational conflict of interest obligations. RSMF at ¶¶ 139-141.  Murray not only simultaneously knew of SAIC's work for the NRC and SAIC's efforts on the BNFL Oak Ridge Recycle Project, but he was so concerned about the potential for an organizational conflict of interest with respect to SAIC's dual roles that he raised his concerns with Turner and others, including the project manager for the 1992 NRC Contract.  *Id.*

Similarly, Mike McKenzie-Carter testified that he understood that SAIC had a very important obligation to avoid and disclose potential organizational conflicts of interest to the NRC.  RSMF at ¶¶ 51, 157.  McKenzie-Carter had knowledge of SAIC's work for the NRC and SAIC's concurrent work on the BJC Dose Assessment Project, SAIC's work on the BNFL Oak Ridge Recycle Project, and SAIC's relationship with ARMR.  RSMF at ¶¶ 156-160 (BNFL Oak Ridge Recycle Project), at ¶¶ 181-183 (BJC Dose Assessment Project), at ¶¶ 196-200 (ARMR).  Both Jeffrey Slack and Thomas Rucker also understood that SAIC was obligated to avoid and

disclose potential organizational conflicts of interest to the NRC.  RSMF at ¶¶ 145, 149.  They understood that a potential organizational conflict of interest arose whenever SAIC was assisting a government agency in a technical area and simultaneously assisting any other entity in the same technical area.  *Id.*  Slack and Rucker had knowledge of SAIC's work for the NRC and also SAIC's work on the BJC Dose Assessment Project and the BNFL Oak Ridge Recycle Project.  RSMF at ¶¶ 142-152 (BNFL Oak Ridge Recycle Project), at ¶¶ 163-175 (BJC Dose Assessment Project).  Additionally, as discussed at length above, other SAIC employees had simultaneous knowledge of SAIC's work for the NRC, SAIC's conflicting work, and SAIC's obligation to avoid and disclosure potential OCIs to its customers, including the NRC.

It is well settled that information is material under the False Claims Act whenever it has a tendency to influence, or is capable of influencing, agency decision-making.  *See, e.g., U.S. ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 118 (D.D.C. 2007); *see also U.S. ex rel. Longhi v. Lithium Pwr. Tech.*, 575 F. 3d 458, 468-69 (5th Cir. 2009); *U.S. ex rel. Sanders v. North American Bus Industries, Inc.*, 546 F.3d 288, 297 (4th Cir. 2008); *Bourseau*, 531 F.3d at 1171; *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1200 (10th Cir. 2006).  Materiality is established whenever a statement has the potential to influence an agency decision and does not require that the agency actually relied on the statement in paying claims submitted by the defendant.  *See Longhi*, 575 F. 3d at 468-69.

Indeed, the evidence at trial was clear that each and every SAIC employee was responsible for organizational conflict of interest compliance.  RSMF at ¶ 105.  Each SAIC employee was trained on how to recognize potential organizational conflicts of interest and on the need to appropriately escalate such situations.  RSMF at ¶¶ 65-70.  This training included training that failure to abide by SAIC's organizational conflict of interest obligations with

respect to its government customers could lead to loss of business, ineligibility to perform government contracts, and monetary damages and penalties.  RSMF at ¶ 67.  The training also included training regarding the need to avoid and disclose exactly the types of relationships at issue in this case.  RSMF at ¶ 219.  Indeed, SAIC itself highlights its efforts to ensure that SAIC employees were made aware of the importance of avoiding and disclosing potential organizational conflicts of interests.  *See* Def. Mem. at 35-36; RSMF at ¶¶ 67-70.  SAIC cannot simultaneously claim that in spite of these efforts, that SAIC or its employees could have reasonably believed that OCI compliance had absolutely no import or ability to influence the government's payment decisions.  In light of the facts, there can be no doubt that these employees knew, or should have known, that compliance with SAIC's organizational conflicts of interest obligations was material as, indeed, both this Court and the Circuit Court have already concluded.  *SAIC*, 626 F. 3d at 1271; *SAIC*, 653 F.Supp.2d at 103.

Ultimately, SAIC's argument amounts to a combination of misstating the applicable standard and cherry-picking a small number of SAIC employees who testified at trial, studiously ignoring many of the SAIC employees who were most knowledgeable regarding SAIC's OCI relationships and also simultaneously aware of SAIC's efforts for the NRC.  Many of the employees cherry-picked by SAIC were not even called by the government at trial, and many have little or no relation to SAIC's organizational conflict of interest relationships.  In doing so, SAIC ignores the large number of SAIC employees who knew of: (1) SAIC's work for the NRC; (2) SAIC's organizational conflicts of interest relationships; and, although the standard articulated by the D.C. Circuit does not require it, (3) that SAIC had an important obligation to avoid and disclose organizational conflicts of interest.  This more than satisfies the government's obligation to demonstrate that individual SAIC employees had actionable scienter under the

False Claims Act, and summary judgment on that question is therefore inappropriate as, indeed, both the D.C. Circuit and this Court have already concluded.  *See, e.g., SAIC*, 653 F.Supp.2d at 111 ("There was significant evidence supporting the jury's finding that SAIC either discovered actual conflicts during its performance or had reason to believe its work for others created a potential conflict, and by failing to disclose the actual or potential conflicts, SAIC knowingly submitted false claims with respect to its OCI obligations.").

### III.      SAIC Acted With Reckless Disregard And/Or Deliberate Ignorance

The Circuit Court opinion in no way changed the legal standard for either reckless disregard or deliberate ignorance.  SAIC's arguments on these two points simply rehash arguments it has already put forth to this Court and to the Circuit Court — arguments that have already been rejected.  SAIC argues that "the absence of evidence of intentional compartmentalization," coupled with the existence of a compliance system, means that a reasonable jury could not find that SAIC acted with reckless disregard for the truth or falsity of the claims for payment that it submitted to the NRC.  Def. Mem at 30.  SAIC, however, ignores the fact that both this Court and the D.C. Circuit have already concluded that the evidence fully supports a finding of reckless disregard or deliberate ignorance.  *SAIC*, 653 F. Supp. 2d at 87, 99 ("Accordingly, there was sufficient evidence to support a jury's finding that SAIC acted with reckless disregard or deliberate ignorance."); *SAIC*, 626 F.3d at 1276 ("Alternatively, relying on evidence regarding the actions of employees or SAIC's systems and structure, the jury could have concluded that the company acted recklessly or with deliberate ignorance of the truth.").

SAIC claims that its compliance routing system was "state-of-the-art", but this Court previously found this system to be "inadequate," and this system did not capture the various relationships that the jury found to be conflicted with the work SAIC was doing for the NRC.

*See* Judgment (Doc. 151); *see also SAIC*, 653 F. Supp. 2d at 99 (SAIC witnesses testified that SAIC's "OCI compliance system was inadequate in certain important respects, including by failing to incorporate some of SAIC's business relationships[.]").

SAIC's OCI compliance system only applied to contracts that SAIC was bidding on, not teaming agreements.  RSMF at ¶¶ 53, 71, 75-76, 82, 83-84, 218.  SAIC's system failed to account for teaming agreements even though it fully understood that such relationships could constitute an organizational conflict of interest.  *Id.*  For teaming agreements, such as the teaming agreement between SAIC and BNFL, SAIC's Ms. Carder merely testified that a business unit "<u>might</u>" notify another business unit of a teaming agreement not to avoid an OCI but for business development purposes.  RSMF at ¶¶ 83-84 (emphasis added).  SAIC's OCI routing system also completed ignored affiliations with associations such as ARMR, patent interests such as the PHP, or planned interests such as the PHP and Alaron, even though SAIC knew that such relationships could constitute organizational conflicts of interest.  RSMF at ¶¶ 71, 76, 78, 218.

Further, the system relied upon employees accurately describing the work and using the proper "key words."  RSMF at ¶ 217.  The entries for the BNFL project did not include either "recycling," "decontamination and decommissioning," or "radiation," despite the fact that these very terms appear in the very title of the BNFL Oak Ridge Recycle Project and despite the fact that recycle and release of radioactive material was the very purpose of the BNFL project. RSMF at ¶¶ 78, 87, 217.  Finally, there was no way for the person who sent out the OCI routing to know whether a recipient reviewed that routing—and therefore whether an OCI existed. RSMF at ¶¶ 78, 85, 216.

Indeed, this Court has already determined that record evidence supports a finding that SAIC acted recklessly and with deliberate ignorance due to significant inadequacies in its OCI

Compliance system.  SAIC, 653 F. Supp. 2d at 99 ("While SAIC maintains that its OCI compliance system was both reasonable and effective, and that it made a diligent inquiry to ensure compliance, there was also testimony provided by at least two witnesses, Sandra Carder and Betty Bidwell, who testified that SAIC's OCI compliance system was inadequate in certain important respects, including by failing to incorporate some of SAIC's business relationships, by containing incomplete descriptions of SAIC's work, and by failing to associate relevant key words with certain descriptions. (Carder Test., 7/22 a.m. Tr. 66:18–69:11, 78:13–21; Bidwell Test., 7/16 a.m. Tr. 76:14–77:9.) . . . Accordingly, there was sufficient evidence to support a jury's finding that SAIC acted with reckless disregard or deliberate ignorance.").

Moreover, the evidence is clear that the two individuals actually responsible for making SAIC's OCI certifications on behalf of SAIC acted without critical knowledge about SAIC's relationships with commercial entities in the areas of radioactive material release and recycle. *SAIC*, 653 F. Supp. 2d at 99 ("witness John Pierce Martin testified that he made representations to the government about SAIC's OCIs without having seen documents the jury could have deemed relevant to their assessment of SAIC's OCIs"); RSMF at ¶¶ 21-24, 32, 220.  The evidence at trial was that SAIC's structure prevented the sharing of information that would make organizational conflicts of interest known and that communication between different SAIC organizations was "very, very poor," even to the extent that one organization might not know that another SAIC organization was working in the same technical area or on a similar matter. RSMF at ¶ 59, 64.  As the Circuit Court noted, this compartmentalization of knowledge is precisely what Congress had in mind when it defined knowledge under the False Claims Act to include reckless disregard and deliberate ignorance.  *SAIC,* 626 F. 3d at 1275-76.  Particularly given the multitude of other SAIC employees who knew that SAIC had potential organizational

conflicts of interest, a jury could reasonably conclude that SAIC's utter failure to share that information with the two individuals actually responsible for making OCI certifications amounted to deliberate ignorance or reckless disregard.

Accordingly, as both this Court and the Circuit Court have already concluded, all of this evidence, taken together with the failure of SAIC's routing system to identify the relationships that the jury necessarily determined to be organizational conflicts of interest, is more than sufficient to create a genuine issue of material fact as to whether SAIC acted with reckless disregard or deliberate ignorance, even without regard to the state of mind of SAIC's individual employees.

## CONCLUSION

SAIC seeks to avoid having a jury once again conclude that its fraudulent behavior entitles the United States to millions of dollars in FCA damages and penalties. In doing so, SAIC studiously ignores both the applicable law and the reams of evidence demonstrating that it acted with the requisite knowledge under the FCA. For the reasons set forth above, SAIC's motion is without basis and should be denied in its entirety.

Respectfully Submitted,

TONY WEST
ASSISTANT ATTORNEY GENERAL


*/s/ Daniel Hugo Fruchter*
JOYCE R. BRANDA
PATRICIA DAVIS
DONALD J. WILLIAMSON
DANIEL HUGO FRUCHTER
PATRICIA M. FITZGERALD
Attorneys
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 305-2035

Attorneys for Plaintiff United States of America


Dated: August 8, 2011


## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of August, 2011, I caused a true copy of the foregoing **PLAINTIFF UNITED STATES OF AMERICA'S MEMORANDUM IN OPPOSITION TO DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON FALSE CLAIMS ACT LIABILITY**, as well as the **UNITED STATES' RESPONSIVE STATEMENT OF GENUINE ISSUES AND MATERIAL FACTS** in support thereof to be served via the Court's electronic filing system to:

Andrew Santo Tullumelo
David Penn Burns

Counsel for SAIC


*/s/ Daniel Hugo Fruchter*
Daniel Hugo Fruchter

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )   Case No.: 04-CV-1543 (RWR)
                                        )
SCIENCE APPLICATIONS                    )
INTERNATIONAL CORPORATION,              )
                                        )
                    Defendant.          )
_____       )

**UNITED STATES' RESPONSIVE STATEMENT
OF GENUINE ISSUES AND MATERIAL FACTS IN SUPPORT OF
ITS MEMORANDUM IN OPPOSITION TO SAIC'S MOTON FOR
<u>SUMMARY JUDGMENT ON FALSE CLAIMS ACT LIABILITY</u>**

The United States of America ("United States" or "Government") hereby submits this statement of genuine issues setting forth all material facts, pursuant to Fed. R. Civ. P. 56 and LCvR 7(h).

**I.      RESPONSE TO SCIENCE APPLICATIONS INTERNATIONAL
         CORPORATION'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

<u>The Contracts Between The NRC And SAIC</u>

**1.      The Nuclear Regulatory Commission ("NRC") is the federal agency that regulates civilian
         uses of nuclear power. Am. Compl. ¶ 8. The U.S. Department of Energy ("DOE"), in
         contrast, operates the Government's atomic research and weapons facilities. DX 800, at 39
         (Exh. 1).**

Response:      Partially disputed.  It is undisputed that the NRC is the federal agency tasked with

regulating civilian use of nuclear power.  It is disputed, however, that the DOE is the only, or even the

primary, entity that operates government atomic research facilities.  In fact, many atomic research

facilities in the United States are operated by federal agencies other than DOE, as well as by public

universities.  *See, e.g., http://nrc.gov/reading-rm/doc-collections/fact-sheets/research-reactors-bg.html.*

1

2.     **Among its other responsibilities, the NRC regulates the disposition of radioactive materials from NRC-licensed facilities. Since 1954, the NRC has prohibited the release of such materials into interstate commerce without an NRC license. Am. Compl. ¶ 10.**

Response:     Undisputed.  This includes release or recycle of radioactive materials into interstate commerce from DOE facilities.  *See, e.g.,* Truitt Testimony, Exhibit 10 to the United States' Statement of Undisputed Material Facts in Support of the United States' Motion for Partial Summary Judgment[1] ("US SMF") (Doc. 195), 7/10 pm Tr. 21:7-22:1 ("any radiological material that went off-site would be subject to NRC once it left the DOE fence"). Turner Testimony, US SMF Exhibit 11, 7/8 p.m. Tr. 39-40, 7/8 a.m. Tr. 66-67; Caldwell Testimony, US SMF Exhibit 12, 7/9 p.m. Tr. 80:11-83:6 (material from the BNFL project that left the DOE site would be subject to compliance with NRC regulations and requirements); Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 90-91 (recycle or release from DOE site into general commerce is activity regulated by the NRC).

3.     **Beginning in the mid-1980s, the NRC sought to alter its case-by-case licensing approach by establishing standards of contamination that are below the level of "regulatory concern," which would have permitted certain slightly radioactive materials to be released from NRC facilities without a license. Am. Compl. ¶ 11. In 1992, however, Congress "ordered the effort halted . . . due to inadequate technical support." Id.**

Response:     Undisputed.

4.     **In response, the NRC set out "to gather the technical support . . . to develop scientifically based standards for the free release of radioactive materials." Am. Compl. ¶ 12. As part of this effort, the NRC contracted with SAIC in 1992 to obtain SAIC's assistance in creating a calculational model relating to the potential reuse of radioactive materials  (hereinafter "1992 Contract"). Under the 1992 Contract, SAIC performed a variety of tasks, including preparing a draft report on "risk assessment scenarios," reviewing relevant literature, and developing and identifying adequate "technical bases upon which to support  NRC regulations in this area." Id. ¶¶ 14-17.**

Response:     Partially disputed.  It is undisputed that the NRC contracted with SAIC to provide broad-based technical support for a regulation in the area of release and recycle of radioactive material

---

[1]     In order to avoid duplicative uploading of exhibits, this Responsive Statement of Material Facts references Exhibits to the United States' Statement of Undisputed Material Facts in Support of the United States' Motion for Partial Summary Judgment ("US SMF") (Doc. 195) where possible.

from nuclear facilities.  However, only one of the tasks SAIC was contracted to perform was to create a

"dose assessment," or a model that would calculate the amount of radiation that a person would be

expected to sustain given release of specified quantity and type of radioactive material.  The other tasks

required SAIC to prepare papers outlining various regulatory options as well as the costs and benefits of

each option, various issues and concerns held by various stakeholders, including, but not limited to, the

radioactive metal recycling industry.  Cardile Testimony, US SMF Exh. 1, 7/2 a.m. Tr. 6:19-17:2; Meck

Testimony, US SMF Exh. 7, 7/3 a.m. Tr. 89:4-89:15; Jupiter Testimony, US SMF Exh. 8, 7/22 p.m. Tr.

27-34.

5.     **The 1992 Contract included conflict-of-interest provisions to ensure that SAIC was "not placed in a conflicting role because of current or planned interests (financial, contractual, organizational, or otherwise) which relate to the work under th[e] contract[s]." PX 8, at 138174 (Exh. 2).  These provisions required SAIC to "forego entering into consulting or other contractual arrangements with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under [the] contract" and mandated that if SAIC "has reason to believe with respect to itself or any employee that any proposed consultant or other contractual arrangement with any firm or organization may involve a potential conflict of interest, [SAIC] shall obtain the written approval of the Contracting Officer prior to execution of such contractual arrangement." Id. at 138175.  SAIC also warranted that "it does not have any organizational conflicts of interest as defined in 41 CFR 20-1.5402(a)," and agreed that "if after award, [SAIC] discovers organizational conflicts of interest with respect to this contract, it shall make an immediate and full disclosure in writing to the Contracting Officer."  Id.  In addition, SAIC "represent[ed] to the best of [its] knowledge and belief" that the award of the contract did "not . . . involve situations or relationships of the type set forth in 20-1.5403(b)." Id. at 138203.**

Response:        Undisputed.  It is undisputed that in order to obtain and keep its NRC contracts,

SAIC was required to represent to the NRC that it did not have any of the types of "situations or

relationships" outlined in the NRC regulations, to avoid such relationships during the existence of the

NRC contracts, and to disclose any such relationships should they arise.  *SAIC*, 626 F. 3d at 1262; 41

C.F.R. § 20-1.54 (1979) ("It is the policy of the U.S. Nuclear Regulatory Commission (NRC) to avoid,

eliminate or neutralize contractor organizational conflicts of interest.  The NRC achieves this objective

by requiring all prospective contractors to submit information describing relationships, if any, with organizations or persons (including those regulated by the NRC) which may give rise to actual or potential conflicts of interest in the event of contract award."); 48 C.F.R. § 2009.570-3; Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 44:25-46:10 (SAIC was obligated to avoid relationships that could give rise to an OCI, to disclose any such relationships, and to certify to the absence of any such relationships).

**6.      In 1997, SAIC delivered a technical report known as draft NUREG-1640 to the NRC. Am. Compl. ¶ 16.**

Response:      It is undisputed that in 1997, SAIC delivered a technical report known as draft NUREG-1640 to the NRC.  It is disputed, however, that this report somehow represented the culmination or totality of the work that SAIC was performing for the NRC.  Pursuant to its two NRC contracts, SAIC continued to seek and receive payment for the work it was performing for the NRC, including work related to the dose assessment task as well as for other tasks under the 1992 and 1999 NRC Contracts.  *See, e.g.,* Jupiter Testimony, US SMF Exh. 8, 7/22 p.m. Tr. 27-34; Meck Testimony, US SMF Exh. 7, 7/3 a.m. 102:2-103:12; McKenzie-Carter Testimony, US SMF Exh. 4, 7/17 p.m. Tr. 16:25-17:8; Motl Testimony, US SMF Exh. 13, 7/23 a.m. 21:20-23:5, 45:1-46:14.

**7.      SAIC submitted 46 claims for payment to the NRC prior to June 1996. See PX 955 (Exh. 4).**

Response:      Undisputed.  Each of these claims implicitly certified compliance with SAIC organizational conflict of interest obligations, and that the NRC relied on this certification in making payment to SAIC.  *See, e.g., United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1270-1272 (D.C. Cir. 2009).

**8.      SAIC submitted 40 claims for payment to the NRC after June 1996. See PX 955 (Exh. 4).**

Response:      Undisputed.  See Response to #7.

9.      Although SAIC had completed its work under the 1992 Contract, the NRC still required
additional technical assistance for its contemplated rulemaking. As a result, in August
1999, the NRC entered into a follow-on contract (hereinafter "1999 Contract") with SAIC
under which SAIC was to provide additional "technical assistance . . . to support NRC
clearance rulemaking." Am. Compl. ¶ 20.

Response:      Partially disputed.  SAIC did not "complete" its work under the 1992 Contract.  In

fact, the 1992 Contract set out five discrete tasks, many of which SAIC had not completed, or even

begun, by the time the 1992 Contract was set to expire.   It is undisputed, however, that in August 1999,

the NRC and SAIC entered into a follow-on contract under which SAIC was to provide additional

technical assistance to support the NRC's rulemaking efforts in the area of release and recycle of

radioactive material from nuclear facilities.   Meck Testimony, US SMF Exh. 7, 7/3 a.m. Tr. 96:13-97:2,

100:17-103:12; McKenzie-Carter Testimony, US SMF Exh. 4, 7/17 p.m. Tr. 16:25-17:8; Motl

Testimony, US SMF Exh. 13, 7/23 a.m. 21:20-23:5, 45:1-46:14.  It is further undisputed that SAIC's

proposal for the 1999 NRC Contract contained a representation that any NRC regulation would

necessarily impact release and recycle from DOE facilities and for that reason, SAIC proposed to be

paid for studying the inventory and impacts of release from DOE facilities.  McKenzie-Carter

Testimony, attached hereto as Exhibit 2, 7/17 p.m. Tr. 55:18-58:23; Mauro Testimony, US SMF Exh. 2,

7/21 a.m. Tr. 117-119.  SAIC's representation in its technical proposal for the 1999 NRC Contract

demonstrates that SAIC's work in the area of release and recycle of radioactive material could have

biased SAIC's work for the NRC, notwithstanding SAIC's argument that its other work was in support

of DOE contractors.

10.     In November 1999, a representative of the Paper, Allied-Industrial, Chemical and Energy
Workers union ("PACE")—who later testified that he lacked knowledge of the details of
SAIC's work—alleged at a public NRC meeting that SAIC had conflicts of interest with
respect to its work for the NRC. See Am. Compl. ¶ 90; Guttman Test., 7/14 a.m. Tr. 34
(Exh. 5). PACE took the position that, because of the alleged conflicts, the NRC should
discard the work SAIC had performed under the 1992 Contract. Thadani Test., 7/21 a.m.
Tr. 16 (Exh. 6).

Response:       Partially disputed.  It is undisputed that in November 1999, a representative of PACE stated at an NRC public meeting that any NRC rulemaking effort in release and recycle could not be relied upon because SAIC, NRC's technical basis contractor, was also a partner and a team member in the largest radioactive metal recycling project in the United States (the "BNFL Oak Ridge Recycling Project"), and that BNFL, SAIC's teaming partner in that effort, stood to profit from the outcome of that project.  Cardile Testimony, US SMF Exh. 1, 7/2 a.m. Tr. 43:16-46:21; Meck Testimony, US SMF Exh. 7, 7/3 a.m. Tr. 108:11-108:22, 7/3 p.m. Tr. 4:21-5:17.  It is further undisputed that until November 1999, the NRC was completely unaware of SAIC's prominent role in "completely plann[ing]" and carrying out this large-scale radioactive metal recycling project, even though SAIC was contractually obligated to avoid and disclose any relationships that could cause actual or potential organizational conflicts of interest, and even though SAIC had, only months before, certified to the NRC that it had no such relationships.  *Id.*; *see also* PX 521, US SMF Exh. 29, BNFL Project Description; Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 41:11-44:9. (SAIC "completely planned" the BNFL Oak Ridge Recycle Project).

**11.      After the NRC and SAIC exchanged additional information, the NRC informed SAIC on December 10, 1999, that it believed the company's work in support of DOE created a conflict of interest. Am. Compl. ¶¶ 91-93. As a result, the NRC ordered SAIC to stop work on the 1999 Contract, effective December 17, 1999. See Martin Test., 7/14 p.m. Tr. 4-5 (Exh. 7); PX 809 (Exh. 8).**

Response:       Undisputed.  However, it is disputed that the "additional information" exchanged by SAIC during this process was truthful.  In fact, during this process of providing "additional information," SAIC knowingly made multiple false representations designed to convince the NRC that no conflict of interest existed and to induce the NRC into allowing SAIC to keep its NRC contract.  *See infra*, ¶¶ 120-130.

**12.      In early 2000, the NRC and SAIC agreed to terminate the contract and entered into a no-cost settlement. Martin Test., 7/14 p.m. Tr. 86 (Exh. 7). In this settlement, the NRC**

**required SAIC to forgo payment for an outstanding invoice of $120,672.57 and for additional costs incurred after November 26, 1999, in order to "offset[ ] the approximate $100,000 required for future peer review of NUREG 1640" arising from the alleged conflicts. PX 981, at 10 (Exh. 9).**

Response:        Undisputed.

**13.        When the NRC officially closed out the 1992 Contract, it observed that "[a]ll obligations have been met by the parties." See PX 889 (Exh. 3). SAIC was paid $2,630,000 for its work on the 1992 Contract. Id.**

Response:  It is undisputed that SAIC was paid $2,630,000 for its work on the 1992 NRC

Contract.  It is also undisputed that the NRC's close-out letter contains the referenced statement.

Stephen Pool, the NRC contracting specialist who signed the letter in question, testified that he was

unaware at that time that SAIC's organizational conflicts of interests had extended back even to the

1992 NRC Contract.  Pool Testimony, attached hereto as Exhibit 3, 7/15 a.m. Tr. 42-44.  Mr. Pool

testified that had he known, he would neither have made that statement nor approved SAIC's close-out

payment.  *Id.*

The Alleged Conflicts Of Interest

**14.        In 1997, BNFL, Inc. ("BNFL") entered into a contract with DOE to decommission and decontaminate certain buildings at DOE's facility in Oak Ridge, Tennessee. Am. Compl. ¶¶ 56, 58. This project—which is sometimes referred to as the "DOE Three-Building Project"—was subject to DOE oversight. SAIC was a subcontractor to BNFL on this contract. See Turner Test., 7/8 p.m. Tr. 90 (Exh. 10). SAIC never performed recycling on the BNFL project. Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 11).**

Response:        Disputed.  As more fully discussed below in ¶¶ 131-162, in 1997, BNFL and

DOE entered into a contract for a project to decommission and decontaminate three very large buildings

in Oak Ridge, Tennessee.   SAIC was, and referred to itself as, a teaming partner on this project, which

it stated that it had "completely plan[ned]."  *See, e.g., supra*, ¶ 10.  The Oak Ridge Recycle Project's

scope of work required not only the decontamination and decommissioning of the three buildings, but

the removal and release of all material and equipment therein, as well as the recycle of material to the

7

maximum extent possible to be accomplished by a BNFL subsidiary licensed under NRC regulatory authority and pursuant to NRC regulations.  *SAIC*, 626 F.3d at 1272 ("several employees acknowledged at trial that British Nuclear and MSC intended to sell materials recycled from DOE's Oak Ridge facility and that such contaminated materials would be subject to NRC regulation once released into general commerce."); *U.S. v. SAIC*, 653 F. Supp. 2d 87, 100-101 (D.D.C. 2009) ("SAIC employees testified that BNFL, with whom SAIC entered into an agreement regarding a recycle project for the DOE, was subject to the NRC's regulations concerning disposal of radioactive waste once the waste left DOE facilities and MSC, a subsidiary of BNFL, was NRC-licensed."); Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 95:4-101:11; Slack Testimony, US SMF Exh. 5, 7/9 a.m. Tr. 94:23-104:12. While it is undisputed that the project was subject to DOE oversight, it is also undisputed that the project was subject to the jurisdiction of a number of other regulators, including the State of Tennessee, the Environmental Protection Agency, and the NRC.  With regard to the NRC, SAIC not only understood but explicitly planned that release of material from the project would be accomplished pursuant to NRC regulations and NRC regulatory authority.  *Id; see also* Truitt Testimony, US SMF Exh. 10, 7/10 p.m. Tr. 21:7-22:1 ("any radiological material that went off-site would be subject to NRC once it left the DOE fence"); Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 112:16-115:4 ("[R]ecycling was a key portion [of the BNFL Oak Ridge Recycling Project]"), 7/8 p.m. Tr. 39:21-40:8; 66:16-68:5; Caldwell Testimony, US SMF Exh. 12, 7/9 p.m. Tr. 80:11-83:6 (material from the BNFL project that left the DOE site would be subject to compliance with NRC regulations and requirements); Slack Testimony, US SMF Exh. 5, 7/9 a.m. Tr. 87:1-87:19:9 ("focus" of BNFL project was metals removal and recycle from Oak Ridge), 95:3-104:12 (Work Smart Standards for the BNFL Oak Ridge Recycle Project included NRC regulations and release standards for material leaving the site); Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 29:12-30:18.

While SAIC did not itself recycle any material from the project, it is undisputed that SAIC was intimately involved in planning the project, including the recycle activities.  *Id.*  SAIC's advice and assistance included preparing plans regarding how the project, including the recycle, would be carried out, and the regulatory and release standards that would govern release and recycle from the project. These standards included NRC release standards and regulations.  *Id.*  Additionally, SAIC's advice and assistance included preparing estimates underlying the cost estimates for the project, analyses that counted on recouping considerable economic value from the project by recycling material to the maximum extent possible.  *See, e.g.,* PX 521, US SMF Exh. 29 (SAIC "completely plan[ned]" the project, including the "removal" and "recycle" aspects); PX 572, attached hereto as Exhibit 4; Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 91:8-94:17, 97:7-110:3, 10:13-12:19; Murray Testimony, US SMF Exh. 9, 7/2 p.m. Tr. 59:15-61:14, 70:12-75:8.  PX 176, Cost Estimate, US SMF Exh. 33; Slack Testimony, US SMF Exh. 5, 7/9 a.m. Tr. 81:21-85:18.  Therefore, it is disputed, and disingenuous, to suggest that SAIC had no role in plans to recycle radioactive material from the BNFL project.

 Finally, it is disputed that anyone, other than SAIC during the course of this litigation, has ever referred to this project as the "DOE Three-Building Project."  The actual name of the project, which was used widely by everyone, including SAIC, was the "Oak Ridge K-25 Site 3-Building Decontamination and Decommissioning and Metals Recycling Project." *See, e.g.,* PX 266, US SMF Exh. 34 at 1.

**15.   Manufacturing Sciences Corporation ("MSC"), a wholly-owned subsidiary of BNFL, was a subcontractor to BNFL on BNFL's prime contract with DOE for the Three-Building Project. See Am. Compl. ¶¶ 58-59. There is no evidence that SAIC and MSC had a contractual relationship in connection with this project.**

Response:  Partially disputed.  While no contract between MSC and SAIC existed, MSC was a wholly-owned subsidiary of BNFL and it is undisputed that teaming agreements and contracts between SAIC and BNFL existed for the project.  *See, e.g.,* PX 190 (BNFL-SAIC Teaming Agreement) and PX 204, Memo re: Possible SAIC Services for Teaming Agreement, US SMF  Exhibit 30; Turner

Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 111:18-112:15.   Further, it is undisputed that SAIC provided

advice and assistance to both BNFL and its subsidiary MSC.   *See, e.g., SAIC*, 626 F.3d at 1263; *SAIC*,

653 F. Supp. 2d at 100-101.   SAIC's advice and assistance to MSC came in the form of advice

concerning MSC's decontamination and release processes, dose assessments supporting the Basis for

Interim Operations that allowed MSC to decontaminate and release material from the project, advice and

assistance concerning classification and security issues surrounding radioactive materials, and assistance

in developing the cost estimates that would allow the project to go forward and that allowed the

BNFL/MSC/SAIC team to successfully bid on the project. PX 572, attached hereto as Exhibit 4; Turner

Testimony, US SMF Exh. 11, 7/8 p.m. Tr. 47:1-49:4, 7/8 a.m. Tr. 97:7-110:3, 10:13-12:19; McBride

Testimony, US SMF Exh. 26, 7/10 p.m. Tr. 54:3-63:18, 7/14 p.m. Tr. 93:13-95:22; Murray Testimony,

US SMF Exh. 9, 7/2 p.m. Tr. 66:20-75:8; *see also* Plaintiff's Exhibit 176, Cost Estimate, US SMF Exh.

33.

**16.    In mid-1999, SAIC performed work for Bechtel Jacobs Company ("BJC"), a contractor for DOE facilities in Oak Ridge. Am. Compl. ¶ 82; PX 731, at 1-3 (Exh. 12). SAIC conducted a radiological dose assessment and performed a cost-benefit analysis regarding the recycling of contaminated metal from DOE facilities. See Am. Compl. ¶ 86; Rucker Test., 7/10 a.m. Tr. 88-90 (Exh. 13). The task order stated that this work was performed "per DOE guidelines." PX 731, at 2 (Exh. 12).**

Response:        Partially disputed.  *See, infra,* ¶¶ 163-183.  As more fully discussed below, it is

undisputed that in 1998 and 1999, SAIC provided advice and assistance to BJC by preparing a dose

assessment, inventory analysis, and cost-benefit analysis regarding the release and recycle of radioactive

material from three facilities (the "BJC Dose Assessment Project").  One of these facilities was the Oak

Ridge facility that was the subject of the BNFL Oak Ridge Recycle Project, while the other two facilities

were DOE-owned gaseous diffusion plants that were nonetheless operated by commercial entities

pursuant to NRC licenses. SAIC's work for the NRC under the 1992 and 1999 NRC Contracts included

considerations of release from these other two gaseous diffusion plants.  PX573, US SMF 32, at

10

0134991, 0135011-0135013.  It is disputed that SAIC's work was performed "per DOE guidelines."  In fact, SAIC's analysis for BJC was an assessment of release and recycle under NRC Regulatory Guide 1.86, an NRC release standard that was both a release standard applicable to release of material from the BNFL Oak Ridge Recycle Project and a release standard under consideration by SAIC as part of its work on the 1992 and 1999 NRC Contracts.  *See, infra,* at ¶¶ 163-183; *SAIC*, 653 F. Supp. 2d at 100-101.  SAIC did not disclose its role on the BJC Dose Assessment Project to the NRC until after the NRC learned of SAIC's role on the BNFL Oak Ridge Recycle Project.  *See, infra*, ¶ 123. RSMF When SAIC did disclose this work to the NRC, and the NRC requested further information, SAIC knowingly made numerous false statements to the NRC regarding the BJC Dose Assessment Project in an attempt to keep its NRC Contract.  *See, infra*, ¶¶ 120-130.

**17.     Alaron Corporation bid on a DOE contract for work at a DOE weapons facility in Georgia. See Tempel Test., 7/9 a.m. Tr. 18-20 (Exh. 14). SAIC would have played a supporting role to Alaron on that contract, but Alaron did not win the contract. See id. at 22; Taylor Test., 7/9 a.m. Tr. 64, 66 (Exh. 15). Alaron had a site-specific NRC license for an unrelated facility in Pennsylvania. See Taylor Test., 7/9 a.m. Tr. 65, 67 (Exh. 15).**

Response:     Disputed.  *See infra* at ¶ 214.  It is undisputed that Alaron Corporation bid for and received a blanket ordering agreement ("BOA") that allowed it to receive future work in the area of radioactive material release and recycle from DOE at the Savannah River site in South Carolina, not Georgia.  *See* Tempel Testimony, US SMF Exh. 39. SAIC had a teaming agreement with Alaron for this work and was proposed to provide regulatory support assistance to Alaron, including support related to NRC release regulations. *Id.*   SAIC's promise of advice and assistance in these areas was relied upon in allowing Alaron to receive the BOA.  *Id.*

However, it is an outright falsehood, and extremely misleading, to suggest that Alaron's NRC-licensed facility in Pennsylvania was "unrelated" to SAIC and Alaron's proposed effort.  Taylor Testimony, US SMF Exh. 38, 7/9 a.m. Tr. 57-58.  In fact, Alaron and SAIC proposed that radioactive

material released from the proposed project be transported to Alaron's NRC-licensed facility in

Pennsylvania prior to recycle and/or release.  *Id.*  Indeed, as SAIC knew, SAIC and Alaron's proposal

for the BOA actually identified Alaron's NRC-licensed facility in Wampum, Pennsylvania as the

"principal place of performance" for the proposed work.  *Id.*  This is because release of radioactive

material from a DOE site into general commerce is subject to NRC regulatory authority and jurisdiction,

including the requirement to possess an NRC license. *See supra*, ¶ 2.

18.    **The Plasma Hearth Process was an experimental concept funded primarily by DOE that was envisioned as a means of melting drums of DOE-generated waste. See Larsen Test., 7/10 a.m. Tr. 7-8, 57-58, 60-61 (Exh. 16). Although SAIC postulated that the sludge resulting from the process might be susceptible to recycling, the technology "was never intended to be a recycling technology," never progressed beyond the conceptual stage, was never tested on radioactive waste, and was not commercially viable. Id. at 58, 60, 62, 66.**

       Response:      Disputed.  *See infra*, ¶¶ 201-213.  SAIC in fact represented that it had invested a

"substantial" amount into the development of the Plasma Hearth Process ("PHP"), and SAIC sought and

received a patent for the process in order to protect its financial interest in the technology.  Larsen

Testimony, attached hereto as Exhibit 5, 7/10 a.m. Tr. 15-21.  Additionally, it is undisputed that SAIC's

plans for the Plasma Hearth Process included treating not only DOE-generated waste, but commercially-

generated waste subject to NRC regulatory authority.  Larsen Testimony, US SMF Exh. 36, 7/10 a.m.

Tr. 25:24-30:16, Tr. 31:11-35:5.  It is further undisputed that for this reason, SAIC's business

development plans for the process included obtaining an NRC license that would allow it to recycle and

release material.  *Id.*  SAIC further committed to follow the NRC's rulemaking efforts for release and

recycle of radioactive material because it understood that NRC regulations would control release and

recycle of material from the Plasma Hearth Process.  Larsen Testimony, US SMF Exh. 36, 7/10 a.m. Tr.

39:9-42:12.  Finally, while SAIC did consider and plan for material from the process to be recycled and

released into commerce, the PHP's usefulness did not depend on recycling.  *Id.*, 7/10 a.m. Tr. 74;

Leatherman Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 47.  SAIC understood that a primary benefit of

the process was to create separate phases of waste that would greatly reduce the cost of disposal of radioactive waste. Leatherman Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 18-19, 51. This would be true both of DOE-generated and commercially generated waste, and both were undisputedly part of SAIC's plans for the process. In fact, SAIC entered into a memorandum of understanding with BNFL to commercialize and market the process for worldwide use in both government and commercial applications. Larsen Testimony, US SMF Exh. 36, 7/10 a.m. Tr. 25:24-30:16.

19. **The Association of Radioactive Metal Recyclers ("ARMR") was a small, short-lived trade association that advocated a national standard governing the release and recycling of radioactive metal. See Loiselle Test., 7/7 p.m. Tr. 48 (Exh. 17); Motl Test., 7/23 a.m. 8:15, 17:23-18:1 (Exh. 18). SAIC was never a member, never paid dues, and had little or no communication with ARMR. See Loiselle Test., 7/7 p.m. Tr. 31, 38, 48 (Exh. 17). An SAIC employee, Gerry Motl, began serving on ARMR's board during his prior employment with an ARMR member. After he arrived at SAIC, he did not immediately resign as a board member. Motl was tasked on SAIC's bid on the 1999 Contract (Motl Test., 7/23 a.m. Tr. 23:5-9 (Exh. 18)), but ARMR was effectively "defunct" by the time that contract was executed. See Loiselle Test., 7/7 p.m. Tr. 48 (Exh. 17).**

Response:        Disputed. *See infra* ¶¶ 184-200. It is disputed that ARMR was small or short-lived. Although ARMR's budget may have been small, ARMR's members included numerous very large companies with a financial interest in releasing and recycling radioactive material. For example, BNFL, a massive international radioactive materials company, was a member of ARMR, as was its subsidiary MSC. Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 12:1-13:3; Loiselle Testimony, US SMF Exh. 25, 7/7 a.m. Tr. 56:12-56:24, 85:11-85:18. Therefore, ARMR was representative of very large and profitable business concerns. Those concerns formed ARMR in order to speak with a unified voice in advocating for regulations that would allow for the release and recycle of radioactive material. Loiselle Testimony, US SMF Exh. 25, 7/7 a.m. Tr. 56:3-56:24, 72:14-74:4, 81; Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 11:18-11:25. Furthermore, it is undisputed that ARMR's existence not only spanned several years, but occupied the exact same time period as SAIC's work on the BNFL Oak

Ridge Recycling Project, SAIC's development and patenting of the PHP, SAIC's assistance as a teaming partner with Alaron, SAIC's advice and assistance for BJC, and SAIC's work on its NRC Contracts.

It is further disputed that SAIC had "little or no communication" with ARMR.  SAIC Vice President Gerald Motl was one of ARMR's most involved individuals and served on ARMR's Board of Directors.   Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 6:4-9:21; Loiselle Testimony, US SMF Exh. 25, 7/7 p.m. Tr. 3:20-9:17.  As a Board member, Motl voted on and contributed to matters of policy, reviewed communications and other documents, and attended numerous ARMR meetings and conferences at SAIC's expense.  Loiselle Testimony, US SMF Exh. 25, 7/7 p.m. Tr. 3:20-9:17, 11:15-11:21; Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 9:19-9:21.

Motl was proposed by SAIC as "key personnel" on the 1999 NRC Contract.  Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 20:22-24:19, 38:14-42:6.  Motl was proposed to perform analysis as to measuring and comparing the costs and benefits of a rule that would permit the release and recycle of radioactive material from nuclear facilities.  *Id.*  Through his participation in ARMR, Motl had already taken the position that the benefits of such a rule outweighed the costs.  Loiselle Testimony, US SMF Exh. 25, 7/7 a.m. Tr. 102:24-106:7, 106:14-109:8, 7/7 p.m. Tr. 8:12-9:17 (Motl "absolutely" reviewed ARMR advocacy letters to the NRC regarding a free release standard), 10:16-11:9 (Motl participation on an ARMR call regarding the ARMR letter to the NRC regarding rulemaking for recycle and reuse).  Further, it is undisputed that ARMR's members stood to profit financially from such a rule, creating the potential for Motl and SAIC's work for the NRC to be biased based on their affiliation with ARMR.  Loiselle Testimony, US SMF Exh. 25, 7/7 a.m. Tr. 79:16-80:15; Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 14:8-15:2.

John Pierce Martin

**20.     Beginning in June 1996, SAIC employee John Pierce Martin served as the contract**

14

**representative on the 1992 Contract. Martin Test., 7/14 a.m. Tr. 46:4-9, 47:25-48:7 (Exh. 19); see also 12/12/05 Martin Depo. Tr. 34:3-6 (Exh. 20). In addition, Martin served as SAIC's contract representative on the short-lived 1999 Contract. Martin Test., 7/14 a.m. Tr. 46:4-9 (Exh. 19).**

Response:      Undisputed.

**21.     Martin did not know during the relevant time periods that SAIC was allegedly violating its conflict-of-interest obligations. See Martin Test., 7/14 p.m. Tr. 15:11-16:8, 46:8-18, 49:3-7, 50:4-6 (Exh. 7); 1/16/06 Martin Depo. Tr. 6:5-7:17, 48:5-20, 49:18-50:4, 115:16-20, 117:58 (Exh. 21).**

Response:      Disputed.  "Knowledge" under the False Claims Act includes not only actual knowledge but also reckless disregard and deliberate ignorance.  Although the United States did not present evidence that, at the time that SAIC was submitting claims on the 1992 and 1999 NRC Contracts, Martin had actual knowledge of SAIC's business relationships with commercial entities in the are of radioactive material release and recycle, Martin did have knowledge as that term is defined by the False Claims Act.  Martin made representations, on behalf of SAIC, to the NRC that SAIC had no situations or relationships of the type identified in the NRC organizational conflict of interest regulations.  *See, e.g., SAIC*, 653 F. Supp. 2d at 99; Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 59-60, 64-77.  In addition, Martin and SAIC sought payment from the NRC on SAIC's NRC Contracts. Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 55-56.

As such, Martin and SAIC were obligated to make reasonable and prudent inquiry concerning SAIC's relationships that could constitute organizational conflicts of interest before submitting certifications and claims for payment.  Of course, Mr. Martin could not know that "SAIC was allegedly violating its conflict of interest obligations" at the time that SAIC was submitting its claims for payment, since no such allegations had been levied.  What Mr. Martin could, and should, have known was that SAIC had relationships with commercial companies in the areas of release and recycle of radioactive material from nuclear facilities, and that SAIC therefore had OCI situations or relationships in violation

15

of its NRC contracts. *SAIC*, 653 F. Supp. 2d. at 99 ("witness John Pierce Martin testified that he made

representations to the government about SAIC's OCIs without having seen documents the jury could

have deemed relevant to their assessment of SAIC's OCIs. (See Martin Test., 7/14 p.m. Tr. 18–40.)

Accordingly, there was sufficient evidence to support a jury's finding that SAIC acted with reckless

disregard or deliberate ignorance.").

**22.      Martin did not have knowledge of SAIC's relationships that the Government now
         characterizes as conflicts of interest. From the time he began working on the 1992 Contract
         until March 2000, Martin did not know about any relationships that SAIC may have had
         with ARMR, Alaron, or MSC. 1/16/06 Martin Depo. Tr. 48:5-20 (Exh. 21). Moreover,
         Martin did not know about any relationship that SAIC had with BNFL until November
         1999—the month in which he worked on SAIC's response to the NRC's request for
         information about possible conflicts of interest. Id. at 49:18-50:4; see also id. at 6:5-7:17.
         Martin did not know that SAIC was doing work for BJC "involving the release of
         radioactive scrap metals" until November 1999. Id. at 115:16-20. Nor did Martin know
         anything about SAIC's purported development of the Plasma Hearth Process. Id. at
         117:58; see also id. at 48:5-20.**

         Response:          Disputed.  See response to ¶ 21.  As SAIC's contracts manager responsible for

seeking and obtaining payment and for making representations to the NRC that SAIC had no situations

or relationships of the type in the NRC organizational conflict of interest ("OCI") regulations, Martin

was responsible for conducting reasonable inquiry concerning all SAIC situations or relationships in the

areas of release and recycle of radioactive material from nuclear facilities.   While the United States does

not allege that Martin had actual knowledge of these relationships, he did have knowledge within the

meaning of the False Claims Act.

**23.      Martin believed that "[t]here were no conflicts because the majority of those contracts
         were being performed by the Department of Energy" and "[t]he NRC does not regulate the
         Department of Energy." Martin Test., 7/14 p.m. Tr. 50:4-6 (Exh. 7); see also id. at 15:11-
         16:8. Thus, Martin did not believe that any of the relationships disclosed in SAIC's
         November 22, 1999 response to the NRC constituted conflicts of interest. Id. at 49:3-7, 50:4-
         6; see also id. at 46:8-18.**

         Response:          Disputed.  SAIC posits above that Martin did not have actual knowledge of

SAIC's relationships.  If that is the case, he could not possibly have had an opinion whether such

16

relationships, of which he supposedly had no knowledge, were with Department of Energy contractors or in any way relied on any belief that because SAIC's relationships were with DOE contractors, no potential organizational conflict of interest concerns existed.

In any event, no exception exists in the NRC's OCI regulations or in SAIC's contractual OCI obligations for advice and assistance performed for commercial entities that are contractors to the Department of Energy. *See, infra,* ¶¶ 105-119.  In fact, the suggestion that no conflict could exist so long as work was being performed for a DOE contractor because NRC does not regulate certain DOE activities is contradicted by the plain wording of the NRC OCI regulations, as Martin well understood. Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 103; *see also* 48 C.F.R. § 2009.570-3 (not all potential organizational conflict of interest relationships enumerated in the NRC regulations required an entity for which SAIC was working to be regulated by the NRC).  As Martin understood, one of the "situations or relationships" that could constitute an actual or potential conflict of interest was any situation or relationship placing SAIC in a role in which its judgment "may be biased." *Id.*  SAIC fully understood that for this situation or relationship to exist, SAIC's work did not have to be performed for an entity regulated by the NRC. *Id.*  In fact, SAIC's own training on organizational conflicts of interest explicitly identified as creating the potential for bias any situation or relationship in which SAIC was providing advice or assistance for a government customer while, at the same time, SAIC was providing advice or assistance in the same technical area for **any other organization**.  PX 919, SAIC OCI Training, US SMF Exh. 41 at 0173287, 0173304; Bidwell Testimony, US SMF Exh. 42, 7/16 a.m. Tr. 62:16-68:23 (emphasis supplied).   SAIC further acknowledged that, therefore, such relationships must be disclosed. *Id.*

Further, contrary to Martin's supposed belief that "the majority of those contracts were being performed by the Department of Energy," none of SAIC's relationships were with the Department of

Energy.  All five were with private companies and organizations seeking to profit from release and recycle of radioactive material.  *See, e.g.,* ¶¶ 14-19.

Accordingly, in the fact of conflicting evidence, including the plain language of the regulation and SAIC's own training materials, it is disputed that Martin actually had such a belief at the time, impossible for him to have in any way relied on any such belief since he claimed to have no knowledge of SAIC's relationships, and disputed that any such belief would have been reasonable such as would be material to the question of knowledge under the False Claims Act.  Given the plain language of the NRC regulations and SAIC's own organizational conflict of interest training, any such belief would have been reckless.

Indeed, the Court has already determined that "the government presented sufficient evidence at trial upon which the jury could conclude that SAIC's representations to the NRC regarding its OCIs were not the result of SAIC's adoption of a reasonable interpretation of ambiguous regulations."  *SAIC*, 653 F. Supp. 2d at 97.

**24.      Martin was not aware of certain documents at the time he made various conflict-of-interest representations to the NRC. Martin Test., 7/14 p.m. Tr. 43:22-44:2 (Exh. 7). Martin testified that, even after he was shown the documents at trial, they did not make him "question the truthfulness or accuracy of SAIC's response to the NRC's cure notice." Id. at 44:3-7; see also id. at 43-46.**

Response:      Partially disputed.  SAIC and Martin <u>should</u> have been aware, with reasonable inquiry, of the work that it was performing for commercial customers in the area of release and recycle of radioactive material when it sought payment from the NRC and made affirmative representations that it had no situations or relationships of the type that required disclosure.  *SAIC*, 653 F. Supp. 2d at 99.  Moreover, while Martin testified he was not aware of a number of documents that contradicted statements made to the NRC, the technical individuals who assisted him in preparing his responses to the NRC were undisputedly aware of such documents.  Martin Testimony, attached hereto as Exhibit 6,

18

7/14 p.m. Tr. 43-45 (Turner and Slack, who assisted Martin in responding to the NRC's inquiries

regarding organizational conflicts of interest, were knowledgeable of the BNFL Oak Ridge Recycle

Project and the BJC Dose Assessment Project.).

**25.     Martin did not know during the relevant time periods that compliance with conflict-of-interest obligations was allegedly material to the Government's decisions to pay SAIC's vouchers. See Martin Test., 7/14 a.m. Tr. 54:19-24 (Exh. 19) (testifying, when asked whether he had "an understanding whether SAIC had to obey these conflict of interest requirements in order to be paid under the contract," that "[t]he payment is separate from complying with the organizational conflict of interest clause"); id. at 55:7-10 (testifying that SAIC could "still bill the NRC and receive payment for its work" even if SAIC did "not obey these conflicts of interest provisions").**

Response:        Disputed.  See responses to ¶¶ 21-22.  Martin made representations to the NRC

regarding organizational conflict of interest in an effort to convince the NRC to allow SAIC to keep its

contracts and, therefore, to continue to be paid under its contracts.  Martin Testimony, US SMF Exh. 14,

7/14 a.m. Tr. 22-23, 29-30, 32, 36; Martin Testimony, attached hereto as Exhibit 6, 7/14 a.m. Tr. 49-54.

Therefore, he well understood that compliance with the OCI provisions was material to the NRC.

Indeed, Martin explicitly understood that the NRC could terminate SAIC's contract for default if SAIC

did not abide by its organizational conflict of interest requirements, further demonstrating his knowledge

that OCI compliance was material.  Martin Testimony, attached hereto as Exhibit 6, 7/14 p.m. Tr. 58.

Furthermore, under the False Claims Act, "material" is defined as having a tendency to influence

the government's payment decision.  *See U.S. ex rel. Fago v. M & T Mort. Corp.*, 518 F. Supp. 2d 108,

118 (D.D.C. 2007) (*quoting U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Alabama*, 104 F.3d 1453,

1460 (4th Cir. 1997)); *U.S. ex rel. Ervin and Assoc., Inc. v. Hamilton Secs. Grp., Inc.*, 370 F. Supp. 2d

18, 45-46 (D.D.C. 2005); *see also Hays v. Hoffman,* 325 F.3d 982, 992 (8th Cir. 2003) ("false claims

were material if they were capable of influencing the government's payment decision") (internal

quotation marks omitted).  Therefore, material extends well beyond something that was actually relied

upon to anything upon which the government *could* rely.  *Id.*  SAIC has presented no evidence that

19

suggests that Martin believed that compliance with SAIC's obligations did not have a natural tendency to influence the NRC's decisions, or that such belief, even if it were held, could be reasonable.  Nor does anything in this paragraph suggest that Martin believed that compliance with SAIC's OCI obligations was not something upon which the NRC _could_ rely; in fact, the evidence indicates that Martin understood just the opposite.

Finally, to the extent that SAIC is suggesting that Martin honestly believed that SAIC was entitled to knowingly violate its organizational conflict of interest requirements, perform biased work for the NRC, and nonetheless would somehow be entitled to full payment because OCI compliance was not "material," any such belief is inherently unreasonable and is contradicted by undisputed evidence in this case, including the contracts themselves.

Therefore, absolutely no evidence supports SAIC's assertion that "Martin did not know during the relevant time periods that compliance with conflict-of-interest obligations was allegedly material to the Government's decisions to pay SAIC's vouchers."

**26. One possible remedy for noncompliance with the NRC's conflict-of-interest requirements was termination of the contract. Martin Test., 7/14 p.m. Tr. 58:5-8 (Exh. 7); see also 1/16/06 Martin Depo. Tr. 12:5-13 (Exh. 21).**

Response:      Undisputed.  That Martin understood that the NRC could terminate SAIC's contract for failure to abide by the contractual organizational conflict of interest requirements demonstrates that Martin understood that those requirements were material because he understood that compliance with SAIC's organizational conflict of interest obligations could lead the NRC to terminate SAIC's contract.

**27. SAIC's January 10, 2000 letter in response to the NRC's cure notice was intended to persuade the NRC to let SAIC keep the 1999 Contract. Martin Test., 7/14 p.m. Tr. 11:1614:12 (Exh. 7); 1/16/06 Martin Depo. Tr. 11:22-12:4, 105:8-17 (Exh. 21).**

Response:      Undisputed.

28.    **Martin did not know whether SAIC would be paid on its outstanding invoices if the NRC elected to terminate the 1999 Contract. Martin Test., 7/14 p.m. Tr. 12:20-23 (Exh. 7).**

        Response:      Undisputed.  Only the NRC could make the decision to pay or not to pay an

invoice.

29.    **Even when the NRC believed that SAIC had a conflict of interest, it nevertheless paid at least one of SAIC's invoices. Martin Test., 7/14 p.m. Tr. 88-91 (Exh. 7).**

        Response:      Disputed.  See response to ¶ 13.

        <u>Thomas Rodehau</u>

30.    **Thomas Rodehau helped prepare SAIC's bid for the 1992 Contract and then served as SAIC's contract administrator on the 1992 Contract until June 1996. Rodehau Test., 7/3 p.m. Tr. 42-43 (Exh. 22); Rodehau Test., 7/7 a.m. Tr. 41:8-10 (Exh. 23); Martin Test., 7/14 a.m. Tr. 47:25-48:7 (Exh. 19); see also Rodehau Test., 7/3 p.m. Tr. 69-70 (Exh. 22).**

        Response:      Undisputed.

31.    **Rodehau did not know that SAIC was allegedly violating its conflict-of-interest obligations. At the time he made certifications under the 1992 Contract, he "[a]bsolutely" "believe[d] them to be true and accurate." Rodehau Test., 7/3 p.m. Tr. 77-78 (Exh. 22); see also Rodehau Depo. Tr. 188:3-6, 199:12-16 (Exh. 24) (similar). He "[n]ever" "learn[ed] of anything that made [him] question the truthfulness and accuracy" of SAIC's certifications. Rodehau Test., 7/3 p.m. Tr. 78 (Exh. 22); see also Rodehau Depo. Tr. 188:7-9 (Exh. 24).**

        Response:      Disputed.  See response to ¶¶ 21-22.  Although the United States did not present

evidence at trial that Rodehau had actual knowledge of SAIC's organizational conflict of interest

relationships, he did have knowledge as defined by the False Claims Act.  As the employee of SAIC

responsible for seeking payment from the NRC, for OCI compliance, and for making affirmative

representations on behalf of SAIC regarding the absence of OCI situations or relationships, SAIC and

Rodehau had an obligation to make reasonable and prudent inquiry regarding work that SAIC was

performing in the area of release and recycle of radioactive material from nuclear facilities.

Additionally, while Mr. Rodehau could not have had actual knowledge that SAIC was "allegedly

violating its conflict of interest obligations" as, at the time he was submitting certifications and requests

for payment, no such allegations had been levied, Rodehau did have knowledge, as that term is defined by the False Claims Act, of SAIC's OCI situations and relationships.

32. **Rodehau "wasn't aware of any relationship" between SAIC and BNFL during his time working on the 1992 Contract. Rodehau Depo. Tr. 121:11-14 (Exh. 24). During his work on the 1992 Contract, Rodehau "had no knowledge" of any SAIC relationship with ARMR and, in fact, had never heard of ARMR until he prepared for his deposition. Id. at 122:8-123:16. In addition, he had "never heard" of Alaron. Id. at 126:2-13.**

      Response:     Disputed.  See responses to ¶¶ 21-22, 31.

33. **Rodehau participated in a public rulemaking during which "the head of NRC's Office of Acquisition . . . made it clear . . . that DOE was not an entity subject to the NRC's regulatory authority." Rodehau Test., 7/7 a.m. Tr. 32:2-8 (Exh. 23).**

      Response:     Disputed.  At the meeting in question, the NRC employee was responding to a question as to whether the NRC's OCI obligations applied to DOE.  The NRC employee responded simply that, to the extent that a contractor was performing work for DOE, DOE's organizational conflict of interest rules would apply to that contractor.  See Rodehau Testimony, attached hereto as Exhibit 7, 7/7 am Tr. 36-37, 43-44; DX 22, attached hereto as Exhibit 8, at 15521-15522.  SAIC, however, was under contract not to the DOE, but to the NRC, so there is no question that the NRC's organizational conflict of interest rules applied to SAIC, and, indeed, the NRC employee stated this explicitly.  *Id.*  No question was ever asked, and the NRC employee never spoke to, whether some sort of blanket exception to the NRC's OCI regulations would apply if SAIC had a business relationship with a commercial entity who happened to also be a DOE contractor and SAIC was, at the same time, under contract to the NRC.

      In any event, as with Martin, because Rodehau testified that he did not have actual knowledge regarding any of SAIC's relationships, he could not have relied on any supposed "DOE Exception" in choosing not to disclose them.  *See, supra*, response to ¶ 23.

34. **Rodehau "would not view [the NRC] as having authority over the DOE and its contractors and the work being performed by those contractors for DOE." Rodehau Depo. Tr. 160:18-161:3 (Exh. 24); see also id. at 245:14-22, 251:17-253:5.**

Response:      Disputed.  At trial, Rodehau testified that the phrase "regulated by the NRC" meant "subject to the regulatory authority of the NRC" and that the phrase included more than simply commercial utilities possessing NRC licenses.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 50-53.  Furthermore, at trial, Rodehau testified that he and SAIC understood that in order for a situation or relationship to require disclosure as an actual or potential conflict of interest, it was not necessary for SAIC to perform work for an NRC-regulated entity.  *Id.*

In any event, as with Martin, because Rodehau testified that he did not have actual knowledge regarding any of SAIC's relationships, he could not have relied on any supposed "DOE Exception" in choosing not to disclose them.  To the extent that Rodehau had and relied on such a belief in choosing not to disclose SAIC's relationships to the NRC, such belief, if indeed it was held, was unreasonable and any reliance upon such a belief was reckless. *See, supra*, response to ¶ 23.

**35.      Rodehau did not know that SAIC's compliance with its conflict-of-interest obligations was allegedly material to the Government's decision to pay. Rodehau explained that, although the NRC required offerors responding to a proposal to make a representation regarding the existence of conflicts of interest, the NRC did not require such contractors to represent that they had no conflicts of interest. See Rodehau Test., 7/7 a.m. Tr. 20 (Exh. 23); see also id. at 18-19. Rodehau believed that "the NRC did not require SAIC to respond . . . that we have no" conflicts. Id. at 18.**

Response:      Disputed.  See response to ¶ 25.  The cited testimony appears to bear no relationship whatsoever to the conclusory and completely unsupported statement in the first sentence that "Rodehau did not know that SAIC's compliance with its conflict-of-interest obligations was allegedly material to the Government's decision to pay."

In any event, the evidence is clear that Rodehau well understood that SAIC's compliance with its organizational conflict of interest obligations was indeed material to the NRC's payment decisions. *SAIC*, 626 F.3d at 1271; *SAIC*, 653 F. Supp. 2d at 103, 105.  Rodehau even went so far as to very forthrightly admit that he made the representations regarding the absence of OCI situations or

relationships in order to "get the contract and to get payments under the contract" and that he understood that if SAIC failed to make those representations, it could not receive the contract or payments thereunder.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 43:24-44:3; 47:5-47:7; 62:19-62:22 (Q: "And again, it was a requirement in order for SAIC to get the contract and to get payments under the contract that it make such certifications, correct?  A: Yes.").  Rodehau further understood the controversy associated with the NRC's rulemaking efforts and that it was therefore extremely important that SAIC be free not only from actual bias, but even the potential for bias caused by OCI situations or relationships.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 44:7-44:10 (Rodehau stated that it was "absolutely" important that SAIC provided advice that was free from bias or potential bias).  Rodehau understood that noncompliance with its OCI obligations was grounds for disqualification from award or termination of SAIC's NRC Contracts.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 46:18-47:4. Rodehau understood that if it had a situation or relationship for which disclosure was required, it was irrelevant whether SAIC could "resist temptations" that could arise from OCIs in any given instance because it was the potential for bias that created an organizational conflict of interest and thus required disclosure.  48 C.F.R. § 2009.570-3(d); Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 51:7-51:22. In other words, Rodehau understood that it was irrelevant to the NRC whether SAIC or someone else could demonstrate that SAIC did not allow an OCI to improperly influence its work.  SAIC understood that what mattered to the NRC was the potential for bias.  *Id.*  Therefore, the evidence is clear that Rodehau had actual knowledge that compliance with SAIC's organizational conflict of interest obligations was material to the NRC's decisions to award SAIC its contracts, allow SAIC to keep its NRC contracts, and to pay SAIC's claims under its NRC Contracts.

Alternatively, even in the absence of actual knowledge, Rodehau would have been deliberately ignorant or in reckless disregard that OCI compliance was material to the NRC.  *See, supra,* response to ¶ 25.

**36.    Rodehau testified that, although certifications were required when proposing certain modifications to the 1992 Contract, SAIC was not required to certify that it had no conflicts. Rodehau Test., 7/7 a.m. Tr. 28:1-17, 30:16-24 (Exh. 23). SAIC was permitted to state that it had a conflict that it needed to discuss with the NRC. Id. at 28:1-17.**

Response:      Partially disputed.  It is undisputed that SAIC <u>could</u>, and indeed <u>should</u>, have disclosed its many business relationships with commercial entities seeking to profit from the release and recycle of radioactive material.  However, as Rodehau testified, SAIC always chose to represent that it had no such conflicts.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 53.  Rodehau further testified that he made those representations for the purpose of receiving NRC contracts and modifications, and payments under those contracts and modifications, and that he understood that if he failed to make the required certification, the NRC would not allow SAIC to obtain the modification or to keep its contract.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 43:24-44:3; 47:5-47:7; 62:19-62:22, 68-70.  Rodehau testified that, in such a situation, while SAIC might be entitled to payment that it had already performed, SAIC would not be entitled to perform any additional work or to get paid for any additional work.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 68-70.

**37.    Rodehau explained that, if a contractor disclosed a conflict or potential conflict, it was sometimes possible to "mitigate or avoid" the conflict, and the offeror could also propose to restructure the Statement of Work so that any potential conflict was eliminated from the scope of services. Rodehau Test., 7/7 a.m. Tr. 19-20 (Exh. 23). In addition, the NRC could, among other things, impose conditions to avoid a conflict or could determine that it was in the Government's best interests to seek an award of the contract notwithstanding the conflict. Id. at 19.**

Response:      Partially disputed.  It is undisputed that if a contractor disclosed an OCI situation or relationship, it would be possible for the NRC, if it had full knowledge of the relevant facts, to agree on a solution to avoid or mitigate any actual or potential conflict of interest.  However, such a decision

could be made only by the NRC after full disclosure of the OCI situation or relationship and all relevant

information.  Rodehau Testimony, attached hereto as Exhibit 7, 7/7 a.m. Tr. 50.  Without full disclosure,

no such avoidance or mitigation could be approved.  *Id.*  In any event, the decision to allow a contractor

to proceed and to be paid based on an avoided or mitigated conflict of interest was a decision that could

be made only by the NRC contracting officer.  *Id.*  In any event, it is undisputed that: (1) SAIC made no

such disclosure but instead concealed its many OCI situations and relationships from the NRC; and (2)

when the NRC did learn of only a few of SAIC's many OCI situations or relationships, the NRC did not

seek to avoid or mitigate the conflict but instead moved almost immediately to suspend and later

terminate the contract.  Rodehau Testimony, US SMF Exh. 3, 7/3 a.m. Tr. 53; Mace Testimony, US

SMF Exh. 20, 7/15 p.m. Tr. 107:16-111:1.

**38.     When Rodehau made no-conflict representations as part of proposing modifications to the
work under the 1992 Contract, he did not make those representations in order to obtain
payment on pending claims. Rodehau Test., 7/7 a.m. Tr. 30:9-15 (Exh. 23). 39. Rodehau
"[n]ever" decided not to disclose a conflict to ensure that SAIC got its claims paid and
"[n]ever" submitted any no-conflict representation to the NRC "just in order to get the
company's claims paid." Rodehau Test., 7/7 a.m. Tr. 30:25-31:6 (Exh. 23).**

Response:       Partially disputed.  The United States does not dispute that "[w]hen Rodehau

made no-conflict representations as part of proposing modifications to the work under the 1992

Contract, he did not make those representations in order to obtain payment on pending claims."  Rather,

the evidence is clear, and Rodehau himself admitted, that Rodehau and SAIC made those representations

in order to allow SAIC to perform, and be paid for, future work on SAIC's NRC Contracts.  Rodehau

Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 43:24-44:3; 47:5-47:7; 62:19-62:22, 68-70.  Rodehau testified

that he understood that without such representations, SAIC would not have been permitted to undertake

any additional work on its NRC contracts, and would not have been able to request or receive payment

for any additional work.  *Id.*  Additionally, *see*, *supra*, response to ¶ 35.

26

In regard to the assertion that "Rodehau '[n]ever' decided not to disclose a conflict to ensure that

SAIC got its claims paid and '[n]ever' submitted any no-conflict representation to the NRC 'just in order

to get the company's claims paid,'" this statement is disputed.  Rodehau explicitly testified that he made

no-conflict representations "in order to get the contract and to get claims paid under the contract."

Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 43:24-44:3; 47:5-47:7; 62:19-62:22, 68-70.

**40.     "[N]one" of the conflict-of-interest representations that Rodehau made before the award of
         the 1992 Contract "were made in order to get any claims paid." Rodehau Test., 7/7 a.m. Tr.
         22-23 (Exh. 23).**

Response:      Disputed.  See response to ¶¶ 35, 39.  The evidence is clear, and Rodehau testified

explicitly, that he made such statements "in order to get the contracts and to get payments under the

contracts."  Of course, prior to award of the 1992 NRC Contract, SAIC had no pending claims, and no

legal vehicle under which it could claim payment, so it is undisputed, and wholly irrelevant, that pre-

award statements were not made to get pending claims paid.

**41.     Rodehau's certification in SAIC's best and final offer from January 1992 and his
         certification in SAIC's revised best and final offer were not made to obtain payment from
         the NRC. Rodehau Test., 7/7 a.m. Tr. 21-22 (Exh. 23).**

Response:      Disputed.  See response to ¶¶ 35, 39, 40.  Rodehau testified that he understood

that such certifications were required in order for SAIC to be awarded the contract.  Rodehau

Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 43:24-44:3; 47:5-47:7; 62:19-62:22, 68-70.   Rodehau further

testified that he made such certifications "in order to get the contract and to get payments under the

contract."  *Id.*  He further testified that he understood that if SAIC failed to make the required

certification, SAIC could not receive the contract and therefore could not be paid under the contract.  *Id.*

Finally, he testified that he understood that if the NRC learned that SAIC had failed to abide by its

organizational conflict of interest requirements, the NRC could terminate the contract and therefore

SAIC would receive no further payments.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 46:18-

47:4.

> Michael McKenzie-Carter

**42.   Michael McKenzie-Carter, an SAIC scientist, helped prepare SAIC's technical proposal for the 1992 Contract and worked on both the 1992 and 1999 Contracts. McKenzie-Carter Test., 7/17 a.m. Tr. 87:11-12, 91:21-23, 96:2-13 (Exh. 25); 2/6/06 McKenzie-Carter Depo. Tr. 8:15-17 (Exh. 26).**

> Response:     Undisputed.

**43.   McKenzie-Carter did not have knowledge of any alleged conflicts of interest. See McKenzie-Carter Test., 7/17 p.m. Tr. 14-16, 24:3-9, 48:7-9, 60:20-23, 88:14-25 (Exh. 27); Meck Test., 7/3 a.m. Tr. 104-06 (Exh. 28); DX 396 (Exh. 29).**

> Response:     Disputed.  See response to ¶¶ 21-22, 31.  For certain of SAIC's organizational

conflict of interest relationships, McKenzie-Carter had actual knowledge while, for others, he had

knowledge as defined by the False Claims Act.

As discussed more fully below, McKenzie-Carter <u>did</u> have actual knowledge regarding SAIC's

work on the BJC Dose Assessment Project.  DX 396, attached hereto as Exhibit 9; see also ¶¶ 181-83.

McKenzie-Carter also <u>did</u> have actual knowledge regarding SAIC's work on the PHP.  Leatherman

Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 47-48, Leatherman Deposition, attached hereto as Exhibit

10, at 74-77; *see also* ¶ 211.

Furthermore, as discussed below, while McKenzie-Carter may, or may not, have had actual

knowledge regarding SAIC's efforts on the BNFL Oak Ridge Recycle Project and ARMR, he did have

knowledge as defined by the False Claims Act.  *See, infra,* ¶¶ 156-160, 196-200.

**44.   McKenzie-Carter "never worked at any projects with private companies involving [the] recycle" of radioactively contaminated materials. See McKenzie-Carter Test., 7/17 p.m. Tr. 48:7-9 (Exh. 27).**

> Response:     Undisputed.

**45.    Prior to the conflict-of-interest allegations being raised in late 1999, McKenzie-Carter "didn't know . . . that [SAIC] had anything specific with BNFL" in Oak Ridge, Tennessee. McKenzie-Carter Test., 7/17 p.m. Tr. 24:3-9 (Exh. 27); id. at 60:20-23.**

Response:         Disputed.  See response to ¶ 43.  McKenzie-Carter knew that BNFL/MSC were engaged in a radioactive scrap metal recycle project in Oak Ridge, Tennessee.  McKenzie-Carter Testimony, attached hereto as Exhibit 2, 7/16 p.m. Tr. 76-77.  McKenzie-Carter also knew that SAIC had an Oak Ridge office that performed work in the areas of radioactive material.  In fact, in 1997, McKenzie-Carter specifically asked SAIC officials Jeffrey Slack and Thomas Rucker in Oak Ridge for assistance in procuring the use of BNFL/MSC's proprietary data from radioactively contaminated materials at MSC's Oak Ridge facility.  *Id.* at 77-79; Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 105:18-112:9.  It would be reasonable to conclude that McKenzie-Carter was made aware, either before or shortly after this request, of the ongoing SAIC-BNFL/MSC relationship that could have facilitated McKenzie-Carter's request.  While neither Slack nor McKenzie-Carter specifically recall whether Slack told McKenzie-Carter that SAIC was teamed with BNFL/MSC on the BNFL Oak Ridge Recycle Project, it is undisputed that Slack knew about SAIC's role on the project and in fact had performed substantial work on the BNFL Oak Ridge Recycle Project.  *Id.*  Equally undisputed is that Slack advised McKenzie-Carter soon after the request that he believed that BNFL/MSC might give SAIC the data "at no cost."  Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 110.

Additionally, Thomas Rucker, another SAIC employee who worked with Slack in Oak Ridge on the BNFL Oak Ridge Recycle Project and the BJC Dose Assessment Project, knew about and worked on the 1992 NRC Contract on which McKenzie-Carter also worked.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 77-87, 102. Given the totality of the circumstances, a jury could certainly reasonably conclude that McKenzie-Carter knew, or was recklessly unaware, of SAIC's role in the BNFL Oak Ridge Recycle Project, or that SAIC acted recklessly when Slack and Rucker failed to

communicate with McKenzie-Carter regarding projects that they understood were in the same technical

areas as SAIC's work for the NRC.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 105-

110; Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 66:21-68:9.

**46.     When McKenzie-Carter asked an NRC official to authorize the sharing of information that DOE had developed relating to the BJC-SAIC project, the NRC official raised no concerns about SAIC simultaneously working on the NRC project and the BJC project; instead, the NRC official authorized the DOE to allow the SAIC team working on the DOE project to share its work product with the SAIC team that was working on the NRC contract. See Meck Test., 7/3 a.m. Tr. 104-06 (Exh. 28); DX 396 (Exh. 29).**

Response:     Partially disputed.  The NRC employee testified that he does not recall ever

receiving the communication in question and would not have focused on it.  Meck Testimony, attached

hereto as Exhibit 13, 7/3 p.m. Tr. 32-35 (Meck not aware of SAIC's work on the BJC Dose Assessment

Project).  Additionally, the communication does not disclose that SAIC's work was being performed for

BJC, a commercial corporation, much less the nature of SAIC's work for BJC – namely, that it analyzed

release under NRC standards, analyzed the costs and benefits of various release and recycle options, and

concerned release from two NRC-licensed facilities as well as from the Oak Ridge facility, on which

SAIC and BNFL were already teamed for the BNLF Oak Ridge Recycle Project.  *See infra* ¶¶ 163-183.

In any event, this episode demonstrates that McKenzie-Carter had actual knowledge of SAIC's work for

BJC and also knew that it was in the same technical area as work that McKenzie-Carter and SAIC were

performing for the NRC.

**47.     McKenzie-Carter visited what he thinks was an MSC facility in Oak Ridge (McKenzie-Carter Test., 7/17 p.m. Tr. 59:10-13 (Exh. 27)), and, at the request of the NRC's Dr. Meck, he worked with other SAIC employees to obtain certain data from MSC about contaminated drums. Id. at 76:24-77:3, 88:14-25.**

Response:     Undisputed.  It is further undisputed that when Dr. Meck made the request in

question, Dr. Meck was completely unaware of SAIC's role on the BNFL Oak Ridge Recycle Project.

*See* response to ¶ 45.

**48.    McKenzie-Carter was aware that SAIC had disclosed a potential conflict of interest prior to the award of the 1999 Contract. McKenzie-Carter Test., 7/17 p.m. Tr. 14-16 (Exh. 27).**

Response:    Undisputed.  This potential organizational conflict of interest had nothing to do

with any of SAIC's OCI situations or relationships that are at issue in this case.  However, it makes clear

that McKenzie-Carter was aware that SAIC had an obligation to avoid and disclose organizational

conflicts of interest to the NRC.

**49.    McKenzie-Carter did not know, prior to the time that the 1999 Contract was terminated, that SAIC employee Gerry Motl allegedly had been an officer or director of ARMR. 2/6/06 McKenzie-Carter Depo. Tr. 221:9-222:2, 222:12-14 (Exh. 26).**

Response:    Disputed.  See Response to ¶¶ 43, 196-200.  While McKenzie-Carter may or may

not have had actual knowledge of Motl's intimate role in ARMR, as the project manager for the 1999

NRC Contract largely responsible for preparing SAIC's proposal, reasonable inquiry would certainly

have made him aware of Motl's role.  McKenzie-Carter Testimony, attached hereto as Exhibit 2, 7/17

p.m. Tr. 76 (McKenzie-Carter prepared SAIC's Technical Proposal for its 1999 NRC Contract that

proposed Motl).  For example, review of any of Motl's many resumes in circulation at the time (though,

curiously, not the resume that was disclosed to the NRC as part of SAIC's proposal on the 1999

Contract), or a conversation with Motl about his resume and qualifications stated in the proposal, would

have revealed Motl's ongoing role with ARMR.  *See* response to ¶¶ 196-200.  In addition, it is entirely

undisputed, rather than alleged, that Motl was an officer of ARMR on its Board of Directors.  SAIC

Amended Answer at ¶ 53, Loiselle Testimony, US SMF Exh. 25, 7/7 a.m. Tr. 58:2-58:4; Motl

Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 6:4-9:21.

**50.    McKenzie-Carter "was not aware of any specifics" about the Plasma Hearth Process, and he did not know that the Plasma Hearth Process purportedly involved the potential recycling or reuse of metals that exited that plasma technology. 5/24/06 McKenzie-Carter Depo. Tr. 321:6-17, 322:4-13 (Exh. 39).**

Response:        Disputed.  See response to ¶¶ 43, 211.  While McKenzie-Carter may not have had

actual knowledge regarding every specific of the Plasma Hearth Process (PHP), he was aware of the

PHP and even worked on it.  For example, McKenzie-Carter worked in the same SAIC office at Idaho

Falls as Gary Leatherman and Milo Larsen, two of the PHP's inventors.  McKenzie-Carter Testimony,

attached hereto as Exhibit 2, 7/17 p.m. Tr. 88-89; Leatherman Testimony, US SMF Exh. 37, 7/16 a.m.

Tr. 42:2-42:7.  McKenzie-Carter worked with Leatherman on SAIC's 1992 NRC Contract while, at the

same time, Leatherman was working on developing and commercializing the PHP.  Leatherman

Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 47:19-50:4.  Leatherman's work on the NRC Contract was

in the same technical area as Leatherman's work on the PHP – specifically, the migration of certain

radionuclides to various exit streams when radioactive metal is heated.  *Id.*, 7/16 a.m. Tr. 42-44, 50-51.

Finally, it is immaterial whether McKenzie-Carter was aware of the potential use for the PHP as a

recycling technology.  SAIC's work for the NRC extended beyond recycle or reuse into release into

commercial landfills.  Part of the benefit of the PHP was that, even excluding any possibility for

recycling, much of the waste would, if it met NRC regulation, be capable of disposal in just such

commercial landfills rather than more expensive radioactive waste disposal facilities.  *See, supra*,

response to ¶¶ 18, 201-211.

**51.     There is no evidence that McKenzie-Carter knew that compliance with conflict-of-interest
          requirements was material to the Government's decision to pay. See McKenzie Carter
          Test., 7/17 a.m. 87-116 (Exh. 25); McKenzie Carter Test., 7/17 p.m. 3-89 (Exh. 27).**

Response:        Disputed.  See response to ¶ 43.  McKenzie-Carter admitted that he understood

that compliance with SAIC's OCI requirements was important and necessary to SAIC's performance

under the NRC Contract, and that SAIC had an obligation to avoid and disclose potential organizational

conflicts of interest and situations in which SAIC's work could potentially be biased.  McKenzie-Carter

Testimony, attached hereto as Exhibit 2, 7/17 p.m. Tr. 45-47; McKenzie-Carter Deposition, attached

hereto as Exhibit 35, at 102-112.  McKenzie-Carter further testified that he understood that it was

important to the NRC's rulemaking efforts that SAIC's advice and assistance be free from the potential

for bias caused by OCI relationships.  *Id.*  He therefore necessarily understood that such compliance had

a tendency to influence and was capable of influencing the NRC's decisions.  *SAIC*, 626 F.3d at 1271;

*SAIC*, 653 F. Supp. 2d at 103.

> Sandra Carder

**52.     Sandra Carder was SAIC's Vice President and Director of Contracts for Corporate Contracts (Carder Test., 7/22 a.m. Tr. 38:13-14 (Exh. 30)) and therefore "didn't have involvement at the line contract level" (id. at 78:23-79:1).**

Response:      It is not disputed that Carder was SAIC's Vice President and Director of

Contracts for Corporate Contracts.  In that position, Carder was responsible for organizational conflict of

interest compliance.  Carder Testimony, attached hereto as Exhibit 14, 7/22 a.m. Tr. 39-40.

**53.     There is no evidence that Carder knew that SAIC was allegedly violating its conflict-of interest obligations. See Carder Test., 7/22 a.m. Tr. 36-83 (Exh. 30).**

Response:      *See, e.g., supra,* responses to ¶¶ 21, 31, 43.  While the United States did not

present evidence at trial that Carder had actual knowledge of SAIC's relationships, the evidence did

indicate that Carder had knowledge as defined by the False Claims Act.  Of course, it would have been

impossible for Carder to have actual knowledge that "SAIC was allegedly violating its conflict of

interest obligations" at the time that SAIC was submitting claims for payment on the NRC contracts,

because no such allegations had been levied.

Carder testified about numerous weaknesses in SAIC's organizational conflict of interest

compliance system.  Not only were there weaknesses in SAIC's system, but the evidence was clear that

SAIC's system, for which Carder was responsible, was intentionally created to exclude certain types of

relationships that SAIC fully understood could constitute organizational conflicts of interest.  Carder

Testimony, attached hereto as Exhibit 14, 7/22 a.m. Tr. 66-78 (for example, SAIC's system didn't

include teaming agreements, planned interests, organizational affiliations, patent applications, and had

other limitations); *see, infra*, ¶¶ 5, 66, 71, 83, 218 (such relationships could cause organizational

conflicts of interest).  To the extent that Carder and SAIC created and relied on a system that it knew did

not account for certain types of relationships that the NRC regulations explicitly stated could cause

organizational conflicts of interest, Carder and SAIC acted with deliberate ignorance and reckless

disregard of these relationships.

54.     **There is no evidence that Carder knew that compliance with conflict-of-interest requirements was allegedly material to the Government's decision to pay. See Carder Test., 7/22 a.m. Tr. 36-83 (Exh. 30).**

      Response:      Disputed.  *See, e.g.*, response to ¶¶ 25, 35, 51.  Materiality is defined as having a

tendency to influence, or being capable of influencing, agency decision-making.  Carder demonstrably

understood that organizational conflict of interest compliance was material to the NRC, so much so that

she testified that SAIC would not even bid on a contract if it had an organizational conflict of interest

that the agency would not agree to mitigate.  Carder Testimony, attached hereto as Exhibit 14, 7/22 a.m.

Tr. 58-59.  Carder testified that organizational conflict of interest training was so important that SAIC

invested "a lot of time and money" into attempting to assure freedom from OCIs.  *Id.* at 63.  Both she

and SAIC clearly recognized its materiality.

      Additionally, Carder testified extensively regarding the extent to which SAIC had a system

designed to identify and disclose potential OCIs.  Carder Testimony, attached hereto as Exhibit 14, 7/22

a.m. Tr. 41-65.  That SAIC would implement such a system demonstrates that SAIC, and Carder,

necessarily understood the importance of SAIC's OCI compliance obligations and their natural tendency

to influence the payment decisions of customer agencies, including the NRC.  In fact, Carder testified

that "organizational conflict of interest [was] very important, that we not engage in contracts where there

could be a conflict with something we're doing."  Carder Testimony, attached hereto as Exhibit 14, 7/22

a.m. Tr. 41-42.  A jury could easily conclude that Carder knew that organizational conflict of interest

compliance was material.  Additionally, to the extent that Carder did not have actual knowledge

regarding the materiality of organizational conflict of interest compliance, Carder, as indicated by her

testimony, certainly had knowledge as defined by the False Claims Act.

    Dr. Mark Otis

**55.**    **Dr. Mark Otis was an SAIC employee who worked on both the 1992 and 1999 Contracts. Otis Test., 7/17 a.m. Tr. 14:2-3 (Exh. 31); Otis Test., 7/16 p.m. Tr. 8:12-17 (Exh. 32).**

    Response:    Undisputed.

**56.**    **There is no evidence that Dr. Otis knew that SAIC was allegedly violating its conflict-of-interest obligations. See Otis Test., 7/17 a.m. Tr. 5-30 (Exh. 31); Otis Test., 7/16 p.m. Tr. 5-83 (Exh. 32).**

    Response:    Disputed.  *See, e.g.*, responses to ¶¶ 21, 31, 43, 53.  Of course, it would have been

impossible for Otis to know "that SAIC was allegedly violating its conflict-of-interest obligations" when

no such allegations had been levied.

    Although the United States did not present evidence that Dr. Otis had actual knowledge

regarding SAIC's relationships, Otis did work closely on the NRC contracts with other individuals who

did have actual knowledge of many of SAIC's relationships.  *See, supra*, ¶¶ 139-153, 156-160, 163-175,

181-205, 211-212.  For example, not only did McKenzie-Carter have actual knowledge of both the

Plasma Hearth Process and the BJC Dose Assessment Project, but both of these projects actually

intersected with McKenzie-Carter's, Otis', and SAIC's work on the NRC Contracts.  *Id.*  In addition,

McKenzie-Carter may have had actual knowledge of the BNFL Oak Ridge Recycle Project and of

Motl's role in ARMR.  *Id.*  Additionally, as Otis testified, each member of the SAIC team working on

the NRC contract had an obligation to ensure freedom from organizational conflicts of interest and

improper bias.  Otis Testimony, attached hereto as Exhibit 15, 7/17 a.m. Tr. 21-28.  Therefore, Otis, and

the SAIC team working on the NRC contract, did have knowledge, as defined by the False Claims Act,

regarding SAIC's relationships as well as knowledge of the importance of the NRC's organizational

conflict of interest requirements.

**57.      There is no evidence that Dr. Otis knew that compliance with conflict-of-interest requirements was allegedly material to the Government's decision to pay. See Otis Test., 7/17 a.m. Tr. 5-30 (Exh. 31); Otis Test., 7/16 p.m. Tr. 5-83 (Exh. 32).**

Response:      Disputed.  *See, e.g.,* responses to ¶¶ 25, 35, 51, 54.  Otis did know that

compliance with organizational conflict of interest requirements was material to the NRC's decision to

award SAIC contracts and to pay SAIC's claims.  Otis fully understood that SAIC was assisting the

NRC related to the release and recycle of radioactive material.  Otis Testimony, attached hereto as

Exhibit 15, 7/17 a.m. Tr. 15:9-17:21.  Otis understood that SAIC's assistance was related to an NRC

rulemaking in the area of release and recycle.  *Id.*  Otis further understood that SAIC's work would be

used to determine what radioactive material could be released or recycled, and what concentration of

radioactivity would be released or recycled into general commerce.  *Id.*  Otis testified that each of

SAIC's employees who worked on the NRC contract contributed their judgment and expertise to SAIC's

work for the NRC.

Dr. Otis testified explicitly that he understood that it was extremely important that his judgment

and the judgment of each and every SAIC employee working on the NRC Contract be free from the

potential for bias.  Otis Testimony, attached hereto as Exhibit 15, 7/17 a.m. Tr. 21:16-22:1.

Furthermore, Dr. Otis testified that he understood that SAIC had to abide by its OCI obligations and that

those obligations were not, and could not be, in any way, obviated or negated by anything else that

SAIC did.  *Id.*, 7/17 a.m. Tr. 26-28.  Accordingly, Dr. Otis did have actual knowledge, and certainly

knowledge as defined by the False Claims Act, that compliance with SAIC's OCI requirements was

material to the NRC's decisions to award and pay SAIC under its NRC Contracts, as both the D.C.

Circuit and this Court have already determined.  *SAIC*, 653 F. Supp. 2d at 103.

Alex Murray

**58.** **Alex Murray did a small amount of work for SAIC on the 1992 Contract and now works at the NRC. See Murray Test., 7/2 p.m. Tr. 24:3-12, 47:9-11, 51:19-24 (Exh. 33); 9/22/06 Aff. of Alex Murray ¶¶ 1-2 (Exh. 38).**

Response:    It is not disputed that Murray worked for SAIC on the 1992 NRC Contract.  It is further undisputed that Murray currently works at the NRC.

**59.** **Murray knew that SAIC's policy was to avoid conflicts; he knew that SAIC wanted any employee who believed there was a problem to report that concern to the company; and he knew that SAIC's "management would be quite concerned about the possibility of a conflict of interest if one truly existed." Murray Test., 7/2 p.m. Tr. 94:16-20, 105:15-23 (Exh. 33).**

Response:    Disputed.  Although Murray testified that SAIC had a stated "policy" of avoiding conflicts of interest, Murray testified that SAIC's organizational structure was such that various SAIC organizations failed to communicate or share information with one another regarding situations or relationships that could constitute actual or potential organizational conflicts of interest.  Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 30-34 (testifying that communication between different SAIC organizations regarding potential organizational conflicts of interest was "very, very poor.").  Murray stated that in practice, SAIC's primary concern was aggressively pursuing business opportunities and dealing with organizational conflict of interest concerns was "more like a secondary interest."  Murray Testimony, attached hereto as Exhibit 1, 7/3 a.m. Tr. 29.   Murray therefore questioned whether SAIC's true policy as carried out was to avoid organizational conflicts of interest.  Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 96, 7/3 a.m. Tr. 29.  He further testified that on many occasions he communicated his concerns about these practices to his superiors, both generally in regard to organizational conflicts of interest and specifically with regard to SAIC's simultaneous work on the Oak Ridge Recycle Project and the 1992 NRC Contract.  *Id*, 7/2 p.m. Tr. 30-34, 40, 91:20-94:4, 98-99, 105-110, 7/3 a.m. Tr. 11:6-12:4.

60.   **Murray did not believe that there was "anything wrong with SAIC doing work for the NRC and for the Department of Energy at the same time." Murray Test., 7/2 p.m. Tr. 89:24-90:12 (Exh. 33).**

Response:       Disputed.  Murray did testify that there was nothing, in and of itself, inherently wrong with performing work for the NRC and for DOE simultaneously.  However, Murray testified that he was concerned about the potential for conflict of interest given his knowledge of SAIC's conflicting work for the NRC and on the BNFL Oak Ridge Recycle Project because the work was overlapping and so closely related.  Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 75-77, 91:20-94:4, 98-99, 105-110, 7/3 a.m. Tr. 11-12.  Murray specifically stated that his organizational conflict of interest concerns began to arise when "discussions turned . . . to the recycle of materials into the commercial industry, including the commercial non-nuclear industry, which would involve meeting NRC regulations." *Id.*, 7/2 p.m. Tr. 90:17-91:1.  Murray testified that he relayed these concerns to Rick Profant, his supervisor, to SAIC Vice President Steven Turner, the SAIC individual most intimately involved in the BNFL Oak Ridge Recycle Project, and to Dr. Reginald Gotchy, SAIC's project manager on SAIC's 1992 NRC Contract.  *Id.*  No evidence exists that his concerns were ever acted upon.

In any event, none of SAIC's OCI situations or relationships involved SAIC performing work for DOE.  Each of SAIC's customers were private corporations with a financial interest in releasing and recycling radioactive material.  *See, e.g.,* ¶¶ 14-19, 131-214.

61.   **Murray testified that, when he purportedly raised a conflict-of-interest issue with SAIC managers, he was attempting to "encourage communications" between SAIC employees because he felt that "it is a generally good thing for different parts of a company to know what they're doing, synergism, cross-fertilization of ideas, et cetera." Murray Test., 7/2 p.m. Tr. 76:18-77:6 (Exh. 33); see also id. at 89:24-90:12; see also Murray Test., 7/3 a.m. Tr. 11:18-19 (Exh. 37) ("I did not complain. I just said we needed to make sure that things were adequately addressed."). Murray stated that he was "expressing . . . a concern that we needed to dot the I's and cross the T's, metaphorically, that work SAIC was doing at Oak Ridge and work SAIC was doing in Germantown, Idaho on the NRC contract were . . . not a potential conflict of interest." Murray Test., 7/2 p.m. Tr. 106:18-22 (Exh. 33); see also id. at 109-10.**

Response:      Disputed.  *See, e.g.,* responses to ¶¶ 59-60, 139-141. Murray testified that he

raised these issues because he was specifically concerned about the possibility of organizational

conflicts of interest given SAIC's simultaneous work on the BNFL Oak Ridge Recycle Project and

SAIC's work for the NRC.  *Id.*  Murray stated that organizational conflict of interest compliance was an

area in which he believed SAIC was deficient due to its priorities, its structure, and the lack of

communication between different organizations.  *Id.*  Further, Murray did not merely raise these conflict

of interest issues with "SAIC managers" but with the individuals most intimately involved with the

BNFL Oak Ridge Recycle Project and SAIC's NRC Contract.  *Id.*

**62.     SAIC specifically addressed the issue that Murray raised and informed him of the company's conclusion that there was not a conflict-of-interest problem. See Murray Test., 7/2 p.m. Tr. 109:7-110:17 (Ex. 33).**

Response:      Disputed.  Absolutely no evidence exists that SAIC ever addressed the issue that

Murray raised internally or notified the NRC that SAICs employees had concerns.  Rather, the evidence

is that Murray *was told* that the issue had been addressed.  Murray Testimony, attached hereto as Exhibit

1, 7/2 p.m. Tr. 110.  Actually addressing the potential organizational conflict of interest raised by

Murray would have jeopardized the hundreds of millions of dollars that SAIC hoped to earn from the

BNFL Oak Ridge Recycle Project and other projects for a comparatively small contract with the NRC in

which SAIC profited approximately $210,000.  PX 955, US SMF Exh. 19; Martin Testimony, attached

hereto as Exhibit 6, 7/14 p.m. Tr. 90 (SAIC's profit 7.41% of the $2,846,068 it earned on the NRC

Contracts); Turner Testimony, US SMF Exh. 11, 7/7 p.m. Tr. 108:9-113:24 (Turner hoped and planned

for SAIC revenues of $300 million related to radioactive material release and recycle opportunities with

BNFL).

**63.     When SAIC informed Murray on January 5, 1996, that he had the option of being laid off or becoming "a consulting employee," Murray drafted a document touting opportunities that he purported to have for additional work at SAIC. Murray Test., 7/2 p.m. Tr. 80:2183:11 (Ex. 33). One such opportunity related to decontaminating and**

decommissioning "the very same gaseous diffusion plant" at which SAIC purportedly wanted to team with BNFL. Id. at 83:9-84:12. Murray stated that the "suggestion in that letter that [he] might be involved in that work was based on [his] understanding" that a conflict of interest "did not exist at that time . . . or . . . would be checked and/or resolved or mitigated." Id. at 108:10-14; see also id. at 84.

Response:     Undisputed.  Murray apparently believed, based on what he had been falsely told

by Turner, that SAIC had adequately addressed the organizational conflict of interest concern he had

raised relative to SAIC's simultaneous work on the BNFL Oak Ridge Recycle Project and the NRC

contract.

64.    **Murray testified that, because of SAIC's structure, "there was a much greater emphasis placed on communication, trying to find out what other parts of SAIC were doing." Murray Test., 7/2 p.m. Tr. 32:1-9 (Exh. 33).**

Response:     Disputed.  *See* response to ¶¶ 59-63.  Murray's testimony was that because

SAIC's structure was such that communication between groups did not take place in a manner sufficient

to identify potential organizational conflicts of interest, he believed that it was extremely important that

SAIC employees communicate in order to find out what other organizations within SAIC were doing.

Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 32-34.  Murray testified that due to SAIC's

structure, "we had to be very careful about conflict of interest" and that, as a result, he raised concerns

with others related to poor communication between different SAIC corporate entities.  *Id.*  Murray

testified that, notwithstanding the concerns he raised, communication between these different internal

organizations within SAIC was "very, very poor," exacerbating organizational conflict of interest

concerns.  *Id.*

This is highlighted by the fact that SAIC's two contract managers on the NRC contracts testified

that they did not have actual knowledge of SAIC's relationships in the exact same technical areas as

SAIC's work for the NRC, relationships that could have biased SAIC's work for the NRC, even though

many SAIC technical employees participated in these relationships and also worked on SAIC's NRC

Contracts. *See, e.g.,* ¶¶ 131-214. Indeed, even when Murray raised specific organizational conflict of interest concerns with both SAIC's NRC project manager and the SAIC official most involved with the BNFL Oak Ridge Recycle Project, these concerns were not addressed and these communications did not take place.

SAIC's Conflict-Of-Interest Compliance System

**65.** **SAIC had a formal policy that it would "not engage in contracts where there could be conflict" with SAIC's other work. Carder Test., 7/22 a.m. Tr. 41:11-42:11 (Exh. 30); see also Rodehau Test., 7/3 p.m. Tr. 81:3-20 (Exh. 22).**

Response:  It is undisputed that this was SAIC's formal policy. This policy demonstrates that SAIC well understood that ensuring freedom from potential OCIs was material to its customers, including the NRC.

**66.** **SAIC had a handbook for contracts representatives, which addressed conflict-of-interest issues and described the process to be utilized when SAIC was considering bidding on a contract. Carder Test., 7/22 a.m. Tr. 47:4-51:2 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 72:18-73:12 (Exh. 22); see also Carder Test., 7/22 a.m. Tr. 49:5-7 (Exh. 30) (the handbook "spell[ed] out in a very detailed level exactly what everyone was supposed to do and how they were supposed to go about it").**

Response:  Partially disputed. SAIC's contracts representative handbook explicitly discusses the importance of organizational conflicts of interest to SAIC and its customers, including the NRC, and the risk of failure to disclose relationships in which SAIC's judgment might be biased. PX 526, attached hereto as Exhibit 16, at 0130990. SAIC's handbook stated that "the risks involved, from SAIC's perspective" for not complying with organizational conflict of interest obligations included termination for default, debarment, and "legal penalties associated with false statements." *Id.* It is further undisputed that, with regard to the NRC, SAIC's handbook stated that the NRC was specifically concerned with "disclosure of information that could be determined to be a conflict of interest," that the NRC regulations extended beyond contractual relationships to "planned work," and that the avoidance and disclosure obligations imposed by the NRC continued "even after contract award." PX 526,

attached hereto as Exhibit 16, at 0130991; Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 75.  The

existence and content of SAIC's contracts representatives handbooks, particularly with regard to the

NRC, demonstrate that SAIC well understood that OCI compliance was material to the NRC's payment

decisions.

67. **SAIC's business units and its Corporate Contracts Department performed conflict-of-interest training. Carder Test., 7/22 a.m. Tr. 50:9-14, 52:21-55:5 (Exh. 30); see also Rodehau Test., 7/3 p.m. Tr. 40:19-23 (Exh. 22). An SAIC contracts manager's responsibilities included attending and providing training regarding conflicts of interest. See Bidwell Test., 7/16 a.m. Tr. 59:1-2, 60:2-5, 60:16-18 (Exh. 11).**

Response:      It is undisputed that SAIC conducted organizational conflict of interest training.

SAIC's training on organizational conflicts of interest included teaching its employees that

organizational conflicts of interest were matters of "public concern" that affect the "integrity of the

Government Procurement Process."  PX 919, US SMF Exh. 41, at 0173280.  The training noted that the

NRC regulations contained "special restrictions on future activity" as well as "non-negotiable OCI

issues."  *Id.* at 0173282.  SAIC's training explained that if a potential OCI existed, SAIC could only

continue with the work "if the parties involved have full knowledge of the potential conflict and consent

to the arrangements."  *Id.* at 0173284.  This training demonstrates that SAIC employees well understood

that ensuring freedom from potential OCIs was material to its customers, including the NRC.  This

training included training that a potential OCI and potential for bias existed any time that SAIC was

providing advice and assistance to a government entity and, at the same time, was providing advice and

assistance in the same technical area to any other organization.  *Id.* at 0173287, 0173304.  SAIC's

training therefore taught that such situations "must be reported."  *Id.* at 0173293.  SAIC trained its

employees that failure to abide by SAIC's OCI obligations could lead to "financial penalties,"

"termination for default," and "debarment."  *Id.* at 0173294.  Given this training, it would have been

unreasonable and reckless for SAIC employees to hold a personal opinion that work performed for a

DOE contractor could never, as a matter of law, constitute a potential conflict of interest with work

SAIC was performing for the NRC, or to rely on such an opinion in ignoring or failing to disclose such a

situation or relationship.  Additionally, given this training, it would have been unreasonable and reckless

for <u>any</u> SAIC employee to believe that compliance with SAIC's organizational conflict of interest

obligations was not material to the NRC's payment decisions.  SAIC's OCI training conclusively

demonstrates that SAIC's employees understood that compliance with its OCI obligations was material.

68.   **SAIC had a Business Ethics Handbook that addressed conflicts of interest; every employee was required to read this handbook and sign a certification annually. Carder Test., 7/22 a.m. Tr. 51:8-18, 52:4-13 (Exh. 30); Bidwell Test., 7/16 a.m. Tr. 83:4-9 (Exh. 11).**

Response:      Undisputed.  This practice further demonstrates that SAIC well understood that

ensuring freedom from potential OCIs was material to its customers, including the NRC.

69.   **All SAIC employees had an obligation to report within the organization any concerns or information about potential or actual conflicts of interest. Bidwell Test., 7/16 a.m. Tr. 64:6-20 (Exh. 11).**

Response:      Undisputed.  This stated policy demonstrates that SAIC well understood that

ensuring freedom from potential OCIs was material to its customers, including the NRC.  However,

despite this stated policy, in practice, SAIC's efforts to avoid and disclose OCIs was often lax.  *See* ¶¶

59-64, 70-90, 215-221.  For example, Alex Murray testified that he raised concerns to SAIC

management regarding SAIC's potentially conflicting roles on the NRC contract and on the BNFL Oak

Ridge Recycle Project.  No evidence exists that these concerns were ever acted upon.  *Id.*

70.   **SAIC encouraged employees to raise any concerns about conflicts of interest, and SAIC specifically addressed an issue allegedly raised by Murray by informing him of the company's conclusion that there was not a conflict of interest. See Murray Test., 7/2 p.m. Tr. 105:15-23, 109:7-110:17 (Exh. 33).**

Response:      As stated above, it is disputed that SAIC ever addressed Murray's concerns.  *See*

¶¶ 59, 62, 69, 139-141.  However, SAIC's stated policy of encouraging employees to raise concerns

regarding organizational conflicts of interest demonstrates that SAIC understood that ensuring freedom

from organizational conflicts of interest was material to the NRC and its other customers.  Additionally,

while SAIC's stated policy may have encouraged employees to raise OCI concerns, it ignored repeated

concerns raised by Murray, both general and specific to the Oak Ridge Recycle Project.  Ignoring

concerns raised by individual employees is the very definition of recklessness.

71.     **Before it entered into its NRC contracts, SAIC had developed a program to identify and address potential conflicts of interest. When designing this system, SAIC took into account NRC and DOE regulations. See Carder Test., 7/22 a.m. Tr. 65:5-7 (Exh. 30).**

Response:       Disputed.  While SAIC had a program to identify and address potential conflicts

of interest, it is disputed that this system meaningfully took into account the NRC regulations.  In fact,

the evidence is undisputed that this system was deliberately or recklessly designed to _exclude_ types of

situations or relationships that SAIC understood could constitute OCI situations or relationships under

NRC regulation.  *See, e.g.,* Carder Testimony, attached hereto as Exhibit 14, 7/22 a.m. Tr. 66-78;

Rodehau Testimony, attached hereto as Exhibit 7, 7/7 a.m. Tr. 44:12-46:24.  For example, SAIC's OCI

compliance program ignored planned or non-contractual relationships, even though it understood that

such relationships could constitute potential OCIs that would require disclosure to the NRC.  *Id.*; *see*

*also* PX 526, attached hereto as Exhibit 16, at 0130991 (SAIC knew that the NRC regulations included

planned interests as potential OCIs).  The PHP, ARMR, and Alaron relationships fall into this category.

Furthermore, SAIC's OCI compliance program excluded membership in professional organizations and

intellectual property interests.  *Id.* The PHP and ARMR relationships fall into these categories.

Furthermore, although it is undisputed that SAIC had a program to identify and address potential

OCIs, the evidence at trial was largely that, categorically and as a matter of law, SAIC employees

somehow believed that absolutely no OCI concern could exist with respect to work for the NRC so long

as the overlapping work was performed for a DOE contractor, regardless of the nature of the work or the

financial interest of the DOE contractor in the work performed for the NRC.  *See, e.g.,* Rucker

Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 100.  This purported position finds no

evidentiary support in a single law, regulation, or document authored by SAIC at the time it was

performing its work for the NRC.  Indeed, the NRC regulations as well as SAIC's own training

materials specifically contradict this position by stating clearly that a potential conflict exists whenever

SAIC furnishes advice to a "government agency in a technical area where [SAIC] is also providing

consulting assistance in same area to <u>any other organization</u>."  PX 919, US SMF Exh. 41, at 0173287,

0173304.  Therefore, not only did SAIC's OCI program not take into account NRC regulations, but

SAIC employees apparently ignored SAIC's own admonitions to avoid and disclose organizational

conflicts of interest in favor of an unsupported and undocumented "DOE exception."

**72.    SAIC was "conscientious and attempted to identify and report all conflicts of interest that
         arose under the[ir] agency work assignments." McWhirter Depo. Tr. 10:18-11:9, 54:7-19,
         68:5-12, 76:2-6 (Exh. 40); see also id. at 129:8-22, 130:7-11 (concluding that SAIC's
         compliance system was above average).**

        Response:        This evidence purportedly supporting this assertion was stricken, on relevance

grounds, from evidence at the parties' pre-trial conference and, as such, was never entered into evidence

at trial.  *See* Pretrial Conference Transcript, 6/18 a.m. Tr. 25.

        In any event, this statement is disputed.  The evidence actually presented at trial demonstrated

that SAIC's system did not even account for numerous types of situations and relationships that SAIC

understood could constitute actual or potential conflicts of interest.  *See, e.g.,* ¶¶ 5, 53, 66, 71, 83, 218.

Furthermore, the evidence presented at trial demonstrated that SAIC employees ignored SAIC's OCI

training in favor of a completely unsupported position that work performed for the NRC and for a DOE

contractor could never conflict.  *See, e.g.,* ¶¶ 23, 33-34, 60, 67, 71-72, 88, 169, 175, 180.  The evidence

at trial further demonstrated that far from being conscientious in raising organizational conflicts of

interest, SAIC employees did not escalate potential conflicts even when they had information suggesting

that SAIC was performing overlapping work for multiple entities that created a potential for bias.  *See,*

*e.g.,* ¶¶ 131-214, 220.  Finally, the available evidence indicates that SAIC ignored Murray's very specific concerns regarding potential conflicts given SAIC's overlapping work for BNFL and for the NRC, as well as more generalized concerns about SAIC's structure's contribution to and exacerbation of organizational conflict of interest problems.  *See, e.g.,* ¶¶ 58-64, 138-141, 153-154.  Therefore, SAIC was not, in any way, conscientious about avoiding or disclosing organizational conflicts of interest, either in its formal program or in its execution of that program relative to this case.

73.     **SAIC's compliance system, "consisting of written policies, actual procedures, training materials, system tools, and supplemental databases[,] was effective in ensuring company-wide notice and access to relevant facts and circumstances to avoid and/or mitigate potential OCIs." 6/12/06 Expert Report of C. Wilkins at 4 (Exh. 41). SAIC's "practices are consistent with industry practice." 9/18/06 Supp. Expert Report of C. Wilkins at 4 (Exh. 42).**

         Response:       Disputed.  See response to ¶ 72.

74.     **The work to be performed by a contractor is not defined in teaming agreements, and "customary practice" does not involve evaluating such opportunities for conflict-of-interest compliance. 9/18/06 Supp. Expert Report of C. Wilkins at 3 & n.3 (Exh. 42).**

         Response:       Disputed.  SAIC fully understood that other than contractual arrangements, such as teaming agreements, could constitute organizational conflicts of interest.  *See* Rodehau Testimony, attached hereto as Exhibit 7, 7/7 a.m. 46:21-46:21, 44:18-44:19; *see also* ¶¶ 5, 53, 66, 71, 83, 218.  To the extent that SAIC chose to ignore teaming agreements in its OCI compliance system, SAIC was acting in deliberate ignorance and/or reckless disregard of the fact that such relationships could constitute OCI situations or relationships.  Furthermore, SAIC's teaming agreements at issue in this case, including its teaming agreement with BNFL, did indeed specify the scope of work to be performed by SAIC on the BNFL Oak Ridge Recycle Project.  *See*, e.g., PX 190, SAIC-BNFL Teaming Agreement, US SMF Exh. 30.

         Further, it is disputed that any of the OCI situations or relationships solely involve amorphous or undefined teaming agreements.  *See* ¶¶ 14-19, 131-214.  In the BNFL and BJC relationships, SAIC had

a contract with the entities, which were commercial entities, to provide advice and assistance regarding release and recycle of radioactive material from nuclear facilities, the same technical area and on the same matters as SAIC was advising the NRC.  *See* ¶¶ 14-16, 131-183.  In the ARMR relationship, SAIC's Vice President was an active member of the Board of Directors of an organization specifically created to advocate for the passage of the exact same rule upon which SAIC was advising the NRC. *See* ¶¶ 19, 184-200.  With regard to the PHP, SAIC had a financial and ownership interest in a decontamination technology it knew would be subject to NRC regulations and licensure.  *See* ¶¶ 18, 201-213.  With regard to Alaron, SAIC, as a member of the Alaron team, had a Blanket Ordering Agreement to perform work related to the decontamination, release, and recycle of radioactive material from a nuclear facility.  *See* ¶¶ 17, 214.

**75.** **SAIC's system was responsible for managing the thousands of contracts that SAIC had at any given time. See Carder Test., 7/22 a.m. Tr. 64:1-8 (Exh. 30); Bidwell Test., 7/16 a.m. Tr. 80:7-10 (Exh. 11); Martin Test., 7/14 p.m. Tr. 50:11-12 (Exh. 7).**

Response:      Undisputed.

**76.** **The first step in SAIC's compliance system was set in motion when an SAIC contract representative received a Request for Proposal ("RFP"). Upon receipt of an RFP, the contract representative would read and analyze the RFP, focusing specifically on any conflict-of-interest clauses or other clauses that might limit future contracts. Carder Test., 7/22 a.m. 45:6-12 (Exh. 30); Rodehau Test., 7/7 a.m. Tr. 5:14-20 (Exh. 23).**

Response:      Undisputed.  This highlights one of the problems with SAIC's system.  A situation or relationship in which no RFP was received would not trigger any action on SAIC's part. Rodehau Testimony, attached hereto as Exhibit 7, 7/7 a.m. Tr. 44:12-46:24. This partially explains SAIC's failure to identify or route the PHP, Alaron, and ARMR relationships, and SAIC's failure to do any routing related to the BNFL Oak Ridge Recycle Project until that project was well under way.

**77.** **For large procurements, SAIC had an acquisition council that would evaluate certain opportunities early on—typically, before a proposal was submitted—to determine, among other things, whether the proposed opportunity presented any conflicts of interest. Rodehau Test., 7/3 p.m. Tr. 82:12-21 (Exh. 22).**

Response:        Undisputed.

78.    **Under SAIC's compliance system, a notification would be electronically routed to other groups within SAIC to inform them about the work on which SAIC was considering bidding and to delineate the types of restrictions that the proposal might involve. Carder Test., 7/22 a.m. Tr. 45:13-16 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 79:8-20, 83:11-13 (Exh. 22); see also Martin Test., 7/14 a.m. Tr. 45:14-23 (Exh. 19). Such notifications were sent via an electronic routing form that identified the potential customer, described the work on which SAIC was considering bidding, and detailed the relevant conflict-of-interest provisions. Carder Test., 7/22 a.m. Tr. 56:7-17, 57:15-19, 59:15-25 (Exh. 30); see also Rodehau Test., 7/3 p.m. Tr. 83:11-22 (Exh. 22). SAIC's contracts staff was "trained on how to summarize the scope of work for purposes of using this system." Carder Test., 7/22 a.m. Tr. 57:11-13 (Exh. 30).**

Response:        Undisputed.  However, the system was only as effective as the individuals responsible for entering information into the system and reading information once it was in the system. In the case of the ARMR, PHP, and Alaron projects, it appears that no routing was ever entered despite the obvious potential for bias with respect to SAIC's work for the NRC, because these relationships were other than contractual.  *See* Rodehau Testimony, attached hereto as Exhibit 7, 7/7 a.m. Tr. 44:12-46:24.  SAIC's system ignored these relationships even though SAIC fully understood that other than contractual relationships could constitute conflicts of interest in violation of SAIC's contractual organizational conflicts of interest obligations and the NRC's OCI regulations.  *See*, e.g., *¶¶* 5, 53, 66, 71, 83, 218.  In the case of the BJC Dose Assessment Project, while a routing may have been completed for the project, the relationship was never disclosed to the NRC despite the fact that SAIC's work scope for BJC and for the NRC were nearly identical – so identical, in fact, that SAIC's work product for BJC copied whole sections of SAIC's work product for the NRC.  *See,* Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 29:5-42:14; Rucker Testimony, US SMF Exh. 6, 7/21 p.m. Tr. 72:2-81:8.  The copied sections included both general background and also SAIC's judgments, conclusions, and recommendations regarding what, and what not, to consider in SAIC's analysis.  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 35:21-36:9, 70:4-74:19; Rucker Testimony, US SMF Exh. 6, 7/21 p.m. Tr.

72:2-81:8.  In the case of the BNFL Oak Ridge Recycle Project, because of SAIC's compliance system's

failure to enter teaming agreements, the Project was not entered at all into SAIC's system until well into

the project.  In addition, the entry of the project into SAIC's Contracts database does not even include

the key words "recycle" or "decontamination and decommissioning" even though the very title of the

project contains both the word "recycle" and the acronym "D&D", which is shorthand for

"decontamination and decommissioning."  Nor does the entry include the key word "radiation," even

though all three of these key words are available for selection.  PX 478, attached hereto as Exhibit 17;

Bidwell Testimony, attached hereto as Exhibit 18, 7/16 a.m. Tr. 76-77.  Further, no internal control

existed to ensure that the individuals who would have the knowledge necessary to identify conflicts

would ever even read the routing.  Rodehau Testimony, attached hereto as Exhibit 7, 7/7 a.m. Tr. 47-48.

Because SAIC's system: (1) excluded types of relationships that SAIC knew could cause organizational

conflicts of interest; (2) failed to accurately describe and identify SAIC's work; (3) failed to impose

internal controls to insure that routings were reviewed appropriately and the contracts database was

searched; and (4) failed to identify potential conflicts in situations even where SAIC's own training

materials made clear that a potential conflict existed, the system was not a reasonable or prudent way of

ensuring compliance with SAIC's OCI obligations.

**79.    Once a conflict-of-interest routing was circulated through SAIC's system, the routings were received by SAIC's senior contracts staff, who were involved in contracts operations at the business unit level. Carder Test., 7/22 a.m. Tr. 58:1-8 (Exh. 30); see also Rodehau Test., 7/3 p.m. Tr. 40:7-13 (Exh. 22); Martin Test., 7/14 p.m. Tr. 64:24-65:11 (Exh. 7). Those individuals were responsible for comparing the routings against the contracts that existed within their respective parts of the company, and for identifying, and alerting others to, any conflicts of interest. Carder Test., 7/22 a.m. Tr. 45:17-22, 58:9-15 (Exh. 30); Rodehau Test., 7/3 p.m. Tr. 87:4-16 (Exh. 22); see also Rodehau Test., 7/7 a.m. Tr. 10:5-14 (Exh. 23); Martin Test., 7/14 p.m. Tr. 65:8-15 (Exh. 7).**

Response:      Undisputed, but see responses to ¶¶ 72-78.

**80.    If the contracts staff person who received a routing needed additional information, she could forward the routing to other SAIC employees. Carder Test., 7/22 a.m. 73:12-16 (Exh.**

30); see also Rodehau Test., 7/3 p.m. 87:10-16 (Exh. 22). **In carrying out his responsibility to review the conflict-of-interest routings, Rodehau "would meet" with his program managers "at least on a weekly basis [to] review[ ] the routings." Rodehau Test., 7/7 a.m. Tr. 10:5-22 (Exh. 23).**

Response:      Undisputed.  See responses to ¶¶ 72-78.

81.    **If no possible conflict-of-interest issues were raised as a result of the routing process, SAIC would then submit its bid. Carder Test., 7/22 a.m. Tr. 45:20-22 (Exh. 30). If issues were raised, however, the contract representative who circulated the routing would investigate the issue further and would share the relevant information with SAIC's technical staff. See Rodehau Test., 7/3 p.m. Tr. 91:5-22 (Exh. 22). The contract representative who circulated the routing and the employees who responded with a possible conflict-of-interest issue would then confer and determine whether there was a way to mitigate the conflict so that SAIC could submit a bid. Carder Test., 7/22 a.m. Tr. 45:23-46:3, 59:7-11 (Exh. 30); see also Rodehau Test., 7/7 a.m. 13:4-14:16 (Exh. 23). If the two groups could not agree, SAIC's Corporate Contracts Department would assist and determine the best approach. Carder Test., 7/22 a.m. Tr. 46:4-8 (Exh. 30). If there was no consensus within SAIC as to how to proceed, SAIC would not submit the bid. Id. at 46:9-13; see also Rodehau Test., 7/7 a.m. Tr. 16:25-17:15 (Exh. 23).**

Response:      Undisputed.  See responses to ¶¶ 72-78.

82.    **SAIC's conflict-of-interest routing system was used for bids, proposals, modifications to contracts, and "qualification packages that could result in a contract award." Rodehau Test., 7/7 a.m. Tr. 44:12-17 (Exh. 23); see also Carder Test., 7/22 a.m. Tr. 66:18-20 (Exh. 30).**

Response:      Undisputed.  See responses to ¶¶ 72-78.

83.    **"It would serve no purpose" to include teaming agreements within the compliance systems because such agreements "do not have an extensive detailed Statement of Work." Carder Test., 7/22 a.m. Tr. 66:21-25 (Exh. 30). Teaming agreements simply involve "companies getting together to think about a future project," and SAIC therefore receives no compensation under such agreements. Carder Test., 7/22 a.m. Tr. 68:15-18, 81:25-82:8 (Exh. 30); see also Rodehau Test., 7/7 a.m. Tr. 46:16-20 (Exh. 23); Bidwell Test., 7/16 a.m. Tr. 77:24 (Exh. 11).**

Response:      Disputed.  Contrary to the assertion that "it would serve no purpose" for SAIC's

compliance system to include teaming agreements, SAIC fully understood that teaming agreements and

other planned interests could constitute organizational conflicts of interest and therefore were required to

be identified and disclosed to the NRC.  Rodehau Testimony, attached hereto as Exhibit 7, 7/3 p.m. Tr.

50

45, 76, 7/7 a.m. Tr. 46; PX 526, attached hereto as Exhibit 16, at 0130991; *see also* ¶¶ 5, 53, 66, 71, 218.

SAIC agreed to abide by these requirements when it signed and requested payment on its NRC

contracts, notwithstanding that it now argues that compliance "would serve no purpose." *Id.*  Contrary

to the assertion that teaming agreements "do not have an extensive detailed Statement of Work," the

work descriptions input into SAIC's OCI system were often vague, relied heavily on keywords, and did

not require anything approaching a "detailed Statement of Work."  PX 478, attached hereto as Exhibit

17; Bidwell Testimony, attached hereto as Exhibit 18, 7/16 a.m. Tr. 76-77.   Contrary to the assertion

that "[t]eaming agreements simply involve companies getting together to think about a future project"

and concern is unnecessary because SAIC is not paid for teaming agreements, the NRC's regulations

could not be more clear, and SAIC fully understood, that planned interests can create organizational

conflicts of interest and must be identified and disclosed.  Rodehau Testimony, attached hereto as

Exhibit 7, 7/3 p.m. Tr. 45, 76, 7/7 a.m. Tr. 46; *see also* PX 526, attached hereto as Exhibit 16, at

0130990-0130991.  SAIC's argument that such relationships are somehow categorically not of concern

represents almost an admission of deliberate ignorance and reckless disregard.

       Additionally, see response to ¶ 74.

**84.**     **SAIC had methods of communicating internally about teaming agreements. "[T]here was a separate process for teaming agreements" (Rodehau Test., 7/7 a.m. Tr. 44:19 (Exh. 23)), whereby one business unit teaming with a company could notify other business units about that arrangement. See Carder Test., 7/22 a.m. Tr. 81:13-18 (Exh. 30); Rodehau Test., 7/7 a.m. Tr. 44:19 (Exh. 23).**

       Response:      Disputed.  SAIC's contention could scarcely be more inaccurate.  Carder

explicitly testified that while, "if one business unit is teaming with a company, they <u>might</u> notify other

business units" as a "marketing and strategy type of thing," there was "<u>no system for teaming</u>

<u>agreements</u>."  Carder Testimony, attached hereto as Exhibit 14, 7/22 a.m. Tr. 81 (emphasis supplied).

Indeed, there is no evidence to suggest that teaming agreements were escalated or otherwise viewed as a

concern by SAIC.  Furthermore, that "one business unit teaming with a company <u>could</u>", or "might," if it so chose, notify other business units, provides no internal control or requirements regarding such arrangements and is reckless given SAIC's understanding that planned work could create an organizational conflict of interest under the NRC regulations.  *See, supra*, responses to ¶¶ 74, 83.

85.     **During the relevant time period, SAIC made a transition to a new computerized routing system. At the time it was being used by SAIC, the earlier system "was state-of-the-art." Carder Test., 7/22 a.m. Tr. 61:24-25 (Exh. 30); see also Rodehau Test., 7/7 a.m. Tr. 6:18-23 (Exh. 23).**

Response:        Disputed.  The evidence is clear that the system excluded situations and relationships that were squarely within the NRC's regulations.  *See, supra*, responses to ¶¶ 5, 53, 66, 71, 83, 218.  Furthermore, the system depended on SAIC employees consciently reading and inputing information into the system, with no internal controls to make sure that they did.  *See, e.g.,* response to ¶ 78.  For example, if no one responded to a proposed business opportunity by raising a potential conflict, SAIC assumed that everyone had diligently read and researched the opportunity and had all determined that no conflict existed, whether in fact anyone had ever read the information or not.  *Id.*  Accordingly, the evidence is clear in this case that even though multiple individuals had simultaneous awareness of work for the NRC and the OCI situations and relationships, other than Mr. Murray, whose concern was ignored, no potential OCI was ever escalated within SAIC, let alone disclosed to the NRC.  *See* ¶¶ 131-214.  Therefore, it is disputed that SAIC's system was in any way effective or "state-of-the-art."

86.     **On a regular basis, SAIC chose not to pursue work because the work would have presented conflict-of-interest concerns. Carder Test., 7/22 a.m. Tr. 40:3-8 (Exh. 30).**

Response:        Partially disputed.  It may very well be that SAIC declined work based on <u>known and identified</u> OCI concerns.  This demonstrates that SAIC and its employees fully understood that OCI compliance was material to its customers, including the NRC.  However, former SAIC employees also testified that SAIC vigorously pursued new business opportunities while making OCI compliance a

secondary concern.  *See, e.g.,* ¶ 59.  Additionally, the evidence is clear that SAIC's system and

personnel did not adequately communicate regarding situations or relationships that could constitute

OCI situations or relationships required to be disclosed to the NRC, and therefore did not adequately

identify or appropriately escalate such concerns.  *See* ¶¶ 131-214.  It would obviously be impossible for

SAIC to decline to pursue work based on OCI concerns that it had not properly identified or escalated.

87.     **SAIC had a contract management database that contained information about the conflict-of-interest clauses contained in SAIC's contracts. Rodehau Test., 7/3 p.m. Tr. 88:23-89:2, 89:18-22 (Exh. 22). This contract management database could be searched using key words in an attempt to identify possible conflicts of interest. Bidwell Test., 7/16 a.m. Tr. 75:2-16 (Exh. 11). For example, Rodehau input information into this database upon notification of award of the 1992 Contract; Martin searched the database in connection with several modifications to that contract; and the database was searched when SAIC was preparing its November 22, 1999 response to the NRC's request for information. Rodehau Test., 7/3 p.m. Tr. 88 (Exh. 22); Martin Test., 7/14 a.m. Tr. 106:22-24 (Exh. 19); Martin Test., 7/14 p.m. Tr. 50:7-16, 51:1-4, 59:4-15, 60:14-23 (Exh. 7).**

Response:        It is undisputed that SAIC had a searchable contracts management database that

used a key words system.  However, from the evidence cited by SAIC, it appears that this database was

only used prior to SAIC bidding on a new contract or a contract modification, or after the NRC raised

OCI concerns.    This is contrary to SAIC's OCI obligations to the NRC, which required it not only to

certify that no OCI situations or relationships existed when bidding on a contract, but that SAIC avoid

and disclose all such relationships during the performance of the contracts.  *See* ¶¶ 66, 105-119.  At the

very least, reasonable inquiry would have required SAIC to search the database whenever it submitted a

claim for payment, since all such claims implicitly represented continuing compliance with SAIC's OCI

obligations.  *SAIC*, 626 F.3d at 1269.

In any event, like other aspects of SAIC's OCI compliance system, the contracts management

database necessarily was only as effective as the information input into it and the individuals filling out

and inputting such information.  For example, the BNFL Oak Ridge Recycle Project entry did not

contain key words for "recycle" or "radiation," or "decontamination and decommissioning", even

53

though those words appear in the very title of the project and even though SAIC employees believed that one could not accurately describe the project without using such words.   PX 478, attached hereto as Exhibit 17; Bidwell Testimony, attached hereto as Exhibit 18, 7/16 a.m. Tr. 76-77; Schultz Deposition, read into record at 7/23 p.m. Tr. 7-9, attached hereto as Exhibit 19.

88. **SAIC's conflict-of-interest policies and systems were implemented in connection with the 1992 and 1999 Contracts. SAIC used the conflict-of-interest routing procedure for the proposals that it prepared for both contracts. Rodehau Test., 7/3 p.m. Tr. 88:11-18 (Exh. 22); Martin Test., 7/14 p.m. Tr. 62:14-22 (Exh. 7). In addition, SAIC used the routing system in connection with proposals for substantive modifications. Rodehau Test., 7/7 a.m. Tr. 28:18-22 (Exh. 23); Rodehau Test., 7/3 p.m. Tr. 84:6-9 (Exh. 22); Martin Test., 7/14 p.m. Tr. 59:4-18, 60:14-23 (Exh. 7); see also Martin Test., 7/14 a.m. Tr. 86:16-25, 87:25-89:3 (Exh. 19).**

Response:      Disputed.  See responses to ¶¶ 65-87, 89, 215-221.  SAIC did not follow even its own inadequate organizational conflict of interest policies in connection with its work on the NRC contract.  Notwithstanding SAIC's official policy to avoid conflicts, conflicting situations and relationships were not routed and were not considered in light of SAIC's work for the NRC, even though SAIC understood that such situations and relationships could constitute organizational conflicts of interest.  *See*, *e.g.*, *¶¶* 5, 53, 66, 71, 83, 218.

Even though SAIC's own internal training for its OCI system identified situations in which SAIC was performing work for a government agency and any other organization in the same technical area as potential organizational conflicts of interest that required disclosure, SAIC did not escalate such situations in favor of what was apparently an unstated, unsupported, and unofficial "DOE exception" that was contradictory to SAIC's training materials and the plain language of the NRC regulations and SAIC's training materials. *See, e.g.,* ¶¶ 23, 33-34, 60, 67, 71-72, 88, 169, 175, 180.  This is true even though many of the exact same individuals were working on the NRC contract, the BJC Dose Assessment, and the BNFL Oak Ridge Recycle Project.  *See e.g.* ¶¶ 131-183.  Other individuals had simultaneous knowledge of SAIC's work for the NRC and the other OCI situations and relationships.

54

*See,* e.g., ¶¶ 184-214.  That SAIC's system failed to act on the multiple individuals who <u>did</u> have simultaneous knowledge of the NRC work and the conflicting work itself demonstrates that the system was woefully inadequate to deal with overlapping work where no one employee possessed such knowledge.

Additionally, in violation to SAIC's stated policies, it appears that SAIC ignored the concerns of Alex Murray regarding the overlapping nature of the BNFL Oak Ridge Recycle Project and the NRC Contract.  *See* ¶¶ 58-64, 139-147.  Mr. Murray was concerned that SAIC's pursuit of business opportunities in the area of radioactive material release and recycle could cause a conflict with regard to SAIC's work for the NRC.  *Id.*  Those concerns were apparently brushed aside or ignored.  *Id.*

**89.  Martin complied with SAIC's conflict-of-interest policies and procedures in administering the 1992 and 1999 Contracts. Martin Test., 7/23 a.m. Tr. 87:20-88:1, 90:20-91:4 (Exh. 34). SAIC performed a "due diligence check" before making any conflict-of-interest certifications in connection with those contracts. Rodehau Test., 7/3 p.m. Tr. 53:7-12 (Exh. 22); see id. at 77:24-79:25.**

Response:      Disputed.  See response to ¶ 88.

**90.  During contract negotiations with the NRC in 1999, SAIC identified a potential future conflict of interest based on "a future desire" for one of SAIC's business units possibly to "go and market" to a particular NRC licensee; this created a potential problem because the initial RFP called for the SAIC team working on the NRC project to visit certain NRC licensee sites, and there was some potential that those sites would be the same ones where the other SAIC business unit had a desire to perform marketing. Martin Test., 7/14 p.m. Tr. 66:2-67:4 (Exh. 7). See generally McKenzie-Carter Test., 7/17 p.m. 14:24-16:15 (Exh. 27). SAIC disclosed the potential conflict to the NRC and worked with the agency to develop a mutually acceptable mitigation plan. See Martin Test., 7/14 p.m. Tr. 69:1-17, 71:3-9 (Exh. 7); see also id. at 64-71; McKenzie-Carter Test., 7/17 p.m. 16:4-15 (Exh. 27).**

Response:      Undisputed.  This potential OCI had nothing to do with any of SAIC's conflicting relationships.  As SAIC understood, it was up to the NRC whether it would allow a contract to be mitigated.  Martin Testimony, attached hereto as Exhibit 6, 7/14 p.m. Tr. 67-68.  During this discussion, the NRC clearly communicated that it would not accept any modification whatsoever to its organizational conflict of interest requirements.  *Id.*, 7/14 p.m. Tr. 68:1-4.  Indeed, SAIC could not be

awarded the 1999 NRC Contract until they had resolved this issue by SAIC agreeing not to visit, for the NRC contract, any NRC licensee sites in which SAIC might be "marketing." *Id.*, 7/14 p.m. Tr. 66-71. Further, this particular episode demonstrates that SAIC understood that organizational conflict of interest compliance was both important and material to the NRC.

## II.      ADDITIONAL MATERIAL FACTS

**The Nuclear Regulatory Commission**

91.      The NRC is an independent federal agency established by the Energy Reorganization Act in 1974 to regulate the civilian use of nuclear materials and to protect public health, public safety, and the environment from the harmful effects of radiation. *See* 42 U.S.C. § 2201; *United States v. SAIC*, 626 F. 3d 1257, 1261 (D.C. Cir. 2010).

92.      Pursuant to the Atomic Energy Act of 1946, as amended in 1954 (AEA), the Atomic Energy Commission and its successor, the NRC, are given the authority to regulate the civilian possession, use, transportation and disposal of nuclear material in the United States. *See* 42 U.S.C. § 2201.

93.      Pursuant to its statutory authority, the NRC oversees the release into interstate commerce of commercially valuable recycled radioactively contaminated materials from nuclear facilities. The NRC carries out its responsibilities by establishing scientific standards for release and recycle, and by requiring entities to possess an NRC license in order to possess, utilize, dispose of, or transport radioactive material. 42 U.S.C. §§ 2201, 2111; 10 C.F.R. § 8.4. *See also SAIC*, 626 F. 3d at 1261.

**SAIC's NRC Contracts**

94.      In 1992, the NRC contracted with SAIC to provide technical assistance in

the areas of control, release, and recycle of radioactive solid material (the "1992 NRC Contract").  The

1992 NRC Contract called for technical assistance on the subject matter of the release and reuse/recycle

of material and equipment from nuclear facilities.  *SAIC*, 626 F.3d at 1261-62; Cardile Testimony, US

SMF Exh. 1, 7/1 p.m. Tr. 78:23-79:10; 86:90:2-90:6.

95.     SAIC's advice and assistance to the NRC on the 1992 NRC Contract was

intended to assist the NRC in developing a regulation regarding the release and recycle of radioactive

scrap metal and other radioactive material  by NRC and Agreement State Licensees. (the "clearance

rule").  Cardile Testimony, US SMF Exh. 1, 7/1 p.m. Tr. 82:10-85:13; Mauro Testimony, US SMF Exh.

2, 7/21 a.m. Tr. 117:19-119:19.

96.     SAIC understood that the subjects upon which SAIC was advising the NRC

were and are, by their very nature, controversial.  It was therefore essential that SAIC's work for the

NRC be free from any actual or potential conflict of interest.  Rodehau Testimony, US SMF Exh. 3, 7/3

p.m. Tr. 59:1-59:23; Cardile Testimony, US SMF Exh. 1, 7/1 p.m. Tr. 71:15-72:4; 84:1-19.

97.     SAIC's work for the NRC on the 1992 Contract was in the following technical

areas: (1) clearance, recycle and release of nuclear material from nuclear facilities; (2) measurement of

radioactivity in solid materials at nuclear facilities; (3) regulations and standards applicable to the

release of slightly contaminated solid material from nuclear facilities; (4) measuring inventories of solid

material at nuclear facilities; and (5) assessment of health and safety issues for nuclear workers, the

public and the environment pertaining to the release of nuclear material from nuclear facilities.  Cardile

Testimony, US SMF Exh. 1, 7/1 p.m. Tr. 82:10-82:15, 85:3-85:13, 7/2 a.m. Tr. 6:3-17:2; McKenzie-

Carter Testimony, US SMF Exh. 4, 7/17 a.m. Tr. 96-102:16; *SAIC*, 653 F. Supp. 87, 92-93 (D. D. C.

2009); *see also* Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 66:21-68:9; Rucker Testimony, US SMF

Exh. 6, 7/10 a.m. Tr. 109:3-110:15.

98.     The NRC sought assistance in these areas because it needed to develop a solid, defensible and unbiased technical foundation and basis to engage in rulemaking on the issue of the release of slightly contaminated solid material from nuclear facilities.  Cardile Testimony, US SMF Exh. 1, 7/1 p.m. 85:3-85:13, 90:2-90:6.

99.     The 1992 NRC Contract set out formal tasks for SAIC to: (1) conduct a literature search and analysis of the information available related to the potential reuse and recycle of material from nuclear facilities; (2) assess the potential dose to various members of the public that could be expected to occur from the recycle, reuse, and release of radioactive material from nuclear facilities; (3) prepare a draft regulatory options paper for the NRC consideration setting forth various regulatory options for release and recycle, and the pros and cons of each option; (4) assist in the preparation of regulatory products as the NRC moved to rulemaking; and (5) assist in the preparation of regulatory guides. Cardile Testimony, US SMF Exh. 1, 7/2 a.m. Tr. 6:19-17:2; Meck Testimony, US SMF Exh. 7, 7/3 a.m. Tr. 89:4-89:15.  A subsequent modification to the 1992 NRC contract required SAIC to prepare a regulatory issues paper setting out the issues and concerns of various "stakeholders," including those who carried out recycle and release of radioactive scrap metal, as well as the costs and benefits of various regulatory options for recycle and release.  Jupiter Testimony, US SMF Exh. 8, 7/22 p.m. Tr. 27-34.

100.    At the time of the 1992 NRC Contract, release of radioactively contaminated solid materials was governed by NRC Regulatory Guide 1.86.  SAIC understood that its work on the NRC contract included considerations of Regulatory Guide 1.86 and that part of what it was advising the NRC on was whether Regulatory Guide 1.86 was adequately protective of public health, safety, and the environment.  Additionally, SAIC understood that the NRC regulation for which SAIC was providing broad technical advice and recommendations would have replaced NRC Regulatory Guide 1.86 and that

SAIC's work would have been used in determining types and quantities of radioactive material that could be released.  McKenzie-Carter Testimony, US SMF Exh. 4, 7/17 p.m. Tr. 41:25-42:16.

101.    Any NRC rule governing the release and recycle of radioactive material into general commerce would have governed entities in so-called "agreement states" such as Tennessee, which are legally required to enact laws and policies consistent with NRC rules and regulations.  SAIC understood this.   Cardile Testimony, US SMF Exh. 1, 7/1 p.m. Tr. 82:16-83:22; McKenzie-Carter Testimony, US SMF Exh. 4, 7/17 p.m. Tr. 40:20-41:13; Murray Testimony, US SMF Exh. 9, 7/2 p.m. Tr. 67:25-68:8; Rucker Testimony, US SMF Exh. 6, 7/10 a.m. Tr. 78:6-78:9; Mauro Testimony, US SMF Exh. 2, 7/21 a.m. Tr. 117:19-119:19.

102.    Additionally, any NRC rule governing the release and recycle of radioactive material into general commerce would have applied to release into general commerce from DOE facilities.  This is because once material leaves a DOE site and enters general commerce, it becomes subject to NRC regulatory authority and jurisdiction.  SAIC employees understood this. *SAIC*, 626 F.3d at 1272; *SAIC*, 653 F. Supp. 2d. at 96-97, 100; Truitt Testimony, US SMF Exh. 10, 7/10 pm Tr. 21:7-22:1 ("any radiological material that went off-site would be subject to NRC once it left the DOE fence"). Turner Testimony; US SMF Exh. 11, 7/8 p.m.  Tr. 39-40, 7/8 a.m. Tr. 66-67; Caldwell Testimony, US SMF Exh. 12, 7/9 p.m. Tr. 80:11-83:6 (material from the BNFL project that left the DOE site would be subject to compliance with NRC regulations and requirements).

103.    As of December 1998, SAIC's work on the 1992 NRC Contract was not complete. Therefore, the NRC awarded a follow-on contract to SAIC in 1999 (the "1999 NRC Contract").  Meck Testimony, US SMF Exh. 7, 7/3 a.m. Tr. 96:13-97:2, 100:17-102:25.

104.    Under the 1999 NRC Contract, SAIC was to provide continued advice and assistance on the NRC's effort to establish a rule providing for the release and recycle of radioactively contaminated

solid materials.  Specifically, SAIC's work in the 1999 Contract was divided into three areas: (1)

analysis and characterization of sources of radioactively contaminated solid material that existed at

commercial and Department of Energy nuclear sites; (2) "dose assessment," that is, estimation of the

potential public health, safety, and environmental impacts of release and recycle of radioactively

contaminated materials; and (3) cost-benefit analysis for the proposed rulemaking focusing on public

health, occupational health, potential changes in costs of consumer products, and industrial operations

not licensed by NRC.  The costs estimated for regulatory alternatives were to be associated with

materials and equipment potentially cleared by NRC and Agreement State licensees.  Meck Testimony,

US SMF Exh. 7, 7/3 a.m. 102:2-103:12; McKenzie-Carter Testimony, US SMF Exh. 4, 7/17 p.m. Tr.

16:25-17:8; Motl Testimony, US SMF Exh. 13, 7/23 a.m. 21:20-23:5, 45:1-46:14.

**SAIC's Organizational Conflict of Interest Obligations**

105.    Each and every SAIC employee was responsible for ensuring that SAIC was free from

improper organizational conflicts of interest and was aware of that responsibility.  Rodehau Testimony,

Exh. 7, 7/3 pm Tr. 45, 57.

106.    Both the 1992 and 1999 NRC Contracts (collectively, the "NRC Contracts")

imposed obligations on SAIC regarding actual and potential organizational conflicts of interest

("OCIs").  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 43:8-53:20.  SAIC and its contracts

manager, Thomas Rodehau, understood that under both contracts, the ultimate determination as to

whether a particular situation or relationship gave rise to an organizational conflict of interest rested

with the NRC and that SAIC's obligation was to disclose relationships that were of the type described in

the NRC regulations.  41 C.F.R. 20-1.54 at p. 3 ("The ultimate determination by NRC as to whether

organizational conflicts of interest exist will be made in light of common sense."); 48 C.F.R. 2009.570-3

("NRC's ultimate determination that organizational conflicts of interest exist will be made in light of common sense…"); Rodehau Testimony, US SMF Exh. 3, 7/3 pm Tr. 72:8-72:13.

107.    Under both contracts, SAIC and its contract managers Rodehau and Martin knew that SAIC was required to avoid certain types of situations and relationships, to certify to the absence of such situations and relationships, and to disclose such situations and relationships if and when they did arise. *SAIC*, 626 F. 3d at 1262; 41 C.F.R. 20-1.54 (1979) ("It is the policy of the U.S. Nuclear Regulatory Commission (NRC) to avoid, eliminate or neutralize contractor organizational conflicts of interest.  The NRC achieves this objective by requiring all prospective contractors to submit information describing relationships, if any, with organizations or persons (including those regulated by the NRC) which may give rise to actual or potential conflicts of interest in the event of contract award."); 48 C.F.R. § 2009.570-3; Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 44:25-46:10 (SAIC was obligated to avoid relationships that could give rise to an OCI, to disclose any such relationships, and to certify to the absence of any such relationships); Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 72:22-77:15; *see also* 42 U.S.C. § 2210a; Scott Testimony, US SMF Exh. 15, 7/3 a.m. Tr. 32:2-32:18 (NRC's OCI requirements are required by and based on its statutory obligation to contract for conflict-free work).

108.    NRC regulations incorporated into SAIC's NRC Contracts described the relationships that SAIC was required to avoid and disclose, and to the absence of which SAIC was required to certify:

(i)     Where the offeror or contractor provides advice and recommendations to the NRC in a technical area in which it is also providing consulting assistance in the same area to any organization regulated by the NRC.

(ii)    Where the offeror or contractor provides advice to the NRC on the same or similar matter in which it is also providing assistance to any organization regulated by the NRC.
        . . . .

(iv)    Where the award of a contract would otherwise result in placing the offeror or contractor in a conflicting role in which its judgment may be biased in relation to its work for the NRC or may otherwise result in an unfair competitive advantage for the offeror or contractor.

41 C.F.R. § 20-1.54 at p. 3; *SAIC*, 626 F. 3d at 1262-63; Rodehau Testimony, US SMF Exh. 3, 7/3 p.m.

Tr. 48:6-50:1.  The 1999 NRC Contract contained a similar provision that did not differ in substance

from that found in the 1992 Contract.  48 C.F.R. § 2009.570-3; *SAIC*, 626 F.3d at 1262; Scott

Testimony, US SMF Exh. 15, 55:2-57:8.  The situations or relationships subject to the rule could be

contractual or other than contractual, and could be present or planned.  Martin Testimony, US SMF Exh.

14, 7/14 a.m. Tr. 52:3-52:8; Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 75:13-76:17.

109.    SAIC's Cost Proposal for the 1992 Contract, submitted on October 1, 1991,

contained the following certification made by SAIC:

> I represent to the best of my knowledge and belief that [t]he award to Science
> Applications International Corp. of a contract or the modification of an existing
> contract . . . does not involve situations or relationships of the type set forth in 20-
> 1.5403(b).

Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 54:16-55:9.

110.    SAIC's Cost Proposal for the 1992 Contract also certifies that "there are no former

or current contractual or organizational relationships of SAIC as a corporation or of individual SAIC

personnel that might give rise to apparent or actual organizational conflicts of interest with respect to the

work proposed.  SAIC will immediately notify NRC of any changes which may result in any

organizational conflicts of interest."  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 55:10-57:6.

111.    SAIC's Best and Final Offer of January 23, 1992, as well as its May 18, 1992 Revised

Best and Final Offer, certify that SAIC and its individual personnel have no relationships that might give

rise to organization conflicts of interest with respect to the work proposed.  SAIC stated that it would

"immediately notify NRC of any changes which may result in organizational conflicts of interest."

Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 59:23-62:22.

112.     The text of the 1992 Contract, executed on August 18, 1992, incorporated and contained

the following certification:

> I represent to the best of my knowledge and belief that:
> The award to Science Applications International Corp. of a contract or the modification
> of an existing contract . . . does not involve situations or relationships of the type set forth
> in 20-1.5403(b).

Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 64:20-65:8; *SAIC*, 626 F.3d at 1262-63.

113.     The 1992 Contract contained post-award OCI obligations in which SAIC agreed to

"forego entering into consulting or other contractual arrangements with any firm or organization, the

result of which may give rise to a conflict of interest with respect to the work being performed under this

contract."  Section H.5(d)(2) of the contract in particular stated:

> The contractor agrees that, if after award, it discovers organization conflicts of
> interest with respect to this contract, it shall make an immediate and full
> disclosure in writing to the Contracting Officer. . . . The NRC may . . . terminate
> the contract if termination is in the best interest of the Government.

 Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 41:16-50:1; *see also SAIC*, 626 F.3d 1261-62.

114.     SAIC submitted proposals for contract modification to the 1992 Contract on at least the

following occasions: December 14, 1994, April 2, 1996, and April 7, 1998.  Each of SAIC's proposals

for contract modification contained the following statement:

> To the best of my knowledge and belief, the award to SAIC of this modification to
> Contract No. NRC-04-92-037 does not involve situations or relationships of the type set
> forth in NRCAR 2009.570-3(b)(1).

Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 65:9-70:10; Martin Testimony, US SMF Exh. 14,

7/14 a.m. Tr. 59:3-61:5; *SAIC* 626 F.3d at 1262-63.

115.     Additionally, the 1992 Contract was bilaterally modified on a number of occasions. Each

modification contained representations by SAIC that all terms of conditions of the original contract,

including SAIC's OCI obligations, "remain unchanged and in full force and effect."  Martin Testimony,

US SMF Exh. 14, 7/14 a.m. Tr. 64:7-71:10.

116.    On May 27, 1999, SAIC's proposal for the 1999 NRC Contract contained the

following representation:

> I represent to the best of my knowledge and belief that:
> The award to Science Applications International Corporation of a contract or the
> modification of an existing contract . . . does not involve situations or relationships of the
> type set forth in 48 CFR 2009.570-3(b).

Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 72:8-77:15.

117.    Like the 1992 Contract, the 1999 Contract also contained post-award disclosure

obligations in which SAIC agreed to "forego entering into consulting or other contractual arrangements

with any firm or organization, the result of which may give rise to a conflict of interest with respect to

the work being performed under this contract."  Section H.1(d)(2) of the contract in particular stated:

> The contractor agrees that, if after award, it discovers organization conflicts of interest
> with respect to this contract, it shall make an immediate and full disclosure in writing to
> the contracting officer. . . . The NRC may . . . terminate the contract if termination is in
> the best interest of the government.

Martin Testimony, US SMF Exh. 14, 7/14/a.m. Tr. 72:8-77:15.

118.    SAIC made these certifications in ¶¶ 17-26, *supra*, to get its NRC contracts, to

keep its NRC Contracts, and to get payments under its NRC Contracts.  SAIC and Rodehau understood

that SAIC had to abide by its OCI obligations in order to get paid on its NRC Contracts.  Rodehau

Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 43:24-44:3; 47:5-47:7; 62:19-62:22 (Q: "And again, it was a

requirement in order for SAIC to get the contract and to get payments under the contract that it make

such certifications, correct?  A: Yes.").  SAIC and its employees, including Rodehau and McKenzie-

Carter, understood that fulfilling SAIC's OCI obligations was critical to the NRC's rulemaking effort.

McKenzie-Carter Testimony, US SMF Exh. 4, 7/17 p.m. Tr. 45:8–46:21; Rodehau Testimony, US SMF

Exh. 3, 7/3 p.m. Tr. 44:7-44:10 (SAIC's contracts manager stated that it was "absolutely" important that SAIC provided advice that was free from bias or potential bias).  SAIC and Rodehau understood that noncompliance with its OCI obligations was grounds for disqualification from award or termination of SAIC's NRC Contracts.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 46:18-47:4.

119.    SAIC and Rodehau understood that if SAIC had a situation or relationship for which disclosure was required, it was irrelevant whether SAIC could "resist temptations" that could arise from OCIs in any given instance because it was the potential for bias that created an organizational conflict of interest and thus required disclosure.  Rodehau Testimony, US SMF Exh. 3, 7/3 p.m. Tr. 51:7-51:22; *see also* 48 C.F.R. § 2009.570-3(d).  In other words, SAIC understood that it was irrelevant to the NRC whether SAIC could demonstrate that SAIC did not allow an OCI to improperly influence its work. SAIC understood that what mattered to the NRC was the potential for bias.  *Id.*

**The NRC Discovers SAIC's Organizational Conflicts of Interest**

120.    In November 1999, with the NRC still completely unaware of SAIC's OCIs, the NRC held a public meeting to discuss its clearance rulemaking.  At the public meeting, an individual complained that the NRC's rulemaking was tainted because of contractor conflict of interest in that SAIC was involved as a partner to BNFL in a large radioactive metal recycling project in Oak Ridge Tennessee.  Cardile Testimony, US SMF Exh. 1, 7/2 a.m. Tr. 43:16-46:21; Meck Testimony, US SMF Exh. 7, 7/3 a.m. Tr. 108:11-108:22, 7/3 p.m. Tr. 4:21-5:17.  This was the first time the NRC learned about SAIC's role in the BNFL Oak Ridge Recycle Project.  *Id.*

121.    Immediately, on November 10, 1999, NRC Contracting Officer, Mary Mace, sent a letter to SAIC stating that the NRC was "very concerned" about this allegation of conflict of interest and asked SAIC to provide an immediate and full disclosure by November 22, 1999 to the NRC of documents that "describe the work that SAIC has performed and is presently performing involving NRC licensees or

applicants (including the Department of Energy and BNFL) which comes within the scope of the referenced NRC/SAIC contracts (including but not limited to individual and collective dose estimates, and recycle or release of nuclear wastes)." Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 84:21-87:18; Plaintiff's Exhibit 779, November 10, 1999 Letter from NRC to SAIC, US SMF Exhibit 22.

122.    On November 22, 1999, SAIC responded to the NRC request and set forth a total of 10 previously undisclosed relationships.   Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 93:24-106:7. SAIC's November 22, 1999 submission falsely did not contain any mention of SAIC's relationships with Alaron, ARMR, or with respect to the PHP. Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 105:18-106:7, 110:16-110:19.

123.    In response to the NRC's November 10, 1999 letter requesting "statements of work or other documents that describe the work that SAIC has performed and is presently performing involving NRC licensees or applicants (including Department of Energy and BNFL) which comes within the scope of the [1992 and 1999 Contracts] (including but not limited to individual and collective dose estimates, and recycle or release of nuclear wastes)," SAIC disclosed some of the  work it performed for BNFL and BJC that is at issue in this case.  Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 93:24-106:7. This was the first time that SAIC disclosed these relationships to the NRC.  Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. at 104:17-104:21.  SAIC's disclosure of these relationships in response to the NRC's request for work "involving NRC licensees or applicants . . . which comes within the scope of" the NRC Contracts demonstrates that SAIC knew that those relationships were of the type discussed in the NRCAR and that SAIC's earlier certifications and claims stating such relationships did not exist, were false.  November 22, 1999 Letter from SAIC to NRC, US SMF Exhibit 46; November 10, 1999 Letter from NRC to SAIC, US SMF Exh. 45.

124.    On December 16, 1999, the NRC, having considered SAIC's November 22 disclosures, issued a Stop Work Order to SAIC.  Martin Testimony, US SMF Exh. 14, 7/14 a.m. Tr. 113:9-114:14.

125.    On December 17, 1999, NRC notified SAIC that it considered SAIC's failure to disclose its relationships with BNFL and BJC to be a breach of the OCI provisions in its contract with the NRC. NRC further notified SAIC that it was considering terminating the contract because of these violations. SAIC was given until January 10 to provide NRC with facts as to why the contract should not be terminated.  Plaintiff's Exhibit 812, December 17, 1999 Cure Letter from NRC to SAIC, US SMF Exhibit 23; Martin Testimony, US SMF Exh. 14, 7/14 p.m. Tr. 5:15-7:22.

126.    On January 10, 2000, SAIC responded to NRC's Cure Notice of December 17 with a Letter to the NRC Contracting Officer.   SAIC set forth facts about its relationships with BNFL and BJC and asserted that termination was unwarranted.  *Id*.  SAIC sent this letter intending that the NRC rely on the representations contained therein, in order to convince the NRC that it did not have any OCIs and that it should be permitted to keep its NRC Contract, and thus, continue to get paid on its NRC contract. Plaintiff's Exhibit 837, January 10, 2000 Letter from SAIC to the NRC, US SMF Exh. 24; Martin Testimony, US SMF Exh. 14, 7/14 p.m. Tr. 13:25-14:12, 22:16–23:3; 29:25–30:3; *see also SAIC*, 653 F. Supp. 2d. at 105.

127.    SAIC's January 10, 2000 letter to the NRC made a number of false assertions about SAIC's relationship with BNFL and SAIC's role on the BNFL Oak Ridge Recycle Project.  SAIC's January 10, 2000 letter claimed, *inter alia*, that: (1) the BNFL contract did not "involve commercial activities of any kind"; (2) "SAIC did not support activities where the State of Tennessee was the regulatory authority"; (3) "SAIC did not support activities related to the unconditional release of materials"; (4) "SAIC did not provide support to BNFL or its subcontractor, MSC, in making dose estimates for released materials"; (5) "SAIC did not provide support to BNFL or its subcontractor, MSC,

in assessing the final state of metals or materials decontaminated by MSC, including residual

quantities"; (6) "SAIC has not developed models or prescribed methods and procedures for measuring

unconditional releases of materials"; (7) "Neither BNFL, nor its subcontractor, MSC, has requested that

SAIC review or comment on the dealings between the project, DOE, and the State of Tennessee relating

to unconditional releases of material"; and (8) "SAIC has not performed analyses of any sort under the

BNFL contract related to the unconditional release of materials, including monitoring requirements or

ALARA analyses.  Plaintiff's Exhibit 837, January 10, 2000 Letter from SAIC to the NRC, US SMF

Exh. 24; Martin Testimony, US SMF Exh. 14, 7/14 p.m. Tr. 14:20-40:10.  SAIC knew that these

statements were false.  SAIC's Martin had only recently taken the position that SAIC's work on the

BNFL contract was indeed "commercial" in nature.  Martin Testimony, US SMF Exh. 14, 7/14 p.m. Tr.

16:20-17:25.  SAIC's Turner and Slack, who assisted in crafting this letter, knew that SAIC had indeed

engaged in the very activities in which it told the NRC that it had not engaged.  Martin Testimony,

attached hereto as Exhibit 6, 7/14 p.m. Tr. 44:8-45:4 (Turner and Slack assisted in preparation of SAIC's

January 10, 2000 Letter); *See also* ¶¶ 131-138, 142-147 (Slack and Turner's knowledge).  Documents

authored by Turner and others for the BNFL Oak Ridge Recycle Project specifically contradicted the

statements in SAIC's January 10, 2000 letter.  Martin Testimony, US SMF Exh., 7/14 p.m. Tr. 14:20-

40:10.

128.    SAIC's January 10, 2000 letter to the NRC also made a number of assertions about

SAIC's relationship with BJC and SAIC's role on the BJC Dose Assessment Project.  The letter

claimed, *inter alia*, that: (1) "SAIC's assessments [for BJC] address current DOE requirements"; and (2)

"[SAIC's assessments] are not based on or derived from SAIC's work under the NRC contract."

Plaintiff's Exhibit 837, January 10, 2000 Letter from SAIC to the NRC, US SMF Exh. 24; Martin

Testimony, US SMF Exh. 14, 7/14 p.m. Tr. 40:11-42:17.  SAIC knew that these statements were false.

SAIC's Slack, who assisted in crafting this letter, knew that SAIC's work for BJC had chosen

parameters and scenarios for its BJC dose assessment by using SAIC's work for the NRC.  Martin

Testimony, attached Exhibit 6, 7/14 p.m. Tr. 44:8-45:4 (Slack assisted in preparation of SAIC's January

10, 2000 Letter); Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 5:4-8:3.  SAIC's Slack also knew that

SAIC's work for BJC was based on release under NRC Regulatory Guide 1.86, an NRC release

standard, and not just "current DOE requirements."  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr.

26:2-27:8.

129.    SAIC's Martin made the statements in its January 10, 2000 letter in an effort to convince

the NRC that no conflict of interest existed and, therefore, that SAIC should be allowed to keep its

contract.  Martin Testimony, US SMF Exh. 14, 7/14 p.m. Tr. 14:20-40:10.  Martin and SAIC understood

that compliance with its contractual OCI obligations was material to SAIC's ability to keep its contract

and to continue to be paid under its contract.  *Id.*; *see also* Martin Testimony, US SMF Exh. 14,

7/14/a.m. Tr. 72:8-77:15; Martin Testimony, attached hereto as Exhibit 6, 7/14 p.m. Tr. 58:5-8.

130.    On March 17, 2000, because of SAIC's failure to avoid and disclose its organizational

conflicts of interest, NRC terminated the SAIC Contract with a no-cost settlement of the 1999 NRC

Contract.  Plaintiff's Exhibit 981, No-Cost Settlement Termination Memo, US SMF Exh. 21; Mace

Testimony, US SMF Exh. 20, 7/15 p.m. Tr. 107:16-111:1.

### SAIC'S Knowledge of the BNFL Oak Ridge Recycle Project

Steven Turner

131.    Steven Turner, an SAIC Vice President, had intimate knowledge of the BNFL Oak Ridge

Recycle Project.   The BNFL Oak Ridge Recycle was the culmination of Turner's pursuit of business

opportunities with BNFL in the area of release and recycle of radioactive material at Oak Ridge,

Tennessee.  During the course of his work on the BNFL Oak Ridge Recycle Project, beginning in early

1996, Turner provided the following advice and assistance to BNFL in the following technical areas: (1) clearance, recycle and release of nuclear material from nuclear facilities; (2) measurement of radioactivity in solid materials at nuclear facilities; (3) regulations and standards applicable to the release of slightly contaminated solid material from nuclear facilities; (4) measuring inventories of solid material at nuclear facilities; (5) dose assessments relating to nuclear materials; and (6) assessment of health and safety issues for nuclear workers, the public and the environment pertaining to the release of nuclear material from nuclear facilities.  SAIC's work with BNFL was in the same technical area, and on the same and similar matters, as its work for the NRC under its NRC Contracts.  *See, e.g.,* Turner Testimony, US SMF Exh. 11, 7/7 p.m. Tr. 81:17-82:14, 84:17-103:17; 120:18-121:15, 7/8 a.m. Tr. 7:5-7:10, 12:20-13:15, 19:23-23:6.

132.    Turner actively pursued business opportunities for SAIC in the area of radioactive material release and recycle.  His goals were aligned with BNFL/MSC's goal to become the world's center for radioactive scrap metal recycling in Oak Ridge, Tennessee.  Turner's pursuit, however, was not limited to Oak Ridge.  He wanted SAIC to pursue and obtain business opportunities in radioactive material release and recycle at other DOE facilities as well as commercial facilities licensed by the NRC.  Plaintiff's Exhibit 94, March 6, 1996 Memo from Steve Turner, US SMF Exh. 27; Turner Testimony, US SMF Exh. 11, 7/7 p.m. Tr. 84:17-103:17, 104:2-108:1, 108:9-118:21, 7/8 a.m. Tr. 78:15-84:24; Plaintiff's Exhibit 100, 3/25/1996 Memorandum from S. Turner, US SMF Exh. 28.

133.    Turner was instrumental in SAIC's work for BNFL on the Oak Ridge Recycle Project.  He prepared and reviewed action plans, cost estimates, dose assessments, regulatory compliance documents, and the majority of the proposal for the project.  SAIC and Turner were responsible for all the planning and for the regulatory actions that allowed the project to take place.  Turner Testimony, US SMF Exhibit 11, 7/8 a.m. Tr. 10:13-12:19, 19:23-29:3, 41:11-44:9, 55:25-64:1, 95:4-110:3, 7/8 p.m. Tr.

116:4-117:4; Plaintiff's Exhibit 521, BNFL Project Description, US SMF Exh. 29; Plaintiff's Exhibit

427, August 11, 1997 Waste Management Plan, US SMF Exh. 35.

134.    Turner, like other SAIC employees, understood that the purpose of the BNFL Oak Ridge

Recycle Project was to remove radioactive material from the three buildings, to decontaminate it to the

extent possible, and to release or recycle as much of it into general commerce as was economically

feasible.  He further understood that material leaving the DOE site for release or recycle would be

subject to NRC regulatory jurisdiction.  Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 112:16-115:4

("[R]ecycling was a key portion [of the BNFL Oak Ridge Recycling Project]"), 7/8 p.m. Tr. 39:21-40:8;

66:16-68:5.

135.    Turner understood that if the NRC's existing release standards were found to be

inadequate to protect public health and the environment, the BNFL Oak Ridge Recycle Project and the

other projects he wanted to pursue would be jeopardized.  Turner Testimony, US SMF Exh. 11, 7/8 p.m.

Tr. 17:14-21:9.  On the other hand, Turner knew that if the NRC were to pass a new regulation allowing

for the release and recycle of radioactive material, the BNFL Oak Ridge Recycle Project and other

similar projects would benefit.  Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 59:15-59:24, 7/8 p.m.

Tr. 116:4-117:4.

136.    The BNFL Oak Ridge Recycle Project Contract and other documents, which Turner

reviewed and prepared, provided that NRC regulations and release standards would govern release of

materials from the project.  Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 29:12-30:18, 112:16-

115:4, 7/8 p.m. Tr. 39:21-40:8, 66:16-68:5.

137.    Turner further assisted BNFL by: (1) preparing and providing cost valuations and cost-

benefit analyses setting forth what materials from the project should be released or recycled; (2)

providing advice and assistance on decontamination methods and on the potential for materials from the

71

project to be released or recycled; (3) preparing dose assessments for the project; and (4) providing advice and assistance related to the characterization of waste materials from the project, including waste that would be subject to NRC regulation.  Turner Testimony, US SMF Exh. 11, 7/8 a.m. Tr. 91:8-94:17, 97:7-110:3, 10:13-12:19 (cost analyses), 7/8 p.m. Tr. 21:19-29:3, 55:25-64:1 (free release potential), 7/8 p.m. Tr. 47:1-49:4 (dose assessments), 7/8 p.m. Tr. 42:5-46:17,  116:4-117:4. (waste characterization and material disposition assistance)

138.    Turner knew that the NRC was working on a rule regarding the release and recycle of radioactive material, and that SAIC was providing contractual support for that rule.  Turner Testimony, attached hereto as Exhibit 20, 7/8 a.m. Tr. 61-62.  Turner aware of the NRC's efforts to develop a release rule); Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 75-77, 91-92, 109-110, 7/3 a.m. Tr. 10-12 (Murray discussed his work on the NRC contract with Turner and also raised concerns of a potential organizational conflict of interest on the NRC work because of Turner and SAIC's work on the BNFL Oak Ridge Recycle Project).  Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 75-77, 91-92, 109-110, 7/3 a.m. Tr. 10-12.  Turner knew that SAIC had an obligation under its NRC contract to avoid and disclose potential organizational conflicts of interest.  *Id.; see also* Turner Testimony, attached hereto as Exhibit 20, 7/8 p.m. Tr. 108-109 (Turner knew of and was responsible for OCI compliance and understood that SAIC took potential OCIs "very seriously").  Alex Murray, an SAIC scientist working with Turner as well as on the NRC contract, raised concerns to Turner that SAIC could have a potential conflict of interest by both assisting the NRC in developing a rule and by assisting BNFL on the BNFL Oak Ridge Recycle Project.  Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 75-77, 91-92, 109-110, 7/3 a.m. Tr. 10-12.  Turner therefore knew that: (1) SAIC was assisting the NRC in developing a rule concerning the release and recycle of radioactive material from nuclear facilities; (2) such a rule would enhance the BNFL Oak Ridge Recycle Project as well as other work that

Turner was pursuing; (3) the rule, and SAIC's assistance to the NRC, was in the same technical area as Turner's advice and assistance to BNFL/MSC on the BNFL Oak Ridge Recycle Project; (4) SAIC had organizational conflict of interest obligations to its customer the NRC; and (5) an SAIC scientist who was working on both the NRC contract and the BNFL project was concerned about the possibility of organizational conflict of interest. *Id.*

Alexander Murray

139. Alex Murray was an SAIC scientist. Murray worked on both the NRC contract and the BNFL Oak Ridge Recycle Project. Murray assisted Turner and BNFL in evaluating decontamination technologies and preparing cost and pricing estimates for the BNFL Oak Ridge Recycle Project. Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 56-77. Murray and Turner had multiple conversations about radioactive materials release and recycle with BNFL and MSC, not only at Oak Ridge but at other nuclear sites around the country. Murray Testimony, US SMF Exh. 9 , 7/2 p.m. Tr. 59-68. Murray knew that projects like the BNFL Oak Ridge Recycle Project would be enhanced by the NRC release rule on which he and other SAIC employees were working. Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 57-59. Murray also knew that MSC was a BNFL subsidiary and was licensed pursuant to NRC regulatory authority and subject to NRC regulations. *Id.*, 7/2 p.m. Tr. 66-68. Murray knew that because the BNFL Oak Ridge Recycle project proposed to release or recycle material into general commerce, NRC regulations would apply. *Id.*, 7/2 p.m. Tr. 90:17-91:1. Murray understood that the BNFL Oak Ridge Recycle Project was in the same technical area, and concerned the same and similar matters, as SAIC's work for the NRC under the NRC contract. *Id.*, 7/2 p.m. Tr. 75-77.

140. Murray also understood the importance of SAIC's work for the NRC being free from any actual or potential organizational conflicts of interest. Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 75-77; *see also* ¶¶ 58-64, 139. Murray knew that SAIC's organizational structure caused

organizational conflict of interest concerns because of the lack of communication between the various SAIC organizations. *Id.* Therefore, Murray was concerned about the possibility for conflict of interest with respect to SAIC's work for the NRC given its role on the BNFL Oak Ridge Recycle Project. *Id.* Murray shared his concerns with at least three individuals: (1) Steve Turner, the SAIC employee most intimately involved with the BNFL Oak Ridge Recycle Project; (2) Reginald Gotchy, SAIC's project manager on the NRC Contract; and (3) Rick Profant, Murray's supervisor. He was told by these individuals that his concerns had been appropriately addressed. *Id.*

141. Alex Murray, therefore, had actual knowledge: (1) that SAIC had an obligation to ensure its work for the NRC was free from potential organizational conflicts of interest, and that compliance with these obligations was material; (2) that SAIC was assisting the NRC in developing a regulation allowing for release and recycle of radioactive material; (3) that the NRC regulations would apply to radioactive material released or recycled from the BNFL Oak Ridge Recycle Project into general commerce; (4) that SAIC's teaming partner, MSC, was an NRC Agreement State licensee and was licensed under NRC regulatory authority; (5) that the BNFL Oak Ridge Recycle Project involved the release or recycle of radioactive material; (6) that the prospects of projects like the BNFL project could be enhanced by a volumetric release standard such as the one with which SAIC was assisting the NRC; (7) that SAIC's work for the NRC and its work on the BNFL Oak Ridge Recycle Project were in the same technical area; and (8) that a potential organizational conflict of interest concern existed given SAIC's simultaneous work on the BNFL Oak Ridge Recycle Project and its work for the NRC. *See ¶¶* 58-64, 139-140.

Jeffrey Slack

142. Jeffrey Slack was an SAIC manager. Like Turner, Slack pursued business opportunities in the area of radioactive material release and recycle, including opportunities with Manufacturing

74

Sciences Corporation, a subsidiary of BNFL and an entity licensed under the NRC's regulatory authority.  Slack Testimony, US SMF Exh. 5, 7/9 a.m. Tr. 81:21-85:18; PX 99, attached hereto as Exh. 21, at 222630.  Like Turner, the opportunities Slack was pursuing in radioactive material release and recycle included, but were not limited to, Oak Ridge.  *Id.*  Slack was aware of, and worked on, SAIC's work for the NRC.  Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 104:13-112:9.  Other employees under Slack's supervision were proposed to work and did work on the NRC Contract.  *Id.* Slack's office was in the same SAIC location in Oak Ridge, Tennessee as Thomas Rucker, Christopher Caldwell, and Steven Turner.  Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 79:25-80:19.

143.     Slack worked on and knew about the BNFL Oak Ridge Recycle Project.  Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 84:24-104:12; PX 266, Work Smart Standards, US SMF Exh. 34.  Slack was one of the SAIC officials responsible for developing and creating the Work Smart Standards developed by SAIC for that project.  Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 94:23-104:12; PX 266, US SMF Exh. 34.  The Work Smart Standards described, in detail, the activities contemplated by the project, and set forth all the standards and regulations that would apply to the project in order to ensure that the project could be carried out in a manner safe for public and occupational health and the environment.  *Id.*  The Work Smart Standards specifically set forth removal and recycle as important aspects of the project.  *Id.*  Further, the Work Smart Standards included NRC regulations and NRC Regulatory Guide 1.86, the release standard that was part of what SAIC was studying in its work on the NRC.  *Id.*  Slack and other SAIC employees certified that the project could be carried out, based on the standards and regulations chosen, including NRC standards and regulations, in a manner that would ensure public, occupational, and environmental health.  *Id.*  At the time that Slack worked on the Work Smart Standards Project, Slack understood that SAIC's was providing advice and assistance to the NRC in support of a rule and that SAIC's work also involved

assessing the public health impacts of the release and recycle of radioactive material.  *Id.*, 7/9 a.m. Tr. 104:13-105:17, 7/9 p.m. Tr. 66:21-68:9.

144.    In 1997, with the BNFL Oak Ridge Recycle Project well underway and only months after completion of the Work Smart Standards for the project, Slack was contacted by Michael McKenzie-Carter of SAIC's Idaho Falls Office requesting further assistance on SAIC's assistance for the NRC. Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 105:18-112:9; PX 317, attached hereto as Exhibit 22; PX 377, attached hereto as Exh. 23.  McKenzie-Carter requested, in furtherance of SAIC's work for the NRC, that Slack attempt to obtain radioactivity data from radioactive material possessed by BNFL's subsidiary MSC.  *Id.*  The communications between McKenzie-Carter and Slack make it clear, and Slack testified that he fully understood, that McKenzie-Carter's request was related to SAIC's contract with the NRC related to the recycle and reuse of radioactive material, and that SAIC was attempting to get measurements from MSC's radioactive material to compare to SAIC's dose assessment modeling work on the NRC contract.  *Id.*

145.    At the time that Slack was contacted by McKenzie-Carter, Slack knew that BNFL, MSC, and SAIC were teamed on the BNFL Oak Ridge Recycle Project, and that the BNFL Oak Ridge Recycle Project involved the release and recycle of radioactive material.  Slack Testimony, US SMF Exh. 5, 7/9 a.m. Tr. 112:5-112:9 ("Q:  You certainly knew at the time that you received this proposal that the project on which SAIC was teamed with BNFL and MSC, that project contemplated the release and recycle of radioactively contaminated scrap metal?  A:  That's true.").  Slack also knew that that SAIC had a contract with the NRC to provide technical advice and assistance in the area of release and recycle of radioactive material.  Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 105:9-105:17 (Slack also knew that SAIC was assisting the NRC in developing a rule related to the release and recycle of radioactive material).  Finally, Slack knew that SAIC was required to avoid and disclose potential

organizational conflicts of interest to its customers.   Slack Testimony, attached hereto as Exhibit 11, 7/9 p.m. Tr. 64:6-65:13; Slack Deposition, attached hereto as Exhibit 24, at 144-147, 180-183, 188-192.

146.    Slack testified that he cannot recall whether or not he informed McKenzie-Carter that BNFL, MSC, and SAIC were teamed on the BNFL Oak Ridge Recycle Project.  Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 105:18-112:9.  However, McKenzie-Carter and Slack discussed that MSC might be willing to provide use of its facility and allow for measurement of its radioactive material "at no cost."

147.    Slack therefore knew, relative to the BNFL Oak Ridge Recycle Project and SAIC's work for the NRC: (1) SAIC had a contract to assist the NRC in developing a rule related to the release and recycle of radioactive material; (2) SAIC's assistance for the NRC included dose modeling and studying the public health impacts of release and recycle of radioactive material; (3) SAIC, at the same time, was a teaming partner with BNFL and MSC on the BNFL Oak Ridge Recycle Project; (4) the BNFL Oak Ridge Recycle Project involved the release and recycle of radioactive material into general commerce, an activity governed by the NRC; (5) the Work Smart Standards that SAIC created for the BNFL Oak Ridge Recycle Project included NRC regulations and release standards; (6) the BNFL Oak Ridge Recycle Project was the culmination of business development by both Slack and Turner; (7) the Work Smart Standards that SAIC created for the BNFL Oak Ridge Recycle Project assured that the project could be completed and carried out in a manner safe for public, occupational, and environmental health, in part, based on the selection of NRC release criteria; (8) SAIC had proposed to use radioactivity data from BNFL/MSC as part of its work on the NRC contract; (9) SAIC's work on the BNFL Oak Ridge Recycle Project and SAIC's work for the NRC were in the same technical areas; (10) SAIC had an obligation to avoid and disclose organizational conflicts of interest to the NRC.  *See, supra*, ¶¶ 142-147.

Thomas Rucker

148.     Thomas Rucker, an SAIC scientist, worked with and for Slack in the same SAIC Oak Ridge office.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 74-77.  Rucker knew about and worked on SAIC's 1992 NRC Contract and was proposed as a task lead for one of the tasks on that contract.  *Id.*, 7/10 a.m. Tr. 77:7-79:23.  Rucker received SAIC's monthly status reports submitted to the NRC that described, in detail, the work that SAIC was performing for the NRC in the area of release and recycle of radioactive materials.  *Id.*  Rucker also received and reviewed proposals for modifications to the NRC Contract.  *Id.*

149.     Rucker understood that SAIC was required to avoid and disclose potential organizational conflicts of interest to its customers, including the NRC.   Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 106:8-108:4; Rucker Deposition, attached hereto as Exhibit 27, at 246-248.  Rucker knew that a potential organizational conflict of interest existed if SAIC provided advice and assistance to a government agency in a technical area while, at the same time, it provided advice and assistance to any other entity in the same technical area.  *Id.*

150.     Rucker also worked on the BNFL Oak Ridge Recycle Project.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 79:24-88:2.  Rucker specifically contributed to the Work Smart Standards, which are discussed above.  *Id.*  Rucker understood that the BNFL Oak Ridge Recycle Project involved the release and recycle of radioactive material, and that SAIC's work on the Work Smart Standards involved assessing the public health impacts of release and recycle of radioactive material.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 79:24-88:2, 109:3-110:15.  Rucker understood that the NRC project involved precisely these same considerations.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 77:25-78:25.

151.     Rucker received a monthly letter status report dated January 10, 1997, concerning SAIC's work on its NRC Contracts.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 81:23-88:2.

78

In the report, SAIC discusses matters such as whether recycling radioactive scrap metal would be financially viable, and what the benefits associated with recycling radioactive scrap metal are. *Id.* SAIC specifically references quantities of radioactive nickel metal owned by the Department of Energy. *Id.* January 10, 1997, is very same day on which SAIC, BNFL, and MSC submitted their proposal for the BNFL Oak Ridge Recycle Project that proposed to recycle into general commerce that very same radioactive metal. *Id.*

152.    Therefore, Rucker had actual knowledge that: (1) SAIC's work on the BNFL Oak Ridge Recycle Project and on the NRC contract both involved release and recycle of radioactive material and included studying the health impacts of release and recycle of radioactive material; (2) SAIC had an obligation to avoid and disclose potential organizational conflicts of interest to its customers, which Rucker knew included the NRC; (3) a potential organizational conflict of interest arose whenever SAIC performed work for a government agency in a technical area while, at the same time, SAIC provided advice and assistance for any other organization in the same technical area; and (4) SAIC's work for the NRC involved many of the same considerations of assessing the potential benefits of recycle of radioactive material as SAIC's work on the BNFL Oak Ridge Recycle Project.

Dr. Reginald Gotchy

153.    Dr. Reginald Gotchy was SAIC's Project Manager on the 1992 NRC Contract.  Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 40-42; Cardile Testimony, attached hereto as Exhibit 25, 7/2 a.m. Tr. 58.  Gotchy therefore knew, or should have known, about SAIC's organizational conflict of interest requirements found in the NRC contract as well as the importance of those requirements to the NRC.  Gotchy and Murray talked often.  Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 40-43.  When Murray began working on the BNFL Oak Ridge Recycle Project, he had discussions with Gotchy regarding the work that SAIC was performing on the BNFL Oak Ridge

Recycle Project and its similarity to the work that SAIC was performing for the NRC.  Murray

Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 75-77, 91-94, 105:15-109:16, 7/3 a.m. Tr. 6, 9,

11:6-12:4.  Murray had these conversations, in part, because he was concerned about the potential for

organizational conflict of interest between the two projects, particularly because SAIC's organizational

structure was such that the different organizations within SAIC often did not know what other parts of

the company were doing.  *Id.*  Gotchy therefore knew: (1) that SAIC was assisting the NRC in

developing a rule concerning the release and recycle of radioactive material; (2) SAIC, simultaneously,

was assisting BNFL on a large project in Oak Ridge, Tennessee that involved the release and recycle of

radioactive material; (3) SAIC's contract with the NRC required it to disclose potential organizational

conflicts of interest to the NRC; and (4) an SAIC scientist working on both the NRC and the BNFL

projects was concerned about a potential organizational conflict of interest.

Richard Profant

154.    Rick Profant was an SAIC employee.  During the time that Murray was working on the

1992 NRC Contract, Profant managed an SAIC division for which Murray worked.  Profant Testimony,

attached hereto as Exhibit 26, 7/22 a.m. Tr. 124.  Murray informed Profant that he was simultaneously

working on the 1992 NRC Contract and on the BNFL Oak Ridge Recycle Project.  Murray Testimony,

attached hereto as Exhibit 1, 7/2 p.m. Tr. 91:20-92:19, 105:15-107:1, 7/3 a.m. Tr. 6:5-12:4.  Murray told

Profant that because of the similarity of the two endeavors, he was concerned about the possibility of an

organizational conflict of interest and wanted to make sure that SAIC had adequately addressed such

concerns.  *Id.*  Profant therefore knew: (1) that SAIC was assisting the NRC in developing a rule

concerning the release and recycle of radioactive material; (2) SAIC, simultaneously, was assisting

BNFL on a large project in Oak Ridge, Tennessee that involved the release and recycle of radioactive

material; and (3) an SAIC employee under his supervision who was familiar with both the BNFL and

the NRC projects was concerned about a potential conflict of interest.

155.    Profant knew that MSC, BNFL's subsidiary and SAIC's teaming partner and an entity for

which SAIC provided advice and assistance on the BNFL Oak Ridge Recycle Project, was an NRC

licensee.  Profant Testimony, attached hereto as Exhibit 26, 7/22 p.m. Tr. 18:2-19:8 (admitting that he

received an e-mail in 1999 indicating that MSC had an NRC license through the state of Tennessee);

*United States v. Sci. Applications Int'l Corp.*, 653 F. Supp. 2d 87, 96-97 (D.D.C. 2009).

Michael McKenzie-Carter

156.    Michael McKenzie-Carter was an SAIC employee who was a task lead on the 1992 NRC

Contract and SAIC's Project Manager for the 1999 NRC Contract.  *See* ¶ 52.  As such, McKenzie-Carter

was intimately familiar with SAIC's efforts for the NRC.  *Id.*  McKenzie-Carter understood that SAIC's

advice and assistance was in furtherance of an NRC rulemaking in the area of release and recycle of

radioactive material.  McKenzie-Carter Testimony, US SMF Exh. 4, 7/17 a.m. Tr. 96-102.  McKenzie-

Carter also understood that the standards and ultimate rule developed as a result of SAIC's work for the

NRC would have replaced NRC Regulatory Guide 1.86, the NRC's only existing release standard.  Id.,

7/17 a.m. Tr. 41:14-42:10.

157.    McKenzie-Carter understood that it was important to the NRC that SAIC's advice and

assistance must be free from potential organizational conflicts of interest.  McKenzie-Carter Testimony,

US SMF Exh. 4, 7/17 a.m. Tr. 45:8-47-47:12.  McKenzie-Carter understood that one of the reasons that

this was important was so that the NRC and the public could have confidence in SAIC's work and the

ultimate rule that would have been based on SAIC's work.  *Id.*

158.    McKenzie-Carter knew that a radioactive material release and recycle project involving

DOE's Oak Ridge facility was underway in Oak Ridge, Tennessee, and that MSC was involved in that

effort.  McKenzie-Carter Testimony, attached hereto as Exhibit 2, 7/17 p.m. Tr. 76:13-77:3.  He also

knew that SAIC had an office in Oak Ridge that did work in the area of radioactive material release and

recycle.  *See, e.g.,* ¶¶ 144-146; *see also* McKenzie-Carter Testimony, attached hereto as Exhibit 2, 7/17

p.m. Tr. 76:24-78:4 (McKenzie-Carter contacted Slack and Rucker, SAIC employees in SAIC's Oak

Ridge office, regarding work related to radioactive material release and recycle.)

159.    McKenzie-Carter had numerous communications with Slack and Rucker, both of whom

had actual knowledge both of the BNFL Oak Ridge Recycle Project and SAIC's NRC Contracts.

McKenzie-Carter Testimony, attached hereto as Exhibit 2, 7/17 p.m. Tr. 76:24-78:4; *see also* ¶¶ 144-

152.  As discussed above, McKenzie-Carter asked Slack and Rucker whether they could assist in

obtaining dose measurements from MSC, BNFL's subsidiary and SAIC's teaming partner on the BNFL

Oak Ridge Recycle Project.  *Id.*  Although he does not recall whether Slack or Rucker informed him

specifically of SAIC's role on the project, in one communication he suggested that SAIC might be able

to use MSC's facility and support "at no cost."  *Id.*  McKenzie-Carter also communicated on numerous

occasions with Murray, who worked with McKenzie-Carter on the NRC Contract and also worked on

the BNFL Oak Ridge Recycle Project; and Gotchy, who worked with McKenzie-Carter on the NRC

Contract and knew about the BNFL Oak Ridge Recycle Project.  Murray Testimony, attached hereto as

Exhibit 1, 7/2 p.m. Tr. 47-52, 56:2-59:14, 87-88.

160.    Therefore, relative to the BNFL Oak Ridge Recycle Project, McKenzie-Carter had actual

knowledge that: (1) SAIC was contracted with the NRC to provide technical advice and assistance

related to the release and recycle of radioactive material; (2) SAIC was obligated to the NRC to avoid

and disclose potential organizational conflicts of interest; and (3) SAIC employees had relationships and

contacts at Manufacturing Sciences Corporation, an Oak Ridge company engaged in the release and

recycle of radioactive material from DOE's facility in Oak Ridge.  Additionally, although he has no

specific recollection, McKenzie-Carter may have had actual knowledge of SAIC's role on the BNFL

Oak Ridge Recycle Contract, which would explain why he believed SAIC might be able to use MSC's

facility and resources "at no cost." *See* ¶¶ 156-159.

Gerald Truitt

161.    SAIC employee Gerald Truitt had actual knowledge of the BNFL Oak Ridge Recycle

Project.  Truitt understood that radioactive material being released and recycled from the BNFL Oak

Ridge Recycle Project was regulated by the NRC.  Truitt Testimony, US SMF Exh. 10, 7/10 pm Tr.

21:7-22:1 ("any radiological material that went off-site would be subject to NRC once it left the DOE

fence"), 7/10 p.m. Tr. 6:10-22:1.  Truitt further understood that NRC regulations governed what material

could be released from the BNFL Oak Ridge Recycle Project and where that material could go.  *Id.*  In

his role on the BNFL Oak Ridge Recycle Project, Truitt assisted BNFL relative to the regulations

applicable to release and disposal of material from the BNFL Oak Ridge Recycle project, which

included NRC regulations.  *Id.*

Christopher Caldwell

162.    SAIC employee Christopher Caldwell had actual knowledge of the BNFL Oak Ridge

Recycle Project.  Caldwell Testimony, US SMF Exh. 12, 7/9 p.m. Tr. 77:9-83:6, 100:10-100:21; 101:10-

110:7.  Caldwell was the regulatory compliance manager for the project and assisted BNFL regarding

the applicability of rules and regulations to the project.  Caldwell Testimony, US SMF Exh. 12, 7/9 p.m.

Tr. 101:10-110:7, 77:9-83:5 (SAIC's Caldwell was the regulatory compliance manager for the BNFL

project and frequently provided advice and assistance to BNFL regarding regulatory compliance);

Turner Testimony, US SMF Exh. 11, 7/8 p.m. Tr. 8:1-8:25.  Caldwell assisted in preparing and

approving the Work Smart Standards, a document setting forth all of the regulations and standards that

applied to the project.   Caldwell Testimony, US SMF Exh. 12, 7/9 p.m. Tr. 82:4-83:1; PX 266, US SMF

Exh. 34.  These standards and regulations included 10 C.F.R. Part 71, an NRC Regulation, and NRC

Regulatory Guide 1.86, an NRC Regulatory Guide and release standard that was one of the subjects of

SAIC's work for the NRC.  *Id.*  Caldwell understood that NRC regulations applied to radioactive

material released or recycled from the BNFL Oak Ridge Recycle Project.  Caldwell Testimony, US

SMF, 7/9 p.m. Tr. 80:11-83:6 (material from the BNFL project that left the DOE site would be subject

to compliance with NRC regulations and requirements); *SAIC*, 626 F.3d at 1272; *SAIC*, 653 F. Supp. 2

at 96-97, 100 (*citing* Caldwell Testimony as evidence that he and SAIC knew that NRC regulations

applied to radioactive material released or recycled from the BNFL Oak Ridge Recycle Project into

general commerce).  Caldwell, who worked closely with Turner, knew that an NRC release standard

would benefit the BNFL Oak Ridge Recycle Project and other projects like it, and that SAIC was

assisting the NRC in developing such a standard.  Caldwell Testimony, US SMF Exh. 12, 7/9 p.m. Tr.

91:24-93:15 (SAIC understood that the recycling potential of the BNFL project would be enhanced by a

volumetric standard such as that on which SAIC was assisting the NRC).

### SAIC'S Knowledge of the BJC Dose Assessment Project

#### Jeffrey Slack

163.    As discussed above, Slack was familiar with SAIC's work on the NRC Contracts,

including that SAIC's work for the NRC: (1) involved the release and recycle of radioactive material

from nuclear facilities; (2) involved considerations of release under NRC Regulatory Guide 1.86; (3)

involved considerations of what to do with radioactive materials as well as the costs and benefits of

various options for release and recycle of radioactive materials; and (4) involved assessment of the

public health impacts of release and recycle of radioactive materials.  Slack was also familiar with and

worked on the BNFL Oak Ridge Recycle Project, and understood that project involved the same

technical areas and considerations.  *See* ¶¶ 142-147.

164.    During the performance of SAIC's work on its NRC Contracts, Slack worked on a project for BJC related to radioactive material release and recycle.  Slack and SAIC conducted an (1) inventory analysis; (2) dose assessment; and (3) cost-benefit analysis related to the release and recycle of radioactive material from three gaseous diffusion plant (GDP) facilities in the United States, including the Oak Ridge facility that was the subject of the BNFL Oak Ridge Recycle Project on which SAIC was already teamed with BNFL and MSC.  Slack Testimony, US SMF Exh. 5, 7/9 a.m. Tr. 112:14-117:16, 7/9 p.m. Tr. 26:2-27:8.

165.    As part of its work for BJC, Slack and SAIC were required to calculate the public and environmental health impacts of release and recycle of radioactive material from the three GDPs.  Slack Testimony, US SMF Exh. 5, 7/9 a.m. Tr. 112:14-117:16, 7/9 p.m. Tr. 26:2-27:8.  Slack understood that SAIC's work for the NRC also involved calculating the public and environmental health impacts of release and recycle of radioactive material.  Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 104:13-105:17.  Slack and SAIC had already taken the position, via the Work Smart Standards, that release and recycle of radioactive material from one of the GDPs, the BNFL Oak Ridge Recycle Project, was safe for the public, the workers, and the environment.  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 11:20-16:4; *see also* ¶ 143.  Slack and SAIC's report for BJC reiterated and expanded on that conclusion by stating that release and recycle of all the material not only from Oak Ridge but from the other two facilities as well would result in only a "trivial dose" to the public.   Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 11:20-16:4.

166.    One of the standards that was the basis for SAIC's work on the BJC Dose Assessment Project was NRC Regulatory Guide 1.86, the NRC's existing release standard.  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 26:6-27:12, 66:21-68:9.  Slack understood that SAIC was assisting the NRC in developing a new standard for release and recycle.  Slack Testimony, attached hereto as Exhibit 11, 7/9

85

a.m. Tr. 105:9-105:17 (Slack also knew that SAIC was assisting the NRC in developing a rule related to the release and recycle of radioactive material); *see also* ¶¶ 142-147.  Slack also knew, through his work on the Work Smart Standards, that NRC Regulatory Guide 1.86 was the standard that applied to the BNFL Oak Ridge Recycle Project, and Slack and SAIC had taken the position that release under Regulatory Guide 1.86 was safe for the public, the workers, and the environment.  Slack Testimony, US SMF Exh. 5, 7/9 a.m. Tr. 94:23-104:12; *see also* ¶¶ 143.

167.    Slack and SAIC based some of their work for the BJC Dose Assessment Project on NUREG-1640, a technical report that SAIC prepared for the NRC pursuant to its NRC Contract.  Specifically, SAIC's work on the BJC Dose Assessment Project chose scenarios and parameters based on review of NUREG-1640.  Slack Testimony, attached hereto as Exhibit 11, 7/9 p.m. Tr. 5:1-9:21.

168.    SAIC's work on the BJC Dose Assessment Project was so similar to SAIC's work for the NRC that in performing its GDP Dose Assessment, SAIC copied, without attribution, whole sections of SAIC's work for the NRC on the 1992 Contract.  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 29:5-42:14; Rucker Testimony, US SMF Exh. 6, 7/21 p.m. Tr. 72:2-81:8.  The copied sections included both general background and also SAIC's judgments, conclusions, and recommendations regarding what, and what not, to consider in SAIC's analysis.  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 35:21-36:9, 70:4-74:19; Rucker Testimony, US SMF Exh. 6, 7/21 p.m. Tr. 72:2-81:8.

169.    Slack understood that there were many similarities between the BJC Dose Assessment Project, the BNFL Oak Ridge Recycle Project, and SAIC's work for the NRC.  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 66:21-68:9; *see also SAIC,* 653 F. Supp. 2d at 100-101.  Slack further understood the importance of avoiding and disclosing potential organizational conflicts of interest.  Slack Testimony, attached hereto as Exhibit 11, 7/9 p.m. Tr. 64:6-65:13; Slack Deposition, attached hereto as Exhibit 24, at 144-147, 180-183, 188-192.  Slack also understood that a potential

organizational conflict of interest arose when SAIC was performing work in a technical area for a government agency and also providing advice or assistance in the same technical area for any other organization, and that such situations had to be disclosed to the government agency. Slack Deposition, attached hereto as Exhibit 24, at 188-192. Nonetheless, he testified that he never even considered whether SAIC's efforts on the BJC Dose Assessment Project and SAIC's work for the NRC could constitute an organizational conflict of interest concerns because he believed that SAIC's potentially conflicting work was performed for DOE and therefore could not be in conflict with work that SAIC was performing for the NRC. *Id.* at 150, 188-192 (even though Slack knew of both the BJC Dose Assessment Project and SAIC's work for the NRC, "it probably never entered [Slack's] mind" that SAIC's simultaneous work on the two projects could constitute a conflict). Slack understood, however, that SAIC's customers on the BNFL Oak Ridge Recycle project and BJC Dose Assessment Project were private companies, not DOE. Slack Testimony, attached hereto as Exhibit 11, 7/9 a.m. Tr. 85, 120.

Thomas Rucker

170.    Like Slack, Rucker worked extensively on the BJC Dose Assessment Project. Rucker Testimony, US SMF Exh. 6, 7/10 a.m. Tr. 88:11-94:2. Rucker also worked on the NRC Contract and on the BNFL Oak Ridge Recycle Project. *See, supra*, ¶¶ 148-152. Like Slack, Rucker was familiar with SAIC's work on the NRC Contracts, SAIC's work on the BNFL Oak Ridge Recycle Project, and SAIC's work on the BJC Dose Assessment Project, and understood that all three projects involved many of the same considerations and overlapping technical areas. *See* ¶¶ 148-152; *see also* Rucker Testimony, US SMF Exh. 6, 7/10 a.m. Tr. 88:11-94:2, 109:3-110:15.

171.    As part of its work for BJC, Rucker and SAIC were required to calculate the public and environmental health impacts of release and recycle of radioactive material from the three GDPs. Rucker Testimony, US SMF Exh. 6, 7/10 a.m. Tr. 88:11-94:2. Rucker understood that SAIC's work for

the NRC also involved calculating the public and environmental health impacts of release and recycle of radioactive material.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 77:7-79:23; *see also* ¶¶ 148-152.  Rucker and SAIC's report on the BJC Dose Assessment Project concluded that release of material from the three facilities would result in only a "trivial dose" to the public.  Rucker Testimony, US SMF Exh. 6, 7/21 p.m. Tr. 47:16-47:24.

172.    One of the standards that was the basis for SAIC's work for BJC was NRC Regulatory Guide 1.86, the NRC's existing release standard.  Rucker understood that SAIC was assisting the NRC in developing a new standard for release and recycle.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 77:7-79:23; *see also* ¶¶ 148-152.  Rucker also knew, through his work on the Work Smart Standards, that NRC Regulatory Guide 1.86 was the standard that applied to the BNFL Oak Ridge Recycle Project, and Rucker and SAIC had taken the position that release under Regulatory Guide 1.86 was safe for the public, the workers, and the environment.  PX 266, US SMF Exh. 34; Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 79:24-88:2, 109:3-110:15.

173.    Rucker and SAIC based their work for the BJC Dose Assessment Project on NUREG-1640, a technical report that SAIC prepared for the NRC pursuant to its NRC Contract.  Specifically, SAIC's work on the BJC Dose Assessment Project chose scenarios and parameters based on review of NUREG-1640.  Rucker Testimony, US SMF Exh. 6, 7/21 p.m. Tr. 54-55.

174.    SAIC's work on the BJC Dose Assessment Project was so similar to SAIC's work for the NRC that in performing its GDP Dose Assessment, SAIC copied, without attribution, whole sections of SAIC's work for the NRC on the 1992 Contract.  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 29:5-42:14; Rucker Testimony, US SMF Exh. 6, 7/21 p.m. Tr. 72:2-81:8.  The copied sections included both general background and also SAIC's judgments, conclusions, and recommendations regarding what, and

what not, to consider in SAIC's analysis.  Slack Testimony, US SMF Exh. 5, 7/9 p.m. Tr. 35:21-36:9,

70:4-74:19; Rucker Testimony, US SMF Exh. 6, 7/21 p.m. Tr. 72:2-81:8.

175.    Rucker understood that there were many similarities between the BJC Dose Assessment

Project, the BNFL Oak Ridge Recycle Project, and SAIC's work for the NRC.  *See* ¶¶ 148-152, 170-

174.  Rucker further understood the importance of avoiding and disclosing potential organizational

conflicts of interest.  *See* ¶¶ 149, 152; Rucker Deposition, attached hereto as Exhibit 27, at 246-248

(Rucker was trained by SAIC to recognize and disclose potential organizational conflicts of interest, and

understood that it was a potential conflict if SAIC was providing advice to a government agency in a

technical area and also providing advice in the same technical area to any other organization.)  Rucker

knew that a potential organizational conflict of interest existed if SAIC provided advice and assistance

to a government agency in a technical area while, at the same time, it provided advice and assistance to

any other entity in the same technical area.  *Id.*   Nonetheless, Rucker testified that he did not escalate

any organizational conflict of interest concerns because he believed that SAIC's potentially conflicting

work was performed for DOE and therefore "it never crossed [his] mind" that the two projects could

create a potential conflict of interest.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr.

99:21-101:5.  Rucker understood, however, that Rucker understood, however, that SAIC's customers on

the BNFL Oak Ridge Recycle project and BJC Dose Assessment Project were private companies, not

DOE.  Rucker Testimony, attached hereto as Exhibit 12, 7/10 a.m. Tr. 105:22-106:7, 7/21 p.m. Tr.

39:10-39:13.

<u>Betty Bidwell</u>

176.    Betty Bidwell was an SAIC Contracts manager working at SAIC's Oak Ridge, Tennessee

office.  Bidwell Testimony, attached hereto as Exhibit 18, 7/16 a.m. Tr. 58:11-59:4.

177.    Bidwell had responsibility for and understood the importance of avoiding and disclosing potential organizational conflicts of interest to SAIC's customers.  Bidwell Testimony, attached hereto as Exhibit 18, 7/16 a.m. Tr. 60:6-68:23, 82:6-82:23.  Bidwell attended and gave training given by SAIC regarding organizational conflict of interest.  *Id.*  Bidwell understood that a potential organizational conflict of interest existed whenever SAIC's work for a customer could be biased by a relationship with a different entity.  *Id.*  Bidwell further understood that the potential for bias and a potential conflict of interest existed any time that SAIC assisted a government agency in a particular technical area, while, at the same time, providing assistance in the same technical area to any other entity.  *Id.;* PX 919, US SMF Exh. 41 at 0173287; DX 198, attached hereto as Exhibit 28, at 016704.

178.    Bidwell was aware of SAIC's work for the NRC.  PX 712, attached hereto as Exhibit 29; PX 717, attached hereto as Exhibit 30.

179.    Bidwell was aware of SAIC's work on the BJC Dose Assessment Project and of the BNFL Oak Ridge Recycle Project.  Bidwell Testimony, attached hereto as Exhibit 18, 7/16 a.m. Tr. 59:14-59:22.

180.    Bidwell understood that SAIC had an obligation to disclose relationships to the NRC which could give rise to actual or potential organizational conflicts of interest.  Bidwell Deposition, attached hereto as Exhibit 31, at 129-130.  Bidwell believed, however, that because SAIC's work for BJC was performed for a contractor working for the DOE, no potential conflict existed with respect to SAIC's work for the NRC.  Bidwell Deposition, attached hereto as Exhibit 31, at 142-43.  No SAIC document or policy supports this view – in fact, it is explicitly contradicted by the aforementioned training as well as by the NRC's organizational conflict of interest regulations themselves.  Plaintiff's Exhibit 919, SAIC OCI Training, US SMF Exh. 41, at 0173287; Bidwell Testimony, US SMF Exh. 42, 7/16 a.m. Tr. 62:16-68:23; DX 198, attached hereto as Exhibit 28, at 016704.

Michael McKenzie-Carter

181.     McKenzie-Carter was fully aware of SAIC's work for the NRC.  *See* ¶¶ 42-51, 156-160.

182.     McKenzie-Carter was aware of SAIC's work on the BJC Dose Assessment Project.  PX 735, attached hereto as Exhibit 32; PX 765, attached hereto as Exhibit 33; PX 766, attached hereto as Exhibit 34; McKenzie-Carter Deposition, attached hereto as Exhibit 35, at 90-94.  McKenzie-Carter knew that SAIC's work on the BJC Dose Assessment Project and SAIC's work for the NRC both involved conducting dose assessments relative to the release and recycle of radioactive material. McKenzie-Carter Deposition, attached hereto as Exhibit 35, at 90-94.  McKenzie-Carter also knew that SAIC had used SAIC's work for the NRC in developing its report on the BJC Dose Assessment Project. PX 735, attached hereto as Exhibit 32.

183.     McKenzie-Carter knew that avoidance and disclosure of potential organizational conflicts of interest was material to the NRC and, at the same time, knew of SAIC's work on the BJC Dose Assessment Project and SAIC's assistance to the NRC.  *See* ¶¶ 51, 156-157, 160.

## SAIC'S Knowledge of ARMR

Gerald Motl

184.     Gerald Motl was an SAIC Vice President.   Motl Testimony, attached hereto as Exh. 36, 7/23 a.m. Tr. 66:14-66:16.  Motl's job responsibilities at SAIC included business development in the area of release and recycle of radioactive material.  *Id.*, 7/23 a.m. Tr. 6:16-7:2.

185.     Between 1994 and 1999, ARMR was a trade organization related to the recycle of radioactive materials.  Loiselle Testimony, US SMF Exh. 25, 7/7 a.m. Tr. 55:6-55:22.  Motl understood that ARMR's purpose was to facilitate and advocate to various entities, including the NRC, for the recycle of radioactively contaminated materials.  Motl Testimony, attached hereto as Exhibit 36, 7/23 a.m. Tr. 11:18-18:1.

186.     While an SAIC Vice President, Gerald Motl served on the Board of Directors of ARMR. SAIC Amended Answer at ¶ 53; Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 8:2-9:21.  Motl served on the ARMR Board of Directors between January 1996 and some time in 1999.  Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 6:4-9:21.

187.     Mr. Motl participated substantially in ARMR while an SAIC employee.  Loiselle Testimony, US SMF Exh. 25, 7/7 p.m. Tr. 3:20-9:17.

188.     Motl understood that a number of ARMR members, including the Alaron Corporation as well as BNFL and MSC, are NRC licensees and entities regulated by the NRC.  Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 12:1-13:3.

189.     At the time he was serving on the ARMR Board of Directors, SAIC Vice President Motl was a business developer for SAIC in the primary markets of Defense, Energy and the Commercial Nuclear Industry.  Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 6:4-8:12.  Mr. Motl attended ARMR events on behalf of SAIC and at SAIC's expense, which he charged to his "business development" account at SAIC.  Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 52:11-55:16.

190.     Motl understood that ARMR was created to advocate for the recycle and reuse of radiologically contaminated metals.  Motl further understood the member organizations of ARMR hoped to profit financially from the expansion of the radioactive scrap metal industry, and an NRC free release rule would make such expansion possible.  Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 14:8-15:2.  Motl understood that the lack of a clearance standard like the one being developed by the NRC was a barrier to the development of the radioactive scrap industry for the ARMR members.  Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 14:8-15:2.

191.     As a director, SAIC's Motl voted to authorize ARMR to conduct its business.

Motl Testimony, US SMF Exh. 13, 7/23 a.m. Tr. 9:19-9:21.  The Directors of ARMR managed the

business and affairs of ARMR.  *Id.*  Mr. Motl contributed substantially to the matters of policy, technical

direction and activity of ARMR on behalf of its members.

192.    Motl and SAIC understood that BNFL/MSC, Alaron, and the other members of ARMR

would receive a clear benefit from the NRC rulemaking on release and recycle. Motl Testimony, US

SMF Exh. 13, 7/23 a.m. Tr. 42:12-44:20.

193.    SAIC's Motl was one of SAIC's key personnel proposed to perform a cost/benefit

analysis for the clearance of radioactive materials on SAIC's contract with the NRC.  Motl Testimony,

US SMF Exh. 13, 7/23 a.m. Tr. 20:22-24:19, 38:14-42:6.  Motl understood that SAIC's work for the

NRC was in furtherance of an NRC rule that would allow for the release and recycle of radioactive

material.  In his role as an ARMR director, Mr. Motl also had a role promoting the benefit of just such a

clearance rule and seeking the issuance of just such a rule by the NRC.   For example, ARMR drafted

correspondence to the NRC, in which Mr. Motl participated in drafting and reviewing.  This

correspondence took a clear position in favor of a rule that would allow free release and recycle.

Loiselle Testimony, US SMF Exh. 25, 7/7 a.m. Tr. 102:24-106:7, 106:14-109:8, 7/7 p.m. Tr. 8:12-9:17

(Motl "absolutely" reviewed ARMR advocacy letters to the NRC regarding a free release standard),

10:16-11:9 (Motl participation on an ARMR call regarding the ARMR letter to the NRC regarding

rulemaking for recycle and reuse).

194.    Motl was informed by SAIC attorneys that for SAIC to participate in ARMR would be a

conflict of interest.  Motl Deposition, attached hereto as Exhibit 37, at 84-86.

195.    Motl therefore had actual knowledge: (1) that SAIC was assisting the NRC in developing

a rule that would provide for the release and recycle of radioactive material; (2) that ARMR, for which

Motl served on the Board of Directors, had been created and existed solely for the purpose of advocating

for exactly the same rule upon which SAIC was assisting the NRC; (3) ARMR members, including

BNFL and Alaron, stood to profit financially from the outcome of the NRC's rulemaking; and (4) that

SAIC had an obligation to avoid and disclose organizational conflicts of interest. *See* ¶¶ 184-194.

     Michael McKenzie-Carter

196.    McKenzie-Carter was SAIC's project manager for the 1999 NRC Contract. *See* ¶ 42.

197.    As project manager, McKenzie-Carter prepared SAIC's technical proposal and was

responsible for the key personnel proposed for the 1999 NRC Contract, including Gerald Motl.

McKenzie-Carter Testimony, US SMF Exh. 4, 7/17 p.m. Tr. 55:18-56:7.

198.    Resumes in circulation for Motl during the relevant time period clearly identified that he

was a director of ARMR. However, while SAIC's proposal for the 1999 NRC Contract told the NRC

that Motl had been, in the past, a director of ARMR, it neglected to inform the NRC that Motl was, at

the time of SAIC's proposal, an ARMR director. Out of multiple Motl resumes produced during this

litigation, only the resume submitted to the NRC as part of SAIC's proposal for the 1999 NRC contract

neglected to mention Motl's ongoing role with ARMR. Motl Testimony, attached hereto as Exhibit 36,

7/23 a.m. Tr. 20:22-38:5; Motl Deposition, attached hereto as Exhibit 37, at 104, 118, 148-153.

199.    A conversation between McKenzie-Carter and Motl, one of the key personnel he was

proposing on the 1999 NRC contract, would have revealed Motl's ongoing and substantial role in

ARMR. A conversation between McKenzie-Carter and Motl would have also revealed the nature of

ARMR and its purpose, which was to advocate for the very rule with which SAIC was assisting the

NRC. However, SAIC often proposed personnel without first communicating with the person they had

proposed. Murray Affidavit, attached hereto as Exhibit 38, at ¶ 18. Additionally, SAIC often doctored

the resumes of its employees without their knowledge. Murray Testimony, attached hereto as Exhibit 1,

7/2 p.m. Tr. 45:8-47:8; Motl Testimony, attached hereto as Exhibit 36, 7/23 a.m. Tr. 37:25-38:13.

200.    McKenzie-Carter therefore had actual knowledge, or should have known, of Motl's

ongoing participation in ARMR at the time of submission of SAIC's proposal for the 1999 NRC

Contract.

### SAIC'S Knowledge of the PHP

Gary Leatherman

201.    Gary Leatherman, an SAIC employee, was one of the inventors of an experimental

plasma treatment technology for high-temperature treatment of radioactive waste known as the Plasma

Hearth Process (PHP).  The goal for the PHP was to treat radioactive waste in such a way that a large

portion of it could be released or recycled into general commerce, greatly reducing disposal and storage

costs.  Leatherman Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 42:8-44:16.

202.    Leatherman understood that the purpose of the Plasma Hearth Process was to

separate hard-to-treat mixed waste into a small and stable volume of glass/slag suitable for

disposal while separating metal largely free from contamination for reuse/recycle.  Mixed waste

contains both hazardous and radioactive materials.  Leatherman Testimony, US SMF Exh. 37, 7/16

a.m. Tr. 42:8-44:16; *see also* PX 70, attached hereto as Exhibit 39.

203.     On June 7, 1996, a patent application was filed by inventors of a method for the PHP.

SAIC was listed as Assignee.  Larsen Testimony, US SMF Exh. 36, 7/10 a.m. Tr. 23:1-25:16; PX 136,

Patent Application for the Plasma Hearth Process, attached hereto as Exhibit 40.  Gary Leatherman was

listed on the patent application as one of the inventors of the PHP.  *Id.*  Leatherman understood that

SAIC wished to commercialize and market the PHP to potential customers.   In fact, Leatherman

engaged in efforts to market the PHP to prospective government and commercial customers.

Leatherman Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 44:24-45:16.

204.    Leatherman, who worked in the same SAIC office in Idaho Falls as McKenzie-Carter,

also worked on SAIC's NRC Contracts.  Leatherman Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 47-51.  His work for the NRC - namely, helping to identify the way in which different radioisotopes migrate to different states of matter and from different streams of waste - was also an important aspect of his work on the PHP.  Leatherman Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 47-51.

205.   Leatherman therefore had actual knowledge:  (1) SAIC was assisting the NRC in developing a rule regarding the release and recycle of radioactive material; (2) the PHP technology, in which SAIC had and was pursuing a direct financial interest, also contemplated the release and recycle of radioactive material; and (3) Leatherman personally performed work on both the PHP and the NRC Contract related to the migration of radionuclides to different streams that would be significant in determining the extent to which various materials could be released or recycled.

Milo Larsen

206.   Along with Leatherman, Milo Larsen was one of the inventors of the PHP, and listed as such on SAIC's patent application for the PHP.  Larsen Testimony, US SMF Exh. 36, 7/10 a.m. Tr. 23:1-25:16.  Larsen understood that the purpose of SAIC's development and patenting of the PHP was to develop a technology that would be profitable for SAIC.  Larsen Testimony, US SMF Exh. 36, 7/10 a.m. Tr. 73:4-74:13.  Larsen began working on the PHP for SAIC in 1990.  *Id.*, 7/10 a.m. Tr. 72:5-72:8, 65:10-65:14.

207.   Larsen had actual knowledge that, in December 1996, SAIC and BNFL executed a Memorandum of Understanding (MOU) setting forth their plans for the worldwide development of the PHP.  Larsen understood that the BNFL-SAIC PHP MOU set forth the SAIC and BNFL plan to cooperate to demonstrate and commercialize the PHP.  It states that BNFL and SAIC hoped to market and use the PHP technology for treatment of Nuclear and Mixed Waste for the DOE and other nuclear and mixed waste projects worldwide, including commercial projects.   Larsen Testimony, US SMF Exh.

36, 7/10 a.m. Tr. 25:24-30:16; *see also* DX 191, BNFL-SAIC MOU for Development of the Plasma

Hearth Process, attached hereto as Exhibit 41.

208.    Larsen and SAIC understood that in order to market the PHP to commercial users, as

SAIC planned, the release and recycle of any material treated by the PHP would be subject to NRC

regulations.  Therefore, Larsen understood that SAIC's commercialization and business plans for the

PHP included the need for an NRC license for the technology as well as the need to follow the NRC's

ongoing rulemaking efforts in the area of free release of radioactive material.  Larsen Testimony, US

SMF Exh. 36, 7/10 a.m. Tr. 31:11-35:5; PX 464, attached hereto as Exhibit 43, at 191352, 191450,

191463 (commercialization plans for PHP included obtaining an NRC license); Larsen Testimony, US

SMF Exh. 36, 7/10 a.m. Tr. 39:9-42:12 (SAIC needed to follow NRC rulemaking efforts regarding free

release because NRC regulations would apply for prospective release/recycle from planned commercial

users of the PHP); DX 533, attached hereto as Exhibit 42 (SAIC committed to following NRC release

rulemaking in connection with its "objectives/needs" for development of the PHP).  This was the very

rule on which SAIC was assisting the NRC.

209.    Larsen and SAIC understood that one of the major advantages for the development of the

PHP was its ability to separate the recyclable metal from the slag.  Larsen Testimony, US SMF Exh. 36,

7/10 a.m. Tr. 18:12-19:14.  Along these same lines, Larsen and SAIC also understood that a key

characteristic of the PHP was its ability to generate two separate products, "allowing segregation and

possible reuse of the metal."  Larsen Testimony, US SMF Exh. 36, 7/10 a.m. Tr. 51:5-51:21.

210.    Larsen knew that the NRC was working on developing a rule that would provide for the

release and recycle of radioactive material.  Larsen Testimony, US SMF Exh. 7/10 a.m. Tr. 42-43.

Larsen was Leatherman's supervisor and worked in the same Idaho Falls office as Leatherman and

McKenzie-Carter and therefore knew, or should have known, that Leatherman was assisting SAIC on

97

the NRC in developing the exact same rule that Larsen understood could be important to the PHP's financial prospects.  Larsen Testimony, attached hereto as Exhibit 5, 7/10 a.m. Tr. 4:21-5:1, 50:23-51:4.

Michael McKenzie-Carter

211.    As stated above, McKenzie-Carter had intimate knowledge of SAIC's efforts in assisting the NRC in its development of a rule that would provide for the release and recycle of radioactive material.  *See* ¶ 42.  At the same time, McKenzie-Carter was also aware of, and participated in, SAIC's efforts on the PHP.  Leatherman Testimony, US SMF Exh. 37, 7/16 a.m. Tr. 48 (Leatherman discussed his work on the PHP with McKenzie-Carter); Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 68-70; Leatherman Deposition, attached hereto as Exhibit 10, at 74-77; McKenzie-Carter Deposition, attached hereto as Exhibit 35, at 317-319 (McKenzie-Carter reviewed a dose assessment related to the PHP prepared by Mary Anderson, an SAIC employee who also worked on the 1992 NRC Contract).  McKenzie-Carter knew, or should have known, that because of the nature of the PHP, its financial viability could depend on the very same rule with which SAIC and McKenzie-Carter were assisting the NRC.  McKenzie-Carter also knew, as discussed above, that compliance with SAIC's organizational conflict of interest requirements was material to SAIC's contract with the NRC.  *See* ¶¶ 51, 156-157, 160.

Alex Murray

212.    Murray knew of SAIC's work on the PHP.  Murray Testimony, attached hereto as Exhibit 1, 7/2 p.m. Tr. 68-70.  Murray also simultaneously knew about SAIC's work on the BNFL Oak Ridge Recycle Project and about SAIC's work for the NRC.  *See* ¶¶ 58-64, 139-141.  Murray knew that compliance with SAIC's organizational conflict of interest requirements was material to the NRC.  *Id.*

Steven Turner

213.    Turner knew about SAIC's work on the PHP.  PX 94, US SMF Exh. 27 (Turner stating

that SAIC was convinced that Larsen's work on the PHP was a "breakthrough method" for radioactive

scrap metal treatment.); Turner Testimony, US SMF Exh. 11, 7/7 p.m. Tr. 97-98. Turner knew that the

PHP was a technology designed to release and recycle radioactive material.  *Id.*  Turner also knew about

SAIC's work on the BNFL Oak Ridge Recycle Project and about SAIC's work for the NRC.  *See* ¶¶

131-141.  Turner knew that SAIC had an obligation to avoid and disclose potential organizational

conflicts of interest to its customers.

### SAIC'S Knowledge of the Alaron Project

214.    Turner knew about SAIC's planned interest with respect to Alaron.  Turner Testimony,

US SMF Exh. 11, 7/7 p.m. Tr. 96-97, 7/8 a.m. Tr. 83-84 (Turner describing SAIC's role with Alaron as

"same role we had with BNFL"); PX 250, Radioactive Scrap Metal Business Initiative, attached hereto

as Exhibit 44.  Turner knew that SAIC had teamed with Alaron on a proposed project involving the

release and recycle of radioactive material.  *Id.* Turner also simultaneously knew about the BNFL Oak

Ridge Recycle Project, the PHP, and SAIC's work for the NRC.  *See* ¶¶ 131-141, 213.  Turner knew that

SAIC had an obligation to avoid and disclose potential organizational conflicts of interest to its

customers.  *See, e.g.,* ¶¶ 138, 140.

### Additional Facts Regarding SAIC's OCI Compliance System and Efforts

215.    SAIC and its employees understood that compliance with its organizational conflict of

interest was not only material, but essential to its performance on its NRC Contracts.  SAIC and its

employees, including Thomas Rodehau, understood that it made representations regarding

organizational conflict of interest compliance in order to obtain its NRC Contracts and to obtain

payments under its NRC contracts.  *See*, *e.g.,* ¶¶ 118.

216.    SAIC and its employees knew that its organizational conflict of interest system lacked positive controls to ensure that those who were appraised of potential SAIC work actually reviewed the work to determine whether a potential organizational conflict of interest existed.  *See* ¶¶ 78, 85.

217.    SAIC and its employees understood that its contracts management database was dependent on adequately and fully describing the work involved as well as the entry of certain "key words" that would allow for searching of SAIC's work to ascertain whether a potential organizational conflict of interest existed.  The keywords entered for the BNFL Oak Ridge Recycle Project did not include the words "recycle," "radiation," or "radioactive."  *SAIC*, 653 F. Supp. 2d at 99 ("there was also testimony provided by at least two witnesses, Sandra Carder and Betty Bidwell, who testified that SAIC's OCI compliance system was inadequate in certain important respects . . . by containing incomplete descriptions of SAIC's work, and by failing to associate relevant key words with certain descriptions.") (*citing* Carder Test., 7/22 a.m. Tr. 66:18–69:11, 78:13–21; Bidwell Test., 7/16 a.m. Tr. 76:14–77:9.); *see also* ¶¶ 78, 87;

218.    SAIC and its employees understood that its OCI compliance system did not account for membership in professional organizations (ARMR), teaming agreements (Alaron, BNFL), memoranda of understanding (PHP), patents (PHP), or planned interests (PHP, Alaron, BNFL).  SAIC further understood that its OCI compliance system did not account for these types of situations and relationships even though it fully understood that organizational conflicts of interest could arise in such situations where interests were planned rather than present or other than contractual.  *SAIC*, 653 F. Supp. 2d at 99 ("there was also testimony provided by at least two witnesses, Sandra Carder and Betty Bidwell, who testified that SAIC's OCI compliance system was inadequate in certain important respects by failing to incorporate some of SAIC's business relationships[.]") (*citing* Carder Test., 7/22 a.m. Tr. 66:18–69:11,

78:13–21; Bidwell Test., 7/16 a.m. Tr. 76:14–77:9); *see also* ¶¶ 5, 53, 66, 71, 83, 218; PX 919, US SMF Exh. 41, at 0173321.

219.   SAIC and its employees understood that the potential for bias and, therefore, a potential organizational conflict of interest, existed whenever SAIC assisted a government agency in a technical area, and at the same time, assisted <u>any other organization</u> in the same technical area and that, therefore, such relationships must be escalated within SAIC and properly disclosed.  Plaintiff's Exhibit 919, SAIC OCI Training, US SMF Exh. 41, at 0173287, 0173304; Bidwell Testimony, US SMF Exh. 42, 7/16 a.m. Tr. 62:16-68:23 (emphasis supplied); DX 198, attached hereto as Exhibit 28, at 016704.

220.   SAIC's certifying officials, Rodehau and Martin, made certifications that SAIC lacked organizational conflicts of interest to the NRC without critical information about SAIC's situations or relationships with commercial companies in the exact same areas as SAIC's work for the NRC.  See, e.g., Martin Testimony, attached hereto as Exhibit 6, 7/14 p.m. Tr. 18-43; *see also* ¶¶ 21-24, 32.

221.   Both Rodehau and Martin understood that compliance with the NRC's organizational conflict of interest requirements was material to the NRC's decision to award SAIC its contracts, to allow SAIC to keep its NRC contracts, and to pay SAIC's claims under its NRC Contracts.  Specifically, both knew that SAIC made its certifications and representations in order to be able to be awarded its NRC Contracts and therefore be paid under its NRC Contracts.  *See, e.g., ¶* 118.

Respectfully Submitted,

TONY WEST
ASSISTANT ATTORNEY GENERAL


*/s/ Daniel Hugo Fruchter*
JOYCE R. BRANDA
PATRICIA DAVIS
DONALD J. WILLIAMSON
DANIEL HUGO FRUCHTER
PATRICIA M. FITZGERALD
Attorneys
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 305-2035

Attorneys for Plaintiff United States of America


Dated: August 8, 2011