**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 04-cv-1543 (RWR) |
| | ) | |
| SCIENCE APPLICATIONS | ) | |
| INTERNATIONAL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL
CORPORATION'S OPPOSITION TO PLAINTIFF UNITED STATES'
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Defendant Science Applications International Corporation, by and through

counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and LCvR

7(h) of the Rules of this Court, hereby opposes Plaintiff United States' Motion for

Partial Summary Judgment.  A Statement of Genuine Issues and Material Facts, a

Memorandum of Points and Authorities, and a Proposed Order are filed

contemporaneously in support of this opposition.

Dated:  August 8, 2011

Respectfully submitted,

John P. Rowley III
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 835-6151
E-mail: john.rowley@bakermckenzie.com

   /s/ Andrew S. Tulumello
Andrew S. Tulumello (D.C. Bar No. 468351)
Amir C. Tayrani (D.C. Bar No. 490994)
Ryan J. Watson (D.C. Bar No. 986906)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com

*Counsel for Defendant Science Applications International Corporation*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 04-cv-1543 (RWR) |
| | ) | |
| SCIENCE APPLICATIONS | ) | |
| INTERNATIONAL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL
## CORPORATION'S RESPONSIVE STATEMENT
## OF GENUINE ISSUES AND MATERIAL FACTS

Defendant Science Applications International Corporation ("SAIC") hereby

submits this statement of genuine issues setting forth all material facts as to which

it is contended there exists a genuine issue necessary to be litigated, pursuant to

Fed. R. Civ. P. 56 and LCvR 7(h).  SAIC hereby submits the following statement, in

which SAIC's responses follow immediately below each of the Government's

paragraphs:[1]

1.  The NRC is an independent federal agency established by the Energy
    Reorganization Act in 1974 to regulate the civilian use of nuclear materials
    and to protect public health, public safety, and the environment from the

---

[1] When responding to certain paragraphs in which the Government made
numerous factual assertions, SAIC has broken up the assertions and the
corresponding responses into several parts.

harmful effects of radiation.   *See* 42 U.S.C. § 2201; *United States v. SAIC,* 626 F. 3d 1257, 1261 (D.C. Cir. 2010).

**Response:** This fact is not in dispute.

2.   Pursuant to the Atomic Energy Act of 1946, as amended in 1954 (AEA), the Atomic Energy Commission and its successor, the NRC, are given the authority to regulate the civilian possession, use, transportation and disposal of nuclear material in the United States.   *See* 42 U.S.C. § 2201.

**Response:** This fact is not in dispute.

3.   Pursuant to its statutory authority, the NRC oversees the release into interstate commerce of commercially valuable recycled radioactively contaminated materials from nuclear facilities.   The NRC carries out its responsibilities by establishing scientific standards for release and recycle, and by requiring entities to possess an NRC license in order to possess, utilize, dispose of, or transport radioactive material.   42 U.S.C. §§ 2201, 2111; 10 C.F.R. § 8.4.   *See also SAIC,* 626 F. 3d at 1261.

**Response:** Disputed.  The NRC is statutorily excluded from regulating

certain Department of Energy ("DOE") activities and facilities.  *See, e.g.*, 42 U.S.C.

§ 2140(a); 10 C.F.R. § 30.12; 10 C.F.R. § 50.11(b)(l)(i)(A); 10 C.F.R. § 830.2(a); *see*

*also United States v. Sci. Applications Int'l Corp.*, 653 F. Supp. 2d 87, 99-100

(D.D.C. 2009).  SAIC's work on the DOE Three-Building Project, for example, was

not regulated by the NRC.  *See* Def.'s Responsive Statement of Genuine Issues and

Material Facts ("Resp. to U.S. Stmt."), *infra* ¶ 60.  The NRC was aware of,

understood, and abided by this jurisdictional divide, as made clear in the NRC's

own notice in 1999 regarding its potential rulemaking.  *Proposed Rules, Nuclear*

*Regulatory Commission*, 64 Fed. Reg. 35090, 35093 (June 30, 1999) ("DOE has

developed criteria for release of solid materials."); *see also* DX 22, at 7 (Exh. 1)

("DOE is not a licensee organization, as it does not manage and operate any NRC-

licensed facilities."); DX 800, at 39-40 (Exh. 2).

4.  In 1992, the NRC contracted with SAIC to provide technical assistance in the
    areas of control, release, and recycle of radioactive solid material (the "1992
    NRC Contract").   The 1992 NRC Contract called for technical assistance on
    the subject matter of the release and reuse/recycle of material and equipment
    from nuclear facilities.  *SAIC,* 626 F.3d at 1261-62; Cardile Testimony,
    attached hereto as Exhibit 1, 7/1 p.m. Tr. 78:23-79:10; 86:90:2-90:6.

    **Response:**  These facts are not in dispute.

5.  SAIC's advice and assistance to the NRC on the 1992 NRC Contract was
    intended to assist the NRC in developing a regulation regarding the release
    and recycle of radioactive scrap metal and other radioactive material by NRC
    and Agreement State Licensees (the "clearance rule").   Cardile Testimony,
    Exh. 1, 7/1 p.m. Tr. 82:10-85:13; Mauro Testimony, attached hereto as Exh. 2,
    7/21 a.m. Tr. 117:19-119:19.

    **Response:**  Disputed.  SAIC's role was to provide technical assistance to a

team of NRC experts led by the NRC project manager, Dr. Robert Meck, as

demonstrated by the fact that SAIC's NUREG 1640 was submitted as an NRC staff

report, not an SAIC report.  Meck Test., 7/3 p.m. Tr. 23-24 (Exh. 23).  The NRC

commissioners—not SAIC—held complete policy responsibility for whether a rule

would be adopted and, if so, what its contents would be.  Paperiello Test., 7/15 p.m.

Tr. 35-36 (Exh. 3); *see also* Resp. to U.S. Stmt., *infra* ¶ 10.   In addition, the cited

materials do not establish that any regulation the NRC might have adopted

governing the recycle and release of radioactive materials would have directly

governed agreement state licensees, as those licensees are subject to regulation by

the agreement state, not the NRC.  *See id.* ¶ 11.

6.  SAIC understood that the subjects upon which SAIC was advising the NRC
    were and are, by their very nature, controversial.  It was therefore essential

3

that SAIC's work for the NRC be free from any actual or potential conflict of interest.  Rodehau Testimony, attached hereto as Exhibit 3, 7/3 p.m. Tr. 59:1-59:23; Cardile Testimony, Exh. 1, 7/1 p.m. Tr. 71:15-72:4; 84:1-19.

**Response:**  Disputed.  As an initial matter, the portion of SAIC's contract proposal referred to in the cited testimony of SAIC employee Thomas Rodehau states that SAIC's "technical work" must be "of the highest standard" and does not address conflict-of-interest issues.  PX 2, at 17649 (Exh. 4).  In addition, the undisputed evidence establishes that SAIC designed and implemented a comprehensive and state-of-the-art compliance system to identify potential and actual conflicts of interest.  *See* SAIC's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment on False Claims Act Liability, Dkt. #196 ¶¶ 65-90.  Indeed, SAIC regularly chose not to pursue work because the work would have presented conflict-of-interest concerns.  Carder Test., 7/22 a.m. Tr. 40:3-8 (Exh. 5).  Moreover, the record evidence demonstrates that SAIC had no economic interest or incentive that would have potentially biased its work for the NRC (Turner Test., 7/8 p.m. Tr. 70:3-71:24 (Exh. 6)) and that the complete transparency of SAIC's work precluded "any realistic possibility that SAIC could inject bias into its work product" (Meck Test., 7/3 p.m. Tr. 35:1-5 (Exh. 23)).  In fact, the NRC's own Dr. Meck concluded that the results of SAIC's work were the "opposite of a conflict" because its deliverable, NUREG 1640, supported more restrictive materials release thresholds than comparable analyses, thus directly contradicting any suggestion that SAIC's work was tainted by conflict of interest because it "promoted" SAIC's interests in recycling. *Id.* at 9:22-10:9 (Exh. 23).

7.      SAIC's work for the NRC on the 1992 Contract was in the following technical areas: (1) clearance, recycle and release of nuclear material from nuclear facilities; (2) measurement of radioactivity in solid materials at nuclear facilities; (3) regulations and standards applicable to the release of slightly contaminated solid material from nuclear facilities; (4) measuring inventories of solid material at nuclear facilities; and (5) assessment of health and safety issues for nuclear workers, the public and the environment pertaining to the release of nuclear material from nuclear facilities.  Cardile Testimony, Exh. 1, 7/1 p.m. Tr. 82:10-82:15, 85:3-85:13, 7/2 a.m. Tr. 6:3-17:2; McKenzie-Carter Testimony, attached hereto as Exhibit 4, 7/17 a.m. Tr. 96-102:16; *SAIC,* 653 F. Supp. 87, 92-93 (D. D. C. 2009); *see also* Slack Testimony, attached hereto as Exhibit 5, 7/9 p.m. Tr. 66:21-68:9; Rucker Testimony, Exh. 6, attached hereto as Exhibit 6, 7/10 a.m. Tr. 109:3-110:15.

**Response:**  Disputed.  The cited materials do not support Paragraph 7's

broad characterization of the technical areas covered by SAIC's work for the NRC

pursuant to the 1992 Contract.  The contract initially assigned SAIC the following

tasks:  "(1) a thorough review of the literature including review of previous pathway

analyses performed, computer codes available for pathway analysis, and current

recycle and reuse practices in other countries; (2) development of, or identification of

adequate existing, pathway models and technical bases upon which to support NRC

regulations in this area; (3) preparation of an options paper outlining the regulatory

approach for recycle and reuse of materials and equipment with very low levels of

radioactivity; (4) assistance in preparation of a rulemaking package, including a

GEIS, a Regulatory Analysis, and amended rules; and (5) assistance in preparation

of implementing regulatory guidance."  PX 8, § C.1.2 (Exh. 8).  A subsequent

modification eliminated the fourth and fifth tasks from the scope of work.  *See* DX

175 (Exh. 61).

8.      The NRC sought assistance in these areas because it needed to develop a solid, defensible and unbiased technical foundation and basis to engage in

rulemaking on the issue of the release of slightly contaminated solid material from nuclear facilities.  Cardile Testimony, Exh. 1, 7/1 p.m. 85:3-85:13, 90:2-90:6.

**Response:**  This fact is not in dispute.

9.     The 1992 NRC Contract set out formal tasks for SAIC to: 1) conduct a literature search and analysis of the information available related to the potential reuse and recycle of material from nuclear facilities; 2) assess the potential dose to various members of the public that could be expected to occur from the recycle, reuse, and release of radioactive material from nuclear facilities; 3) prepare a draft regulatory options paper for the NRC consideration setting forth various regulatory options for release and recycle, and the pros and cons of each option; 4) assist in the preparation of regulatory products as the NRC moved to rulemaking; and 5) assist in the preparation of regulatory guides.  Cardile Testimony, Exh. 1, 7/2 a.m. Tr. 6:19-17:2; Meck Testimony, attached hereto as Exhibit 7, 7/3 a.m. Tr. 89:4-89:15.  A subsequent modification to the 1992 NRC contract required SAIC to prepare a regulatory issues paper setting out the issues and concerns of various "stakeholders," including those who carried out recycle and release of radioactive scrap metal, as well as the costs and benefits of various regulatory options for recycle and release.  Jupiter Testimony, attached hereto as Exhibit 8, 7/22 p.m. Tr. 27-34.

**Response:**  Disputed.  SAIC's tasks pursuant to the 1992 Contract included

the following:  "(1) a thorough review of the literature including review of previous

pathway analyses performed, computer codes available for pathway analysis, and

current recycle and reuse practices in other countries; (2) development of, or

identification of adequate existing, pathway models and technical bases upon which

to support NRC regulations in this area; (3) preparation of an options paper

outlining the regulatory approach for recycle and reuse of materials and equipment

with very low levels of radioactivity; (4) assistance in preparation of a rulemaking

package, including a GEIS, a Regulatory Analysis, and amended rules; and (5)

assistance in preparation of implementing regulatory guidance."  PX 8, § C.1.2

6

(Exh. 8).  A subsequent modification eliminated the fourth and fifth tasks from the

scope of work.   *See* DX 175 (Exh. 61).

10.    At the time of the 1992 NRC Contract, release of radioactively contaminated
       solid materials was governed by NRC Regulatory Guide 1.86.  SAIC
       understood that its work on the NRC contract included considerations of
       Regulatory Guide 1.86 and that part of what it was advising the NRC on was
       whether Regulatory Guide 1.86 was adequately protective of public health,
       safety, and the environment.  Additionally, SAIC understood that the NRC
       regulation for which SAIC was providing broad technical advice and
       recommendations would have replaced NRC Regulatory Guide 1.86 and that
       SAIC's work would have been used in determining types and quantities of
       radioactive material that could be released.  McKenzie-Carter Testimony,
       Exh. 4, 7/17 p.m. Tr. 41:25-42:16.

**Response:**  Disputed.  As an initial matter, it is inaccurate to describe

Regulatory Guide 1.86 as "NRC Regulatory Guide 1.86" because the Regulatory

Guide was not prepared by the NRC.  Instead, it was prepared by the Atomic

Energy Commission before the commission was abolished and its responsibilities

assigned to the agencies that subsequently became the Department of Energy and

the Nuclear Regulatory Commission.  *See* Slack Test., 7/9 a.m. Tr. 98:11-18 (Exh. 9)

("[I]t was an Atomic Energy Commission-issued document before NRC and DOE

split.  It was a really old document that was generated a long time ago that both

DOE and NRC had used over the years to control surface releases of contaminated

materials.").  In addition, contrary to what the government implies, Regulatory

Guide 1.86 is not even a regulation; instead, it expressly notes that it is "not [a]

substitute[ ] for regulations" and that "compliance . . . is not required."  *See* U.S.

Atomic Energy Commission, Regulatory Guide 1.86 (June 1974).

Moreover, the cited materials do not establish that SAIC was "advising the NRC" regarding the adequacy of Regulatory Guide 1.86 from a policy perspective. SAIC's role was to provide technical assistance, under the close supervision of the NRC's Dr. Meck, while the NRC commissioners—not SAIC—held complete policy responsibility for whether a rule would be adopted and, if so, what its contents would be.  Paperiello Test., 7/15 p.m. Tr. 35-36 (Exh. 3).  For example, SAIC's McKenzie-Carter testified that SAIC's work "was going to form part of the technical basis . . . for a rule." McKenzie-Carter Test., 7/17 p.m. Tr. 37:5-7 (Exh. 10).  He further explained that "the NRC would have used the dose factors in conjunction with other materials to then develop . . . a contamination level below which they . . . would allow clearance." *Id.* at 38:2-5; *see also id.* at 73:7-9 (explaining that "[the NRC] wanted the technical basis" and was "not asking what level . . . material could be released at.").  Similarly, McKenzie-Carter testified that he believed the potential rulemaking could have replaced Regulatory 1.86, but he also explained that "we didn't know what the rule was going to do" and that it was unclear if "the rulemaking was intended to replace [Regulatory Guide 1.86] or just supplement it with volumetric contamination." *Id.* at 41:20-42:7.

11.     Any NRC rule governing the release and recycle of radioactive material into general commerce would have governed entities in so-called "agreement states" such as Tennessee, which are legally required to enact laws and policies consistent with NRC rules and regulations.  SAIC understood this. Cardile Testimony, Exh. 1, 7/1 p.m. Tr. 82:16-83:22; McKenzie-Carter Testimony, Exh. 4, 7/17 p.m. Tr. 40:20-41:13; Murray Testimony, attached hereto as Exhibit 9, 7/2 p.m. Tr. 67:25-68:8; Rucker Testimony, Exh. 6, Exh. 6, 7/10 a.m. Tr. 78:6-78:9; Mauro Testimony, Exh. 2, 7/21 a.m. Tr. 117:19-119:19.

**Response:**  Disputed.  An NRC rule governing the recycle and release of radioactive materials would not have directly governed entities in agreement states. SAIC's expert, Michael H. Mobley, concluded that, "[c]ontrary to the implications of the government's allegations in this case, the NRC does not regulate the Agreement States."  Supplemental Report of Defendant's Expert Michael H. Mobley, at 6 (June 12, 2006) (Exh. 62).  Mobley further explained that, while "Tennessee maintains adequacy and compatibility with the NRC standards," "Tennessee law reserves regulatory control to the state and Tennessee maintains substantial latitude in making decisions under its regulatory program."  *Id.* at 4.  As a result, "Tennessee has the authority to determine how and if it will allow the release of items volumetrically contaminated with [radioactive material]."  *Id.*; *see also* Trottier Depo. Tr. 91 (Exh. 62) (statement of NRC 30(b)(6) witness acknowledging that Agreement States "have latitude" in responding to new NRC rules).

12.     Additionally, any NRC rule governing the release and recycle of radioactive material into general commerce would have applied to release into general commerce from DOE facilities.  This is because once material leaves a DOE site and enters general commerce, it becomes subject to NRC regulatory authority and jurisdiction.  SAIC understood this.  *SAIC,* 626 F.3d at 1272; *SAIC,* 653 F. Supp.2nd  at 96-97, 100; Truitt Testimony, attached hereto as Exhibit 10, 7/10 pm Tr. 21:7-22:1 ("any radiological material that went off-site would be subject to NRC once it left the DOE fence").  Turner Testimony; attached hereto as Exhibit 11, 7/8 p.m. Tr. 39-40, 7/8 a.m Tr. 66-67; Caldwell Testimony, attached hereto as Exhibit 12, 7/9 p.m. Tr. 80:11-83:6 (material from the BNFL project that left the DOE site would be subject to compliance with NRC regulations and requirements).

**Response:**  Disputed.  The cited materials do not establish the absence of a genuine issue as to how any hypothetical NRC rule would have applied to the release of material from DOE facilities.  To the contrary, it is undisputed that the

9

DOE has its own rules for the release of materials from its facilities, as made clear

in the NRC's own notice in 1999 regarding its potential rulemaking. *Proposed*

*Rules, Nuclear Regulatory Commission*, 64 Fed. Reg. 35090, 35093 (June 30, 1999)

("DOE has developed criteria for release of solid materials.").  This same NRC notice

explicitly acknowledged the lack of certainty regarding whether DOE would follow

whatever rule the NRC might adopt.  *Id.* ("If the NRC issues a regulation

containing criteria for release of solid materials, decisions would have to be made by

DOE as to whether DOE would in the interest of consistency adopt the standards in

the NRC regulation, or if DOE decides to release solid materials would NRC be

required to authorize distribution of that material.").  Moreover, with respect to the

work on the BNFL Three-Building Project, SAIC understood that if any regulatory

authority applied outside of the DOE facility, it was the State of Tennessee, not the

NRC.  *See* Turner Test., 7/8 a.m. Tr. 99:16-24 (Exh. 11); *see also* Resp. to U.S. Stmt.

¶¶ 11, 60.

13.    As of December 1998, SAIC's work on the 1992 NRC Contract was not
       complete.  Therefore, the NRC awarded a follow-on contract to SAIC in 1999
       (the "1999 NRC Contract").   Meck Testimony, Exh. 7, 7/3 a.m. Tr. 96:13-97:2,
       100:17-102:25.

       **Response:**  Disputed.  The cited materials do not establish that SAIC had

not completed its assigned work on the 1992 Contract.  To the contrary, when the

NRC officially closed out the contract, it stated that "[a]ll obligations have been met

by the parties."  PX 889 (Exh. 12).  Dr. Meck's testimony indicates that the NRC

awarded a follow-on contract in 1999 not because SAIC had not completed its work,

but instead due to "good contracting practices" that required a new contract to be

re-bid "after a certain number of modifications [and] a certain number of years of

work."  Meck Test., 7/3 a.m. Tr. 96:19-97:2 (Exh. 7).

14.     Under the 1999 NRC Contract, SAIC was to provide continued advice and
        assistance on the NRC's effort to establish a rule providing for the release
        and recycle of radioactively contaminated solid materials.  Specifically,
        SAIC's work in the 1999 Contract was divided into three areas: (1) analysis
        and characterization of sources of radioactively contaminated solid material
        that existed at commercial and Department of Energy nuclear sites; (2) "dose
        assessment," that is, estimation of the potential public health, safety, and
        environmental impacts of release and recycle of radioactively contaminated
        materials; and (3) cost-benefit analysis for the proposed rulemaking focusing
        on public health, occupational health, potential changes in costs of consumer
        products, and industrial operations not licensed by NRC.  The costs estimated
        for regulatory alternatives were to be associated with materials and
        equipment potentially cleared by NRC and Agreement State licensees.  Meck
        Testimony, Exh. 7, 7/3 a.m. Tr. 102:2-103:12; McKenzie-Carter Testimony, Exh.
        4, 7/17 p.m. Tr. 16:25-17:8; Motl Testimony, attached hereto as Exhibit 13,
        7/23 a.m. 21:20-23:5, 45:1-46:14.

        **Response:**  These facts are not in dispute.

15.     Both the 1992 and 1999 NRC Contracts (collectively, the "NRC Contracts")
        imposed obligations on SAIC regarding actual and potential organizational
        conflicts of interest ("OCIs").  Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 43:8-
        53:20.  Under both contracts, the ultimate determination as to whether a
        particular situation or relationship gave rise to an organizational conflict of
        interest rested with the NRC. 41 C.F.R. 20-1.54 at p. 3 ("The ultimate
        determination by NRC as to whether organizational conflicts of interest exist
        will be made in light of common sense."); 48 C.F.R. 2009.570-3 ("NRC's
        ultimate determination that organizational conflicts of interest exist will be
        made in light of common sense..."); Rodehau Testimony, Exh. 3, 7/3 pm Tr.
        72:8-72:13.

        **Response:**  Disputed.  The 1992 and 1999 Contracts required SAIC to

disclose information related to conflicts of interest only in specified circumstances.

Two of the specified circumstances were limited to situations in which SAIC was

working for an organization "regulated by the NRC."  *See* 48 C.F.R. § 2009.570-

3(b)(i) & (ii).  The third relevant circumstance was implicated only where SAIC

11

determined that "its judgment may be biased in relation to its work for the NRC."

48 C.F.R. § 2009.570-3(b)(iv).  The Director of the NRC's Division of Contracts

acknowledged that these regulations provide contractors like SAIC with the

authority to exercise reasonable "judgment and discretion" in determining whether

a situation must be disclosed.  Scott Test., 7/3 a.m. Tr. 75:3-23 (Exh. 13).  In

addition, the regulations do not equate a "potential conflict of interest" with a

situation that could create the "appearance of a conflict" to someone not familiar

with all of the relevant facts.  To the contrary, the regulations specifically define a

"potential conflict of interest" as applying when a "factual situation exists that

suggests that an actual conflict of interest may arise from award of a proposed

contract."  48 C.F.R. § 2009.570-2.  Finally, the full text of the regulation cited in

Paragraph 15 provides that the NRC's determination must be made "in light of

common sense and good business judgment based upon the relevant facts."  48

C.F.R. 2009.570-3(a)(2).

16.    Under both contracts, SAIC was required to avoid certain types of situations
       and relationships, to certify to the absence of such situations and
       relationships, and to disclose such situations and relationships if and when
       they did arise.  *SAIC,* 626 F. 3d at 1262; 41 C.F.R. 20-1.54 (1979) ("It is the
       policy of the U.S. Nuclear Regulatory Commission (NRC) to avoid, eliminate
       or neutralize contractor organizational conflicts of interest.  The NRC
       achieves this objective by requiring all prospective contractors to submit
       information describing relationships, if any, with organizations or persons
       (including those regulated by the NRC) which may give rise to actual or
       potential conflicts of interest in the event of contract award."); 48 C.F.R. §
       2009.570- 3; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 44:25-46:10 (SAIC was
       obligated to avoid relationships that could give rise to an OCI, to disclose any
       such relationships, and to certify to the absence of any such relationships);
       Martin Testimony, attached hereto as Exhibit 14, 7/14 a.m. Tr. 72:22-77:15;
       *see also* 42 U.S.C. § 2210a; Scott Testimony, attached hereto as Exhibit 15,

7/3 a.m. Tr. 32:2-32:18 (NRC's OCI requirements are required by and based on its statutory obligation to contract for conflict-free work).

**Response:** Disputed.  As explained above in response to Paragraph 15, SAIC's disclosure obligations were limited to the particular circumstances specified in the regulations.  Moreover, as the Director of the NRC's Division of Contracts acknowledged, the regulations provide contractors like SAIC with the authority to exercise reasonable "judgment and discretion" in determining whether a situation must be disclosed.  *See* Resp. to U.S. Stmt., *supra* ¶ 15.

17.   NRC regulations incorporated into SAIC's NRC Contracts described the relationships that SAIC was required to avoid and disclose, and to the absence of which SAIC was required to certify:

> (i)   Where the offeror or contractor provides advice and recommendations to the NRC in a technical area in which it is also providing consulting assistance in the same area to any organization regulated by the NRC.

> (ii)   Where the offeror or contractor provides advice to the NRC on the same or similar matter in which it is also providing assistance to any organization regulated by the NRC.

> (iv)   Where the award of a contract would otherwise result in placing the offeror or contractor in a conflicting role in which its judgment may be biased in relation to its work for the NRC or may otherwise result in an unfair competitive advantage for the offeror or contractor.

41 C.F.R. 20-1.54 at p. 3; *SAIC,* 626 F. 3d at 1262-63; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 48:6-50:1; Scott Testimony, Exh. 15, 7/3 a.m. Tr. 42:16-44:2. The 1999 NRC Contract contained a similar provision that did not differ in substance from that found in the 1992 Contract.  48 C.F.R. § 2009.570-3; *SAIC,* 626 F.3d at 1262; Scott Testimony, Exh. 15, 55:2-57:8.  The situations or relationships subject to the rule could be contractual or other than contractual, and could be present or planned.  Scott Testimony, Exh. 15, 7/3 a.m. Tr. 45:23-46:19, 67:6- 73:21; Martin Testimony, Exh. 14, 7/14 a.m. Tr. 52:3-52:8; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 75:13-76:17.

**Response:**  These facts are not in dispute.

18.   SAIC's Cost Proposal for the 1992 Contract, submitted on October 1, 1991, contained the following certification made by SAIC:

> I represent to *the* best of my knowledge and belief that [t]he award to Science Applications International Corp. of a contract or the modification of an existing contract . . . does not involve situations or relationships of the *type set forth in 20-1.5403(b).*

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 54:16-55:9

**Response:** This fact is not in dispute, except that the proposal was dated

September 30, 1991. *See* PX 2 (Exh. 4).

19.   SAIC's Cost Proposal for the 1992 Contract also certifies that "there are no former or current contractual or organizational relationships of SAIC as a corporation or of individual SAIC personnel that might give rise to apparent or actual organizational conflicts of interest with respect to the work proposed.  SAIC will immediately notify NRC of any changes which may result in any organizational conflicts of interest."  Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 55:10-57:6.

**Response:** This fact is not in dispute.

20.   SAIC's Best and Final Offer of January 23, 1992, as well as its May 18, 1992 Revised Best and Final Offer, certify that SAIC and its individual personnel have no relationships that might give rise to organization conflicts of interest with respect to the work proposed.  SAIC stated that it would "immediately notify NRC of any changes which may result in organizational conflicts of interest."  Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 59:23-62:22.

**Response:** This fact is not in dispute.

21.   The text of the 1992 Contract, executed on August 18, 1992, incorporated and contained the following certification:

> I represent to the best of my knowledge and belief that:
> The award to Science Applications International Corp. of a contract or the modification of an existing contract . . . does not involve situations or relationships of the type set forth in 20-1.5403(b).

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 64:20-65:8; *SAIC,* 626 F.3d at 1262-63.

**Response:** This fact is not in dispute.

14

22.   The 1992 Contract contained post-award OCI obligations in which SAIC agreed to "forego entering into consulting or other contractual arrangements with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under this contract." Section H.5(d)(2) of the contract in particular stated:

> The contractor agrees that, if after award, it discovers organization conflicts of interest with respect to this contract, it shall make an immediate and full disclosure in writing to the Contracting Officer. . . . The NRC may . . . terminate the contract if termination is in the best interest of the Government.

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 41:16-50:1; *see also SAIC,* 626 F.3d 1261-62.

**Response:**  This fact is not in dispute.

23.   SAIC submitted proposals for contract modification to the 1992 Contract on at least the following occasions: December 14, 1994, April 2, 1996, and April 7, 1998.  Each of SAIC's proposals for contract modification contained the following statement:

> To the best of my knowledge and belief, the award to SAIC of this modification to Contract No. NRC-04-92-037 does not involve situations or relationships of the type set forth in NRCAR 2009.570-3(b)(1).

Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 65:9-70:10; Martin Testimony, Exh. 14, 7/14 a.m. Tr. 59:3-61:5; *SAIC* 626 F.3d at 1262-63.

**Response:**  SAIC does not dispute that each modification contained the

quoted statement or a substantially similar statement.

24.   Additionally, the 1992 Contract was bilaterally modified on a number of occasions.  Each modification contained representations by SAIC that all terms of conditions of the original contract, including SAIC's OCI obligations, "remain unchanged and in full force and effect."  Martin Testimony, Exh. 14, 7/14 a.m. Tr. 64:7-71:10.

**Response:**  This fact is not in dispute.

25.   On May 27, 1999, SAIC's proposal for the 1999 NRC Contract contained the following representation:

15

> I represent to the best of my knowledge and belief that:  The award to Science Applications International Corporation of a contract or the modification of an existing contract . . . does not involve situations or relationships of the type set forth in 48 CFR 2009.570-3(b).

Martin Testimony, Exh. 14, 7/14 a.m. Tr. 72:8-77:15.

**Response:**  This fact is not in dispute.

26.   Like the 1992 Contract, the 1999 Contract also contained post-award disclosure obligations in which SAIC agreed to "forego entering into consulting or other contractual arrangements with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under this contract."  Section H.1(d)(2) of the contract in particular stated:

> The contractor agrees that, if after award, it discovers organization conflicts of interest with respect to this contract, it shall make an immediate and full disclosure in writing to the contracting officer. . . . The NRC may . . . terminate the contract if termination is in the best interest of the government.

Martin Testimony, Exh. 14, 7/14/a.m. Tr. 72:8-77:15.

**Response:**  This fact is not in dispute.

27.   SAIC made these certifications in ¶¶ 17-26, *supra,* to get its NRC contracts, to keep its NRC Contracts, and to get payments under its NRC Contracts. SAIC understood that it had to abide by its OCI obligations in order to get paid on its NRC Contracts.  Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 43:24-44:3; 47:5-47:7; 62:19-62:22 (Q: "And again, it was a requirement in order for SAIC to get the contract and to get payments under the contract that it make such certifications, correct? A: Yes.").  SAIC further understood that fulfilling its OCI obligations was important to NRC's project.  McKenzie-Carter Testimony, Exh. 4, 7/17 p.m. Tr. 45:8–46:21; Thadani Testimony, attached hereto as Exhibit 16, 7/21 a.m. Tr. 53:15–56:6, 64:19–67:2; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 44:7-44:10 (SAIC's contracts manager stated that it was "absolutely" important that SAIC provided advice that was free from bias or potential bias).  SAIC understood that noncompliance with its OCI obligations was grounds for disqualification from award or termination of SAIC's NRC Contracts. Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 46:18-47:4; Scott Testimony, Exh. 15, 7/3 a.m. Tr. 51:12-53:14.

**Response:** Disputed.  The cited materials do not establish the absence of a genuine issue as to whether SAIC made certifications "to get" its claims paid within the meaning of the False Claims Act.  *See*, *e.g.*, Rodenhau Test., 7/7 a.m. Tr. 21:3-23:8, 25:12-21, 30:25-31:2 (Exh. 14) ("Q: Did you ever submit to the NRC any representation that SAIC had no OCIs just in order to get the company's claims paid? A. Never."); Martin Test., 7/14 p.m. Tr. 60:7-9 (Exh. 15) ("Q: So, was the representation you made regarding no OCIs, was that made in order to get any of your claims paid? A: No.").  In addition, the record is disputed as to whether compliance with the conflict-of-interest provisions was sufficiently important that it rose to the level of being "material to the government's decision to pay" within the meaning of the D.C. Circuit's opinion.  For example, even after the NRC knew about the alleged conflicts of interest, it nonetheless paid two of SAIC's invoices.  *See* McCubbin Test., 7/15 p.m. Tr. 96:23-100:13 (Exh. 16); Pool Test., 7/15 a.m. Tr. 55:20-57:16(Exh. 17); Martin Test., 7/14 p.m. Tr. 88:1-90:14 (Exh. 15).  Finally, it is undisputed that the existence of a conflict would not automatically have precluded SAIC from obtaining the NRC contracts or receiving payments under them.  Indeed, when a conflict was identified during negotiations regarding the 1999 Contract, the NRC exercised its discretion to accept a mitigation plan that permitted SAIC to nonetheless be awarded the contract.  Martin Test., 7/14 p.m. Tr. 70:21-72:19 (Exh. 15).

28.   The NRC relied on the accuracy of SAIC's representations that SAIC had no relationships of the type listed in the NRC's OCI regulations in awarding SAIC its NRC Contracts, in allowing SAIC to keep its NRC Contracts, and in approving SAIC's claims for payment on its NRC Contracts.  *SAIC,* 626 F.3d

17

at 1271; McCubbin Testimony, attached hereto as Exhibit 17, 7/15 p.m. Tr. 65:14-68:11, 69:9-70:19; Pool Testimony, attached hereto as Exhibit 18, 7/15 a.m. Tr. 30:4-34:18, 48:6-48:25; *see also* Scott Testimony, Exh. 15, Tr. 7/3 a.m. 32:4–32:8 (stating that the NRC was very concerned that work done by the agency or in support of its regulations "be free of any kind of doubt or conflict, and that the public can trust in the work that the agency does").

**Response:** Disputed.  The NRC knew about SAIC's past and ongoing work for the DOE on nuclear radiation issues.  For example, the Company's proposals for the 1992 and 1999 Contract included extensive information about this work. Martin Test., 7/14 p.m. Tr. 73:6-80:14 (Exh. 15); McKenzie-Carter Test., 7/17 p.m. Tr. 5:18-13:19 (Exh. 10); Mace Test., 7/16 a.m. Tr. 31:23-32:2 (Exh. 18); Cardile Test., 7/2 a.m. Tr. 95:18-102:10 (Exh. 19).  Indeed, Frank Cardile, who served on the NRC's Source Evaluation Panel for the 1999 Contract, testified that at the time of the contract award the NRC considered SAIC's DOE work to be a positive factor demonstrating the Company's experience.  Cardile Test., 7/2 a.m. Tr. 101:19-102:4 (Exh. 19).  Moreover, SAIC's contracts with the NRC afforded the agency discretion in responding to potential conflict-of-interest situations by providing that, when a conflict arose, the NRC could either accept measures to avoid or mitigate the conflict or, "if . . . in the best interest of the Government," terminate the contract. PX 8, at 138175 (Exh. 8).  When a conflict was identified during negotiations regarding the 1999 Contract, for example, the NRC exercised its discretion to accept a mitigation plan.  Martin Test., 7/14 p.m. Tr. 70:21-72:19 (Exh. 15).  In addition, NRC paid two of SAIC's invoices after the NRC knew about alleged conflicts of interest.  *See* McCubbin Test., 7/15 p.m. Tr. 96:23-100:13 (Exh. 16); Pool Test., 7/15 a.m. Tr. 55:20-57:16 (Exh. 17); Martin Test., 7/14 p.m. Tr. 88:1-90:14 (Exh. 15).

29.    SAIC understood that if it had a situation or relationship for which disclosure was required, it was irrelevant whether SAIC could "resist temptations" that could arise from OCIs in any given instance because it was the potential for bias that created an organizational conflict of interest and thus required disclosure.  48 C.F.R. § 2009.570-3(d); Scott Testimony, Exh. 15, 7/3 a.m. Tr. 40-41; Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 51:7-51:22.  In other words, SAIC understood that it was irrelevant to the NRC whether SAIC or someone else could demonstrate that SAIC did not allow an OCI to improperly influence its work.  SAIC understood that what mattered to the NRC was the potential for bias.  *Id.*

**Response:**  Disputed.  The cited materials do not establish that the NRC cared only about the "potential for bias" and was not interested in whether a particular situation or relationship would have in fact improperly influenced SAIC's work.  The fact that the NRC was concerned about actual bias—and not merely the "potential for bias"—is demonstrated by its regular consideration of plans to mitigate the impact of an identified conflict rather than simply terminating (or not hiring) any entity that faces a conflict.  For example, as noted above in response to Paragraph 28, after a conflict was identified during negotiations regarding the 1999 contract, the NRC exercised its discretion to accept a mitigation plan that permitted SAIC to be awarded the contract.  Martin Test., 7/14 p.m. Tr. 70:21-72:19 (Exh. 15).  The applicable regulations expressly provide the NRC's contracting officers with the authority to adopt such mitigating measures.  *See, e.g.*, 48 C.F.R. § 2009.570-6; 48 C.F.R. § 2009.570-7.

Moreover, SAIC repeatedly sought guidance from the NRC regarding its conflict-of-interest obligations.  SAIC was particularly concerned about taking on work that might conflict with the work it was performing for DOE, its primary government customer.  Before signing the 1992 Contract, SAIC representatives

19

attended a public meeting that the NRC held to address proposed changes to its conflict-of-interest policies and specifically asked the NRC for guidance about its DOE-related work. *See* Rodehau Test., 7/7 a.m. Tr. 31:25-38:8 (Exh. 14). The head of the NRC's Office of Acquisition stated that "*DOE was not an entity subject to the NRC's regulatory authority*" and that the NRC's conflict-of-interest provisions do not apply to DOE. *See id.* at 32:8 (emphasis added). Similarly, during a public meeting the NRC hosted on the potential release of radioactive materials shortly after SAIC was awarded the 1999 Contract, an NRC official was asked about SAIC's work on a DOE project in Oak Ridge, Tennessee, and reaffirmed that the NRC "*do[es] not regulate the DOE facilities*." DX 800, at 39 (Exh. 2) (emphasis added). A participant then asked: "[D]oes the NRC have responsibility now or would it have responsibility under this proposed possible rule for release of material from DOE facilities?" *Id.* at 39-40. The NRC official reiterated that "[t]he answer in today's environment, as I understand it, is no, in terms of the DOE's decision to release from their facilities." *Id.* at 40.

30.     SAIC submitted, and the NRC paid, 82 claims for payment under the 1992 NRC Contract, for a total of $2,630,000.00, and 5 claims for payment under the 1999 NRC Contract, for a total of $216,068.42. In total, SAIC was paid $2,846,068.48 by the NRC on the two contracts. Plaintiff's Exhibit 955, stipulated exhibit regarding claims submitted to and paid by the NRC, attached hereto as Exhibit 19; Martin Testimony, Exh. 14, 7/14 a.m. Tr. 71:17-72:7, 84:9- 84:20.

**Response:** These facts are not in dispute, except that the second sentence incorrectly states that SAIC was paid a total of $2,846,068.48 when the actual total was $2,846,068.42.

31.     SAIC did not disclose its financial interest in the Plasma Hearth Process
        ("PHP"), or its relationships with British Nuclear Fuels, Inc. ("BNFL" ),
        Bechtel-Jacobs Corporation ("BJC"), the Association of Radioactive Metals
        Recyclers ("ARMR"), or Alaron Corporation ("Alaron") to the NRC.  Mace
        Testimony, attached hereto as Exhibit 20, 7/15 p.m. Tr. 114:7-114:10, 116:18-
        118:1, 7/16 a.m. Tr. 37:14-38:7; Pool Testimony, Exh. 18, 7/15 a.m. Tr. 34:23-
        36:19; Meck Testimony, Exh. 7, 7/3 p.m. Tr. 35-36.

**Response:**  Disputed.  The cited materials do not establish the absence of a

genuine issue as to whether SAIC had in fact disclosed information about the

alleged conflicts to the NRC.  SAIC's proposals for the 1992 and 1999 Contracts

contained extensive information about the Company's past and ongoing work for the

DOE on nuclear radiation issues.  Martin Test., 7/14 p.m. Tr. 73:6-80:14 (Exh. 15);

McKenzie-Carter Test., 7/17 p.m. Tr. 5:18-13:19 (Exh. 10); Mace Test., 7/16 a.m. Tr.

31:23-32:2 (Exh. 18); Cardile Test., 7/2 a.m. Tr. 95:18-102:10 (Exh. 19).  And, as the

government has previously admitted, SAIC's proposal for the 1999 Contract

specifically noted that Gerald Motl "served a complete term as director of ARMR."

*United States v. Sci. Applications Int'l Corp.*, 555 F. Supp. 2d 40, 53 (D.D.C. 2008).

Following the submission of the 1992 proposals, the NRC's Source Evaluation Panel

"reviewed [SAIC's] related nuclear experience to determine the existence of an

actual or potential organizational conflict of interest" and concluded that SAIC did

"not have conflicting roles which might bias [its] judgment in relation to its work for

the NRC."  *See* DX 28, at 37672 (Exh. 20); *see also* DX 379, at 20977 (Exh. 21)

(concluding with respect to 1999 proposal that SAIC does not have even an

"apparent" conflict-of-interest).  In addition, the record contains documentary

evidence demonstrating that the NRC's Dr. Meck was aware of SAIC's work as a

contractor for the DOE doing dose assessment work for the gaseous diffusion plant

in Oak Ridge, Tennessee.  *See* DX 396 (Exh. 22); Meck Test., 7/3 p.m. Tr. 33:15-

34:16 (Exh. 23) (acknowledging receipt of e-mail, but stating that he did not

remember reading the relevant portion).  Moreover, for the reasons explained

throughout this Responsive Statement of Genuine Issues and Material Facts, SAIC

had no reason to believe that disclosure of these specific relationships was required

under the terms of the conflict-of-interest provisions.

32.     If SAIC had disclosed its relationships with those entities, the NRC: (1)
        would not have awarded SAIC its NRC Contracts; (2) would not have allowed
        SAIC to keep its NRC Contracts; and (3) would not have approved payment
        to SAIC on its NRC Contracts.  Mace Testimony, Exh. 20, 7/15 p.m. Tr.
        114:11-115:19 (if the NRC had known about SAIC's relationships, "[t]he
        contract would not have been awarded to SAIC" and if the NRC had found
        out after the contract had been awarded, it would have been terminated);
        Pool Testimony, Exh. 18, 7/15 a.m. Tr. 34:23-38:21, 42:16-43:16; McCubbin
        Testimony, Exh. 17, 7/15 p.m. Tr. 73:5-80:16; Plaintiff's Exhibit 981, No-Cost
        Settlement Termination, attached hereto as Exhibit 21.  The NRC would
        have immediately pursued the matter and terminated the contract as it did
        in March 2000 after SAIC was forced to disclose its relationships with BNFL
        and BJC.  Mace Testimony, Exh. 20, 7/15 p.m. Tr. 107:16-108:9, 117:3-118:1;
        Plaintiff's Exhibit 981, No-Cost Settlement Termination, Exh. 21, *see also,*
        *infra,* SMF at ¶¶ 33-42.

        **Response:**  Disputed.  To begin with, as noted above in response to

Paragraph 31, SAIC's contract proposals disclosed substantial information about

the alleged conflicts to the NRC.  Even assuming that additional disclosure was

required, the cited materials do not establish the absence of a genuine issue as to

what steps the NRC would have taken upon learning of the relationships in

question.  As noted above in response to Paragraph 28, SAIC's contracts with the

NRC afforded the agency discretion in responding to potential conflict-of-interest

situations by providing that, when a conflict arose, the NRC could either accept

measures to avoid or mitigate the conflict or, "if . . . in the best interest of the

Government," terminate the contract.  PX 8, at 138175 (Exh. 8).  When a conflict

was identified during negotiations regarding the 1999 Contract, for example, the

NRC exercised its discretion to accept a mitigation plan.  Martin Test., 7/14 p.m. Tr.

70:21-72:19 (Exh. 15).  In addition, NRC paid two of SAIC's invoices after the NRC

knew about alleged conflicts of interest.  *See* McCubbin Test., 7/15 p.m. Tr. 96:23-

100:13 (Exh. 16); Pool Test., 7/15 a.m. Tr. 55:20-57:16 (Exh. 17); Martin Test., 7/14

p.m. Tr. 88:1-90:14 (Exh. 15).

33.    In November 1999, with the NRC still completely unaware of SAIC's OCIs,
       the NRC held a public meeting to discuss its clearance rulemaking.  At the
       public meeting, an individual complained that the NRC's rulemaking was
       tainted because of contractor conflict of interest in that SAIC was involved as
       a partner to BNFL in a large radioactive metal recycling project in Oak Ridge
       Tennessee.  Cardile Testimony, Exh. 1, 7/2 a.m. Tr. 43:16-46:21; Meck
       Testimony, Exh. 7, 7/3 a.m. Tr. 108:11-108:22, 7/3 p.m. Tr. 4:21-5:17.  This
       was the first time the NRC learned about SAIC's role in the BNFL Oak Ridge
       Recycle Project.  *Id.*

**Response:**  Disputed.  For the reasons explained above in response to

Paragraph 31, the cited materials do not establish the absence of a genuine issue as

to whether the NRC was "completely unaware" of the allegedly conflicting

relationships in November 1999.  *See* Resp. to U.S. Stmt., *supra* ¶ 31.  In addition,

the NRC re-affirmed at this very same public meeting that it "do[es] not regulate

the DOE facilities."  DX 800, at 39 (Exh. 2) (emphasis added).  This statement

merely confirmed what was already widely understood—that the NRC and the DOE

operated in entirely separate regulatory jurisdictions and that SAIC's work for the

NRC would not affect regulations applicable to DOE facilities.  *See, e.g.*, Resp. to

U.S. Stmt., *supra* ¶ 12.  As explained in Paragraph 29, a participant then asked:

"[D]oes the NRC have responsibility now or would it have responsibility under this

proposed possible rule for release of material from DOE facilities?"  *Id.* at 39-40.

The NRC official reiterated that "[t]he answer in today's environment, as I

understand it, is no, in terms of the DOE's decision to release from their facilities."

*Id.* at 40.

34.  Immediately, on November 10, 1999, NRC Contracting Officer, Mary Mace,
     sent a letter to SAIC stating that the NRC was "very concerned" about this
     allegation of conflict of interest and asked SAIC to provide an immediate and
     full disclosure by November 22, 1999 to the NRC of documents that "describe
     the work that SAIC has performed and is presently performing involving
     NRC licensees or applicants (including the Department of Energy and BNFL)
     which comes within the scope of the referenced NRC/SAIC contracts
     (including but not limited to individual and collective dose estimates, and
     recycle or release of nuclear wastes.)" Martin Testimony, Exh. 14, 7/14 a.m.
     Tr. 84:21-87:18; Plaintiff's Exhibit 779, November 10, 1999 Letter from NRC
     to SAIC, attached hereto as Exhibit 22.

     **Response:**  Disputed.  The NRC did not respond "immediately."  Mary

Mace's letter from November 10, 1999, was sent nine days after the meeting

referred to in Paragraph 33, which occurred on November 1, 1999.  *See* DX 800, at 1

(Exh. 2).

35.  On November 22, 1999, SAIC responded to the NRC request and set forth a
     total of 10 previously undisclosed relationships.  Martin Testimony, Exh. 14,
     7/14 a.m. Tr. 93:24- 106:7.  SAIC's November 22, 1999 submission did not
     contain any mention of SAIC's relationships with Alaron, ARMR, or with
     respect to the PHP.  Martin Testimony, Exh. 14, 7/14 a.m. Tr. 105:18-106:7,
     110:16-110:19.

     **Response:**  Disputed.  SAIC had no reason to believe that its "relationships

with Alaron, ARMR, or with respect to the PHP" should have been disclosed.  SAIC

24

was never a member of ARMR, never paid dues, and had little or no communication

with ARMR.  *See* Loiselle Test., 7/7 p.m. Tr. 31, 38, 48 (Exh. 24); *see also* Resp. to

U.S. Stmt., *infra* ¶¶ 98-107.  In addition, SAIC never performed any work for

Alaron and, in any event, would have handled any such work at the DOE facility in

Georgia subject to DOE regulation.  *See* Tempel Test., 7/9 a.m. Tr. 32:23-25 (Exh.

25); Taylor Test., 7/9 a.m. Tr. 62:15-23, 66:9-19 (Exh. 26); Ryan Test., 7/8 p.m. Tr.

121:15-18 (Exh. 27).  Finally, the Plasma Hearth Process "was never intended to be

a recycling technology," never progressed beyond the conceptual stage, was never

tested on radioactive waste, and was not commercially viable.  Larsen Test., 7/10

a.m. Tr. 58, 60, 62, 66 (Exh. 28); *see also* Resp. to U.S. Stmt., *infra* ¶¶ 78-85.

36.    In response to the NRC's November 10, 1999 letter requesting "statements of
       work or other documents that describe the work that SAIC has performed
       and is presently performing involving NRC licensees or applicants (including
       Department of Energy and BNFL) which comes within the scope of the [1992
       and 1999 Contracts] (including but not limited to individual and collective
       dose estimates, and recycle or release of nuclear wastes), SAIC disclosed
       certain work performed for BNFL and BJC that is at issue in this case.
       Martin Testimony, Exh. 14, 7/14 a.m. Tr. 93:24-106:7.  This was the first time
       that SAIC disclosed these relationships to the NRC.  Martin Testimony, Exh.
       14, 7/14 a.m. Tr. at 104:17-104:21.

       **Response:**  Disputed.  For the reasons explained above in response to

Paragraph 31, the cited materials do not establish the absence of a genuine issue as

to whether this letter was the "first time" that SAIC had disclosed the relationships

in question to the NRC.  *See* Resp. to U.S. Stmt., *supra* ¶ 31.  In addition, although

the text of the NRC's November 10, 1999 letter could be read to suggest that the

Department of Energy and BNFL are "NRC licensees or applicants," that is not the

case. *See, e.g.*, DX 22, at 7 (Exh. 1) ("DOE is not a licensee organization, as it does not manage and operate any NRC-licensed facilities.").

37.   On November 24, 1999, SAIC sent the NRC an additional letter, stating:

> "Although SAIC has been involved with regulatory compliance work since the project onset, we have not supported work or regulatory compliance specifically related to the unconditional release of materials."

Martin Testimony, Exh. 14, 7/14 a.m. Tr. at 111:19-112:21.

**Response:** This fact is not in dispute.

38.   On December 16, 1999, the NRC, having considered SAIC's November 22 disclosures, issued a Stop Work Order to SAIC.  Martin Testimony, Exh. 14, 7/14 a.m. Tr. 113:9- 114:14.

**Response:** This fact is not in dispute.

39.   On December 17, 1999, NRC notified SAIC that it considered SAIC's failure to disclose its relationships with BNFL and BJC to be a breach of the OCI provisions in its contract with the NRC.  NRC further notified SAIC that it was considering terminating the contract because of these violations.  SAIC was given until January 10 to provide NRC with facts as to why the contract should not be terminated.  Plaintiff's Exhibit 812, December 17, 1999 Cure Letter from NRC to SAIC, attached hereto as Exhibit 23; Martin Testimony, Exh. 14, 7/14 p.m. Tr. 5:15-7:22.

**Response:** This fact is not in dispute.

40.   On January 10, 2000, SAIC responded to NRC's Cure Notice of December 17 with a Letter to the NRC Contracting Officer.  SAIC set forth facts about its relationships with BNFL and BJC and asserted that termination was unwarranted.  *Id.*  SAIC sent this letter intending that the NRC rely on the representations contained therein, in order to convince the NRC that it did not have any OCIs and that it should be permitted to keep its NRC Contract, and thus, continue to get paid on its NRC contract.  Plaintiff's Exhibit 837, January 10, 2000 Letter from SAIC to the NRC, attached hereto as Exhibit 24; Martin Testimony, Exh. 14, 7/14 p.m. Tr. 13:25-14:12, 22:16–23:3; 29:25–30:3; *see also SAIC,* 653 F. Supp. 2d. 87, 105 (D.D.C. 2009).

**Response:** Disputed. The cited materials do not establish that SAIC sent the letter "to get" its claims paid within the meaning of the False Claims Act. *See* Resp. to U.S. Stmt., *supra* ¶ 27.

41. SAIC's January 10, 2000 letter to the NRC made a number of assertions about SAIC's relationship with BNFL and SAIC's role on the BNFL Oak Ridge Recycle Project. SAIC's January 10, 2000 letter claimed, *inter alia,* that: (1) the BNFL contract did not "involve commercial activities of any kind"; (2) "SAIC did not support activities where the State of Tennessee was the regulatory authority"; (3) "SAIC did not support activities related to the unconditional release of materials"; (4) "SAIC did not provide support to BNFL or its subcontractor, MSC, in making dose estimates for released materials"; (5) "SAIC did not provide support to BNFL or its subcontractor, MSC, in assessing the final state of metals or materials decontaminated by MSC, including residual quantities"; (6) "SAIC has not developed models or prescribed methods and procedures for measuring unconditional releases of materials"; (7) "Neither BNFL, nor its subcontractor, MSC, has requested that SAIC review or comment on the dealings between the project, DOE, and the State of Tennessee relating to unconditional releases of material"; and (8) "SAIC has not performed analyses of any sort under the BNFL contract related to the unconditional release of materials, including monitoring requirements or ALARA analyses. Plaintiff's Exhibit 837, January 10, 2000 Letter from SAIC to the NRC, Exh. 24; Martin Testimony, Exh. 14, 7/14 p.m. Tr. 14:20-40:10.

    **Response:** This fact is not in dispute.

42. SAIC's January 10, 2000 letter to the NRC also made a number of assertions about SAIC's relationship with BJC and SAIC's role on the BJC Dose Assessment Project. The letter claimed, *inter alia,* that: (1) "SAIC's assessments [for BJC] address current DOE requirements"; and (2) "[SAIC's assessments] are not based on or derived from SAIC's work under the NRC contract." Plaintiff's Exhibit 837, January 10, 2000 Letter from SAIC to the NRC, Exh. 24; Martin Testimony, Exh. 14, 7/14 p.m. Tr. 40:11-42:17.

    **Response:** This fact is not in dispute.

43. On March 17, 2000, because of SAIC's failure to avoid and disclose its organizational conflicts of interest, NRC terminated the SAIC Contract with a no-cost settlement of the 1999 NRC Contract. Plaintiff's Exhibit 981, No-Cost Settlement Termination Memo, Exh. 21; Mace Testimony, Exh. 20, 7/15 p.m. Tr. 107:16-111:1.

**Response:** Disputed.  The NRC did not unilaterally terminate the 1999 Contract, as this Paragraph suggests.  Rather than choosing to unilaterally terminate the contract for default or for convenience, the NRC decided to enter into an agreement with SAIC for a "no-cost termination settlement" that purported to "constitute[ ] the complete and final settlement of all matters related to [the 1999 Contract]." PX 860 (Exh. 29).

44.    (a) During the course of SAIC's performance of its NRC Contracts, BNFL Inc., the United States subsidiary of British Nuclear Fuels plc., was a nuclear waste management, decommissioning, engineering, and nuclear materials handling company.  *See, e.g.,* Murray Testimony, Exh. 9, 7/2 p.m. Tr. 65:10-20.

**Response:** Disputed.  The cited page of testimony refers to "British Nuclear Fuels Limited," not BNFL, Inc.  *See* Murray Test., 7/2 p.m. Tr. 65:3-4 (Exh. 30).  Moreover, the cited testimony does not refer to any entity being the United States subsidiary of British Nuclear Fuels plc.  *See id.* at 65:1-25.

(b) During the course of SAIC's performance of its NRC Contracts, Manufacturing Sciences Corporation (MSC) was a radioactive materials recycling company.  Murray Testimony, Exh. 9, 7/2 p.m. Tr. 65:10-68:8.

**Response:** This fact is not in dispute.

(c) As of January 1996, MSC and BNFL were business partners on MSC's radioactive metal recycling facility in Oak Ridge, Tennessee.  Loiselle Testimony, attached hereto as Exhibit 25, 7/7 a.m. Tr. 91-93; Turner Testimony, Exh. 11, 7/7 p.m. Tr. 94-95.

**Response:** This fact is not in dispute.  SAIC and MSC, however, had no contractual relationship.  *See* Turner Test., 7/7 p.m. Tr. 93:25-94:16 (Exh. 31).

(d) This facility was licensed by the State of Tennessee, pursuant to NRC regulations, to possess, handle, decontaminate, and recycle radioactive materials.  Murray Testimony, Exh. 9, 7/2 p.m. Tr. 65:10-68:8.

**Response:** Disputed.  The Government's factual assertion is incorrect because it suggests that having a license from the State of Tennessee is no different than having a license from the NRC.  *See* DX 800, at 40 (Exh. 2) (statement of an NRC official distinguishing between "the jurisdiction of either the Commission or the appropriate agreement state"); Resp. to U.S. Stmt., *supra* ¶ 11.  Moreover, all of SAIC's work on its subcontract with BNFL was within the DOE's regulatory authority and within the DOE's jurisdictional fence.  Caldwell Test., 7/9 p.m. Tr. 114, 116 (Exh. 32); Turner Test., 7/8 p.m. Tr. 88, 104 (Exh. 6); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60).

> (e) Subsequently, during the relevant time period, BNFL purchased MSC. Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 91-93; *SAIC,* 653 F. Supp. 2d at 100 (MSC a BNFL subsidiary).

**Response:** Disputed.  The cited materials do not establish the absence of a genuine dispute as to the timing of any purchase of MSC by BNFL.  Moreover, the Government's allegation that this purchase occurred "during the relevant time period" is insufficiently precise to merit a specific response.

45.  As set forth in ¶¶ 48-77, by no later than March 1996, SAIC began developing a relationship with BNFL pursuant to which SAIC provided BNFL with advice and assistance in the technical area of clearance of materials for recycle and reuse.  *See, e.g.,* Turner Testimony, Exh. 11, 7/7 p.m. Tr. 81:17-82:14, 120:18-121:15, 7/8 a.m. Tr. 7:5-7:10, 12:20-13:15, 19:23- 23:6.  Between March 1996 and March 2000, SAIC advised and assisted BNFL on a variety of nuclear projects relating to clearance of materials for reuse/recycle.  SAIC provided advice and assisted BNFL with technical issues and matters related to: (1) clearance, recycle and release of nuclear material from nuclear facilities (2) measurement of radioactivity in solid materials at nuclear facilities; (3) regulations and standards applicable to the release of slightly contaminated solid material from nuclear facilities; (4) measuring inventories of solid material at nuclear facilities; (5) dose assessments relating to nuclear

materials; and (6) assessment of health and safety issues for nuclear workers, the public and the environment pertaining to the release of nuclear material from nuclear facilities.  SAIC's work with BNFL was in the same technical area, and on the same and similar matters, as its work for the NRC under its NRC Contracts.  *Id; see also* Turner Testimony, Exh. 11, 7/7 p.m. Tr. 84:17-103:17, Murray Testimony, Exh. 9, 7/2 p.m. Tr. 71:15-72:9; Slack Testimony, Exh. 5, 7/9 p.m. Tr. 66:21-68:9; Caldwell Testimony, Exh. 12, 7/9 p.m. Tr. 77:9-80:10, 101:10-103:10; McBride Testimony, attached hereto as Exhibit 26, 7/10 p.m. Tr. 54:3-63:18; *see also, infra,* ¶¶ 4-14 (scope of SAIC's NRC Contracts), 46-77 (scope of SAIC's assistance to BNFL).

**Response:**  Disputed.  The BNFL contract was not signed until August 1997. Turner Test., 7/7 p.m. Tr. 81:22-23, 119:3-12 (Exh. 31).  Any memoranda from Turner prior to that date were idea papers reflecting Turner's big-picture ideas, which were not acted upon by management.  *See* Turner Test., 7/7 p.m. Tr. 113:14-24, 116:21-117:1 (Exh. 31).  Moreover, Turner provided advice regarding *DOE*'s disposal rules and documentation requirements (*see* Turner Test., 7/8 a.m. Tr. 12-13 (Exh. 11)), and SAIC's work for BNFL included preparing high-level plans regarding compliance with *DOE*-approved standards and procedures that were to be followed on the project (Caldwell Test., 7/9 p.m. Tr. 113 (Exh. 32)).  In addition, the first sentence of Paragraph 45 is inaccurate to the extent that it suggests that SAIC actually performed recycling on this project.  On the contrary, SAIC never performed recycling on this project (Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 33)) and SAIC did not have "any responsibility to release metals from the DOE facility" (Caldwell Test., 7/9 p.m. Tr. 114:7-9 (Exh. 32).  SAIC was compensated on a time-and-materials basis for its work with BNFL—and thus had no economic interest in recycling.  *See* Turner Test., 7/8 p.m. Tr. 81-83 (Exh. 6); Caldwell Test., 7/9 p.m. Tr. 114-15 (Exh. 32).  Additionally, the cited materials do not establish the absence of a

genuine dispute as to the allegation that "SAIC's work with BNFL was in the same technical area, and on the same and similar matters, as its work for the NRC under its NRC Contracts." *See* Resp. to U.S. Stmt., *infra* ¶¶ 46-77, *infra*. SAIC scientists have experience in examining how radiation affects metals, but this does not establish that SAIC worked in the same technical area as the NRC work. Indeed, SAIC has never been in the metals recycling business. *See, e.g.*, Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 33). Moreover, the metals at DOE and NRC facilities differ substantially. The NRC, for example, did not ask SAIC to address in its modeling the potential impact of releasing nickel, which is a metal unique to DOE facilities. *See* Slack Test., 7/9 p.m. Tr. 48 (Exh. 34); Turner Test., 7/8 p.m. Tr. 71-72 (Exh. 6). For numerous reasons, including those stated above, SAIC's work on the BNFL project was not in the same "technical area" as its work for the NRC.

46.   On March 6, 1996, SAIC's Turner prepared and distributed a Proprietary Memorandum to eight other executives at SAIC as part of SAIC's business planning in the area of metal recycling and recovery. The Memorandum identified "major opportunities" for SAIC to pursue involving radioactive scrap recycling including with BNFL. Plaintiff's Exhibit 94, March 6, 1996 Memo from Steve Turner, attached hereto as Exhibit 27; Turner Testimony, Exh. 11, 7/7 p.m. Tr. 84:17-103:17.

**Response:** Disputed. The memorandum reflected only the big-picture ideas of one employee who lacked decision-making authority on these issues; moreover, the ideas never got off of the drawing board because SAIC's management did not approve them. *See* Turner Test., 7/7 p.m. Tr. 113:14-24, 116:21-118:21 (Exh. 31); Turner Test., 7/8 a.m. Tr. 79:13-19 (Exh. 11); Turner Test., 7/8 p.m. Tr. 105:17-106:6 (Exh. 6) (SAIC's management "didn't agree with the approach," which was therefore

"rejected quickly," and Turner was only given permission to continue discussions with BNFL regarding the Three-Building Project).

47.    SAIC knew that BNFL/MSC was focusing on becoming the world's center for radioactive scrap metal recycling in Oak Ridge, Tennessee.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 99:4-103:17.

**Response:**  Disputed.  The Government's factual assertion inaccurately suggests that BNFL and MSC were *themselves* seeking to become the world's center for radioactive scrap metal recycling.  *See* Turner Test., 7/7 p.m. Tr. 99:17-20 (Exh. 31).  Moreover, SAIC was compensated on a time-and-materials basis for its work with BNFL—and thus had no economic interest in recycling.  *See* Turner Test., 7/8 p.m. Tr. 81-83 (Exh. 6); Caldwell Test., 7/9 p.m. Tr. 114-15 (Exh. 32).

48.    BNFL/MSC was planning on recycling not only DOE radioactive materials but also radioactive metal from commercial nuclear power plants licensed by the NRC.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 99:4-103:17.  SAIC was looking at ways of taking advantage of these opportunities on its own behalf by teaming with BNFL and MSC.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 99:4-103:17; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 81:21-85:18.

**Response:**  Disputed.  With respect to SAIC, the cited materials refer only to consideration of potential DOE opportunities.  *See* Turner Test., 7/7 p.m. Tr. 101:19-102:2 (Exh. 31) ("I was particularly focusing with BNFL on pursuing the Three-Building D&D job.  I wasn't interested in pursuing all the opportunities . . . ."); Slack, 7/9 a.m. Tr. 83:11-14 (Exh. 9).

49.    On March 25, 1996, SAIC's Turner updated his opportunities memorandum on metal recycling and circulated it to the same executives.  In this memorandum, SAIC again discussed "long-term opportunities" in the Metal Recycling and Recovery business.  SAIC noted that one of the "discriminators" that made SAIC stand out for commercial firms looking for opportunities was its "DOE/NRC knowledge."  Plaintiff's Exhibit 100,

3/25/1996 Memorandum from S. Turner, attached hereto as Exhibit 28; Turner Testimony, Exh. 11, 7/7 p.m. Tr. 104:2- 108:1.

**Response:** Disputed.  The memorandum reflected only the big-picture ideas of one employee who lacked decision-making authority on these issues; moreover, the ideas never got off of the drawing board because SAIC's management did not approve them.  *See* Turner Test., 7/7 p.m. Tr. 113:14-24, 116:21-118:21 (Exh. 31); Turner Test., 7/8 a.m. Tr. 79:13-19 (Exh. 11); Turner Test., 7/8 p.m. Tr. 105:17-106:6 (Exh. 6).  Moreover, because the distribution list for the March 25, 1996 memorandum was not precisely the same as the distribution list for the March 6, 1996 memorandum (*see* Turner Test., 7/7 p.m. Tr. 104:2-24 (Exh. 31); PX 94 (Exh. 35); PX 100 (Exh. 36)), the assertion that the two memoranda were circulated to "the same executives" is inaccurate.

50.     At the same time, also in March 1996, another SAIC Vice President, Jeffrey Slack, had identified "DOE Metal Recycling" as the number one business development priority for his group.  At this time, Slack was particularly interested in opportunities teaming with BNFL/MSC at Oak Ridge and other GDPs.  Slack Testimony, Exh. 5, 7/9 a.m. Tr. 81:21-85:18.

**Response:** Disputed.  The cited materials do not establish the absence of a genuine dispute.  For example, the cited materials do not establish that SAIC as a company pursued this.  Nor do the cited materials demonstrate that Slack's ideas were authorized or supported by the company.  In any event, Slack (who previously worked for DOE) and Turner testified that the DOE is not regulated by the NRC and that SAIC's work for the NRC had no application to DOE facilities.  Slack Test., 7/9 p.m. Tr. 64-65 (Exh. 34); Turner, 7/8 p.m. Tr. 104, 111-12 (Exh. 6).  Additionally,

Slack was an assistant vice president (Slack Test., 7/9 a.m. Tr. 79:25-80:3 (Exh. 9)),

not a "Vice President," of SAIC.

51.     SAIC provided advice and assistance on decontamination methods for release
        and recycle, the price of radioactive scrap metal, the amounts and quality of
        radioactive scrap metal, the regulatory standards in existence for different
        types of contamination in radioactively contaminated scrap metal, recycling
        facilities available in Oak Ridge, and long term planning on how to make the
        radioactive scrap metal recycling part of a long-term business.  Murray
        Testimony, Exh. 9, 7/2 p.m. Tr. 70:12-75:8; Turner Testimony, Exh. 11, 7/7
        p.m. Tr. 108:14- 118:21.  At the same time SAIC was providing this advice
        and assistance, SAIC was performing similar work on the 1992 Contract.
        Murray Testimony, Exh. 9, 7/2 p.m. Tr. 75:9-75:25, 47:9- 51:1; *see also, supra,*
        ¶¶ 4-14.

        **Response:**  Disputed.  The cited materials largely describe "an idea paper"

that was "floated up to [Turner's] management," which "actually didn't move

forward with this information at all" (*see* Turner Test., 7/7 p.m. Tr. 116:23-117:1

(Exh. 31))—not the actual provision of advice or assistance.   The meetings about

which Murray testified pertained to potential work, not work for which the DOE

had issued a contract.  *See* Murray Test., 7/2 p.m. Tr. 70:21-71:18 (Exh. 30).

Moreover, Murray was speaking based on his experience from "earlier in the 1990s,"

and, accordingly, his statements at the meetings were fairly general.  *See id.* at

71:6-72:9.  Additionally, SAIC's work for BNFL was not "similar" to its work on the

1992 Contract (*see* Resp. to U.S. Stmt. ¶¶ 44-85) and the Oak Ridge facility was a

*DOE* facility, not an NRC facility (*see United States v. Sci. Applications Int'l Corp.*,

626 F.3d 1257, 1272 (D.C. Cir. 2010) ("*SAIC IV*")).

52.     SAIC also prepared a Radioactive Scrap Metal Recycling Business Initiative
        in June 1996.  Turner Testimony, Exh. 11, 7/7 p.m. Tr. 108:9-118:21, 7/8 a.m.
        Tr. 78:15-84:24.  The Business Initiative is accompanied by a status report
        indicating that BNFL wanted SAIC on its team to support BNFL in the

decontamination and decommissioning (D&D) of all three Gaseous Diffusion Plants (GDPs) located in the United States. *Id.*

**Response:** Disputed. The document to which this sentence refers contained one SAIC employee's "initial thoughts" about a possibility, which he expressed to management. It does not represent an intention by SAIC's management to get into the recycling business. *See* Turner Test., 7/8 a.m. Tr. 79:13-19 (Exh. 6). Moreover, the GDPs are DOE facilities, not NRC facilities. *See* Turner Test., 7/7 p.m. Tr. 112:21-24 (Exh. 31).

53.    SAIC understood that the market for radioactive scrap metal would grow as the D&D of commercial nuclear reactors licensed by the NRC commenced. Turner Testimony, Exh. 11, 7/7 p.m. Tr. 108:9-118:21, 7/8 a.m. Tr. 78:15-84:24; Murray Testimony, Exh. 9, 7/2 p.m. Tr. 56:2-59:14.

   **Response:** This fact is not in dispute.

54.    By this point in time, SAIC had a Business Plan in which it would play a support role for BNFL on the D&D of the GDPs, work that would cost billions of dollars to complete. Turner Testimony, Exh. 11, 7/7 p.m. Tr. 108:9-113:24; *see also* Murray Testimony, Exh. 9, 7/2 p.m. Tr. 62:24-64:5. SAIC estimated in 1996 that it might earn more than $300 million in revenues from teaming with BNFL on D&D and recycle projects for the three GDPs. Turner Testimony, Exh. 11, 7/7 p.m. Tr. 108:9-113:24.

   **Response:** Disputed. The assertion that "SAIC had a Business Plan" is inaccurate; instead, the document to which this sentence refers was an "idea paper" reflecting one person's big-picture ideas, and management did not act on the ideas. *See* Turner Test., 7/7 p.m. Tr. 113:14-24, 116:21-117:1 (Exh. 31). Moreover, the cited testimony does not establish that SAIC actually performed the work described in Paragraph 54, which means that it could not possibly have constituted a conflict of interest.

55.   By July 19, 1996, SAIC had already assisted BNFL by preparing a plan and cost estimate for the D&D and recycle of Building K-33 in Oak Ridge. The SAIC Plan called for "maximizing the unrestricted free release of materials contained within K-33 into forms which are suitable for onward processing (recycle or reuse)." The plan contained a detailed estimate of the amounts of material available for recycle from Building K-33. The Plan specifically notes that it is assumed the project will be performed under NRC and EPA regulations. Turner Testimony, Exh. 11, 7/8 a.m. Tr. 95:4-101:11.

**Response:** Disputed. The term "SAIC Plan" is inaccurate. *See* PX 159, at 1 (Exh. 37). In addition, the assumption referred to in the last sentence of Paragraph 55 was an "assumption that BNFL wanted to make for the cost estimate," and Turner disagreed with that assumption. Turner Test., 7/8 a.m. Tr. 97:19-98:20, 99:16-24 (Exh. 11). Moreover, Turner testified that, notwithstanding any reference to the NRC, "we all knew that the key authority was the State of Tennessee." *Id.* at 99:8-100:3.

56.   Over the next several years SAIC continued to provide assistance to BNFL with respect to the clearance of material for recycle and reuse on this BNFL Oak Ridge Recycle Project. SAIC admitted in its own project description that it was involved with BNFL on the K-25 Site 3-Building D&D and Metal Recycle Project from "the onset of the project providing technology selection and design to establish the best technical means of applying the proven BNFL methods to the U.S. equipment within the regulatory constraints of the DOE and other regulators." Plaintiff's Exhibit 521, BNFL Project Description, attached hereto as Exhibit 29; Turner Testimony, Exh. 11, 7/8 a.m. Tr. 41:11-44:9.

**Response:** Disputed. Paragraph 56 is inaccurate to the extent that it suggests that SAIC actually performed recycling on this project. On the contrary, SAIC never performed recycling on this project. Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 33). In addition, SAIC disputes the first six words of the quotation because they are inaccurate. *See* PX 521, at 1 (Exh. 38).

57.     SAIC has admitted that it used its process knowledge to "completely plan the
        D&D activities and to provide the integrated cost estimate for the removal,
        decontamination, and metal recycle actions." SAIC acknowledged that it was
        responsible for all of the documentation associated with the regulatory
        actions to enable the project to begin. Plaintiff's Exhibit 521, BNFL Project
        Description, Exh. 29; Turner Testimony, Exh. 11, 7/8 a.m. Tr. 41:11-44:9.

        **Response:** Disputed. SAIC disputes the Government's factual assertion

that SAIC used its process knowledge to "completely plan the D&D activities"; as

the cited testimony itself demonstrates, the language about completely planning the

D&D activities was "a little overstated" and "probably a little bit of an exaggeration"

(*see* Turner Test., 7/8 a.m. Tr. 43:9-24 (Exh. 11)). Moreover, PX 521 does *not* show

that "SAIC acknowledged that it was responsible" for the referenced documentation.

*See* PX 521, at 1 (Exh. 38).

58.     On September 20, 1996, SAIC entered into a Teaming Agreement with BNFL
        for metals recycling at Oak Ridge, Tennessee. SAIC committed to providing
        assistance to BNFL on this recycle project in the areas of regulatory support,
        health and safety, and radiation protection. Plaintiff's Exhibit 190 (BNFL-
        SAIC Teaming Agreement) and Plaintiff's Exhibit 204, Memo re: Possible
        SAIC Services for Teaming Agreement, attached hereto as Exhibit 30; Turner
        Testimony, Exh. 11, 7/8 a.m. Tr. 111:18-112:15.

        **Response:** Disputed. SAIC never performed recycling on this project.

Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 33). Moreover, the project involved more

than recycling. *See* PX 190, at 1 (Exh. 39). In addition, the referenced teaming

agreement was not signed as of September 20, 1996. *See* Turner Test., 7/8 a.m. Tr.

111:12-13 (Exh. 11). The cited materials do not establish that SAIC necessarily was

committing to provide all of the referenced services. *See* PX 190, at 1 (Exh. 39).

59.     SAIC discussed a number of potential services it could provide pursuant to its
        Teaming Agreement with BNFL. These services included "develop[ing] and
        issu[ing] to the NRC all necessary licensing documents." Plaintiff's Exhibit

37

190 (BNFL-SAIC Teaming Agreement) and Plaintiff's Exhibit 204, Memo re:
Possible SAIC Services for Teaming Agreement, Exh 30; Turner Testimony,
Exh. 11, 7/8 a.m. Tr. 111:18-112:15.

**Response:** This fact is not in dispute.

60.     SAIC understood that the purpose of the BNFL Oak Ridge Recycle Project
        was, in part, to remove radioactive material from a DOE facility and release
        and/or recycle that material into general commerce, an activity regulated by
        the NRC. *SAIC,* 626 F.3d at 1272 ("several employees acknowledged at trial
        that British Nuclear and MSC intended to sell materials recycled from DOE's
        Oak Ridge facility and that such contaminated materials would be subject to
        NRC regulation once released into general commerce."); *SAIC,* 653 F. Supp.
        2d at 100-101 ("SAIC employees testified that BNFL, with whom SAIC
        entered into an agreement regarding a recycle project for the DOE, was
        subject to the NRC's regulations concerning disposal of radioactive waste
        once the waste left DOE facilities and MSC, a subsidiary of BNFL, was NRC-
        licensed."); Truitt Testimony, Exh. 10, 7/10 p.m. Tr. 21:7-22:1 ("any
        radiological material that went off-site would be subject to NRC once it left
        the DOE fence"); Turner Testimony, Exh. 11, 7/8 a.m. Tr. 112:16-115:4
        ("[R]ecycling was a key portion [of the BNFL Oak Ridge Recycling Project]"),
        7/8 p.m. Tr. 39:21-40:8; 66:16-68:5; Caldwell Testimony, 7/9 p.m. Tr. 80:11-
        83:6 (material from the BNFL project that left the DOE site would be subject
        to compliance with NRC regulations and requirements); Slack Testimony,
        Exh. 5, 7/9 a.m. Tr. 87:1-87:19:9 ("focus" of BNFL project was metals removal
        and recycle from Oak Ridge); Rodehau Testimony, Exh. 3, 7/3 p.m. Tr. 49:19-
        50:16 ("regulated by the NRC" means subject to the regulations or regulatory
        authority of the NRC and was broader than just commercial utilities licensed
        by the NRC); Palau Testimony, attached hereto as Exhibit 31, 7/15 a.m. 13-20
        (SAIC's work for the NRC actually used to release materials from the BNFL
        project). Additionally, SAIC understood that the standard under which this
        release and recycle would take place was the NRC's then-existing release
        standard, NRC Regulatory Guide 1.86. Turner Testimony, Exh. 11, 7/8 a.m.
        Tr. 29:12-30:18; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 95:3-99:21; Caldwell
        Testimony, Exh. 12, 7/9 p.m. Tr. 100:10-100:21; *see also,* infra, ¶ 63, 70-72. In
        fact, SAIC prepared the project documents that set out that release from the
        BNFL Oak Ridge Recycle Project would be conducted under NRC Regulatory
        Guide 1.86, including the Work Smart Standards. These Work Smart
        Standards set out the regulatory and scientific standards, including
        Regulatory Guide 1.86, that would govern release from the project, and
        certified that release and recycle under that standard would be adequately
        protective of public health, safety, and the environment. Turner Testimony,
        Exh. 11, 7/8 a.m. Tr. 29:12-30:18; Slack Testimony, Exh. 5, 7/ 9 a.m. Tr. 95:3-

104:12.  SAIC's work for the NRC involved considerations of the need for replacing Regulatory Guide 1.86.

**Response:**  Disputed.  Numerous SAIC employees understood that SAIC's work on the DOE Three-Building Project was not regulated by the NRC.  *See* Turner Test., 7/8 p.m. Tr. 104:13-23 (Exh. 6) (testifying that Turner, "BNFL and everybody else in the project understood that DOE would be the regulating authority for the Three-Building Project"); Caldwell Test., 7/9 p.m. Tr. 116:12-25 (Exh. 32); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60).  In any event, "all of SAIC's services were performed within the DOE facility" (Caldwell Test., 7/9 p.m. Tr. 114:1-3 (Exh. 32)); SAIC did not have "any responsibility to release metals from the DOE facility" (*id.* at 114:7-9); SAIC never performed recycling on this project (Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 33)); and, if any regulatory authority applied outside of the DOE facility, it was the State of Tennessee, not the NRC (*see* Turner Test., 7/8 a.m. Tr. 99:16-24 (Exh. 11)).  Moreover, SAIC was compensated on a time-and-materials basis for its work with BNFL—and thus had no economic interest in recycling.  *See* Turner Test., 7/8 p.m. Tr. 81-83 (Exh. 6); Caldwell Test., 7/9 p.m. Tr. 114-15 (Exh. 32).  Additionally, the Government's citation of Rodehau's testimony is unavailing.  Rodehau testified that the head of the NRC's Office of Acquisition had publicly stated "that DOE was not an entity subject to the NRC's regulatory authority."  Rodehau Test., 7/7 a.m. Tr. 32:8 (Exh. 14).

At most, the cited testimony establishes that only Table 1 of Guide 1.86 applied.  *See* Slack Test., 7/9 a.m. Tr. 98:2-10 (Exh. 9); Turner Test., 7/8 a.m. Tr. 29:12-17 (Exh. 11).  The DOE had the authority to incorporate into its regulations

for the Three-Building Project any technical requirements it wanted.  The DOE's utilization of Table 1 of Guide 1.86 does not constitute NRC regulation of the site any more than incorporation of IAEA standards would have meant that the project was being regulated by that international agency.  Moreover, Guide 1.86 is not an NRC-issued document.  *See* Slack Test., 7/9 a.m. Tr. 98:11-18 (Exh. 9) ("[I]t was an Atomic Energy Commission-issued document before NRC and DOE split.  It was a really old document that was generated a long time ago that both DOE and NRC had used over the years to control surface releases of contaminated materials."); *id.* at 99:1-13 (testifying that DOE used the "same numbers" or "limits" as those contained in the Guide); Turner Test., 7/8 a.m. Tr. 30:2-10 (Exh. 11) ("I don't know how the NRC felt about it or whether they adopted it or whether they actually used it.").  The testimony also shows that "DOE [was] the regulator using the Work Smart Standards."  Turner Test., 7/8 p.m. Tr. 98:9-11 (Exh. 6).  The decision to use the Guide was made as part of an "agreement with DOE."  Turner Test., 7/8 a.m. Tr. 29:23-24 (Exh. 11).  Indeed, SAIC employee Jeffrey Slack testified that DOE approved the guidelines in the Work Smart Standards and that the contemplated release of radioactive materials would be "within the current DOE guidelines."  Slack Test., 7/9 a.m. Tr. 104:1-9 (Exh. 9).  Moreover, Guide 1.86 was "mistakenly included in the Work Smart Standards."  *Id.* at 93:9-11.  Finally, the Government has not established that the assertion in the last sentence of Paragraph 60 is undisputed, because the Government failed to "include references to the parts of the record relied on to support the statement," as required by LCvR 7(h)(1).

61.     SAIC understood that if it was determined that release of material under NRC Regulatory Guide 1.86 was not protective of public health, that would be a big problem for the project. Turner Testimony, Exh. 11, 7/8 p.m. Tr. 17:14-21:9. Whether Regulatory Guide 1.86 was adequately protective of public health was precisely one of the issues being considered by SAIC as part of its work on the 1992 NRC Contract. Plaintiff's Exhibit 573, Draft Options Paper, attached hereto as Exhibit 32, at pp. 2, 12. Additionally, the rule SAIC was assisting the NRC to develop would have replaced Regulatory Guide 1.86. *See, supra,* ¶ 10.

**Response:** Disputed. As to the first sentence, the cited testimony does not

establish the absence of a genuine dispute regarding the Government's factual

assertion. Moreover, Guide 1.86 is not an NRC-issued document. *See* Slack Test.,

7/9 a.m. Tr. 98:11-18, 99:1-13 (Exh. 9); Turner Test., 7/8 a.m. Tr. 30:2-10 (Exh. 11).

The second and third sentences of Paragraph 61 are disputed for the reasons set

forth in detail in response to Paragraph 10. *See* Resp. to U.S. Stmt., *supra* ¶ 10.

62.     On the other hand, SAIC understood that the recycling potential of the BNFL project, and thus the viability of the project as a whole, would benefit from a "volumetric" free release standard, precisely the same standard on which SAIC was advising and assisting the NRC. Turner Testimony, Exh. 11, 7/8 a.m. Tr. 59:15-59:24, 7/8 p.m. Tr. 116:4-117:4; Murray Testimony, Exh. 9, 7/2 p.m. Tr. 56:2-59:19; Caldwell Testimony, Exh. 12, 7/9 p.m. Tr. 91:24- 93:15 (SAIC understood that the recycling potential of the BNFL project would be enhanced by a volumetric standard such as that on which SAIC was assisting the NRC).

**Response:** Disputed. The cited materials do not establish the absence of a

genuine dispute on this issue. Paragraph 62 is inaccurate because, among other

things, it implies that any standard would allow more materials to be released.

That is not the case: Dr. Meck concluded that SAIC's work "constituted the opposite

of a conflict." Meck Test., 7/3 p.m. Tr. 9-10 (Exh. 23); *see also id.* at 7. The Director

of the NRC's Office of Nuclear Regulatory Research made the same determination.

41

*See* DX 518, at 1 n.1 (Exh. 40).  These conclusions were premised on the fact that

"the results of [draft NUREG-1640] generally lead to more restrictive release levels

than those of other comparable analyses" (*id.*) and that utilizing SAIC's work

product would therefore have been "more protective of the public safety than were

comparable products."  10/8/08 Judgment, Dkt. #151 at 2.  Indeed, the final

NUREG-1640 prepared by another contractor was "less conservative" than SAIC's

draft report.  Mauro Test., 7/21 a.m. Tr. 104-05 (Exh. 41).  In any event, SAIC had

no policy responsibility for the potential NRC rule.  *See* Paperiello Test., 7/15 p.m.

Tr. 35:15-36:20 (Exh. 3).  Moreover, the DOE had the authority to decide whether it

would adopt any NRC standard.  In addition, there was no chance that an NRC rule

would be promulgated during the BNFL project.  Finally, the metals at NRC and

DOE facilities differ substantially; for example, nickel is unique to DOE facilities

and was therefore not addressed in SAIC's modeling for the NRC.  Slack, 7/9 p.m.

Tr. 48 (Exh. 34); Turner, 7/8 p.m. Tr. 71-72 (Exh. 6).

63.   Additionally, the BNFL Oak Ridge Recycle Project Contract, executed on
      August 25, 1997, expressly provided that "all contractor activities under this
      statement of work and/or within the scope of the removal action shall comply
      with federal and state regulations identified as Applicable or Relevant and
      Appropriate Requirements (ARAR) and applicable DOE Orders listed on
      Appendix I of this SOW and Clause H-5 of this contract entitled Laws
      Regulations and DOE Directives.  These applicable regulations and
      standards identified by the Contract included NRC Regulation 10 CFR 71
      and NRC Regulatory Guide 1.86."  Turner Testimony, Exh. 11, 7/8 a.m. Tr.
      25:25-31:17.

      **Response:**  Disputed.  At most, Table 1 of Guide 1.86 applied.  *See* Slack

Test., 7/9 a.m. Tr. 98:2-10 (Exh. 9); Turner Test., 7/8 a.m. Tr. 29:12-17 (Exh. 11).

Moreover, Paragraph 63 is inaccurate to the extent that it suggests that this project

was subject to NRC regulation. *See, e.g.*, Turner Test., 7/8 p.m. Tr. 104:13-23 (Exh.

6) (testifying that Turner, "BNFL and everybody else in the project understood that

DOE would be the regulating authority for the Three-Building Project"); Caldwell

Test., 7/9 p.m. Tr. 116:12-25 (Exh. 32); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60);

7/23 a.m. Tr. 112:5-113:7 (Exh. 57) (DOE project manager's statement that "[t]he

NRC had no authority over us on this project at all"). Moreover, Guide 1.86 is not

an NRC-issued document. *See* Slack Test., 7/9 a.m. Tr. 98:11-18, 99:1-13 (Exh. 9);

Turner Test., 7/8 a.m. Tr. 30:2-10 (Exh. 11).

64. Additionally, Section 2.9.2 of the BNFL Contract specifically stated that all Uranium Deposits "shall be transferred to an NRC Class-I nuclear materials licensee, or facilities operated under a UK Nuclear Installations Inspectorate Site License…" Turner Testimony, Exh. 11, 7/8 a.m. Tr. 32:5-34:10.

**Response:** Disputed. The quoted sentence appears to refer to the transfer of

ownership of only those uranium deposits that are removed by the contractor, as

opposed to the uranium deposits that are removed by DOE itself. *See* PX 442, at 23-

24 (Exh. 42) (Bates SAIC.0047553-54). Moreover, although Section 2.9.2 states that

ownership shall be transferred "to an NRC Class-I nuclear materials licensee, or

facilities operated under a United Kingdom (UK) Nuclear Installations Inspectorate

Site License, *or equivalent International Atomic Energy Agency (IAEA) regulated*

*firm*," Paragraph 64's quotation omits the italicized portion of this sentence. *See id.*

at 23 (Exh. 42) (Bates SAIC.0047553) (emphasis added). This quotation is also

irrelevant, as it does not involve SAIC's work as a DOE subcontractor.

65. SAIC offered assistance to BNFL in performing cost valuations for recycling materials on the BNFL Recycle Project and cost/benefit analyses for determining what materials should be recycled and reused. Turner

Testimony, Exh. 11, 7/8 a.m. Tr. 97:7-110:3, 10:13- 12:19; Murray Testimony, Exh. 9, 7/2 p.m. Tr. 70:12-75:8.  For example, on September 5, 1996, SAIC's Turner completed a cost evaluation for the BNFL Recycle Project.  Plaintiff's Exhibit 176, Cost Estimate, attached hereto as Exhibit 33; Turner Testimony, Exh. 11, 7/8 a.m. Tr. 104:7-110:3.

**Response:**  Disputed.  The cited testimony refers to cost estimates, but not necessarily analyses of the "benefit[s]," as the Government's factual assertion suggests.  *See, e.g.*, Turner Test., 7/8 a.m. Tr. 97:7-9 (Exh. 11).  Additionally, the second sentence is inaccurate because it states that Turner completed the cost evaluation; on the contrary, the document was based on input from BNFL, MSC, and SAIC.  *See* Turner Test., 7/8 a.m. Tr. 106:10-107:4 (Exh. 11).  Finally, the cost evaluation was submitted to the DOE, not to the NRC.  *See id.* at 106:9-14 (Exh. 11).

66.    In June 1997, BNFL sought advice from SAIC on the potential revenues that could be obtained from the D&D of all the Gaseous Diffusion Plants.  SAIC was hoping to partner with BNFL on this work as well.  Turner Testimony, Exh. 11, 7/8 a.m. Tr. 91:8-94:17, Murray Testimony, Exh. 9, 7/2 p.m. Tr. 59:15-61:14; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 81:21-85:18.

**Response:**  Disputed.  As to the first sentence, the cited testimony establishes that BNFL was considering costs of D&D for all of the gaseous diffusion plants, but it does not establish that BNFL sought SAIC's advice on this issue.  As to the second sentence, the cited testimony does not refer to SAIC's hopes.  *See* Turner Test., 7/8 a.m. Tr. 94:2-5 (Exh. 11).  In any event, even if this potential work had taken place, it would have been regulated by the DOE, just as the Three-Building Project was.  *See, e.g.*, Turner Test., 7/8 p.m. Tr. 104:13-23 (Exh. 6) (testifying that Turner, "BNFL and everybody else in the project understood that

44

DOE would be the regulating authority for the Three-Building Project"); Caldwell

Test., 7/9 p.m. Tr. 116:12-25 (Exh. 32); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60).

67.     SAIC assisted BNFL in calculating the free release potential and strategies
        for releasing material from the BNFL Project.  Turner Testimony, Exh. 11,
        7/8 p.m. Tr. 21:19-29:3, 55:25-64:1.  In October 1997, SAIC assisted BNFL in
        assessing the "free release" potential and realistic revenue streams that could
        be expected from releasing certain nickel tubing from the project.  SAIC
        provided advice and recommendations to BNFL on the methods and means
        by which they might free release nickel from the BNFL recycle project in the
        fall of 1997 and the Spring of 1998.  Turner Testimony, Exh. 11, 7/8 p.m. Tr.
        55:25-64:1.

        **Response:**  Disputed.  The cited testimony does not establish the absence of

a genuine dispute as to whether SAIC provided such advice and recommendations

in "the Spring of 1998."  Moreover, SAIC never performed recycling on this project.

Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 33).  In any event, the reference in

Paragraph 67 to nickel underscores why there was no conflict of interest, as nickel

is a metal unique to DOE facilities.  *See* Slack Test., 7/9 p.m. Tr. 48 (Exh. 34);

Turner Test., 7/8 p.m. Tr. 71-72 (Exh. 6).

68.     SAIC assisted BNFL by providing advice about the various laws and
        regulations applicable to clearance of materials for recycle/reuse.  SAIC
        assisted BNFL in devising the regulatory strategy for the BNFL Recycle
        Project.  Caldwell Testimony, Exh. 12, 7/9 p.m. Tr. 101:10-110:7, 77:9-83:5
        (SAIC's Caldwell was the regulatory compliance manager for the BNFL
        project and frequently provided advice and assistance to BNFL regarding
        regulatory compliance); Turner Testimony, Exh. 11, 7/8 p.m. Tr. 8:1-8:25.

        **Response:**  Disputed.  The cited materials do not establish that "SAIC

assisted BNFL in devising the regulatory strategy for the BNFL Recycle Project."

On the contrary, numerous entities worked on the Work Smart Standards, and

*DOE* approved the guidelines in the Work Smart Standards.  *See* Turner Test., 7/8

p.m. Tr. 98:9-11 (Exh. 6); Turner Test., 7/8 a.m. Tr. 29:23-24 (Exh. 11); Slack Test.,

7/9 a.m. Tr. 104:1-9 (Exh. 9).

69.     SAIC assisted BNFL in preparing the January 1997 Technical Proposal
        submitted on the BNFL Oak Ridge Recycle Project and, in fact, prepared
        most of BNFL's proposal for the project.  Turner Testimony, Exh. 11, 7/8 a.m.
        Tr. 19:23-23:12.

        **Response:**  These facts are not in dispute except that the cited testimony

does not establish the date of the technical proposal being discussed.

70.     SAIC was the lead member of the BNFL Oak Ridge Recycling Project Team
        for designing the Work Smart Standards (WSS) that governed the regulatory
        requirements for the entire recycle project.  SAIC was the project leader for
        developing the WSS on the BNFL Recycle Project.  The WSS process was
        used to define the applicable DOE Orders and other nationally recognized
        codes, standards and regulations needed to ensure safety and environmental
        protection for the project.  The WSS identified all of the regulations and
        standards that applied to the Recycle Project, including NRC Regulatory
        Guide 1.86 and NRC Regulation 10 CFR 71, an NRC regulation.  Plaintiff's
        Exhibit 266, Work Smart Standards for the BNFL Oak Ridge Recycle Project,
        attached hereto as Exhibit 34; Caldwell Testimony, Exh. 12, 7/9 p.m. Tr. 82:4-
        83:1; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 94:23-104:12.

        **Response:**  Disputed.  The cited materials do not establish the lack of a

genuine dispute as to whether SAIC was "the lead member" or "project leader" of

the team.  In fact, a DOE employee is listed as the team leader for the so-called

"identification team."  *See* PX 266, at vii (Exh. 43).  At most, Table 1 of Guide 1.86

applied.  *See* Slack Test., 7/9 a.m. Tr. 98:2-10 (Exh. 9); Turner Test., 7/8 a.m. Tr.

29:12-17 (Exh. 11).  In addition, Guide 1.86 is not an NRC-issued document.  *See,*

*e.g.*, Slack Test., 7/9 a.m. Tr. 98:11-18, 99:1-13 (Exh. 9); Turner Test., 7/8 a.m. Tr.

30:2-10 (Exh. 11).  Moreover, Guide 1.86 was "mistakenly included in the Work

Smart Standards" (Slack Test., 7/9 a.m. Tr. 93:9-11 (Exh. 9)), and "DOE [was] the

46

regulator using the Work Smart Standards" (Turner Test., 7/8 p.m. Tr. 98:9-11

(Exh. 6); *see also, e.g.*, Turner Test., 7/8 a.m. Tr. 29:23-24 (Exh. 11)).  Finally, the

decision to use the Guide was made as part of an "agreement with DOE."  Turner

Test., 7/8 a.m. Tr. 29:23-24 (Exh. 11).  Indeed, SAIC employee Jeffrey Slack testified

that DOE approved the guidelines in the Work Smart Standards and that the

contemplated release of radioactive materials would be "within the current DOE

guidelines."  Slack Test., 7/9 a.m. Tr. 104:1-9 (Exh. 9).

71.    The WSS Report noted that its purpose is to demonstrate that a confirmed
       set of ES&H standards that fully meets DOE requirements has been
       developed and to provide the results of the WSS process as performed on the
       D&D/Recycling Project.  The WSS Report was signed and approved by
       various representatives of DOE, BNFL, and SAIC in January 1997.  SAIC
       identified itself as a "Stakeholder" in the BNFL Oak Ridge Recycle Project.
       Slack Testimony, Exh. 5, 7/9 a.m. Tr. 90:25-104:12; WSS, Exh. 34, at Appx. D
       and Section 5.3

       **Response:**  These facts are undisputed except to the extent that the second

sentence of Paragraph 71 suggests that representatives of only DOE, BNFL, and

SAIC signed the Work Smart Standards Report.  In fact, representatives from other

entities also signed the report.  *See* PX 266, at vi-vii (Exh. 43).

72.    In signing the Work Smart Standards, SAIC understood that it was taking a
       position that the standards that were being applied to the BNFL Recycle
       Project were sufficient to protect the workers, the public and the environment
       with regard to all the work being performed, including the free release and
       recycling activities.  WSS, Exh. 34, at iii (the WSS "adequately ensure the
       health and safety of workers and the public and protection of the
       environment"); Slack Testimony, Exh. 5, 7/9 a.m. Tr. 94:23-104:12.

       **Response:**  These facts are undisputed.

73.    SAIC assisted BNFL with dose assessments in connection with the BNFL
       Recycle Project.  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 47:1-49:4; McBride

Testimony, Exh. 26, 7/10 p.m. Tr. 54:3-63:18, 7/14 p.m. Tr. 93:13-95:22.

**Response:**  These facts are undisputed.

74.   SAIC also provided BNFL with substantial assistance in determining the technical requirements for clearing materials for off-site shipments for recycle and reuse.  *See, e.g.,* Truitt Testimony, Exh. 10, 7/10 p.m. Tr. 6:7-8:17. For example, SAIC provided advice and assistance regarding the development of management instructions and other project documents regarding the procedures and requirements related to free release and recycle of material from the BNFL Oak Ridge Recycle project.  *See, e.g.,* Truitt Testimony, Exh. 10, 7/10 p.m. Tr. 6:10-22:1.

**Response:**  These facts are undisputed.  SAIC's work, however, was not

regulated by the NRC.  *See* Turner Test., 7/8 p.m. Tr. 104:13-23 (Exh. 6); Caldwell

Test., 7/9 p.m. Tr. 116:12-25 (Exh. 32); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60).

75.   SAIC assisted BNFL in preparing the characterization requirements for any materials on the BNFL Oak Ridge Recycle Project that were to be sent off site for recycling and/or disposal, and for determining whether those materials could be free released or needed to be sent to MSC for further decontamination.  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 42:5- 46:17. SAIC's assistance to BNFL included assistance related to the applicability of NRC regulations to material being released from the BNFL Oak Ridge Recycle Project.  Truitt Testimony, Exh. 10, 7/10 p.m. Tr. 19:6-22:1.

**Response:**  Disputed.  The testimony refers to SAIC's work relating to

potentially releasing material "under DOE regulations."  Turner Test., 7/8 p.m. Tr.

45:5-7 (Exh. 6); *see also* Truitt Test., 7/10 p.m. Tr. 21:21-22:1 (Exh. 44).  The cited

testimony also demonstrates that free release of materials was not inevitable.  *See*

Truitt Test., 7/10 p.m. Tr. 21 (Exh. 44).

76.   SAIC assisted BNFL in writing the Waste Management Plan (WMP) for the BNFL Oak Ridge Recycle Project.  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 116:4-117:4; Plaintiff's Exhibit 427, August 11, 1997 Waste Management Plan, attached hereto as Exhibit 35. The WMP advised that wastes would be generated that were subject to several environmental statutes and implementing regulations.  These included materials subject to NRC and

DOE Regulations.  WMP, Exh. 35, at 19.  The WMP was prepared by SAIC to advise and assist BNFL and the Recycle Team about the requirements necessary to ensure wastes from the project would be managed in a safe and compliant manner.  This included radioactively contaminated recyclable metal that would be shipped off site to MSC for further decontamination and material that was deemed to be non-radioactive and could be free released right from the facility.  WMP, Exh. 35, at 8-10.

**Response:**  Disputed.  Paragraph 76 is inaccurate because it suggests that this project was subject to NRC regulation.  *See, e.g.*, Turner Test., 7/8 p.m. Tr. 104:13-23 (Exh. 6) (testifying that Turner, "BNFL and everybody else in the project understood that DOE would be the regulating authority for the Three-Building Project"); Caldwell Test., 7/9 p.m. Tr. 116:12-25 (Exh. 32); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60).  Moreover, the third sentence of Paragraph 76 inaccurately suggests that the materials *would* be subject to NRC *and* DOE regulations, but the cited page of the report states merely that the wastes "*may* include materials subject to . . . Nuclear Regulatory Commission/U.S. Department of Energy (NRC/DOE) regulations."  *See* PX 427, at 19 (Exh. 45) (emphasis added).

77.  SAIC's WMP explicitly noted that, in addition to using NRC Regulatory Guide 1.86, the BNFL Oak Ridge Recycle project would make use of any volumetric standards that were "subsequently developed."  Turner Testimony, Exh. 11, 7/8 p.m. Tr. 116:4-117:4; WMP, Exh. 35, at 10.  Such a volumetric standard for release is the very project on which SAIC was assisting the NRC.  *See, supra,* ¶¶ 4-14.

**Response:**  Disputed.  As an initial matter, Guide 1.86 is not an NRC-issued document.  *See* Slack Test., 7/9 a.m. Tr. 98:11-18, 99:1-13 (Exh. 9); Turner Test., 7/8 a.m. Tr. 30:2-10 (Exh. 11).  In addition, the cited portion of the waste management plan stated that "any subsequently developed volumetric criteria will be used *as appropriate*"—not that such criteria would necessarily be used.  *See* PX 427, at 10

(Exh. 45) (emphasis added); *see also* Turner Test., 7/8 p.m. Tr. 116:25-117:4 (Exh. 6) (noting the "as appropriate" language).  Moreover, Paragraph 77 inaccurately suggests that the NRC was going to issue a rule before the Three-Building Project was complete.  On the contrary, there was no way of knowing whether the NRC would even pursue a rulemaking or whether it would use NUREG 1640 as the basis for any new rule.  *See, e.g.*, *Proposed Rules, Nuclear Regulatory Commission*, 64 Fed. Reg. 35090, 35093 (June 30, 1999) ("In considering rulemaking alternatives, the NRC would consider policies and precedents set by other nations and international agencies, by other Federal agencies, by States, and by other standards setting bodies.").  Additionally, even if the NRC promulgated a rule, it would not necessarily have allowed more materials to be released.  In fact, Dr. Meck and the Director of the NRC's Office of Nuclear Regulatory Research concluded that SAIC's work "constituted the opposite of a conflict" (Meck Test., 7/3 p.m. Tr. 9-10 (Exh. 23); *see also id.* at 7; *see* DX 518, at 1 n.1 (Exh. 40)) because "the results of [draft NUREG-1640] generally lead to more restrictive release levels than those of other comparable analyses" (*id.*), and utilizing SAIC's work product would therefore have been "more protective of the public safety than were comparable products."  10/8/08 Judgment, Dkt. #151 at 2.  Indeed, the final NUREG-1640 prepared by another contractor was "less conservative" than SAIC's draft report.  Mauro Test., 7/21 a.m. Tr. 104-05 (Exh. 41).  In any event, SAIC had no policy responsibility for the potential NRC rule.  *See* Paperiello Test., 7/15 p.m. Tr. 35:15-36:20 (Exh. 3). Finally, the Three-Building Project and SAIC's work for the NRC were unrelated.

50

*See, e.g.*, Slack Test., 7/9 a.m. Tr. 111 (Exh. 9); Slack Test., 7/9 p.m. Tr. 48 (Exh. 34);

Turner Test., 7/8 p.m. 71-72 (Exh. 6).

78.   Beginning in 1990, SAIC was developing an experimental plasma treatment
      technology for high-temperature treatment of radioactive waste.  The goal for
      the technology was to treat radioactive waste in such a way that a large
      portion of it could be released or recycled into general commerce, greatly
      reducing disposal and storage costs.  Larsen Testimony, attached hereto as
      Exhibit 36, 7/10 a.m. Tr. 72:5-72:8, 65:10-65:14; Leatherman Testimony,
      attached hereto as Exhibit 37, 7/16 a.m. Tr. 42:8-44:16.

**Response:**  Disputed.  The Plasma Hearth Process "was never intended to be

a recycling technology," never progressed beyond the conceptual stage, was never

tested on radioactive waste, and was not commercially viable.  Larsen Test., 7/10

a.m. Tr. 58, 60, 62, 66 (Exh. 28); *see* Leatherman Test., 7/16 a.m. Tr. 47:7-18 (Exh.

46).  Testing on radioactive waste would have been a prerequisite to this becoming a

viable technology.  Larsen Test., 7/10 a.m. Tr. 58, 60 (Exh. 28).  Moreover, this

concept was "designed specifically for DOE's . . . mixed waste" (Leatherman Test.,

7/16 a.m. Tr. 42:12-21 (Exh. 46)), was primarily funded by DOE (*see* Larsen Test.,

7/10 a.m. Tr. 58 (Exh. 28)), and was largely intended to be used for melting DOE-

generated waste (*id.*).  In addition, the cited testimony does not establish that a

large portion of output from the Plasma Hearth Process was intended to be eligible

for release "into general commerce," as Paragraph 78 asserts.  *See* Leatherman

Test., 7/16 a.m. Tr. 42:12-21 (Exh. 46).

79.   The purpose of the Plasma Hearth Process was to separate hard-to-treat
      mixed waste into a small and stable volume of glass/slag suitable for disposal
      while separating metal largely free from contamination for reuse/recycle.
      Mixed waste contains both hazardous and radioactive materials.  Larsen
      Testimony, Exh. 36, 7/10 a.m. Tr. 7:3-10:5, 16:14-19:14; Leatherman
      Testimony, Exh. 37, 7/16 a.m. Tr. 42:8-44:16.

51

**Response:** Disputed. The Plasma Hearth Process was "designed specifically for DOE's . . . mixed waste." Leatherman Test., 7/16 a.m. Tr. 42:12-21 (Exh. 46). In any event, the Plasma Hearth Process "was never intended to be a recycling technology," never progressed beyond the conceptual stage, was never tested on radioactive waste, was funded primarily by the DOE, and was not commercially viable. Larsen Test., 7/10 a.m. Tr. 58, 60, 62, 66 (Exh. 28); *see* Leatherman Test., 7/16 a.m. Tr. 47:7-18 (Exh. 46).

80.     On June 7, 1996, a patent application was filed by inventors of a method for such a high-temperature waste treatment. SAIC was listed as Assignee. SAIC referred to this technology as the Plasma Hearth Process. Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 23:1-25:16. The purpose of SAIC's development and patenting of the PHP was to develop a technology that would be profitable for SAIC. Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 73:4-74:13.

**Response:** Disputed. The cited testimony does not establish the absence of a genuine dispute as to (1) the assertion that the patent application was filed on June 7, 1996 and (2) that the purpose of *patenting* the Plasma Hearth Process was to develop a profitable technology. In any event, the Plasma Hearth Process "was never intended to be a recycling technology," never progressed beyond the conceptual stage, was never tested on radioactive waste, was funded primarily by the DOE, and was not commercially viable. Larsen Test., 7/10 a.m. Tr. 58, 60 (Exh. 28), 62, 66; *see* Leatherman Test., 7/16 a.m. Tr. 47:7-18 (Exh. 46).

81.     One of the inventors of the PHP, Gary Leatherman, was also one of the individuals providing advice and assistance to the NRC under SAIC's NRC contracts. Leatherman Testimony, Exh. 37, 7/16 a.m. Tr. 47-51. His work for the NRC - namely, helping to identify the way in which different radioisotopes migrate to different states of matter and form different streams

of waste - was also an important aspect of his work on the PHP.  Leatherman
Testimony, Exh. 37, 7/16 a.m. Tr. 47-51.  Mr. Leatherman also engaged in
efforts to market the PHP technology to prospective government and
commercial customers.  Leatherman Testimony, Exh. 37, 7/16 a.m. Tr. 44:24-
45:16.

**Response:**  Disputed.  The cited testimony does not establish that

Leatherman's work for the NRC "was also an important aspect of his work on the

PHP."

82.   In December 1996, SAIC and BNFL executed a Memorandum of
      Understanding (MOU) setting forth their plans for the worldwide
      development of the PHP.  The BNFL-SAIC PHP MOU set forth the SAIC and
      BNFL plan to cooperate to demonstrate and commercialize the PHP.  It
      states that BNFL and SAIC hope to market and use the PHP technology for
      treatment of Nuclear and Mixed Waste for the DOE and other nuclear and
      mixed waste projects worldwide, including commercial projects.  Larsen
      Testimony, Exh. 36, 7/10 a.m. Tr. 25:24-30:16.

**Response:**  Disputed.  The Plasma Hearth Process "was never intended to be

a recycling technology," never progressed beyond the conceptual stage, and was not

commercially viable.  Larsen Test., 7/10 a.m. Tr. 58, 60, 62, 66 (Exh. 28); *see*

Leatherman Test., 7/16 a.m. Tr. 47:7-18 (Exh. 46).  Moreover, this concept was

"designed specifically for DOE's . . . mixed waste."  Leatherman Test., 7/16 a.m. Tr.

42:12-21 (Exh. 46).  In addition, the cited materials do not establish the absence of a

genuine dispute as to the date when the MOU was executed.  *See* DX 191, at 4 (Exh.

47) (Bates BNG000418) (containing signatures that were executed in January 1997,

not December 1996).

83.   SAIC understood that in order to market the PHP to commercial users, as it
      planned to do, the release and recycle of any material treated by the PHP
      would be subject to NRC regulation.  Therefore, SAIC's commercialization
      and business plans for the PHP included the need for an NRC license for the
      technology as well as the need to follow the NRC's ongoing rulemaking efforts

in the area of free release of radioactive material.  Larsen Testimony, Exh.
36, 7/10 a.m. Tr. 31:11-35:5 (NRC license needed for planned commercial use
for the PHP), 39:9- 42:12 (SAIC needed to follow NRC rulemaking efforts
regarding free release because NRC regulations would apply for prospective
release/recycle from planned commercial users of the PHP).  This was the
very rule on which SAIC was assisting the NRC.  *See, supra,* ¶¶ 4 to 14.

**Response:**  Disputed.  The cited testimony does not establish the absence of

a genuine dispute as to whether SAIC understood that the potential "recycle" of

PHP material "would be subject to NRC regulation."  On the contrary, if this

technology had become economically viable, the primary customer for the Plasma

Hearth Process would have been DOE.  Leatherman Test., 7/16 a.m. Tr. 42:12-21

(Exh. 46).  The technology, however, never progressed beyond the conceptual stage

and was not commercially viable.  Larsen Test., 7/10 a.m. Tr. 58, 60, 62, 66 (Exh.

28); *see* Leatherman Test., 7/16 a.m. Tr. 47:7-18 (Exh. 46).  Moreover, the second

sentence of Paragraph 83 inaccurately claims that SAIC had plans stating that it

*needed* an NRC license.  *See* Larsen Test., 7/10 a.m. Tr. 34:22-35:5 (Exh. 28).

Additionally, Paragraph 83 should refer to "the Recycle 2000 program and other . . .

NRC activities," not "ongoing rulemaking efforts" (*see id.* at 41:5-10).  The third

sentence of Paragraph 83 is inaccurate because it suggests that SAIC was crafting a

"rule."  *See* Paperiello Test., 7/15 p.m. Tr. 35:15-36:20 (Exh. 3).  Instead, SAIC was

working on a technical basis.  In any event, there was no way of knowing whether

the NRC would even pursue a rulemaking or whether it would use NUREG 1640 as

the basis for any new rule.  *See, e.g.*, *Proposed Rules, Nuclear Regulatory*

*Commission*, 64 Fed. Reg. 35090, 35093 (June 30, 1999).

84.    SAIC understood that one of the major advantages for the development of the PHP was its ability to separate the recyclable metal from the slag.  Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 18:12-19:14.  Along these same lines, SAIC also understood that a key characteristic of the PHP was its ability to generate two separate products, "allowing segregation and possible reuse of the metal."  Larsen Testimony, Exh. 36, 7/10 a.m. Tr. 51:5-51:21.

**Response:**  Disputed.  Paragraph 84 is inaccurate because it suggests that

PHP was commercially viable.  PHP, however, never progressed beyond the

conceptual stage and was not commercially viable.  Larsen Test., 7/10 a.m. Tr. 58,

60, 62, 66 (Exh. 28); *see* Leatherman Test., 7/16 a.m. Tr. 47:7-18 (Exh. 46).

Moreover, the cited testimony refers only to an advantage, not "one of the major

advantages," of PHP.  *See* Larsen Test., 7/10 a.m. Tr. 18:12-19:14 (Exh. 28).

Additionally, the word "recyclable" should not appear in the first sentence of

Paragraph 84.  *See id.* at 19:5-14.

85.    In November 1999, even after the NRC learned about SAIC's role on the BNFL Oak Ridge Recycle Project and requested information about SAIC's other relationships with BNFL, SAIC did not disclose the PHP Project to the NRC.  Martin Testimony, Exh. 14, 7/14 a.m. Tr. 110:16-110:19.

**Response:**  Disputed.  The cited testimony establishes only that Martin did

not know of any disclosure of the Plasma Hearth Process in a November 22 letter.

*See* Martin Test., 7/14 a.m. Tr. 110:16-19 (Exh. 48).  In any event, there is no

plausible argument that the PHP created a conflict of interest that needed to be

disclosed.  *See* Resp. to U.S. Stmt., *supra* ¶¶ 78-84.

86.    Beginning in 1998 and continuing in 1999, SAIC also began work for the Bechtel Jacobs Corporation ("BJC") on a dose assessment project involving recycle and release of materials from the three Gaseous Diffusion plants (GDPs) in Oak Ridge, Tennessee, Paducah, Kentucky and Portsmouth, Ohio. (GDP Dose Assessment).  Slack Testimony, Exh. 5, 7/9 a.m. Tr. 112:14-117:16; Rucker Testimony, Exh. 6, 7/10 a.m. Tr. 88:11-94:2.

**Response:** Disputed.  With respect to the time frame at issue, the cited

testimony establishes only that the dose assessment work began in Summer 1999.

*See* Rucker Test., 7/10 a.m. Tr. 92:15-17 (Exh. 60).  In any event, SAIC's work was

performed pursuant to DOE guidelines and limits.  PX 731, at 2 (Exh. 49); Slack

Test., 7/9 p.m. Tr. 26:2-27:8 (Exh. 34).

87.     SAIC's work on the GDP Dose Assessment was to provide technical support
        for radiological dose and risk assessment modeling and assist in developing
        criteria for the unrestricted and restricted release of radiologically
        contaminated materials.  Slack Testimony, Exh. 5, 7/9 a.m. Tr. 112:14-117:16;
        Rucker Testimony, Exh. 6, 7/21 p.m. Tr. 46:16-48:17.

   **Response:** Disputed.  The support related only to a "possible" release of

materials.  *See* Rucker Test., 7/21 p.m. Tr. 46:16-20 (Exh. 50).

88.     The Technical effort by SAIC involved an analysis of the amount of material
        meeting the "current DOE and NRC limits for release (see regulatory Guide
        1.86)."  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 26:2-27:8.

   **Response:** Disputed.  Paragraph 88 is inaccurate because it suggests that

SAIC's work on the BJC project was regulated by the NRC.  "DOE's limits [are]

what applied" to SAIC's work for BJC.  Slack Test., 7/9 p.m. Tr. 26:2-27:8 (Exh. 34).

The relevant task order stated that the work was performed "per DOE guidelines."

PX 731, at 2 (Exh. 49).  In fact, the Government has previously conceded that BJC

was not an NRC licensee or applicant during any relevant time period.  *See* U.S.

Responsive Stmt. of Genuine Issues, Dkt. #71 ¶ 17; *cf.* Slack Test., 7/9 p.m. Tr. 64-

65 (Exh. 34) (Slack, the SAIC employee who managed this project, believed that

"DOE and NRC were always two separate [authorities]").

89.     SAIC's work on the GDP Dose Assessment included tasks related to
        inventory analysis and characterization, preparation of a dose-assessment,
        and cost-benefit analysis of various recycle and release options.  Slack
        Testimony, Exh. 5, 7/9 a.m. Tr. 117:1-117:16; Rucker Testimony, Exh. 6, 7/21
        p.m. Tr. 43:6-43:9 (cost-benefit one of the tasks performed by SAIC on the
        GDP Dose Assessment).  SAIC performed inventory, cost-benefit, and dose
        assessment tasks related to release and recycle of radioactive material from
        nuclear facilities on its NRC Contracts as well.  Meck Testimony, Exh. 7, 7/3
        a.m. 102:2-103:12, *supra,* ¶¶ 4-14.

**Response:**  Disputed.  The cited testimony does not establish that SAIC

performed "characterization" of inventory.  Additionally, there is a genuine dispute

as to whether SAIC performed dose assessment tasks related to release and recycle

of radioactive material from nuclear facilities on its NRC contracts.  *See* Rucker

Test., 7/21 p.m. Tr. 42:3-19 (Exh. 50) ("Q: Would you agree with me that both

projects involve calculating the dose from the recycle or release of slightly

contaminated radioactive metal from a nuclear facility?  A: No. I believe the NRC

work was relative to calculating dose factors, not a specific dose.").  In any event,

SAIC's work on the BJC project was performed pursuant to DOE guidelines and

limits.  PX 731, at 2 (Exh. 49); Slack Test., 7/9 p.m. Tr. 26:2-27:8 (Exh. 34).

90.     In performing the GDP Dose Assessment, SAIC compared and utilized the
        results of its work on the NRC 1992 Contract.  Slack Testimony, Exh. 5, 7/9
        p.m. Tr. 5:4-8:3; Rucker Testimony, Exh. 6, 7/21 p.m. Tr. 54:12-55:14.

**Response:**  Disputed.  "[I]n no case did [SAIC's BJC team] *use* the NRC

parameter."  Rucker Test., 7/21 p.m. Tr. 54:12-55:14 (Exh. 50) (emphasis added).

Paragraph 90 is also inaccurate to the extent that it suggests that SAIC's BJC team

consulted these parameters and scenarios because they were uniquely applicable; in

fact, DOE also directed SAIC to use an EPA document and "any other guidance" or

57

"other models that were out there."  *See* Slack Test., 7/9 p.m. Tr. 5:4-12 (Exh. 34).

Paragraph 90 is also inaccurate to the extent that it suggests that *SAIC* made the

decision to compare the parameters and scenarios.  *See id.* (DOE directed SAIC to

do this); *id.* at 6:18-7:3 (SAIC checked with DOE to ensure that there was not a

conflict from DOE's perspective).

91.    In performing its GDP Dose Assessment, SAIC copied, without attribution,
       whole sections of SAIC's work for the NRC on the 1992 Contract.  Slack
       Testimony, Exh. 5, 7/9 p.m. Tr. 29:5-42:14; Rucker Testimony, Exh. 6, 7/21
       p.m. Tr. 72:2-81:8. The copied sections included both general background and
       also SAIC's judgments, conclusions, and recommendations regarding what,
       and what not, to consider in SAIC's analysis.  Slack Testimony, Exh. 5, 7/9
       p.m. Tr. 35:21-36:9, 70:4-74:19; Rucker Testimony, Exh. 6, 7/21 p.m. Tr. 72:2-
       81:8.

       **Response:**  Disputed.  The language that was borrowed constituted general,

publicly available background information.  *See, e.g.*, Slack Test., 7/9 p.m. Tr. 5:4-

12, 57:18-22 (Exh. 34) ("the information that was borrowed from draft NUREG-1640

and put into this draft of the ALARA report was in the nature of general

background material and nothing more than that"); *id.* at 37:5-12 ("it was general

information that was available – I mean, it would be like taking it out of an

encyclopedia or something"); *id.* at 35:18-19; 38:17-21; Rucker Test., 7/21 p.m. Tr.

77:6-7, 79:6-7 (Exh. 50).  The borrowed language represented only a small portion of

a very large document.  *See* Slack Test., 7/9 p.m. 57:18-58:6 (Exh. 34).  Moreover,

any suggestion that SAIC skewed its work for the NRC in order to benefit the BJC

project is implausible for numerous reasons, including the fact that the dollar-value

of the BJC project for SAIC was a mere $75,000.  *See* PX 731, at 1 (Exh. 49).

Moreover, at trial, the Government introduced a demonstrative exhibit showing that a draft of SAIC's report on the BJC project included passages from the then-publicly available draft of NUREG-1640.  The exhibit's title purported to include a quote from a January 10, 2000 letter that SAIC wrote in response to the NRC's Cure Notice, which had made accusations of undisclosed conflicts of interest.  Although the first page of the exhibit read "SAIC's Work 'Was Not Based on or Derived From SAIC's Work Under the NRC Contracts,'" the January 10, 2000 letter actually states that "SAIC's assessments address current DOE requirements and are not based on or derived from SAIC's work under the NRC contract."  Slack Test., 7/9 p.m. Tr. 23-24 (Exh. 34); PX 837, at 7 (Exh. 51).  This statement was truthful: none of the draft NUREG-1640 information inserted into the draft ALARA report involved any scientific information that supported dose assessments.  Slack Test., 7/9 p.m. Tr. 54 (Exh. 34).

92.     SAIC employees Jeffrey Slack and Thomas Rucker both worked on the BJC Dose Assessment, SAIC's NRC Contracts, and the BNFL Oak Ridge Recycle Project.  Both agreed that many similarities existed between the three projects.  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 66:21-68:9; Rucker Testimony, Exh. 6, 7/8 Tr. 109:3-110:15.

**Response:**  Disputed.  The cited testimony does not establish the absence of a genuine dispute as to whether there were "many" similarities.  Additionally, even if there were some similarities, any similarities were immaterial and would therefore have had little probative value concerning whether there were conflicts of interest.  *See* Slack Test., 7/9 p.m. Tr. 66-68  (Exh. 34) (describing similarities such as the following:  "In a general sense, they all were involving radioactive

materials."). In addition, the cited testimony does not establish that Slack and

Rucker worked on *both* of "SAIC's NRC Contracts."[2]

93.     SAIC's GDP Dose Assessment considered the release and recycle of metals
        from the three gaseous diffusion plants in the United States. These included
        the Oak Ridge plant and thus involved the same materials on which SAIC
        was advising BNFL on the BNFL Oak Ridge Recycle Project. Slack
        Testimony, Exh. 5, 7/9 a.m. Tr. 112:14-117:16. SAIC's GDP Dose Assessment
        also included considerations related to release of materials from the Paducah
        and Portsmouth GDPs, the very same sites that SAIC was hoping to make
        money on if the BNFL project was a success. Turner Testimony, Exh. 11, 7/7
        p.m. Tr. 108:9-118:21, 7/8 a.m. Tr. 78:15-84:24; Murray Testimony, Exh. 9,
        7/2 p.m. Tr. 59:15-61:14; Slack Testimony, Exh. 5, 7/9 a.m. Tr. 81:21-85:18.

**Response:** Disputed. The cited testimony does not establish that the dose

assessment involved the same *materials* that were involved in the BNFL project.

As to the second sentence of Paragraph 93, the cited testimony does not establish

the absence of a genuine dispute regarding whether the Paducah and Portsmouth

GDPs were "the very same sites that SAIC was hoping to make money on if the

BNFL project was a success" because, for example, an idea paper by Turner that

was not approved by management does not establish SAIC's hopes. *See* Turner

Test., 7/7 p.m. Tr. 113:14-24, 116:21-117:1 (Exh. 6). Moreover, the NRC's Dr. Meck

raised no concerns despite his knowledge that SAIC was working on the BJC

project; indeed, Dr. Meck even asked his DOE counterpart to authorize SAIC's team

on the BJC project to share its work product with the SAIC team that was working

on the NRC contract. *See* Meck Test., 7/3 a.m. Tr. 104-06 (Exh. 7). Neither Dr.

---

  [2] When attempting to cite Rucker's testimony, the Government appears to have
mistakenly cited the July 8 transcript instead of the transcript from the morning of
July 10.

Meck nor DOE's project manager saw any problem with this collaboration.  Finally,

SAIC's work on the BJC project was performed pursuant to DOE guidelines and

limits.  PX 731, at 2 (Exh. 49); Slack Test., 7/9 p.m. Tr. 26:2-27:8 (Exh. 34).

94.  One of the SAIC conclusions in the GDP ALARA Dose Assessment was that
     the release and recycle of the of radioactive materials from the three GDP's
     would result in only a "trivial" dose of one millirem a year.  Slack Testimony,
     Exh. 5, 7/9 p.m. Tr. 12:16-16:4.  Assessing the expected dose to a member of
     the public resulting from the release and recycle of material from a nuclear
     facility was the same subject matter and technical area on which SAIC was
     providing advice to the NRC.  *Supra,* ¶¶ 4-14.

**Response:**  Disputed.  The cited testimony discusses a first draft of the

report (Slack Test., 7/9 p.m. Tr. 12:9-18 (Exh. 34)), so Paragraph 96's description of

"conclusions in the GDCP ALARA Dose Assessment" is inaccurate.  In addition, the

conclusion in the first draft pertains only to "scrap steel from the three DOE

gaseous diffusion plants" (*see id.* at 12:24-13:12), so Paragraph 96's phrase

"radioactive metals" is not completely accurate.  Moreover, the cited testimony

refers to a draft conclusion that the dose impact would be "less than 1 milligram per

year to the RMEI" (*see id.*), so Paragraph 96's phrase "one millirem a year" is not

accurate.  For the reasons stated in the responses to Paragraphs 86-97, SAIC's work

on the BJC project did not involve the "same subject matter and technical area" as

its work for the NRC.  *See* Resp. to U.S. Stmt. ¶¶ 86-97.  It is also relevant that the

metals at DOE and NRC facilities differ substantially; for example, the NRC did not

ask SAIC to address in its modeling the potential impact of releasing nickel, which

is a metal unique to DOE facilities.  *See* Slack Test., 7/9 p.m. Tr. 48 (Exh. 34);

Turner Test., 7/8 p.m. Tr. 71-72 (Exh. 6).

95.  SAIC's assessment of the costs and benefits of various recycle and release options concluded that the recycle and free release option was the best option. Slack Testimony, Exh. 5, 7/9 p.m. Tr. 11:20-12:15.  SAIC was assessing the same costs and benefits of these same release and recycle options in its work for the NRC.  *Supra,* ¶¶ 9, 13.

**Response:**  Disputed.  SAIC's work for the NRC did not involve "assessing the same costs and benefits" as were being considered on the BJC project, because the BJC project related to *DOE* facilities.  DOE facilities are regulated by the DOE and contain certain DOE-specific materials.  *See, e.g.*, Slack Test., 7/9 p.m. Tr. 48 (Exh. 34); Turner Test., 7/8 p.m. Tr. 71-72, 88, 104 (Exh. 6); Caldwell Test., 7/9 p.m. Tr. 114, 116 (Exh. 32); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60).

96.  In its work on the GDP Dose Assessment, SAIC calculated the dose that would be expected from release under the limits prescribed in NRC Regulatory Guide 1.86.  Slack Testimony, Exh. 5, 7/9 p.m. Tr. 26:2-27:8.  This was the same release standard on which SAIC was providing the NRC with advice and assistance, including assistance as to whether NRC Regulatory Guide 1.86 was adequately protective of public health and whether it needed to be replaced.  McKenzie–Carter Testimony, Exh. 4, 7/17 p.m. Tr. 41:14–42:7.

**Response:**  Disputed.  The first sentence of Paragraph 96 is inaccurate because the cited testimony establishes that "DOE's limits [are] what applied," that DOE and NRC limits were the same, and that the draft's citation of what "also happened to be NRC's limits is irrelevant."  Slack Test., 7/9 p.m. Tr. 26:2-27:8 (Exh. 34).  Additionally, the first sentence of Paragraph 96 is inaccurate because it suggests that SAIC's work on the BJC project was regulated by the NRC.  On the contrary, the relevant task order stated that the work was performed "per DOE guidelines."  PX 731, at 2 (Exh. 49).  The Government has previously conceded that BJC was not an NRC licensee or applicant during any relevant time period.  *See*

U.S. Responsive Stmt. of Genuine Issues, Dkt. #71 ¶ 17; *cf.* Slack Test., 7/9 p.m. Tr.

64-65 (Exh. 34).   Moreover, the document being discussed in the first sentence of

Paragraph 96 was only "the first draft of the report."  *Id.* at 27:1.   Moreover, Guide

1.86 is not an NRC-issued document.  *See* Slack Test., 7/9 a.m. Tr. 98:11-18, 99:1-13

(Exh. 9); Turner Test., 7/8 a.m. Tr. 30:2-10 (Exh. 11).   The second sentence of

Paragraph 96 is also inaccurate because SAIC had no policy responsibility for the

potential NRC rule.  *See* Paperiello Test., 7/15 p.m. Tr. 35:15-36:20 (Exh. 3).

97.    Additionally, in its GDP Dose Assessment report for BJC, SAIC reiterated
       the conclusion it had reached in the Work Smart Standards on the BNFL
       project that recycling and releasing radioactive metal at Oak Ridge was an
       activity that was safe for occupational, public, and environmental health.
       Slack Testimony, Exh. 5, 7/9 p.m. Tr. 12:16-16:4 (both the GDP Dose
       Assessment and the Work Smart Standards conclude that recycling and
       release from Oak Ridge is safe for the public, occupational health, and the
       environment).   This was one of the same subjects upon which SAIC was
       advising the NRC.   Slack Testimony, Exh. 5, 7/9 p.m. Tr. 66:21-68:9; *supra,*
       ¶¶ 4-14; Cardile Testimony, Exh. 1, 7/2 a.m. Tr. 27:19-28:5; *SAIC,* 653 F.
       Supp. 2d at 100 ("The government's evidence showed that under SAIC's
       contract with the NRC, SAIC was charged with the responsibility to 'assess
       the health and safety impacts of the potential large scale reuse and recycle of
       contaminated nuclear material.'") (internal quotation omitted).

       **Response:**  Disputed.   The first sentence of Paragraph 97 is inaccurate and

misleading because SAIC did not do any dose calculations on this issue in

connection with the BNFL project.  *See* Slack Test., 7/9 p.m. Tr. 13:9-18 (Exh. 34);

*see also id.* at 14:21-15:8.   Moreover, as Slack testified, the statement in the Work

Smart Standards and the statement in the "first draft" of the dose assessment

report were "not the same statements."  *Id.* at 16:3, 27:1.   The second sentence of

Paragraph 97 is inaccurate because the cited testimony does not establish the

absence of a genuine dispute as to whether SAIC advised the *NRC* about whether

releasing radioactive metal from the *DOE* facility in Oak Ridge was safe.

98.   Between 1994 and 1999, ARMR was a trade organization related to the
      recycle of radioactive materials.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr.
      55:6-55:22.  ARMR's purpose was to facilitate and advocate to various
      entities, including the NRC, for the recycle of radioactively contaminated
      materials.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 56:3-56:24, 72:14-74:4;
      Motl Testimony, Exh. 13, 7/23 a.m. Tr. 11:18-11:25.

      **Response:**  Disputed.  ARMR was not chartered or incorporated until 1995

(*see* Loiselle Test., 7/7 a.m. Tr. 58:5-8, 72:5-13 (Exh. 52)) and the cited testimony

does not establish that ARMR existed until 1999 (*see id.* at 55:6-9).

99.   Gerald Motl, an SAIC Vice President, served on the Board of Directors of
      ARMR.  SAIC Amended Answer at ¶ 53, Loiselle Testimony, Exh. 25, 7/7 a.m.
      Tr. 58:2-58:4.  Motl served on the ARMR Board of Directors between January
      1996 and some time in 1999. Motl Testimony, Exh. 13, 7/23 a.m. Tr. 6:4-9:21.

      **Response:**  Disputed.  Motl joined ARMR in 1993, while he was an employee

at FERMCO, a different company wholly unrelated to SAIC.  Loiselle Test., 7/7 p.m.

Tr. 4, 39, 53-54 (Exh. 24).  SAIC was never an ARMR member, never paid dues, and

had little or no communication with ARMR.  *Id.* at 31, 38, 46-48.  Indeed, when

ARMR asked SAIC to become a member, ARMR got "no response." *Id.* at 38:13-14.

Motl could not remain on the ARMR Board after he started work at SAIC because

ARMR's by-laws only permitted companies to join ARMR.  *Id.* at 45-46.  Motl was

eligible for Board membership while working at FERMO, which was an ARMR

member at the time, but not after leaving FERMCO.  *Id.* at 46:20-22.  To the extent

that Motl remained on the ARMR Board after he became a SAIC employee, in

violation of ARMR's by-laws, he did so wholly in his personal capacity and not as a

representative of SAIC.  Loiselle Test., 7/7 p.m. Tr. 46-48 (Exh. 24).

100.   Mr. Motl participated substantially in ARMR while an SAIC employee.
       Loiselle Testimony, Exh. 25, 7/7 p.m. Tr. 3:20-9:17.

       **Response:**  Disputed.  Motl was not eligible to be part of ARMR Board while

an SAIC employee because SAIC was never a member of ARMR.  Loiselle Test., 7/7

p.m. Tr. 46-48 (Exh. 24).  In addition, the characterization of Motl's participation as

"substantial[ ]" is mere speculative conjecture and thus not an undisputed fact.

101.   A number of ARMR members, including the Alaron Corporation as well as
       BNFL and MSC, are NRC licensees and entities regulated by the NRC.  Motl
       Testimony, Exh. 13, 7/23 a.m. Tr. 12:1-13:3; Loiselle Testimony, Exh. 25, 7/7
       a.m. Tr. 56:12-56:24, 85:11-85:18.

       **Response:**  Disputed.  The cited testimony does not mention BNFL.  The

testimony does not establish that MSC was an NRC licensee during the time of its

ARMR membership and does not establish that Alaron had a license from the NRC

as opposed to from an Agreement State.

102.   At the time he was serving on the ARMR Board of Directors, SAIC Vice
       President Motl was a business developer for SAIC in the primary markets of
       Defense, Energy and the Commercial Nuclear Industry.  Motl Testimony,
       Exh. 13, 7/23 a.m. Tr. 6:4-8:12.  Mr. Motl attended ARMR events on behalf of
       SAIC and at SAIC's expense, which he charged to his "business development"
       account at SAIC.  Motl Testimony, Exh. 13, 7/23 a.m. Tr. 52:11-55:16.

       **Response:**  Disputed.  The cited testimony only states that Motl was

involved in some business development, not that he was "a business developer," and

does not establish the time frame of when this occurred.  Motl Test., 7/23 a.m. Tr.

6:16-18 (Exh. 53).  In addition, far from supporting the claim that Motl's

development was "in the primary markets of Defense, Energy and the Commercial

Nuclear Industry," the cited testimony merely states that DOE was an important

SAIC customer.  *Id.* at 6:21-23.  More importantly, Motl never attended any ARMR

event "on behalf of SAIC" and could not have done so because SAIC was not an

ARMR member.  Loiselle Test., 7/7 p.m. Tr. 46-48 (Exh. 24).  The cited testimony

demonstrates that Motl did *not* travel specifically for ARMR meetings (Motl Test.,

7/23 a.m. Tr. 52:11-17, 65:19-66:6 (Exh. 53)) and that there "wouldn't be virtually

any separate expenses" for attending ARMR meetings (*see id.* at 52:23-53:1).

103.  ARMR was created to advocate for the recycle and reuse of radiologically
      contaminated metals.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 56:3-56:24,
      72:14-74:4.  ARMR's bylaws specifically state that ARMR's purpose is to
      "[p]romote the recycle of [radioactive scrap metal] as an environmentally
      favorable and cost-effective alternative to disposal."  Loiselle Testimony, Exh.
      25, 7/7 a.m. Tr. 81:17-20.  The member organizations of ARMR hoped to profit
      financially from the expansion of the radioactive scrap metal industry, and
      an NRC free release rule would make such expansion possible.  Loiselle
      Testimony, Exh. 25, 7/7 a.m. Tr. 79:16-80:15; Motl Testimony, Exh. 13, 7/23
      a.m. Tr. 14:8-15:2.  The lack of a clearance standard like the one being
      developed by the NRC was a barrier to the development of the radioactive
      scrap industry for the ARMR members.  Loiselle Testimony, Exh. 25, 7/7 a.m.
      Tr. 74:20-77:3; Motl Testimony, Exh. 13, 7/23 a.m. Tr. 14:8-15:2.

**Response:**  Disputed.  ARMR was concerned with how releases of

radiologically contaminated metals would be handled, while believing that such

releases should be recycled where "environmentally favorable."  Loiselle Test., 7/7

a.m. Tr. 56:3-56:24, 72:14-74:4 (Exh. 52).  The "environmentally favorable"

promotion of recycling was *a* purpose—not *the* purpose—of ARMR.  *Id.* at 81:15-16.

In addition, the cited testimony states only that the lack of a standard for

volumetrically contaminated materials was a barrier to development, not

necessarily that "[t]he lack of a clearance standard like the one being developed by

66

the NRC was a barrier." Importantly, one of the key reasons that Dr. Meck and the

Director of the NRC's Office of Nuclear Regulatory Research concluded that SAIC's

work "constituted the opposite of a conflict" (Meck Test., 7/3 p.m. Tr. 9-10 (Exh. 23);

*see also id.* at 7; DX 518, at 1 n.1 (Exh. 40)) was that "the results of [draft NUREG-

1640] generally lead to more restrictive release levels than those of other

comparable analyses" (*id.*) and utilizing SAIC's work product would have been

"more protective of the public safety than were comparable products." 10/8/08

Judgment, Dkt. #151 at 2. And the "majority" of objections to the draft NUREG-

1640 came from industry stakeholders asserting that the conservative assumptions

in that draft would unduly restrict the amount of materials that could be cleared.

Mauro Test., 7/21 a.m. Tr. 104 (Exh. 41); *see id.* at 103-07. Moreover, ARMR's

members included not only companies, but also members of academia, which belies

the notion that ARMR's activities were driven solely by the financial incentives of

its members. Finally, contrary to the government's suggestion, ARMR was not a

full-scale advocacy organization, as evidenced by the fact that its bylaws prohibited

"lobbying." *See* PX 58, § 2.03 (Exh. 64).

104. As a director, SAIC's Motl voted to authorize ARMR to conduct its business. Loiselle Testimony, Exh. 25, 7/7 p.m. Tr. 11:15-11:21; Motl Testimony, Exh. 13, 7/23 a.m. Tr. 9:19-9:21. The Directors of ARMR managed the business and affairs of ARMR. *Id.* Mr. Motl contributed substantially to the matters of policy, technical direction and activity of ARMR on behalf of its members. Loiselle Testimony, Exh. 25, 7/7 p.m. Tr. 3:20-9:17.

**Response:** Disputed. First and most importantly, Motl did not participate

in ARMR on behalf of SAIC because SAIC was never an ARMR member (Loiselle

Test., 7/7 p.m. Tr. 31, 38, 46-48 (Exh. 24)), and so SAIC had nothing to do with any

67

of the alleged duties of ARMR Directors in general or Motl in particular.  Second,

the cited testimony states that Motl voted on ARMR business (*see id.* at 11:15-21),

which is not the same thing as voting to authorize ARMR to conduct its business.

Third, the claim that "Directors of ARMR managed the business and affairs of

ARMR" is vague and thus inappropriate for a statement of undisputed facts.

Finally, the characterization of Motl's contribution as "substantial[ ]" is mere

speculative conjecture and thus not an undisputed fact.

105.   SAIC understood that BNFL/MSC, Alaron, and the other members of ARMR
       would receive a clear benefit from the NRC rulemaking on release and
       recycle.  Motl Testimony, Exh. 13, 7/23 a.m. Tr. 42:12-44:20.  Additionally,
       the rule for which ARMR was formed to advocate was precisely the same rule
       on which SAIC was providing advice and assistance to the NRC.  *See, supra,*
       ¶¶ 4-14.

**Response:**  Disputed.  *First*, SAIC was not crafting a "rule" and had no

policy responsibility for the potential NRC rule.  *See* Paperiello Test., 7/15 p.m. Tr.

35:15-36:20 (Exh. 3).  *Second*, it was not clear what form any potential NRC rule

might take.  Indeed, "the results of [draft NUREG-1640] generally lead to more

restrictive release levels than those of other comparable analyses" (DX 518, at 1 n.1

(Exh. 40)), and utilizing SAIC's work product would have been "more protective of

the public safety than were comparable products" (10/8/08 Judgment, Dkt. #151 at

2).  *See also* Meck Test., 7/3 p.m. Tr. 7, 9-10 (Exh. 23); Mauro Test., 7/21 a.m. Tr.

104-05 (Exh. 41).  *Third*, the purported benefit discussed in the cited testimony was

merely the benefit that flows from having rules in a general and nonspecific sense:

Motl generically explained that rules are a good thing by noting, for example, that

airport security rules help prevent chaos.  Motl Test., 7/23 a.m. Tr. 44:6-20 (Exh.

53).  *Fourth*, the cited testimony does not even mention BNFL.  *Fifth*, ARMR was

not formed solely to advocate for one particular rule but rather to "[p]romote the

recycle of RSM as an environmentally favorable and cost-effective alternative to

disposal."  Loiselle Test., 7/7 a.m. Tr. 81:15-18 (Exh. 52).

106.    SAIC's Motl was one of SAIC's key personnel proposed to perform a
        cost/benefit analysis for the clearance of radioactive materials on SAIC's
        contract with the NRC.  Motl Testimony, Exh. 13, 7/23 a.m. Tr. 20:22-24:19,
        38:14-42:6.  In his role as an ARMR director, Mr. Motl also had a role
        promoting the benefit of just such a clearance rule and seeking the issuance
        of just such a rule by the NRC.  For example, ARMR drafted correspondence
        to the NRC, in which Mr. Motl participated in drafting and reviewing.  This
        correspondence took a clear position in favor of a rule that would allow free
        release and recycle.  Loiselle Testimony, Exh. 25, 7/7 a.m. Tr. 102:24-106:7,
        106:14-109:8, 7/7 p.m. Tr. 8:12-9:17 (Motl "absolutely" reviewed ARMR
        advocacy letters to the NRC regarding a free release standard), 10:16-11:9
        (Motl participation on an ARMR call regarding the ARMR letter to the NRC
        regarding rulemaking for recycle and reuse).

        **Response:**  Disputed.  *First*, if one assumes (as the Government does) that

ARMR wanted to have a permissive release rule, SAIC's ultimate work product

would have been at cross-purposes with that alleged goal because "the results of

[draft NUREG-1640] generally lead to more restrictive release levels than those of

other comparable analyses."  DX 518, at 1 n.1 (Exh. 40).  *Second*, Motl was not a

"key" person at SAIC with regard to anything having to do with the 1992 Contract.

PX 3 (Exh. 54).  While he played a larger role under the 1999 Contract, ARMR was

already defunct by the time that contract had been awarded.  Loiselle Test., 7/7 p.m.

Tr. 48:19-21 (Exh. 24).  *Third*, to the extent that Motl participated in any

promotional efforts directed at the NRC in conjunction with ARMR, this would have

been wholly in his personal capacity because SAIC was never an ARMR member.

*Id.* at 46-48.

107.   SAIC did not disclose its relationship with ARMR to the NRC.  Mace
       Testimony, Exh. 20, 7/15 p.m. Tr. 114:7-114:10, 116:18-118:1; Pool
       Testimony, Exh. 18, 7/15 a.m. Tr. 34:23-36:19; Meck Testimony, Exh. 7, 7/3
       p.m. Tr. 36:12-36:17.

   **Response:**  Disputed.  SAIC had no relationship with ARMR:  it was never a

member, never paid dues, and had little or no communication with ARMR.  *See*

Loiselle Test., 7/7 p.m. Tr. 31, 38, 46-48 (Exh. 24).

108.   During the relevant time period, SAIC also provided consulting assistance to
       Alaron Corporation, a Pennsylvania corporation licensed by the NRC to
       recycle and free release nuclear material. Taylor Testimony, attached hereto
       as Exhibit 38, 7/9 a.m. Tr. 53:9-64:8; Tempel Testimony, attached hereto as
       Exhibit 39, 7/9 a.m. Tr. 18:3-33:9.  SAIC's advice to Alaron was in the
       technical area of the release of nuclear material from nuclear facilities.
       Taylor Testimony, Exh. 38, 7/9 a.m. Tr. 53:9-64:8; Tempel Testimony, Exh.
       39, 7/9 a.m. Tr. 18:3-33:9.  SAIC's assistance was in the technical area of
       regulatory compliance and characterization of nuclear materials being
       shipped off site and recycled.  Taylor Testimony, Exh. 38, 7/9 a.m. Tr. 62:13-
       64:8; Tempel Testimony, Exh. 39, 22:6-33:9.

   **Response:**  Disputed.  Alaron submitted a proposal for possible work at the

DOE Westinghouse Savannah River Company plant in Georgia and listed SAIC as

a "team member" on this proposal.  Taylor Test., 7/9 a.m. Tr. 54-56 (Exh. 26).  There

is no evidence that SAIC played any part ("consulting" or otherwise) in preparing

this proposal, only that SAIC wrote a letter of commitment explaining what work it

would accomplish should Alaron win the contract.  *Id.* at 56-57.  And SAIC never

actually performed any work contemplated by this letter because Alaron did not win

the DOE contract.  *See id.* at 32:23-25, 66:9-19, 76:3-15.  In any case, even if Alaron

had been awarded the contract, SAIC's support work would have taken place wholly

70

at the DOE site and would not have involved matters subject to NRC regulation.

*See id.* at 66-67.  Because SAIC never provided any "assistance" to Alaron's failed

proposal and because any such proposal would have been under DOE's jurisdiction,

there is at least a factual dispute with regard to whether SAIC's low-level

interaction with Alaron constituted "assistance" in the same  "technical area" as

SAIC's work for the NRC.  Moreover, the Government's claim that Alaron was an

NRC-licensed *entity*—in some broad manner—is either irrelevant or unintelligible.

109.  Alaron was another member of ARMR and was seeking a national standard
      for recycling and release in order to improve its business in the area.  Taylor
      Testimony, Exh. 38, 7/9 a.m. Tr. 52:6-53:8.

**Response:**  Disputed.  The cited testimony does not support the assertion

that Alaron was seeking a national standard for recycling and release, to improve

its business or otherwise.

110.  By May 1996, SAIC assisted Alaron in proposing for, and receiving, a blanket
      ordering agreement from Westinghouse Savannah River Company to treat,
      release and dispose of Large Equipment from the Savannah River Site.
      SAIC's assistance and support were necessary to the award of the contract to
      Alaron.  Ryan Testimony, attached hereto as Exhibit 40, 7/8 p.m. Tr. 119:15-
      123:2, 7/9 a.m. Tr. 5:15-8:11; Tempel Testimony, Exh. 39, 7/9 a.m. Tr. 22:6-
      33:9; Taylor Testimony, Exh. 38, 7/9 a.m. Tr. 53:9-64:8.

**Response:**  Disputed.  Alaron submitted a proposal for possible work at the

DOE's Westinghouse Savannah River Company plant in Georgia and listed SAIC as

a "team member" on this proposal.  Taylor Test., 7/9 a.m. Tr. 54-56 (Exh. 26).  There

is no evidence that SAIC played any part ("consulting" or otherwise) in preparing

this proposal, only that SAIC prepared a letter of commitment explaining what

work it would accomplish should Alaron win the contract.  *Id.* at 56-57.  And SAIC

never actually performed any work contemplated by this letter because Alaron did

not win the DOE contract.  *See id.* at 32:23-25, 66:9-19, 76:3-15.  In any case, even if

Alaron had been awarded the contract, SAIC's support work would have taken place

wholly at the DOE site and would not have involved matters subject to NRC

regulation.  *See id.* at 66-67.  Additionally, the cited testimony does not discuss the

May 1996 date and does not establish or suggest that SAIC's  assistance was

"necessary" to an award of a contract that Alaron never actually received in any

case.

111.   As SAIC well understood, the proposed and planned Alaron project was
       regulated by the NRC.  Alaron was to receive, possess, decontaminate, and,
       ultimately, release the material pursuant to its NRC license and in
       compliance with NRC regulations regarding free release.  Tempel Testimony,
       Exh. 39, 7/9 a.m. Tr. 22:6-33:9, 47:12-49:6; Taylor Testimony, Exh. 38, 7/9
       a.m. Tr. 53:9-64:8.  SAIC's relationship with Alaron called for SAIC to
       provide advice and assistance to Alaron regarding this release and recycle of
       material, the same subject matter upon which it was advising the NRC.
       Tempel Testimony, Exh. 39, 7/9 a.m. Tr. 22:6-33:9, 47:12-49:6; Taylor
       Testimony, Exh. 38, 7/9 a.m. Tr. 53:9-64:8;

**Response:**  Disputed.  The cited testimony does not establish that "the

proposed and planned Alaron project was regulated by the NRC," let alone that

"SAIC well understood" as much.  To the contrary, the scope of the proposed work

that SAIC would potentially have performed involved a DOE project, performed

exclusively at a DOE site, that was, unsurprisingly, regulated only by the DOE.

Taylor Test., 7/9 a.m. Tr. 66-67 (Exh. 26).  The cited testimony does not establish

the absence of a genuine dispute as to whether either Alaron or SAIC would have

actually released material in a manner subject to NRC regulations had Alaron

actually won the contract.  Nor does the cited testimony establish the absence of a

genuine dispute as to whether the potential work that conceivably could have been—but was not—awarded to Alaron would have required SAIC to provide assistance on the same subject matter as to which it was assisting the NRC.

112.    SAIC did not disclose its relationship with Alaron to the NRC, even though Alaron was an NRC-licensed entity, even though SAIC's advice and assistance to Alaron was in the same technical area as its work for the NRC, and even though SAIC's OCI obligations specifically required disclosure of "planned interests" that could give rise to actual or potential OCIs.  Mace Testimony, Exh. 20, 7/15 p.m. Tr. 114:7-114:10, 116:18-118:1; Pool Testimony, Exh. 18, 7/15 a.m. Tr. 34:23-36:19; Martin Testimony, Exh. 14, 7/14 a.m. Tr. 105:18-106:7, 110:16-110:19.

**Response:**  Disputed.  The factual assertions in Paragraph 112 fail to support the Government's implication that SAIC had a duty to disclose its non-relationship with Alaron.   Most notably, the claim that Alaron was an NRC-licensed *entity*—in some broad manner—is either irrelevant or unintelligible.  While Alaron may have engaged in some project or projects, wholly unrelated to SAIC, which involved the NRC (Tempel Test., 7/9 a.m. Tr. 48:1-3 (Exh. 25); Taylor Test., 7/9 a.m. Tr. 57:23-25 (Exh. 26)), the only project at issue here was Alaron's rejected proposal to the DOE regarding the DOE's Westinghouse Savannah River Company plant (Taylor Test., 7/9 a.m. Tr. 32:23-25, 66-67, 76:3-15 (Exh. 26)).  Nor does the cited testimony establish the absence of a genuine dispute as to whether this hypothetical work would have required SAIC to provide assistance on the same subject matter as to which it was assisting the NRC.  Finally, there is at least a substantial factual dispute as to whether SAIC had a "planned interest" in this highly speculative project, under the auspices of a wholly separate federal agency.

113.   SAIC understood, and indeed trained its employees, that the potential for bias in SAIC's work existed whenever SAIC performed work for one organization and performed work in the same technical area for any other organization and that, therefore, such situations had to be disclosed. Plaintiff's Exhibit 919, SAIC OCI Training, attached hereto as Exhibit 41; Bidwell Testimony, attached hereto as Exhibit 42, 7/16 a.m. Tr. 62:16-68:23 (emphasis supplied).

**Response:**  Disputed.  The cited materials do not establish the absence of a genuine issue as to SAIC's understanding of its conflict-of-interest obligations under the NRC contracts.  The cited materials indicate only that SAIC trained its employees to disclose internally the types of situations described in Paragraph 113, so that managers could make a determination as to whether a conflict existed.  *See* Bidwell Test., 7/16 a.m. Tr. 64:1-20 (Exh. 33).  Moreover, SAIC's employees consistently testified that they did not view the projects in question as presenting a potential or actual conflict.  *See, e.g.*, Turner Test., 7/8 p.m. Tr. 104:13-23 (Exh. 6) (testifying that Turner, "BNFL and everybody else in the project understood that DOE would be the regulating authority for the Three-Building Project"); Slack Test., 7/9 p.m. Tr. 64-65 (Exh. 34) ("DOE and NRC were always two separate [authorities]—there was a firewall between them, so there was never a conflict between the two agencies"); Caldwell Test., 7/9 p.m. Tr. 116:12-25 (Exh. 32); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60).

114.   At the close of evidence, the Court concluded, that as a matter of law, SAIC's statements and omissions were material to the NRC's decision to pay SAIC. 7/24 a.m. Tr. 138, attached hereto as Exhibit 43.

**Response:**  Disputed.  This Court concluded that, in the event the D.C. Circuit subsequently held that materiality is a question of law, SAIC's allegedly

false claims and statements were material.  7/24 a.m. Tr. 138 (Exh. 55).  This Court

did not, however, grant summary judgment on the materiality issue.  Moreover, this

Court's statement on materiality has no force because the D.C. Circuit held on

appeal that materiality is a question for "the jury."  *SAIC IV*, 626 F.3d at 1271.

115.   The Court instructed the jury that, in order to find SAIC liable to the United
       States for breach of contract, the jury had to find that SAIC failed to adhere
       to its contractual obligation to avoid and disclose organizational conflicts of
       interest.  7/28 a.m. Tr. 22-24, attached hereto as Exhibit 44.

**Response:**  Disputed.  The jury instructions did not suggest that SAIC had a

contractual obligation to avoid all organizational conflicts of interest.  Instead, the

instructions properly stated that breach could be found if SAIC "fail[ed] to disclose"

such conflicts.  7/28 a.m. Tr. 23:17-23:21 (Exh. 56).  As explained above in response

to Paragraph 28, the NRC had the discretion, which it exercised in at least one

instance, to accept a mitigation plan permitting SAIC to continue its work despite a

conflict.  *See* Resp. to U.S. Stmt., *supra* ¶ 28.


Dated:  August 8, 2011                       Respectfully submitted,

                                               /s/ Andrew S. Tulumello
John P. Rowley III                           Andrew S. Tulumello (D.C. Bar No. 468351)
BAKER & McKENZIE LLP                         Amir C. Tayrani (D.C. Bar No. 490994)
815 Connecticut Avenue, N.W.                 Ryan J. Watson (D.C. Bar No. 986906)
Washington, D.C.  20006                      GIBSON, DUNN & CRUTCHER LLP
Telephone: (202) 835-6151                    1050 Connecticut Avenue, N.W.
E-mail: john.rowley@bakermckenzie.com        Washington, D.C.  20036
                                             Telephone: (202) 955-8657
                                             E-mail: atulumello@gibsondunn.com

*Counsel for Defendant Science Applications International Corporation*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) <br>            ) <br>         Plaintiff,    ) <br>            ) <br>       v.            ) <br>            ) <br> SCIENCE APPLICATIONS     ) <br> INTERNATIONAL CORPORATION,   ) <br>            ) <br>         Defendant.   ) <br>            ) <br>            ) | Case No.: 04-cv-1543 (RWR) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S OPPOSITION TO PLAINTIFF UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Andrew S. Tulumello (D.C. Bar No. 468351)
Amir C. Tayrani (D.C. Bar No. 490994)
Ryan J. Watson (D.C. Bar No. 986906)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com

John P. Rowley III
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 835-6151
E-mail: john.rowley@bakermckenzie.com

*Counsel for Defendant Science
Applications International Corporation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

ARGUMENT ............................................................................................ 4

I.      THE JURY'S GENERAL VERDICT THAT SAIC BREACHED THE 1992 CONTRACT DOES NOT RELIEVE THE GOVERNMENT OF ITS BURDEN OF PROVING THE ELEMENTS OF ITS FCA CLAIMS ....................................................... 4

     A.      Issue Preclusion Applies Only Where An Issue Has Been Actually And Necessarily Decided By A Prior Jury ..................... 4

     B.      The Government Cannot Establish With The Requisite Specificity The Issues That Were Actually And Necessarily Decided By The First Jury ........................................ 8

     C.      The Law-Of-The-Case Doctrine Is Inapplicable Here And, In Any Event, Does Not Assist The Government ....................... 15

II.      THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON WHETHER SAIC SUBMITTED FALSE CLAIMS OR MADE FALSE STATEMENTS TO GET FALSE CLAIMS PAID ....................................................................................... 17

     A.      SAIC's Work On Other Projects Was Not Regulated By The NRC ....................................................................................... 18

     B.      SAIC's Work Did Not Place It In A Conflicting Role That Biased Its Work For The NRC ..................................................... 21

     C.      SAIC's Compliance With Its Conflict-Of-Interest Obligations Was Not Material To The Government's Decision To Pay ........................................................................... 26

     D.      SAIC Did Not Make The Purportedly False Statements "To Get" False Claims Paid ....................................................... 28

CONCLUSION ........................................................................................ 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison Engine Co. v. United States ex rel. Sanders,*
    553 U.S. 662 (2008) ................................................................................ 28

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................................................ 18

*Bd. of Cnty. Supervisors of Prince William Cnty. v. Scottish & York Ins.*
    *Servs., Inc.,*
    763 F.2d 176 (4th Cir. 1985) .................................................................. 11

*C.B. Marchant Co. v. E. Foods, Inc.,*
    756 F.2d 317 (4th Cir. 1985) .................................................................... 8

*Calhoun v. Johnson,*
    632 F.3d 1259 (D.C. Cir. 2011) .............................................................. 18

*Casey v. Dep't of State,*
    980 F.2d 1472 (D.C. Cir. 1992) ......................................................... 7, 12

*Chew v. Gates,*
    27 F.3d 1432 (9th Cir. 1994) .................................................................... 7

* *Connors v. Tanoma Mining Co.,*
    953 F.2d 682 (D.C. Cir. 1992) ....................................... 1, 4, 5, 6, 7, 8, 11

*Dodge v. Cotter Corp.,*
    203 F.3d 1190 (10th Cir. 2000) ......................................................... 7, 12

*Fayerweather v. Ritch,*
    195 U.S. 276 (1904) .............................................................................. 5, 6

*Fogg v. Ashcroft,*
    254 F.3d 103 (D.C. Cir. 2001) ............................................................... 16

*Gasoline Prods. Co. v. Champlin Refining Co.,*
    283 U.S. 494 (1931) ...................................................................... 6, 11, 14

*Jackson v. Coalter,*
    337 F.3d 74 (1st Cir. 2003) .................................................................... 16

*Johnson v. Bd. of Educ. of Chi.*,
    457 U.S. 52 (1982) (per curiam) ................................................................. 16

*LaShawn A. v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996) (en banc) .................................................. 16

*Martin v. Dep't of Justice*,
    488 F.3d 446 (D.C. Cir. 2007) ..................................................................... 4

*Nat'l Sav. & Trust Co. v. Rosendorf*,
    559 F.2d 837 (D.C. Cir. 1977) .............................................................. 5, 15

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ....................................................................................... 4

*Overby v. Nat'l Ass'n of Letter Carriers*,
    601 F. Supp. 2d 101 (D.D.C. 2009) .......................................................... 17

*Richards v. Jefferson Cnty.*,
    517 U.S. 793 (1996) ........................................................................................ 5

* *Russell v. Place*,
    94 U.S. 606 (1877) ............................................................................ 5, 6, 11

*S.E.L. Maduro (Fla.), Inc. v. M/V Antonio de Gastaneta*,
    833 F.2d 1477 (11th Cir. 1987) .................................................................. 8

*United States v. Munsingwear, Inc.*,
    340 U.S. 36 (1950) ....................................................................................... 16

* *United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010) ................................. 3, 8, 13, 14, 15, 26, 28

*Universal Guar. Life Ins. Co. v. Coughlin*,
    481 F.3d 458 (7th Cir. 2007) ..................................................................... 16

*Wolcott v. Ginsburg*,
    697 F. Supp. 540 (D.D.C. 1988) ............................................................... 16

**Statutes**

31 U.S.C. § 3729(a)(1) ............................................................................... 9, 13

31 U.S.C. § 3729(a)(2) ........................................................................... 9, 13, 28

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................... 18

**Treatises**

JAMES WM. MOORE ET AL.,
   *Moore's Federal Practice* (3d ed. 2011) ....................................................................... 5

WRIGHT, MILLER & COOPER,
   *Federal Practice and Procedure* (2d ed. 2002)..................................................... 5, 16

## INTRODUCTION

The Government's motion for partial summary judgment betrays a fundamental misunderstanding of the requirements of issue preclusion.  The only claim upon which the jury returned a verdict, and that is now final after affirmance by the D.C. Circuit, is the breach-of-contract claim on the 1992 Contract.  At trial, however, the Government alleged five *alternative* conflict-of-interest relationships and proffered multiple theories about why those relationships created conflicts of interest.  The jury's general verdict on the breach-of-contract claim provides no basis for determining which of the Government's alternative arguments the jury adopted.   Even in the face of this ambiguity, the Government asks this Court to grant it summary judgment on the falsity element of its False Claims Act ("FCA") claims and to preclude SAIC from challenging *any* of its conflict-of-interest allegations.  This Court should reject the Government's unprecedented preclusion argument.

*First*, the Government's argument that issue preclusion bars SAIC from denying any of the five alleged conflicts of interest flatly contradicts well-established preclusion principles.  A party invoking the issue-preclusive effect of a prior verdict must be able to demonstrate that the issue in question was "actually and necessarily" decided in its favor in the prior proceeding.  *Connors v. Tanoma Mining Co.*, 953 F.2d 682, 686 (D.C. Cir. 1992).  The general verdict that the jury returned on the Government's breach-of-contract claim in this case does not identify with any specificity the issues that the jury actually decided.  The breach-of-

contract verdict merely establishes that the jury found that SAIC had some, *unspecified* conflict of interest that breached its contractual obligations—but does not indicate whether the jury found that only one of SAIC's relationships constituted a conflict of interest, that all of the relationships constituted conflicts, or that some subset constituted a conflict. Because the Government cannot demonstrate that the issues on which it seeks preclusion were actually decided by the first jury, it cannot invoke issue preclusion to establish any element of its FCA claims.

*Second*, this Court should not take the alternative course of instructing the jury that SAIC had at least one, unspecified conflict of interest because such an instruction would needlessly confuse the jury and would not assist its resolution of the Government's FCA claims. The jury will need to know *which* relationship or relationships were conflicts of interest—and under what theory or theories—in order to determine whether those conflicts were material to the Government's decision to pay a claim and whether that claim was submitted with scienter. Instructing the jury that at least one, unspecified relationship was a conflict, for at least one, unspecified reason, would invite the jury to guess about which relationships in fact constituted a conflict—in violation of SAIC's due process and Seventh Amendment rights.

*Third*, even if this Court concluded that the breach-of-contract verdict authoritatively established that each of SAIC's relationships was a conflict of interest, the Government would not be entitled to summary judgment on the issue

of "falsity" because the Government would still need to prove the element of FCA

materiality, which is an essential part of the falsity inquiry.  The D.C. Circuit made

clear in this case that not every breach of contract is "material" under the FCA.  *See*

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010)

("*SAIC IV*").  Because the breach-of-contract verdict did not even arguably require

the jury to find that SAIC's breach was material to the Government's decision to

pay any claim, the issue of FCA materiality remains to be resolved in this case.

Perhaps recognizing that the basis for invoking issue preclusion in these

circumstances is so weak, the Government contends as a back-up that there are no

disputed issues of material fact on the question of falsity.  It is odd in the extreme

that, after failing to move for summary judgment on falsity before the first trial in

this case, the Government now contends that, despite a four-week trial at which the

issue of falsity was sharply contested, it is now *undisputed* that SAIC submitted

false claims and made false statements.  The Government's argument fails because

there is substantial evidence demonstrating that SAIC's work in support of other

government contractors was not regulated by the NRC, that the work did not bias

SAIC's judgment on its NRC project, and that SAIC's compliance with its conflict-of-

interest obligations was not material to the Government's decision to pay.  These

disputed issues of fact must be resolved by a jury.

## ARGUMENT

## I.  THE JURY'S GENERAL VERDICT THAT SAIC BREACHED THE 1992 CONTRACT DOES NOT RELIEVE THE GOVERNMENT OF ITS BURDEN OF PROVING THE ELEMENTS OF ITS FCA CLAIMS.

The Government contends that "SAIC should be legally precluded from relitigating this Court's determinations that: (1) SAIC breached its conflict of interest obligations by failing to avoid and disclose organizational conflicts of interest; and (2) SAIC submitted false claims and false statements to the NRC." U.S. Br. 22. The Government's effort to ease its burden of proof on retrial fails because the Government cannot meet the basic requirements for invoking the preclusive effect of the jury's breach-of-contract verdict.

### A.  Issue Preclusion Applies Only Where An Issue Has Been Actually And Necessarily Decided By A Prior Jury.

"Collateral estoppel"—or issue preclusion—"requires three elements . . . : [1], the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case[; 2], the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case[; and] [3], preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007) (internal quotation marks omitted); *see also New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001); U.S. Br. 17.

The party invoking preclusion "has the burden of showing that the same issue was 'actually and necessarily determined' in a prior litigation." *Connors*, 953

F.2d at 684; *see also Nat'l Sav. & Trust Co. v. Rosendorf*, 559 F.2d 837, 840 (D.C. Cir. 1977); 18 Wright, Miller & Cooper, *Federal Practice and Procedure* §§ 4419, 4420 (2d ed. 2002).  "If the basis of [the prior] decision is unclear," the requirements of issue preclusion cannot be met.  *Connors*, 953 F.2d at 685; *see also* 18 Wright, Miller & Cooper, *supra*, § 4420, at 516 (an "opaque judgment fails to preclude relitigation"); 18 James Wm. Moore et al., *Moore's Federal Practice* § 132.03[3][d], at 132-98 (3d ed. 2011) (issue preclusion is inappropriate where a jury verdict or judicial opinion is "vague" and where "the basis of a decision is unclear").  Thus, where there is "any uncertainty" whatsoever over whether an issue was actually decided in prior litigation, the court must decline to apply issue preclusion.  *Russell v. Place*, 94 U.S. 606, 608 (1876); *see also Connors*, 953 F.2d at 685 (evidence of preclusion must remove all "lingering uncertainty").

Indeed, the Supreme Court has confirmed that due process *requires* that a plaintiff invoking preclusion establish that the issue in question was "actually decided" in prior litigation.  *See Fayerweather v. Ritch*, 195 U.S. 276, 307 (1904); *see also Richards v. Jefferson Cnty.*, 517 U.S. 793, 797 (1996) ("extreme applications of [preclusion] doctrine" are unconstitutional).  In the absence of such a showing, there is an unacceptable risk that liability will be imposed without any jury ever having found the facts on which liability was premised.  *Fayerweather*, 195 U.S. at 307.  Granting preclusive effect to a prior verdict on a basis "not disclosed by the record" of the first trial would also violate the Seventh Amendment by denying the party against whom preclusion is invoked its right to have the relevant issues actually

decided by a jury.  *See Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 499-500 (1931).

Under these well-established principles, where the prior decision may have rested upon one of several alternative grounds—and where the record does not unambiguously disclose which of the grounds the decision-maker relied upon—"relitigation of the issue is not precluded."  *Connors*, 953 F.2d at 684.  This has been settled for more than 125 years.  *See Russell*, 94 U.S. at 608 (preclusion is unavailable where "several distinct matters may have been litigated, upon one or more of which the judgment may have passed, without indicating which of them was thus litigated, and upon which the judgment was rendered").[1]

Thus, in *Connors v. Tanoma Mining Co.*, the D.C. Circuit refused to give issue-preclusive effect to a prior Eleventh Circuit decision because "the precise legal basis upon which the [earlier] judgment rest[ed] [was] unclear."  953 F.2d at 685. The Eleventh Circuit had not specified whether its decision was based on the contractual term that was in dispute in the D.C. Circuit case or instead on the "course of dealing between the parties" to the Eleventh Circuit proceedings (which was different from the dealings between the parties to the D.C. Circuit case).  *Id.* The D.C. Circuit concluded that, "[i]n light of this lingering uncertainty, we cannot say that the [parties invoking preclusion] have discharged their burden of showing

---

[1]  As the Supreme Court stated in *Fayerweather*: where "testimony was offered at the prior trial upon several distinct issues, the decision of any one of which would justify the verdict or judgment, then the conclusion must be that the prior decision is not an adjudication upon any particular issue or issues."  195 U.S. at 307.

that the Eleventh Circuit 'actually and necessarily' resolved the issue" of contractual interpretation on which preclusion was sought. *Id.* at 685-86; *see also Casey v. Dep't of State*, 980 F.2d 1472, 1475 n.3 (D.C. Cir. 1992) (refusing to "assign . . . preclusive weight" to a judgment dismissing a prior suit between the same parties for lack of jurisdiction because the earlier court did not specify which of "two alternative theories" it applied when dismissing the case).

Other courts of appeals have repeatedly applied these same principles by refusing to give preclusive effect to a general jury verdict that does not specify which of several alternative theories of liability the jury adopted. In *Dodge v. Cotter Corp.*, 203 F.3d 1190 (10th Cir. 2000), for example, the Tenth Circuit held that the plaintiffs could not rely on the preclusive effect of a prior negligence verdict against the defendant to establish the elements of their negligence claim because the plaintiffs in the prior litigation had asserted eleven different grounds of negligence and the jury returned a general verdict that did not identify the specific basis for its findings. *Id.* at 1198. Because this "general finding under the negligence instruction fail[ed] to identify what the jury found sustained by the evidence," the court could not "say as a matter of law the issue decided by the first jury is identical to the issue in controversy in this case." *Id.* at 1198-99.[2]

---

[2] Numerous other courts have similarly held that a general verdict cannot preclude the litigation of issues in a subsequent case where it is impossible to determine whether those issues were actually resolved by the jury in the prior proceeding. *See, e.g.*, *Chew v. Gates*, 27 F.3d 1432, 1438 (9th Cir. 1994) ("We can only speculate as to which injury or injuries underlay the verdict, and speculation

[Footnote continued on next page]

**B.      The Government Cannot Establish With The Requisite Specificity The Issues That Were Actually And Necessarily Decided By The First Jury.**

Under these well-established preclusion principles, the Government cannot invoke the jury's general breach-of-contract verdict to establish any element of its FCA claims because the Government cannot meet its burden of demonstrating that the jury "actually and necessarily decided" the issues on which it seeks preclusion. *Connors*, 953 F.2d at 686.

During the first trial, the Court instructed the jury that SAIC breached its 1992 Contract with the NRC if SAIC failed "to disclose circumstances that the government alleges constituted organizational conflicts of interest that the SAIC was required to disclose to the NRC under the terms of the contract." 7/28 Tr. 23 (Exh. 56). The jury returned a general verdict that found that SAIC breached the 1992 Contract—without identifying the specific basis for its finding—and determined that, under the benefit-of-the-bargain standard, the Government incurred $78 in damages as a result of the breach. *See* Verdict Form, Dkt. #127 at

---

[Footnote continued from previous page]
will not support the application of collateral estoppel."); *S.E.L. Maduro (Fla.), Inc. v. M/V Antonio de Gastaneta*, 833 F.2d 1477, 1483 (11th Cir. 1987) ("The general nature of the jury's verdict indicates that the ['critical and necessary part of the judgment'] prerequisite for collateral estoppel has not been satisfied."); *C.B. Marchant Co. v. E. Foods, Inc.*, 756 F.2d 317, 319 (4th Cir. 1985) (rejecting the application of issue preclusion because "[g]iven the jury's general verdict in the [first trial], it [was] impossible to discern whether the damages awarded were based on the *de facto* merger theory or on breach of contract").

2; SAIC's Motion for Summary Judgment on Damages, Dkt. #197 at 16-25.[3]  The

D.C. Circuit affirmed this aspect of the judgment on appeal but vacated the jury's

FCA verdict.  *See SAIC IV*, 626 F.3d at 1273, 1277.  The Government now argues

that the jury's general breach-of-contract finding relieves it of the burden of proving

the falsity elements of its FCA claims.  *See* 31 U.S.C. § 3729(a)(1) (imposing liability

where the defendant "knowingly presents . . . a false . . . claim for payment"); *id.*

§ 3729(a)(2) (imposing liability where the defendant "knowingly makes . . . a false

. . . statement to get a false . . . claim paid").  The Government further contends

that, at a minimum, the breach-of-contract verdict establishes that "SAIC breached

its conflict of interest obligations."  U.S. Br. 22.

　　　The Government ignores settled preclusion standards when it argues that the

jury's breach-of-contract verdict establishes that each of SAIC's relationships at

issue in this case constituted a conflict of interest.  At trial, the Government

premised its breach-of-contract theory on the following five relationships, each of

which the Government alleged constituted a conflict of interest:  "BNFL, Inc.

('BNFL'), Bechtel Jacobs Company ('BJC'), the Association of Radioactive Metal

Recyclers ('ARMR'), the Alaron Corporation, [and SAIC's] financial interest in a

radioactive waste treatment technology known as the Plasma Hearth Process

('PHP')."  U.S. Br. 8.  For several of these relationships, the Government presented

multiple, independent theories as to why the relationship constituted a conflict of

---

[3]  The Government did not allege that SAIC breached the 1999 Contract.

interest.  To take just one example, the Government argued that SAIC's

relationship with BNFL constituted a conflict because SAIC provided "advice and

assistance to BNFL . . . while preparing the Waste Management Plan," because

SAIC "prepared the 'Work Smart Standards' laying out the regulatory rules under

which [BNFL's] project was carried out," and also because "BNFL partnered with

and also later owned Manufacturing Sciences Corporation ('MSC')," which the

Government alleges was an NRC licensee that created a *per se* conflict.  *Id.* at 9-10;

*see also id.* at 8-16, 26-28 (offering multiple different reasons why each of SAIC's

other relationships constituted a conflict).

If the jury found that any *one* of SAIC's relationships constituted a conflict of

interest—under any of the Governments multiple conflict-of-interest theories—at

any point while the 1992 Contract was in force, it could have returned a breach-of-

contract verdict against SAIC.  *See* 7/28 Tr. 23 (Exh. 56) (instructing the jury that

SAIC breached the 1992 Contract if SAIC failed to disclose "organizational conflicts

of interest that the SAIC was required to disclose to the NRC under the terms of the

contract").

Yet, the jury's general breach-of-contract verdict gives no indication as to

*which* of SAIC's relationships the jury in fact found to be a conflict of interest (or

under which conflict-of-interest theory), let alone that it found all five relationships

to be conflicts, as the Government now contends.  *Id.*; Verdict Form, Dkt. #127 at 2.

Thus, the jury might have found that SAIC's relationship with BNFL constituted a

conflict due to the alleged interactions between the NRC and BNFL's subsidiary

MSC, *but see infra* at 19, while both rejecting the Government's remaining theories of conflict with regard to BNFL and finding that SAIC's other relationships did not constitute a conflict under any of the Government's arguments, *see id.* at 19-26. Alternatively, the jury might well have determined that the only conflict was the membership of one of SAIC's vice presidents in the ARMR board. *But see infra* at 25-26. In this scenario, the jury would have agreed with SAIC that its relationships with BNFL, BJC, Alaron Corporation, and PHP did not violate SAIC's conflict-of-interest obligations. *See infra* at 19-25. There is simply no way to know which conflicts—or theories underlying those conflicts—the jury actually found based on the jury's opaque breach-of-contract verdict.

Nor can this Court engage in guesswork regarding the basis for the jury's breach-of-contract finding by hypothesizing that the jury must have found all five relationships to be conflicts. Courts "cannot distill special findings from a general verdict" because "do[ing] so would intrude on the independent role of a jury." *Bd. of Cnty. Supervisors of Prince William Cnty. v. Scottish & York Ins. Servs., Inc.*, 763 F.2d 176, 179 (4th Cir. 1985). Indeed, imposing liability based on speculation about what the jury might have found would strip SAIC of both its due process rights and its Seventh Amendment right to have facts found by a jury. *See Russell*, 94 U.S. at 608; *Gasoline Prods.*, 283 U.S. at 499-500.

Because it is impossible to determine which relationship(s) the jury "actually and necessarily" found to be a conflict of interest or the theories on which those conflicts were based, *Connors*, 953 F.2d at 686, the Government cannot invoke the

jury's breach-of-contract verdict to establish that all five relationships were in fact a conflict.  Just as a general finding of negligence cannot be given preclusive effect on a specific theory of negligence because it does not establish which alternative theory the jury actually adopted (*Dodge*, 203 F.3d at 1198-99)—and a general jurisdictional dismissal cannot be given preclusive effect on a specific theory of jurisdictional defect because it does not establish which alternative theory the court invoked (*Casey*, 980 F.2d at 1475 n.3)—a general breach-of-contract finding cannot be given preclusive effect to establish that every alleged relationship constituted a conflict of interest because that general verdict does not establish which alternative theory of breach the jury relied on.  *See Dodge*, 203 F.3d at 1198 ("our concern is not that the jury did not find negligence on one or more specific allegations, but that the general finding under the negligence instruction fails to identify what the jury found sustained by the evidence").

Nor should this Court take the alternative course of instructing the jury that SAIC had at least one, unspecified conflict of interest, under at least one, unspecified theory; such an instruction would needlessly confuse the jury without assisting its decision-making process.  The jury cannot resolve the Government's FCA claims without knowing *which* of SAIC's relationships constituted a conflict of interest and *why* those relationships were a conflict.

In order to find FCA liability as to *any* particular SAIC claim or statement, the jury must find that: (1) a *particular* relationship was a conflict of interest; (2) the conflict of interest as to *that* relationship was material to the Government's

decision to pay; and (3) at least one SAIC employee knew both that the *particular* relationship was a conflict of interest and that the conflict was material.  *SAIC IV*, 626 F.3d at 1271-76.  All of these inquiries depend on the jury's finding that a particular relationship is a conflict of interest, and none of them can be made without pinpointing the particular relationship at issue or the basis for the conflict. Indeed, the jury would need to know the reason a relationship constituted a conflict both because some bases for a conflict may be more weighty—and thus more likely to be "material"—than others and because an employee is unlikely to have had knowledge about a conflict unless that employee knew the reason *why* the relationship constituted a conflict to begin with.

Similarly, in order to determine the *number* of false claims or statements allegedly made by SAIC, the jury must decide which of SAIC's relationships were conflicts of interest and at what point in time.  Liability under § 3729(a)(1) of the FCA depends in part on the submission of a false claim; the Government therefore must prove that the alleged conflict of interest existed at the time that the claim in question was submitted.  Liability under § 3729(a)(2) requires the submission of a false statement to get a false claim paid, which likewise requires the Government to prove the existence of a conflict at the time a statement was made.  Accordingly, during the first trial, the Government conceded in its closing argument that the number of false claims it can allege ranges widely *depending on which relationships the jury determined were conflicts of interest* because the different alleged conflicts began on different dates.   7/28 Tr. at 51-53 (Exh. 56) (Government closing).  The

Government's closing argument—indeed, its entire theory of the case—is thus a recognition that whether any particular claim or statement is false turns on which relationships are conflicts of interest (and when).

Instructing the jury that SAIC had an unspecified conflict would thus not assist the jury in making this determination; instead, it would simply generate "confusion and uncertainty"—and invite the jury to speculate as to the identity and reasons for the conflicts—because the jury would still need to determine *which* of SAIC's particular relationships were conflicts (and why) in order to conduct *any* of its FCA analysis.  *Gasoline Prods.*, 283 U.S. at 500.

Finally, even if this Court concludes that SAIC is precluded from contesting that all five of its relationships were conflicts of interest, the Government still would not be entitled to preclusion on the element of falsity because, under the implied certification theory, a claim is only false under the FCA where it is *material* to the Government's decision to pay.  *See SAIC IV*, 626 F.3d at 1271 ("To establish FCA liability under an implied certification theory, the plaintiff must prove by a preponderance of the evidence that compliance with the legal requirement in question is material to the government's decision to pay.").  Thus, even if one assumes that all of SAIC's relationships at issue in this case were conflicts of interest—and there is no basis in the generalized language of the breach-of-contract verdict for reaching that conclusion—the failure to disclose those alleged conflicts could give rise to a "false claim" within the meaning of the FCA only if the jury also

found that those undisclosed conflicts were material to the Government's decision to pay SAIC's claims.  *Id.*

The jury, however, was not required to find FCA materiality when it returned its breach-of-contract verdict.  Under this Court's instructions, the jury could find that SAIC breached the 1992 Contract as long as it had a single conflict of interest that violated the terms of the Contract.  7/28 Tr. 23 (Exh. 56).  Because the breach-of-contract instructions did not direct the jury to determine whether SAIC's alleged conflicts were material to the Government's payment decisions, the issue of FCA materiality was not "actually litigated and determined" by the jury when it found that SAIC breached the 1992 Contract.  *Rosendorf*, 559 F.2d at 840.[4]

### C.    The Law-Of-The-Case Doctrine Is Inapplicable Here And, In Any Event, Does Not Assist The Government.

The Government's effort to ease its burden of proof on retrial draws equally little support from the law-of-the-case doctrine.

As SAIC explained in its Memorandum in Support of its Motion for Summary Judgment on Damages, issue preclusion—not the law of the case—is the appropriate doctrine for analyzing the impact of a jury's prior factual findings on a

---

[4] As the D.C. Circuit explained, not every claim submitted in violation of a contract's terms is "material" (and therefore false) under the FCA.  *SAIC IV*, 626 F.3d at 1271.  A party therefore can be in breach of its contractual obligations, and submit claims for payment, and those claims are not necessarily false under the FCA.  *See id.*  In order to be false, the underlying contractual violation must be material to the Government's decision to pay.  *Id.*  It is undisputed that this Court's breach-of-contract instructions did not ask the jury to decide whether SAIC's alleged conflicts were material to the Government's payment decisions.  7/28 Tr. 23 (Exh. 56).

party's burden of proof on retrial.  *See* SAIC's Motion for Summary Judgment on

Damages, Dkt. #197 at 23-24 (citing *Fogg v. Ashcroft*, 254 F.3d 103, 110-11 (D.C.

Cir. 2001)).  But even if the law-of-the-case doctrine applies here, its application is

conditioned on the same requirements as the doctrine of issue preclusion.  *See* 18

Wright, Miller & Cooper, *supra* § 4418, at 489.  Law of the case applies only to

issues that were "actually decided" in prior litigation (*Universal Guar. Life Ins. Co.

v. Coughlin*, 481 F.3d 458, 462 (7th Cir. 2007); 18 Wright, Miller & Cooper, *supra* §

4478), and mandates that "the *same* issue presented a second time in the *same case*

in the *same court* should lead to the *same result*."  *LaShawn A. v. Barry*, 87 F.3d

1389, 1393 (D.C. Cir. 1996) (en banc) (emphases in original).

The Government cannot demonstrate that the same issues on which it seeks

to invoke the law-of-the-case doctrine were "actually decided" in the prior trial

because it is impossible to determine which of SAIC's relationships the jury found to

constitute conflicts of interest.   Accordingly, the Government cannot rely on the

law-of-the-case doctrine to establish any element of its FCA claims.[5]

---

[5] Nor can the Government invoke the jury's now-vacated FCA findings to
diminish its burden of proof on retrial.  Verdict Form, Dkt. #127 at 2.  It is well-
established that vacated judgments can have *no* issue-preclusive or law-of-the-case
effect.  *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39-40 (1950); *Johnson
v. Bd. of Educ. of Chi.*, 457 U.S. 52, 53-54 (1982) (per curiam); *Jackson v. Coalter*,
337 F.3d 74, 85 (1st Cir. 2003); *see also Wolcott v. Ginsburg*, 697 F. Supp. 540, 543
(D.D.C. 1988) ("a judgment which is vacated, for whatever reason, is deprived of its
conclusive effect, both as collateral estoppel and *res judicata*").  The Government
does not rely upon those findings in its motion for summary judgment here (and has
therefore waived any argument that those findings have preclusive effect).  *See*

[Footnote continued on next page]

## II. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON WHETHER SAIC SUBMITTED FALSE CLAIMS OR MADE FALSE STATEMENTS TO GET FALSE CLAIMS PAID.

The Government also moves—for the first time in nearly seven years of litigation—for partial summary judgment on the ground that the purportedly undisputed evidence demonstrates that SAIC submitted false claims and made false statements to get false claims paid.  The Government apparently believes that four weeks of trial testimony—after which the jury found that only some of SAIC's claims were false—eliminates any dispute as to whether SAIC submitted false claims and made false statements to get false claims paid.  But, the four-week trial did not erase these factual disputes; instead, it only sharpened and deepened them.

Contrary to the Government's position, the undisputed facts do *not* show that SAIC submitted false claims and made false statements to get false claims paid. There are numerous factual disputes as to whether SAIC's DOE-related work was regulated by the NRC, whether SAIC's DOE-related work placed it in a conflicting role in which its judgment on its NRC work may have been biased, whether SAIC's alleged conflicts of interest were material to the Government's decision to pay SAIC's claims, and whether any false statements made by SAIC were made *to get* false claims paid.  These disputes must be resolved at trial by a jury.

---

[Footnote continued from previous page]
*Overby v. Nat'l Ass'n of Letter Carriers*, 601 F. Supp. 2d 101, 110 n.2 (D.D.C. 2009) (failure to timely raise a preclusion argument waives that argument).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011). "A dispute about a material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Calhoun*, 632 F.3d at 1261 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted). "In making that determination, the court must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." *Id.* (internal quotation marks and alterations omitted).[6]

## A.    SAIC's Work On Other Projects Was Not Regulated By The NRC.

The Government insists that it is undisputed that SAIC's work in support of other government contractors was "regulated by the NRC" within the meaning of the contractual conflict-of-interest provisions. *See* U.S. Br. 26-27. The Government

---

[6] The Government's reliance on this Court's rulings on SAIC's post-trial motions to support is summary judgment motion is misplaced. The post-trial opinion considered whether, granting all inferences in the *Government's* favor, the verdict should be overturned on the ground that no reasonable jury could have concluded that SAIC submitted false claims and made false statements. In the present motion, however, the Court is faced with the question whether, after granting all inferences in *SAIC's* favor, the evidence is so one-sided that a reasonable jury would necessarily conclude that SAIC submitted false claims and made false statements. *See Calhoun*, 632 F.3d at 1261. The fact that there may be sufficient evidence in the record to support a jury finding that SAIC submitted false claims and made false statements does not mean that the jury could only reach one possible conclusion based on that record.

ignores numerous factual disputes and ample evidence that SAIC's work for other contractors was *not* regulated by the NRC and that SAIC's overall work for the NRC was the "opposite of a conflict."

**BNFL:**  Substantial testimony from SAIC employees and the DOE project manager demonstrates that SAIC's work on the DOE Three-Building Project was *not* regulated by the NRC.  *See* Turner Test., 7/8 p.m. Tr. 104:13-23 (Exh. 6) (testifying that Turner, "BNFL and everybody else in the project understood that DOE would be the regulating authority for the Three-Building Project"); Caldwell Test., 7/9 p.m. Tr. 116:12-25 (Exh. 32); Rucker Test., 7/10 a.m. Tr. 99-101 (Exh. 60); 7/23 a.m. Tr. 112:5-113:7 (Exh. 57) (DOE project manager's statement that "[t]he NRC had no authority over us on this project at all").  In any event, "NRC rules would only apply to those materials being released *outside* the DOE complex" (Truitt Test., 7/10 p.m. Tr. 21:7-11 (Exh. 44) (emphasis added)), and "all of SAIC's services were performed *within* the DOE facility" (Caldwell Test., 7/9 p.m. Tr. 114:1-3 (Exh. 32) (emphasis added)).  Moreover, the Government's allegation that MSC—another subcontractor on the project—had a license from the State of Tennessee, pursuant to NRC regulations (*see* U.S. Statement of Undisputed Facts ¶ 44 (hereinafter "U.S. Stmt.")), is beside the point because SAIC had no contractual relationship with MSC, and a license from Tennessee is not the same as an NRC license (*see* Resp. to U.S. Stmt. ¶¶ 11, 44).

**BJC:**  There is also testimony that "DOE's limits [are] what applied" to SAIC's work for BJC.  Slack Test., 7/9 p.m. Tr. 26:2-27:8 (Exh. 34).  Indeed, the

19

relevant task order stated that the work was performed "per DOE guidelines." PX 731, at 2 (Exh. 49). Moreover, the Government itself has previously conceded that BJC was not an NRC licensee or applicant during any relevant time period. *See* U.S. Responsive Stmt. of Genuine Issues, Dkt. #71 ¶ 17.

**Alaron:** The Government's reference to Alaron's NRC-licensed facility in Pennsylvania bears no weight because Alaron was not awarded the potential DOE contract on which SAIC would have provided assistance. *See* Tempel Test., 7/9 a.m. Tr. 32:23-25 (Exh. 25); Taylor Test., 7/9 a.m. Tr. 66:9-19 (Exh. 26); Ryan Test., 7/8 p.m. Tr. 121:15-18 (Exh. 27). Accordingly, SAIC never performed that work for Alaron. *See* Tempel Test., 7/9 a.m. Tr. 32:23-25 (Exh. 25); Taylor Test., 7/9 a.m. Tr. 66:9-19 (Exh. 26); Ryan Test., 7/8 p.m. Tr. 121:15-18 (Exh. 27). In any event, SAIC's scope of work on the contract-that-never-came-to-be would have included work at the *DOE facility* in Georgia, not at Alaron's NRC-licensed facility in Pennsylvania. Taylor Test., 7/9 a.m. Tr. 62:15-23, 66:20-67:12 (Exh. 26).

**Plasma Hearth Process:** Nor was SAIC's development of the Plasma Hearth Process regulated by the NRC. "SAIC's plans" (U.S. Br. 26) to monitor NRC activities and *potentially* to obtain an NRC license in the future (*see* Resp. to U.S. Stmt. ¶ 83) are irrelevant because those plans—like the Plasma Hearth technology—never came to fruition. Additionally, this technology was "designed specifically for DOE's . . . mixed waste" (Leatherman Test., 7/16 a.m. Tr. 42:12-21 (Exh. 46)), was primarily funded by DOE (*see* Larsen Test., 7/10 a.m. Tr. 58 (Exh. 28)), and was largely intended to be used for melting DOE-generated waste (*id.*).

**ARMR:**  That some ARMR members had NRC licenses is similarly inapposite because SAIC was never a member, never paid dues, and had little or no communication with ARMR.  *See* Loiselle Test., 7/7 p.m. Tr. 31, 38, 48 (Exh. 24); *see also* Resp. to U.S. Stmt. ¶¶ 98-107.

## B.  SAIC's Work Did Not Place It In A Conflicting Role That Biased Its Work For The NRC.

The Government maintains that SAIC's non-NRC work placed it in a conflicting role in which its judgment on its NRC work could be biased (*see* U.S. Br. 27-28), but again disregards the substantial evidence that creates a factual dispute on this issue.

In support of its position, the Government cites to SAIC's training materials—which, in the Government's view, establish a broad definition of what constitutes a conflict of interest.  *See* U.S. Br. 27.  But language in an internal training document cannot alter SAIC's legal obligations under contractual conflict-of-interest provisions.  In any event, SAIC's work in support of other government contractors did not create a conflict under the standard articulated in the SAIC training document—namely, that a "[c]ontract involves preparing or giving advice to [the] Client in a technical area where SAIC is providing consulting assistance in [the] same area to another organization" (PX 919, at Bates SAIC 0173304 (Exh. 59))—because that work was not in the same technical area or on the same or similar matters as SAIC's NRC work.

The mere fact that SAIC performed other work relating in some way to the possible release of radioactive materials does not mean that it was placed in a

conflicting role that could bias its judgment on its NRC work.  Indeed, SAIC's DOE-related work relating to decontamination and decommissioning was widely known, including to the NRC.  *See* Cardile Test., 7/2 a.m. Tr. 103 (Exh. 19) (explaining that SAIC disclosed to the NRC in 1992 that it was heavily involved in reviewing and providing assistance to the decontamination and decommissioning evaluations of DOE's gaseous diffusion plants); *see also id.* at 100-01.  The NRC viewed such experience as an asset, not a problem.  *See id.*  Moreover, according to the NRC's own project managers, SAIC's work was highly transparent (Meck Test., 7/3 p.m. Tr. 7, 35 (Exh. 23); Cardile Test., 7/2 a.m. Tr. 54:14-18 (Exh. 19)), and there was therefore no realistic possibility that SAIC could inject bias into its work product (Meck Test., 7/3 p.m. Tr. 7, 35 (Exh. 23)).  Indeed, Dr. Meck, the project manager on the 1992 Contract, believed that SAIC's work "constituted the opposite of a conflict" (*id.* at 9) because it would lead to more restrictive radioactive release levels than other models (10/8/08 Judgment, Dkt. #151 at 2; DX 518, at 1 n.1) and was subject to close NRC oversight and widespread peer review.  Meck Test., 7/3 p.m. Tr. 9-10, 21 (Exh. 23); Paperiello Test., 7/15 p.m. Tr. 4-9 (Exh. 3).  In sum, when the details of SAIC's non-NRC work are examined, it becomes clear that there is significant evidentiary support for SAIC's position that this work could not have biased its judgment on its NRC projects.  This evidence—and the factual disputes it creates—is documented in depth in SAIC's Response to the Government's Statement of Undisputed Material Facts (*see* Resp. to U.S. Stmt. ¶¶ 44-112); several illustrative examples are discussed below.

**BNFL:**  As an initial matter, SAIC never performed recycling on the BNFL Three-Building Project (Bidwell Test., 7/16 a.m. Tr. 81:13-20 (Exh. 33)), and SAIC did not have "any responsibility to release metals from the DOE facility" (Caldwell Test., 7/9 p.m. Tr. 114:7-9 (Exh. 32)).  Moreover, SAIC was compensated on a time-and-materials basis for its work with BNFL—and thus had no economic interest in recycling—which at least creates a genuine dispute as to whether its work could have biased its judgment.  *See* Turner Test., 7/8 p.m. Tr. 81-83 (Exh. 6); Caldwell Test., 7/9 p.m. Tr. 114-15 (Exh. 32).

The Government makes much of the fact that the Work Smart Standards, which SAIC helped develop in connection with the Three-Building Project, cited Regulatory Guide 1.86.  *See, e.g.*, U.S. Stmt. ¶ 60; *see also* U.S. Br. 28.  But DOE used the "*[s]ame* numbers" or "limits" as those contained in Guide 1.86, and the decision to use Guide 1.86 was made as part of an "agreement with DOE."  Slack Test., 7/9 a.m. Tr. 99:1-13 (Exh. 9) (emphasis added); Turner Test., 7/8 a.m. Tr. 29:23-24 (Exh. 11).  Indeed, SAIC employee Jeffrey Slack testified that DOE approved the guidelines in the Work Smart Standards and that the contemplated release of radioactive materials would be "within the current DOE guidelines."  Slack Test., 7/9 a.m. Tr. 104:1-9 (Exh. 9).  In sum, "DOE [was] the regulator using the Work Smart Standards."  Turner Test., 7/8 p.m. Tr. 98:9-11 (Exh. 6).

**BJC:**  The NRC knew and approved of SAIC's work on the BJC project—a fact that undeniably demonstrates that SAIC's work on this project could not have biased its judgment.  Specifically, the NRC's Dr. Meck raised no concerns despite

his knowledge that SAIC was working on the BJC project; indeed, Dr. Meck even asked his DOE counterpart to authorize SAIC's team on the BJC project to share its work product with the SAIC team that was working on the NRC contract. *See* Meck Test., 7/3 a.m. Tr. 104-06 (Exh. 7). Neither Dr. Meck nor DOE's project manager saw any problem with this collaboration.[7]

The Government contends that SAIC used the results of its work on its NRC contract when it performed the dose assessment on the BJC project. But, while SAIC may have *compared* parameters and scenarios (*see* Slack Test., 7/9 p.m. Tr. 5:16-21, 7:4-22 (Exh. 34)), "in no case did [SAIC's BJC team] *use* the NRC parameter." Rucker Test., 7/21 p.m. Tr. 54:19-20 (Exh. 50) (emphasis added); *see also id.* at 54:12-55:14. This comparison was part of a DOE-mandated task in which SAIC was also directed to use an EPA document and "any other guidance" or "other models that were out there." Slack Test., 7/9 p.m. Tr. 5:4-12 (Exh. 34). Moreover, most, if not all, of the language that SAIC borrowed from the NRC report when working on the BJC project constituted general background information. *See, e.g.*, *id.* at 35:18-19, 37:5-12; 38:17-21, 57:18-22; Rucker Test., 7/21 p.m. Tr. 77:6-7, 79:6-7 (Exh. 50).

The Government also notes that a first draft of SAIC's dose assessment report on the BJC project cited Regulatory Guide 1.86. *See* U.S. Stmt. ¶ 96. As

---

[7] As on the BNFL project, SAIC's compensation is telling. The dollar-value of the BJC project for SAIC was a mere $75,000 (*see* PX 731, at 1)—which is hardly a sum that would induce a respected government contractor to skew its work on a multi-million dollar contract for the NRC.

Slack explained, however, "DOE's limits [are] what applied" to the BJC project, and, in any event, the DOE and NRC limits were the same. Slack Test., 7/9 p.m. Tr. 26:2-27:8 (Exh. 34). Thus, the fact that the draft report cited what "also happened to be NRC's limits is irrelevant." *Id.*

**Alaron:** The Government argues that SAIC had a conflict of interest as a result of its *proposed* supporting role to Alaron, a company that bid on a DOE contract. But SAIC never performed any work for Alaron and, in any event, would have handled the work at the DOE facility in Georgia. *See* Tempel Test., 7/9 a.m. Tr. 32:23-25 (Exh. 25); Taylor Test., 7/9 a.m. Tr. 62:15-23, 66:9-19 (Exh. 26); Ryan Test., 7/8 p.m. Tr. 121:15-18 (Exh. 27).

**Plasma Hearth Process:** Although SAIC postulated that the sludge resulting from its experimental Plasma Hearth concept might be susceptible to recycling, the concept "was never intended to be a recycling technology," never progressed beyond the conceptual stage, was never tested on radioactive waste, and was not commercially viable. Larsen Test., 7/10 a.m. Tr. 58, 60, 62, 66 (Exh. 28); *see also* Resp. to U.S. Stmt. ¶¶ 78-85.

**ARMR:** As noted above, SAIC was never a member of ARMR, never paid dues, and had little or no communication with the organization. *See* Loiselle Test., 7/7 p.m. Tr. 31, 38, 48 (Exh. 24); *see also* Resp. to U.S. Stmt. ¶¶ 98-107. Moreover, the fact that one of SAIC's vice presidents, Gerry Motl, was tasked on SAIC's bid on the 1999 Contract is not evidence of a conflict because ARMR was effectively "defunct" by the time that the 1999 Contract was executed. *See* Loiselle Test., 7/7

p.m. Tr. 48 (Exh. 24).  Moreover, the weakness of the Government's ARMR

allegations is underscored by the Government's counterfactual assertion that Motl

attended ARMR events on SAIC's behalf and at SAIC's expense.  *See* U.S. Stmt.

¶ 102.  This assertion is flatly inaccurate.  Motl testified that he did *not* travel out of

town specifically for ARMR meetings and that, accordingly, "there wouldn't be

virtually any separate expenses" for attending ARMR meetings.  Motl Test., 7/23

a.m. 52:11-17, 52:23-53:1 (Exh. 53).

C.  **SAIC's Compliance With Its Conflict-Of-Interest Obligations Was Not Material To The Government's Decision To Pay.**

In vacating the judgment in this case, the D.C. Circuit emphasized that the

FCA's materiality requirement must be "strict[ly] enforce[d]."  *SAIC IV*, 626 F.3d at

1271.  Accordingly, "[t]o establish FCA liability under an implied certification

theory, the plaintiff must prove by a preponderance of the evidence that compliance

with the legal requirement in question is material to the government's decision to

pay."  *Id.*  Evidence that compliance was material to the Government's decision to

terminate the contract does *not* establish that compliance was "material to the

government's *decision to pay*."  *Id.* (emphasis added).  Summary judgment is

inappropriate because the Government has failed to demonstrate the absence of a

genuine dispute of fact as to materiality.

The testimony of SAIC's contracts representatives on the NRC contracts, as

well as the fact that the NRC paid invoices after the alleged conflicts of interest

came to light, creates a genuine factual dispute as to the materiality of the conflict-

of-interest requirements that SAIC allegedly violated.  When John Pierce Martin, SAIC's contract representative for the NRC contracts beginning in June 1996, was asked if he had "an understanding [as to] whether SAIC had to obey these conflicts of interest requirements in order to be paid under the contract," he responded that "[t]he payment is separate from complying with the organizational conflicts of interest clause."  Martin Test., 7/14 a.m. Tr. 54:19-24 (Exh. 48).  Martin explained that SAIC could "still bill the NRC and receive payment for its work" even if SAIC did "not obey these conflicts of interest provisions."  *Id.* at 55:7-10.

The testimony of Thomas Rodehau, SAIC's contract representative prior to June 1996, is to the same effect.  Rodehau testified that, although SAIC was required to make certifications regarding the existence of conflicts of interest, "the NRC did not require SAIC to respond . . . that we have no [conflicts]" in order for SAIC to receive payment.  Rodehau Test., 7/7 a.m. Tr. 18:19-22 (Exh. 14); *see also id.* at 18-20.  Rodehau stated that, while certifications were required when proposing certain modifications to the 1992 Contract, SAIC was *not* required to certify that it had no conflicts.  *Id.* at 28:1-17, 30:16-24.  On the contrary, SAIC was permitted to state that it had a conflict that it needed to discuss with the NRC.  *Id.* at 28:1-17.  In the case of such a disclosure, the NRC could, among other things, impose conditions to avoid a conflict or could determine that it was in the Government's best interest to proceed with the contract notwithstanding the conflict.  *Id.* at 19.  The testimony of Martin and Rodehau is confirmed by the NRC's decision to pay two of SAIC's invoices even after the NRC discovered SAIC's alleged

conflicts.  *See* McCubbin Test., 7/15 p.m. Tr. 96:23-100:13 (Exh. 16); Pool Test., 7/15

a.m. Tr. 55:20-57:16 (Exh. 17); Martin Test., 7/14 p.m. Tr. 88-91 (Exh. 15).[8]

### D.    SAIC Did Not Make The Purportedly False Statements "To Get" False Claims Paid.

Under 31 U.S.C. § 3729(a)(2), any person is liable under the FCA who

"knowingly makes, uses, or causes to be made or used, a false record or statement to

get a false or fraudulent claim paid or approved by the Government."  31 U.S.C.

§ 3729(a)(2).  As the Supreme Court has held, "a plaintiff asserting a § 3729(a)(2)

claim must prove that the defendant *intended* that the false record or statement be

material to the Government's decision to pay or approve the false claim."  *Allison*

*Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 665, 668-69 (2008)

(emphasis added).  There is a genuine dispute of fact as to whether SAIC made any

purportedly false statements with the intent to get its allegedly false claims paid.

Thomas Rodehau testified that he never made a certification about the

absence of a conflict of interest in order to obtain payment from the NRC.

Specifically, Rodehau stated that he "[n]ever" decided not to disclose a conflict to

ensure that SAIC got its claims paid and that he "[n]ever" submitted any no-conflict

representation to the NRC "just in order to get the company's claims paid."

Rodehau Test., 7/7 a.m. Tr. 30:25-31:6 (Exh. 14).  He also testified that "none" of the

---

[8]  The Government mentions in passing that this Court concluded that, in the
event the D.C. Circuit subsequently held that materiality is a question of law,
SAIC's allegedly false claims and statements were material.  U.S. Br. 30-31.  The
D.C. Circuit held on appeal that materiality is a question for "the jury."  *SAIC IV*,
626 F.3d at 1271.

conflict-of-interest representations he made prior to the award of the 1992 Contract "were made in order to get any claims paid" and that SAIC did not make its conflict-of-interest representations in the 1992 Contract "in order to get any claims paid." *Id.* at 22-23, 25.  Similarly, John Pierce Martin's testimony demonstrates that he did not make representations to the NRC in order to get claims paid.  *See* Martin Test., 7/14 p.m. Tr. 60 (Exh. 15).  This testimony creates a genuine dispute that can only be resolved at trial.

## CONCLUSION

The Government's motion seeks an extreme departure from ordinary preclusion principles.  It would relieve the Government of the burden of proving essential elements of its FCA claims—and deprive SAIC of core elements of its defense—based on a breach-of-contract verdict that says nothing about what relationships or theories of conflict of interest the jury adopted.  Under well-settled precedent, a general jury verdict that could have been based upon alternative theories of liability does not have preclusive effect on specific theories in later litigation.  Yet, that is precisely what the Government seeks to impose through its motion.  The issue of falsity was—and remains—highly disputed, and subject to significant proof that favors SAIC.  The Government's motion should be denied.

Dated:  August 8, 2011

Respectfully submitted,

   /s/ Andrew S. Tulumello

John P. Rowley III
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 835-6151
E-mail: john.rowley@bakermckenzie.com

Andrew S. Tulumello (D.C. Bar No. 468351)
Amir C. Tayrani (D.C. Bar No. 490994)
Ryan J. Watson (D.C. Bar No. 986906)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com

*Counsel for Defendant Science Applications International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of August 2011, I filed the foregoing with the Clerk of Court via the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.

    /s/ Andrew S. Tulumello
Andrew S. Tulumello (D.C. Bar No. 468351)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com