# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SCIENCE APPLICATIONS<br>INTERNATIONAL CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No.: 04-cv-1543 (RWR) |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON FALSE CLAIMS ACT LIABILITY

Andrew S. Tulumello (D.C. Bar No. 468351)
Amir C. Tayrani (D.C. Bar No. 490994)
Ryan J. Watson (D.C. Bar No. 986906)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com

John P. Rowley, III (D.C. Bar No. 392629)
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 835-6151
E-mail: john.rowley@bakermckenzie.com

*Counsel for Defendant Science
Applications International Corporation*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II. ARGUMENT .......................................................................................................3

    A.   THE GOVERNMENT'S PRIMARY ARGUMENT—THAT IT IS
NOT REQUIRED TO IDENTIFY A SPECIFIC SAIC EMPLOYEE
WHO KNEW BOTH THAT SAIC WAS VIOLATING ITS
CONFLICT-OF-INTEREST OBLIGATIONS AND THAT
COMPLIANCE WITH THOSE OBLIGATIONS WAS
MATERIAL—CONTRAVENES THE D.C. CIRCUIT'S DECISION .........3

    B.   THE GOVERNMENT FAILS TO IDENTIFY ANY SAIC
EMPLOYEE WHO POSSESSED BOTH ELEMENTS OF
SCIENTER ................................................................................................7

        1.   The Government Erroneously Focuses On Knowledge Of
Underlying Facts—Instead Of Knowledge Of Falsity............................8

        2.   The Government Distorts The Materiality Element Of The
Scienter Requirement ........................................................................10

        3.   The Evidence Cited By The Government To Support Its
Fallback Argument Does Not Create A Genuine Dispute As To
Whether A Specific SAIC Employee Knew Both That SAIC
Was Violating Its Conflict-Of-Interest Obligations And That
Compliance Was Material....................................................................11

    C.   NO REASONABLE JURY COULD FIND THAT SAIC'S
COMPLIANCE SYSTEM DEMONSTRATED THAT THE
COMPANY ACTED WITH RECKLESS DISREGARD OR
DELIBERATE IGNORANCE ...................................................................16

    D.   NOTHING IN THE D.C. CIRCUIT'S OPINION OR THIS
COURT'S POST-TRIAL RULING FORECLOSES SUMMARY
JUDGMENT ...........................................................................................22

III. CONCLUSION ................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Saba v. Compagnie Nationale Air France,*
  78 F.3d 664 (D.C. Cir. 1996) .................................................................................5

*Staub v. Proctor Hosp.,*
  131 S. Ct. 1186 (2011) ..........................................................................................6

*Stone v. Ritter,*
  911 A.2d 362 (Del. 2006) ......................................................................................19

* *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.,*
  298 F. Supp. 2d 91 (D.D.C. 2004) .........................................................17, 18, 21

*United States ex rel. Harrison v. Westinghouse Savannah River Co.,*
  352 F.3d 908 (4th Cir. 2003) .................................................................................6

* *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.,*
  495 F.3d 103 (3d Cir. 2007) ..................................................................................17

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,*
  214 F.3d 1372 (D.C. Cir. 2000) ............................................................................9

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,*
  525 F.3d 370 (4th Cir. 2008) .................................................................................11

*United States v. Bank of New England, N.A.,*
  821 F.2d 844 (1st Cir. 1987) .................................................................................5

*United States v. Philip Morris USA Inc.,*
  566 F.3d 1095 (D.C. Cir. 2009) ............................................................................5

* *United States v. Sci. Applications Int'l Corp.,*
  626 F.3d 1257 (D.C. Cir. 2010) ................................................................... *passim*

*United States v. Sci. Applications Int'l Corp.,*
  653 F. Supp. 2d 87 (D.D.C. 2009) ........................................................................22

*United States ex rel. Taylor-Vick v. Smith,*
  513 F.3d 228 (5th Cir. 2008) .................................................................................11

**Statutes**

31 U.S.C. § 3729(a)(1) ..............................................................................................4

31 U.S.C. § 3729(a)(2) ..............................................................................................4

31 U.S.C. § 3729(b) ..................................................................................................2

## I.    INTRODUCTION

Despite the D.C. Circuit's emphasis on "strict enforcement of the [False Claims]

Act's . . . scienter requirement[ ]" in implied certification cases, the Government's opposition

brief gives short shrift to this critical element of FCA liability.  *United States v. Sci. Applications*

*Int'l Corp.*, 626 F.3d 1257, 1261, 1270-71 (D.C. Cir. 2010) ("*SAIC IV*").  But the

Government's effort to create a disputed issue of fact on scienter fails because it is unable to

identify a single SAIC employee who simultaneously possessed the two elements of scienter

required by the D.C. Circuit's decision in this case.

The Government's scienter analysis ignores the D.C. Circuit's holding that scienter

cannot be established using the collective knowledge theory.  *SAIC IV*, 626 F.3d at 1271,

1273-77.  In direct conflict with the D.C. Circuit's decision, the Government insists that it

can satisfy the two-part scienter requirement by piecing together the knowledge of multiple

SAIC employees.  DOJ Opp'n 27.  The D.C. Circuit made clear, however, that to prove

scienter, the Government must identify a *specific* SAIC employee who, at the time SAIC was

allegedly submitting false claims, (1) knew, or was recklessly unaware, that SAIC was

violating its conflict-of-interest obligations and (2) knew, or was recklessly unaware, that

compliance with those obligations was material to the Government's decision to pay SAIC's

claims.  *SAIC IV*, 626 F.3d at 1271.

The Government's fallback effort to meet that standard fails as a matter of law

because it rests on a diluted version of the scienter requirement.  The Government

erroneously focuses, for example, on whether SAIC employees had knowledge of underlying

facts about work that SAIC was performing—rather than on whether SAIC employees knew

that such relationships purportedly constituted conflicts of interest.  Even if SAIC employees were aware of SAIC's allegedly conflicting work, the Government cannot establish the first element of the scienter requirement without demonstrating that the employees also knew that the work in question created a conflict of interest.  *SAIC IV*, 626 F.3d at 1271, 1276.

Moreover, the Government's continued insistence that SAIC's compliance system manifests reckless disregard or deliberate ignorance is at odds with the uncontradicted evidence.  Indeed, the Government's own admissions establish that SAIC's system for identifying and addressing possible conflicts of interest was comprehensively designed and enforced, and that any failures in the system reflected, *at most*, negligence on the part of SAIC.  As the D.C. Circuit made clear, "Congress clearly had no intention to turn the FCA, a law designed to punish and deter fraud, into a vehicle for either punishing honest mistakes or incorrect claims submitted through mere negligence or imposing a burdensome obligation on government contractors rather than a limited duty to inquire." *SAIC IV*, 626 F.3d at 1274 (internal quotation marks and brackets omitted); *see also* 31 U.S.C. § 3729(b) (2008) (defining "knowingly" to include only actual knowledge, deliberate ignorance, or reckless disregard).

Finally, nothing in the D.C. Circuit's opinion or this Court's post-trial opinion forecloses SAIC's motion for summary judgment as to FCA liability.  No prior opinion in this case has identified a specific SAIC employee who simultaneously possessed the two components of scienter required by the D.C. Circuit.  Summary judgment in favor of SAIC is therefore warranted.

## II.   ARGUMENT

**A.   THE GOVERNMENT'S PRIMARY ARGUMENT—THAT IT IS NOT REQUIRED TO IDENTIFY A SPECIFIC SAIC EMPLOYEE WHO KNEW BOTH THAT SAIC WAS VIOLATING ITS CONFLICT-OF-INTEREST OBLIGATIONS AND THAT COMPLIANCE WITH THOSE OBLIGATIONS WAS MATERIAL—CONTRAVENES THE D.C. CIRCUIT'S DECISION.**

The Government takes the untenable position that it need not prove that a particular SAIC employee simultaneously knew that (1) the company was violating its conflict-of-interest obligations and (2) compliance with those obligations was material to the Government's payment decisions.  *See* DOJ Opp'n 28.  This argument flatly contradicts the D.C. Circuit's unambiguous holding in this case.

The Government contends that "SAIC has not pointed to a single case in support of its assertion that, in order to demonstrate a corporation's knowledge under the FCA, the United States must demonstrate that one 'single actor' knew all facts underlying the defendant's liability under the FCA."  DOJ Opp'n 30.  The Government is wrong.  Not only has SAIC pointed to such a case, but the opinion to which SAIC points is the D.C. Circuit's opinion in *this very case.*

On appeal, the D.C. Circuit held that establishing scienter "on the basis of implied certification requires the plaintiff to prove that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay."  *SAIC IV*, 626 F.3d at 1271.  The court emphasized that FCA plaintiffs must "prove[ ] *both*" components of the scienter standard "based on the proper standard for knowledge—*which . . . excludes 'collective knowledge.'*"  *Id.* (emphases added). The collective knowledge theory, the D.C. Circuit explained, improperly "allows a plaintiff to

prove scienter by piecing together scraps of innocent knowledge held by various corporate officials." *Id.* at 1275 (internal quotation marks omitted).  Instead of relying on the artificial aggregation of multiple employees' knowledge, the Government must identify a specific employee who possessed both components of scienter.  *Id.* at 1271, 1275.

The D.C. Circuit's holding—that, in an implied certification case, a single employee must have known about both the underlying violation and its materiality—flows directly from the statutory requirement that a defendant have "knowingly present[ed], or cause[d] to be presented . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1); *see also id.* § 3729(a)(2) (establishing liability for a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government").  In implied certification cases, a claim is not false unless the defendant fails to comply with a legal requirement that "is material to the government's decision to pay."  *SAIC IV*, 626 F.3d at 1271.  Accordingly, an individual does not "know[ ]" that a claim is false unless she knows that the defendant is failing to comply with a legal requirement *and* knows that compliance with that requirement is material to the Government's decision to pay.  *See id.*; *see also* 31 U.S.C. § 3729(a)(1).

The Government claims that "at no point does the D.C. Circuit's opinion articulate the standard posited by SAIC."  DOJ Opp'n 27-28.  Specifically, the Government asserts that "[n]othing in the Circuit Court's opinion suggests . . . that an individual SAIC employee must have had knowledge both that SAIC was in violation of SAIC's organizational conflict of interest requirements and that the same employee must simultaneously have knowledge

4

that SAIC's organizational conflict of interest requirements were material to the NRC's

payment decision." *Id.* at 28.  The Government is incorrect.  As the D.C. Circuit stated:

> Establishing knowledge . . . on the basis of implied certification requires the
> plaintiff to prove that the defendant knows (1) that it violated a contractual
> obligation, and (2) that its compliance with that obligation was material to the
> government's decision to pay.  If the plaintiff proves both, and does so based
> on the proper standard for knowledge—which . . . excludes "collective
> knowledge" . . . —then it will have established that the defendant sought
> government payment through deceit, surely the very mischief the FCA was
> designed to prevent.

*SAIC IV*, 626 F.3d at 1271 (emphasis added).  In an implied certification case, liability must

be premised on an individual employee having the requisite mental state.

The requirement that a single employee possess both elements of scienter is

confirmed by well-settled tort law and agency principles.  SAIC Mot. for Summ. J. on False

Claims Act Liability ("SAIC Liability Mot.") 15 n.3.  In *Saba v. Compagnie Nationale Air France*,

78 F.3d 664 (D.C. Cir. 1996), for example, the D.C. Circuit explained that "the acts of an

agent . . . can be attributed to its principal[,] . . . [b]ut the agency relationship cannot

transform" an innocent state of mind into a culpable state of mind by aggregating the mental

state of multiple employees.  *Id.* at 670 n.6.  And, in the fraud context, the D.C. Circuit has

emphasized that "proscribed corporate intent depends on the wrongful intent of *specific*

employees." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118, 1122 (D.C. Cir.

2009) (emphasis added), *cert. denied sub nom. Lorillard Tobacco Co. v. United States*, 130 S. Ct.

3502 (2010).

In addition to clinging to the "easily distinguishable" decision in *United States v. Bank*

*of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987) (*see SAIC IV*, 626 F.3d at 1275), the

Government relies heavily on the Fourth Circuit's decision in *United States ex rel. Harrison v.*

*Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003). *See* DOJ Opp'n 28-30. According to the Government, *Harrison* rejected a "single actor" theory of knowledge because that theory would supposedly allow corporations to immunize themselves from FCA liability by compartmentalizing roles within the corporation. *Id.* at 28-29. But *Harrison* is completely inapposite here because it was *not* an implied certification case and therefore did not implicate the "strict[ly] enforce[d]" two-part scienter requirement that applies in such cases. *See Harrison*, 352 F.3d at 912-13, 916, 918 (describing the defendant's *express* certification, as well as the jury instructions and jury interrogatories); *SAIC IV*, 626 F.3d at 1270-71 (holding that, in *implied* certification cases, the scienter and materiality requirements must be "strict[ly] enforce[d]").

Furthermore, contrary to the Government's reading of the case, the relator in *Harrison* was required to prove that at least one of the defendant's employees "knew of the *wrongful* conduct"—which means that the relator was required to establish the defendant's knowledge of falsity, not merely knowledge of the underlying facts. *Harrison*, 352 F.3d at 918 n.9 (emphasis added). In any event, even if the Government's strained interpretation of *Harrison* were correct, that decision would still be inconsistent with the controlling scienter standard adopted by the D.C. Circuit in this case. *Compare SAIC IV*, 626 F.3d at 1271-77, *with Harrison*, 352 F.3d at 917-21; *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1191-92 (2011) (distinguishing between *Harrison* and the D.C. Circuit's decision in this case). In fact, the D.C. Circuit's decision expressly *rejected* the Government's argument that it is appropriate to aggregate the knowledge of multiple individuals in order to prevent corporations "from evading liability by compartmentalizing knowledge." *SAIC IV*, 626 F.3d at 1275 (internal

quotation marks and brackets omitted).  The court explained that there is no reason to expand the scienter inquiry to encompass the combined mental states of multiple individuals because the FCA's deliberate ignorance and reckless disregard standards already prevent a corporation from "evading liability by compartmentalizing knowledge."  *Id.* at 1275-76 (brackets omitted).

Moreover, like its threshold scienter argument, the Government's insistence that, "[a]t the very least, a factfinder should be permitted" to rely on "the *cumulative* knowledge of SAIC employees" is merely an attempt to reargue the position that the D.C. Circuit rejected. DOJ Opp'n 30 n.4 (emphasis added).  The Government cannot simply replace the label "collective knowledge" with "cumulative knowledge," and then proceed as if the D.C. Circuit's opinion did not exist.  Whatever label is used, the D.C. Circuit's opinion plainly forecloses efforts to prove scienter by aggregating the mental states of multiple individuals. *See SAIC IV*, 626 F.3d at 1271, 1273-74, 1276.

## B.  THE GOVERNMENT FAILS TO IDENTIFY ANY SAIC EMPLOYEE WHO POSSESSED BOTH ELEMENTS OF SCIENTER.

As a fallback argument, the Government maintains that, even if it is required to identify a particular SAIC employee who knew about an alleged conflict of interest and its materiality to the Government, summary judgment remains inappropriate.  The Government's effort to manufacture a triable issue of fact contravenes both the scienter and materiality standards established by the D.C. Circuit, and patently ignores the court's call for "strict enforcement" of these requirements.  *SAIC IV*, 626 F.3d at 1261, 1270-71.

1.    **The Government Erroneously Focuses On Knowledge Of Underlying Facts—Instead Of Knowledge Of Falsity.**

The Government insists that, to establish scienter, "it is sufficient for the United States to demonstrate that individual employees knew, or were recklessly unaware, of the *basic facts* giving rise to FCA liability." DOJ Opp'n 31 (emphasis added). The Government emphasizes, for example, that certain SAIC employees "worked on and/or had actual knowledge of the BNFL project and also had actual knowledge of SAIC's work for the NRC." *Id.* at 10. Similarly, the Government alleges that certain SAIC employees "had actual knowledge of both SAIC's work on the BJC Dose Assessment Project and SAIC's work for the NRC." *Id.* at 12; *see also id.* at 13-14 (ARMR); *id.* at 14-15 (Plasma Hearth Process); *id.* at 15-16 (Alaron). According to the Government, the scienter standard is "[s]urely" satisfied if the Government can prove that one or more individual SAIC employees "(1) knew about SAIC's work for the NRC; (2) knew about SAIC's situations and relationships; and (3) understood that they had an obligation to avoid and disclose potential organizational conflicts of interest to their customers." *Id.* at 30. The Government is incorrect.

As the D.C. Circuit explained in this case, the FCA requires knowledge of *falsity*—not merely knowledge of underlying facts. The "key statutory terms 'knowing' and 'knowingly' are . . . defined to include a defendant's 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard' *of the truth or falsity of information* in the defendant's claim for payment or statements made to get such claims paid." *SAIC IV*, 626 F.3d at 1266 (emphasis added). Accordingly, to establish scienter, the Government must prove, among other things, that a particular SAIC employee knew that SAIC "violated a contractual obligation," not simply that the employee knew about work that the Government later alleged was a conflict of interest. *Id.*

at 1271; *see also id.* at 1276 (explaining that the scienter requirement would not only require an employee to have knowledge of the underlying relationships, but would also require that the same employee know that SAIC was violating its conflict-of-interest obligations and that such obligations were material to payment); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000). If this were not the rule, "any contracting party that misunderstands its legal entitlements and therefore fails to recover on an invoice in full would be liable under the False Claims Act." *Siewick*, 214 F.3d at 1378. That outcome would flatly contradict the D.C. Circuit's admonition that the scienter requirement must be strictly applied in the implied certification context. *SAIC IV*, 626 F.3d at 1261, 1270-71.

Indeed, it is difficult to conceive of a situation in which the Government would be unable to use its proposed scienter standard to transform a defendant's inadvertent breach of a contractual requirement into an FCA violation triggering treble damages and onerous civil penalties. In the Government's view, (1) SAIC had actual knowledge under the FCA because certain employees allegedly *knew* about SAIC's NRC work and its work with other companies in support of DOE and (2) SAIC acted with reckless disregard or deliberate ignorance because certain other employees allegedly *did not know* about the company's NRC work and its work with other companies in support of DOE. In other words, the Government's position would mean that a defendant facing conflict-of-interest allegations will almost always have scienter because its employees will either *know* about the existence of the relevant contractual relationships (in which case they will have actual knowledge) or the employees will *not know* about the existence of the relevant contractual relationships (in

which case they will have acted with reckless disregard or deliberate ignorance). The D.C. Circuit's opinion did not create such a toothless scienter requirement.

###   2.   The Government Distorts The Materiality Element Of The Scienter Requirement.

The Government also contends that it can satisfy the second component of the D.C. Circuit's scienter requirement—knowledge that compliance was material to the Government's decision to pay SAIC's claims—by proving that SAIC employees knew that SAIC had conflict-of-interest obligations and that the employees took those obligations seriously or otherwise knew that compliance was important in some vague and abstract sense. DOJ Opp'n 32-34. Under the D.C. Circuit's decision, however, this component of scienter requires an employee to have known that SAIC's compliance with its conflict-of-interest obligations "was material to the government's *decision to pay*" the contractor's claims. *SAIC IV*, 626 F.3d at 1271 (emphasis added); *see also id.* at 1261, 1267-68. Scienter therefore cannot be established based on an employee's amorphous understanding that those obligations were generally important to the Government. *See id.* at 1271 (linking the materiality inquiry to the "decision *to pay*") (emphasis added).

The Government's contrary argument would eviscerate the materiality component of the FCA's scienter requirement. That unprecedented position should be rejected because it has no support in the D.C. Circuit's decision and—in conflict with the objectives of the FCA—would improperly impose FCA liability on companies engaged in a good-faith effort to comply with contractual obligations. Such a result would contravene the D.C. Circuit's holding that the "materiality and scienter requirements" must be "strict[ly] enforce[d]" so that "the government and *qui tam* relators" cannot abuse the FCA by "turn[ing] the violation

of minor contractual provisions into an FCA action" (*SAIC IV*, 626 F.3d at 1270), or as several other courts have observed, by converting negligence and breach-of-contract actions into full-blown FCA cases (*see United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231-32 (5th Cir. 2008); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 373, 378 (4th Cir. 2008)).

**3.    The Evidence Cited By The Government To Support Its Fallback Argument Does Not Create A Genuine Dispute As To Whether A Specific SAIC Employee Knew Both That SAIC Was Violating Its Conflict-Of-Interest Obligations And That Compliance Was Material.**

The Government specifically identifies five SAIC employees who purportedly knew that SAIC was violating its conflict-of-interest obligations and that those obligations were material to the Government's decision to pay SAIC's claims.  *See* DOJ Opp'n 32-33.  But even minimal scrutiny makes clear that these arguments are legally and factually insufficient to create a genuine dispute as to scienter.[1]

**a.    Steve Turner did not act with scienter.**

The Government alleges that Steve "Turner simultaneously knew of SAIC's work for the NRC and of SAIC's efforts on the BNFL Oak Ridge Recycle Project, SAIC's efforts on

---

[1]  The Government makes a number of significant factual concessions that reflect the paucity of evidentiary support for its scienter argument.  For example, the Government expressly concedes that it did not present *any* evidence at trial that John Pierce Martin, Thomas Rodehau, Sandra Carter, or Dr. Mark Otis had *actual knowledge* within the meaning of the FCA of conflicts of interest.  *See* DOJ Resp. Stmt. of Genuine Issues & Material Facts ("DOJ Resp. Stmt.") ¶¶ 21-22, 31, 53, 56.  The Government also undermines any argument that SAIC had actual knowledge when it admits that "the evidence at trial was largely that, categorically and as a matter of law, SAIC employees somehow believed that absolutely no OCI concern could exist with respect to work for the NRC so long as the overlapping work was performed for a DOE contractor, regardless of the nature of the work or the financial interest of the DOE contractor in the work performed for the NRC."  *Id.* ¶ 71.

the Plasma Hearth Process, and SAIC's planned work on the Alaron Recycle Project."  DOJ Opp'n 32; *see also* DOJ Resp. Stmt. ¶¶ 213-14.  Even if that allegation were true, however, it would be insufficient to establish the first component of scienter because it speaks only to Turner's knowledge of underlying facts—not to his knowledge that SAIC had a conflict of interest.  *See supra* at 8-10.

Moreover, to the extent the Government may be attempting in its factual statement to allege that Turner knew that SAIC's work with BNFL created a conflict of interest, that allegation is inconsistent with the undisputed evidence.  Indeed, it is uncontradicted that Turner did not even know that SAIC was working on the NRC contracts until the conflict-of-interest allegations were raised in November 1999 (Turner Test., 7/8 p.m. Tr. 111 (attached as Exh. 6 to SAIC's Opposition to the Government's Motion)); he thus could not possibly have acted with scienter during the time that SAIC was submitting claims to the Government under those contracts while purportedly failing to disclose its relationship with BNFL.  In any event, Turner testified that he and others involved in the work for BNFL believed that such work was regulated by DOE.  *See id.* at 104:13-23 (Turner's testimony that he, "BNFL and everybody else in the project understood that DOE would be the regulating authority for the Three-Building Project"); *see also* SAIC Stmt. of Undisputed Material Facts in Support of Mot. for Summ. J. on FCA Liability ("SAIC Stmt.") ¶¶ 6, 12, 44, 45, 50, 60, 77 (discussing Turner's testimony).

The Government's allegations regarding the second component of scienter fare no better.  The Government alleges that Turner "took organizational conflict of interest compliance very seriously and . . . understood that compliance with SAIC's organizational

conflicts of interest obligations was very important." DOJ Opp'n 32. But taking compliance seriously—or understanding in an abstract sense that compliance was important—is insufficient as a matter of law to establish knowledge that a contractual obligation was material. The Government must instead demonstrate that Turner knew that SAIC's compliance with its conflict-of-interest obligations "was material to the government's *decision to pay*" SAIC's claims. *SAIC IV*, 626 F.3d at 1271 (emphasis added). The Government does not point to any evidence supporting that conclusion.

### b.    Michael McKenzie-Carter did not act with scienter.

The Government's arguments regarding Michael McKenzie-Carter suffer from many of the same flaws as its arguments relating to Turner's purported knowledge. According to the Government, "McKenzie-Carter had knowledge of SAIC's work for the NRC and SAIC's concurrent work on the BJC Dose Assessment Project, SAIC's work on the BNFL Oak Ridge Recycle Project, and SAIC's relationship with ARMR." DOJ Opp'n 32. But these allegations pertain merely to knowledge that SAIC performed certain work, not to knowledge that such work created conflicts of interest.

As to the second component of scienter, the Government asserts that McKenzie-Carter "understood that SAIC had a very important obligation to avoid and disclose potential organizational conflicts of interest to the NRC." DOJ Opp'n 32. Understanding in an abstract sense that compliance was important, however, is not sufficient to establish knowledge that SAIC's compliance with its conflict-of-interest obligations "was material to the government's decision to pay." *SAIC IV*, 626 F.3d at 1271.

### c.   Alex Murray did not act with scienter.

The Government continues to insist that Alex Murray "not only simultaneously knew of SAIC's work for the NRC and SAIC's efforts on the BNFL Oak Ridge Recycle Project, but he was so concerned about the potential for an organizational conflict of interest with respect to SAIC's dual roles that he raised his concerns with Turner and others, including the project manager for the 1992 NRC Contract."  DOJ Opp'n 32.  As an initial matter, Murray's purported concerns relate to only *one* of the alleged conflicts of interest—SAIC's work with BNFL (*see id.*; DOJ Resp. Stmt. ¶¶ 139-41)—which the Government now admits was "subject to DOE oversight" (DOJ Resp. Stmt. ¶ 14).[2]  Moreover, Murray's ambiguous and misguided concerns do not establish his knowledge of a purported conflict of interest because his "concerns" were tentative, equivocal, vague, and internally inconsistent.  SAIC Stmt. ¶¶ 58-64; SAIC Liability Mot. 23-25, 39, 41-42.  For example, Murray acknowledged that, when he raised his vague concerns, his message was little more than an attempt to "encourage communications" between SAIC employees because he felt that "it is a generally good thing for different parts of a company to know what they're doing, synergism, cross-fertilization of ideas, et cetera."  Murray Test., 7/2 p.m. Tr. 76:18-77:6 (attached as Exh. 33 to SAIC Liability Mot.); *see also id.* at 89:24-90:12.

The Government likewise misses the mark when it attempts to show that Murray knew about the alleged materiality of SAIC's conflict-of-interest obligations.  The Government asserts that Murray "fully understood the importance of compliance with

---

[2]  The Government believes that the project was also subject to the oversight of other regulators.  DOJ Resp. Stmt. ¶ 14.

SAIC's organizational conflict of interest obligations." DOJ Opp'n 32. As explained above, however, simply understanding in a general sense that compliance was important is not enough to establish knowledge that SAIC's compliance with its conflict-of-interest obligations was material. *SAIC IV*, 626 F.3d at 1271.

> ### d. Neither Jeffrey Slack nor Thomas Rucker acted with scienter.

Finally, the Government maintains that Jeffrey Slack and Thomas Rucker "understood . . . a potential organizational conflict of interest arose whenever SAIC was assisting a government agency in a technical area and simultaneously assisting any other entity in the same technical area," and that they both "had knowledge of SAIC's work for the NRC[,] . . . SAIC's work on the BJC Dose Assessment Project[,] and the BNFL Oak Ridge Recycle Project." DOJ Opp'n 33. As with other employees singled out by the Government, however, these allegations pertain merely to knowledge that SAIC performed certain work, not knowledge that such work created conflicts of interest. In any event, the Government tacitly acknowledges that Slack and Rucker lacked actual knowledge of any conflicts of interest. *See* DOJ Resp. Stmt. ¶ 169 (Slack "testified that he never even considered whether SAIC's efforts on the BJC Dose Assessment Project and SAIC's work for the NRC could constitute an organizational conflict of interest . . . because he believed that SAIC's potentially conflicting work was performed for DOE and therefore could not be in conflict with work that SAIC was performing for the NRC"); *id.* ¶ 175 ("Rucker testified that . . . he believed that SAIC's potentially conflicting work was performed for DOE and therefore 'it never crossed [his] mind' that the two projects could create a potential conflict of interest" (brackets in original)); *see also id.* ¶ 71. Moreover, the Government's contention

that Slack and Rucker believed that performing work in the same technical area as the work for the NRC constituted a *per se* conflict of interest is inconsistent with SAIC's contractual conflict-of-interest obligations, under which the mere performance of work in the same technical area, standing alone, cannot create a conflict.  *See* DOJ Opp'n 7 (quoting the conflict-of-interest standards).

The Government also asserts that Slack and Rucker "understood that SAIC was obligated to avoid and disclose potential organizational conflicts of interest to the NRC." DOJ Opp'n 32-33.  Yet, the mere awareness of conflict-of-interest obligations cannot establish that Slack and Rucker knew that SAIC's compliance with its conflict-of-interest obligations "was material to the government's decision to pay."  *SAIC IV*, 626 F.3d at 1271. Moreover, to the extent that the cited paragraphs of the Government's factual statement assert that Slack and Rucker understood in a general sense that compliance was important (*see* DOJ Resp. Stmt. ¶¶ 169, 175), such knowledge would also be legally insufficient to establish scienter because it is not specifically linked to the Government's decision to pay SAIC's claims.

## C. NO REASONABLE JURY COULD FIND THAT SAIC'S COMPLIANCE SYSTEM DEMONSTRATED THAT THE COMPANY ACTED WITH RECKLESS DISREGARD OR DELIBERATE IGNORANCE.

The Government's admissions in its summary judgment briefing eliminate any dispute of fact as to whether SAIC acted in reckless disregard or deliberate ignorance of the veracity of its claims or statements.  The Government's admissions conclusively establish

that SAIC made a reasonable, good-faith effort to establish an effective conflict-of-interest compliance system.[3]

The Government must make an exacting showing to prove reckless disregard or deliberate ignorance based on an allegedly faulty compliance system. To meet that burden, it is insufficient for the Government merely to show that a compliance system is imperfect. SAIC Liability Mot. 30-32, 40-41; *see, e.g.*, *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 106-08, 110 (3d Cir. 2007); *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 298 F. Supp. 2d 91, 100-01 (D.D.C. 2004). In *Hefner*, for example, the Third Circuit held that, despite "a breakdown in [defendant's] billing system" that caused double-billing, there was not "sufficient evidence for a reasonable jury to conclude that [defendant's] conduct satisfied the FCA's scienter requirement." 495 F.3d at 106, 108. Staff turnover in defendant's billing department had resulted in no one entering the billing code that was necessary to prevent double-billing. *Id.* at 107. The court held that defendant did not act in reckless disregard of the truth because defendant had "formalized practices that were already in place" in an attempt to ensure compliance. *Id.* at 110. Although defendant's billing system did not function as intended, the Third Circuit emphasized that "[t]he mere failure of a system to catch an error does not establish recklessness." *Id.*

---

[3] The Government's contention that the D.C. Circuit's "opinion in no way changed the legal standard for either reckless disregard or deliberate ignorance" (DOJ Opp'n 35) is incorrect. The D.C. Circuit explained that the FCA's scienter standard can be satisfied by actual knowledge, reckless disregard, or deliberate ignorance—and the court's subsequent statements about the scienter requirement (including its rejection of the Government's collective knowledge theory) apply with equal force to all three aspects of the scienter standard. *See SAIC IV*, 626 F.3d at 1266, 1271-77.

Similarly, an FCA decision from this District explicitly rejected the argument that the "fail[ure] to install a system by which concerns . . . were to be routed to the responsible personnel" establishes reckless disregard. *Hamilton Sec. Grp.*, 298 F. Supp. 2d at 101. Indeed, the court declared that it was aware of no authority supporting "the proposition that failure to implement proper channels of communication may constitute gross negligence, let alone extreme gross negligence under the False Claims Act." *Id.* "Proof of reckless disregard," the court emphasized, "requires much more than errors, even egregious errors." *Id.*

The Government's opposition brief fails to address the *Hefner* and *Ervin* decisions. What is more, the Government does not identify a single FCA case in which scienter was based on an inadequate compliance system, and we can find none. This would be the first. Moreover, the Government cites no precedent (except for the opinions in this case) in the section of its brief that addresses reckless disregard and deliberate ignorance. This deficiency is compounded by the fact that the Government's critiques of SAIC's compliance system are fundamentally inconsistent with well-established benchmarks for compliance systems. *See* SAIC Liability Mot. at 39-40 (discussing this point in detail). Any ruling that the purported imperfections in SAIC's compliance system demonstrate reckless disregard or deliberate ignorance under the FCA would go against the grain of these benchmarks and would revolutionize the requirements for corporate compliance systems.[4]

---

[4] Additionally, if the purported imperfections in SAIC's compliance system could demonstrate scienter, it would transform the FCA into the weapon of choice for failure-to-monitor claims. Under Delaware corporate law, "the necessary conditions predicate for director oversight liability" are that "(a) the directors utterly failed to implement *any* reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations[,] thus disabling themselves

In light of the authority discussed above, the admissions made in the Government's opposition materials establish as a matter of law that, notwithstanding the Government's nitpicking regarding SAIC's compliance system, SAIC's good-faith effort to comply with its obligations does not amount to reckless disregard or deliberate ignorance:

- "SAIC had a program to identify and address potential conflicts of interest . . . ." DOJ Resp. Stmt. ¶ 71; *see also* DOJ Opp'n 16 ("SAIC had a compliance system related to organizational conflicts of interest . . . .").

- "SAIC had a formal policy that it would not engage in contracts where there could be conflict with SAIC's other work." DOJ Resp. Stmt. ¶ 65 (internal quotation marks omitted).

- "Each SAIC employee was trained on how to recognize potential organizational conflicts of interest and on the need to appropriately escalate such situations." DOJ Opp'n 33; *see also id.* at 25 ("[E]ach and every SAIC employee was . . . trained on organizational conflict of interest compliance."); DOJ Resp. Stmt. ¶ 67.

- "SAIC had a Business Ethics Handbook that addressed conflicts of interest; every employee was required to read this handbook and sign a certification annually." DOJ Resp. Stmt. ¶ 68.

- "All SAIC employees had an obligation to report within the organization any concerns or information about potential or actual conflicts of interest." DOJ Resp. Stmt. ¶ 69.

- "SAIC had a searchable contracts management database . . . ." DOJ Resp. Stmt. ¶ 87.

- "The first step in SAIC's compliance system was set in motion when an SAIC contract representative received a Request for Proposal ('RFP'). Upon receipt of an RFP, the contract representative would read and analyze the RFP, focusing

---

from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (first emphasis added). It would make little sense for the FCA—a punitive anti-fraud statute—to utilize a more lenient standard for such claims than the standard used in run-of-the-mill corporate-law cases. There must be evidence that the company knowingly designed a compliance system to keep the "left hand" from knowing what the "right hand" was doing, or that the company disregarded compliance systems at all. The record here is worlds away from either scenario.

specifically on any conflict-of-interest clauses or other clauses that might limit future contracts." DOJ Resp. Stmt. ¶ 76.

- "For large procurements, SAIC had an acquisition council that would evaluate certain opportunities early on—typically, before a proposal was submitted—to determine, among other things, whether the proposed opportunity presented any conflicts of interest." DOJ Resp. Stmt. ¶ 77.

- "Under SAIC's compliance system, a notification would be electronically routed to other groups within SAIC to inform them about the work on which SAIC was considering bidding and to delineate the types of restrictions that the proposal might involve. Such notifications were sent via an electronic routing form that identified the potential customer, described the work on which SAIC was considering bidding, and detailed the relevant conflict-of-interest provisions. SAIC's contracts staff was 'trained on how to summarize the scope of work for purposes of using this system.'" DOJ Resp. Stmt. ¶ 78 (citations omitted).

- "Once a conflict-of-interest routing was circulated through SAIC's system, the routings were received by SAIC's senior contracts staff, who were involved in contracts operations at the business unit level. Those individuals were responsible for comparing the routings against the contracts that existed within their respective parts of the company, and for identifying, and alerting others to, any conflicts of interest." DOJ Resp. Stmt. ¶ 79 (citations omitted).

- "If the contracts staff person who received a routing needed additional information, she could forward the routing to other SAIC employees." DOJ Resp. Stmt. ¶ 80.

- "In carrying out his responsibility to review the conflict-of-interest routings, Rodehau 'would meet' with his program managers 'at least on a weekly basis [to] review[ ] the routings.'" DOJ Resp. Stmt. ¶ 80 (alterations in original).

- "If no possible conflict-of-interest issues were raised as a result of the routing process, SAIC would then submit its bid. If issues were raised, however, the contract representative who circulated the routing would investigate the issue further and would share the relevant information with SAIC's technical staff. The contract representative who circulated the routing and the employees who responded with a possible conflict-of-interest issue would then confer and determine whether there was a way to mitigate the conflict so that SAIC could submit a bid. If the two groups could not agree, SAIC's Corporate Contracts Department would assist and determine the best approach. If there was no consensus within SAIC as to how to proceed, SAIC would not submit the bid." DOJ Resp. Stmt. ¶ 81 (citations omitted).

Despite these admissions—which establish that SAIC had a comprehensive and sophisticated conflicts compliance system—the Government argues that summary judgment is inappropriate because John Pierce Martin and Thomas Rodehau, SAIC's contracts staff on the 1992 and 1999 Contracts, purportedly made conflict-of-interest certifications "without critical knowledge about SAIC's relationships with commercial entities in the areas of radioactive release and recycle."  DOJ Opp'n 37.  As a matter of law, however, the "fail[ure] to install a system by which concerns . . . were to be routed to the responsible personnel" does not establish reckless disregard.  *Hamilton Sec. Grp.*, 298 F. Supp. 2d at 101.  In any event, Martin testified that, even after he was shown the relevant documents at trial, the documents did not make him "question the truthfulness or accuracy of SAIC's response to the NRC's cure notice."  SAIC Stmt. ¶ 24 (internal quotation marks omitted).

Moreover, the Government's repetition of its argument that Murray felt SAIC's structure inhibited communication within the organization (DOJ Opp'n 37) cannot overcome the fact that his speculative and internally inconsistent testimony is a legally insufficient basis for a reasonable jury to find scienter (*see* SAIC Liability Mot. 42).  Murray knew that SAIC's policy was to avoid conflicts; he knew that SAIC wanted any employee who believed there was a problem to report that concern to the company; and he knew that SAIC's "management would be quite concerned about the possibility of a conflict of interest if one truly existed."  SAIC Stmt. ¶ 59.  In addition, Murray testified that, because of SAIC's structure, "there was a much greater emphasis placed on communication, trying to find out what other parts of SAIC were doing."  *Id.* ¶ 64.

Finally, the Government complains that "SAIC's system did not adequately account for the fact that its obligations to the NRC did not end after contract award but continued for the life of SAIC's NRC Contracts."  DOJ Opp'n 17.  But the uncontradicted evidence is plainly to the contrary:  SAIC did utilize its compliance system after contract award.  SAIC Stmt. ¶¶ 88-89.  Indeed, SAIC performed a due diligence check before making certifications, and it also used the conflict-of-interest routing system in connection with proposals for substantive modifications.  *Id.*

## D.   NOTHING IN THE D.C. CIRCUIT'S OPINION OR THIS COURT'S POST-TRIAL RULING FORECLOSES SUMMARY JUDGMENT.

In a final effort to evade summary judgment, the Government contends that various statements previously made by the D.C. Circuit and this Court recognize the existence of a disputed issue of material fact as to scienter.  *See* DOJ Opp'n 22, 35.  As an initial matter, the Government leans heavily on language it extracts from the D.C. Circuit's harmless-error analysis, but that analysis in no way controls the question whether summary judgment on remand is warranted.  Those statements, moreover, focused primarily on the first component of the scienter requirement (knowledge of conflicts of interest), not the second component (knowledge that compliance with conflict-of-interest obligations was material).  *SAIC IV*, 626 F.3d at 1272-73; *United States v. Sci. Applications Int'l Corp.*, 653 F. Supp. 2d 87, 99 (D.D.C. 2009) ("*SAIC III*").  Neither the D.C. Circuit's opinion nor this Court's post-trial opinion states that the evidence could support a finding that the *same* SAIC employee knew both (1) that SAIC had conflicts of interest that violated its contractual requirements *and* (2) that compliance with those requirements was material to the Government's decision to pay.  *SAIC IV*, 626 F.3d at 1272; *SAIC III*, 653 F. Supp. 2d at 95-99.  Accordingly, nothing in

these opinions—or in the D.C. Circuit's affirmance of this Court's denial of SAIC's post-trial motions—establishes that a reasonable jury could find that SAIC fell within the stringent scienter standard set forth by the D.C. Circuit in this case.

## III.   CONCLUSION

The Government's argument that it need not identify a specific SAIC employee who simultaneously possessed both elements of scienter directly contravenes the D.C. Circuit's holding in this case.  Moreover, the Government's fallback attempt to identify a specific employee who simultaneously possessed both elements of scienter fails because this argument rests on an impermissibly diluted version of the FCA's scienter and materiality requirements.  Finally, in light of the Government's admissions and the complete lack of authority supporting the Government's attack on SAIC's compliance system, there is no basis on which to hold that SAIC's compliance system demonstrates reckless disregard or deliberate ignorance.  Accordingly, and for all of the foregoing reasons, SAIC is entitled to summary judgment on Counts I and II.


Dated:  September 22, 2011                    Respectfully submitted,

                                              ___/s/ Andrew S. Tulumello___
John P. Rowley, III                           Andrew S. Tulumello (D.C. Bar No. 468351)
(D.C. Bar No. 392629)                         Amir C. Tayrani (D.C. Bar No. 490994)
BAKER & McKENZIE LLP                          Ryan J. Watson (D.C. Bar No. 986906)
815 Connecticut Avenue, N.W.                  GIBSON, DUNN & CRUTCHER LLP
Washington, D.C.  20006                       1050 Connecticut Avenue, N.W.
Telephone: (202) 835-6151                     Washington, D.C.  20036
E-mail:                                       Telephone: (202) 955-8657
john.rowley@bakermckenzie.com                 E-mail: atulumello@gibsondunn.com

*Counsel for Defendant Science Applications International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22d day of September 2011, I filed the foregoing with the

Clerk of Court via the CM/ECF system, which will send notification of such filing to the

counsel of record in this matter who are registered on the CM/ECF system.

<div style="margin-left: 45%;">

 /s/ Andrew S. Tulumello    
Andrew S. Tulumello (D.C. Bar No. 468351)  
GIBSON, DUNN & CRUTCHER LLP  
1050 Connecticut Avenue, N.W.  
Washington, D.C.  20036  
Telephone: (202) 955-8657  
E-mail: atulumello@gibsondunn.com

</div>