# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 04-cv-1543 (RWR) |
| SCIENCE APPLICATIONS INTERNATIONAL CORPORATION, | ) | |
| Defendant. | ) | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S MOTION FOR <u>SUMMARY JUDGMENT ON DAMAGES</u>

Andrew S. Tulumello (D.C. Bar No. 468351)
Amir C. Tayrani (D.C. Bar No. 490994)
Ryan J. Watson (D.C. Bar No. 986906)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com

John P. Rowley, III (D.C. Bar No. 392629)
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 835-6151
E-mail: john.rowley@bakermckenzie.com
*Counsel for Defendant Science Applications International Corporation*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................... 1

II.   ARGUMENT ................................................................................................... 4

  A.   THE GOVERNMENT IS COLLATERALLY ESTOPPED FROM
       RECOVERING MORE THAN $78 IN FCA DAMAGES UNDER
       THE 1992 CONTRACT. ........................................................................... 4

    1.   The Breach-Of-Contract Claim Required The Parties To
         Litigate The "Same Issue" Of Damages As The
         Government's FCA Claims. ........................................................... 4

    2.   The Jury "Actually And Necessarily Decided" The Issue
         Of Benefit-Of-The-Bargain Damages Under The 1992
         Contract. ..................................................................................... 11

    3.   There Is No "Strategic Decision" Exception To The
         Collateral Estoppel Doctrine. ...................................................... 13

  B.   THE GOVERNMENT CANNOT PROVE FCA DAMAGES
       UNDER THE 1999 CONTRACT. ............................................................. 17

III.   CONCLUSION ................................................................................................ 23

i

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

## Cases

*Bigelow v. RKO Radio Pictures, Inc.*,
   327 U.S. 251 (1946) ............................................................................................ 2, 9, 12

*Commercial Fed. Bank, F.S.B. v. United States*,
   59 Fed. Cl. 338 (2004) ............................................................................................ 10

*Electronic & Missile Facilities, Inc. v. United States*,
   416 F.2d 1345 (Ct. Cl. 1969) ................................................................................. 9

*Eves v. Am. Clearinghouse, Inc.*,
   No. 2:02-cv-665, 2006 WL 6449923 (S.D. Ohio Nov. 20, 2006)............................. 10

*Faulk v. United States*,
   198 F. 2d 169 (5th Cir. 1952) ............................................................................. 10, 11

*GE Harris Ry. Electronics, L.L.C. v. Westinghouse Air Brake Co.*,
   No. Civ. A. 99-070, 2004 WL 1854198, (D. Del. Aug. 8, 2004) ................................ 10

*In re Southeast Banking Corp.*,
   69 F.3d 1539 (11th Cir. 1995) ...................................................................... 13, 14, 15

*Martin v. DOJ*,
   488 F.3d 446 (D.C. Cir. 2007) ............................................................................. 4, 14

*Moreno v. Baca*,
   No. 00-cv-7149, 2002 WL 338366 (C.D. Cal. Feb. 25, 2002)................................... 15

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979) ................................................................................................ 17

*Patel v. Howard Univ.*,
   896 F. Supp. 199 (D.D.C. 1995) ............................................................................. 17

*Price v. Highland Cmty. Bank*,
   722 F. Supp. 454 (N.D. Ill. 1989) ........................................................................... 10

*Roseburg Lumber Co. v. Madigan*,
   978 F.2d 660 (Fed. Cir. 1992) ................................................................................ 9

*S. Cal. Fed. Sav. & Loan Ass'n v. United States,*
 422 F.3d 1319 (Fed. Cir. 2005) .................................................................. 5

*Simmons v. O'Brien,*
 77 F.3d 1093 (8th Cir. 1996) .................................................................... 14

*United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Group, Inc.,*
 370 F. Supp. 2d 18 (D.D.C. 2005) ...................................................... 17, 18

*United States ex rel. Harrison v. Westinghouse Savannah River Co.,*
 352 F.3d 908 (4th Cir. 2003) ...................................................................... 6

*United States ex rel. Miller v. Bill Harbert International Construction, Inc.,*
 608 F.3d 871 (D.C. Cir. 2010) ................................................................ 7, 9

*United States v. American Packing Corp.,*
 113 F. Supp. 223 (D.N.J. 1953) .................................................................. 9

*United States v. Bornstein,*
 423 U.S. 303 (1976) .................................................................................... 7

*United States v. Collyer Insulated Wire Co.,*
 94 F. Supp. 493 (D.R.I. 1950) ...................................................... 2, 12, 18

*United States v. Mississippi Valley Generating Co.,*
 364 U.S. 520 (1961) .................................................................................... 6

*United States v. Mouling,*
 557 F.3d 658 (D.C. Cir. 2009) ................................................................. 12

*United States v. Rogan,*
 517 F.3d 449 (7th Cir. 2008) ...................................................................... 7

* *United States v. Sci. Applications Int'l Corp.,*
 626 F.3d 1257 (D.C. Cir. 2010) ...................................................... passim

*United States v. Swift & Co.,*
 270 U.S. 124 (1926) .................................................................................. 11

*United States v. TDC Management Corp.,*
 288 F.3d 421 (D.C. Cir. 2002) .................................................................... 7

**Statutes**

18 U.S.C. § 208 ............................................................................................. 6

**Other Authorities**

Charles Alan Wright & Arthur R. Miller,
   *Federal Practice and Procedure* (3d ed. 2010)............................................. 13, 14, 16

James Wm. Moore et al.,
   *Moore's Federal Practice* (2d ed. 1995) .................................................................... 14

Restatement (Second) of Contracts (1981)..................................................... 5, 9, 10, 11

## I.     INTRODUCTION

As the D.C. Circuit held on appeal in this case, damages under the False Claims Act ("FCA") are measured using a "benefit-of-the-bargain framework." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278-79 (D.C. Cir. 2010) ("*SAIC IV*").  This standard is identical to—and *derived directly* from— contract law.  For that reason, the D.C. Circuit emphasized that this Court's "breach of contract instruction asked the jury to make *just such a valuation*" when assessing damages on the Government's breach-of-contract claim.  *SAIC IV*, 626 F.3d at 1280 (emphasis added); *see also* 7/28 Tr. 24 (Exh. 1) (instructing the jury to award breach-of-contract damages in the "amount of money necessary to place the [Government] in the same economic position it would have been if the contract had not been breached.").  On the basis of that benefit-of-the-bargain instruction, the jury found that the Government incurred $78 in damages as a result of SAIC's alleged conflicts of interest.  *See* Verdict Form (Dkt. #127) at 2. This finding collaterally estops the Government from recovering more than $78 in damages on its pending FCA claims based on the 1992 Contract.  Moreover, the undisputed facts establish that the Government is entitled to *no* FCA damages at all under the 1999 Contract.

The Government's efforts to evade the collateral-estoppel effect of the breach-of-contract finding contradict the D.C. Circuit's holding, the jury's breach-of-contract verdict, and bedrock collateral estoppel principles.  As an initial matter, the Government appears unwilling to accept the D.C. Circuit's holding regarding

the proper measure of FCA damages; indeed, it argues at length that a conflict of interest automatically entitles it to recoup *all* its payments to a contractor (*see* DOJ Opp'n 13-15, 20-27), but that is the *precise* issue it lost on appeal.  *See SAIC IV*, 626 F.3d at 1278.  The Government's claim that FCA damages can be less precise and more subjective than breach-of-contract damages (DOJ Opp'n 16-19) contradicts the D.C. Circuit's holding that the "benefit-of-the-bargain framework" (626 F.3d at 1279) applicable to FCA claims is the *same* as the damages standard applicable to breach-of-contract claims.  *SAIC IV*, 626 F.3d at 1280 (the "breach of contract instruction asked the jury to make just such a valuation" of the Government's damages).  In any event, an unbroken line of authority—from the Supreme Court to basic damages treatises—establishes that *every* FCA damages principle on which the Government relies applies with equal force to breach-of-contract damages.

The Government also advances two arguments as "fallback" positions, neither of which has merit.  First, the Government contends that the jury may not have actually decided the issue of benefit-of-the-bargain damages because its $78 verdict was merely an award of "nominal" damages.  But this Court's instructions authorized the jury to find that the Government suffered nominal damages *only* if there were "no proven damages" under the benefit-of-the-bargain standard or if the damages were  "speculative" (7/28 Tr. 24 (Exh. 1))—which is the *same* standard that applies when determining whether nominal damages are appropriate under the FCA.  *United States v. Collyer Insulated Wire Co.*, 94 F. Supp. 493, 498 (D.R.I. 1950) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946)).  The breach-of-

contract verdict therefore reflects the jury's finding that the Government failed to prove more than $78 in benefit-of-the-bargain damages.

The Government further contends that it is not bound by collateral estoppel because it made a "strategic decision" *not* to attempt to prove during the first trial that SAIC's alleged conflicts diminished the value of its services to the Government. DOJ Opp'n 35-38.  Federal preclusion law, however, offers no support for the Government's attempt to manufacture a "strategic decision" exception to collateral estoppel.  The Government is bound by its strategic decisions during the first trial— even if it regrets them now.  Moreover, the Government's revisionist view of its trial strategy is belied by the record.  Indeed, its own brief is replete with record citations showing that the Government did *in fact* litigate, and litigate aggressively, the issue of benefit-of-the-bargain damages during the first trial.  *Compare* DOJ Opp'n 27 ("the evidence at trial was clear that the NRC did not, in any way, receive the benefit of its bargain with SAIC") *with id.* at 37 ("SAIC is not able to point to a shred of evidence or a single argument offered by the United States that SAIC's work had no value.").  The Government may be unhappy with the jury's benefit-of-the-bargain damages award under the 1992 Contract, but the Government's desire for more money in a retrial does not give it license to re-litigate an issue a jury has already decided in a judgment affirmed by the D.C. Circuit or to evade fundamental principles of collateral estoppel.

With respect to the 1999 contract, the Government has not demonstrated any factual dispute warranting a jury trial.  There is no competent evidence from which

a jury could reasonably find that the Government suffered harm under that contract.  SAIC was already required to forgo more than $300,000 in payments for work completed under the 1999 Contract as part of its no-cost settlement with the Government.  There is no evidence that SAIC's high-quality and uniformly praised work under that contract provided the Government with less value than the already discounted amount of $216,068.42 that it paid SAIC for that work.

Summary judgment should therefore be entered precluding the Government from recovering more than $78 in damages on its FCA claims.

## II.    ARGUMENT

### A.    THE GOVERNMENT IS COLLATERALLY ESTOPPED FROM RECOVERING MORE THAN $78 IN FCA DAMAGES UNDER THE 1992 CONTRACT.

The Government is collaterally estopped from recovering more than $78 in damages on its FCA claims under the 1992 Contract because this issue was "contested by the parties and submitted for judicial determination in the" first trial, "the issue [was] . . .  actually and necessarily determined by" the jury in that trial, and preclusion would "not work a basic unfairness to" the Government.  *Martin v. DOJ*, 488 F.3d 446, 454 (D.C. Cir. 2007) (internal quotation marks omitted).  The Government's attempt to dispute each of these elements of estoppel lacks merit.

#### 1.    The Breach-Of-Contract Claim Required The Parties To Litigate The "Same Issue" Of Damages As The Government's FCA Claims.

The Government argues that the amount of breach-of-contract damages to which it is entitled is not the "same issue" as the amount of FCA damages.  DOJ

Opp'n 13-19.  This effort to circumvent the preclusive force of the breach-of-contract verdict directly conflicts with the D.C. Circuit's decision in this case.

The D.C. Circuit held that FCA damages are calculated under the "benefit-of-the-bargain framework" (*SAIC IV*, 626 F.3d at 1279), which "puts the government in the same position as it would have been if the defendant's claims had not been false" (*id.* at 1278).  This is the *same* standard applied in this Court's breach-of-contract jury instructions, which instructed the jury to award damages in the "amount of money necessary to place the [Government] in the same economic position it would have been if the contract had not been breached."  7/28 Tr. 24 (Exh. 1).   Indeed, courts, commentators, and the Government itself have all explained that the "benefit-of-the-bargain framework" is the hornbook approach for calculating breach-of-contract damages.  *See, e.g.*, *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1334 (Fed. Cir. 2005) ("Expectation damages give the non-breaching party the benefit of his bargain."); Restatement (Second) of Contracts § 347 cmt. a (1981) ("Contract damages . . . are intended to give him the benefit of his bargain."); Gov't's Proposed Jury Instructions (Dkt. #94-9) at 72 ("Contract damages are intended to give the injured party the benefit of his bargain.").

The Government nevertheless refuses to accept the D.C. Circuit's benefit-of-the-bargain holding as binding in this proceeding.  It argues at length that, in any FCA case arising from an undisclosed conflict of interest, the Government should be entitled to recover the full amount of its payments without regard to the value of the services conferred by the contractor.  According to the Government, *United*

*States v. Mississippi Valley Generating Co.*, 364 U.S. 520 (1961), establishes that contracts obtained in violation of the federal criminal conflict-of-interest statute, 18 U.S.C. § 208, are unenforceable against the Government.  DOJ Opp'n 20-24.  But this entire discussion is indisputably irrelevant to this case because, as the Government is ultimately compelled to concede, it has not alleged that SAIC violated Section 208 and "is not seeking to void SAIC's contracts under the *Mississippi Valley* doctrine."  DOJ Opp'n 20.  In any event, this argument is nothing more than an attempt to repackage the categorical approach to FCA damages advocated by the Government during the first trial, which the D.C. Circuit resoundingly rejected on appeal.  *See SAIC IV*, 626 F.3d at 1280 ("we see no basis for adopting an irrebuttable presumption—essentially what the government seeks—that treats services involving expert advice and analysis affected by potential organizational conflicts as categorically worthless").

Moreover, the FCA cases on which the Government relies demonstrate that—as the D.C. Circuit held on appeal—the calculation of FCA damages turns on case-specific evidence of value, not on a general presumption about the harm caused by undisclosed conflicts.  In *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003), for example, the Fourth Circuit held that a relator was not entitled to any FCA damages where a contractor made false conflict-of-interest certifications to obtain the contract because the contractor delivered all the services for which the Government bargained.  *See id.* at 911, 912 n.2, 922-23.  Similarly, the D.C. Circuit emphasized on appeal in this case that *United States v.*

6

*TDC Management Corp.*, 288 F.3d 421 (D.C. Cir. 2002), was a decision in which "the government *prove[d]* that it received no value from the product delivered." *SAIC IV*, 626 F.3d at 1279 (emphasis added); *see also TDC*, 288 F.3d at 428; *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (holding that the full amount of the Government's payments was the proper measure of damages because the defendant "did not furnish any medical service to the United States").[1]

The Government also implausibly contends that to the extent it must satisfy the D.C. Circuit's "benefit-of-the-bargain framework"—which it plainly must—the D.C. Circuit adopted an FCA-specific approach that differs from the breach-of-contract standard.  But the Government cannot even clearly articulate what the *supposed* differences are.  According to the Government, FCA "damages are appropriately measured by the amount that the NRC paid over and above the amount that the NRC would have paid had it known about SAIC's business

---

[1]  The Government is therefore incorrect when it argues that collateral estoppel should not apply because the benefit-of-the-bargain standard endorsed by the D.C. Circuit represents an intervening doctrinal change.  DOJ Opp'n 12 n.1.  The D.C. Circuit's holding followed directly from *United States v. Bornstein*, 423 U.S. 303, 309 n.4, 316 n.13 (1976), *United States ex rel. Miller v. Bill Harbert International Construction, Inc.*, 608 F.3d 871 (D.C. Cir. 2010), and other settled appellate precedent.  *See SAIC IV*, 626 F.3d at 1278-79.  In any event, the measure of FCA damages applicable at the time of the first trial is irrelevant to the availability of collateral estoppel on retrial because SAIC is invoking the preclusive effect of the first jury's breach-of-contract finding, not its now-vacated FCA findings.  Put another way, SAIC's preclusion argument would be exactly the same even if there had been no prior trial on the FCA claims at all.  The Government does not contend that there has been an "intervening change" in how contract damages are measured, and it is the preclusive effect of *that* judgment which is at issue here.

relationships, less the value, if any, of SAIC's work to the NRC."  DOJ Opp'n 15.

But this articulation of the benefit-of-the-bargain standard is no different from the

standard applicable under contract law, where the value of the service provided is

subtracted from the value of the service bargained for.  *See SAIC IV*, 626 F.3d at

1278-79.  For example, under either FCA or breach-of-contract principles, if the

Government paid $1,000 for work from a contractor with an undisclosed conflict of

interest that it would not have paid if it had known about the conflict, then it is

entitled to recover that $1,000 "less the value" of the work it received; if the jury

finds that the work had a value of $250, then the Government is entitled to a total

recovery of $750.  This recovery "puts the government in the same position as it

would have been if the defendant's claims had not been false" (*SAIC IV*, 626 F.3d at

1278)—or, as this Court explained to the jury on the Government's breach-of-

contract claim, "places the [Government] in the same economic position it would

have been if the contract had not been breached."  7/28 Tr. 24 (Exh. 1).

     Nor is there any merit to the Government's contention that benefit-of-the-

bargain damages under the FCA may be less precise or more subjective than

benefit-of-the-bargain damages awarded on a breach-of-contract claim.  *See* DOJ

Opp'n 16-18.  The D.C. Circuit explicitly rejected the notion that the standards for

awarding FCA and breach-of-contract damages differ from each other.  After

specifying the "benefit-of-the-bargain framework" that would be applied to the

Government's FCA claims on remand, the D.C. Circuit explained that "the district

court's breach of contract instruction asked the jury to make *just such a valuation*." *SAIC IV*, 626 F.3d at 1280 (emphasis added).

Moreover, the cases the Government cites to substantiate its purported distinctions between FCA and breach-of-contract damages actually demonstrate that the *same* benefit-of-the-bargain standard is used in both calculations. For example, the United States contends that contract damages differ from FCA damages because FCA damages can be awarded despite the absence of "mathematical certainty" (DOJ Opp'n 17) whereas contract damages require mathematical certainty. That is wrong. Fundamental and long settled breach-of-contract principles provide that "[d]amages need not be calculable with mathematical accuracy and are often at best approximate." Restatement (Second) of Contracts § 352 cmt. a; *see also Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 668 (Fed. Cir. 1992) ("[W]here responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision") (quoting *Electronic & Missile Facilities, Inc. v. United States*, 416 F.2d 1345 (Ct. Cl. 1969)). Indeed, the cases on which the Government relies—*United States ex rel. Miller v. Bill Harbert International Construction, Inc.*, 608 F.3d 871, 905 (D.C. Cir. 2010), and *United States v. American Packing Corp.*, 113 F. Supp. 223, 226 (D.N.J. 1953)—cited the Supreme Court's decision in *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946), for the proposition that "the jury may not render a verdict based on speculation or guesswork[,] [b]ut [it] may make a just and reasonable estimate of the damage based on relevant data." *Id.* at 264. *Bigelow*,

9

however, is not an FCA case, but an antitrust case, and courts deciding breach-of-contract claims—no less than courts deciding FCA claims—regularly cite the case for this rule. *See, e.g.*, *Eves v. Am. Clearinghouse, Inc.*, No. 2:02-cv-665, 2006 WL 6449923, at *8 (S.D. Ohio Nov. 20, 2006); *GE Harris Ry. Electronics, L.L.C. v. Westinghouse Air Brake Co.*, No. Civ. A. 99-070, 2004 WL 1854198, at *13 (D. Del. Aug. 8, 2004); *Price v. Highland Cmty. Bank*, 722 F. Supp. 454, 459 (N.D. Ill. 1989).

Similarly, the fact that an FCA jury should take into account the value of the good or service "'to the government'" (DOJ Opp'n 18-19 (quoting *SAIC IV*, 626 F.3d at 1279)) is identical to the rule under contract law that "requires a determination of the values of those performances *to the injured party himself* . . . and not their values to some hypothetical reasonable person or on some market." Restatement (Second) of Contracts § 347 cmt. b (emphasis added); *see also Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 352 (2004) (same). For that reason, the Government is also wrong when it argues that this Court's breach-of-contract instructions required the jury to determine "*objective* economic value" rather than the supposedly different *subjective* value of SAIC's services to the Government. DOJ Opp'n 18-19 (emphasis added). Nothing in this Court's breach-of-contract instructions told the jury to ignore the value of SAIC's work to the Government in determining benefit-of-the-bargain damages.[2]

---

[2] The Government's reliance on *Faulk v. United States*, 198 F. 2d 169 (5th Cir. 1952), is misplaced. That three-page opinion does not state, as the Government

[Footnote continued on next page]

## 2. The Jury "Actually And Necessarily Decided" The Issue Of Benefit-Of-The-Bargain Damages Under The 1992 Contract.

The Government further contends that, even if the benefit-of-the-bargain framework applied under the FCA and breach-of-contract law is identical, collateral estoppel is inapplicable because the jury may have awarded only nominal damages on the breach-of-contract claim and therefore may not have "actually and necessarily decided" the amount of benefit-of-the-bargain damages to which it was entitled. DOJ Opp'n 38-40. This Court's jury instructions belie the Government's speculation.

After instructing the jury on the benefit-of-the-bargain standard, this Court stated:

> If you find that SAIC breached the contract with the NRC, and you find that there are *no proven damages resulting, or that damages are only speculative, then you may award nominal damages* to the United States for the Breach of Contract claim. Nominal damages are a small amount of money, such as $1, awarded without regard to the amount of loss.

---

[Footnote continued from previous page]
contends, that the difference between the value of the fresh milk for which the Government contracted and the value of the substandard milk the contractor delivered was "negligible." DOJ Opp'n 19. Rather, the defendant's misconduct in *Faulk* made determining the value of the defective milk impossible, necessitating an alternative measure of that value. *Faulk*, 198 F. 2d at 172-73. This flexible approach is consistent with breach-of-contract principles. *See* Restatement (Second) of Contracts § 352 cmt. a; *see also United States v. Swift & Co.*, 270 U.S. 124, 149 (1926) ("The rule is that where there is no general market, or the merchandise is of a peculiar character and not staple, it is necessary that some other criterion be taken than the difference between the agreed price and the general market value.").

7/28 Tr. 24 (Exh. 1) (emphasis added); *see also United States v. Mouling*, 557 F.3d 658, 665 (D.C. Cir. 2009) (a jury is presumed to follow the court's instructions). This Court's statement that the jury could award nominal damages if there were "no proven damages" or "damages were only speculative" is consistent with the benefit-of-the-bargain framework applied under the FCA. Indeed, the Supreme Court's decision in *Bigelow* explained that "the jury may not render a verdict based on *speculation or guesswork*." 327 U.S. at 264 (emphasis added). Multiple FCA and breach-of-contract cases have relied upon this language. *See supra* at 9-10. Nominal damages are therefore recoverable under the FCA's benefit-of-the-bargain framework for the same reason and on the same basis as under contract law: where there are no proven or non-speculative damages. *See United States v. Collyer Insulated Wire Co.*, 94 F. Supp. 493, 498-99 (D.R.I. 1950) (citing to *Bigelow* and awarding nominal damages under the FCA where the only evidence of the Government's benefit-of-the-bargain damages was "speculative in character").

Accordingly, to the extent that this Court treats the jury's $78 breach-of-contract verdict as an award of nominal damages, that verdict would reflect a finding by the jury that the Government proffered no non-speculative proof of its benefit-of-the-bargain damages. That finding collaterally estops the Government from recovering more than $78 in damages on its FCA claims under the 1992 Contract—whether those damages are considered nominal or not.

### 3.   There Is No "Strategic Decision" Exception To The Collateral Estoppel Doctrine.

The Government also argues that it would be "unfair[ ]" to preclude it from relitigating the issue of FCA damages under the 1992 Contract because it made a "strategic decision" during the first trial not to introduce evidence that the value of the services it received from SAIC was diminished by the alleged conflicts of interest.  DOJ Opp'n 12, 35.  The Government wants this Court to believe that it made a strategic decision to abandon its claim for $2,630,000 in breach-of-contract damages—even though it was much more likely to prevail on that claim (which does not require proof of scienter or other FCA requirements)—to avoid confusing the jury with two different damages calculations.  The Government's last-ditch effort to avoid preclusion fails because there is no "strategic decision" exception to collateral estoppel and because the Government in any event did not make such a "strategic decision" during the first trial.

There is no exception to the application of collateral estoppel where a party makes a "strategic decision" during the initial proceeding not to introduce certain evidence in support of its pending claims.  *See* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4419 (3d ed. 2010) ("Nor can preclusion be defeated by seeking rescue from a mistaken trial strategy.").  Thus, in *In re Southeast Banking Corp.*, 69 F.3d 1539 (11th Cir. 1995), the Eleventh Circuit held that collateral estoppel applied to a district court's determination that a derivative action could only be brought by the FDIC, not by a bankruptcy trustee, even though the trustee in the first trial had focused on proving that the claim was not a

derivative claim at all, rather than on whether any derivative claim belonged to the FDIC. *Id.* at 1553. The Eleventh Circuit explained that, while "[i]t appears the trustee may have, in the prior litigation, selected a litigation strategy he now regrets, placing all his eggs in the 'direct, not derivative' basket[,] . . . his choice of that strategy will not prevent the application of collateral estoppel." *Id.* Other federal courts and commentators uniformly agree that trial strategies and tactical decisions do not bar application of the preclusion doctrine. *See, e.g.*, *Simmons v. O'Brien*, 77 F.3d 1093, 1097 (8th Cir. 1996) ("For issue preclusion to apply . . . [t]here is no further requirement that the party actually take advantage of th[e] opportunity to fully and fairly litigate the issue."); Wright & Miller, *Federal Practice and Procedure* § 4419 ("Nor can preclusion be defeated by seeking rescue from a mistaken trial strategy") (citing *Southeast Banking*)); James Wm. Moore et al., *Moore's Federal Practice* ¶ 0.441[2], at 523 (2d ed. 1995).

Consistent with this unambiguous authority, the D.C. Circuit has never recognized any "strategic decision" component to collateral estoppel's "unfairness" exception. Rather, the D.C. Circuit has held that the unfairness exception applies in cases where the party against whom preclusion is invoked had no "incentive[ ]" to litigate the issue in the prior proceeding. *Martin*, 488 F.3d at 302. In this case, the Government had *every* incentive to prove its breach-of-contract damages at trial by demonstrating that it received services of diminished value from SAIC because the FCA's exacting scienter requirement made it far more likely that the Government would recover on its breach-of-contract claim than on its FCA claims. *See* SAIC's

14

Mot. Summ. J. on False Claims Act Damages ("SAIC Damages Mot.") 18 (citing

*SAIC IV*, 626 F.3d at 1273-77).

The only case the Government cites in support of its purported "strategic

decision" exception is the unreported district court decision in *Moreno v. Baca*, No.

00-cv-7149, 2002 WL 338366, at *7 (C.D. Cal. Feb. 25, 2002).  But *Moreno* was

interpreting a special rule of California law that protects criminal defendants from

unwarranted preclusive effects resulting from strategic decisions in criminal trials.

*Id.*  The Government cites no case that holds or even implies that this limited

exception to collateral estoppel applies outside the narrow context of California

criminal law.  Thus, even if the Government did strategically "plac[e] all [its] eggs"

in the FCA damages basket (*Southeast Banking*, 69 F.3d at 1553) during the first

trial (*but see infra* at 15-16) the Government must live with the preclusive

consequences of that strategic decision.

In any event, the record from the first trial makes clear that the Government

did not in fact make the "strategic decision" that it now claims but instead fully

litigated the issue of breach-of-contract damages.  As to this point, the

Government's opposition brief engages in revisionist history with the trial record.

Indeed, the Government acknowledges that it introduced "at trial" what it deems to

be "a *significant amount of evidence* [that] established that the United States did

not get what it paid for."  DOJ Opp'n 27-28 (emphasis added).  For example, the

Government presented evidence purportedly indicating that SAIC's work was

"'clouded by questions of contractor conflict of interest'" (DOJ Opp'n 29 (quoting DX

479, at 113)), as well as several witnesses who testified that the value of SAIC's work for the Government was supposedly diminished by its alleged conflicts. *See, e.g.*, DOJ Opp'n 29; DOJ Resp. Stmt. of Genuine Issues & Material Facts ("DOJ Resp. Stmt.") ¶¶ 51-53, 56 (citing Paperiello Test., 7/15 p.m. Tr. 53, 56-57; Cardile Test., 7/2 a.m. Tr. 46; Thadani Test., 7/21 a.m. Tr. 26-27, 56-60)); *see also* 7/28 Tr. at 57-58, 139-40 (Exh. 1) (Government closing).  This evidence refutes the Government's implausible contention that it made the strategic decision to forgo up to $2,630,000 in breach-of-contract damages simply because it was worried about "confus[ing]" the jury on the FCA claim.  DOJ Opp'n 37.[3]

---

[3]  The Government also suggests that pre-trial rulings discouraged it from putting on a damages case on the contract claim.  Specifically, the Government contends that this Court's decision to preclude SAIC's damages expert from testifying as to value when dealing with False Claims Act damages encouraged its purported strategic decision to abandon presenting damages evidence on its breach-of-contract claim.  DOJ Opp'n 36-37.  But the Court's ruling specifically referenced "False Claims Act damages," and thus could not have impacted the Government's strategy with regard to breach of contract damages.  7/1 a.m. Tr. 11-12 (Exh. 4).  In addition, the Court stated that if the Government "persists at trial" in alleging that it "received nothing of value under the contracts," SAIC would not be "precluded from rebutting the government's evidence on that point."  *Id.* at 12.  As demonstrated above, the Government did introduce evidence at trial purportedly establishing that SAIC's work product was worthless as a result of the alleged conflicts.  *See* DX 479, at 113 (Exh. 3); 7/28 Tr. at 57-58, 139-40 (Exh. 1) (Government closing).  Consistent with its prior ruling, the Court therefore permitted SAIC to introduce substantial evidence that the Government got what it paid for, including testimony from high-level NRC personnel that SAIC's work "quality was extremely high," Meck Test., 7/3 p.m. Tr. 20-21 (attached as Exh. 4 to Opening Brief on Damages); Meck Test., 7/3 a.m. Tr. 86-88 (attached as Exh. 7 to Opening Brief on Damages), and "constituted the opposite of a conflict," Meck Test., 7/3 p.m. Tr. 9 (attached as Exh. 4 to Opening Brief on Damages); SAIC Stmt. ¶¶ 9, 21.  *See generally* SAIC Damages Mot. 9-12; *supra* at 15-16.

\*     \*     \*

Allowing the Government to relitigate its benefit-of-the-bargain damages in front of a second jury would be fundamentally inconsistent with the principles of "judicial economy" on which the doctrine of collateral estoppel is founded. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). It would also be fundamentally unfair to SAIC. The parties spent weeks litigating these issues during the first trial, and the Government offers no plausible justification for discarding the first jury's finding. In accordance with that finding, the Government should be precluded from recovering more than $78 in damages on its FCA claims under the 1992 Contract.

## B. THE GOVERNMENT CANNOT PROVE FCA DAMAGES UNDER THE 1999 CONTRACT.

SAIC is also entitled to summary judgment on the FCA damages sought by the Government under the 1999 Contract because the Government has failed to produce sufficient evidence to create a genuine dispute of fact as to whether it received the full benefit of its bargain under that contract.

To recover damages on its FCA claims, "the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased." *SAIC IV*, 626 F.3d at 1279. This standard requires the Government to establish "that the amount of damages can be reasonably computed." *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Group, Inc.*, 370 F. Supp. 2d 18, 55 (D.D.C. 2005). Mere speculation

that the FCA violations caused some vague and unquantifiable harm to the Government will not suffice. *See id.*; *see also Patel v. Howard Univ.*, 896 F. Supp. 199, 206 (D.D.C. 1995) (where "proof of damages is vague or speculative," the plaintiff can recover, at most, only nominal damages); *Collyer Insulated*, 94 F. Supp. at 498 (awarding nominal damages under the FCA where the Government's evidence of damages was "speculative in character").

The Government has not identified any non-speculative evidence that the services it received under the 1999 Contract were worth less than the $216,068.42 that it paid to SAIC. The Government nevertheless argues that a full recovery of all payments made to SAIC under the 1999 Contract is appropriate because SAIC did not produce a "deliverable[ ]" or a "tangible thing of value" under the contract. DOJ Opp'n 41. But that argument is nothing more than an improper attempt to circumvent the D.C. Circuit's decision on appeal by shifting the burden to SAIC to prove the value of its services. *See SAIC IV*, 626 F.3d at 1279-80 (recovery of all payments is appropriate only if the Government can show that "the value of SAIC's advice and assistance was completely compromised by the existence of undisclosed conflicts"); *see also* 31 U.S.C. § 3731(d) (expressly placing the burden of proving damages on *the Government*).

Moreover, the best indication of the value of the services received by the Government under the 1999 Contract is the parties' no-cost settlement agreement— which required SAIC to forgo more than $300,000 in payments for completed work but permitted it to retain approximately $200,000 that it had already received. The

Government contends that, to the extent "the amount reached in the no-cost settlement termination" reflects the value of SAIC's services, the amount is $0. DOJ Opp'n 41.  The agreement itself, however, makes clear that the amount of the Government's prior payments—$216,068.42—"represents all costs and fee[s] to which the Contractor is *entitled* to reimbursement under the contract."  PX 860 at ¶ 1 (attached as Exh. 13 to Opening Brief on Damages) (emphasis added).

The Government has not produced any evidence that contradicts the valuation embodied in this "complete and final settlement" between the parties.  *Id.* As an initial matter, none of the evidence the Government cites is specific to the 1999 Contract.  Indeed, the record evidence is uncontradicted that SAIC's work on the 1999 Contract was technically sound and was relied upon extensively by Sandy Cohen & Associates ("SC&A"), the contractor the NRC hired to complete the work on the 1999 Contract.  *See* Mauro Test., 7/21 a.m. Tr. 98-110 (attached as Exh. 3 to Opening Brief on Damages); *see also* Mauro Decl. ¶ 6 (Exh. 2) ("SC&A was able to smoothly transition from its work as a subcontractor to SAIC, to its work as a prime contractor to the NRC . . . ."); *id.* ¶ 12 ("There was no duplicative work or inefficiencies associated with SC&A assuming work that was formerly the subject of SAIC's 1999 contract with the NRC—it was as if the baton in a relay race had been cleanly passed from SAIC to SC&A.").  In addition, the NRC's own internal documents state that the "majority of the harm to NRC occurred" under the 1992 Contract.  SAIC Stmt. of Undisputed Material Facts in Support of Mot. for Summ. J. on Damages ("SAIC Stmt.") ¶ 18.  Taken together with the jury's finding that the

NRC suffered only $78 in economic harm under the 1992 Contract, the absence of any evidence specific to the 1999 Contract is fatal to the Government's damages claims.

In any event, the evidence that the Government cites related to the value of SAIC's work on the 1992 Contract is insufficient to surmount the summary judgment threshold.  The Government argues, for example, that "SAIC's work did exhibit actual bias"—meaning that its results were not based on sound science but were instead skewed by SAIC's alleged conflicts of interest.  *See* DOJ Opp'n 32.  But the cited materials provide no support for this assertion.  First, the Government cites a suggestion from the National Academy of Sciences ("NAS") that SAIC's draft NUREG-1640 be revised to consider the effect of potential human error at nuclear facilities (such as the "failure to monitor properly, failure to properly handle and contain loose contamination, and delivery of material to the wrong recipient").  *Id.*; *see also* DX 479 at 106 (Exh. 3).  This technical recommendation does not support a finding of actual bias because it applied uniformly to SAIC *and* the authors of every other study the NAS reviewed.  *See* DX 479 at 106 (Exh. 3) ("Human error was not explicitly addressed in the analyses supporting dose factor estimates in any of the studies reviewed.").  To the contrary, the NAS Report "found the overall conceptual plan of draft NUREG-1640 to be the best of all of the studies that it reviewed," "commended [the authors of draft NUREG-1640] for developing an excellent approach," and concluded that the conflict-of-interest allegations did not make it

"necessary from a scientific perspective" to discard SAIC's work.  *See* SAIC Stmt. ¶¶ 24-26.

Second, the Government points to evidence that the dose calculations in SAIC's draft NUREG-1640 were less protective than the "status quo" (as embodied in Regulatory Guide 1.86) and were five times less protective for one particular radioisotope, Technetium-99, which is common at gaseous diffusion plants such as the Oak Ridge facility.  DOJ Opp'n 32-33.  But it is undisputed that the other entities to conduct similar evaluations (including a contractor for the EPA) uniformly produced results that were much *less* protective than SAIC's draft NUREG-1640.  *See* SAIC Stmt. ¶ 21; *see also* Mauro Test., 7/21 a.m. Tr. 90-93 (attached as Exh. 3 to Opening Brief on Damages) (describing the EPA's less conservative approach).  In fact, as a result of draft NUREG-1640's conservative results, the NRC's project manager, Dr. Meck, concluded that SAIC's work was the "opposite of a conflict," and the Director of the NRC's Office of Nuclear Regulatory Research determined that "the results of [draft NUREG-1640] generally lead to more restrictive release levels than those of other comparable analyses."  SAIC Stmt. ¶ 21.  The absurdity of the Government's assertion of actual bias is underscored by the fact that the NRC directed its follow-on contractor to revise NUREG-1640 in a way that made it *less protective* than SAIC's initial draft— something the NRC surely would not have done if it was concerned that bias had rendered SAIC's draft insufficiently protective of public safety.  *See* Mauro Test., 7/21 a.m. Tr. 104-05 (attached as Exh. 3 to Opening Brief on Damages).

The Government also asserts that SAIC's alleged conflicts inhibited the
NRC's ability to issue a final rule authorizing the release of low-level radioactive
materials.  DOJ Opp'n 30, 37-38.  In support, the Government points to the
testimony of Cheryl Trottier, the Government's 30(b)(6) damages witness, who,
when asked at her deposition about the NRC's "knowledge of facts" regarding the
alleged lack of value in SAIC's work, answered:  "Well, this is a difficult question
because, again, we raise the issue of the cloud.  In the absence of NRC moving
forward on rulemaking, we could postulate that a component of this delay is the
uncertainty associated with the reaction to NUREG-1640."  Trottier Dep., at 114-15
(attached as Exh. 28 to Opening Brief on Damages).

This unsubstantiated "*postulat[ion]*" about the impact of the alleged conflicts
is not only speculative, but also flatly at odds with the record evidence.  The NRC
itself provided three specific reasons for discontinuing the rulemaking, none of
which related to a "cloud" surrounding draft NUREG-1640.  *See* SAIC Stmt. ¶ 34.
The actual reasons for the NRC's decision were:  (1) "that the Agency is currently
faced with several high priority and complex tasks," (2) "that the current approach
to review specific cases on an individual basis is fully protective of public health and
safety," and (3) "that the immediate need for this rule has changed due to the shift
in timing for reactor decommissioning."  *Id.*  Indeed, far from being stymied by
SAIC's alleged conflicts, the NRC Chairman expressly stated that the NRC had
developed "the technical information base necessary to provide a solid foundation
for this policy decision."  *Id.* ¶ 35.  These unambiguous statements from the NRC

itself confirm that unrelated external factors—and not any "appearance of bias" associated with SAIC's technical work—ultimately caused the NRC to terminate its clearance rulemaking process, just as similar factors had led the EPA, whose contractor did not face any conflict allegations, to discontinue its parallel effort several years earlier.  *See* Mauro Test., 7/21 a.m. Tr. 98 (attached as Exh. 3 to Opening Brief on Damages).[4]

### III.   CONCLUSION

The Government attempts to evade the issue preclusive effect of the jury's breach-of-contract verdict as to the 1992 Contract by asking this Court to ignore the D.C. Circuit's holding as to the measure of FCA damages.  The Government also fails to show that there is *any* non-speculative evidence that it received less than it bargained for under the 1999 Contract.   Thus, the Government is not entitled to recover more than $78 in damages.

---

4 The Government advances several iterations of this same argument—including "that the NRC was never able to use SAIC's work in the way it intended" (DOJ Opp'n 29; *see* DOJ Resp. Stmt. ¶¶ 48-55) and that "SAIC's conflicts caused a loss of [public] confidence" (DOJ Resp. Stmt. ¶ 76; *see id.* at ¶¶ 56-57; DOJ Opp'n 31-32)—but they all fail for the same reason.  As explained above, the undisputed facts show that SAIC's work was *in fact* relied on by the follow-on contractor and incorporated in its final product, and that factors completely unrelated to SAIC's alleged conflicts ultimately led the NRC to discontinue its rulemaking effort.

Dated:  September 22, 2011                Respectfully submitted,

    /s/ Andrew S. Tulumello

John P. Rowley, III                       Andrew S. Tulumello (D.C. Bar No. 468351)
(D.C. Bar No. 392629)                     Amir C. Tayrani (D.C. Bar No. 490994)
BAKER & McKENZIE LLP                      Ryan J. Watson (D.C. Bar No. 986906)
815 Connecticut Avenue, N.W.              GIBSON, DUNN & CRUTCHER LLP
Washington, D.C.  20006                   1050 Connecticut Avenue, N.W.
Telephone: (202) 835-6151                 Washington, D.C.  20036
E-mail:                                   Telephone: (202) 955-8657
john.rowley@bakermckenzie.com             E-mail: atulumello@gibsondunn.com

*Counsel for Defendant Science Applications International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September 2011, I filed the foregoing with the Clerk of Court via the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.

    /s/ Andrew S. Tulumello    .
Andrew S. Tulumello (D.C. Bar No. 468351)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8657
E-mail: atulumello@gibsondunn.com
