UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
UNITED STATES OF AMERICA,       )
                               )
     Plaintiff,                 )
                               )
     v.                         )     Civil Action No. 04-1543 (RWR)
                               )
SCIENCE APPLICATIONS            )
INTERNATIONAL CORPORATION,      )
                               )
     Defendant.                 )
_____)
```

MEMORANDUM OPINION AND ORDER

The United States brought this suit against Science Applications International Corporation ("SAIC") under the False Claims Act ("FCA"), 31 U.S.C. § 3729, and District of Columbia common law, alleging that SAIC failed to make disclosures of organizational conflicts of interest ("OCIs") as was required under two contracts that SAIC entered into with the Nuclear Regulatory Commission ("NRC") in 1992 and 1999. After a jury found SAIC liable on the FCA and breach of contract claims and SAIC's motion for judgment as a matter of law or, alternatively, for a new trial was denied, SAIC appealed. The D.C. Circuit affirmed the denial of SAIC's motion for judgment as a matter of law and the denial of SAIC's motion for a new trial on the breach of contract claim. However, the D.C. Circuit vacated the judgment on FCA liability and damages and remanded the case for further proceedings. SAIC now moves for summary judgment

-2-

regarding the FCA knowledge element and damages and the

government moves for partial summary judgment regarding the FCA

falsity element.  Because there are genuine disputes of material

fact regarding the FCA scienter and falsity elements and damages,

the parties' motions will be denied.

<u>BACKGROUND</u>

The relevant facts were set out in <u>United States v. Science</u>

<u>Applications International Corp.</u> (<u>SAIC II</u>), 653 F. Supp. 2d 87

(D.D.C. 2009) as follows:

> The NRC is an independent federal agency
> established to regulate the civil use of nuclear
> materials.  The NRC creates scientific standards for
> allowing radioactive materials with low levels of
> contamination to be released to the private sector for
> recycling and reuse.  In 1992 and 1999, the NRC
> contracted with SAIC to provide technical assistance
> related to this effort.  Under the 1992 contract, SAIC
> was to provide the NRC with technical assistance
> related to the recycling and reuse of radioactive
> material and was to present an options paper outlining
> the possible approaches to rulemaking for the release
> of these materials.  The goal of the 1999 contract was
> to assess regulatory alternatives regarding the release
> of reusable materials.  SAIC's neutrality was critical
> under both contracts.
> SAIC promised in both contracts to forego entering
> into any consulting or other contractual arrangements
> with any organization that could create a conflict of
> interest.  The purpose of this clause was to avoid OCIs
> that were, among others, financial, organizational, or
> contractual.  SAIC warranted upon entering both
> contracts that it had no OCIs as that term is defined
> in 41 C.F.R. § 20-1.5402(a).  The regulation defined an
> OCI as "a relationship . . . whereby a contractor or
> prospective contractor has present or planned interests
> related to the work to be performed under an NRC
> contract which: (1) may diminish its capacity to give
> impartial, technically sound, objective assistance and
> advice or may otherwise result in a biased work

-3-

product, or (2) may result in its being given an unfair
competitive advantage." 41 C.F.R. § 20-1.5402(a)
(1979).[1] SAIC further promised in both contracts to

---

[1] Furthermore, the NRC regulations incorporated into the
1992 Contract required SAIC to disclose information concerning
situations or relationships that may give rise to OCIs under the
following circumstances:
    (i) Where the offeror or contractor provides advice and
    recommendations to the NRC in a technical area in which
    it is also providing consulting assistance in the same
    area to any organization regulated by the NRC.
    (ii) Where the offeror or contractor provides advice to
    the NRC on the same or similar matter in which it is
    also providing assistance to any organization regulated
    by the NRC.
    (iii) Where the offeror or contractor evaluates its own
    products or services, or the products or services of
    another entity where the offeror or contractor has been
    substantially involved in their development or
    marketing.
    (iv) Where the award of a contract would result in
    placing the offeror or contractor in a conflicting role
    in which its judgment may be biased in relation to its
    work for the NRC, or would result in an unfair
    competitive advantage for the offeror or contractor.
See 41 C.F.R. [§] 20-1.54 at p. 3.
    The NRC regulations incorporated into the 1999 Contract
required SAIC to disclose situations or relationships that may
give rise to organizational conflicts of interest under the
following circumstances:
    ([i]) Where the offeror or contractor provides advice
    and recommendations to the NRC in the same technical
    area where it is also providing consulting assistance
    to any organization regulated by the NRC.
    (ii) Where the offeror or contractor provides advice to
    the NRC on the same or similar matter on which it is
    also providing assistance to any organization regulated
    by the NRC.
    (iii) Where the offeror or contractor evaluates its own
    products or services, or has been substantially
    involved in the development or marketing of the
    products or services of another entity.
    (iv) Where the award of a contract would result in
    placing the offeror or contractor in a conflicting role
    in which its judgment may be biased in relation to its
    work for the NRC, or would result in an unfair

-4-

disclose any OCIs it discovered after entering the
contract.  SAIC repeatedly certified throughout the
periods its contracts were in force that it had no OCIs
and would notify the NRC of any changes resulting in an
OCI.

SAIC II, 653 F. Supp. 2d at 92-93.

The government contends "that SAIC breached its OCI

obligations under the 1992 and 1999 contracts by engaging in

relationships with organizations that created an appearance of

bias in the technical assistance and support it provided the

NRC."  Id. at 93.  Specifically, the government alleges that SAIC

had five actual or potential OCIs that SAIC did not disclose to

the NRC as required under the 1992 and 1999 contracts.  First,

the government argues that SAIC's relationship with British

Nuclear Fuels, Ltd. ("BNFL") created an OCI.  The Department of

Energy ("DOE") contracted with BNFL in 1997 to "decommission and

decontaminate buildings at a [DOE] site in Oak Ridge, Tennessee."

United States v. Sci. Applications Int'l Corp. (SAIC III), 626

F.3d 1257, 1263 (D.C. Cir. 2010).  BNFL "engaged SAIC to serve as

a subcontractor" on the project.  Id.  "[T]he government argued

that SAIC's relationship with British Nuclear created a potential

conflict because the project involved the recycling and release

of radioactive materials that would become subject to NRC

_____

competitive advantage for the offeror or contractor.
See 48 C.F.R. [§] 2009.570-3(b)(1).

regulation after leaving the DOE facility and entering into

interstate commerce." Id.

Second, in 1999, SAIC performed consulting work for Bechtel

Jacobs Corporation ("BJC").

> SAIC helped Bechtel Jacobs with a dose assessment and
> performed a cost-benefit analysis regarding the
> recycling of radioactively contaminated materials from
> the site.  The government contended that SAIC's work
> for Bechtel Jacobs closely overlapped with the
> company's work for the NRC, as illustrated most starkly
> by the allegation that a company employee copied
> material from a report prepared for the NRC and pasted
> it into one for Bechtel Jacobs.

Id.

Third, "SAIC pursued potential radioactive metal recycling

opportunities" with Alaron Corporation.  SAIC II, 653 F. Supp. 2d

at 100.  The government alleges that Alaron was "both licensed

and regulated by the NRC" and that SAIC's proposed work with

Alaron was "in technical areas that were very similar if not

identical to the advice that SAIC gave to the NRC." United

States v. Sci. Applications Int'l Corp. (SAIC I), 555 F. Supp. 2d

40, 54 (D.D.C. 2008) (internal quotation marks omitted).

Fourth, SAIC's Vice President Gerald Motl served "as an

officer and board member of the Association of Radioactive Metal

Recyclers (ARMR), a trade association that advocated for national

regulatory standards governing the reuse and recycling of

radioactive materials." SAIC III, 626 F.3d at 1264.  Motl also

worked on the 1999 NRC contract.  The government alleges that

-6-

Motl's work with the ARMR created an OCI with SAIC's work for the NRC.

Fifth, in 1990, SAIC began developing the Plasma Hearth Process ("PHP"), "an experimental plasma treatment technology for high-temperature treatment of radioactive waste." Pl. U.S.'s Mot. for Partial Summ. J. ("U.S. Mot. (Falsity)"), Pl. U.S.'s Stmt. of Undisputed Material Facts in Supp. of U.S.'s Mot. for Partial Summ. J. ("U.S. Stmt. (Falsity)") ¶ 78. The government alleges that "[t]he goal for the technology was to treat radioactive waste in such a way that a large portion of it could be released or recycled into general commerce." Id. It further alleges that, if used, the PHP would be regulated by the NRC and thus created an OCI with SAIC's work for the NRC. See U.S. Mot. (Falsity), U.S.'s Mem. of P. & A. in Supp. of its Mot. for Partial Summ. J. ("U.S. Mem. (Falsity)") at 14.

The government filed a five-count amended complaint against SAIC. Count One charged that SAIC knowingly presented, or caused to be presented, to the NRC false or fraudulent claims for payment or approval in violation of the FCA, 31 U.S.C. § 3729(a)(1). Am. Compl. ¶¶ 103-05. Count Two alleged that SAIC knowingly made, or caused to be made or used false records and statements for the purpose of getting the NRC to pay SAIC's false and fraudulent vouchers in violation of the FCA, 31 U.S.C.

-7-

§ 3729(a)(2).[2]  Am. Compl. ¶¶ 106-08.  Counts Three and Four

alleged quasi-contract theories.  Id. ¶¶ 109-13.  Count Five

alleged that SAIC breached its 1992 contract by failing to

disclose its OCIs as required under the contract.  Id. ¶¶ 114-16.

Judgment was entered in favor of SAIC on Counts Three and

Four of the amended complaint pretrial, SAIC I, 555 F. Supp. 2d

at 60, and a jury trial was held on Counts One, Two, and Five.

> The jury found SAIC liable under § 3729(a)(1) and
> (a)(2) and liable for breach of its 1992 contract with
> the NRC.  Specifically, the jury found that SAIC
> knowingly presented or caused to be presented sixty
> false or fraudulent claims for payment or approval by
> the government, causing the government to pay to SAIC
> $1,973,839.61 over and above what the government would
> have paid had SAIC presented truthful claims.  The jury
> also found that SAIC knowingly made, used, or caused to
> be made or used seventeen false records or statements
> to get a false or fraudulent claim paid or approved by
> the United States government, causing the government to
> pay to SAIC $1,973,839.61 on the false or fraudulent
> claims over and above what the government would have
> paid had SAIC made truthful statements.  In addition,
> the jury found that there was a contract between the
> United States and SAIC and that SAIC breached the
> contract by failing to fully perform a duty under the
> contract without legal excuse and awarded the United
> States monetary damages of $78 for the breach.
> Judgment was entered in favor of the United States
> against SAIC in the amount of $5,921,518.83 in damages
> for the FCA claims, $577,500 in civil penalties for the

---

[2] This subsection was recodified as 31 U.S.C.
§ 3729(a)(1)(B) under the Fraud Enforcement and Recovery Act of
2009, Pub. L. No. 111-21, 123 Stat. 1617.  However, the amended
version of this provision does not apply in this action.  See
SAIC II, 653 F. Supp. 2d at 106-07; cf. SAIC III, 626 F.3d at
1266 (assuming that the district court's determination that the
amended version of the FCA does not apply to this action is
correct).  Thus, this memorandum opinion will continue to refer
to § 3729(a)(2).

-8-

FCA claims, and $78 in damages for the contract claim,
for a total of $6,499,096.83.

SAIC II, 653 F. Supp. 2d at 94.

After trial, SAIC moved for judgment as a matter of law
under Federal Rule of Civil Procedure 50(b) or, in the
alternative, for a new trial under Federal Rule of Civil
Procedure 59(a).  SAIC's motion was denied, SAIC II, 653 F. Supp.
2d at 112, and SAIC appealed "seeking judgment as a matter of law
with respect to liability on all causes of action and with
respect to FCA damages."  SAIC III, 626 F.3d at 1265.
Alternatively, SAIC moved for an order vacating "the district
court's judgment and remand[ing] for a new trial on all claims."
Id.

On appeal, the D.C. Circuit

affirm[ed] the district court's denial of SAIC's motion
for judgment as a matter of law, as well as its
judgment as to both liability and damages on the
government's claim for breach of contract.  With
respect to the judgment as to liability and damages
under FCA sections 3729(a)(1) and 3729(a)(2), [the
court] vacate[d] and remand[ed] for further proceedings
consistent with [its] opinion.

Id. at 1280.

On remand, SAIC now moves for summary judgment arguing that
the government cannot establish that SAIC is liable under the FCA
because there are insufficient facts for a jury to find that SAIC
"knowingly" failed to disclose its alleged OCIs to the NRC.  SAIC
also moves for partial summary judgment on FCA damages.  The

government moves for partial summary judgment that SAIC's claims and statements were false.

## DISCUSSION

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009). A dispute is "genuine" "where the 'evidence is such that a reasonable jury could return a verdict for the non-moving party,' a situation separate and distinct from a case where the evidence is 'so one-sided that one party must prevail as a matter of law.'" Dozier-Nix v. District of Columbia, 851 F. Supp. 2d 163, 166 (D.D.C. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law[.]" Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Anderson, 477 U.S. at 248).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c). The movant may also rely on sworn testimony given in an earlier

judicial proceeding.  See Langston v. Johnson, 478 F.2d 915, 918

n.17 (D.C. Cir. 1973); see also Int'l Distrib. Corp. v. Am. Dist.

Tel. Co., 569 F.2d 136, 138 (D.C. Cir. 1977).

    To survive a motion for summary judgment, the nonmoving

party "must provide evidence showing that there is a triable

issue as to an element essential to that party's claim."

Arrington v. United States, 473 F.3d 329, 335 (D.C. Cir. 2006);

see also Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1032 (D.C.

Cir. 1988) ("[A] court must enter summary judgment against a

nonmovant 'who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial.'"

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986))).

"In considering a motion for summary judgment, [the court should

draw] all 'justifiable inferences' from the evidence . . . in

favor of the nonmovant."  Cruz-Packer v. District of Columbia,

539 F. Supp. 2d 181, 189 (D.D.C. 2008) (quoting Anderson, 477

U.S. at 255).

    The law of the case "'doctrine posits that when a court

decides upon a rule of law, that decision should continue to

govern the same issues in subsequent stages in the same case.'"

Pepper v. United States, 131 S. Ct. 1229, 1250 (2011) (quoting

Arizona v. California, 460 U.S. 605, 618 (1983)).  "This

principle applies to 'issues decided both explicitly and by

necessary implication.'" Margolis v. U-Haul Int'l, Inc., 818 F.
Supp. 2d 91, 99 (D.D.C. 2011) (quoting PNC Fin. Servs. Grp., Inc.
v. Comm'r, 503 F.3d 119, 126 (D.C. Cir. 2007)). "Under the law-
of-the-case doctrine, 'the *same* issue presented a second time in
the *same* case in the *same court* should lead to the *same result*.'"
Cobell v. Salazar, 679 F.3d 909, 916-17 (D.C. Cir. 2012) (quoting
LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en
banc)). The doctrine applies only to issues that were previously
litigated and decided. Nat'l Souvenir Ctr., Inc. v. Historic
Figures, Inc., 728 F.2d 503, 510 n.3 (D.C. Cir. 1984). "If an
attempt is made to press the same fact issue for a second time on
an unchanged record, law-of-the-case reluctance approaches
maximum force." 18B Charles Alan Wright, Arthur R. Miller &
Edward H. Cooper, Federal Practice and Procedure § 4478.5 at 808
(2d ed. 2002); see also Teague v. Mayo, 553 F.3d 1068, 1072-73
(7th Cir. 2009) (finding that a jury verdict is law of the case).

 Under the FCA, a person who

> (1) knowingly presents, or causes to be presented, to
> an officer or employee of the United States
> Government . . . a false or fraudulent claim for
> payment or approval; [or]
> (2) knowingly makes, uses, or causes to be made or
> used, a false record or statement to get a false or
> fraudulent claim paid or approved by the Government;
> . . .
> is liable to the United States Government for a civil
> penalty of not less than $5,000 and not more than
> $10,000, plus 3 times the amount of damages which the
> Government sustains because of the act of that
> person[.]

-12-

31 U.S.C. § 3729(a) (2008).  "'The three elements of FCA
liability [under § 3729(a)(1)] are that (1) defendant submitted a
claim to the government; (2) which was false; and (3) which the
defendant knew was false.'"  SAIC I, 555 F. Supp. 2d at 49
(quoting United States ex rel. Hockett v. Columbia/HCA Healthcare
Corp., 498 F. Supp. 2d 25, 57 (D.D.C. 2007)); see also United
States ex rel. Folliard v. Govplace, Civil Action No. 07-719
(RCL), 2013 WL 1092859, at *3 (D.D.C. Mar. 18, 2013) (citing
United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d
196, 199 (D.C. Cir. 1995)).  A defendant is liable under
§ 3729(a)(2) if (1) the defendant made, used, or caused to be
made a record or statement, (2) which was false, (3) which the
defendant knew was false, and (4) which the defendant made to get
a false or fraudulent claim paid or approved by the government.
Any person who violates the FCA is liable for a civil penalty and
damages.  A defendant is liable for civil penalties if the
defendant "submits a false claim or makes a false statement to
get a false claim paid . . . regardless of whether the government
shows that the submission of that claim caused the government
damages."  SAIC III, 626 F.3d at 1277.  For treble damages, the
government must also prove the amount of damages it sustained as
a result of the defendant's act.  See id. at 1277-78.

-13-

I.   FCA LIABILITY

There are several types of false claims under the FCA.
Here, the government argues that SAIC's claims and statements
were false under the "implied certification theory."  Id. at
1266.  "Under this theory, a claim for payment is false when it
rests on a false representation of compliance with an applicable
federal statute, federal regulation, or contractual term."  Id.;
see also SAIC I, 555 F. Supp. 2d at 49 ("'The theory of implied
certification is that where the government pays funds to a party,
and would not have paid those funds had it known of a violation
of a law or regulation, the claim submitted for those funds
contained an implied certification of compliance with the law or
regulation and was fraudulent.'" (quoting United States ex rel.
Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 28, 33
(D.D.C. 2003))).  "Courts infer implied certifications from
silence 'where certification was a prerequisite to the government
action sought.'"  SAIC III, 626 F.3d at 1266 (quoting United
States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d
1372, 1376 (D.C. Cir. 2000)).  Thus, under the implied
certification theory, a claim is false or fraudulent if a
defendant withholds "information about its noncompliance with
material contractual requirements."  Id. at 1269.

-14-

A.    Scienter

To be liable under the FCA, a defendant must have presented a false claim or made a false statement knowingly, meaning that the defendant had "actual knowledge of the information" or "act[ed] in deliberate ignorance [or reckless disregard] of the truth or falsity of the information."  31 U.S.C. § 3729(b)(2008); see also United States v. TDC Mgmt. Corp., Inc., 24 F.3d 292, 297-98 (D.C. Cir. 1994) (explaining that a defendant subject to liability under the FCA must have "'actual knowledge' of the falsity of their claims or acted with 'deliberate ignorance' or 'reckless disregard' of the truth or falsity of their claims" (quoting 31 U.S.C. § 3729(b)).  Thus, a defendant is liable if it had actual knowledge or if it had constructive knowledge of the falsity of its claims or statements.  See S. Rep. No. 99-345, at 7, 14-15 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272.

Under the implied certification theory, the plaintiff must establish that "the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." See SAIC III, 626 F.3d at 1271.[3]

_____

[3] The government contends that under the implied certification theory, the second prong of the scienter requirement requires that it show that an SAIC employee knew that the contractual provision was material.  It proceeds to explain that "information is material under the False Claims Act whenever it has a tendency to influence, or is capable of influencing, agency decision-making."  U.S.'s Mem. in Opp'n to Def. SAIC's

-15-

1.   D.C. Circuit's consideration of SAIC's scienter

SAIC argues that it is entitled to summary judgment on

Counts One and Two of the amended complaint because a reasonable

jury could not find that SAIC knowingly submitted false claims

and made false statements.   The government asserts that "the D.C.

Circuit has already considered, and rejected SAIC's argument, and

has explicitly held that record evidence supports a finding that

individual SAIC employees acted with knowledge."   U.S.'s Mem. in

Opp'n to Def. SAIC's Mot. for Summ. J. on FCA Liability ("U.S.

Opp'n (FCA Liability)") at 21.   The government makes several

arguments to support its assertion.   First, the government quotes

the D.C. Circuit's language that "record evidence is sufficient

to have allowed the jury to reasonably believe that SAIC

knowingly submitted false claims for payment and made false

_____

Mot. for Summ. J. on FCA Liability at 33.   However, the D.C.
Circuit made clear that the materiality element of the scienter
requirement in this case requires that an SAIC employee knew that
the contractual obligation was "material to the government's
*decision to pay*."   <u>SAIC III</u>, 626 F.3d at 1271 (emphasis added).
Thus, to avoid summary judgment, the government must show that an
employee knew that compliance with SAIC's conflict of interest
obligations was material to -- or had a tendency to influence --
the NRC's decision to pay the false claims.   <u>See</u> <u>United States ex
rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.</u>, 370 F.
Supp. 2d 18, 45 (D.D.C. 2005) ("For a violation to give rise to
false claims liability under this theory, compliance with the
presented claim must have been so important to the contract that
the government would not have honored the submission for payment
on the claim if it were aware of the violation." (citing <u>TDC
Mgmt. Corp.</u>, 288 F.3d at 426)); <u>see also</u> <u>United States ex rel.
Head v. Kane Co.</u>, 798 F. Supp. 2d 186, 200 (D.D.C. 2011)
(explaining that the FCA plaintiff must show that the false claim
was material to the government's "decision to pay").

-16-

statements of compliance with the organizational conflict of interest requirements set forth in its NRC contracts." SAIC III, 626 F.3d at 1273.  The D.C. Circuit earlier cabined this conclusion by explaining that SAIC argued only that it was entitled to judgment as a matter of law because the government had not shown that SAIC knew that it had violated a contractual obligation.  See id. at 1271.  Accordingly, the D.C. Circuit proceeded to consider whether there was record evidence that SAIC knew that the company was violating its contractual conflict of interest obligations.  In resolving this question, the court of appeals concluded that, based on the record, a reasonable jury could have found that "SAIC employees knew that either the company or its employees had other relationships that placed SAIC in a conflicting role that might have biased its judgment." Id. at 1272.  The D.C. Circuit did not address whether there was also sufficient evidence that SAIC knew that the conflict of interest provision was material.  Thus, in affirming the denial of SAIC's motion for judgment as a matter of law, the D.C. Circuit did not finally decide whether there is sufficient evidence for a jury to find that SAIC met both prongs of the scienter requirement under the implied certification theory.

Second, the government contends that the D.C. Circuit "explicitly considered and rejected SAIC's argument," U.S. Opp'n (FCA Liability) at 22, when the D.C. Circuit stated:

-17-

> We agree that the jury, relying entirely on evidence of
> actual knowledge possessed by individual company
> employees, could have found that SAIC knowingly
> submitted false claims and made false statements.
> Alternatively, relying on evidence regarding the
> actions of employees or SAIC's systems and structure,
> the jury could also have concluded that the company
> acted recklessly or with deliberate ignorance of the
> truth.

SAIC III, 626 F.3d at 1276.  This language does not foreclose

SAIC's argument that there is insufficient evidence for a jury to

find that SAIC knowingly submitted false claims and made false

statements.  Despite the government's characterization that this

language is the D.C. Circuit's "holding," see U.S. Opp'n (FCA

Liability) at 22, the language was neither the result of the D.C.

Circuit's opinion nor "portions of the opinion necessary to that

result," Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 67

(1996).[4]  As such, it is dictum and is not controlling.

Moreover, the import and meaning of that language is open to

interpretation.  Immediately after that language, the court

commented that "record evidence suggests that some employees who

knew about SAIC's organizational conflict of interest obligations

to the NRC were also aware of the company's business

relationships with British Nuclear, MSC, and Bechtel Jacobs."

---

[4] This language was the court's "counterfactual assessment
of what verdict the jury might have reached" had it not relied on
an erroneous jury instruction.  See SAIC III, 626 F.3d at 1276.
The court found that such an assessment was insufficient under
the relevant standard to affirm the judgment for the government
on its FCA claims and thus vacated the judgment and remanded the
case.  See id. at 1276-77.

-18-

SAIC III, 626 F.3d at 1276.  The court continued that, "[i]f the jury found that these individuals knew or recklessly failed to know that SAIC, by having these conflicts and failing to disclose them, violated a requirement under its NRC contract that was material to the receipt of payment, then that finding would be enough to establish SAIC's scienter."  Id. (emphasis added). However, the court did not comment on whether the record was sufficient for the jury to have found that SAIC knew that compliance with its OCI obligations was material to the NRC's decision to pay SAIC's claims.  Thus, while the court's language may be read as a determination that there is sufficient evidence for a jury to find that SAIC knew that its claims and statements were false, the language may also be a simple explanation of what the jury might have done.  "In any event, the ambiguous comment[s] [were] made without analysis in dicta and [do] not control this case."  Pac. Operators Offshore, LLP v. Valladolid, 132 S. Ct. 680, 688 (2012).

  2. Actual knowledge

   a. _D.C. Circuit's standard_

SAIC argues that under the implied certification theory, to prove that SAIC had actual knowledge of a false claim or statement, the government must show that at least one individual SAIC employee knew both that SAIC had an OCI and that SAIC's conflict of interest obligations were material.  See Def. SAIC's

-19-

Mot. for Summ. J. on FCA Liability ("SAIC Mot. (FCA Liability)"),
Mem. of P. & A. in Supp. of Def. SAIC's Mot. for Summ. J. on FCA
Liability ("SAIC Mem. (FCA Liability)") at 14-15.  The government
counters that it can meet its burden by showing that one SAIC
employee knew that SAIC had an OCI and a different SAIC employee
knew that the conflict of interest obligations were material.
<u>See</u> U.S. Opp'n (FCA Liability) at 27-31.

The D.C. Circuit did not expressly address this issue on
appeal.  However, in rejecting the "collective knowledge" jury
instruction, it explained that, to establish a corporation's
scienter under the implied certification theory, the FCA
plaintiff must show that an individual employee knew both that
the corporation was noncompliant with its contractual obligations
and that the obligations were material.  At trial, the jury was
instructed that SAIC is

> liable for the collective knowledge of all employees
> and agents within the corporation so long as those
> individuals obtained their knowledge acting on behalf
> of the corporation.
>     Therefore, if a corporation has many employees or
> agents, you must consider the knowledge possessed by
> those employees and agents as if it was added together
> and combined into one collective pool of information.
> If that collective pool of information here gives a
> reasonably complete picture of false or fraudulent
> statements or claims -- false or fraudulent claims or
> false statements, you may find that SAIC itself
> possessed a reasonably complete picture of the false or
> fraudulent claims or false statements and acted
> knowingly.

Final Jury Instructions, 7/28 a.m. Tr. at 17:1-14.

-20-

On appeal, the D.C. Circuit held that the "collective knowledge" instruction "provides an inappropriate basis for proof of scienter because it . . . is inconsistent with the Act's language, structure, and purpose." SAIC III, 626 F.3d at 1274. It explained that the statutory definitions of knowing and knowingly are meant

> to capture the "'ostrich-like' conduct which can occur in large corporations" where "corporate officers insulate themselves from knowledge of false claims submitted by lower-level subordinates" . . . [without] "punishing honest mistakes or incorrect claims submitted through mere negligence" or imposing "a burdensome obligation" on government contractors rather than a "limited duty to inquire." The resulting statutory language demonstrates the care Congress took to balance competing objectives. Although Congress defined "knowingly" to include some forms of constructive knowledge, its definition of that term imposes liability for mistakenly false claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence.

SAIC III, 626 F.3d at 1274-75 (quoting S. Rep. No. 99-345, at 6-7, 19 (1986)). Thus, the court concluded that the collective knowledge instruction was problematic because it

> [l]ack[s] such balance and precision . . . and allows "a plaintiff to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds."

Id. (quoting United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 918 n.9 (4th Cir. 2003)).

Like its view of the collective knowledge instruction, the government's interpretation of the scienter requirement lacks the

-21-

balance that Congress intended to establish in defining knowing

and knowingly.  The government's scienter requirement would allow

it to prove that SAIC knowingly submitted false claims and made

false statements by piecing together "innocent" knowledge.  For

example, the government could show that SAIC had the requisite

scienter by showing that one employee knew that SAIC was

noncompliant with the NRC contracts because SAIC had OCIs and

that another employee knew the conflict of interest obligations

were material.  To establish scienter, the government would not

have to show that the employees ever spoke to each other, were

aware of what each other knew, or recklessly disregarded the

truth or falsity of their claims or statements.  However, the

D.C. Circuit made clear that this kind of "constructive

knowledge" should be the basis for liability only where a

corporation's structure or processes prevented an employee from

learning what the other knew.  <u>See</u> <u>SAIC III</u>, 626 F.3d at 1274-75.

Otherwise, a company may be found liable under the FCA where its

employees were merely negligent.  To maintain Congress's intended

balance, the same employee must have actual knowledge that a

claim is false.

Under the implied certification theory, a claim is false if

"the contractor withheld information about its noncompliance with

material contractual requirements."  <u>Id.</u> at 1269.  Thus, the

government must prove either that the same employee knew of the

-22-

noncompliance with a contractual obligation *and* knew that the
obligation was material, or that SAIC deliberately ignored or
recklessly disregarded the truth.   See United States v. Fadul,
No. DKC 11-0385, 2013 WL 781614, at *9 (D. Md. Feb. 28, 2013)
(citing SAIC III, 626 F.3d at 1274) (explaining that in a case
where the government seeks to hold an entity liable under the FCA
under an implied certification theory, "the Government must prove
an entity's scienter by demonstrating that a *particular* employee
or officer acted knowingly" (emphasis added)); see also SAIC III,
626 F.3d at 1276 (stating that a jury could find that SAIC had
actual knowledge where there is evidence that "some employees who
knew about SAIC's organizational conflict of interest obligations
to the NRC were *also* aware of the company's business
relationships with British Nuclear, . . . and Bechtel Jacobs" and
"that these individuals knew or recklessly failed to know that
SAIC, by having these conflicts and failing to disclose them,
violated a requirement under its NRC contract that was material
to the receipt of payment" (emphasis added)).[5]

_____

        [5] United States ex rel. Harrison v. Westinghouse Savannah
River Co., 352 F.3d 908 (4th Cir. 2003), does not compel a
different conclusion.  In its opposition to SAIC's motion for
summary judgment on FCA liability, the government argues that in
Harrison, the Fourth Circuit "refused to adopt a standard less
onerous than the one sought by SAIC here."  U.S. Opp'n (FCA
Liability) at 28.  In Harrison, the defendant argued that the FCA
requires that the plaintiff show that an employee knew of the
company's noncompliance with a contractual provision and that the
same employee knew that the company was required to submit
certifications and submitted a false certification to the

-23-

b.   *Evidence that individual SAIC employee knew*
*that claims and statements were false*

SAIC argues that it is entitled to summary judgment on the government's FCA claims because there is "no evidence that any SAIC employee simultaneously knew of SAIC's alleged conflict-of-interest violations and that those violations were supposedly material to the Government's payment decisions." SAIC Mem. (FCA Liability) at 2. Specifically, SAIC asserts that SAIC employees John Pierce Martin, Thomas Rodehau, Alex Murray, Michael McKenzie-Carter, Sandra Carder, and Dr. Mark Otis did not know that SAIC had OCIs in violation of the 1992 and 1999 contracts and that those employees did not know that SAIC's conflict of interest obligations were material to the government's decision to pay.

The government counters that the evidence shows that multiple SAIC employees knew both that SAIC had OCIs that

---

government. 352 F.3d at 918. The court "decline[d] to adopt Westinghouse's view that a single employee must know both the wrongful conduct and the certification requirement." Id. at 919. The court explained that if it "established such a rule, corporations would establish segregated 'certifying' offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability." Id. The government admits that the "single actor" theory rejected in Harrison is distinct from the standard adopted by the D.C. Circuit in this case. However, the government has not established the relevance of Harrison to this case or demonstrated that Harrison's "single actor" theory is less onerous than the D.C. Circuit's requirement that the same employee know of the company's non-compliance with a contractual provision and the materiality of that provision.

-24-

violated the NRC contracts and that SAIC's conflict of interest
obligations were material to the government's decision to pay
SAIC's claims.  Specifically, the government argues that five
SAIC employees knew both that SAIC had an OCI and that SAIC's OCI
obligations were material.

First, the government argues that SAIC employee Steve Turner
knew that SAIC's claims were false.  There is sufficient evidence
in the record to create a triable question of whether Turner was
aware that the BNFL Oak Ridge project could create an OCI with
the work being done for the NRC under the 1992 and 1999
contracts.  See, e.g., Turner Test., 7/7 p.m. Tr. 87:22-90:25
(testifying that the Oak Ridge project would involve recycling
metal from commercial nuclear power plants); Turner Test., 7/8
a.m. Tr. 61:18-62:16 (suggesting that he may have known that the
NRC was working on developing rules regarding recycling
radioactive materials);  Murray Test., 7/2 p.m. Tr. 75:11-25,
76:18-21, 92:1-6, 109:21-110:2 (testifying that Murray told
Turner that the Oak Ridge project may create an OCI with the NRC
project).  However, the government has not identified evidence
that shows that Turner was aware that SAIC had conflict of
interest obligations under the NRC contracts and thus, that SAIC
was noncompliant with the 1992 and 1999 contracts.  Similarly,
although Turner testified that both he and SAIC "take [OCIs] very
seriously," Turner Test., 7/8 p.m. Tr. 109:1-3, the government

-25-

has not shown that Turner knew that the conflict of interest obligations were material to the government's decision to pay the claims submitted under the 1992 and 1999 contracts.  Therefore, the government has not provided evidence that shows that there is a triable issue as to whether Turner knew that SAIC's claims and statements were false.

Second, the government argues that Murray knew that SAIC had an OCI with its work for the NRC and that its conflict of interest obligations were material.  There is evidence that Murray knew that SAIC's work with BNFL on the Oak Ridge Project created an OCI.  See, e.g., Murray Test., 7/2 p.m. Tr. 75:11-25 (testifying that he knew that there were some "overlaps" between SAIC's work with BNFL and the NRC); Murray Test., 7/3 a.m. Tr. 11:25-12:4 (testifying that he was "concerned that there was a potential for conflict of interest for work related to the Oak Ridge projects, . . . and the work on the NRC contract on metal recycle").  However, the government has not cited any evidence that shows that Murray knew that the NRC contracts contained conflict of interest obligations or that the obligations were material.  Thus, the government has not made a showing sufficient to establish that Murray knew that SAIC's claims and statements were false.

Third, the government alleges that McKenzie-Carter knew that SAIC's claims and statements were false.  McKenzie-Carter was an

-26-

SAIC scientist who "helped prepare SAIC's technical proposal for the 1992 Contract and worked on both the 1992 and 1999 Contracts." SAIC Mot. (FCA Liability), Def. SAIC's Stmt. of Undisputed Material Facts in Supp. of its Mot. for Summ. J. on FCA Liability ¶ 42. In this capacity, he was familiar with the scope of the work to be performed under the NRC contracts including that SAIC's work could affect potential rulemaking. McKenzie-Carter Test., 7/17 p.m. Tr. 41:14-42:10. In his deposition, McKenzie-Carter testified that he was "somewhat familiar" with the OCI regulations that applied to the 1992 and 1999 contracts. U.S. Opp'n (FCA Liability), Ex. 35 ("McKenzie-Carter Dep.") at 105:19-106:2. At trial, McKenzie-Carter also confirmed that he understood that the NRC wanted a product that could be "trusted" and that "one of the ways that NRC seeks to make sure that its contractors' assistance can be trusted is organizational conflict of interest avoidance." McKenzie-Carter Test., 7/17 p.m. Tr. 45:25-46:21. Thus, a jury could find that McKenzie-Carter knew that the conflict of interest obligations in the NRC contracts were material.

McKenzie-Carter testified that, in late 1999, another SAIC employee informed him about the work that employee was doing on the BNFL Oak Ridge Project. See McKenzie-Carter Test., 7/17 p.m. Tr. 77:12-18. In his deposition, McKenzie-Carter stated that he knew about the BJC project and had considered whether it created

an OCI with SAIC's work for the NRC.  See McKenzie-Carter Dep. at
91:20-92:20, 93:11-12.  Although McKenzie-Carter testified that
he ultimately concluded that there was no OCI, a jury could
disbelieve his testimony in light of McKenzie-Carter's knowledge
of the substantial overlap between the work being done for the
BJC project and the work being done under the NRC contracts.  See
id. at 93:13-94:17.  Thus, the record could support a finding
that McKenzie-Carter knew that the BNFL Oak Ridge project and the
BJC project created OCIs with the NRC work.  The government also
asserts that McKenzie-Carter either knew or recklessly
disregarded Motl's role on the board of the ARMR.  See U.S.'s
Resp. Stmt. of Genuine Issues & Material Facts in Supp. of its
Mem. in Opp'n to SAIC's Mot. for Summ. J. on FCA Liability ("U.S.
Resp. Stmt. (FCA Liability)") ¶ 200.  Specifically, the
government argues that unlike other versions of Motl's resume,
the one submitted with the NRC contract omitted Motl's service
with the ARMR.  See id. ¶ 198.  However, the United States failed
to provide any evidence that McKenzie-Carter was responsible for
selecting Motl to work on the 1999 contract or that McKenzie-
Carter knew or was responsible for omitting the ARMR board
position from the version of Motl's resume submitted to the NRC
with the 1999 Contract.  Accordingly, the government has shown
that whether McKenzie-Carter knew that SAIC's claims and
statements were false in 1999 is a triable issue.

-28-

Fourth, the government argues that SAIC employee Jeffery Slack knew that SAIC's claims were false.  The government has provided sufficient evidence to establish that Slack knew that the Oak Ridge Project with BNFL created an OCI with the NRC contracts.  Slack testified that he worked on the BNFL Oak Ridge project and on the BJC project.  Slack Test., 7/9 a.m. Tr. 84:24-85:11, 112:14-23.  He further stated that his work for BJC included recycling radioactive materials.  Id. at 100:1-101:19. Slack admitted that he was aware of the work that SAIC was doing under the NRC contracts and that he knew that the work included recycling contaminated metals.  See id. at 104:13-105:17. However, the government has not demonstrated that Slack knew of SAIC's conflict of interest obligations under the NRC contracts or that Slack knew that those obligations were material to the government's decision to pay.  Thus, the government has not provided evidence that shows that there is a triable issue as to whether Slack knew that SAIC's claims and statements were false.

Finally, the government asserts that Rucker "understood that SAIC was required to avoid and disclose potential organizational conflicts of interest to its customers, including the NRC."  U.S. Resp. Stmt. (FCA Liability) ¶ 149.  However, the government has provided no evidence to support this assertion.[6]  Moreover, even

---

[6] The portions of Rucker's trial and deposition testimony that the government cites do not support its assertion.  At his deposition, Rucker testified that he received OCI training at

if Rucker did testify that he knew that SAIC was required to avoid potential OCIs, the government has not cited any evidence that Rucker knew of SAIC's obligations under the 1992 and 1999 contracts or that they were material to the NRC's decision to pay SAIC's claims.  Therefore, the government has not made a showing sufficient to establish that Rucker knew that SAIC's claims and statements were false.

In its Responsive Statement of Genuine Issues and Material Facts in Support of its Memorandum in Opposition to SAIC's Motion for Summary Judgment on False Claims Act Liability, the government also argues that SAIC employees Richard Profant, Gerald Truitt, Christopher Caldwell, Motl, Gary Leatherman, and Milo Larsen knew that the NRC contracts contained an OCI provision and that the OCI provision was material.  <u>See</u> U.S. Resp. Stmt. (FCA Liability) ¶¶ 154-55, 161-62, 184-95, 201-10.[7]

---

SAIC.  U.S. Opp'n (FCA Liability), Ex. 27 (Rucker Dep. at 246:21-247:1).  However, he did not testify about the knowledge he gained from that training.  Similarly, the cited portions of Rucker's trial testimony are silent as to whether Rucker knew that SAIC had an obligation to avoid and disclose potential OCIs. <u>See</u> Rucker Test., 7/10 a.m. Tr. 106:8-108:15 (testifying that he did not think that "it was a potential conflict of interest if SAIC was preparing or furnishing advice to a government agency in a technical area where it was also providing consulting assistance to any other organization").

[7]  The government buried these arguments in its 101-page Responsive Statement, hardly the "concise" statement contemplated by Local Civil Rule 7(h)(1).  Its legal arguments and conclusions belonged in its memorandum of points and authorities in opposition, which cannot exceed 45 pages.  LCvR 7(a)-(b), (e).

-30-

However, the government's arguments in its Responsive Statement are insufficient to create a triable issue as to whether SAIC had actual knowledge of its allegedly false claims.

The government asserts that a jury could reasonably infer that SAIC employee Dr. Reginald Gotchy knew that SAIC had OCI obligations under the 1992 contract and that they were material. See id. ¶ 153.  While Gotchy's status as SAIC's Project Manager for the 1992 contract is sufficient evidence to create a genuine dispute of material fact about whether Gotchy knew that the 1992 contract imposed conflict of interest obligations on SAIC, without more, this evidence is insufficient for a reasonable jury to conclude that Gotchy knew that the obligations were material to the NRC's decision to pay.

The government argues that SAIC employee Betty Bidwell knew that SAIC's claims to the NRC were false.  See id. ¶¶ 176-80. During her deposition, Bidwell agreed that it was her "understanding that contractors with the NRC, contractors like SAIC, have an obligation to disclose to the NRC information describing relations which may give rise to an actual or potential conflict of interest."  U.S. Opp'n (FCA Liability), Ex. 31 (Bidwell Dep. at 129:22-130:4).  She also testified that contractors must "disclose relevant information in accordance with whatever the [request for proposal] states if there's a potential OCI for [a relationship] to be an actual conflict."

Id. at 130:7-11.  However, the government did not provide any
evidence to establish that Bidwell knew that the NRC contracts
included such an obligation or that if it did, that the
obligation was material.  Thus, the government has not provided
evidence that shows that there is a triable issue as to whether
Bidwell knew that SAIC was noncompliant with the NRC contracts
and that the OCI obligations were material.

Thus, evidence in the record could support a finding that in
1999, McKenzie-Carter knew that SAIC was noncompliant with its
OCI obligations and that SAIC's conflict of interest obligations
were material to the government's decision to pay the NRC
contract.  The government has not made a showing sufficient to
establish that any other individual SAIC employee had actual
knowledge that SAIC's claims and statements were false.

3.    Reckless disregard or deliberate ignorance

SAIC argues that there is insufficient evidence to show that
SAIC recklessly disregarded or deliberately ignored the truth or
falsity of its claims submitted to the NRC.  See SAIC Mem. (FCA
Liability) at 30-42.  The government counters that as was
determined in SAIC II, there is sufficient evidence for a
reasonable jury to find that SAIC's OCI compliance system
prevented SAIC from determining the truth or falsity of its
claims or statements.  U.S. Opp'n (FCA Liability) at 35-38.  SAIC
retorts that the government cannot rely on the holding in SAIC II

-32-

because in <u>SAIC III</u>, the D.C. Circuit changed the reckless
disregard and deliberate ignorance standards.  <u>See</u> Reply Mem. in
Supp. of Def. SAIC's Mot. for Summ. J. on FCA Liability at 17 n.3
(arguing that the D.C. Circuit's "statements about the scienter
requirement (including its rejection of the Government's
collective knowledge theory) apply with equal force" to the three
FCA knowledge standards).

In finally rejecting the collective knowledge theory, the
D.C. Circuit limited the theories an FCA plaintiff can use to
prove that a defendant had constructive knowledge that its claims
or statements were false.[8]  However, the court agreed that an FCA
plaintiff can still establish that a defendant acted knowingly by
demonstrating that a corporate defendant's structures or
processes were such that the defendant could not learn that its
claims and statements were false.  <u>See</u> <u>SAIC III</u>, 626 F.3d at 1276
(explaining that "if a plaintiff can prove that a government
contractor's structure prevented it from learning facts that made
its claims for payment false, then the plaintiff may establish

_____

   [8] For example, if a contractor's employee was recklessly
unaware of the contractor's non-compliance with a contractual
provision and another employee was recklessly unaware of the
materiality of that contractual provision, an FCA plaintiff could
not rely on the employees' "collective pool of knowledge" alone
to argue that the contractor knew that its claims were false.
Instead, an FCA plaintiff would have to show that the
organization's structure or processes prevented one employee from
learning of the falsity of the claim.  <u>See</u> <u>SAIC III</u>, 626 F.3d at
1274-75.

-33-

that the company acted in deliberate ignorance or reckless disregard of the truth of its claims").

In <u>SAIC II</u>, SAIC argued that "the evidence at trial was legally insufficient to support a jury finding of knowledge under a reckless disregard or deliberate ignorance theory because the evidence shows that SAIC made diligent inquiry to ensure compliance with its OCI obligations."  653 F. Supp. 2d at 99 (internal citations omitted).  This argument was rejected:

> While SAIC maintains that its OCI compliance system was both reasonable and effective, and that it made a diligent inquiry to ensure compliance, there was also testimony provided by at least two witnesses, Sandra Carder and Betty Bidwell, who testified that SAIC's OCI compliance system was inadequate in certain important respects, including by failing to incorporate some of SAIC's business relationships, by containing incomplete descriptions of SAIC's work, and by failing to associate relevant key words with certain descriptions. (Carder Test., 7/22 a.m. Tr. 66:18-69:11, 78:13-21; Bidwell Test., 7/16 a.m. Tr. 76:14-77:9.)  Similarly, witness John Pierce Martin testified that he made representations to the government about SAIC's OCIs without having seen documents the jury could have deemed relevant to their assessment of SAIC's OCIs. (<u>See</u> Martin Test., 7/14 p.m. Tr. 18-40.)  Accordingly, there was sufficient evidence to support a jury's finding that SAIC acted with reckless disregard or deliberate ignorance.

<u>Id.</u>  Thus, it has already been determined that there is sufficient evidence for a jury to find that SAIC's compliance system did not allow SAIC to determine the truth or falsity of its claims or statements.[9]  Because there is sufficient evidence

---

[9] Although <u>SAIC II</u> was deciding a motion for judgment as a matter of law under Rule 50, "the standard for granting summary

that SAIC knew that its claims and statements were false, SAIC's motion for summary judgment will be denied.

B.   False claims and statements

The government moves for partial summary judgment that SAIC's claims and statements were false.

"[T]o establish the existence of a 'false or fraudulent' claim on the basis of implied certification of a contractual condition, the FCA plaintiff -- here the government -- must show that the contractor withheld information about its noncompliance with material contractual requirements." SAIC III, 626 F.3d at 1269.  The government may establish materiality in numerous ways "such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue." Id.

The government argues that the jury's verdict that SAIC violated the FCA bars SAIC from relitigating that SAIC breached its conflict of interest obligations and that SAIC failed to disclose its noncompliance with the NRC.  See U.S. Mem. (Falsity) at 20-22.  The government asserts it is the law of the case that SAIC submitted false claims and made false statements to the NRC. Id.  On remand, the D.C. Circuit vacated "the judgment as to

judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (quoting Anderson, 477 U.S. at 250-51)."

-35-

liability and damages under FCA sections 3729(a)(1) and

3729(a)(2)." <u>SAIC III</u>, 626 F.3d at 1280.  Vacated judgments are

not law of the case.  <u>See</u> <u>Johnson v. Bd. of Educ. of Chicago</u>, 457

U.S. 52, 53 (1982); <u>see also</u> <u>Jackson v. Coalter</u>, 337 F.3d 74, 85

(1st Cir. 2003).  Because the court of appeals vacated the

judgment as to FCA liability, the jury's verdict that SAIC

violated the FCA is not the law of the case.[10]

     The government also argues that the undisputed evidence

shows that all five of SAIC's challenged business

relationships -- SAIC's relationships with BNFL, BJC, ARMR, and

Alaron, and its financial interest in the PHP -- violated SAIC's

_____

     [10] The government also argues that the jury's verdict that
SAIC breached the 1992 contract precludes SAIC "from arguing
during retrial that it did not breach its duty to avoid and
disclose organizational conflicts of interest."  U.S. Mem.
(Falsity) at 17.  However, "[i]ssue preclusion is inapplicable
here because it applies only where a Court has decided an issue
in a separate lawsuit."  <u>Havens v. Mabus</u>, 892 F. Supp. 2d 303,
310 n.4 (D.D.C. 2012) (citing <u>Novak v. World Bank</u>, 703 F.2d 1305,
1309 (D.C. Cir. 1983)); <u>accord</u> <u>Jewish War Veterans of the U.S.,
Inc. v. Gates</u>, 506 F. Supp. 2d 30, 38-39 (D.D.C. 2007); <u>see also</u>
<u>Montana v. United States</u>, 440 U.S. 147, 153 (1979) ("Under
collateral estoppel, once an issue is actually and necessarily
determined by a court of competent jurisdiction, that
determination is conclusive in *subsequent* suits based on a
different cause of action involving a party to the prior
litigation." (emphasis added)).  Instead, because the government
argues that the jury in this case previously decided these
issues, only the law of the case doctrine applies.  <u>See</u> <u>Overseas
Shipholding Grp., Inc. v. Skinner</u>, 767 F. Supp. 287, 296 (D.D.C.
1991) (explaining that "it is hornbook law that the law of the
case doctrine operates as a form of issue preclusion *within the
same case*").  Curiously, the government did not argue in its
motion for summary judgment that the jury's breach of contract
verdict and the issues necessarily decided by implication are law
of the case.

-36-

conflict of interest obligations.  See U.S. Mem. (Falsity) at 26;

see also U.S. Reply in Supp. of its Mot. for Partial Summ. J.

("U.S. Reply (Falsity)") at 23 n.18.  In addition, the government

argues that it is undisputed that SAIC did not disclose any of

these relationships to the NRC.  U.S. Mem. (Falsity) at 26.

> 1.   Contractor provides work to an organization
>      regulated by the NRC in the same area or on the
>      same matter as the contractor's work for the NRC

The 1992 and 1999 contracts required SAIC to certify that

the NRC contracts did not result in any of the following

situations or relationships:

> (i) Where the . . . contractor provides advice and
> recommendations to the NRC in the same technical area
> where it is also providing consulting assistance to any
> organization regulated by the NRC.
> (ii) Where the . . . contractor provides advice to the
> NRC on the same or similar matter on which it is also
> providing assistance to any organization regulated by
> the NRC.

48 C.F.R. § 2009.570-3(b)(1); see also SAIC III, 626 F.3d at

1262.  The government argues that at least four of SAIC's five

challenged business relationships were with organizations that

were regulated by the NRC.  See U.S. Mem. (Falsity) at 26-27.

The government further argues that undisputed evidence shows that

SAIC's work with these companies was in the same area as the work

that SAIC was performing for the NRC.  See id. at 27-28.

First, the government has shown that there is evidence in

the record that BNFL was regulated by the NRC.  See SAIC II, 653

F. Supp. 2d at 100.  SAIC counters that there is evidence that

-37-

SAIC's work with BNFL was not regulated by the NRC.  See, e.g.,
Turner Test., 7/8 p.m. Tr. at 104:13-23.  However, SAIC does not
dispute the government's broader claim that BNFL is an
organization regulated by the NRC.  Thus, the government's
assertion that BNFL was a NRC licensee during the relevant period
is conceded.  See Fed. R. Civ. P. 56(e)(2) (allowing court to
consider as undisputed a movant's factual assertion that the
opponent fails to address); Iweala v. Operational Techs. Servs.,
Inc., 634 F. Supp. 2d 73, 80-81 (D.D.C. 2009).  The government
contends that SAIC was assisting BNFL in the release and recycle
of radioactive material which was the same technical area as was
SAIC's work with the NRC.  SAIC provides sufficient evidence to
show that there is a genuine dispute as to whether SAIC's work
with BNFL was in the "same area" as its work for the NRC.  For
example, Slack testified that SAIC's work with BNFL included
studying a metal used at DOE facilities but not at NRC
facilities.  See Slack Test., 7/9 p.m. Tr. at 48:3-49:1.  A
reasonable jury could find that given the different metals,
SAIC's work with BNFL was not in the "same area" as its work for
the NRC.

Second, the government argues that ARMR included a number of
NRC licensees.  See Loiselle Test., 7/7 a.m. Tr. at 56:12-15.
The government further argues that as a member of the board of
directors for ARMR, Motl advised and assisted ARMR on the same

-38-

proposed rule with which SAIC was assisting the NRC.  See id. at 106:2-109:8.  However, SAIC provides evidence that SAIC was never a member of ARMR.  See Loiselle Test., 7/7 p.m. Tr. at 38:1-5.  Thus, a reasonable jury could find that SAIC was not a member of ARMR and that Motl's individual role on the board of directors was insufficient to create an actual or potential OCI.

Third, at trial, there was evidence that Alaron had an NRC-regulated facility.  See SAIC II, 653 F. Supp. 2d at 100.  There was also evidence that SAIC was going to assist Alaron with and advise Alaron on the release and recycle of nuclear materials if Alaron was awarded a contract.  Taylor Test., 7/9 a.m. Tr. at 63:13-64:8.  SAIC counters that it was going to work at Alaron's DOE facility in Georgia and not at Alaron's NRC-regulated Pennsylvania facility.  See id. at 66:20-67:4.  However, SAIC does not dispute the government's general allegation that Alaron was regulated by the NRC.  SAIC does provide evidence that it did not advise or assist Alaron because Alaron was never awarded the proposed contract.  See Tempel Test., 7/9 a.m. Tr. at 32:23-25.  Thus, a jury could find that SAIC's relationship with Alaron did not violate SAIC's conflict of interest obligations because SAIC's proposed work with Alaron never occurred.

Fourth, the government asserts that based on SAIC's concept of the PHP, the project could have involved materials regulated by the NRC including radioactive waste.  See Larsen Test., 7/10

a.m. Tr. at 32:2-14; 11:2-10.  SAIC counters that the PHP never

came to fruition.  See id. at 57:15-23.  As such, it contends

that any plans to seek an NRC license are irrelevant because the

concept was never regulated by the NRC.  There is also evidence

that the majority of the PHP work was "designed specifically for

DOE's [waste]."  Leatherman Test., 7/16 a.m. Tr. at 42:12-21.

Based on the evidence in the record, a reasonable jury could find

that the PHP was not regulated by the NRC and that the SAIC's

proposed work with the PHP was not in the same area or on the

same matter as SAIC's work for the NRC.

    2.  Potential bias

    Under the 1992 and 1999 contracts, SAIC affirmed numerous

times that it did not have any OCIs and agreed to promptly

disclose any OCIs that arose after SAIC entered into the

contracts.  The contracts adopted the then-NRC regulations'

definition of an OCI.  The regulations defined an OCI as:

> "a relationship . . . whereby a contractor or
> prospective contractor has present or planned interests
> related to the work to be performed under an NRC
> contract which: (1) May diminish its capacity to give
> impartial, technically sound, objective assistance and
> advice or may otherwise result in a biased work
> product, or (2) may result in its being given an unfair
> advantage."

SAIC III, 626 F.3d at 1262 (quoting 41 C.F.R. § 20-1.5402(a)).

The government argues that SAIC's contested business

relationships created a potential that SAIC would present the NRC

with biased work product.  See U.S. Mem. (Falsity) at 28.  SAIC

-40-

counters that there is a genuine dispute whether SAIC's
relationships resulted in a biased work product for the NRC.

There is evidence that SAIC's work with BNFL did not result
in biased work for the NRC.  Caldwell denied that SAIC had "any
responsibility to release metals from" from BNFL's facility.
Caldwell Test., 7/9 p.m. Tr. at 114:7-9.  He further testified
that SAIC did not have a financial interest in the release or
recycle from the BNFL facility.  Id. at 114:10-115:2.  Because
SAIC was not obligated to release metals and did not have a
financial interest in any release or recycle from the BNFL
facility, a reasonable jury could find that SAIC's work with BNFL
did not result in biased work for the NRC.

There is also evidence that SAIC's work with BJC did not
result in biased work for the NRC.  At trial, the government
introduced testimony and other evidence that SAIC's work for both
BJC and the NRC included dose assessment and cost-benefit
analyses of proposed recycle options.  See SAIC II, 653 F. Supp.
2d at 101.  "On the evidence presented at trial regarding the
similarities between the work performed for the NRC and for the
BJC Dose Assessment project, [a] jury could . . . reasonably
conclude[] that the BJC project may have created an actual or
potential OCI."  Id.  However, a reasonable jury could also reach
the opposite conclusion and find that SAIC's work for the NRC was
not biased despite the similarities.  For example, Slack

-41-

testified that the DOE limits on the release of materials applied
to the BJC project.  See Slack Test., 7/9 p.m. Tr. at 26:22.
However, because the NRC and the DOE placed the same limits on
release, in an early report prepared for BJC, SAIC stated that
the assessments in the report complied with both DOE and the NRC
limits for release.  See id. at 26:13-27:12.  Thus, a reasonable
jury could find that the similarities between the work SAIC was
doing for BJC and the NRC reflected common industry practices and
mirrored similarities between the NRC's and the DOE's regulations
and a finding that the similarities indicate bias overstate their
significance.

     SAIC has shown that whether its relationship with ARMR
created a potential to produce biased work for the NRC is
disputed.  Although there is evidence that "Motl's involvement
with the [ARMR] placed SAIC in a conflicting role where it may
have been biased," SAIC II, 653 F. Supp. 2d at 101, there is also
evidence that the relationship did not result in SAIC bias.  For
example, as is noted above, there is evidence that SAIC was not a
member of ARMR.  There is also evidence that SAIC did not pay for
Motl to attend ARMR meetings that were not in Motl's hometown.
See Motl Test., 7/23 a.m. Tr. at 52:11-53:1.  While the parties
agree that Motl played a significant role in the 1999 contract,
see U.S. Stmt. (Falsity) ¶ 106; Def. SAIC's Opp'n to Pl. U.S.'s
Mot. for Partial Summ. J., Def. SAIC's Resp. Stmt. of Genuine

-42-

Issues & Material Facts ¶ 106,[11] there is evidence that ARMR was "kind of defunct" by the time SAIC entered the 1999 contract, <u>see</u> Loiselle Test., 7/7 p.m. Tr. at 48:19-21.  Thus, a reasonable jury could find that Motl in his individual capacity, and not SAIC, was involved with ARMR and that Motl's later involvement with the 1999 contract did not produce bias in SAIC's work for the NRC because the ARMR was "defunct" by that time.

As is discussed above, SAIC's work with Alaron and PHP never progressed beyond conceptual, planning stages.  Because SAIC never engaged in work with Alaron or employed the PHP concept, a reasonable jury could find that these projects did not create OCIs because they did not create a potential to produce bias in SAIC's work for the NRC.

3.    Materiality of conflict of interest obligations

The government argues that there is no genuine dispute of material fact that SAIC's conflict of interest obligations were material.  <u>See</u> U.S. Reply (Falsity) at 23 n.18; <u>see also</u> U.S. Mem. (Falsity) at 29-31.  At trial, "[n]umerous witness[es] from both the NRC and SAIC testified that the OCI obligations in SAIC's contracts with the NRC were important to the overall purpose of the contract."  <u>SAIC II</u>, 653 F. Supp. 2d at 103; <u>see</u>

---

[11] There is evidence that Motl did not play a key role in the 1992 contract, <u>see</u> Mem. of P. & A. in Supp. of Def. SAIC's Opp'n to Pl. U.S.' Mot. for Partial Summ. J., Ex. 54 (SAIC's Request for Proposal (Jan. 23, 1992)) (not listing Motl as a management/technical lead or technical support).

-43-

also SAIC III, 626 F.3d at 1271 (quoting SAIC II, 653 F. Supp. 2d at 103).  However, there is also evidence that SAIC did not understand that payment from the NRC was conditional on SAIC's compliance with its conflict of interest obligations.  See, e.g., Martin Test., 7/14 a.m. Tr. at 54:5-20 (testifying that SAIC agreed to the conflict of interest obligations so that SAIC would be awarded the contract but that "getting paid and signing the contract" were "mutually exclusive"); Rodehau Test., 7/7 a.m. Tr. 18:13-19:8 (testifying that he believed that SAIC had to certify whether it had conflicts but that SAIC would be paid whether it certified that it did or did not have conflicts).  Thus, there are genuine disputes of material fact regarding whether SAIC's conflict of interest obligations were material.

Because SAIC has provided sufficient evidence for a reasonable jury to find that its challenged business relationships did not violate its OCI obligations and that the obligations were not material, the government's motion for summary judgment will be denied.

C.  Statements or records made "to get" false claims paid

The government argues that "the undisputed facts demonstrate that SAIC made and used false statements regarding its lack of OCIs to get its claims paid."  U.S. Mem. (Falsity) at 31.  As used in 31 U.S.C. § 3729(a)(2), "to get" denotes a defendant's purpose of getting the government itself to pay the claim.

-44-

Allison Engine Co., Inc. v. United States ex rel. Sanders, 553

U.S. 662, 668-69 (2008).

Here, there was evidence at trial that SAIC made statements

about its OCIs directly to the NRC "*for the purpose* of having

[its] claims paid." SAIC II, 653 F. Supp. 2d at 104-05.  For

example,

> Rodehau testified that SAIC had to agree to the
> provisions regarding OCIs in its NRC contract to be
> eligible for an award of the contract and to receive
> payment under the contract, and that a violation of the
> OCI provisions could result in termination of the
> contract.  SAIC's Martin also testified that in
> response to the NRC's cure notice seeking additional
> information regarding SAIC's OCIs, SAIC submitted a
> response to the NRC that SAIC intended the NRC to rely
> on when deciding whether to terminate its contract with
> SAIC.

Id. at 105 (internal citations omitted).  However, Rodehau also

agreed at trial that he had never "submit[ted] to the NRC any

representation that SAIC had no OCIs just in order to get the

company's claims paid." Rodehau Test., 7/7 a.m. Tr. at 30:25-

31:2.  Martin also testified that when he received a modification

of the 1992 contract, he did not make his OCI representation to

get any of SAIC's claims paid.  See Martin Test., 7/14 p.m. Tr.

at 60:7-9.  Drawing all justifiable inferences in favor of SAIC,

there is a genuine dispute as to whether SAIC made statements "to

get" the NRC to pay its claims.

-45-

II.  FCA DAMAGES

     A.   1992 contract

     SAIC argues that the government is barred under the issue
preclusion or law of the case doctrines from recovering more than
$78 in FCA damages under the 1992 contract because the proper
measure of FCA damages articulated in SAIC III is "identical" to
the breach of contract damages actually and necessarily decided
by the jury.  See Def. SAIC's Mot. for Summ. J. on Damages ("SAIC
Mot. (Damages)"), Mem. of P. & A. in Supp. of Def. SAIC's Mot.
for Summ. J. on Damages ("SAIC Mem. (Damages)") at 16-25.[12]  The
government counters that it is not precluded from arguing that it
is entitled to more than $78 in FCA single damages because FCA
damages and breach of contract damages are not the same issue and
thus, FCA damages were not decided by the jury.  U.S. Mem. in
Opp'n to Def. SAIC's Mot. for Partial Summ. J. on Damages ("U.S.
Opp'n (Damages)") at 12.

     SAIC argues that breach of contract damages and FCA damages
in this case are the same issue.  In SAIC III, the court of
appeals held that in this case, "[t]o establish [FCA] damages,
the government must show not only that the defendant's false
claims caused the government to make payments that it would have
otherwise withheld, but also that the performance the government

_____

     [12] For the reasons discussed above, see supra note 10, law
of the case and not issue preclusion applies in this context.

-46-

received was worth less than what it believed it had purchased."
SAIC III, 626 F.3d at 1279.  This is because the fact-finder
should base "damages on the amount the government actually paid
minus the value of the goods or services the government received
or used."  Id.

SAIC contends that in holding that FCA damages should be
calculated using the benefit of the bargain measure described,
the D.C. Circuit "adopted a measure of FCA damages that is
identical to the standard used by the jury to calculate the
Government's $78 award of breach-of-contract damages."  SAIC Mem.
(Damages) at 22.  At trial, the jury was instructed that "[t]he
measure of damages for a breach of contract is that amount of
money necessary to place the injured party in the same economic
position it would have been if the contract had not been
breached."  Final Jury Instructions, 7/28 a.m. Tr. at 24:2-6.
The jury was further instructed that the government is entitled
only to "damages that were foreseeable at the time the contract
was made."  Id. at 24:13-14.

Breach of contract damages include "(a) the loss in the
value to him of the other party's performance caused by its
failure or deficiency, plus (b) any other loss, including
incidental or consequential loss, caused by the breach, less
(c) any cost or other loss that he has avoided by not having to
perform."  Restatement (Second) of Contracts § 347 (1981).  Thus,

to calculate damages, a jury should "first determine the amount
of money the plaintiff would have received had the contract not
been breached.  Next, add both incidental damages and
consequential damages, if any.  Lastly, subtract from that any
money [the plaintiff] saved because [the plaintiff] did not have
to complete the contract."  D.C. Std. Civ. Jury Instr. No. 11-31
(Breach of Contract -- Damages).  Additionally, contract damages
are recoverable only if they were reasonably foreseeable when the
parties formed the contract.  See Sears, Roebuck & Co. v. Goudie,
290 A.2d 826, 832 (D.C. 1972).  SAIC does not address whether FCA
damages also include incidental and consequential damages and
whether they are reduced by any avoidance costs.  Similarly, SAIC
does not discuss whether FCA damages must also be foreseeable.
Thus, SAIC has not shown that breach of contract damages decided
by the jury is the "same issue" as FCA damages.  Because SAIC has
not shown that breach of contract damages and FCA damages are the
same, its motion for summary judgment regarding the 1992 contract
damages will be denied.[13]

---

[13] SAIC argues that the D.C. Circuit explicitly confirmed
that the jury's breach of contract damages calculation is
identical to the FCA damages.  SAIC Mem. (Damages) at 16-17.  In
recognizing the "difficulty the jury will face in calculating the
value of services tainted by potential conflict," the D.C.
Circuit confirmed that the jury can make such a calculation
noting that "the district court's breach of contract instruction
asked the jury to make just such a valuation."  SAIC III, 626
F.3d at 1280.  The D.C. Circuit's acknowledgment that the jury
was asked to value the services SAIC provided as part of the
breach of contract damages calculation does not equate with the

-48-

B.   <u>1999 contract</u>

SAIC moves for summary judgment on the government's claim
that it incurred FCA damages under the 1999 contract arguing that
"the Government has failed to produce any evidence that the value
of SAIC's work under that Contract was less than what the
Government paid for it."   SAIC Mem. (Damages) at 25.

The government is seeking "the total amount paid by the
United States under the 1999 Contract" as single damages for
SAIC's allegedly false claims and statements made under the 1999
Contract.   <u>See</u> SAIC Mem. (Damages), Ex. 24 (The U.S.'s Am. Obj'ns
& Resps. to Def. SAIC's 2d Set of Interrogs. at 4).   In this
case, the government's damages are "the amount of money the
government paid due to SAIC's false claims over and above what
the services the company actually delivered were worth to the
government."   <u>SAIC III</u>, 626 F.3d at 1279.   Thus, to recover the
full amount that the government paid, the government must show by
a preponderance of the evidence "that the value of SAIC's advice
and assistance was completely compromised by the existence of
undisclosed conflicts, making the full amount paid to SAIC the
proper measure of damages."   <u>Id.</u> at 1279-80.

SAIC argues that the government cannot show that it suffered
any damages as a result of SAIC's allegedly false claims and

_____

court adopting the contract damages' calculation as the proper
measure of FCA damages and SAIC has not demonstrated otherwise.

-49-

statements under the 1999 contract for at least three reasons.
First, "[i]n early 2000, the NRC and SAIC agreed to terminate the
[1999] contract and entered into a 'no-cost' settlement."  SAIC
Mot. (Damages), Def. SAIC's Stmt. of Undisputed Material Facts in
Supp. of its Mot. for Summ. J. on Damages ("SAIC Stmt.
(Damages)") ¶ 16.  Under the agreement, SAIC agreed to forego
payment of an outstanding invoice for work that SAIC completed
after November 26, 1999.  Id.; see also SAIC Mem. (Damages), Ex.
13 (Modification No. 1 Under Contract NRC-04-99-046 ¶ 1 at 2).
SAIC contends that there is "no better valuation of the services
. . . 'actually delivered' than the amount agreed upon in an
arms-length negotiation after the Government is aware of the
deficiency."  SAIC (Damages) at 27 (quoting SAIC III, 626 F.3d at
1279) (internal citations omitted).  Thus, SAIC argues that the
March 2000 no-cost settlement agreement is "conclusive evidence
of the value that the NRC believed it had received for the work
SAIC performed under the 1999 Contract."  Id. at 27.  While SAIC
may argue at trial that the no-cost settlement agreement is
evidence of the value the government placed on SAIC's services,
there is evidence that the agreement does not reflect the value
of SAIC's services.  For example, Mary Mace, the contracting
officer at the NRC for the 1992 and 1999 contracts, testified
that in executing the agreement, it was important to her that the
agreement include nonpayment of a particular invoice to "get [the

-50-

termination of the contract] over with" and avoid "prolonged litigation." See Mace Test., 7/18 p.m. Tr. 106:14, 107:4-11, 110:9-19. Based on Mace's testimony, a reasonable jury could conclude that the purpose of the no-cost settlement was for the NRC to avoid having to pay the outstanding invoice or an attempt to avoid litigation and was not a reflection of the value that the NRC placed on SAIC's services. Therefore, SAIC has not shown that the no-cost settlement agreement is conclusive evidence of the value that the government placed on SAIC's services under the 1999 contract.

Second, SAIC asserts that "[t]he Government's pursuit of FCA damages under the 1999 Contract is also inconsistent with the undisputed record evidence that SAIC delivered high-quality, technically sound work product to the NRC." SAIC Mem. (Damages) at 27-28. There is evidence in the record that SAIC provided "extremely high" quality work to the NRC and that the NRC continued to use SAIC's work even after it discovered the alleged OCIs. See, e.g., Robert Meck Test., 7/3 p.m. Tr. 21:2-3 (government's witness); Ashok Thadani Test., 7/21 a.m. Tr. 40:17-19 (SAIC's witness). However, there is also evidence that despite the quality of SAIC's work, it was less valuable to the government than work free from OCIs would have been. For example, after learning of the OCIs, rather than abandon SAIC's work product, the NRC commissioned a center to conduct an

independent peer review of SAIC's work.  SAIC Stmt. (Damages)
¶ 23.  Cheryl Trottier, an NRC employee who oversaw SAIC's work
for the NRC, testified in her deposition that the government was
unable to use SAIC's work as the technical basis for the NRC's
rulemaking as originally planned because of SAIC's alleged OCIs
and the public's resulting distrust of SAIC's work product.  U.S.
Opp'n (Damages), Ex. 7 ("Trottier Dep." at 52:4-53:10); see also
id. at 42:20-43:14.  Trottier also implied that SAIC's work was
worthless to the government because the only way the government
could have erased any trace of bias was to completely redo the
work.  Id. at 25:21-27:19, 48:4-22, 49:23-50:12.  Accordingly,
there is a genuine dispute of material fact about whether the
value of SAIC's services were less than the government paid.[14]

Third, SAIC contends that the government cannot produce any
"non-speculative evidence of diminished value."  SAIC Mem.
(Damages) at 29.  Under the FCA, the government bears the burden
of presenting sufficient evidence to allow the jury to determine
the amount of damages it is owed.  See SAIC III, 626 F.3d at

---

[14] To the extent that SAIC argues that undisputed evidence
showing that it provided to the government high quality work bars
the government from arguing that it is entitled to FCA damages,
the D.C. Circuit has already explained that this is not the case.
In SAIC III, the court reasoned that "a jury could rationally
conclude that no matter how technically proficient SAIC's
performance, the value of that performance to the NRC was
compromised by the appearance of bias created by the company's
failure to live up to its contractual conflict of interest
obligations."  SAIC III, 626 F.3d at 1278.

-52-

1280.  "[D]amages must be proven with reasonable certainty."

United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec.

Grp., Inc., 370 F. Supp. 2d 18, 55 (D.D.C. 2005).  Thus, a jury's

damages calculation cannot be "based on speculation or

guesswork."  Joel M. Androphy, Federal False Claims Act and Qui

Tam Litigation § 11.08 (2013) (citing United States v. Killough,

848 F.2d 1523, 1531 (11th Cir. 1988)).  There is non-speculative

testimony from at least three witnesses -- Trottier, Frank

Cardile, and McKezie-Carter -- that SAIC's services had less

value to the NRC than the amount the NRC paid for the work.  As

is discussed above, Trottier testified in her deposition that she

believed that the NRC could not base its potential rule on SAIC's

work because of the OCIs.  She based her conclusion, in part, on

comments made at public meetings convened to discuss the NRC's

potential rulemaking.  See Trottier Dep. at 25:21-27:19.

Similarly, Cardile testified that SAIC's OCIs "complicated [the

NRC's] ability to move ahead with rule-making" and based on

comments made at the public meetings.  See Cardile Test., 7/2

a.m. Tr. at 45:12-46:21.  McKenzie-Carter agreed in his

deposition that "the fact that NRC was receiving letters from

Congresspersons about [SAIC's conflict of interests], had a

negative impact on the [NRC's attempted] rulemaking."  U.S. Opp'n

(Damages), Ex. 11 (McKenzie-Carter Dep. at 245:5-9).  These

potential witnesses' testimonies are based on more than their

"mere speculation."  Accordingly, there is sufficient evidence
for a jury to find that the government is owed damages.

<u>CONCLUSION AND ORDER</u>

There is sufficient evidence for a reasonable jury to find
that SAIC knew that its claims and statements were false, but
also that SAIC's challenged business relationships did not create
potential or actual OCIs.  Because SAIC has not shown that the
amount of FCA damages under the 1992 contract is the "same issue"
as the breach of contract damages, the government is not
precluded from arguing that it is entitled to FCA damages under
the 1992 contract beyond $78.  The government provided sufficient
evidence to show that there is a genuine dispute as to the value
of SAIC's services provided under the 1999 contract.
Accordingly, it is hereby

ORDERED that SAIC's motion [196] for summary judgment on FCA
liability be, and hereby is, DENIED.  It is further

ORDERED that the government's motion [195] for partial
summary judgment regarding the element of falsity be, and hereby
is, DENIED.  It is further

ORDERED that SAIC's motion [197] for partial summary
judgment on FCA damages be, and hereby is, DENIED.  It is further

ORDERED that the parties appear for a scheduling conference
on September 5, 2013 at 9:45 a.m.

-54-

SIGNED this 22nd day of July, 2013.


_____/s/_____
RICHARD W. ROBERTS
Chief Judge