## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 04-cv-1543 (RWR) |
| | ) | |
| SCIENCE APPLICATIONS | ) | |
| INTERNATIONAL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF SAIC'S MOTION
## FOR TARGETED DISCOVERY ON DAMAGES

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 2

    A.   THE NRC ACTIVELY USED SAIC'S TECHNICAL ANALYSIS
          CONTAINED IN NUREG-1640 EVEN AFTER ALLEGATIONS OF A
          CONFLICT AROSE. ............................................................................................ 2

    B.   NO WITNESS PROVIDED DEPOSITION OR TRIAL TESTIMONY ABOUT
          THE NRC'S CONTINUED USE OF SAIC'S WORK PRODUCT IN
          DISCOVERY. ....................................................................................................... 5

    C.   THE D.C. CIRCUIT CLARIFIED THAT THE VALUE THE NRC
          RECEIVES FROM ITS CONTINUED USE OF SAIC'S WORK IS
          INTEGRAL TO DAMAGES. ................................................................................ 6

ARGUMENT ......................................................................................................................... 7

    I.    GOOD CAUSE EXISTS TO ALLOW SAIC TO CONDUCT TARGETED
          DISCOVERY OF THE VALUE SAIC'S WORK HAS CONFERRED ON
          THE NRC. ............................................................................................................ 7

    II.   THE NRC'S CONTINUED USE OF NUREG-1640 IS ESSENTIAL TO AN
          ACCURATE CALCULATION OF FCA DAMAGES. ............................................ 10

    III.  SAIC SEEKS ONLY VERY TARGETED DISCOVERY ON THE
          QUESTION OF VALUE RECEIVED BY THE GOVERNMENT. ........................... 15

    IV.  SAIC PROPOSES A BRIEF PERIOD OF FACTUAL DISCOVERY
          FOLLOWED BY EXPERT DISCOVERY. ................................................................ 17

CONCLUSION ..................................................................................................................... 18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barnes v. District of Columbia*,
 289 F.R.D. 1 (D.D.C. 2012)........................................................................................ 8

*Cartel Asset Mgmt. v. Ocwen Fin. Corp.*,
 No. 01-RB-1644, 2009 U.S. Dist LEXIS (D. Colo. Feb. 3, 2009) ......................... 13

*Childers v. Slater*,
 197 F.R.D. 185 (D.D.C. 2000)................................................................................... 7

*Edmond v. U.S. Postal Serv. Gen. Counsel*,
 949 F.2d 415 (D.C. Cir. 1991)................................................................................... 8

*Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*,
 743 F.2d 932 (D.C. Cir. 1984)................................................................................. 15

*Every Penny Counts, Inc. v. Bank of Am. Corp.*,
 No. 2:07-cv-042, 2009 WL 6853402 (M.D. Fla. May 27, 2009) ............................ 8

*In re Sealed Case (Medical Records)*,
 381 F.3d 1205 (D.C. Cir. 2004)................................................................................ 7

*In re Veiga*,
 746 F. Supp. 2d 27 (D.D.C. 2010)........................................................................... 15

*Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*,
 62 F. Supp. 2d 13 (D.D.C. 1999)............................................................................. 8

*McQueen v. Life Ins. Co of N. Am.*,
 595 F. Supp. 2d 752 (E.D. Ky. 2009) ....................................................................... 7

*Story Parchment Co. v. Patterson Parchment Paper Co.*,
 282 U.S. 555 (1931).................................................................................................. 15

*United States v. AT&T, Inc.*,
 No. 1:11-cv-01560, 2011 WL 5347178 (D.D.C. Nov. 6, 2011).............................. 15

*United States v. Procter & Gamble Co.*,
 356 U.S. 677 (1958).................................................................................................. 8

*United States v. SAIC*,
 626 F.3d 1257 (D.C. Cir. 2010).......................................................................... *passim*

*Visa Int'l Serv. Ass'n v. JSL Corp.*,
 No. 2:06-CV-00932, 2006 WL 3248395 (D. Nev. Nov. 7, 2006)....................... 8, 17

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Watt v. All Clear Bus. Solutions*,
840 F. Supp. 2d 324 (D.D.C. 2012) .................................................................... 7, 9, 10

*Winding v. Allstate Insur. Co.*,
No. Civ. S–09–03526, 2012 WL 2934820 (E.D. Cal. July 18, 2012) ........................................ 9

*Yong v. Nemours Found.*,
432 F. Supp. 2d 439 (D. Del. 2006) ........................................................................ 9

**Rules**

Fed. R. Civ. P. 16(b)(4) ............................................................................... 8

Fed. R. Civ. P. 26(b)(1) ............................................................................... 8

Fed. R. Civ. P. 30(b)(6) ............................................................................. 15

## INTRODUCTION

Today—nearly 13 years after the Nuclear Regulatory Commission ("NRC" or "Commission") initiated this lawsuit—it <u>continues</u> to receive substantial value from the work SAIC performed.  SAIC's work was published in a report referred to as NUREG-1640 that has been publicly available on the NRC's website without interruption since 1997.  The report provides a "special recognition" to the specific SAIC scientists who were the principal authors of the report.  A search of the NRC website today returns more than <u>300</u> hits in which NUREG-1640 is cited in NRC documents currently available to the public.  Moreover, in the <u>seven years</u> that have elapsed since discovery closed in 2006, the NRC has continuously relied on NUREG-1640 and SAIC's work in performing its regulatory functions.

The premise of the government's case is that SAIC's scientific assessment was rendered worthless by a purported "cloud" of public mistrust that grew out of allegations that SAIC performed work without being free of conflicts of interest.  The government is wrong that SAIC had any conflicts of interest, as SAIC will prove at trial.  But equally important, the government is wrong that SAIC's work provided no value.  Each and every time the NRC relies on and uses NUREG-1640, it benefits from the work that SAIC performed.  That benefit and that value also compound and grow each and every time the NRC uses the dose assessment model and the underlying science that SAIC developed.  The government's theory of harm is repudiated by the NRC's constant, repeated, and public use of SAIC's work for the last 16 years.

The value that the NRC has received from SAIC's work is now central to this litigation.  In reversing the False Claims Act ("FCA") damages awarded by the jury in the first trial, the D.C. Circuit clarified that FCA damages, if any, are confined to the amount the government paid SAIC less the value the NRC has received.  If (as the government maintains) the NRC has not received any value whatsoever from SAIC's work, it must <u>prove</u> that fact, and SAIC must be

afforded the opportunity to demonstrate that the NRC <u>has</u> relied on and benefitted from SAIC's scientific analysis or dose assessment model, including in the intervening years since the first trial.

SAIC requests that this Court permit SAIC a very brief discovery period before the case proceeds to a re-trial so that SAIC can assess the veracity of the government's claim that the NRC has received no value from SAIC's work.  SAIC seeks to depose one government witness pursuant to Federal Rule of Civil Procedure 30(b)(6) who can knowledgably testify about the NRC's use of SAIC's work.  SAIC also seeks responses to one interrogatory and specific document requests related to damages, and the authorization to conduct three half-day depositions of <u>new</u> fact witnesses only (*i.e.*, not depositions of anyone previously deposed or anyone who testified at trial).

SAIC's requests do not seek duplicative discovery; they do not prejudice or inconvenience the government; and they will ensure that the evidence submitted at the re-trial is sufficient to allow the jury to calculate any damages fairly and in accordance with the law now governing this case.  By contrast, without this evidence, SAIC will be severely prejudiced in any re-trial, because it will be unable to present a full and complete picture of the value its services conferred on the government consistent with the D.C. Circuit's ruling.

## FACTUAL BACKGROUND

### A.   THE NRC ACTIVELY USED SAIC'S TECHNICAL ANALYSIS CONTAINED IN NUREG-1640 EVEN AFTER ALLEGATIONS OF A CONFLICT AROSE.

In 1992 and again in 1999, the NRC retained SAIC to provide it with technical assistance, including by conducting a scientific analysis of the dose of radioactivity a member of the public could be exposed to if materials were released from nuclear facilities.  Over the course of nearly seven years, SAIC developed a sophisticated and technically robust model for

conducting these "dose assessments."  The model considered the dosages that could result to an individual if he or she were exposed to any one of four materials (aluminum, steel, copper, or concrete) that was slightly contaminated by any one of 85 radionuclides that traveled along any one of 79 pathways.  The end-result of SAIC's efforts was an innovative model that could be harnessed to conduct other dose assessments by altering the material, contamination factor, or pathway.  (Exhibit 1: NUREG-1640, Vol. 1, at iii; R. 164: Trial. Tr. at 106 (Mauro) (the model was a "state-of-the-art platform or tool to do calculations of this type")).  SAIC's pioneering work was regarded by the NRC as first-rate.  (R. 135: Trial. Tr. at 21 (Meck) ("I think the quality [of SAIC's work] was extremely high."); Exhibit 2: Trottier Dep. at 36 (agreeing that SAIC's dose assessment methodology "would be classified as state of the art"); R. 143: Trial Tr. at 105 (Thadani) (discussing memorandum in which he described NUREG-1640 as having "a notably high quality of development")).

Despite the universally-acknowledged high quality of the work, the government claims that SAIC's analysis and model have been rendered worthless because SAIC provided similar assistance to contractors servicing the Department of Energy during the course of its work for the NRC.  The government claims that public allegations regarding SAIC's work for those contractors spawned a "cloud" over the disinterestedness of SAIC's analysis and that this "cloud" harmed the government in unspecified ways, perhaps by inhibiting the government from proceeding with a formal rule-making.  (Exhibit 2: Trottier Dep. at 51–53, 114–115).

Nevertheless, the NRC has continued to use SAIC's work.  The NRC retained the Southwest Research Institute Center for Nuclear Waste Regulatory Analyses ("CNWRA") to conduct a peer-review of SAIC's analysis, and invited the National Academy of Sciences— which NRC's own expert described as a "very prominent" organization "used by the

Government to establish fundamental standards in this country"—to review SAIC's work while it assessed the broader field of radioactive recycling for the NRC.  (*See* R. 141: Trial Tr. at 7 (Paperiello)).  Both peer reviews found SAIC's work to be technically robust and <u>neither found evidence of bias</u>.  (R. 163: Trial Tr. at 97, 99–100, 107; R. 141: Trial Tr. at 9).  The NRC retained Sanford Cohen & Associates ("SC&A") to complete the work that SAIC had begun. SC&A used SAIC's model and analysis as a foundation and relied on it to complete the contract. (R. 164: Trial Tr. at 102 (Mauro) (SAIC's work was "essential to allowing this work to continue")).  After SC&A picked up where SAIC had left off, responded to public comments, and provided the NRC with advice on any rule it might promulgate, the NRC published SAIC's model and findings as a staff report titled "NUREG-1640."

To this day, the publicly-available NUREG-1640 gives a "special recognition" to the "technical work" of five SAIC scientists who were "the principal authors of the draft report." (*See* Exhibit 1: NUREG-1640, Vol. 1, at xxiv).  The acknowledgment credits them with "establishing the foundations for the analytical approaches" contained in the report.  (*Id.*).  The NRC has never excised SAIC's contributions from NUREG-1640 and the Commission has never publicly disavowed the report.  In fact, the NRC has relied extensively on SAIC's dose modeling since the allegations of a conflict first arose in 1999 to grant or amend licenses, provide advice to licensees, or evaluate dose assessments: As of today, NUREG-1640 is cited in more than 300 documents publicly available on the NRC's website.[1]

---

[1]  Based on a search of the NRC website for the term "NUREG-1640" on September 13, 2013.

**B.      NO WITNESS PROVIDED DEPOSITION OR TRIAL TESTIMONY ABOUT THE NRC'S CONTINUED USE OF SAIC'S WORK PRODUCT IN DISCOVERY.**

During discovery in the first trial, SAIC sought to ascertain the nature and scope of the NRC's continued use of its work product.  SAIC issued a Rule 30(b)(6) notice to the NRC and included as a subtopic "[t]he value (or, lack thereof) of SAIC's work for the NRC under the 1992 Contract and the 1999 Contract because of, or related to SAIC's 'conflicted relationships.'" (Amended Notice of Rule 30(b)(6) Deposition of the Nuclear Regulatory Commission, Topic 12(n)).  SAIC also included as a topic "[t]he factual basis for the damages allegedly suffered by the NRC, as alleged in the Complaint."  (*Id.*, Topic 17).  The NRC designated several witnesses in response to SAIC's Rule 30(b)(6) notice but only one, Cheryl Trottier, was designated to discuss the value of SAIC's work.

Trottier's deposition was taken in January 2006 and lasted less than four hours.  During her deposition, after testifying about any delay in "implementation of NUREG-1640 related to SAIC's 'conflicted relationships,'" she was asked to "go to . . . NRC's knowledge of facts concerning the value or lack thereof of SAIC's work for NRC."  (Exhibit 2: Trottier Dep. at 112:20–24).  She responded, in relevant part, that because the NRC was unable to proceed with rule-making on account of the lack of public confidence in NUREG-1640, "there [was] very little value."  (*Id.* at 114:23–115:6).  She also claimed that whether NUREG-1640 would ever be used was "a question that isn't answered right now."  (*Id.* at 115).

SAIC's counsel asked her if she could reconcile her position that little value remained with the foreword to NUREG-1640, which said that NRC "[l]icensees may use the approaches, models or results of [NUREG-1640] to evaluate the operational situations or to prepare requests for action from the NRC or state regulators."  (Exhibit 2: Trottier Dep. at 120:16–121:9, 123:17–124:9).  Trottier replied that the language in the foreword and the NRC's publication of NUREG-

1640 "doesn't take away from the concerns that [NRC had] that the conflict of interest issue clouded the value of this work for the NRC." (*Id.* at 121:18–124:20).

While no order from this Court precluded it, Trottier was not specifically asked whether the NRC had used SAIC's work in performing its regulatory functions, nor was any other witness asked this question during discovery. All fact and expert discovery was concluded prior to the first trial by June 2006.

At trial, on the government's motion, this Court precluded SAIC from offering expert testimony "that the value of SAIC's work negates any damages that the United States sustained." (R. 174: Trial Tr. at 12). As a result, the jury never heard any evidence about any of the NRC's use of SAIC's work or the value that the NRC has received.

## C.   THE D.C. CIRCUIT CLARIFIED THAT THE VALUE THE NRC RECEIVES FROM ITS CONTINUED USE OF SAIC'S WORK IS INTEGRAL TO DAMAGES.

At the close of the first trial, the jury returned a breach of contract verdict in the amount of a mere $78 and an FCA damages award of over $6 million in favor of the government. The D.C. Circuit affirmed the $78 breach of contract award and vacated the False Claims Act judgment on the ground that the jury had been erroneously instructed to "limit its calculation of damages to the [amount of the] government's payments." *United States v. SAIC*, 626 F.3d 1257, 1278 (D.C. Cir. 2010). The court clarified that damages should instead be confined to "the amount the government actually paid <u>minus</u> the value of the goods or services the government received or used." *Id.* at 1279 (emphasis added). And though the government bears the burden of proving damages, the court directed that SAIC must be allowed to offer evidence to counter the government's claim that it paid more to SAIC than SAIC's work was worth, including evidence that "<u>the NRC continued to use SAIC's work product after the potential conflicts were identified and the 1999 contract was terminated</u>." *Id.* at 1280 (emphasis added).

**ARGUMENT**

I. **GOOD CAUSE EXISTS TO ALLOW SAIC TO CONDUCT TARGETED DISCOVERY OF THE VALUE SAIC'S WORK HAS CONFERRED ON THE NRC.**

This Court should allow the parties a brief period of discovery on the discrete issue of damages. Absent an opportunity to develop the evidentiary record regarding the NRC's continued use of SAIC's work product, SAIC will be irreparably prejudiced in its ability to mount a defense on damages at trial.

This Court has broad discretion to allow the parties to conduct discovery of any information relevant to a claim or defense. Fed. R. Civ. P. 26(b)(1). Where a party seeks broader discovery on matters relevant to the subject matter of litigation, or where a party seeks additional discovery after a discovery deadline has passed, district courts still enjoy broad discretion to allow the discovery "for good cause." Fed. R. Civ. P. 26(b)(1), 16(b)(4); *see also Watt v. All Clear Bus. Solutions*, 840 F. Supp. 2d 324, 326 (D.D.C. 2012) (Roberts, J.) (citing *Childers v. Slater*, 197 F.R.D. 185, 188 (D.D.C. 2000)). "What constitutes good cause necessarily varies with the circumstances of each case," *Watt*, 840 F. Supp. 2d at 326, and district courts are vested with broad discretion to undertake "some substantive balancing of interests." *In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1215 (D.C. Cir. 2004).

SAIC should be permitted to take targeted discovery concerning the NRC's continued use of its work product because that evidence is now unquestionably critical to its defense in light of the D.C. Circuit's decision. *See SAIC*, 626 F.3d at 1280. Where, as here, an intervening development in the law impacts a party's claim or defense, federal district courts appropriately exercise their discretion to allow targeted discovery. *See, e.g., McQueen v. Life Ins. Co of N. Am.*, 595 F. Supp. 2d 752, 755 (E.D. Ky. 2009) (granting Rule 16 motion in wake of intervening Supreme Court decision); *Every Penny Counts, Inc. v. Bank of Am. Corp.*, No. 2:07-cv-042, 2009

WL 6853402, at *1 (M.D. Fla. May 27, 2009) (parties permitted to re-open discovery to examine effect of intervening appellate court decision); *Visa Int'l Serv. Ass'n v. JSL Corp.*, No. 2:06-CV-00932, 2006 WL 3248394, at *1 (D. Nev. Nov. 7, 2006) (parties permitted to re-open discovery in light of an "intervening change in the law").

Though the parties <u>were</u> able to conduct discovery related to damages before the first trial, and the Court did not preclude them from doing so, the record was not sufficiently developed to allow a jury to determine what value the NRC receives from its continued use of SAIC's work.  Trottier claimed that whether the NRC would ever use NUREG-1640 was an unanswered question at the time of her deposition.  (Exhibit 2: Trottier Dep. at 115).  <u>Moreover, it was, by definition, not possible to take discovery of the NRC's continued use of SAIC's work product from 2006 (the end of discovery) to 2013—a period of seven years in which the NRC has continued to make use of SAIC's work</u>.

SAIC's ability earlier in the case to conduct discovery regarding damages in the period before 2006 does not foreclose targeted discovery before the re-trial because, as a general matter, "discovery under the Federal Rules of Civil Procedure should be freely permitted."  *See Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13, 24 (D.D.C. 1999) (allowing document and expert discovery prior to re-trial) (citing favorably *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991)).  This is because the "liberal discovery provisions of [the] Federal Rules are designed to make 'trial less a game of blind man's bluff and more a fair [contest] with the basic issues and facts disclosed to the fullest practical extent.'"  *Barnes v. District of Columbia*, 289 F.R.D. 1, 25 (D.D.C. 2012) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)).

Even <u>absent</u> a re-trial or an intervening change in law, courts routinely allow parties to conduct discovery after an initial round of discovery has concluded where the court finds good cause. *See, e.g.*, *Winding v. Allstate Insur. Co.*, No. Civ. S–09–03526, 2012 WL 2934820, at *1 (E.D. Cal. July 18, 2012) (finding good cause to allow defendant to re-open discovery in order to depose witnesses plaintiff intended to call at trial because absent opportunity to do so, "defendant would be genuinely prejudiced at trial"). In *Watt*, for example, this very Court granted a party's request to re-open limited discovery pursuant to Rule 16(b)(4) where, as here, "no trial date ha[d] been set;" the opposing party would not suffer "any significant prejudice" from re-opening limited discovery; and the additional discovery would "lead to relevant evidence of the scope of the damages at issue." 840 F. Supp. 2d at 327. Each of these factors similarly supports granting SAIC's motion.

First, this Court has not yet set a date for the re-trial. SAIC is requesting an abbreviated discovery period of 120 days to conduct very targeted discovery on the value the NRC has received from SAIC's work, followed by the designations of expert witnesses. SAIC anticipates that all fact and expert discovery could be completed by March 2014 and the Court can set a trial date shortly thereafter. The government agreed at the September 5, 2013, status conference that it is amenable to a trial date in 2014. (Exhibit 3: 09/05/13 Tr. at 8–9, 16). Therefore, SAIC's request will not result in any unnecessary delay.

Second, the government will not suffer any prejudice from allowing SAIC to conduct limited discovery on the value SAIC conferred on the NRC. *See Watt*, 840 F. Supp. 2d at 326; *see also Yong v. Nemours Found.*, 432 F. Supp. 2d 439, 441 (D. Del. 2006) (granting plaintiff's requests to re-open discovery on re-trial because the plaintiff's limited requests would not cause the defendant "undue prejudice"). Indeed, the government <u>agrees</u> that limited <u>document</u>

discovery in this area is "consistent with the truth-finding mission," (Exhibit 3: 09/05/13 Tr. at 14–15, 17), and SAIC's request for a single Rule 30(b)(6) witness is at most a light burden, especially in light of the critical nature of the evidence to SAIC's defense.  The government's prior Rule 30(b)(6) witness was deposed for less than four hours.  One Rule 30(b)(6) deposition and three half-day depositions of new fact witnesses is not overly burdensome.

Third, it is undisputed that the discovery SAIC is seeking will "lead to relevant evidence of the scope of the damages at issue."  *See Watt*, 840 F. Supp. 2d at 326.  During discovery before the first trial, the parties did undertake discovery relevant to damages, but the discovery focused on (i) peer reviews of SAIC's work; (ii) SC&A's completion of the 1999 contract; and (iii) the Commission's ability to promulgate a rule based on SAIC's technical analysis contained in NUREG-1640.  (Exhibit 3: 09/05/13 Tr. at 12–14 (government highlighting these topics explored during pre-trial discovery)).  Whatever the import of these various lines of questioning, none of them solicited information about whether, when, and how the NRC continues to use SAIC's work product—which the D.C. Circuit has expressly held is evidence of value to the government.  *SAIC*, 626 F.3d at 1280.

## II.  THE NRC'S CONTINUED USE OF NUREG-1640 IS ESSENTIAL TO AN ACCURATE CALCULATION OF FCA DAMAGES.

Moreover, between the close of discovery and trial and today, the NRC has <u>continued</u> to make use of SAIC's work product in NUREG-1640.  (Exhibit 3: 09/05/13 Tr. at 12, 22 (government acknowledging presence of SAIC work product in calculations the NRC continues to use)).  Whatever might be said for discovery before 2006, <u>the evidence from 2006 to 2013 could not have been developed previously</u>, and it is critical to the valuation assessment the jury will be asked to make.  Any FCA damages awarded in this case must reflect the jury's estimation of the value that the NRC has received.  *SAIC*, 626 F.3d at 1278.  The NRC's continued reliance

on NUREG-1640 is essential to proving the value that SAIC's work conferred on the government.

The NRC has relied on SAIC's work product in performing its basic regulatory functions, including granting and amending licenses and advising NRC-licensees, since well before the first trial.  For example, in 2005, the NRC produced a Safety Evaluation Report regarding a request by Yankee Atomic Electric Company to dispose of contaminated demolition debris.  The report states that "[t]he [NRC] staff used NUREG-1640 . . . to estimate worker radiation doses."  *See* Safety Evaluation Report, Yankee Atomic Electric Company, Yankee Nuclear Power Station, *available at* http://pbadupws.nrc.gov/docs/ML0510/ML051040346.pdf.  Similarly, in 2006, the NRC granted the Pennsylvania Department of Environmental Protection an exception for the release of material in a landfill not licensed under the Atomic Energy Act.  The NRC staff "base[d] their decision on the generic analyses from NUREG-1640."  *See* 2006 Safety Evaluation Report, Pennsylvania Department of Environmental Protection, *available at* http://pbadupws.nrc.gov/docs/ML0628/ML062890118.pdf.

These and other active uses of SAIC's work product by the NRC were on-going at the time of Trottier's Rule 30(b)(6) deposition.  Nevertheless, when she was asked to testify about "the value or lack thereof of SAIC's work for the NRC," she did not disclose that the NRC was even then making use of SAIC's scientific analysis contained in NUREG-1640, nor did she divulge that the NRC was receiving value through that use.  (*See* Exhibit 2: Trottier Dep. at 112–126).  In fact, Trottier testified that the NRC "published [NUREG-1640] because there was a lot of administrative pressure to complete it" but claimed that "whether it will ever be used is . . . a question that isn't answered right now."  (*Id.* at 115).  As a result, the value the NRC receives through its on-going use of SAIC's work product in conducting its regulatory functions is

altogether absent from the record developed prior to the first trial, though now the answer is clear that NUREG-1640 was at all times being used by the NRC.

Moreover, in the seven years that have elapsed since the close of fact discovery prior to the first trial, the NRC has continued to rely on NUREG-1640 (and, *a fortiori*, SAIC's work product) extensively.  For example, the NRC has relied on NUREG-1640 in each of the following instances:

- In 2007, the NRC issued a license amendment to the Sacramento Municipal Utility District.  The NRC used NUREG-1640 to evaluate a scenario involving an industrial worker being exposed to residual radioactivity from embedded piping removal activities.  *See* Rancho Seco Nuclear Generating Station – Issuance of Amendment Re: License Termination Plan, *available at* http://pbadupws.nrc.gov/docs/ML0720/ML072070291.pdf.

- In 2007, the NRC's Office of Nuclear Material Safety and Safeguards issued a memorandum to the Homer Laughlin China Company in response to Homer Laughlin's request for technical assistance.  Relying heavily on NUREG-1640, the NRC evaluated a dose assessment submitted by Homer Laughlin and found that "the dose from exposure to residual radioactive materials during transport and disposal of the material and site closure would be significantly below" the amount allowed by the NRC.  *See* Response to Technical Assistance Request, http://pbadupws.nrc.gov/docs/ML0735/ML073541298.pdf.

- In October 2007, the NRC approved Honeywell Specialty Chemicals's request to transfer contaminated scrap metals.  The approval letter states that in reviewing Honeywell's request, "the NRC staff used the guidance provided in NUREG-1640" and relies on two of the dose assessment scenarios.  *See* Honeywell – Request to Transfer Scrap Material Under 10 CFR 40.13, *available at* http://pbadupws.nrc.gov/docs/ML0726/ML072690539.pdf.

- In 2009, the NRC approved an update by Honeywell regarding its intention to transfer industrial scrap metal based on Honeywell's analysis of the potential doses of radioactivity such transfer could cause, which, in turn, relied on several NUREG-1640 scenarios, including the truck driver scenario and industrial scrap metal disposal scenario.  *See* Approval of Request to Transfer Scrap Materials Under 10 CFR 40.14, "Unimportant Quantities of Source Material," *available at* http://pbadupws.nrc.gov/docs/ML0930/ML093030377.pdf.

- In January 2009, the NRC, along with the Environmental Protection Agency, the Department of Energy, and the Department of Defense, published the Multi-Agency Radiation Survey and Assessment of Materials and Equipment Manual, designed to

"provid[e] information on planning, conducting, evaluating, and documenting radiological disposition surveys for the assessment of materials and equipment." The Manual cites NUREG-1640 throughout and relies on NUREG-1640 for various dose assessments. *See* Safety Evaluation Report Related to A Request to Revise Authority to Dispose of Contaminated Demolition Debris Pursuant to 10 CFR 20.2002, Yankee Atomic Electric Company, Yankee Nuclear Power Station, *available at* http://pbadupws.nrc.gov/docs/ML0902/ML090260577.pdf.

None of these uses of NUREG-1640 and SAIC's work product could possibly have been the subject of discovery because they occurred after discovery closed in June 2006. SAIC should have the opportunity to establish that these uses of NUREG-1640 and SAIC's work (and any other uses that have been undertaken by the NRC) confer value to the government. This is precisely the type of evidence the D.C. Circuit held SAIC could introduce. *See SAIC*, 626 F.3d at 1280 (holding SAIC "must . . . be allowed to offer evidence . . . [of] the fact that the NRC continued to use SAIC's work product after the potential conflicts were identified and the 1999 contract was terminated" (emphasis added)).

The government objects to SAIC's request at least in part because "discovery in trials have cutoff dates" and it would prefer that in this case, that cutoff date remain sometime in 2006. (Exhibit 3: 09/05/13 Tr. at 20-21). But there is no basis in law to limit SAIC's ability to reduce the government's damages claim to value incurred by the NRC prior to 2006. Because it is "readily conceivable under the applicable law for damages" that relevant evidence "accrued during and after the first trial," there is "no principled basis" to restrict SAIC's discovery of relevant defense materials to a particular period of time. *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-RB-1644, 2009 U.S. Dist LEXIS, at *8–9 (D. Colo. Feb. 3, 2009). Rather, where, as here, the government received a tool that provides it with recurring and enduring value, the jury should be free to consider the recent, current, and continued use that benefits the NRC. Absent this discovery, SAIC will be severely impaired from putting on a full and complete damages defense by explaining the value the government received through 2006, and the value

13

the government has <u>continued</u> to receive for the last seven years (2006–2013). The jury should hear the full story and see the complete picture, not a distorted or truncated version of events. That would not be consistent with the truth-finding role of a trial.

The government also apparently contends that NUREG-1640 was not SAIC's product, and that SAIC was retained to provide technical advice that is somehow unrelated to NUREG-1640. (Exhibit 3: 09/05/13 Tr. at 21). But this narrow view of SAIC's work is hotly contested, it wrongly minimizes the role that SAIC played in the creation of NUREG-1640, and it is directly contrary to the position that the government took at trial. SAIC conducted the underlying analysis, built the dose assessment model, prepared initial drafts of the report, and is given "special recognition" in the final draft of NUREG-1640 for its contributions. (R.142: Trial Tr. at 18–21; Exhibit 1: NUREG-1640, Vol. 1 at xxiv).

At trial, the government highlighted the significance of NUREG-1640 and SAIC's contributions to it. In fact, during closing argument, the government explained to the jury that "SAIC advised the government in a variety of different ways," including by performing dose assessments, a "type of analysis [the jury] heard a lot about." (R. 161: Trial Tr. at 29). The government explicitly recognized that "the result of SAIC's dose assessment was a report called NUREG-1640." (*Id.*). Faced now, however, with SAIC's ability to introduce evidence of the NRC's continuing use of NUREG-1640, the government contends that "SAIC was hired not to develop a product but to provide services" to the NRC. (Exhibit 3: 09/05/13 Tr. at 21). Nevertheless, the government concedes, as it must, that there is a "factual presence of SAIC work product in some of the calculations and all that are used by the NRC," (*id*. at 22), and though the government claims that its presence is purportedly "diminishing" (*id*.), SAIC is

entitled to discovery of that use.  That use proves value to the government.  *SAIC*, 626 F.3d at

1280.

## III.    SAIC SEEKS ONLY VERY TARGETED DISCOVERY ON THE QUESTION OF VALUE RECEIVED BY THE GOVERNMENT.

SAIC seeks to depose one Rule 30(b)(6) NRC witness who can knowledgeably testify

about the NRC's continued use of SAIC's work product.  *See* Fed. R. Civ. P. 30(b)(6).  During

the re-trial, the government will bear the burden of producing evidence sufficient to allow a jury

to calculate damages "as a matter of just and reasonable inference" because "damages may not

be determined by mere speculation or guess."  *Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*,

743 F.2d 932, 939 (D.C. Cir. 1984) (internal quotation marks omitted); *see Story Parchment Co.*

*v. Patterson Parchment Paper Co.*, 282 U.S. 555, 564 (1931).  The government will, therefore,

call a witness at trial who will presumably testify regarding the value that the NRC has received

from SAIC's work from inception to present.  It is the government's position that it received no

value and that it is entitled to recoup everything it paid to SAIC.

SAIC will be severely prejudiced if it is unable to take critical discovery to negate that

position.  *See In re Veiga*, 746 F. Supp. 2d 27, 43 (D.D.C. 2010) (noting party's "substantial

need" for the discovery where the "evidence sought undoubtedly 'goes to the heart'" of the

party's claims and defenses); *United States v. AT&T, Inc.*, No. 1:11-cv-01560, 2011 WL

5347178, at *7 (D.D.C. Nov. 6, 2011) (granting motion to compel third party to refresh

document productions because "'refresh[ed]' documents [were] very important to [defendant's]

probable defense").  Absent such discovery, a re-trial would be a one-sided, distorted version of

the facts that denies SAIC the ability to present to the jury the value the government has received

and continues to receive from SAIC's work.  This issue is now central to this litigation because

the D.C. Circuit has squarely held that FCA damages are limited to "the amount the government

actually paid minus the value of the goods or services the government received or used." *SAIC*,
626 F.3d at 1279. Moreover, the D.C. Circuit expressly directed that "SAIC . . . must also be
allowed to offer evidence . . . [of] the fact that the NRC continued to use SAIC's work product."
*Id.* at 1280. SAIC will be substantially impaired in its efforts to effectively mount its defense
without the evidence expressly contemplated by the D.C. Circuit.

For the same reasons, SAIC also seeks responses from the government to the following
specific, particularized document requests and interrogatory related to damages:

> Interrogatory: For each Count of the Complaint: (a) identify the dollar amount of
> damages you claim are recoverable; (b) describe in detail how you calculated your
> damage claims; (c) describe in detail each and every component comprising your damage
> claims; and (d) identify any and all contracts, payments and/or costs which are included
> in your damage claims.
>
> Document Request: All documents related to or reflecting the NRC's use of SAIC's
> work performed under the 1992 and 1999 Contracts and the NRC's use of NUREG-1640.
>
> Document Request: All documents that evidence, support or establish the damages
> allegedly incurred by the Government as a result of the OCIs alleged in the Complaint.
>
> Document Request: All documents upon which the Government intends to rely at trial
> (related to damages).

The government to its credit <u>agrees</u> that document discovery related to damages is
consistent with the truth-finding function and that the parties can likely agree on issues of scope.
(Exhibit 3: 09/05/13 Tr. at 15). The same should be true for the response to the single
interrogatory relating to damages listed above. The government's response to these targeted
document requests and interrogatory will be directly relevant to the Rule 30(b)(6) deposition and
also will confirm the continued value the government receives from SAIC's work product.

SAIC also seeks authorization to conduct three half-day depositions of new fact witnesses
on issues related to damages. However, SAIC does not endorse re-deposing any fact or expert
witness who was previously deposed or any fact or expert witness who testified at trial. Rather,

SAIC agrees with the government that any re-depositions of these witnesses would be
unnecessary and inappropriate, particularly with respect to those witnesses who provided
testimony that this Court has already concluded does not present a triable issue of fact.  (R. 206:
Memorandum Opinion at 23–31) (holding that the government identified only one SAIC
employee, Michael McKenzie-Carter, for whom there is a triable issue of fact on whether SAIC
acted with the requisite scienter).

## IV.    SAIC PROPOSES A BRIEF PERIOD OF FACTUAL DISCOVERY FOLLOWED BY EXPERT DISCOVERY.

At the status conference, the government suggested that any factual and expert discovery
proceed simultaneously.  (Exhibit 3: 09/05/13 Tr. at 10).  This is not workable as a practical
matter.  The new expert reports that the government acknowledges will be necessary here, (*id.* at
9, 16), will obviously need to incorporate the new facts about the NRC's use of SAIC's work
product.  Accordingly, expert disclosures should follow the short period for factual discovery so
that the expert reports and analyses may incorporate the new evidence.  Evidence of the NRC's
continuing use of SAIC's work product in the years since the first trial will be particularly
valuable to any expert designated to evaluate the government's request for FCA damages.
Accordingly, SAIC proposes a 120-day period in which to complete fact discovery, to be
followed by a period of expert discovery not to exceed 60 days.  Under this timing, the case can
be set for trial as early as March 2014.

***

Seven years have passed since discovery closed in this case.  There has been an
intervening change in the applicable law.  New facts have emerged about the NRC's continued
use of SAIC's work product.  These are precisely the circumstances under which a district court
can and should exercise its discretion to allow limited additional discovery.  *See generally Visa*,

17

2006 WL 3248395, at *1 (approving of court's decision to re-open discovery where "several years had passed since discovery had been stayed, creating the potential for new evidence to become available" and "there had been an intervening change in the law which modified the standards" applicable to the issues at trial).  Additional discovery to inform the jury's understanding of damages in this case will help ensure that the second trial in this matter is the last.

**CONCLUSION**

For the foregoing reasons, SAIC asks this Court to authorize fact discovery for a period of 120 days, to be followed by expert discovery, in advance of a trial date to be set by the Court.

DATED:  September 13, 2013

Respectfully submitted,


/s/ Andrew S. Tulumello
Andrew S. Tulumello (D.C. Bar No. 468351)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
E-mail: atulumello@gibsondunn.com

*Counsel for SAIC*

Of Counsel:

Lawrence E. Ruggiero
Deputy General Counsel
Science Applications International Corporation
1710 SAIC Drive, MS 3-5-0
McLean, Virginia 22101