UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

SCIENCE APPLICATIONS
INTERNATIONAL CORPORATION,

              Defendant.

Civil No.  04-CV-1543 (RWR)

**UNITED STATES OF AMERICA'S MEMORANDUM IN OPPOSITION TO
DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S
MOTION FOR DISCOVERY**

## INTRODUCTION

In accordance with Federal Rules of Civil Procedure 16 and 26, and with LCvRs 7 and 16.5 of the Local Rules of this Court, the United States respectfully submits this brief in opposition to Defendant Science Applications International Corporation's (SAIC) Motion for Targeted Discovery on Damages (R. 207) and Memorandum in support thereof (Def. Mem.).  (R. 207-1).  SAIC argues that the Court should re-open discovery in this matter for what it characterizes as "targeted" discovery on the question of value received by the government from SAIC's contractual efforts between 1992 and 2000.

SAIC's motion should be denied.  In its initial Complaint filed in this action on September 3, 2004, the United States explicitly alleged that the NRC paid SAIC for SAIC's best, disinterested efforts and advice, untainted in both fact and appearance, and free from conflict of interest.  R. 1 at ¶101.  The United States also explicitly alleged that because of SAIC's failure to disclose its substantial organizational conflicts of interest to the NRC, the NRC received "nothing of value" under its 1992 Contract and the 1999 Contract with SAIC.  *Id.* at ¶102.  These facts and assertions were placed at issue for discovery in the very first document filed in this case and have been at issue ever since.  SAIC was responsible for conducting, and in fact did conduct, as much discovery on these facts and assertions as it determined to be necessary and appropriate.  SAIC's motion for discovery concedes as much.  Def. Mem. at 8.  Now, after years of document requests, interrogatories, and depositions, followed by dispositive motions, a five week trial, a two year appeal, a remand, and more dispositive motions, SAIC seeks a "do-over" of discovery that it has already obtained on issues that have been in this case since its inception.  While the United States agrees that, on retrial, the parties must be permitted to present argument and evidence regarding the extent of the value, if any, of SAIC's services to the NRC, re-opening

discovery for this purpose is neither warranted nor necessary.  SAIC's request fails to meet the

high burden of re-opening discovery at this stage.  SAIC seeks discovery on issues on which it

has both already obtained substantial discovery and issues that are irrelevant to the issues that the

jury must decide on retrial.  Further, the extensive re-opening that SAIC seeks will substantially

delay trial and prejudice the United States.  The United States respectfully requests that the Court

deny SAIC's Motion and set a trial date in this matter.

## ARGUMENT

I.      **Further Discovery at This Stage is Appropriate Only to Prevent a Manifest
        Injustice**

The discovery period in this case has long been completed and closed.  Indeed, after the

close of discovery in 2006, the parties filed extensive briefing on dispositive motions that were

denied by the Court.  After that discovery and briefing, the Court issued a series of final pretrial

orders that set forth requirements for documents and witnesses to appear at trial.  Pursuant to the

Court's April 22, 2005 Scheduling Order  (R. 12) and local Rule 16, the parties submitted final

pretrial statements in June 2008 and the Court conducted its final pretrial conference on June 26,

2008.  Trial in this matter began the following week in July 2008.

Whether to extend or re-open discovery on remand is committed to the sound discretion

of the trial court.  *Cleveland v. Piper Aircraft Corp.*, 985. F.2d 1438, 1449 (10th Cir. 1993).

Moreover, in a retrial setting, Federal Rule of Civil Procedure 16(e) and Local Rule 16.5

mandate that final pretrial orders issued by the Court for the first trial "shall control the

subsequent course of the action ... [and] shall be modified only to prevent manifest injustice."

Fed. R. Civ. Pro. 16(e); Local Rule 16.5.  While this does not mean that a final pretrial order is a

legal "straitjacket" that unwaveringly binds the parties and the court, and while the Court

obviously retains a "certain amount of latitude to deviate from a pretrial order," *Manley v. AmBase Corp.,* 337 F.3d 237, 249 (2d Cir.2003), this discretion should be exercised to re-open discovery prior to a retrial only as necessary to prevent manifest injustice. *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1449-50 (10th Cir. 1993).  *See* Fed. R. Civ. P. 16(e).[1]

As examples of situations that would constitute "manifest injustice," the Tenth Circuit observed, "if a lay or expert witness is deceased or ill or for whatever reason unable to attend trial, the court should give every consideration to allowing additional witnesses to testify" beyond those identified in the final pretrial statement.  *Piper Aircraft*, 985 F.2d at 1450.  Nothing of this sort exists here.  Rather, SAIC merely wishes to try to improve its case and to attempt a more favorable outcome with more discovery on topics that were already covered before the first trial.

With respect to retrials, district courts have the discretion to admit or exclude new evidence or witnesses on retrial.  *See Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co.,* 195 F.3d 765, 775 (5th Cir.1999); *Piper Aircraft,* 985 F.2d at 1449-50; *Total Containment, Inc. v. Dayco Prods.,* 177 F. Supp. 2d 332, 338-39 (E.D. Pa. 2001); Wright & Miller, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2803 (1995); *see also Habecker v. Clark Equip. Co.,* 36 F.3d 278, 288 (3d Cir.1994).

Accordingly, where the court "perceives 'manifest injustice' in limiting evidentiary proof at a new trial . . . it may, with proper notice, allow additional witnesses and relevant proof."

---

[1] Although it does not appear that the D.C. Circuit has ruled directly on this issue, several other circuit courts have specifically adopted and cited with approval the Tenth Circuit's holding in *Cleveland v. Piper Aircraft*.  *See, e.g*., *Martin's Herend Imports, Inc., et al. v. Diamond & Gem Trading*, 195 F.3d 765, 775 (5th Cir. 1999); *David Schudel, et al. v. General Electric Co, et al.*, 35 Fed. Appx. 484, 487; 2002 U.S. App. LEXIS 9180 (9th Cir. 2002); *CGB Occupational Therapy, Inc., et al. v. RHA Health Services, Inc.,* 499 F.3d 184, 190 (3rd Cir. 2007).

*Martin's Herend Imports,* 195 F.3d at 775; *Piper Aircraft,* 985 F.2d at 1450.  Similarly, a court's discretion also entails refusing additional discovery prior to a retrial.  *See Martin's Herend Imports,* 195 F.3d at 775 n. 15.  Particularly, if the moving party knew or should have known that certain witnesses or evidence were necessary at the time of the first pretrial conference, then the exclusion of those witnesses during the retrial will likely not be manifestly unjust.  *Id.*

In light of the D.C. Circuit's ruling, SAIC should be permitted on retrial to introduce testimony and documents obtained during the lengthy, fulsome, and unconstrained discovery period that concluded in 2006 that it believes support its position regarding the alleged value to the NRC of SAIC's advice and assistance.  However, SAIC will not suffer manifest injustice if this Court rejects its attempt to re-conduct broad discovery on those matters about which SAIC has known and conducted discovery from the outset of the case through the close of discovery.  Nor can SAIC show that it could not have known this evidence was necessary at the time of the first pretrial conference because SAIC argued for its admission at the first trial.  As the Tenth Circuit observed, "[i]t is always easy in hindsight for counsel to realize there may be a better way to try a case the second time around."  *See Piper Aircraft*, 985 F.2d at 1449.  But such hindsight does not justify the time and resources to redo discovery on the value of SAIC's contractual efforts, absent a showing of manifest injustice.

By contrast, SAIC's proposed discovery do-over would greatly prejudice the United States and would likely delay trial substantially.[2]

---

[2] In its Motion, SAIC ignores the manifest injustice standard mandated by Fed. R. Civ. P 16(e) and Local Rule 16.5 and instead seeks to apply a basic "good cause" standard applicable to ordinary extensions of the discovery period under Fed. R. Civ. P. 16(b)(4) and Local Rule 16.4. SAIC Memo at 7-8.  The cases cited by SAIC, however, are inapplicable to a situation like that

## II.      SAIC Does Not Meet the Standard for Re-Opening Discovery

SAIC simply does not meet the high standard for re-opening discovery at this late stage. SAIC had every opportunity to obtain, and did obtain, discovery on precisely the same topics on which it now seeks a new round of discovery.  To the extent that SAIC could obtain information that it did not obtain in the first round of discovery, that information would be irrelevant to any facts at issue or elements that the jury will be required to address, and any evidentiary value it may have is minimal.  Finally, SAIC's efforts to conduct a "re-do" of discovery on issues SAIC apparently believes it did not successfully develop previously will substantially delay trial and prejudice the United States.

### a.    SAIC Had a Full and Fair Opportunity to Develop the Topics on Which It Now Seeks Another Round of Discovery, and Has Done So

The issues relating to the value of SAIC's efforts for the NRC have been present in this case since its inception.  The United States filed its Complaint in this action on September 3, 2004 and immediately made clear its factual assertion that SAIC had been paid under its contracts with the NRC to deliver services and advice that was both technically sound and free from potential conflicts of interest.  R. 1 at ¶101.  The initial Complaint further alleged:

> 102. Because of the failure of SAIC to disclose its substantial [organizational conflict of interest] relationships to the NRC and the resulting damage to the NUREG 1640 effort, NRC received nothing of value under its 1992 Contract and the 1999 Contract with SAIC.

R. 1 at ¶ 102.  SAIC had years to conduct any discovery that it determined necessary and appropriate on this issue.  Indeed, SAIC concedes that it was ". . . able to conduct discovery

---

presented here, where a final pretrial order has issued and the case has been tried.  As noted below, however, even the "good cause" standard does not support SAIC's request.

related to damages before the first trial, and the Court did not preclude them from doing so[.]"

Def. Mem. at 8.

In fact, SAIC conducted extensive discovery on precisely this issue. SAIC served

extensive document requests on the United States on March 3, 2005. In those requests,

SAIC sought the very same type of documents that it seeks in the present motion. All of

these documents were gathered over a period of 11 months and produced in the first round

of discovery that took place in 2005 and 2006.[3] For example, in its document requests,

SAIC sought:

> 15.  All documents that evidence or establish that SAIC's work under
>      the 1992 or 1999 NRC-SAIC Contracts was impacted, altered or
>      in any way affected by the OCIs alleged by the Government in
>      the Complaint.
>
> 16.  All documents that constitute, refer or relate to "peer reviews" or
>      other independent evaluations of SAIC's work product resulting
>      from the 1992 and 1999 NRC-SAIC Contracts.
>
> 17.  All documents that constitute, refer or relate to NRC evaluations
>      of SAIC's work product resulting from the 1992 and 1999 NRC-
>      SAIC Contracts.
>
> 18.  All communications from 1991 to the present between NRC and
>      any other party that refer or relate to SAIC, including but not
>      limited to: SAIC's performance under the 1992 and 1999 NRC-
>      SAIC Contracts; SAIC's dealings with DOE and its
>      subcontractors; and the facts alleged in the Complaint.
>
> 25.  All communications between NRC and DOE that refer or relate
>      to NUREG 1640.

---

[3] Given the tremendous breadth of the SAIC document requests, as well as the technical
nature of many of the responsive documents, the United States chose to produce numerous
collections of documents to SAIC by making them available as they were kept at that time in the
ordinary course of business. SAIC chose what documents from those collections it wished to
receive copies of. To repeat even some of this process eight years later would be resource
intensive (collections would have to be relocated and made available, often from archives) and
take months to achieve.

32.    All documents that evidence, support or establish the damages allegedly incurred by the Government as a result of the OCIs alleged in the Complaint.

34.    All documents that refer or relate to the independent review of SAIC's work conducted by the National Research Council, including but not limited to, all communications between NRC and the National Research Council regarding the review.

40.    All documents that refer or relate to the NRC's decision to use Sandy Cohen & Associates to audit SAIC's work product produced pursuant to the 1992 and/or 1999 NRC-SAIC Contracts, including but not limited to any documents that analyze any actual or potential OCIs that Sandy Cohen & Associates may have had.

41.    All documents that refer or relate to Sandy Cohen & Associates' audit of SAIC's work product resulting from the 1992 and/or 1999 NRC-SAIC Contracts, including but not limited to all reports and draft reports generated by Sandy Cohen & Associates.

42.    All documents that refer or relate to any changes to SAIC's work product resulting from the 1992 and/or 1999 NRC-SAIC Contracts recommended or implemented by Sandy Cohen & Associates.

43.    All communications between the NRC and Sandy Cohen & Associates that refer or relate to SAIC or SAIC's work product resulting from the 1992 and 1999 NRC-SAIC Contracts or the facts alleged in the Complaint.

52.    All documents upon which the Government intends to rely at trial.

53.    All documents not already produced in response to a previous request that refer or relate to the facts alleged in the Complaint.

In addition to the extensive documentary discovery that took place prior to the trial in this matter, SAIC obtained extensive testimony on the topics it now wishes rediscover. Specifically, SAIC obtained discovery through depositions of numerous individual

employees of the NRC and, pursuant to Fed. R. Civ. P. 30(b)(6), of the NRC itself.  For

example, in December 2005, SAIC served a deposition notice under Rule 30(b)(6) on the

NRC seeking agency testimony on a total of 17 categories with multiple subcategories.  *See*

Notice of Rule 30(b)(6) Deposition, attached hereto as Exhibit 1. Category 3 sought and

obtained testimony from the NRC on the quality of work actually performed by SAIC under

the 1992 Contract and the 1999 Contract with the NRC.  Category 12(n) specifically sought

and obtained testimony from the NRC on the factual basis for the allegation in ¶102 of the

Complaint that NRC received <u>nothing of value</u> under its contracts with SAIC.  The NRC

prepared a witness to testify on these topics and, on January 24, 2006, Cheryl Trottier was

designated to answer any and all of SAIC's questions.  For example, SAIC extensively

questioned the NRC as to whether some of the post-conflict efforts discussed above had

cleansed the SAIC efforts of the bias that resulted from the conflict.  Trottier Dep., attached

hereto as Exhibit 2, at 50 (responding that "in order to have the issue of bias ruled out in the

minds of those who believe there is bias, you would – I believe you would need to start

afresh, not just redo exactly what was done before.").  SAIC also extensively questioned the

NRC about the fact that the NRC had published Final NUREG-1640 using, as a foundation

for the analytical approaches, Draft NUREG-1640 co-authored by SAIC and the NRC.

Trottier Dep., attached hereto as Exhibit 2, at 52-53, 120-121 (pointing out that SC&A, not

SAIC, was the principal author of Final NUREG-1640 and that whatever connection SAIC's

work may have had to Final NUREG-1640, it was not being used for its intended purpose of

rulemaking and could not be used for the purpose due to SAIC's conflicts).  This is the very

topic on which SAIC seeks another round of deposition testimony from the NRC and

additional witnesses.  SAIC further questioned the NRC about the NRC's continuing efforts

in the area of release and recycle and whether SAIC's work had provided value in that area. Trottier Dep., attached hereto as Exhibit 2, at 66-68.  (stating that "the lack of confidence that many in the public sector have" was due to SAIC's conflicts and that "only a complete redo" would ever be capable of removing the cloud around SAIC's advice and assistance.). SAIC also questioned Ms. Trottier and the NRC about the fact that Final NUREG-1640 was available on the NRC's website.  Trottier Dep., attached hereto as Exhibit 2, at 120-123 (pointing out that the referenced version was that created by SC&A, not SAIC, and that it did not impact the NRC's view that SAIC's services and advice lacked value. )  Lastly, SAIC specifically asked Ms. Trottier to reconcile the NRC view that the SAIC effort had no value and the fact that the NRC website suggested Final NUREG-1640 might be used by licensees "to evaluate operational situations or to prepare requests for action from the NRC or state regulators."  Trottier Dep., attached hereto as Exhibit 2, at 52-53, 119-123.  This is the very topic that SAIC claims was not addressed by discovery.  Ms. Trottier, however, responded then as the United States does now:  Final NUREG-1640 was an SC&A product, not an SAIC product; that it was not an endorsement of the SAIC work; that there was a requirement that a final document be published; that SAIC's conflict of interest still clouded the value of the work to the NRC; and the fact that it could be used by licensees to have things evaluated was not the same thing as rulemaking and had little, if any, value to the NRC.  *Id.*

SAIC utilized this written and testimonial discovery to proffer an expert, Patrick McGeehin, for trial on the topic of damages.  Expert Report of Patrick McGeehin, attached hereto as Exhibit 3.  Based upon his consideration of the depositions of Cheryl Trottier and Frank Cardile of the NRC, as well as other depositions and documents from fact discovery,

Mr. McGeehin offered a number of opinions relative to the value of SAIC's work: 1) the government received what it bargained for under the 1992 and 1999 contracts with SAIC; 2) the government did not suffer any damages as a result of the alleged false claims; 3) the view of the NRC that there is a cloud of bias over the SAIC work that renders SAIC's effort worthless is not supported by documents; and finally 4) that the NRC received significant value from the effort (and resultant) billings from SAIC as is evidenced by the fact that the 2003 Final NUREG-1640 is still on the NRC website and acknowledges and commends SAIC.  *Id.* at 4-9.

In summary, the NRC spent years gathering and producing thousands of documents and making witnesses available concerning SAIC's efforts under its contracts, the technical and factual results of those efforts, peer reviews of those efforts, follow-on contracts awarded to SC&A for development of technical products, reviews by the National Academy of Sciences, and the publishing of Final NUREG-1640 by the NRC for the use of its licensees.  All of this information was produced by the United States and available for consideration by SAIC at trial. The fact that current SAIC counsel may not agree with the approach taken or results obtained by prior SAIC counsel on the first go around, or would do things differently now, does not change the conclusion that SAIC will suffer no manifest justice for being denied a second round of discovery on the same topics.  *See Martin's Herend Imports,* 195 F.3d at 775 n. 15 (if the moving party knew or should have known that certain witnesses or evidence were necessary at the time of the first pretrial, then the exclusion of those witnesses during the retrial will likely not be manifestly unjust).[4]  SAIC claims that it needs this discovery but then fails entirely to address

---

[4] The United States agrees that discovery of events occurring after the trial could not have occurred before the trial.  In that sense, SAIC did not have an opportunity to take discovery on

which of the thousands of documents produced already it is missing or what aspect of Final

NUREG -1640 it failed to compare to Draft NUREG 1640.  Indeed, SAIC defeats its own

argument by admitting that it was not precluded in any way from taking such discovery.

 The topics on which SAIC now seeks discovery were also a significant part of

SAIC's case at trial.  SAIC examined numerous witnesses regarding the relative

conservativeness of Draft NUREG-1640 as compared to the Final NUREG-1640 prepared

by the NRC and SC&A.  *See, e.g.*, Mckenzie-Carter Test., 7/17 p.m. Tr. 27:1-29:13; Mauro

Test., 7/21 a.m. Tr. 104:16-104:20.  In fact, directly contrary to its statement that it did not

have the opportunity to present evidence about the NRC's continuing use of NUREG-1640,

SAIC counsel explicitly referenced, in their opening statement, that:

> the evidence will show that final NUREG-1640 -- SAIC
> worked on draft NUREG-1640 -- final NUREG-1640, much of
> which was built upon the work that SAIC did in creating draft
> NUREG-1640 -- has been used by the NRC for years.  It's on
> their website even as we sit here today.  Indeed, the NRC
> invites licensees to rely on its content.

Opening Statement, 7/1 p.m. Tr. 33.

 SAIC concedes that it has been given every opportunity to discover fully any "alternative

uses" that were made of its "work product" after its termination and multiple peer reviews at

least up through the discovery period preceding the first trial.[5]  SAIC has thus failed to

---

these matters.  As set forth below, however, SAIC has not demonstrated how this information is
relevant to the upcoming retrial or that its evidentiary value justifies re-opening discovery.

[5] While SAIC obviously could not take discovery regarding events that happened after
2006, that fact does not entitle to discovery to the broad discovery it seeks here.  It is often the
case that a gap exists between the close of discovery and the beginning of trial.  For example,
during the last trial discovery closed in 2006 and the trial was conducted in July 2008.
Moreover, as discussed below, SAIC has failed to explain why any hypothetical use of its work

demonstrate why it must now start that process all over again in the hopes of finding some

unspecified thing it apparently believes it missed the first time.

    b. The Discovery Sought by SAIC is not Relevant to the Question of Damages and Any Evidentiary Value It May Have is Minimal, Redundant, and Excessively Burdensome

  While the parties must be permitted, on retrial, to present argument and evidence

regarding the extent to which SAIC's advice and assistance had value to the NRC, it does not

follow that any reference, however remote or distant, to a product not even authored by SAIC,

and for purposes unrelated to SAIC's original contracts, would be relevant or of evidentiary

value.  Accordingly, SAIC's proposed re-opening of discovery should also be rejected because

the issues on which SAIC seeks additional discovery are not relevant to the question of damages,

and any relevance or evidentiary value they may have is minimal, redundant, and outweighed by

the burden and prejudice to the United States of responding to the requests.  The Circuit Court's

ruling makes clear that while value is an appropriate consideration in determining the amount of

damages under the False Claims Act, the question of value in a case such as this one is a

subjective one in that value is determined not by market value but by "what the services the

company actually delivered were worth to the government."  *United States v. SAIC*, 626 F.3d

1257, 1279 (D.C. Cir. 2010).  Both discovery and trial in this matter have established as an

undisputed fact that the purpose for which the NRC contracted SAIC was not to manufacture a

product, but to provide advice and assistance to the NRC in support of a rulemaking effort that

the NRC and SAIC knew would be subject to public scrutiny.  *See United States v. SAIC*, 626

F.3d 1257, 1261 (D.C. Cir. 2010); Rodehau Test., 7/3 p.m. Tr. 59; Cardile Test., 7/1 p.m. Tr. 71-

product after 2008 would have any greater relevance than the same type of information in the period that was covered in the discovery already taken in this case.

72, 84, 89:18-90:6 ("[t]he objective of this contract is to provide [the NRC] with detailed technical assistance in the development of an information base and subsequent rulemaking . . ."). One aspect of SAIC's advice and assistance pertained to the generation of Draft NUREG-1640, a document published by the NRC in 1999 and co-authored by the NRC and SAIC.  McKenzie-Carter Test., 7/17 a.m. Tr. 115.  Like all of SAIC's advice and assistance, the NRC's purpose in developing and publishing Draft NUREG-1640 was to use it as a basis for the rulemaking effort. Cardile Test., 7/2 a.m. Tr. 9:9-9:21.  Enacting a rule was important because it would lead to certainty and significant cost savings for both the NRC and the industry in the release and recycle of slightly radioactively contaminated solid material.  Paperiello Dep., attached hereto as Exhibit 4, at 229:12-230:9.  Rather than having to perform a costly and time consuming case-by-case evaluation for each request to release material, the NRC, the industry, and the public could rely on the fact that if radioactivity levels were below a certain level, release of that material would be protective of public health and the environment.  *See id*.; see also Cardile Test., 7/2 a.m. Tr. 9:9-12:12.  The rule would thus have been of significant value to the NRC, industry, and the public who ultimately foots the bill in the form of utility rate payments and taxes.  In order for SAIC's advice and assistance to have value to the NRC, it had to be free from bias. Thadani Test., 7/21 a.m. Tr. at 54-60; Cardile Test., 7/1 p.m. Tr. 83:23-84:19; Paperiello Test., 7/15 p.m. Tr. 53, 56-57.  It also had to be usable for its intended purpose, as a basis for rulemaking.  Trottier Dep., attached hereto as Exhibit 2, 18-20, 42-43, 52.

There can be no clearer demonstration of this than what actually happened.  When SAIC's previously undisclosed conflicts came to light, the NRC's rulemaking efforts were halted and public confidence in the basis for the rule was destroyed.  McKenzie-Carter Dep., attached hereto as Exhibit 5, at 245:5-9; Cardile Test., 7/2 a.m. Tr. 45:12-46:21; Trottier Dep., attached

hereto as Exhibit 2, at 26:11-27:19, 42:20-43:13, 52:4-53:10.  Both NRC and SAIC personnel have testified about how SAIC's conflicts undermined the NRC's rulemaking effort and prevented SAIC's work from having value to the NRC for their originally contracted purpose. *Id*.  The value, if any, of SAIC's advice and assistance to the NRC's rulemaking effort is the question the jury will have to address on retrial.

Rather than focus on this relevant issue, on retrial SAIC now seeks to examine the NRC's use of Final NUREG-1640 -- a product that was not even authored by SAIC.  Whether the NRC maintains Final NUREG-1640 on the NRC's website is wholly irrelevant to the question of whether the NRC has obtained value from the advice and assistance that was intended to be in support of a public rulemaking.  *See, e.g.*, Def. Mem. at 1 (stating that NUREG-1640 is "publicly available on the NRC's website.").[6]

Nor is the information sought by SAIC regarding the handful of instances over the past ten years in which the NRC staff has referenced Final NUREG-1640 in any way relevant to the jury's consideration of damages.  As discussed above, it is not disputed that SAIC's services were never useful to the NRC for the purpose for which they were contracted, and that SAIC's conflicts were a significant factor in why they were not useful.  SAIC now points to a handful of instances over the past fourteen years since SAIC's conflicts came to light in which the NRC staff referenced Final NUREG-1640 in evaluating licensee proposals to dispose of slightly radioactively contaminated solid materials.  Def. Mem. at 10-13.  SAIC's argument ignores the fact that not one of these instances involve reliance on Draft NUREG-1640 for which SAIC and

---

[6] Indeed, the NRC's practice is to make all of its documents publicly available other than those that are proprietary, classified, export controlled, privileged, or otherwise specifically exempt from disclosure.  See 10 C.F.R. § 2.390.

the NRC shared authorship.  Rather, each instance identified by SAIC involves a reference to Final NUREG-1640, a 2003 document co-authored by the NRC and Sanford Cohen & Associates (SC&A), a firm that the NRC hired to replace SAIC when SAIC's undisclosed conflicting business relationships came to the light and the NRC promptly fired SAIC.  Final NUREG-1640 credits SAIC only for "establishing the foundations for the analytical approaches" contained in the report.[7]

To the extent that the question of whether and how SAIC's work on Draft NUREG-1640, issued in 1999, was incorporated into Final NUREG-1640, issued in 2003, is relevant to damages, that question has already been fully discovered, was completely knowable at the time of discovery, and does not need to be re-discovered.[8]  Because the NRC could not rely on any of SAIC's advice or assistance due to SAIC's conflicting business relationships with companies that stood to profit from the very activities on which SAIC was providing support to the NRC,

---

[7] After lengthy discovery and trial, only two instances of usage of Draft NUREG-1640, the document on which SAIC provided advice and assistance, have been identified.  Both illustrate SAIC's conflicts, and neither was disclosed to the NRC.  SAIC's business partner, British Nuclear Fuels, Ltd., used Draft NUREG-1640 to justify releasing radioactively contaminated concrete from the BNFL-SAIC Recycle Project.  Palau Test., 7/15 a.m. Tr. 13-20.  SAIC also used Draft NUREG-1640 to develop an analysis for Bechtel-Jacobs Corporation that attempted to justify releasing and recycling contaminated material from three projects, one of which was the BNFL-SAIC Recycle Project, in accordance with existing NRC release standards.  Slack Test., 7/9 p.m. Tr. 5-9, 29-42.  The NRC received no value from either use of Draft NUREG-1640 and both of these uses have been fully discovered.

[8] Moreover, Draft NUREG-1640 was co-authored by the NRC staff.  McKenzie-Carter Test., 7/17 Tr. 115.  SAIC made much of the NRC's co-authorship and contribution to Draft NUREG-1640 and cannot now argue or demonstrate that any limited "value" that the NRC may have received from that document was conferred by SAIC rather than by the NRC scientists that worked on that effort.  *See, e.g.,* Meck Test., 7/3 p.m. Tr. 9; Opening Statement, 7/1 p.m. Tr. 33:10-34:7.  In any event, SAIC has already enjoyed an opportunity for full discovery regarding both Draft and Final NUREG-1640.

the NRC almost immediately stopped work on SAIC's contract and ultimately terminated the contract within a few months of first learning of SAIC's conflicts.  McCubbin Test., 7/15 p.m. Tr. 95:6-95:24; Mace Test., 7/15 p.m. Tr. 107:12-108:9, 7/16 a.m. Tr. 22:16-23:2.  Unable to proceed with rulemaking, the NRC spent significant time and expense peer-reviewing and analyzing the work that was performed by the NRC-SAIC team to try to salvage from it what it could.  Trottier Dep., attached hereto as Exhibit 2, at 28:1-30:1, 69:15-72:17; Thadani Test., 7/17 p.m. Tr. 103.

Ultimately, the National Academy of Science concluded that due to SAIC's conflicts, the NRC could not use Draft NUREG-1640 or rely on any of SAIC's advice and assistance until and unless the NRC re-verified and examined each parameter and assumption made by SAIC.   DX 479, attached hereto as Exhibit 6, at 43, 113; Paperiello Test., 7/15 p.m. Tr. 51:19-53:21.  Even that laborious process could not fully remove the taint of SAIC's conflicts.  Paperiello Test., 7/15 p.m. Tr. 53:5-53:21, 56-57; Trottier Dep., attached hereto as Exhibit 2, at 26:11-27:19, 42:20-43:13, 52:4-53:10, 66-69, 119-120.  The NRC was forced to hire another contractor, Sanford Cohen and Associates (SC&A), and the NRC and SC&A spent years working on the issue, redoing the analyses, and preparing a new version of NUREG-1640, which used Draft NUREG-1640 to establish "foundations for analytical approaches."  Trottier Deposition, attached hereto as Exhibit 2, at 37-40, 121:18-19; NUREG-1640, Vol. 1, R. 207-5, at 21.  Finally, in 2003, the NRC issued Final NUREG-1640, which was co-authored by the NRC and SC&A.  Id.  There is no further evidence of any use or reliance by the NRC on Draft NUREG-1640.  As a result, SAIC does not and cannot contend that the NRC has used Draft NUREG-1640, the document for which SAIC provided advice and assistance, to support or justify the release of radioactive materials.  Each of the instances identified by SAIC refer to Final NUREG-1640 prepared by the

NRC and SC&A -- not SAIC – and none of the instances involve rulemaking, the intended purpose for SAIC's advice and assistance.  Def. Mem. at 11-13.

In summary, these fields have been extensively ploughed.  SAIC has sought, and the United States has produced, extensive documents and testimony on each and every aspect of the topics for which SAIC now seeks new discovery – the genesis, analysis, review, use, and ultimate value of the work SAIC performed under its contracts with the NRC and the use that has been made of its work.

While the United States agrees that there is some relevance to the fact that Draft NUREG-1640 was utilized by the NRC in establishing a foundation for the analytical approaches in the Final NUREG-1640, which was co-authored by the NRC and SC&A and published by the NRC in 2003, that occurred well before the first period of discovery, and, as demonstrated above, was already discovered by SAIC and argued at the first trial.  The issuance of Final NUREG-1640 in 2003, to whatever extent it did or did not rely on SAIC's work on Draft NUREG-1640, represents the final temporal point at which the value, if any, of SAIC's advice and assistance to the NRC would be determinable.

SAIC's argument essentially amounts to a claim for royalties for each reference the NRC makes to Final NUREG-1640 in perpetuity.  That information is not relevant to the actual value to the NRC of SAIC's advice and assistance.  Indeed, during the first trial, SAIC acknowledged this fact when it chose to focus not on the individual and derivative references to Final NUREG-1640 by the NRC but rather on the conservatism in SAIC's approach in its work on Draft NUREG-1640, in contrast to the approach taken by the NRC in Final NUREG-1640.  The United States agrees that SAIC's efforts contributed to Final NUREG-1640.  However, the extent to which Final NUREG-1640 -- the product of work, decisions, and calculations not by SAIC but

by the NRC and SC&A -- is utilized by the NRC or its licensees between 2003 and the present, is

not reflective of value conferred by SAIC because SAIC's advice and assistance ended in 1999

and was not used or relied upon by the NRC after, at the very latest, 2003.

The NRC bargained for advice and assistance in support of a rulemaking free from

conflict of interest.  Instead, it received tainted and conflicted advice and assistance that finally,

after significant peer review, rework, and additional analysis, all made necessary by SAIC's

conflicts, contributed not to rulemaking, but only to "foundations for analytical approaches" to a

technical document authored by others and usable only on a case-by-case basis and only

sporadically over the ten years since it was published.  The difference in value between what the

NRC contracted for and what it got will be for the jury to decide on retrial.  The relevance and

evidentiary value, if any, of the NRC's use, on a handful of occasions, of Final NUREG-1640 in

the ten years since it has been published, cannot possibly justify re-opening discovery at this

stage.

     c.     The Discovery Sought by SAIC and the Ensuing Delay Will Significantly
                  Prejudice the United States

It has been more than five years since a jury last found SAIC liable for violation of the

False Claims Act in this matter.  The United States believes that the parties should proceed as

quickly as possible to retrial.  The discovery proposed by SAIC will not only delay the retrial, it

will also substantially prejudice the United States in other ways.

First, the discovery proposed by SAIC will, by its own calculations, take through March

2014.  Def. Mem. at 9.  Thus, SAIC is essentially proposing at least a six-month delay in getting

to trial.  This fact alone is a substantial prejudice to the United States.  As stated above, the

United States believes that the delay that would be caused by the requested discovery would

extend well beyond six months.  Moreover, the very fact that SAIC requires the United States to reproduce all of this information on an expedited basis itself prejudices the United States in its preparations for retrial.

Second, the very fact that SAIC is proposing to against subject the United States to discovery on topics that have already been discovered constitutes a significant prejudice. Though SAIC recognizes and "endorses" the basic concept that it would be "unnecessary" and "inappropriate" to re-depose any witnesses (Def. Mem. at 17), that is precisely what SAIC is proposing in that it again wishes to depose the NRC for a second time on the same topics about which the previous NRC designee, Cheryl Trottier, testified.  Ms. Trottier has retired and, therefore, SAIC's request would require the NRC to locate, prepare, and designate a new witness.  The same is true of SAIC's suggestion that it be allowed unilaterally to take fact depositions of new witnesses (so far unidentified) and issue new written discovery.  This will not only cause further delay in the trial, but it will unnecessarily burden the NRC and its staff to re-identify, re-gather, and reproduce thousands of documents that have already been made available to SAIC.  Not only is this not necessary to prevent a manifest injustice, it would create a substantial injustice for the United States.  *Martin's Herend Imports*, 195 F.3d at 775-76. (injustice would result from having to prepare for new evidence on retrial).

Third, it is entirely unfair and prejudicial to the United States to allow SAIC to re-open discovery, unilaterally develop facts to attempt to support new theories, and not allow the United States a similar opportunity to rediscover its case.[9]  The new witnesses, both fact and expert,

---

[9]  For example, given that the D.C. Circuit has now rejected "the collective knowledge theory," if the Court were to re-open discovery the United States would seek additional

developed by SAIC will undoubtedly create new issues that will need to be pursued, which will lead to further delay.

      d.    <u>Even Under a Good Cause Standard, SAIC's Motion Is Unwarranted</u>

In its motion, SAIC urges the application of a "good cause" standard to justify its request to re-open discovery and allow it to retake discovery for which it has already been provided a full and fair opportunity.  In urging this standard, SAIC relies upon cases that do not present the same situation presented here.[10]

Even assuming, however, that SAIC were correct in urging this standard, it still misapplies this standard to the situation at hand.  For example, SAIC notes that "this very Court" applied a good cause standard in deciding to re-open discovery in *Watt v. All Clear Bus. Solutions*, 840 F. Supp. 2d 324, 326 (D.D.C. 2012).  Def. Mem. at 9.  SAIC then sets forth three factors in *Watt* that it claims are present here: no trial date, no "significant prejudice," and

_____

discovery that more precisely focuses on each SAIC employee's relevant knowledge of conflict of interest requirements and their materiality.  R. 206 at 32.

[10] For example, SAIC cites to Fed. R. Civ. P. 16(b)(4), which governs the initial scheduling of discovery in a case as opposed to the result of a final pretrial order under Fed. R. Civ. P. 16(e) (the court may modify the order issued after a final pretrial conference only to prevent manifest injustice).  Def. Mem. at 7-8.  Similarly, *Watt v. All Clear Bus. Solutions,* 840 F. Supp. 2d 324 (D.D.C. 2012); *Barnes v. District of Columbia*, 289 F.R.D. 1 (D.D.C. 2012); *In re Sealed Case (Medical Records)*, 381 F.3d 1205 (D.C. Cir. 2004); *Every Penny Counts, Inc. v. Bank of Am. Corp.*, No.2:07-cv-042, 2009 WL 6853402 (M.D. Fla. May 27, 2009), and *Visa Int'l Serv. Ass'n v. JSL Corp.,* No. 2:06-CV-00932, 2006 WL 3248394 (D. Nev. Nov. 7, 2006), all involve requests for discovery extensions in cases that were not being retried and had never progressed to a final pretrial order.  *McQueen v. Life Ins. Of N. Am.* , 595. F. Supp. 2d 752 (E.D. Ky. 2009) presented a wholly different situation of a court considering whether to allow pretrial discovery for the first time on an administrative appeal).  Only *Material Supply Int'l, Inc. v. Sunmatch Industries Co.*, 62 F. Supp. 2d 13 (D.D.C. 1999) involved an actual retrial after appeal.  In that case, the court allowed discovery as to parties and issues that had not been in existence for the first discovery period.

discovery leading to relevant evidence on the scope of damages.  SAIC, however, ignores the

actual "good cause" factors, including:  "(1) whether trial is imminent (not just scheduled);

(2) whether the request is opposed; (3) whether the non-moving party would be prejudiced;

(4) whether the moving party was diligent in obtaining discovery within the guidelines

established by the court; (5) the foreseeability of the need for additional discovery in light of the

time allotted by the district court; and (6) the likelihood that the discovery will lead to relevant

evidence." *Watt*, 840 F. Supp. 2d at 326 (*quoting Childers v. Slater,* 197 F.R.D. 185, 188

(D.D.C. 2000)).  SAIC ignores these factors because each of them weighs heavily against its

motion.  Thus, even the less stringent "good cause" standard compels a conclusion that discovery

should not be re-opened for the purposes espoused by SAIC.  First, a trial date may not have

been set yet, but trial is imminent.  Second, the request by SAIC is opposed.  Third, as discussed

above, unlike the defense in *Watt*, the United States will be significantly prejudiced by the

proposed discovery.  Fourth, as explained above, to the extent SAIC does not have this discovery

it seeks, that fact is due to its own tactics and/or its own lack of diligence.  The fact that

replacement counsel would perhaps conduct some aspects of discovery differently is no basis to

put the United States to the time and expense and delay of the repeat discovery.  Fifth, at the

status conference held in 2011, SAIC did allude to the possibility that it may request 60 to 90

days of discovery *total* prior to a new trial being scheduled.  *See* Transcript of Status Conference,

April 1, 2011, attached hereto as Exhibit 7, at 13-14.  At no time in the intervening two years has

SAIC attempted to seek permission for the discovery that it now demands and which it suggests

will take 180 days, (though, in reality, it will likely require closer to one year to complete, even

on an expedited basis).  As the United States explained at the hearing in 2011, this discovery is

21

not necessary because it has already occurred.  *Id.* at 14.  Sixth, as explained above, the material

SAIC is now seeking to discover is irrelevant and redundant.

## IV.  SAIC went beyond the purposes of this briefing

At the September 5, 2013 Status Conference, SAIC raised, and the Court invited SAIC to

brief, a request to take a 30(b)(6) deposition on the use of SAIC's work product.  SAIC's motion,

however, not only fails to identify with specificity the topic on which it seeks another 30(b)(6)

deposition,[11] it also adds a document request, an interrogatory, and three half-day depositions of

persons that SAIC has still not identified.  Because of this vague approach to its requested

discovery, the United States cannot assess or address the length of time it will take to conduct

such discovery, nor can the United States assess its own need for any responsive discovery.  For

example, if the requested Rule 30(b)(6) deposition is truly limited to the continued uses by the

NRC of "SAIC's work product" (Def. Mem. at 15), then it will not take long to prepare a witness

to so testify.  This is so because the NRC never used SAIC's work product for its contractual

purpose – rulemaking – and has not utilized SAIC's work product for any purpose since 2003 at

the very latest.  All of this was covered in the testimony in the initial discovery period.  On the

other hand, if SAIC has some broader, unmentioned intention regarding its requested Rule

30(b)(6) deposition, the United States has not been given an opportunity to assess what that

might be.  Similarly, if SAIC truly limits its document requests to documents reflecting or

relating to its work performed under the contracts, the United States has already produced all

---

[11] Indeed, on this basis alone, the United States requests that SAIC's motion seeking
permission to take a 30(b)(6) deposition be denied.  Local Rule 5.2a requires a verbatim setting
forth of any discovery sought by the motion.  It is not possible for the United States to assess the
breadth of the topic, the number of witnesses that may need to be designated, prepared and
testify on the topic, or the length of time that it will take to do so.

such documents to SAIC for use in discovery between 2005 and 2008.  If, however, SAIC seeks

an overly broad definition of its work product to include any documents that use or reference any

version of NUREG-1640 (even those created well after SAIC's termination and with respect to

which SAIC had no role), then a search for such documents would take months to locate, gather

and produce.  It is also not possible for the United States to assess SAIC's request for half-day

depositions because SAIC has failed to identify these witnesses or to explain the purpose of their

testimony.

## V. Government's Position

Accordingly, the United States opposes SAIC's attempt to rediscover issues that have

already been the subject of discovery, as to which SAIC has already been fully entitled to

discovery, and which are of little, if any, relevance to the determinations the jury will have to

make on retrial.  Discovery relating to the time period prior to 2006 is particularly unwarranted,

repetitive, and prejudicial.  The United States therefore requests that the Court set a new trial

date as soon as possible.  The United States further proposes that the scheduling order include a

brief period of time for the parties to supplement their responses to their disclosures and

discovery responses, if necessary.  Finally, although it does not believe that it is warranted, the

United States would be willing to agree to limited expert discovery (one expert for each side) on

the specific question of the value of SAIC's advice and assistance to the NRC, so long as this

discovery can be accomplished within the time frame for trial set by the court and can be

completed within 105 days of the scheduling order.

## CONCLUSION

SAIC has neither demonstrated a need for, nor justified the delay that would be caused by

re-opening discovery on issues and facts that have been present in this case since day one.

Accordingly, 1) SAIC's Motion should be denied; 2) a new trial date should be established; 3) the parties each should be ordered to update their discovery and disclosures to the extent required by Rule 26; and 4) the parties should be ordered to disclose any new expert on the issue of the value of SAIC's performance within 45 days of the Court's Order on this motion, to file any rebuttal to said disclosures 30 days thereafter, and to complete any and all expert discovery within 105 days of the Court's Order on this Motion.

<div style="margin-left: 40%;">

Respectfully Submitted,

STUART F. DELERY
ASSISTANT ATTORNEY GENERAL

/s *Daniel Hugo Fruchter*
MICHAEL D. GRANSTON
TRACY L. HILMER
DONALD J. WILLIAMSON
DANIEL HUGO FRUCHTER
Attorneys
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-3173

</div>

DATED: September 20, 2013

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of September, 2013, I caused a true copy of the foregoing **UNITED STATES OF AMERICA'S MEMORANDUM IN OPPOSITION TO DEFENDANT SCIENCE APPLICATIONS INTERNATIONAL CORPORATION'S MOTION FOR DISCOVERY** and exhibits in support thereof to be served via the Court's electronic filing system to registered counsel for SAIC.

*/s/ Daniel Hugo Fruchter*
Daniel Hugo Fruchter