**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| SCIENCE APPLICATIONS | ) |
| INTERNATIONAL CORPORATION, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

_____)

Case No.: 04-cv-1543 (RWR)

<u>**REPLY MEMORANDUM IN SUPPORT OF SAIC'S MOTION**</u>
<u>**FOR TARGETED DISCOVERY ON DAMAGES**</u>

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................ 1

I.  THE APPLICABLE STANDARD IS GOOD CAUSE AND SAIC HAS
    SURPASSED THAT THRESHOLD. ...................................................... 2

II. THE TARGETED DISCOVERY SAIC SEEKS IS CRITICAL TO ITS
    DEFENSE AND WILL UNCOVER RELEVANT EVIDENCE. ................................. 6

    A.  The NRC's use of SAIC's work product was not the subject of prior
        discovery. .................................................................................. 10

    B.  Evidence of the value the NRC has received from its use of SAIC's work
        product is integral to the jury's damages determination. ...................................... 11

        1.  Value is a fact question to be determined by the jury. .................................. 12

        2.  The value of SAIC's work product to the NRC is independent of the
            NRC's rule-making efforts. .................................................... 12

    III. THE GOVERNMENT IS NOT PREJUDICED BY SAIC'S REQUEST. ................... 14

    IV. SAIC'S DISCOVERY CAN BE COMPLETED IN SIX MONTHS. ...................... 18

CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

\* *Material Supply International, Inc. v. Sunmatch Indus. Co.*,
   62 F. Supp. 2d 13 (D.D.C. 1999) ............................................................... 3, 4

\* *United States v. SAIC*,
   626 F.3d 1257 (D.C. Cir. 2010) ............................................................... *passim*

*Bennett v. Martin-Trigona*,
   686 F. Supp. 6 (D.D.C. 1988) ..................................................................... 16

*Childers v. Slater*,
   197 F.R.D. 185 (D.D.C. 2000) ...................................................................... 6

*Cleveland v. Piper Aircraft Corp.*,
   985 F.2d 1438 (10th Cir. 1993) .................................................................... 6

*D'Onofrio v. SFX Sports Group, Inc.*,
   247 F.R.D. 43 (D.D.C. 2008) ...................................................................... 16

*Edmond v. U.S. Postal Services General Counsel*,
   949 F.2d 415 (D.C. Cir. 1991) ...................................................................... 4

*Manley v. AmBase Corp.*,
   337 F.3d 237 (2d Cir. 2003) ......................................................................... 5

*Watt v. All Clear Business Solutions, LLC*,
   840 F. Supp. 2d 324 (D.D.C. 2012) .............................................................. 6

*Yong v. Nemours Foundation*,
   432 F. Supp. 2d 439 (D. Del. 2006) .............................................................. 5

**Rules**

Fed. R. Civ. P. 16(b)(4) ..................................................................................... 3

Fed. R. Civ. P. 26 .............................................................................................. 3

Fed. R. Civ. P. 26(b)(1) ..................................................................................... 4

Local Rule 16.4 .................................................................................................. 5

Local Rule 16.5 .................................................................................................. 4

Local Rule 5.2(b) ............................................................................................. 16

**Other Authorities**

Charles Wright, Arthur Miller & Mary Kane,
   11 Fed. Prac. & Proc. Civ. § 2803 (3d ed.) .................................................. 6

## INTRODUCTION

The D.C. Circuit vacated the FCA damages award previously imposed in this case precisely because it did not reflect "the value of the goods or services the government received or used." *United States v. SAIC*, 626 F.3d 1257, 1279 (D.C. Cir. 2010).  The D.C. Circuit expressly instructed that on re-trial, SAIC must be allowed to offer evidence of "the fact that the NRC continued to use SAIC's work product after the potential conflicts were identified." *Id.* at 1280. If SAIC is precluded from obtaining the very evidence the D.C. Circuit mandated it be permitted to present, SAIC will suffer severe prejudice and any resulting damages award will contravene the court's directive.

Moreover, the government concedes that in light of the D.C. Circuit's decision in this case, SAIC should be permitted on re-trial to introduce evidence regarding the value of its work to the government because the court's ruling "makes clear that . . . value is an appropriate consideration in determining the amount of damages under the False Claims Act."  (R. 208: Government's Br. at 4, 12).  The government also concedes that the value the NRC has received through its use of SAIC's work product during at least the last five years was <u>not discoverable</u> during the initial discovery period, (*id.* at 10–11 n.4), and that the NRC has <u>continued</u> to use calculations developed by SAIC.  (R. 207-7: 09/05/13 at 11–12, 21–22).  That use confers value that SAIC now seeks leave to explore.

At the recent status conference, the government also agreed that limited written discovery and updated document production regarding damages would be appropriate and "consistent with the truth-finding mission."  (R. 207-7: 09/05/13 Tr. at 14–15).  The government also represented that it was "confident", based on the tone of the discussions between the parties, that the parties could reach agreement as to the scope of that discovery.  *Id.* at 15.  Moreover, the government expressly agreed in court that a trial in this matter should be scheduled in 2014 to allow for

limited discovery.  (R. 207-7: 09/05/13 Tr. at 8–9 (government explaining that a trial "sometime in the next year for a number of reasons would be appropriate")).  Despite these concessions and prior representations to this Court just a few weeks ago, the government now backtracks and offers scanty reasons why this Court should deny SAIC's request for a brief discovery period on the sole issue of damages in advance of a re-trial early next year.

The government's objections to SAIC's request for targeted discovery should be rejected.  SAIC has demonstrated the acute need for discovery on the NRC's use of its work product to inform the jury's damages assessment under the new law.  The NRC has garnered value through its use of SAIC's work—particularly during the seven years that have elapsed since pretrial discovery closed—that is altogether absent from the record and that is integral to SAIC's damages defense.  SAIC's request will not prejudice the government because SAIC seeks only a brief window of time in which to complete targeted discovery and has identified narrow and discrete topics to address.

Because the discoverable evidence is integral to SAIC's defense and SAIC's request for limited discovery does not prejudice the government, this Court should grant SAIC's motion.

## I.    THE APPLICABLE STANDARD IS GOOD CAUSE AND SAIC HAS SURPASSED THAT THRESHOLD.

SAIC has demonstrated that good cause exists for this Court to permit SAIC to conduct targeted discovery on the topic of damages.  (*See* R. 207-1: SAIC Br. at 11–13 (setting forth specific examples of the NRC's use of SAIC's work product)).  Evidence of the NRC's use of SAIC's work product is vital to SAIC's damages defense under the standard declared by the D.C. Circuit.  *SAIC*, 626 F.3d at 1280.  This targeted discovery will not delay the re-trial and, contrary to its protestations, will not prejudice the government.  Allowing a limited amount of

targeted discovery is, as the government agreed just a few weeks ago, consistent with the truth-finding mission of a trial.  (*See* R. 207-7: 09/05/13 Tr. at 15).

The government claims that SAIC's motion requires a showing of "manifest injustice", rather than good cause.  (R. 208: Government Br. at 2–4).  But the government's claim is contrary to the federal rules, the local rules, and this Court's precedent.  *See* Fed. R. Civ. P. 26 (requiring no showing where discovery sought is relevant to claims and defenses, and only showing of good cause for broader discovery); Fed. R. Civ. P. 16(b)(4) (requiring only showing of good cause to modify scheduling order to allow further discovery).

As the government concedes, the D.C. Circuit has not adopted the "manifest injustice" standard to govern a party's motion to obtain limited additional discovery prior to a re-trial.  (R. 208: Government's Br. at 3 n.1).  Thus, the government relies solely on cases decided outside this Circuit to advance its argument that this Court should review SAIC's motion under a "manifest injustice" standard.  (*Id*. at 3–4).  This Court, however, previously has considered whether to grant limited additional discovery in circumstances similar to those presented here and required only a showing of <u>relevance</u>.  *See Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13 (D.D.C. 1999).

In *Material Supply*, this Court considered motions by both the plaintiff and the defendant requesting additional discovery after the D.C. Circuit had remanded the case for re-trial.  62 F. Supp. 2d 13.  As the government notes, this Court granted the defendant additional discovery to obtain evidence regarding a possible alter-ego of the plaintiff that did not exist during the original trial.  *Id*. at 22–23; (*see* R. 208: Government's Br. at 20 n.10).  That, however, is not the portion of the decision upon which SAIC relies.  (*See* R. 207-1: SAIC Br. at 8).

The most <u>relevant</u> holding in *Material Supply*, nowhere mentioned by the government, is the Court's decision to grant a separate motion by the plaintiffs that sought discovery on an issue that <u>had in fact been raised and explored</u> before the first trial.  Specifically, the plaintiffs in *Material Supply* sought documents regarding the defendant's argument that the defendant "was the first to use the Suntech trademark in the United States," as well as expert discovery information.  62 F. Supp. 2d at 24.  The defendant's use of the Suntech trademark had been at issue since the first trial.  *Id*. at 17.  Nevertheless, this Court granted the plaintiff's motion, reasoning that "'[a]s a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted . . . .'"  *Id*. at 24 (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991) and citing Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . .")).  The court's liberal grant of additional discovery prior to the re-trial is far from the manifest injustice standard the government advances here.

The "manifest injustice" standard advanced by the government applies only to motions to amend final pretrial orders, but the parties in this case are not presently proceeding pursuant to any pretrial order.  *See* Local Rule 16.5 ("[A] final Pretrial Order . . . shall govern the trial.").  Indeed, the Court ordered briefing on SAIC's request for targeted discovery to shape the pretrial order.  (*See* R. 206: Mem. Op. and Order at 53 (setting scheduling conference); R. 207-7: 09/05/13 Tr. at 3 (The Court: "What I wanted to do was a set a trial conference date and a trial date, but I think I first need to find out from both sides how long you expect your cases to take."), 18 ("Perhaps once [the discovery dispute has] been decided, that may shape how much time . . . I think you all would need to finish this up and then set a pre-trial and a trial date.")).

The government also suggests that a pretrial order governs "the subsequent course" of a civil action, evidently in perpetuity. (*See* R. 208: Government Br. at 2–3). But the rules and cases the government cites do not provide that a pretrial order governs post-trial, post-appeal remand proceedings; nor could they, since a pretrial order by definition does not contemplate post-trial proceedings. (*See id.* (citing, *e.g.*, *Manley v. AmBase Corp.*, 337 F.3d 237, 249 (2d Cir. 2003) (amending pretrial order governing the second trial to address challenge to limiting instruction to be issued during that trial))).

If anything, SAIC's motion is a request to establish or amend a scheduling order, which sets limitations on the time for and amount of discovery parties are allowed to obtain prior to trial, and which is governed by a "good cause" standard. (*See* R. 12: Scheduling Order (as amended by order at R. 34 granting government's motion to extend discovery deadline)); *c.f.*, *Yong v. Nemours Found.*, 432 F. Supp. 2d 439, 441–42 (D. Del. 2006) (granting request prior to re-trial to amend scheduling order to allow limited additional discovery). Local Rule 16.4 provides that "[t]he court may modify the scheduling order at any time upon a showing of good cause."

The good cause standard is the correct standard, but in any event, under either standard, SAIC should be granted limited additional discovery. As both SAIC and the government have acknowledged, a district court has broad discretion in managing cases on re-trial, including with regard to whether to grant additional discovery. (R. 207-1: SAIC Br. at 7; R. 208: Government Br. at 2). This Court has explained that when considering what constitutes good cause to re-open discovery, courts consider factors including:

> (1) whether trial is imminent; (2) whether the request is opposed; (3) whether the non-moving party would be prejudiced; (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court; (5) the foreseeability

of the need for additional discovery in light of the time allotted by the district court; and (6) the likelihood that the discovery will lead to relevant evidence.

*Watt v. All Clear Bus. Solutions, LLC*, 840 F. Supp. 2d 324, 326 (D.D.C. 2012) (quoting

*Childers v. Slater*, 197 F.R.D. 185, 188 (D.D.C. 2000)).

Under the standard advocated by the government, the court "retain[s] broad latitude" to allow a party to conduct discovery on re-trial if the court "perceives in limiting evidentiary proof in a new trial a manifest injustice, to one side or the other," and the party "makes a timely motion to produce new and material evidence which was not otherwise readily accessible or known." *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1450 (10th Cir. 1993). The court should give the parties "sufficient leeway . . . to produce new evidence, without undue prejudice to their interest." *Id*.

Both standards proffered by the parties empower this Court to authorize the discovery. "Decisions respecting the admission of additional witnesses and proof should be guided by considerations of fairness and justice to all parties," Charles Wright, Arthur Miller & Mary Kane, 11 Fed. Prac. & Proc. Civ. § 2803 (3d ed.), and "common sense should control." *Cleveland*, 985 F.2d at 1450. As discussed below, common sense and fairness dictate that SAIC should be granted the opportunity to seek limited additional discovery that will yield evidence relevant to its defense on damages, will not unduly burden the government, and will not delay the re-trial.

## II.    THE TARGETED DISCOVERY SAIC SEEKS IS CRITICAL TO ITS DEFENSE AND WILL UNCOVER RELEVANT EVIDENCE.

A jury cannot return an informed or accurate damages assessment in this case unless SAIC is afforded an opportunity to uncover the scope and extent of the NRC's use of SAIC's work product. *See SAIC*, 626 F.3d at 1280. That is the only discovery SAIC seeks and it is integral to its ability to defend against the government's damages claim in this case. Despite the

importance and relevance of this evidence, the government grasps at every conceivable thread to oppose SAIC's request.

None of the government's arguments has merit.  In fact, buried in the government's many objections to SAIC's request for targeted discovery is a concession that should resolve the question of whether that discovery is necessary: the government acknowledges that the NRC's use of SAIC's work in the period since trial could not have been subject to prior discovery.  (R. 208: Government Br. at 10–11 n.4 ("The United States agrees that discovery of events occurring after the trial could not have occurred before the trial.  In that sense, SAIC did not have an opportunity to take discovery on these matters.")).  The government has never been asked for discovery relevant to that time period and its witnesses could not have addressed it.  This evidence is essential to SAIC's ability to mount a full and effective damages defense and SAIC should be allowed a brief discovery period to explore it.

Despite the government's previous concessions that some limited discovery on this very topic is appropriate, (R. 207-7: 09/05/13 Tr. at 14–16), the government now objects to SAIC's request to conduct such discovery by (1) retreating from its prior representations that limited document and expert discovery are necessary and appropriate; (2) claiming that SAIC should have sought this discovery sooner; and (3) arguing that any evidence of the NRC's continued reliance on NUREG-1640 is of minimal relevance.  The government is wrong on all counts.

First, the government's change in position on the propriety of limited document discovery and experts is striking and should be rejected.  At the status conference, the government expressly agreed that both limited document discovery and expert discovery on damages are appropriate.  (*See* R. 207-7: 09/05/13 Tr. at 15–16 ("[W]e're both in agreement that some . . . single topic expert disclosure is appropriate.")).  The government has, however,

significantly backtracked from its prior representation to this Court and now claims that it "does not believe that [experts are] warranted." (R. 208: Government Br. at 23). But despite the government's inconsistent positions on the need for experts, it remains "willing to agree to limited expert discovery . . . on the specific question of the value of SAIC's advice and assistance to the NRC." (*Id.*). For the expert discovery that both parties in Court agreed is appropriate to be meaningful, SAIC must be permitted to develop the factual evidence that will inform the experts' analysis. Otherwise, the parties' ability to proffer new damages experts will be constrained by their reliance on the inadequate and time-warped factual record, which both parties agree is devoid of evidence of the NRC's use of SAIC's work product or NUREG-1640 since at least post-2008.

Second, the Court should reject the NRC's argument that SAIC should have sought leave to conduct this discovery in the two years since the previous status conference. (R. 208: Government Br. at 21). SAIC refrained from doing so (perhaps obviously) because the Court was actively considering its potentially dispositive motion on damages. (*See* R. 197: SAIC's Motion for Partial Summary Judgment on Damages). In light of that, requesting from this Court leave to conduct discovery on damages or unilaterally undertaking to do so could have resulted in a tremendous waste of resources by both parties (and no doubt the government would have opposed it). Instead, SAIC deferred to the Court pending a determination on its motion for partial summary judgment on damages, and has sought this targeted discovery at the earliest opportunity since receiving the Court's ruling. (*See* R. 206: Mem. Op. and Order (setting scheduling conference for Sept. 5, 2013); R. 207-7: 09/05/13 Tr. at 5 (SAIC requesting "a brief period to be able to take the discovery that . . . is now allowable and permissible to put on our defense case")).

Third, the government's argument that the NRC's continued and ongoing use of the final version of NUREG-1640 is irrelevant because the final report was ultimately authored by the NRC and SC&A is baseless.  (R. 208: Government Br. at 17).  It is impossible to divorce the final product from its genesis in SAIC's work.  (*See* R. 164: Trial Tr. at 102 (Mauro) (testifying SAIC's work was the foundation of SC&A's work going forward)).  And the government conceded at the status conference that the "factual presence of SAIC work product" remains in the calculations that are used even today by the NRC, however "diminishing" the government may claim that presence is.  (R. 207-7: 09/05/13 Tr. at 22; *see also id.* at 11–12 (government recognizing "that some of the work product from the SAIC effort continued to be used")).  The government's ongoing attempt to minimize SAIC's role in developing the "calculational tool" at the heart of NUREG-1640, (R. 164: Trial Tr. at 105–06), cannot erase the value the NRC has received by continuing to use that tool.  Moreover, this is a <u>question of fact</u> that the jury—not the government—gets to decide, and the jury should decide it based on the evidence SAIC seeks here.

The Court should also reject the government's contention that there is only limited relevance to even the NRC's most recent use of NUREG-1640, a document it casts as "authored by others and useable only on a case-by-case basis and only sporadically over the ten years since it was published."  (R. 208: Government Br. at 18).  SAIC fundamentally disagrees with the government's newly-minted characterization of SAIC's contribution to NUREG-1640. (*Compare* R. 161: Trial Tr. at 29 (government arguing in closing that "the result of SAIC's dose assessment was a report called NUREG-1640")).  SAIC's bedrock technical analysis is still embedded in NUREG-1640 and represents a valuable calculation tool on which the NRC regularly continues to rely.  The NRC's continued use of SAIC's work and NUREG-1640 that

9

SAIC has already found through open source internet searching and documented in its motion,

(R. 207-1: SAIC Br. at 11–13), represents value to the government.  Further, the NRC's use of

SAIC's work product may be more extensive, more repeated, and more valuable than what SAIC

has been able to find through public sources.  That is yet another reason SAIC needs this

discovery.  And far from seeking "royalties" on the NRC's continued use of SAIC's work, (R.

208: Government Br. at 17), SAIC seeks only to prove that the government is not entitled to claw

back the payments that SAIC earned for its work.

      The government's objections to discovery related to the NRC's use of SAIC's work

product <u>prior</u> to the close of the previous discovery period are similarly baseless.  As explained

below, the discovery that SAIC seeks now was not previously explored; the NRC's continued

use of NUREG-1640 is integral to the jury's damages calculation; and the value the NRC has

received from SAIC's efforts stands independent of any rule-making.

      **A.**     **The NRC's use of SAIC's work product was not the subject of prior discovery.**

      The government argues that SAIC should not be permitted to take additional discovery

because the question of the value of SAIC's work was always at issue in these proceedings.  (*See*

R. 208: Government Br. at 5–6).  The government contends that all questions of value were

exhausted during the discovery period prior to the first trial.  (R. 208: Government's Br. at 5–11).

That is incorrect.  It is true that SAIC engaged in discovery, (*see id.* at 6–7 (listing SAIC's

document requests related to varied topics)), but the discovery the government points to

addressed largely the question of whether there was ever any proof of bias discovered by anyone

who evaluated SAIC's work, (*see, e.g.*, *id.* (listing discovery related to the NRC's assessment of

the quality of SAIC's work and the findings of various peer reviews)), and what steps, if any, the

NRC took to mitigate any damages, (*see, e.g.*, *id.* (listing discovery related to SC&A's reliance

on SAIC's work to complete 1999 contract)).  Discovery prior to the first trial also focused on whether the NRC has ever, at any point, told the public or other agencies that SAIC's work was conflicted.  (*Id.* at 6 (listing discovery related to the NRC's communications with third parties and other agencies concerning SAIC's work or NUREG-1640)).

The question SAIC seeks to explore now in order to measure value is distinct: when and how does the NRC actively use the analytical framework SAIC developed and preserved in NUREG-1640, or any other work provided by SAIC pursuant to the contracts at issue, in performing its regulatory functions or otherwise.  That question remains unanswered.  The NRC's witnesses were not questioned about the NRC's <u>use</u> of SAIC's work product in performing its regulatory functions and, contrary to the government's claim, (R. 208: Government Br. at 9–10), Mr. McGeehin did not opine on the value that the government's use of SAIC's work confers.

The government claims that Cheryl Trottier settled the matter when she testified that there was very little value to the government because of the "cloud" she pictured suspended above the report.  (R. 208: Government's Br. at 9).  But Trottier did not divulge the NRC's on-going use of NUREG-1640 that was occurring at the time, and she claimed instead that whether NUREG-1640 would ever be used remained "unanswered".  (R. 207-6: Trottier Dep. at 115).  The NRC cannot stand behind her incomplete and ambiguous testimony to shield itself from producing actual evidence of its continued use of SAIC's work and the value that use confers.

### B.  Evidence of the value the NRC has received from its use of SAIC's work product is integral to the jury's damages determination.

The government attempts to obscure the relevance of the evidence SAIC seeks by arguing that (1) the question of value to the government is subjective, and (2) any value SAIC

could have conferred to the NRC was conditioned on an eventual rule-making.  (R. 208: Government's Br. at 12–14).  Neither contention is true.

### 1.      Value is a fact question to be determined by the jury.

The government argues that value "is determined not by market value but by 'what the services the company actually delivered were worth <u>to the government</u>.'"  (R. 208: Government's Br. at 12 (quoting *SAIC*, 626 F.3d at 1279, and adding emphasis)).  Based on this emphasized language from the D.C. Circuit's opinion, the government argues that "the question of value in a case such as this one is a subjective one."  (*Id.*).  But, of course, the question of value in this case or any other is a question for the jury.  (*Id.* at 18 (acknowledging that "[t]he difference in value between what the NRC contracted for and what it got will be for the jury to decide on retrial")).  The government claims here that it received no value as a result of public allegations that SAIC had a purported conflict of interest.  (*Id*. at 8).  But the whole point of a trial is to allow the government to make that argument to a jury; to allow SAIC to present evidence that the NRC in fact continues to use the work that SAIC provided; and to let the jury decide whether to credit the government's claim in light of the NRC's conduct.  *See SAIC*, 626 F.3d at 280.  The government is not entitled unilaterally to settle the matter for all time by stating that "the product was not worth much to us in our view."  (*See generally, e.g.*, R. 207-7: 09/05/13 Tr. at 11–12).  They must leave that assessment to the jury.

### 2.      The value of SAIC's work product to the NRC is independent of the NRC's rule-making efforts.

Remarkably, the government claims that "it is not disputed that SAIC's services were never useful to the NRC for the purpose for which they were contracted, and that SAIC's conflicts were a significant factor in why they were not useful."  (R. 208: Government Br. at 14).

12

But those are the very claims that SAIC denies and intends to disprove at trial.  They are obviously contested and hotly disputed.

The government's claim that SAIC's work was worthless absent an ultimate rule-making, (R. 208: Government Br. at 12–14), is belied by the record.  The government contends that all parties agreed that SAIC was retained to support the NRC's rule-making in the area of nuclear waste recycling.  (*Id.* at 12).  But whether the NRC would promulgate a rule at all was always only one option of many, and SAIC was retained in part to advise the NRC on whether a rule was the best regulatory approach.  (R. 172: Trial. Tr. at 95 (Meck) (agreeing with government's proposition that included in scope of work was preparation of options paper that would "set out . . . various regulatory options that the Commission might consider" and "include a discussion of the relative pros and cons of each option")).  SAIC ultimately subcontracted the preparation of the options paper to Jupiter Corporation.  (*Id.* at 99–100).  Followed to its logical conclusion, the government's position is that had SAIC or Jupiter Corporation advised the NRC against adopting any rule at all, SAIC's work would have been rendered worthless because the NRC would not have proceeded to rule-making.  That is an illogical and untenable claim that no jury will accept. (*See* Exhibit 1: Trial Tr. at 83-86, 88-89 (Cardile) (testifying the regulatory alternatives available to the NRC always included the option not to issue a rule)).

Moreover, there were complex considerations surrounding whether to promulgate a rule, including shifting trends in the industry and in Washington, D.C.  The Commission ultimately decided to refrain from rule-making for reasons independent from SAIC.  Frank Cardile, a project manager at the NRC, testified at trial that in 2005, the Commission decided to put off any rule-making for mixed-use waste for three reasons: (1) the Commission concluded that the existing regulatory guidance was sufficiently effective; (2) the NRC was busy with security rules

(presumably post-9/11); and (3) the utility companies that had been planning to decommission their nuclear power plants decided to extend their lives instead so there was no large-scale recycling effort on the horizon as the NRC had originally anticipated.  (Exhibit 1: Trial Tr. at 74–75 (Cardile); *see also* R. 207-6: Trottier Dep. at 68 ("[T]he politics of [rule-making] is that sometimes you have to make a decision on where to invest resources.")).

The government cannot shut down discovery based on the contested and inaccurate assertion that the question of value is settled because the NRC did not go through with the rule-making.  SAIC has demonstrated, (*see* R. 207-1: SAIC Br. at 11–13), that the NRC continues to use SAIC's analysis and NUREG-1640 in performing its basic regulatory functions, including when granting and amending licenses, advising NRC-licensees, and evaluating dose assessments. It is clearly the act of continuing to avail itself of SAIC's work—whether in a rule-making or not—that constitutes the value the NRC continues to receive.

## III.   THE GOVERNMENT IS NOT PREJUDICED BY SAIC'S REQUEST.

The government cannot identify any disadvantage it will face, nor any damage to its case, as a result of SAIC's request for limited discovery.  Instead, the government complains that it will be burdened and inconvenienced because it has already suffered through discovery in this matter for "years" and it cannot be bothered with more.  (R. 208: Government Br. at 19 (lamenting the "very fact that SAIC is proposing to again subject the United States to discovery")).  The flaws in its arguments are many.

As an initial matter, the reason that the government was engaged in discovery prior to the first trial for "years" was because the government conducted an extensive and exhaustive investigation into SAIC prior to filing the complaint in 2004.  SAIC was exceedingly accommodating, signing several tolling agreements to allow the government to continue its query unbounded by the statute of limitations.  (*See* Exhibit 2: Letter from A. Baron to D.

14

Williamson, dated Jan. 7, 2004 (transmitting "most recent" tolling agreement)).  The government acknowledges that document discovery in this matter actually lasted only eleven months, (R. 208: Government Br. at 6), which is shorter than the year the government claims SAIC's significantly more targeted discovery will take.  (*Id.* at 21 (claiming, without any factual basis, "it will likely require closer to one year to complete, even on an expedited basis")).

The government cannot claim that it is prejudiced by SAIC's request to depose an NRC witness pursuant to Rule 30(b)(6).  In fact, the government reports that Trottier has retired and cannot, therefore, serve as the government's witness on damages.  (R. 208: Government Br. at 19).  As a result, the government would have to "locate, prepare, and designate a new witness" to respond to SAIC's request for discovery.  (*Id.*).  But the government is going to have to do that anyway to prepare for trial, where the government will bear the burden of proving damages to the jury.

Similarly, SAIC's request for three half-day depositions of new fact witnesses will not burden the government.  SAIC anticipates designating for these depositions percipient fact witnesses identified by the NRC's Rule 30(b)(6) witness who have knowledge of the NRC's use of SAIC's work product from 2006 (the close of discovery) to the present.  As the government has acknowledged, the period of time at least since trial has not previously been the subject of discovery.  (*See* R. 208: Government's Br. at 10–11 n.4).  These half-day depositions, like the Rule 30(b)(6) deposition, can be conducted with minimal imposition to the government.

The government complains that SAIC has not set forth with sufficient specificity the topics subject to discovery through the Rule 30(b)(6) witness.  (R. 208: Government's Br. at 22).  This position misconstrues Local Rule 5.2 to require SAIC to have filed with its motion discovery materials that do not yet exist.  Although the government asserts that "Local Rule 5.2a

[*sic*] requires a verbatim setting forth of any discovery sought by the motion," (*id.* at 22 n.11), Local Rule 5.2(b) in fact provides that "[a]ny motion concerning discovery matters shall be accompanied by a copy of, or shall set forth verbatim, the relevant portion of any nonfiled discovery materials as to which the motion is addressed."  The discovery materials the government argues should have been filed with SAIC's motion do not yet exist for the simple reason that this Court has not yet granted SAIC leave to serve such materials.  Local Rule 5.2(b) typically applies to discovery documents that are the subject of motions to compel production so that the court knows specifically which requests are at issue, not motions to allow a party to take additional discovery, which, by definition, cannot implicate specific discovery requests that have already been served.  *See, e.g.*, *D'Onofrio v. SFX Sports Group, Inc.*, 247 F.R.D. 43, 55 (D.D.C. 2008) (denying motion to compel); *Bennett v. Martin-Trigona*, 686 F. Supp. 6, 11 (D.D.C. 1988) (discussing previous denial of motion to compel).  The government is grasping at virtually any argument to deprive SAIC of a chance to forcefully challenge the government's position at trial.

The government also claims that it would be prejudiced by being forced to reproduce countless documents, many of which were initially made available by the government only in hard copy.  (R. 208: Government Br. at 6 n.3).  This argument sets up a classic straw man.  SAIC does not seek document discovery on any broad scale.  To the contrary, it has proposed to move forward with three targeted document requests related to damages, (*see* R. 207-1: SAIC Br. at 16), an area that the government has already conceded warrants additional document discovery. (R. 207-7: 09/05/13 Tr. at 14–15).

Finally, the government claims that SAIC's proposed schedule is prejudicial because it "is essentially proposing at least a six-month delay in getting to trial."  (R. 208: Government Br. at 18).  But the government itself proposed a schedule that would delay the re-trial for at least

16

105 days, (R. 208: Government Br. at 23; R. 207-7: 09/05/13 Tr. at 17), and the difference in the schedule proposed by SAIC is 75 days.  Over the course of a case that has been litigated for nearly <u>ten</u> years, 75 days is hardly a significant delay, particularly given the significance of the evidence to SAIC's defense.

Moreover, the government's independent request for 105 days of discovery is based on its undeniable recognition that new experts are necessary to opine "on the issue of the value of SAIC's performance."  (R. 208: Government's Br. at 23–24; *see also* R. 207-7: 09/05/13 at 16 (representing the parties' agreement that there is a need for new expert discovery "given what has occurred at the Court of Appeals")).  But without an opportunity to develop facts that will allow the experts to analyze that question based on <u>a current and accurate record</u>, neither party's expert will be able to return an opinion that will meaningfully assist the jury.  Instead, the parties must be able to develop a record that will enable the experts to provide an informed opinion on the "value of the goods or services the government received or used," *SAIC*, 626 F.3d at 1279, especially in light of "the fact that the NRC [has] continued to use SAIC's work product," *id.* at 1280.  Without this evidence, the experts would be entirely hamstrung by the lack of meaningful evidence on the very question the parties (and the jury) need their expertise to assess.

The most effective way to maximize the value and utility of the re-trial, particularly to "the public who ultimately foots the bill," (R. 208: Government's Br. at 13), is to ensure that the jury receives a fair and accurate representation of the facts at issue in this case in conformity with the D.C. Circuit's decision.  That simply cannot happen unless the parties (and their experts) are able to identify and consider evidence of the value the NRC has received from SAIC.  *SAIC*, 626 F.3d at 1280.

**IV.     SAIC'S DISCOVERY CAN BE COMPLETED IN SIX MONTHS.**

The government has asked the Court for 105 days of discovery and for a trial date to be set sometime after "the end of February" in 2014.  (R. 207-7: 09/05/13 Tr. at 16).  This Court recognized that the government has effectively "suggest[ed] the same period of time" as SAIC. *Id.* at 17.  Indeed, SAIC requests only 120 days in which to conduct targeted fact discovery, including one Rule 30(b)(6) deposition, three half-day depositions of new (and not already deposed) fact witnesses, and extremely limited written and document discovery.  SAIC requests this brief window of fact discovery be followed by 60 days of expert discovery.

The government alleges that the discovery SAIC seeks will "in reality . . . likely require closer to one year to complete, even on an expedited basis."  (R. 208: Government Br. at 21). The government suggests that it would take months to produce documents that reference NUREG-1640, but the government provides no reason why that might be the case.  The government admits that most NRC documents are public—presumably on the website in electronic format and searchable.  (*Id.* at 14 n.6).  The government's concern about reproducing hard copy documents is misplaced since surely most documents created by the NRC or others post-publication of the draft NUREG-1640 in 1999 are available electronically.  If there are voluminous amounts of documents related to the NRC's continuing use of SAIC's work product, that suggests there is great value, and that should count <u>in favor</u> of SAIC's need for the discovery, not against it.  Moreover, SAIC will work with the government to address its apparent distress about its capacity to meet its discovery obligations.

The government also suggests that discovery could result in additional delay if SAIC takes an "overly broad" view of its "work product."  (R. 208: Government's Br. at 23).  This is all premature and can be constructively resolved by the parties.  Obviously, the government's position is that SAIC's "work product" existed beyond the bounds of NUREG-1640, so SAIC is

18

seeking discovery related to the NRC's use of NUREG-1640 and any other deliverable it obtained from SAIC pursuant to the 1992 and 1999 contracts.  SAIC's requests are therefore exceedingly narrow.  Indeed, before taking its current position in opposing SAIC's request, the government also represented that it believed the parties could reach agreement as to the scope of such discovery.  (*See* R. 207-7: 09/05/13 Tr. at 15).  SAIC is confident that they can.

Finally, the government argues that "it is entirely unfair . . . to allow SAIC to re-open discovery . . . and not allow the United States a similar opportunity to rediscover its own case." (R. 208: Government Br. at 19).  But if the government could meet the good cause standard, it should have independently moved for discovery and made such a showing.  It did not.

SAIC is not seeking to broadly re-open discovery merely so that it can "develop facts to attempt to support new theories."  (R. 208: Government Br. at 19).  SAIC is only seeking to conduct very limited discovery so that the evidence at trial comports with the D.C. Circuit's mandate governing FCA damages.  When the D.C. Circuit vacated the prior damages award, it provided the parties and this Court with clear and unequivocal guidance that SAIC must be permitted to introduce evidence of the NRC's use of SAIC's work product so that the jury can accurately calculate damages based on "the amount the government actually paid <u>minus</u> the value of the goods or services the government received or used."  *SAIC*, 626 F.3d at 1279.  If SAIC is again exposed to a damages award that does not reflect this value, it will again be unquestionably prejudiced.  The D.C. Circuit has mandated the jury's consideration of evidence of the value the NRC has received, and SAIC asks only for a brief window to discover it.

## CONCLUSION

For the foregoing reasons, SAIC asks this Court to grant its Motion for Targeted

Discovery on Damages.

DATED:  September 25, 2013

> Respectfully submitted,
>
>
> /s/ Andrew S. Tulumello
> Andrew S. Tulumello (D.C. Bar No.
> 468351)
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, D.C.  20036
> Telephone: (202) 955-8500
> Facsimile: (202) 467-0539
> E-mail: atulumello@gibsondunn.com
>
> *Counsel for SAIC*

Of Counsel:

Lawrence E. Ruggiero
Deputy General Counsel
Science Applications International Corporation
1710 SAIC Drive, MS 3-5-0
McLean, Virginia 22101