**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LEIDOS, INC., | ) |
| | ) |
| Defendant. | ) |

Case No.: 04-cv-1543 (RWR)

———————————————————

**MEMORANDUM IN SUPPORT OF DEFENDANT LEIDOS, INC.'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON RECKLESS DISREGARD
OR, IN THE ALTERNATIVE, MOTION IN LIMINE**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

ARGUMENT ......................................................................................................................10

I.      SAIC is Entitled to Partial Summary Judgment Because As A Matter Of Law,
        Without Expert Evidence, the Government Cannot Prove SAIC's OCI
        Compliance Systems Showed Reckless Disregard to the Alleged OCIs. .........................10

        A.      It is well-settled that technical issues beyond a lay person's understanding
                cannot be fairly assessed by a jury without expert evidence. ................................11

        B.      The government cannot prove that SAIC recklessly disregarded OCIs
                without any expert evidence concerning OCI compliance systems......................13

        C.      The government cannot overcome SAIC's uncontroverted expert evidence
                that SAIC's OCI compliance systems were superior to others' in the
                government contractor industry. ..........................................................................18

II.     In the Alternative, the Court Should Limit the Government's Evidence and
        Argument at Trial on Reckless Disregard........................................................................20

CONCLUSION....................................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ........................................................................................................... 18

ARINC Eng'g Servs., LLC v. United States,
77 Fed. Cl. 196 (Fed. Cl. 2007) .......................................................................................... 16

B.L. Harbert-Brasfield & Gorrie, JV,
B-402229, 2010 WL 1041053 (Comp. Gen. Feb. 16, 2010) ............................................. 16

Bailey v. Allgas, Inc.,
284 F.3d 1237 (11th Cir. 2002) .......................................................................................... 12

Barnes v. District of Columbia,
924 F. Supp. 2d 74 (D.D.C. 2013) ................................................................................ 20, 21

\* Beard v. Goodyear Tire & Rubber Co.,
587 A.2d 195 (D.C. 1991) ......................................................................................... passim

Boring v. Kozakiewicz,
833 F.2d 468 (3d Cir. 1987) ........................................................................................... 5, 12

\* Briggs v. Wash. Metro. Area Transp. Auth.,
481 F.3d 839 (D.C. Cir. 2007) ........................................................................... 2, 5, 11, 12

Calhoun v. Johnson,
632 F.3d 1259 (D.C. Cir. 2011) ......................................................................................... 10

\* Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.
630 F.3d 217 (D.C. Cir. 2011) .................................................................................... passim

Footbridge Ltd. Trust v. Zhang,
584 F. Supp. 2d 150 (D.D.C. 2008) .................................................................................... 12

Harvey v. Mohammed,
941 F. Supp. 2d 93 (D.D.C. 2013) ..................................................................................... 22

Lightfoot v. Rosskopf,
377 F. Supp. 2d 31 (D.D.C. 2005) ..................................................................................... 22

Luce v. United States,
469 U.S. 38 (1984) ....................................................................................................... 20, 21

Montgomery v. Pinchak,
294 F.3d 492 (3d Cir. 2002) ............................................................................................... 12

Nat'l Tel. Coop. Assoc. v. Exxon Corp.,
38 F. Supp. 2d 1 (D.D.C. 1998) ..................................................................................... 5, 12

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Porter v. McHugh,*
850 F. Supp. 2d 264 (D.D.C. 2012) ........................................................................... 5

*Protegrity Corp. v. Voltage Sec., Inc.,*
No. 3:10-cv-755 (RNC), 2013 WL 6880597 (D. Conn. Dec. 31, 2013) ........................... 13

*Quintana-Ruiz v. Hyundai Motor Corp.,*
303 F.3d 62 (1st Cir. 2002) ................................................................................ 3, 19

*Shea v. Kerry,*
961 F. Supp. 2d 17 (D.D.C. 2013) ........................................................................... 22

*Sigma Tool & Mach. v. Nagayama Elec. Indus. Co.,*
No. 00-2936, 2002 WL 34354482 (D.D.C. Dec. 18, 2002) ............................................ 4

\*   *United States v. Sci. Applications Int'l Corp.,*
626 F.3d 1257 (D.C. Cir. 2010) ........................................................................ *passim*

*United States v. Smith,*
640 F.3d 358 (D.C. Cir. 2011) ................................................................................ 22

*Webster v. Offshore Food Serv., Inc.,*
434 F.2d 1191 (5th Cir. 1970) ................................................................................ 19

*Williams v. District of Columbia,*
530 F. Supp. 2d 119 (D.D.C. 2008) ........................................................................ 12

*Worldwide Basketball & Sport Tours, Inc. v. NCAA,*
388 F.3d 955 (6th Cir. 2004) ................................................................................ 12

**Rules**

Fed. R. Civ. P. 26(a)(2) ...................................................................................... 21

Fed. R. Civ. P. 56(a) ......................................................................................... 10

Fed. R. Civ. P. 56(b) ......................................................................................... 10

Fed. R. Civ. P. 56(c)(1)(A) ................................................................................. 10

Fed. R. Evid. 104(b) .......................................................................................... 23

Fed. R. Evid. 403 ............................................................................................. 23

Fed. R. Evid. 701(c) .......................................................................................... 22

Fed. R. Evid. 702 ............................................................................................. 22

Local Rule 7(l) ............................................................................................... 10

**Regulations**

48 C.F.R. § 9.508(a) .......................................................................................... 16

**INTRODUCTION**

Ten years ago, the government sued Leidos, Inc. (formerly known as "SAIC") for violating the False Claims Act, alleging that SAIC knowingly withheld information about potential conflicts of interest from the United States Nuclear Regulatory Commission ("NRC") over the course of its work for the agency between 1992 and 1999.  At the heart of this lawsuit is whether SAIC *knowingly* failed to disclose these alleged conflicts.  And sitting today at this stage of the proceedings—post-remand and primed for retrial—that question can be resolved as a matter of law.

The government has available to it only two avenues to prove scienter under the False Claims Act—and it cannot prevail under either theory.  The government must either prove that a single SAIC employee knew of the alleged organizational conflicts of interest ("OCIs") and knew of the materiality of SAIC's obligation to disclose them, or the government must prove that SAIC's OCI compliance systems were *so deficient* that they showed "that SAIC deliberately ignored or recklessly disregarded" OCIs.  Dkt. 206: Summ. J. Order at 21–22.  The government cannot prove that a single SAIC employee possessed actual knowledge of the alleged OCIs because no such individual exists.[1]  And as set forth in this motion, the government similarly cannot prove that SAIC's OCI compliance systems were so unreasonably deficient as to demonstrate reckless disregard to those OCIs.

---

[1]  As explained in the motion in limine filed contemporaneously with this motion, the government is limited to proving that one particular SAIC employee—Michael McKenzie-Carter—had actual knowledge of false claims, but the only remaining triable issue of fact regarding his actual knowledge was limited by this Court to what he knew after June of 1999 about SAIC's alleged relationships with British Nuclear Fuels Limited ("BNFL") and Bechtel Jacobs Company ("BJC").  Dkt. 206:  Summ. J. Order at 25–27, 31.

In order to prove reckless disregard, the government must prove that SAIC's OCI compliance systems were characterized by "aggravated gross negligence." *United States v. Sci. Applications Int'l Corp.* (*SAIC*), 626 F.3d 1257, 1275 (D.C. Cir. 2010).  But whether and to what degree a government contractor's OCI compliance systems are unreasonably deficient is a question beyond the realm of a layperson's knowledge, thus requiring the government to present expert evidence.  The well-settled rule is that when an element of a plaintiff's claim requires determination of an issue "beyond the ken of the average lay person," the plaintiff *must produce* expert evidence.  *See Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.* 630 F.3d 217, 225 (D.C. Cir. 2011) (affirming summary judgment for defendant when plaintiff failed to produce expert testimony on elements "beyond the ken of the average layperson"); *Briggs v. Wash. Metro. Area Transp. Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (holding expert testimony required to prove improper lighting at metro stop).

And courts in this circuit and district have repeatedly held that, absent expert testimony on factual issues beyond the ken of lay juries, a party cannot carry its burden of proof.  Because evaluating a government contractor's OCI compliance system requires specialized professional knowledge, the government must produce expert evidence or it will fail to carry its burden of proof under these precedents.  The government has never designated—and does not intend to designate—an expert on OCI compliance systems.  This absence of expert testimony is fatal to the government's reckless disregard theory of False Claims Act liability.

First, the government's proof leaves the jury to undertake the highly technical assessment of the functionality of SAIC's OCI compliance systems without the specialized knowledge necessary to make an informed assessment.  *See Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 200–01 (D.C. 1991) (requiring expert testimony in assessing a credit card application

system because it was "beyond the ken of the average lay juror").  In light of an OCI compliance system's historical, technical, regulatory, and substantive components, the jury cannot fairly be tasked with evaluating whether SAIC's OCI compliance systems were deficient without expert evidence.  The party bearing the burden of proof on these issues must introduce competent expert testimony or that party will be deemed to have failed to carry its burden of proof.  *See Capitol Sprinkler*, 630 F.3d at 225.

Second, the government has not established a standard by which the jury is to measure any negligence, much less "aggravated gross negligence," in either the design or the function of SAIC's OCI compliance systems.  The absence of a standard effectively subjects SAIC to the False Claims Act under strict liability: if the jury finds there was any deficiency in SAIC's systems at all, then SAIC could be found liable for *fraud* and subject to *treble damages*, even if any deficiency was reasonable or consistent with the state-of-the-art at the time.  But that is contrary to the settled law of the D.C. Circuit, and it contravenes the court's ruling that the False Claims Act's scienter requirements are to be strictly enforced.  *SAIC*, 626 F.3d at 1270–71.

Because the government cannot provide the jury with this expert assistance, its claim that SAIC's OCI compliance systems "recklessly disregarded" the alleged OCIs fails as a matter of law.  Even absent this failure of necessary proof, the government cannot overcome the *uncontroverted* record evidence of SAIC's two expert witnesses who opined that SAIC's compliance systems were superior to others' in the government contractor industry.  *See, e.g.*, Ex. A, Attach. 1: Expert Report of Charles L. Wilkins at 9; Ex. B: McWhirter Dep. at 130; *see also Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 75–78 (1st Cir. 2002) (holding that uncontested expert testimony cannot be rejected by jury without good cause).

Because the government cannot, as a matter of law, prove that SAIC showed reckless

disregard to the alleged OCIs without providing the jury with any guidepost or expert assistance

by which to measure such alleged recklessness, this Court should grant SAIC partial summary

judgment.  Doing so will avoid another protracted trial in this case that will needlessly consume

judicial resources without ultimately providing the jury sufficient information on which to base

its decision.  In the alternative, the Court should preclude the government from attempting to

(1) circumvent the Federal Rules by calling an undesignated compliance expert at trial; (2) rebut

the uncontroverted expert evidence proffered by SAIC's experts through lay witnesses; (3) rely

on lay witnesses to testify on areas requiring specialized knowledge; or (4) piece together threads

of perceived imperfections to prove that SAIC's OCI compliance systems were so deficient as to

prove that SAIC recklessly disregarded OCIs.[2]

## BACKGROUND

**I.**      Juries are often asked to evaluate the reasonableness of the actions of others,

particularly in determining whether a party was negligent or reckless.  In making these

determinations, juries rely on the common sense and wisdom of everyday experience found

within the jurors, themselves; however, some cases present issues that are simply beyond this

---

[2] In the first trial, the parties sought to limit evidentiary issues through motions in limine.  The Court rejected some of these attempts, finding that summary judgment motions were the appropriate mechanism to limit such evidence.  *See* Ex. C: June 26, 2008 Status Call/Pretrial Conference Tr. at 7–8 (motions in limine "can't be used as a substitute for all of the procedural protections that are provided by the rules governing motions for summary judgment"); *see also Sigma Tool & Mach. v. Nagayama Elec. Indus. Co.*, No. 00-2936, 2002 WL 34354482, at *2 (D.D.C. Dec. 18, 2002) (denying motion in limine that sought to dispose of factual issues for trial, requiring use of summary judgment proceedings for this purpose).  As this motion is premised both on legal and factual insufficiencies in the government's primary scienter theory, SAIC has presented both avenues for the Court's consideration.

4

everyday experience.  In matters that are "so distinctly related to some science, profession or occupation as to be beyond the ken of the average lay person," courts require expert evidence to educate the jury on the proper standards that should apply.  *Briggs*, 481 F.3d at 84.  A plaintiff's failure to present this required evidence entitles the defendant to summary judgment.  *Nat'l Tel. Coop. Assoc. v. Exxon Corp.*, 38 F. Supp. 2d 1, 9 (D.D.C. 1998) (entering summary judgment for defense in case involving proper maintenance of underground storage tanks because plaintiff produced no expert on the issue).  This Court and others have consistently granted summary judgment on this basis.  *See, e.g.*, *Capitol Sprinkler*, 630 F.3d at 225; *see also Porter v. McHugh*, 850 F. Supp. 2d 264, 268 (D.D.C. 2012) (granting summary judgment to defendant because matter at issue involved "professional judgment and skill" and plaintiff had presented no expert on the matter).

Accordingly, where a jury is asked to assess whether issues beyond its everyday knowledge comport with a standard of care based on facts that "would [not] be apparent to a lay person," *Boring v. Kozakiewicz*, 833 F.2d 468, 473–74 (3d Cir. 1987), the plaintiff cannot prevail on that theory of liability without an expert as a matter of law.  *See Capitol Sprinkler*, 630 F.3d at 225; *Nat'l Tel. Coop.*, 38 F. Supp. 2d at 9–11; *Beard*, 587 A.2d at 200–01 (holding "it is beyond the ken of the average lay juror to identify the appropriate standard of care to which retail merchants should be held in processing applications for credit cards," particularly because "the ordinary citizen may not even know what questions to ask," since "[t]hese are technical subjects on which jurors need expert advice").  This case presents facts that are very complicated, particularly with respect to the adequacy of SAIC's OCI compliance systems.

II.      Throughout the 1990s and through today, SAIC has always maintained robust OCI compliance systems.  SAIC's OCI compliance systems between 1992 and 1999 featured

three primary components.  First, SAIC fostered a culture of compliance through mandatory employee trainings, regularly-updated manuals, and a clear line of reporting.  *See* Ex. A, Attach. 1: Expert Report of Charles L. Wilkins at 6–8.  Second, SAIC maintained an electronic data base containing all of SAIC's active contracts, which could be searched using key words or search terms to identify potential conflicts.  *Id.*  Third, SAIC deployed a "routing system" pursuant to which any proposed scope of work was "routed" to contract professionals throughout the company to confirm there were no known conflicts to SAIC undertaking any proposed scope of work.  *Id.*  In or around 1999, SAIC's routing system was converted from a "VAX" system—a reference to the particular type of software employed—to a Lotus-Notes system that transmitted routings throughout SAIC via the company's e-mail system.  *See id.* at 7–8; *see also* Dkt. 163: 7/22 a.m. Tr. at 55–56, 59–62 (Carder Test.).

SAIC's OCI compliance systems were also subjected to audits and evaluations by its government agency clients.  For example, in 1996, the United States Environmental Protection Agency ("EPA") conducted an audit of SAIC's OCI compliance systems.  The EPA review team, led by Calvin McWhirter, "found that SAIC is committed and conscientiously working towards identifying and disclosing all actual and potential [OCIs]," Ex. B: McWhirter Dep. at 67–68, and concluded that SAIC's OCI compliance systems were within the industry "better than average." *Id.* at 129–30.

Unsurprisingly, then, when the government sued SAIC for alleged failures to disclose alleged OCIs, it did *not* allege that SAIC's OCI compliance systems were in any way deficient. *See generally* Dkt. 35: Am. Compl. and Jury Trial Demand.  In fact, the Amended Complaint made no allegations concerning SAIC's OCI compliance systems at all.  Nevertheless, in its strained efforts to prove that SAIC possessed the requisite scienter for liability under the False

Claims Act, the government began to assert that SAIC possessed constructive knowledge based on a failure of SAIC's OCI compliance systems to detect the alleged OCIs.  Dkt. 70: Pl.'s Mem. in Opp'n to SAIC's Mot. for Summ. J. at 40–41.

To defend against the government's litigation-inspired theory that SAIC's OCI compliance systems were somehow deficient, SAIC retained Charles Wilkins, an expert in compliance systems with over forty-five years of experience in the government contracting industry, to assess SAIC's OCI compliance systems.  Ex. A, Attach. 1: Expert Report of Charles L. Wilkins at 1–2.  Mr. Wilkins set forward a standard, looking to federal regulations, industry standards, and the costs and benefits of such systems, to determine whether they adequately and effectively allowed companies to identify, avoid, and mitigate any potential OCIs.  Mr. Wilkins found, in his expert opinion, that SAIC's OCI compliance systems, "consisting of written policies, actual procedures, training materials, system tools, and supplemental databases[,] w[ere] effective in ensuring company-wide notice and access to relevant facts and circumstances to avoid and/or mitigate potential OCIs [and that] SAIC personnel were able to make OCI determinations based upon information obtained through SAIC's OCI compliance plan."  Ex. A, Attach. 1: Expert Report of Charles L. Wilkins at 9.

Mr. Wilkins also found that SAIC's OCI compliance systems, from 1992 to 2000, were an industry leader.  *Id.*  He explained that across the government contractor industry, "the methods and means by which contractors ensure compliance with OCI obligations vary widely." *Id.*  Indeed, older systems "contained minimal written policies and relied upon informal processes or internal discussions and debate to identify opportunities that may create conflicts. As the regulatory environment became more enforcement oriented and OCI mitigation more prevalent, many contractors . . . initiated more formalized systems to identify and avoid potential

OCIs." *Id.*  Of those contractors that had a formalized OCI compliance system, most used e-mail or internal memorandum exchanges, or they operated a system "comprised *solely*" of something akin to SAIC's contract data base system, in which a user could access a data base of existing contracts.  *Id.*  Unlike SAIC's systems, "most contractor OCI systems [were] implemented [only] at a project or business unit level," rather than company-wide.  *Id.*  Even comparing SAIC's 1992 to 2000 systems to others' existing in 2006, Mr. Wilkins found that other government contractors did not have a system "that rises to the level of formality, oversight, and effectiveness of the OCI Plan used at SAIC."  *Id.*  Indeed, he concluded that SAIC's OCI compliance plan was "in a category by itself in terms of its quality and effectiveness"—it was an industry leader and state-of-the-art.  *Id.*

Given Mr. Wilkins's experience in the industry and his careful assessment of SAIC's OCI compliance systems, SAIC designated Mr. Wilkins as an expert witness prior to the first trial.  Dkt. 94, Ex. 3: SAIC's Witness Schedule at 9–10.  SAIC also designated Mr. McWhirter as a hybrid fact and expert witness to testify about the EPA's audit of SAIC's OCI compliance systems and his conclusion that SAIC's OCI compliance systems surpassed those of many of its peers.  *Id.* at 6; *see also* Ex. B: McWhirter Dep. at 130.

The government, on the other hand, did not designate any expert witnesses prior to the first trial to testify regarding the effectiveness, sufficiency, or reasonableness of SAIC's OCI compliance systems.  The government filed two expert reports for the first trial, submitted by expert designees Dr. Carl J. Paperiello and Martin G. Malsch.  *See* Ex. E: Pl.'s Expert Disclosure Pursuant to Rule 26(a)(2) at 1.  Neither report discussed OCI compliance systems.  At trial, instead of presenting expert testimony, the government relied on lay witness testimony from SAIC employees concerning the design and function of SAIC's OCI compliance systems.  *See*

Dkt. 199: Pl.'s Mem. in Opp'n to Def. SAIC's Mot. for Summ. J. on False Claims Act Liability at 36–37.  The government simply cross-examined SAIC employees who otherwise believed the systems were robust and effective about aspects which the government later argued were deficient, but it never presented evidence to establish that these "deficiencies" were, in fact, deficiencies in an OCI compliance system as measured against an accepted standard, or that they were in any way unreasonable, much less grossly and aggravatingly so.  *See* Dkt. 199: Pl.'s Responsive Statement of Genuine Issues and Material Facts in Supp. of its Mem. in Opp'n to SAIC's Mot. for Summ. J. on False Claims Act Liability ¶¶ 71, 75, 82–84.

The jury ultimately returned a verdict for the government, SAIC appealed, and the D.C. Circuit vacated the False Claims Act verdict and remanded this case for further proceedings. Since then, the parties have been preparing for the retrial of this case.  To that end, SAIC sought targeted additional discovery on damages to comport with the D.C. Circuit's ruling that SAIC must be given an opportunity to present evidence of the value that SAIC conferred upon the government during its work for the NRC.  Dkt. 207: Def.'s Mot. for Targeted Disc. on Damages at 2.  This Court granted SAIC's request for targeted discovery, and permitted each party to designate one additional expert witness on the measure of value of SAIC's work to the government.  Dkt. 210: Mem. Order at 10–11.

The government, on the other hand, has not moved this Court for leave to conduct any further fact or expert discovery.  In fact, the government has represented to SAIC that it does not intend to call at trial any expert witness who was not designated prior to the first trial, with the exception of the new expert on value requested by SAIC.  *See* Ex. D: E-mail from D. Williamson to C. Fiebig, dated February 7, 2014 ("To be clear, [the government does] not intend to designate new experts other than the one ordered by the Court on December 19[, 2013,] absent some

extenuating circumstances with our currently designated experts."). Accordingly, the

government will not present any expert evidence on SAIC's OCI compliance systems during the

retrial.

## ARGUMENT

I.      **SAIC is Entitled to Partial Summary Judgment Because As A Matter Of Law,
        Without Expert Evidence, the Government Cannot Prove SAIC's OCI Compliance
        Systems Showed Reckless Disregard to the Alleged OCIs.**

This Court should grant SAIC partial summary judgment because the jury cannot return a

verdict for the government based on SAIC's alleged reckless disregard in the absence of an

expert witness establishing standards by which the jury could conclude that SAIC's OCI

compliance systems were so deficient that they constituted "aggravated gross negligence."

*SAIC*, 626 F.3d at 1275. Thus, there are no genuine issues of material fact and SAIC is entitled

to judgment as a matter of law on this theory of scienter. Fed. R. Civ. P. 56(a); *Calhoun v.

Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011).

In considering summary judgment, this Court should look to all "materials in the record,"

including trial testimony and exhibits from earlier proceedings in this case. Fed. R. Civ. P.

56(c)(1)(A). The record here demonstrates that summary judgment is appropriate, and the Court

should resolve this motion in advance of the pre-trial hearing to further narrow the issues open

for retrial. *See* Fed. R. Civ. P. 56(b) ("A party may file a motion for summary judgment [unless

local rules or court order dictate otherwise] at any time until 30 days after the close of all

discovery."); Local Rule 7(l) ("A dispositive motion . . . shall be filed sufficiently in advance of

the pretrial conference that it may be fully briefed and ruled on before the conference.").

### A.   It is well-settled that technical issues beyond a lay person's understanding cannot be fairly assessed by a jury without expert evidence.

The government cannot prove that SAIC recklessly disregarded alleged OCIs because it has not proffered an expert witness on the subject of OCI compliance systems.  Under well-settled law, degrees of negligence—including reckless disregard, deliberate indifference, and aggravated gross negligence—are measured against a reasonableness standard.  But where, as here, a jury is asked to assess the reasonableness of matters "so distinctly related to some science, profession or occupation as to be beyond the ken of the average lay person," *Capitol Sprinkler*, 630 F.3d at 225 (quoting *Briggs*, 481 F.3d at 845), expert evidence is required.  Indeed, if a plaintiff does not produce expert evidence on an issue requiring specialized knowledge, the defendant is entitled to summary judgment even where the issues could appear non-technical.

For instance, in *Capitol Sprinkler*, liability was contested based on whether a party violated certain national fire protection standards, turning on the meaning of whether a party had "ready accessibility" to a drum drip.  630 F.3d at 225.  The plaintiff designated no expert to discuss such standards, and the D.C. Circuit affirmed summary judgment for the defendant— even as it recognized that the jury would understand the meaning of the phrase "ready accessibility"—because, without an expert, the jury would not understand the phrase in the proper context of the national fire protection standards at issue.  *Id.*  Similarly, in *Beard*, the plaintiff sued a number of retail merchants for negligence claiming that the stores' credit card application processes inadequately checked for fraud, which the plaintiff alleged allowed an imposter to obtain credit cards in the plaintiff's name.  587 A.2d at 197–98.  Despite the fact that members of a jury may be familiar with applying for a credit card, the court affirmed summary judgment for the defendants because the plaintiff did not provide any expert evidence on the

standard by which the jury should evaluate a store's credit card application process.  *See id.* at 200–01.

In illuminating the types of cases where plaintiffs must produce expert evidence to carry their burden, the D.C. Circuit has recognized a number of issues requiring such evidence.  *See Briggs*, 481 F.3d at 845 (collecting cases that required experts on issues such as "maintenance of leaning trees," "application of hair relaxer," "tightness of handcuffs," "cushioning for the ground underneath playground monkey bars," "maintenance of street lights to prevent falling light globes," "time frame for ordering building materials on a construction project," "response when an arrestee is found hanging in his cell," and "installation of 'a crosswalk, instead of a stop sign, light, or crossing guard'") (internal citations omitted); *see also Footbridge Ltd. Trust v. Zhang*, 584 F. Supp. 2d 150, 158–60 (D.D.C. 2008) (requiring expert to establish legal malpractice claim regarding recording of real estate transaction); *Nat'l Tel. Coop.*, 38 F. Supp. 2d at 9–10 (finding "little difficulty concluding that expert testimony is essential to establish" a "standard of care for storing and operating" underground storage tanks).  These principles are fundamental in state tort law, and they apply with equal force under federal law in both federal tort and statutory claims.  *See Boring*, 833 F.2d at 473–74  (requiring expert testimony to establish deliberate indifference to prisoners' medical needs in Section 1983 claim).[3]

_____

[3]  *See Williams v. District of Columbia*, 530 F. Supp. 2d 119, 127 (D.D.C. 2008) (dismissing suit for lack of standing because there was no expert evidence that second-hand smoke actually injured plaintiff in Section 1983 claim); *see also Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 963 (6th Cir. 2004) (rejecting claim due to failure of expert evidence to establish relevant market in Sherman Act claim); *Montgomery v. Pinchak*, 294 F.3d 492, 504 (3d Cir. 2002) (holding that expert testimony was required where "deliberate indifference" turned on showing serious deterioration in plaintiff's heart condition in Section 1983 claim); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1257–58 (11th Cir. 2002) (affirming summary judgment because expert evidence was insufficient to establish

[Footnote continued on next page]

Just as in *Beard*, in which the court recognized that evaluating a credit card application system requires expert testimony, 587 A.2d at 201, the government's failure to offer expert evidence on OCI compliance systems leaves the jury with no guidance, forcing it to make a standardless determination, unmoored by the evidence to fairly decide what is and what is not *reckless*.

**B.      The government cannot prove that SAIC recklessly disregarded OCIs without any expert evidence concerning OCI compliance systems.**

In order to prevail on its theory of reckless disregard, the government must first establish for the jury an appropriate standard of care, and then prove to the jury that whatever the standard, SAIC's OCI compliance systems dramatically failed to meet it.  *SAIC*, 626 F.3d at 1274–75 (liability attaches if OCI compliance systems were designed with such "aggravated gross negligence" that SAIC should be held liable as if it had acted intentionally); *see also id.* (discussing amendments to the False Claims Act aimed at rooting out "ostrich-like" conduct, not "honest mistakes or incorrect claims").  The government has done neither, and cannot do either without expert evidence.

The government made no effort to establish the standard of care for OCI compliance systems in general, much less in addressing the standard of care from 1992 to 1999.  As such, the government has presented a case, not of "aggravated gross negligence" toward OCI compliance, but of strict liability for failing to identify OCIs.  Its entire case is a circular condemnation of SAIC's systems:  by the government's reasoning, certain things could be OCIs; SAIC did not

---

[Footnote continued from previous page]
elements of price discrimination claim under the Sherman Act); *Protegrity Corp. v. Voltage Sec., Inc.*, No. 3:10-cv-755 (RNC), 2013 WL 6880597, at *3 (D. Conn. Dec. 31, 2013) (entering summary judgment on lost profits damages for defense in patent infringement case because "[i]n the absence of expert testimony supporting [plaintiff's] claim, summary judgment is appropriate").

find those OCIs through its OCI compliance systems; therefore, SAIC has shown reckless disregard to OCI compliance. *See* Dkt.199: Pl.'s Mem. in Opp'n to Def. SAIC's Mot. for Summ. J. on False Claims Act Liability at 35–37. But this does not show even negligence, much less "aggravated gross negligence"—only under a strict liability theory is one held liable for all failures regardless of fault, and that is precisely the type of over-expansive False Claims Act liability rejected by the D.C. Circuit. *See SAIC*, 626 F.3d at 1274–75.

The government's strict liability theory is underscored by its failure to produce any evidence of the relative costs and benefits of implementing SAIC's OCI compliance systems. SAIC potentially could have spent millions of additional dollars and countless additional employee hours on OCI compliance, and it could have adopted any number of additional (though potentially redundant) protocols or processes—but there is a limit to where the line of reasonableness crosses into the unreasonable. The government presents no evidence of the costs of OCI compliance, nor does it present evidence of how likely any particular alternative would be in identifying OCIs: it does not even attempt the most basic cost-benefit analysis of proving unreasonableness, an admission of the *ipse dixit*-nature of the theory on which the government's case now depends. *See Beard*, 587 A.2d at 201 (citing lack of expert evidence on cost and benefit of additional protections in credit card anti-fraud process in granting summary judgment to the defendant).

Moreover, there are at least four aspects of SAIC's OCI compliance systems in this case that require specialized knowledge and expertise: (1) the historical context of the systems and technologies used by SAIC in the 1990s; (2) the structure of SAIC's OCI compliance systems, including the functionality of its electronic systems; (3) the technical OCI compliance rules set out in federal regulations with which SAIC's systems were designed to comply; and (4) the

substance of the information contained within and communicated by the OCI compliance systems.

First, evaluation of SAIC's OCI compliance systems must be informed by the specialized knowledge of the historical context of OCI compliance systems from 1992 to 1999. Technology has changed dramatically over the last twenty years, as has the government contracting industry. Even assuming that the average layperson could be expected to know what the standard of care is for an OCI compliance system today, it is unreasonable to posit that the average layperson would know and be able to fairly apply the standard from 1992 to 1999, which is a period at the beginning of the technology revolution which streamlined this very type of information-sharing process.

The government's reckless disregard claim rests in part on its contention that SAIC's systems did not adequately allow information to travel through the company. But this is exactly the type of evaluation that requires a historical context. In today's world in which smart phones, inter-office messaging systems, e-mail filtering systems, blogging, texting, and other technological advances are commonplace, SAIC's lack of actual knowledge of any potential OCIs may seem far more suspicious or blameworthy than when compared to industry standards and capabilities in the 1990s. Thus, an expert is required to provide this historical context, and the government's failure to proffer *any* standard of care, let alone a standard of care *applicable at that time*, is fundamentally prejudicial to SAIC.

Second, the structure of OCI compliance systems themselves is highly technical. At SAIC, the OCI compliance systems used to detect potential OCIs were comprised of, among other things, two separate electronic tools, and SAIC adopted an innovative computerized compliance program during the relevant time period. In fact, the uncontradicted testimony was

that the computer system used for this OCI system—the VAX system—was a "state-of-the-art" computer system for its time.  Dkt. 163: 7/22 a.m. Tr. 61–62 (Carder Test.).  Additionally, SAIC's OCI compliance systems involved cross-corporate policies in a complex organizational structure.  *See* Ex. A, Attach. 1: Expert Report of Charles L. Wilkins at 7–9.  It is unlikely that anyone outside of a government contractor or someone otherwise in the field of compliance familiar with OCI regulations could appreciate or understand the significance of this type of multi-pathway system.

Third, understanding OCI compliance rules is essential to understanding the design of a system to ensure OCI compliance.  SAIC's alleged OCIs are governed by the Federal Acquisition Regulation ("FAR"), a technical set of regulations governing contracting with the federal government, as well as agency-specific rules for the NRC.  Ex. A, Attach. 1: Expert Report of Charles L. Wilkins at 4–5.  FAR's OCI rules are complicated—in writing FAR subpart 9.5, the government added "examples" of common types of OCIs to help illustrate how it is, for instance, that a company helping the Navy design a power plant for a group of submarines can then provide the navigation system for a submarine, but not the components of the power plant. *See* 48 C.F.R. § 9.508(a).  These rules and practices have been fleshed out over time, through common industry practices as well as through Government Accountability Office and judicial opinions.  *See*, *e.g.*, *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 207 (Fed. Cl. 2007) (denying bid protest regarding unequal access to information OCI); *B.L. Harbert-Brasfield & Gorrie, JV*, B-402229, 2010 WL 1041053, at *9 (Comp. Gen. Feb. 16, 2010) (evaluating bid protest based on OCI).  Thus, understanding whether SAIC's systems were properly designed requires a specialized understanding of what the OCI obligations are under the FAR and other agency-specific regulations.

16

Fourth, the substance of the information contained within and communicated by SAIC's OCI compliance systems is highly technical.  The government has asserted that specific routings show reckless disregard because the routings failed to include certain "key words" in the routing descriptions, which might have alerted SAIC to a potential OCI.  Dkt. 199: Pl.'s Mem. in Opp'n to Def. SAIC's Mot. for Summ. J. on False Claims Act Liability at 36.  The routings at issue in this case concerned highly technical, substantive components of SAIC's work for the NRC related to nuclear engineering, health physics, radioactivity, and other sophisticated scientific analyses.  In order to demonstrate that any particular routing was recklessly deficient, the government would need to provide evidence or testimony from an expert with specialized knowledge of the *substance* of these particular routings and how such descriptions should be written under the appropriate standard of care.  Asking the jury to render a verdict on this issue without an expert is analogous to asking a jury to evaluate whether a technical routing from NASA summarizing a space shuttle launch adequately and accurately reflected every element of what happened during the launch.  Evaluation of written documents often requires the context that only an expert can provide, and that is surely the case here where the substance of the writings is so technical.  *See Capitol Sprinkler*, 630 F.3d at 225.

Significantly, the government has never contended that an OCI compliance system is within the realm of common knowledge.  In the government's pre-trial motions in limine, the government sought to exclude Mr. Charles Wilkins's testimony; however, never did it contend that his testimony would have been irrelevant, would have been improper expert opinion since

OCI compliance systems are within the common knowledge of lay persons, or that he lacked the expertise to render such opinions.  The government's only attack was on the methods used.[4]

Without any standard of care established or any expert assistance provided in evaluating these aspects of SAIC's OCI compliance systems, the jury is left with only speculative and arbitrary methods for deliberating about whether SAIC's OCI compliance systems fell to the level of aggravated gross negligence in detecting OCIs.  Thus, the government's proof on reckless disregard must fail as a matter of law.

C.      **The government cannot overcome SAIC's uncontroverted expert evidence that SAIC's OCI compliance systems were superior to others' in the government contractor industry.**

Even if the government could sustain its theory that SAIC's OCI compliance systems were so poorly designed as to reflect aggravated gross negligence, based only on à la carte evidence and without any expert testimony establishing any standard of care for OCI compliance systems generally, it cannot justify a trial in the face of undisputed evidence that SAIC's OCI compliance systems were superior to others' in the government contractor industry.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52 (1986) (holding that summary judgment is appropriate where nonmoving party's evidence is "not significantly probative" and represents a mere "scintilla" of supporting evidence).

SAIC engaged expert Charles Wilkins to opine on exactly these issues, taking his knowledge of relevant federal regulations and of comparative practices in the government contractor community from 1992 to 2000 to put SAIC's OCI compliance systems to the test.  And he has opined that SAIC was "an industry leader," "in a category by itself in terms of []

---

[4]  The Court denied the government's motion.  *See* Dkt. 174: 7/01/08 a.m. Tr. 13.

quality and effectiveness," and that, even compared to systems in 2006, the 1992 to 2000 systems at SAIC surpassed all others' in terms of their "level of formality, oversight, and effectiveness."  Ex. A: Decl. of Charles L. Wilkins ¶¶ 5–7; *see also* Ex. B: McWhirter Dep. at 130 (testifying that SAIC's OCI compliance systems were above average).

While the government has presented evidence of what it claims are inadequacies in the systems, it has not attempted to contradict these expert opinions that SAIC's systems were some of the best in the industry or to present any other factual evidence of SAIC's OCI compliance systems as compared to regulatory or industry standards.  Thus, it has conceded the point.  *See Quintana-Ruiz*, 303 F.3d at 76–77 ("While juries may decide what weight to give to the testimony of expert witnesses, they are not at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness where . . . the testimony bears on technical questions . . . beyond the competence of lay determination." (quoting *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970))).

Nevertheless, the government proposes to conduct another full-fledged trial based on its claim that these best-in-show systems actually manifest aggravated gross negligence for monitoring OCIs.  To accept such a theory would lead to the conclusion that practically every government contractor was operating with reckless disregard in monitoring OCI compliance from 1992 to 1999.  Thus, if *any* government contractor from 1992 to 1999 mistakenly failed to identify or disclose a material OCI obligation, that contractor—regardless of its actual knowledge or other evidence—would be liable for a violation of the False Claims Act under the government's standardless theory.  But the government's position disregards that all contractors must make a cost-benefit analysis both as to the OCI compliance systems themselves, and any disclosures detected by those systems.  *See* Ex. A, Attach. 2: Supplemental Expert Report of

Charles L. Wilkins at 4–5; *see also Beard*, 587 A.2d at 201 (discussing negligence by weighing the cost and benefit of additional protections).  Allowing the government to proceed on this theory would contradict the Court's charge for "strict enforcement of the False Claims Act's materiality and scienter requirements."  *SAIC*, 626 F.3d at 1270.

## II.     In the Alternative, the Court Should Limit the Government's Evidence and Argument at Trial on Reckless Disregard.

The Court should grant SAIC partial summary judgment on False Claims Act liability based on the government's inadequate proofs on reckless disregard.  However, if the Court finds that the government is not required to produce expert testimony on SAIC's OCI compliance systems and that SAIC's undisputed expert evidence does not entitle it to summary judgment, then the Court should nevertheless in its discretion limit the government's evidence regarding SAIC's OCI compliance systems.  *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (district courts enjoy broad discretion to limit evidence as requested by a party's motion in limine "pursuant to the district court's inherent authority to manage the course of trials"); *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 79 (D.D.C. 2013) ("[T]rial judges are afforded broad discretion in rendering evidentiary rulings, a discretion which extends to assessing the probative value of the proffered evidence and weighing any factors against admissibility.").

During the first trial, the government produced no evidence, through experts or through the fact witnesses it called at trial, to dispute the comparative facts about the quality of SAIC's OCI compliance systems or to present any standard (comparative, objective, or otherwise) by which SAIC's OCI compliance systems should be evaluated.  The government instead relied on lay witness testimony that SAIC's OCI compliance program applied only "to contracts that SAIC was bidding on, not teaming agreements"; that the systems "ignored affiliations with associations such as [the Association of Radioactive Metal Recyclers], patent interests such as the [Plasma

Heath Process], or planned interests . . . even though SAIC knew that such relationships could constitute organizational conflicts of interest"; that the systems "relied upon employees accurately describing the work and using the proper 'key words'"; that the BNFL project description did not include the words "'recycling,'" "'decontamination and decommissioning,'" or "'radiation'"; and that there was "no way for the person who sent out the OCI routing to know whether a recipient reviewed that routing—and therefore whether an OCI existed."  Dkt. 199: Pl.'s Mem. in Opp'n to Def. SAIC's Mot. for Summ. J. on False Claims Act Liability at 36.

Because none of the government's evidence regarding SAIC's OCI compliance systems was proffered by experts, the Court should limit the evidence the government may present at the retrial in the following ways: (1) prohibit the government from now offering any expert opinions as to SAIC's OCI compliance systems; (2) exclude any argument or evidence by the government purporting to show that SAIC's OCI compliance systems compare unfavorably to peer systems, to industry standards, or to standards set forward in the FAR or other rules; (3) exclude all lay opinions regarding SAIC's OCI compliance systems because it is an area requiring specialized knowledge; and (4) exclude lay testimony regarding alleged "inadequacies" in SAIC's OCI compliance systems as proof of "reckless disregard" sufficient to satisfy scienter under the FCA. *Luce*, 469 U.S. at 41 n.4; *Barnes*, 924 F. Supp. 2d at 79.

With full knowledge that SAIC designated Charles Wilkins as an expert to evaluate SAIC's OCI compliance systems before the first trial, the government cannot now attempt at the retrial to present for the first time expert testimony regarding SAIC's OCI compliance systems. The government has not designated nor disclosed any experts on this topic as required by Federal Rule of Civil Procedure 26(a)(2), and thus it is precluded from offering such testimony at trial.

*See Harvey v. Mohammed*, 941 F. Supp. 2d 93, 100 (D.D.C. 2013) (excluding expert testimony not disclosed pursuant to Rule 26(a)(2)).

The government's failure to produce any expert testimony or evidence that compares SAIC's OCI compliance systems to peer systems, to industry standards, or to regulations contained in the FAR or the NRC's supplemental regulations precludes the government from arguing such points.  The government has provided no evidentiary basis for challenging Mr. Wilkins's or Mr. McWhirter's comparative expert opinions, thus leaving these facts undisputed. The government should accordingly be precluded from arguing that SAIC's OCI compliance systems did not compare favorably to its peers' systems, were not industry leaders, or did not compare favorably to standards set out by the FAR or the NRC.

Without an expert opinion to aid its case, the government may attempt to admit opinion testimony through cross examination of SAIC employees or other sources.  Such testimony must be excluded under Federal Rule of Evidence 701 precisely because the adequacy of a government contractor's OCI compliance system is a matter of "scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c).  As such, since the government has failed to provide a qualified expert under Rule 702, it cannot be allowed to bring in this critical testimony through lay witnesses.  *See United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (holding that police officer could not offer opinion based on his past experience without qualifying as Rule 702 expert); *Shea v. Kerry*, 961 F. Supp. 2d 17, 50 (D.D.C. 2013) (barring lay opinion testimony on statistical significance of underrepresentation of minorities in Title VII case); *Lightfoot v. Rosskopf*, 377 F. Supp. 2d 31, 33 (D.D.C. 2005) (barring lay opinion testimony that accident victim's stress and anxiety was exacerbated by an accident since such an opinion would require expert knowledge).

Finally, the bits and pieces of alleged deficiencies the government has argued add up to reckless disregard must be excluded because, without any standard or context for evaluating SAIC's OCI compliance systems, these individual bits and pieces of information—like assessments of lone routings assessed in a vacuum—lack relevance under Federal Rule of Evidence 104(b) and must be excluded under Rule 403.[5]  To allow these disconnected strands of alleged "inadequacies" to serve as evidence of SAIC's reckless disregard of OCIs would infuse them with probative value that the jury cannot properly weigh absent any standard of reasonable care.  Accordingly, evidence of any one-off, singular deficiency in SAIC's OCI compliance systems should be excluded under Federal Rule of Evidence 403 because it will mislead or confuse the jury.

## CONCLUSION

For the foregoing reasons, SAIC respectfully requests that the Court grant SAIC partial summary judgment on the government's reckless disregard theory.  In the alternative, SAIC respectfully requests that the Court limit the government's evidence on this issue in the following ways: (1) prohibit the government from now offering any expert opinions as to SAIC's OCI compliance systems; (2) exclude any argument or evidence by the government purporting to show that SAIC's OCI compliance systems compare unfavorably to peer systems, to industry standards, or to standards set forth in the FAR or other rules; (3) exclude all lay opinions regarding SAIC's OCI compliance systems because government contractor compliance systems

---

[5]  Specifically, SAIC moves to exclude evidence identified by the government as supporting this theory, Dkt. 199: Pl.'s Mem. in Opp'n to Def. SAIC's Mot. for Summ. J. on False Claims Act Liability at 36–37, regarding SAIC's OCI compliance systems, namely the failure to include teaming agreements, patent interests, planned future interests, and the failure to include certain "key words" in describing the BNFL Three-Building Project statement of work.

are an area of specialized knowledge; and (4) exclude lay testimony regarding alleged

inadequacies in SAIC's OCI compliance systems.


Dated:  April 17, 2014                              Respectfully submitted,

                                                    /s/ Andrew S. Tulumello
                                                    Andrew S. Tulumello (D.C. Bar No. 468351)
                                                    GIBSON, DUNN & CRUTCHER LLP
                                                    1050 Connecticut Avenue, N.W.
                                                    Washington, D.C.  20036
                                                    Telephone: (202) 955-8657
                                                    E-mail: atulumello@gibsondunn.com

                                                    *Counsel for Defendant Leidos, Inc.*